## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and CITY OF NEW YORK, | Civ. Action No. 1:20-cv-00119 |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF AGRICULTURE; GEORGE ERVIN PERDUE III, in his official capacity as Secretary of the U.S. Department of Agriculture, and UNITED STATES OF AMERICA, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR
## 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW

Pursuant to Local Rule 65.1, Plaintiffs the District of Columbia, the State of New York,

the State of California, the State of Connecticut, the State of Maryland, the Commonwealth of

Massachusetts, Attorney General Dana Nessel on behalf of the people of Michigan, the State of

Minnesota, the State of Nevada, the State of New Jersey, the State of Oregon, the

Commonwealth of Pennsylvania, the State of Rhode Island, the State of Vermont, the

Commonwealth of Virginia, and the City of New York (collectively, "Plaintiffs" or the "States"),

bring this action for preliminary relief enjoining the enforcement and implementation of the final

agency action, *Supplemental Nutrition Assistance Program: Requirements for Able-Bodied*

*Adults Without Dependents*, 84 Fed. Reg. 66,782 (Dec. 5, 2019) (to be codified at 7 C.F.R. Part

273) (the "Rule"), by U.S. Department of Agriculture ("USDA" or the "agency") and George

Ervin Perdue III, Secretary of USDA (collectively with the United States, "Defendants").

Alternatively, Plaintiffs seek an order postponing the Rule's effective date pending judicial

review, pursuant to 5 U.S.C. § 705. As demonstrated in the accompanying Memorandum of

Points and Authorities, Plaintiffs are entitled to relief because the Rule violates the

Administrative Procedure Act (APA) and will cause Plaintiffs irreparable harm absent this

preliminary relief. This motion is accompanied by a Memorandum of Points and Authorities; the

Declarations of Steven Banks, Edward Bolen, Tikki Brown, Catherine Buhrig, Alexis Carmen

Fernandez, Steve Fisher, Holly Freishtat, Jeffrey Gaskell, Deidre Gifford, Heather Hartline-

Grafton, Daniel Haun, Kathleen Konopka, Ed Lazere, Brittany Mangini, Victoria Negus, Elisa

Neira, S. Duke Storen, Dawn Sweeney, and Laura Zeilinger; and a proposed Order. Oral

argument is requested on this motion because of the complex legal arguments involved in this

case.

Dated: January 16, 2020          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

                                 */s/ Kathleen Konopka*
                                 Kathleen Konopka (D.C. Bar No. 495257)
                                 Deputy Attorney General

Jennifer Rimm (D.C. Bar No. 1019209)
Vikram Swaruup
Nicole Hill (D.C. Bar No. 888324938)
David Brunfeld (D.C. Bar No. 1672059)
Assistant Attorneys General

441 Fourth Street, N.W., Suite 650-S
Washington, D.C. 20001
(202) 742-6610 (Phone)
kathleen.konopka@dc.gov
jennifer.rimm@dc.gov
vikram.swaruup@dc.gov
nicole.hill@dc.gov

*Attorneys for the District of Columbia*

LETITIA JAMES
Attorney General for the State of New York

*/s/ Eric R. Haren*
Eric R. Haren (D.C. Bar No. 985189)
Special Counsel

Matthew Colangelo (D.C. Bar No. 997893)
Chief Counsel for Federal Initiatives

28 Liberty Street
New York, NY 10005
(212) 416-8804 (Phone)
eric.haren@ag.ny.gov
matthew.colangelo@ag.ny.gov

*Attorneys for the State of New York*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN,, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and CITY OF NEW YORK,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; GEORGE ERVIN PERDUE III, in his official capacity as Secretary of the U.S. Department of Agriculture, and UNITED STATES OF AMERICA,<br><br>    Defendants. | Civ. Action No. 1:20-cv-00119 |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND .......................................................... 3

I.   CONGRESS INTENDED FOR SNAP TO EFFECTIVELY ADDRESS HUNGER. ..................... 3

II.  USDA HAS RELIED ON THE SAME FACTUAL DETERMINATIONS IN SETTING
     ITS SNAP AGENCY POLICY FOR DECADES. ...................................................... 6

III. CONGRESS REJECTED THE REWRITE OF THE STATUTE THAT USDA
     ATTEMPTS TO EFFECTUATE BY RULE. ............................................................. 7

IV.  THE CHALLENGED RULE UPENDS DECADES OF AGENCY POLICY AND
     ADOPTS STRICT REQUIREMENTS THAT CONGRESS FOUND CONTRARY TO
     THE STATUTORY LANGUAGE AND REJECTED. ................................................. 8

ARGUMENT ........................................................................................................... 11

I.   LEGAL STANDARDS ..................................................................................... 11

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............................... 11

   A.   The Rulemaking Process Was Flawed. ................................................... 13

   B.   The Rule Is Contrary to Clear Statutory Text and Congressional Intent. ........... 18

      i.   The Rule's Strict Definition of "Area" Contravenes the Language and
           Clear Intent of the Statute. ..................................................................... 18

      ii.  The Rule's Imposition of an Unemployment Floor and Emphasis on
           General Unemployment Contravenes the Statute. ................................. 21

      iii. The Rule's Curtailment of Exemption Carry-Over is Contrary to Law. ............. 23

   C.   The Rule Is Unreasoned and Arbitrary and Capricious. ....................... 25

      i.   The Rule Is Motivated by Factors that Congress Never Intended the
           Agency to Consider. ............................................................................... 26

      ii.  The Rule Runs Counter to the Evidence before the Agency. ............... 27

      iii. The Rule Fails to Consider Important Aspects of the Rule, Including
           the Costs It Imposes on States. ............................................................. 31

D.     The Rule Fails to Address the Agency's Prior Factual Findings and
         Reliance Interests Resulting from Prior Regulations. ......................................... 34

III.   ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IMMEDIATE, IRREPARABLE
         HARM.. ........................................................................................................ 38

A.     Rapid Implementation of the Rule Will Greatly Burden the States. ................... 38

B.     The Rule Will Endanger the Health of Hundreds of Thousands of
         Plaintiffs' Residents and Increase States' Healthcare Costs. ............................. 41

C.     The Rule Will Harm States' Economies. ............................................................ 43

IV.    CONSIDERATION OF INJURY TO OTHERS AND THE PUBLIC INTEREST FAVOR
         AN INJUNCTION TO PRESERVE THE STATUS QUO ........................................................ 43

V.     THE COURT SHOULD ENJOIN IMPLEMENTATION OF THE RULE WITHOUT
         GEOGRAPHIC LIMITATION. ....................................................................................... 44

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

CASES

*Albemarle Paper Co. v. Moody*

    422 U.S. 405 (1975).................................................................................................... 20

*Allina Health Servs. v. Sebelius*

    746 F.3d 1102 (D.C. Cir. 2014). ................................................................................ 14

*Am. Fed'n of Labor & Cong. of Indus. Organizations v. Donovan,*

    757 F.2d 330 (D.C. Cir. 1985) ............................................................................. 12, 16

*Am. Petrol. Inst. v. S.E.C*

    953 F. Supp. 2d 5 (D.D.C. 2013) ............................................................................... 26

*Am. Radio Relay League, Inc. v. F.C.C.*

    524 F.3d 227, 236 (D.C. Cir. 2008) ........................................................................... 12

*Am. Wild Horse Pres. Campaign v. Perdue*

    873 F.3d 914 (D.C. Cir. 2017) .................................................................................... 35

*Ass'n of Am. Railroads v. I. C. C.*

    564 F.2d 486 (D.C. Cir. 1977) .................................................................................... 20

*Ass'n of Private Sector Colls. & Univs. v. Duncan*

    681 F.3d 427, 462 (D.C. Cir. 2012) ...................................................................... 16 34

*AT&T Wireless Services Inc. v. F.C.C.*

    270 F. 3d 959 (D.C. Cir. 2001) .................................................................................. 34

**TABLE OF AUTHORITIES**
(continued)

*California by & through Becerra v. U.S. Dep't of the Interior*

    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................... 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*

    467 U.S. 837 (1984) ........................................................................ 12

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*

    365 F. Supp. 3d 28 (D.D.C. 2019) ....................................................... 34

*CSX Transp., Inc. v. Surface Transp. Bd.*

    584 F.3d 1076 (D.C. Cir. 2009) ..................................................... 14, 16

*Cuomo v. U.S. Nuclear Regulatory Comm'n*

    772 F.2d 972 (D.C. Cir. 1985) ........................................................... 11

*Encino Motorcars, LLC v. Navarro*

    136 S. Ct. 2117 (2016) ................................................................. 13, 38

*Envtl. Integrity Project v. E.P.A.*

    425 F.3d 992 (D.C. Cir. 2005) ........................................................... 14

*FCC v. Fox Tel. Stations, Inc.*

    556 U.S. 502 (2009) ...................................................................... 13

*Forest Grove Sch. Dist. v. T.A.*

    557 U.S. 230 (2009) ...................................................................... 19

*Fox Tel. Stations, Inc. v FilmOn X LLC*

    150 F. Supp. 3d 1 (D.D.C. 2015) ..................................................... 19, 35

*Garnett v. Zeilinger*

    313 F. Supp. 3d 147 (D.D.C. 2018) ................................................... 42, 44

**TABLE OF AUTHORITIES**
(continued)

*Georgetown Univ. Hosp. v. Bowen*

  821 F.2d 750 (D.C. Cir. 1987) ................................................................. 24

*Good Fortune Shipping SA v. I.R.S.*

  897 F.3d 256 (D.C. Cir. 2018) ................................................. 12, 27, 28, 31

*Harmon v. Thornburgh*

  878 F.2d 484 (D.C. Cir. 1989). ............................................................. 44

*Hearth, Patio & Barbecue Association v. U.S. Dep't of Energy*

  706 F.3d 499 (D.C. Cir. 2013) ............................................................. 24

*Home Box Office, Inc. v. F.C.C.*

  567 F.2d 9 (D.C. Cir. 1977) ................................................................. 17

*Indus. & Fin. Markets Ass'n v. U.S. Commodity Future Trading Commis.*

  67 F. Supp. 3d 373 (D.D.C. 2014) ......................................................... 33

*Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. N.L.R.B.*

  814 F.2d 697 (D.C. Cir. 1987) ............................................................. 20

*Int'l Long Term Care, Inc. v. Shalala*

  947 F. Supp. 15 (D.D.C. 1996) ............................................................. 42

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*

  407 F.3d 1250, 1259 (D.C. Cir. 2005) ................................................. 14, 16

*Kay v. F.C.C.*

  443 F.2d 638 (D.C. Cir. 1970) ............................................................. 23

*Make the Road NY v. McAleenan*

  405 F. Supp. 3d 1 (D.D.C. 2019) ........................................................... 44

**TABLE OF AUTHORITIES**
(continued)

*McFalls v. Purdue*

    No. 3:16-CV-2116-SI, 2018 WL 785866 (D. Or. Feb. 8, 2018) .............................................. 34

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*

    456 U.S. 353 (1982) ...................................................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*

    463 U.S. 29 (1983) ................................................................................................ 13, 27, 31

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*

    416 U.S. 267 (1974) ...................................................................................................... 19

*N.A.A.C.P v. Trump*

    298 F. Supp. 3d 209 (D.D.C.) ...................................................................................... 38

*Nat. Lifeline Assoc. v. F.C.C.*

    921 F.3d 1102 (D.C. Cir. 2019) ................................................................................... 35

*Nat. Res. Def. Council, Inc. v. Daley*

    209 F.3d 747 (D.C. Cir. 2000) ..................................................................................... 12

*Nat. Res. Def. Council, Inc. v. Rauch*

    244 F. Supp. 3d 66 (D.D.C. 2017) .......................................................................... 27, 31

*Nat.'l Fuel Gas Supply Corp. v. F.E.R.C.*

    468 F.3d 831 (D.C. Cir. 2006) ..................................................................................... 27

*New Haven Board of Education v. Bell*

    456 U.S. 512 (1982) ...................................................................................................... 20

**TABLE OF AUTHORITIES**
(continued)

*New York v. E.P.A.*

    443 F.3d 880 (D.C. Cir. 2006) ................................................................................... 18

*New York v. U.S. Dep't of Health & Human Servs.*

    No. 19 CIV. 4676 (PAE), 2019 WL 5781789, (S.D.N.Y. Nov. 6, 2019) ............................... 16

*Nielsen v. Preap*

    139 S. Ct. 954 (2019) ................................................................................................ 18

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*

    344 F. Supp. 3d 355 (D.D.C. 2018) ........................................................................... 26

*Pennsylvania v. President United States*

    930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019) ......................................... 44

*Pharm. Research & Mfrs. of Am. v. Thompson*

    251 F.3d 219 (D.C. Cir. 2001) ................................................................................... 12

*Portland Cement Ass'n v. E.P.A.*

    665 F.3d 177 (D.C. Cir. 2011) ................................................................................... 35

*Robinson v. Shell Oil Co.*

    519 U.S. 337 (1997) ................................................................................................ 12

*Russello v. United States*

    464 U.S. 16 (1983) ................................................................................................. 21

*Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin.*

    830 F. Supp. 5 (D.D.C. 1993) ................................................................................... 28

*Sottera, Inc. v. F.D.A.*

    627 F.3d 891 (D.C. Cir. 2010) ................................................................................... 11

## TABLE OF AUTHORITIES
### (continued)

*State v. Azar*

   385 F. Supp. 3d 960 (N.D. Cal. 2019) ...................................................................... 32

*United Healthcare Ins. Co. v. Azar*

   330 F. Supp. 3d 173 (D.D.C. 2018) ......................................................................... 31

*Util. Air Regulatory Grp. v. E.P.A.*

   573 U.S. 302 (2014) ................................................................................................. 24

*Wisconsin Gas Co. v. F.E.R.C.*

   758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 38

S**TATUTES**

5 United States Code

   § 553 .............................................................................................................. 11, 25
   § 704 .................................................................................................................... 34
   § 705 .............................................................................................................. 11, 44
   § 706 .................................................................................................................... 11

7 United States Code

   § 2011 ........................................................................................................... *passim*
   § 2015 ........................................................................................................... *passim*
   § 2020 .................................................................................................................... 19

8 United States Code

   § 1601........................................................................................................................ 4

**TABLE OF AUTHORITIES**
**(continued)**

29 United States Code

   § 3121 ............................................................................................................... 19

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018) .................... 7

Balanced Budget Act of 1997, Pub. L. No. 105-33 ......................................................... 5

**REGULATIONS**

7 C.F.R. § 15.3 ................................................................................................. 34

7 C.F.R. § 273.24(f)(2)(ii) .......................................................................... 10, 19

64 Fed. Reg. 48,249. ............................................................................................ 37

64 Fed. Reg. 70,920. ............................................................................................ 36

Food Stamp Program: Personal Responsibility Provisions of the Personal

   Responsibility and Work Opportunity Reconciliation Act of 1996,

   66 Fed. Reg. 4438 ....................................................................................... 7, 35

*Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without*

   *Dependents*, Notice of Proposed Rulemaking, 84 Fed. Reg. 980 (Feb. 1, 2019) .............. *passim*

**OTHER AUTHORITIES**

Agriculture and Nutrition Act of 2018, H.R. 2, 115th Cong. § 4015 ............................................ 7

142 Cong. Rec. H7905 (1996) ...................................................................................... 4

H. Conf. Rpt. on H.R. 2 (115-1072) .......................................................... 8, 20, 23, 24

S. 3042, 115th Cong. § 4103 ........................................................................................ 8

**INTRODUCTION**

Plaintiffs move for a preliminary injunction or an order postponing the effective date of a USDA Rule that unlawfully curtails States' ability to provide vital food assistance to their residents. For more than 40 years, the Supplemental Nutrition Assistance Program ("SNAP"), formerly the "Food Stamp Program," has been the country's primary weapon against hunger for low-income Americans. SNAP provides nutritional support for millions of low-income individuals and families in the form of non-cash benefits redeemable for SNAP-eligible foods. Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet through normal channels of trade." 7 U.S.C. § 2011.

Under a 1996 law, SNAP benefits are time limited for unemployed adults who are not disabled or raising minor children. These "Able-Bodied Adults Without Dependents," or "ABAWDs," may not receive SNAP benefits for more than three months in any 36-month period, unless they meet certain work requirements. However, because the time limit was not designed to penalize individuals who are willing but unable to find work, the law allows states to seek waivers to suspend the time limit for areas that lack sufficient jobs for ABAWDs.

Congress also allotted a limited number of discretionary exemptions that allow states to temporarily extend SNAP benefits to individual ABAWDs who are otherwise subject to the time limit. For 24 years, USDA recognized that determining whether there are insufficient jobs for ABAWDs is a nuanced inquiry that requires looking to a number of data sources and that states are best positioned to assess whether and where waivers or exemptions are needed by local communities.

The Rule abruptly reverses course, unduly restricting waivers, and, if allowed to go into effect, serving to deprive nearly 700,000 low-income individuals of essential access to food. The Rule entirely retreats from the purpose of its authorizing statute, which is to provide access to

nutrition to those who cannot reasonably find work. Instead, the Rule superimposes a new goal, nowhere supported in the Congressional or administrative record, to reduce the overall number of ABAWD SNAP recipients and "address the problem of States' manipulative usage" of waiver standards "to maximize waived areas." 84 Fed. Reg. at 66,794.

The Rule violates the APA's procedural and substantive prohibitions. USDA deprived commenters, including Plaintiffs, of a meaningful opportunity to address material aspects of the Rule, including the removal of a state's qualification for extended unemployment benefits as a readily approvable basis for a time limit waiver and imposition of a "strict" definition of the area for which waivers must be sought. USDA's procedural improprieties alone warrant vacatur.

The Rule also plainly contravenes the statutory text and Congressional intent. The Rule effectively eliminates the insufficient jobs for ABAWDs basis for waiver provided in the statute, eliminating states' ability to tailor requests to areas that lack qualifying job opportunities by reducing the inquiry to one of general unemployment rates without consideration of the specific barriers to employment faced by ABAWDs. In 2018, Congress expressly rejected a proposal to strike this basis and impose nearly identical restrictions as those found in the Rule.

Additionally, the Rule is arbitrary and capricious. It considers factors that Congress did not intend, runs contrary to the evidence, and fails to address significant parts of the problem before the agency. Congress did not intend for the overall number of ABAWDs living in waived areas to steer USDA decision-making. Moreover, USDA ignores a plethora of evidence, including its own prior findings, that general unemployment figures fail to properly capture ABAWDs' ability to find work in light of their limited resources, education, and work experience, and their lack of access to appropriate housing and transportation.

The Rule cites no evidence that the ABAWD reality has changed. Instead, USDA brushes

the weight of the evidence aside and relies on unsupported "operational experience" and currently low general unemployment rates to assume that states manipulated agency flexibility to obtain waivers for undeserving ABAWDs. Addressing this alleged state misuse, according to the agency, outweighs the need to ensure that ABAWDs willing but unable to find work can eat.

USDA issued the Rule without considering significant evidence of harm to Plaintiffs and their ABAWD populations. The loss of essential food and nutrition by hundreds of thousands of individuals will result in detrimental health outcomes, increased use of health services, including emergency and hospital services, and increased rates of poverty and housing instability. Plaintiffs will bear the burdens associated with reduced quality in residents' healthcare, housing, and nutrition, and they will suffer irreparable harm to their public health.

Plaintiffs also will suffer irreparable harm through significant increased regulatory burdens and injury to their economies. USDA admits as much in the Rule, stating, "the Department expects states to support ABAWDs in their efforts to find work and meet the work requirement by expanding access to work programs and other supportive services for ABAWDs." 84 Fed. Reg. at 66,796. However, the Rule fails to account for the significant cost to the States of such an expansion. For these reasons, the Rule is an unlawful exercise of USDA's authority and must fall.

## LEGAL AND FACTUAL BACKGROUND
### I.   CONGRESS INTENDED FOR SNAP TO EFFECTIVELY ADDRESS HUNGER.

Congress has declared that it is the policy of this Nation to "promote the general welfare" by "raising levels of nutrition among low-income households." 7 U.S.C. § 2011. Since 1977, SNAP has been the primary vehicle for this policy by providing vital food assistance to low income adults. Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet through normal channels of

trade." *Id.*

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. § 1601 *et seq.,* places a limit on SNAP benefits for ABAWDs who fail to engage in available employment. *See* 7 U.S.C. § 2011 *et seq.* (the "Statute"). ABAWDs may not receive SNAP benefits for more than three months in any 36-month period unless they are employed or in a work or training program for at least 20 hours per week (the "ABAWD time limit"). 7 U.S.C. § 2015(o).

Because the purpose of the time limit is to engage ABAWDs in the work force, Congress made clear that it should not apply when ABAWDs reside in an area where there are insufficient jobs for them. 142 Cong. Rec. H7905 (1996). Congressman and co-author of the provision John Kasich stated "[i]t is *only* if you are able-bodied, if you are childless, and if you live in an area where you are getting food stamps and *there are jobs available*, then it applies." *Id.* (emphasis added).

Thus, Congress provided for waivers from the ABAWD time limit for any "group of individuals" when the "area in which the individuals reside (i) has an unemployment rate above 10 percent; or (ii) does not have a sufficient number of jobs to provide employment *for the individuals*." 7 U.S.C. § 2015(o)(4) (emphasis added). The dual basis for waivers—high general unemployment or a lack of "sufficient jobs" for ABAWDs—reflects Congress's recognition that "the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities." Konopka Decl. Ex. C, at 3. Thus, a more flexible fact-intensive approach is needed to best tailor waivers to areas that lack jobs for which ABAWDs are qualified.

Congress's provision for waivers of the time limit when there are insufficient jobs *for the*

*ABAWDs subject to the waiver*, as opposed to insufficient jobs for the general population, is by design and of particular importance. Most ABAWDs face significant barriers to finding permanent employment even in strong economic times. Bolen Decl.[1] ¶ 12. Many ABAWDs have at most a high school education, which limits their job prospects. *Id.* ¶ 15. ABAWDs also disproportionately struggle with minimal work history, physical and mental illnesses that are undiagnosed or do not qualify them for disability services, lack of access to reliable transportation, caregiving responsibilities for relatives or friends, and homelessness or unstable living situations. *Id.* ¶¶ 12, 17-22, Ex. A at 116-117; Gifford Decl. ¶ 18; Storen Decl. ¶ 11.

Unsurprisingly, these challenges result in documented unemployment rates for ABAWDs that are significantly higher than, and often at least twice, the national average. *See* Bolen Decl. ¶¶ 15, 20. Additionally, a substantial percentage of ABAWDs are members of racial minority groups or women that disproportionately lack job opportunities due to discrimination. Konopka Decl. Ex. F, at 20. As the Center on Budget and Policy Priorities noted in its comment on the Rule, "Over one-quarter of childless adult SNAP participants targeted by the time limit are African American and approximately 20 percent are Latino. These groups, particularly African Americans, have higher unemployment rates than white Americans and are more affected by recessions." Bolen Decl. Ex. A, at 36.

Congress additionally recognized that, in times of swift economic downturn or declining employment opportunities, waivers of the ABAWD time limit may not be supported or obtainable quickly enough to maintain food security for those in need. Thus, under the Balanced

---

[1] Plaintiffs refer throughout to declarations submitted with this Motion by the last name of the declarant, followed by the pertinent reference to the paragraph or exhibit number of that declaration.

Budget Act of 1997, Pub. L. No. 105-33, Congress provided states with exemptions for 15 percent of their ABAWDs who would otherwise be subject to the time limit. These exemptions enable states to extend benefits for one additional month to this percentage of their ABAWDs. 7 U.S.C. § 2015(o)(6). If a state does not use all its exemptions in a given year, it may carry over those exemptions to subsequent years. 7 U.S.C. § 2015(o)(6)(G). These exemptions and the ability to carry them over give states the flexibility to quickly respond to changing economic circumstances that hamper ABAWDs from meeting work requirements.

The waiver and exemption provisions reflect Congress's intent to continue food assistance for ABAWDs who are willing but unable to work because of a lack of qualifying jobs for them in local areas. Additionally, the Statute provides discretion to the states to define the scope of the waiver based on local economic and employment conditions and to rely on data sources that best highlight the ABAWD experience in that particular location.

## II.   USDA HAS RELIED ON THE SAME FACTUAL DETERMINATIONS IN SETTING ITS SNAP AGENCY POLICY FOR DECADES.

For more than two decades, USDA conformed to this clear Congressional intent. In 1996, USDA published guidance that made clear "that the law provided authority to waive these provisions in recognition of the challenges that low-skilled workers may face in finding and keeping permanent employment." Konopka Decl. Ex. C, at 1. USDA also gave "States broad discretion in defining areas that best reflect the labor market prospects of program participants and administrative needs." *Id.*

The 1996 Guidance recognized that factors other than general unemployment rates are relevant to determining whether there are insufficient jobs in any area for ABAWDs for whom a waiver is sought. USDA therefore provided that states could submit whatever data they deemed appropriate to support their request "[b]ecause there are no standard data or methods to make the

determination of the sufficiency of jobs." *Id*. at 3. USDA codified this guidance into regulation in 2001. Food Stamp Program: Personal Responsibility Provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 66 Fed. Reg. 4438, 4462 (Jan. 17, 2001). These regulations remained unchanged until this Rule. *See* Konopka Decl. Exs. D & E.

### III. CONGRESS REJECTED THE REWRITE OF THE STATUTE THAT USDA ATTEMPTS TO EFFECTUATE BY RULE.

Congress has reauthorized SNAP eligibility requirements four times without materially changing the flexible framework for state waiver requests and exemption use and carry-over.[2] Congress's most recent reauthorization in 2018 provides an instructive lens into how far USDA has strayed from the law it claims to enforce. Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018) ("2018 Farm Bill").

The House version of the 2018 Farm Bill proposed to eliminate the statutory language permitting a waiver based on a lack of "sufficient jobs" and replace it with a requirement that states show one of the following: (1) that the area has a 24-month average unemployment rate that is 20 percent above the national average for the same period ("20 percent standard") *and* has at least seven percent unemployment; (2) that the area is designated by the Department of Labor ("DOL") as a Labor Surplus Area; (3) that the state was in an extended benefit period within the meaning of section 203 of the Federal-State Extended Unemployment Compensation Act of 1970; or (4) that the state was being provided with temporary or emergency unemployment compensation under any federal law. Agriculture and Nutrition Act of 2018, H.R. 2, 115th Cong. § 4015 (as passed by House, June 21, 2018), available at https://www.congress.gov/bill/115th-

---

[2] *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (2002); Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008); Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649 (2014); Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018).

congress/house-bill/2/text/eh ("House Bill"). In addition, the House proposed to limit the ability

of states to combine individual jurisdictions in a waiver request unless the jurisdictions were

designated as a Labor Market Area ("LMA") by the DOL. *Id.* Finally, the House proposed to

terminate states' ability to carry over unused ABAWD exemptions from year to year. *Id.* The

Senate version of the 2018 Farm Bill did not make any changes to the time-limit waiver or

exemption requirements. S. 3042, 115th Cong. § 4103 (as reported by S. Comm. on Agric.,

Nutrition, & Forestry, June 18, 2018).

The Conference Committee largely rejected the House's version of the Bill, adopting the

Senate version which maintained the statutory lack of "sufficient jobs" language and imposed no

new restrictions on state waiver requests or exemption carry-over. H. Conf. Rpt. on H.R. 2 (115-

1072) ("Conference Report"). President Trump signed the 2018 Farm Bill into law on December

20, 2018. Pub. L. No. 115-334.

### IV. THE CHALLENGED RULE UPENDS DECADES OF AGENCY POLICY AND ADOPTS STRICT REQUIREMENTS THAT CONGRESS FOUND CONTRARY TO THE STATUTORY LANGUAGE AND REJECTED.

One month after President Trump signed the 2018 Farm Bill into law, the Secretary of

Agriculture announced a proposed rule "intended to move more able-bodied recipients of

[SNAP] benefits to self-sufficiency through the dignity of work." *Supplemental Nutrition

Assistance Program: Requirements for Able-Bodied Adults Without Dependents*, Notice of

Proposed Rulemaking, 84 Fed. Reg. 980 (Feb. 1, 2019) ("Proposed Rule"). The Proposed Rule

sought to do exactly what Congress had rejected: (1) restrict state discretion to define the

geographic scope of waiver requests based on characteristics of local labor markets and

economic conditions, (2) impose new data restrictions that narrowed the "insufficient jobs" for

ABAWDs inquiry to a question of general unemployment levels, and (3) limit the carry-over of

ABAWD discretionary exemptions. The Proposed Rule claimed that these new restrictions were

necessary because USDA's "operational experience" demonstrated that states had manipulated the prior flexible criteria to request waivers for areas where it was "questionable" that there were insufficient jobs for ABAWDs. 84 Fed. Reg. at 981. The Proposed Rule expressly stated that USDA would maintain state qualification for extended unemployment benefits as a basis for a waiver and continued to allow states to seek waivers for single jurisdictions like a county or town, but restricted grouping of substate areas for waiver purposes to LMAs only.

USDA received over 100,000 comments on the Proposed Rule, the gross majority expressing strong opposition to its restrictions. 84 Fed. Reg. at 66,783. Commenters, including Plaintiffs, provided significant evidence demonstrating that the proposed changes would result in hundreds of thousands of ABAWDs who suffer from inadequate job opportunities losing vital food assistance that they could not reasonably replace with income from gainful employment. Commenters made clear that this improper termination of benefits would lead to detrimental health and other outcomes that would be largely borne by the States.

Specifically, the Rule enacts the following changes:

*Imposing a Strict Definition for Waiver "Area."* The Rule goes even farther than the rejected House proposal, imposing a "strict definition" for "area" under the Statute to mean only an LMA. 84 Fed Reg. at 66,793. Thus, states may no longer request a waiver for a single jurisdiction, such as a county or town, or a group of counties or towns. The only substate area that can be the basis of a waiver is an LMA.[3] The unemployment rate for the entire LMA must meet the Rule's thresholds, even when a state requests a waiver for only its intrastate portion of

---

[3] Under the final Rule, states would only be able to obtain a state-wide waiver if they successfully obtain waivers for all LMAs (or the intrastate portion of an interstate LMA) that fall within the statess' boundaries.

an interstate LMA. This change goes into effect on April 1, 2020.

    *Limiting the Criteria for Waiver to High General Unemployment.* USDA's prior regulation allowed states to substantiate a waiver based on a number of different criteria relevant to the ABAWD-specific inquiry, including that: (i) the area has been designated a Labor Surplus Area for the current fiscal year by DOL, (ii) DOL's Department of Unemployment Insurance Service has qualified the state for extended unemployment benefits, (iii) the area has a low and declining employment-to-population ratio, (iv) the area has declining occupations or industries, (v) the area is described in an academic study or other publication as an area where there are a lack of jobs, or (vi) the area has unemployment at least 20 percent higher than the national average for a 24 month period. 7 C.F.R. § 273.24(f)(2)(ii).

    The Rule reduces this previously nuanced inquiry to a mere assessment of general unemployment that fails to answer the question posed by Congress: whether there is a lack of sufficient jobs for ABAWDs in the area. A state now only qualifies for a waiver under the "insufficient jobs" for ABAWDs inquiry if an LMA meets the 20 percent standard *and* has an unemployment rate of at least six percent. The Rule also eliminates state qualification for extended unemployment benefits as a basis for a waiver despite assurances in the Proposed Rule to the contrary. These changes also go into effect on April 1, 2020.

    *Eliminating Carry-over of Exemptions.* Effective October 1, 2020, the Rule proscribes the carry-over of exemptions beyond one year. 84 Fed. Reg. at 66,783. In combination with the other changes under the Rule, this has the effect of a one-two punch against ABAWDs —the ABAWD population needs to rely more on individual exemptions because of the restrictions on waiver criteria, but their ability to receive exemptions is greatly diminished.

## ARGUMENT

### I.   LEGAL STANDARDS

When deciding whether to grant a preliminary injunction, the Court must consider whether "'(1) [] [Plaintiffs] have a substantial likelihood of success on the merits; (2) [] [Plaintiffs] would suffer irreparable injury were an injunction not granted; (3) an injunction would not substantially injure other interested parties; and (4) the grant of an injunction would further the public interest.'" *Sottera, Inc. v. F.D.A.,* 627 F.3d 891, 893 (D.C. Cir. 2010) (citation omitted). Alternatively, the APA empowers courts "to postpone the effective date of an agency action . . . pending conclusion of [] [judicial] review proceedings." 5 U.S.C. § 705. The standard for such a stay is the same as the standard for a preliminary injunction. *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

### II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The APA provides that courts must "hold unlawful and set aside" agency action that is "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; "arbitrary, capricious, [or] an abuse of discretion"; or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D).

The APA imposes both procedural and substantive requirements on agency actions. The APA's procedural requirements demand that an agency publish "notice" of "either the terms or substance of the proposed rule or a description of the subjects and issues involved," in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c).

Settled precedent provides that "[n]otice is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was

there.'" *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008) (citation

omitted). If notice is inadequate, the "regulation must fall on procedural grounds, and the

substantive validity of the change accordingly need not be analyzed." *Am. Fed'n of Labor &*

*Cong. of Indus. Organizations v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985).

      If an agency action complies with the APA's procedural requirements, a court assesses

whether an agency action is in accordance with law under the two-step analysis set forth in

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first step asks

whether Congress "has directly spoken to the precise question at issue." *Id*. at 842. Under this

step, courts examine not only "the [statutory] language itself, [but also] the specific context in

which that language is used, and the broader context of the statute as a whole" to determine

whether Congress has spoken to the question at issue. *Robinson v. Shell Oil Co*., 519 U.S. 337,

341 (1997). The D.C. Circuit has directed courts to use the "traditional tools of statutory

interpretation," including "text, structure, purpose, and legislative history" to ascertain

Congress's intent at *Chevron* step one. *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d

219, 224 (D.C. Cir. 2001). If this examination "'yields a clear result, then Congress has

expressed its intention as to the question . . . .'" and the inquiry is over. *Nat. Res. Def. Council,*

*Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) (citation omitted).

      Conversely, if the statute is ambiguous, the court will defer to the agency under *Chevron*

step two if the agency's interpretation is "reasonable." *Chevron*, 467 U.S. at 845. "Whether an

agency's construction is reasonable depends, in part, 'on the construction's "fit" with statutory

language as well as its conformity to statutory purposes.'" *Good Fortune Shipping SA v. I.R.S.*,

897 F.3d 256, 262 (D.C. Cir. 2018) (quoting *Goldstein v. S.E.C*, 451 F.3d 873, 881 (D.C. Cir.

2006)). *Chevron* deference is not warranted where the agency has failed to establish that its

interpretation is "'rationally related to the goals of the statute.'" *Id.* (citation omitted).

Moreover, while an agency is permitted to change its existing policies, it must provide a reasoned explanation for the change, including its disregard of "'facts and circumstances that underlay or were engendered by the prior policy.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009)). The agency must also take into account reliance interests engendered by longstanding policies before changing those policies. *Id.* at 2126. An inadequately explained change in agency policy is unlawful, arbitrary and capricious, and unworthy of *Chevron* deference. *Id*. Courts have found that agency action is arbitrary and capricious where the agency (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

Applying these principles, Plaintiffs are likely to prevail on their claim that the Rule violates both the APA's procedural and substantive requirements and must be vacated.

A.    **The Rulemaking Process Was Flawed.**

Plaintiffs are likely to succeed on the merits of their claim that Defendants failed to comply with the APA's procedural requirements by failing to provide adequate notice of key aspects of the Rule.

"Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of*

13

*Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Here, the notice

provided by the Proposed Rule was insufficient under these standards in at least three respects:

(1) the Rule eliminated qualification for extended unemployment benefits as a basis for a waiver

after the Proposed Rule expressly stated that this basis would be maintained; (2) the Proposed

Rule did not provide notice that LMAs would be the sole geographical unit for a waiver; and (3)

the Proposed Rule failed to adequately define or explain the "operational experience" that

provides the sole basis for much of the Rule's changes to prior policy. Because Defendants failed

to fairly apprise interested parties of the nature of the proposed modifications to the waiver

requirements and the reasons for those changes, stakeholders did not have a fair opportunity to

provide relevant information or meaningfully comment on important aspects of the Rule. This

alone requires that the Rule be vacated. *See, e.g., Allina Health Servs. v. Sebelius*, 746 F.3d 1102,

1110-11 (D.C. Cir. 2014).

   The Proposed Rule maintained that "the Department would continue to approve a state's

waiver request that is based upon the state's qualification for extended unemployment benefits,

as determined by DOL's Unemployment Insurance Service." 84 Fed. Reg. at 985. In a "surprise

switcheroo" prohibited by the APA, *Envtl. Integrity Project v. E.P.A.*, 425 F.3d 992, 996 (D.C.

Cir. 2005), the Rule eliminates this basis for a waiver. 84 Fed. Reg. at 66,789-90. This Circuit

has repeatedly found that notice and comment requirements are not met where, as here, an

agency enacts the opposite of what it proposed to the public. *Allina Health Servs.*, 746 F.3d at

1108; *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009); *Envtl.*

*Integrity Project*, 425 F.3d at 996; *Int'l Union.*, 407 F.3d at 1261. USDA's failure to provide

notice of this change deprived commenters, including Plaintiffs, of a meaningful opportunity to

address how removing this basis, which is consonant with extreme economic and employment

hardship, is contrary to law and arbitrary and capricious. For this reason alone, the APA's notice requirements were not met.

Second, the Proposed Rule failed to provide the public with adequate notice and opportunity to comment on USDA's imposition of a "strict" definition of the "area" for which a wavier may be requested. The Proposed Rule indicated only that states would be limited to LMAs when *grouping* substate areas for purposes of a single waiver request. 84 Fed. Reg. at 986. Thus, under the Proposed Rule, states could continue to request waivers for single jurisdictions like counties and cities based on data specific to that single county or city, and states would only need to consider LMAs if they wished to group cities or counties together for a waiver. For example, under the Proposed Rule, the District of Columbia could continue to seek a District-wide waiver (as it has every year since 1997) despite belonging to an interstate LMA because it would be applying for a single jurisdiction and use District-specific data.

Under the final Rule, however, USDA newly defined the statutory phrase "an area in which the individuals reside" to mean an LMA. That is, states can no longer seek waivers for substate areas like cities or counties. The only substate area that could be the geographic basis for a waiver is an LMA. States can request a waiver for their intrastate portion of an interstate LMA, but the unemployment data used for such a waiver request must still be based on the entire LMA. As a result, states must base their waivers on data that reflects vastly differing labor markets and economic conditions within the LMA. For example, the District of Columbia can no longer seek a District-wide waiver without accounting for the general unemployment rates of its neighboring states, which have markedly different industry, labor markets, levels of educational attainment among their workforces, and public transportation options. *See* Bolen Decl. ¶ 29.

This change is not merely ministerial. Prior to the final Rule, it was not uncommon for a

county or city to rely on a waiver. For example, beginning in 2016, New York City obtained a

waiver for most ABAWDs living in New York City, applying the waiver to boroughs and

Community Districts with higher unemployment rates. Banks Decl. ℗ 12. Because the final Rule

will require the entire LMA in which New York City lies to meet the Rule's unemployment

thresholds, the City will not qualify for a waiver despite the fact that several areas within it meet

the final Rule's new six percent floor. *Id*. ℗ 22. As a result, thousands of New York City

residents will lose access to their SNAP benefits. *Id*. ℗ 9. *See also* Mangini Decl. ℗ 7 (no cities or

towns in Massachusetts currently qualified for a waiver will qualify for a waiver under the final

Rule because the unemployment rate of their corresponding LMA does not reach the six percent

threshold); Gifford Decl. ℗ 14; Freishtat Decl. ℗ 10; Bolen Decl. ℗ 29 (listing interstate LMAs).

The Proposed Rule "nowhere even hinted" that USDA was considering this drastic

change. *CSX Transp.*, 584 F.3d at 1082; *see Ass'n of Private Sector Colls. & Univs. v. Duncan*,

681 F.3d 427, 462 (D.C. Cir. 2012). "The gap between the [Proposed Rule] and the final Rule is

particularly gaping here, inasmuch as the final Rule, without advance notice, overcomes a

longstanding statutory framework" permitting states to define the geographic scope of their

waiver requests. *New York v. U.S. Dep't of Health & Human Servs.*, No. 19 CIV. 4676 (PAE),

2019 WL 5781789, at *54 (S.D.N.Y. Nov. 6, 2019). While the Rule notes that some commenters

proposed that the definition of "area" should be limited, 84 Fed. Reg. 66,796, this is insufficient

to overcome the procedural defect because comments by members of the public do not constitute

adequate notice. Under the standards of the APA, notice must come from the agency. *See*

*Donovan*, 757 F.2d 3at 340; *Int'l Union*, 407 F.3d at 1261. Such notice was lacking and deprived

Plaintiffs and the public of meaningful comment.

Finally, USDA violates APA procedural requirements by relying on vague and

unsupported "operational experience" as its primary basis for the Rule. The Proposed Rule
baldly cites to USDA's purported "operational experience" six times as evidence that changes to
longstanding waiver requirements are necessary to address states' manipulation of prior
standards that has resulted in an improperly inflated number of ABAWDs subject to a waiver. 84
Fed. Reg. at 981, 984, 986-87. The agency does not otherwise define their "operational
experience" or explain how it informed its decision-making. "[T]he notice required by the APA .
. . must disclose in detail the thinking that has animated the form of a proposed rule and the data
upon which that rule is based." *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 (D.C. Cir. 1977).
This term on its own fails to provide interested parties, including Plaintiffs, with a meaningful
opportunity to test and refute the agency's reasoning for its sweeping changes. This is
particularly confounding because Congress designed SNAP to give states vastly more
operational responsibility than USDA has—in terms of benefits administration, waiver requests,
and administration of education and training ("E&T") programs —each of which entails more
familiarity with local economic conditions than USDA could conceivably possess.

The Proposed Rule fails to cite examples of instances where states have used
gamesmanship to manipulate the discretion that they were accorded to support a waiver request,
or where areas were granted waivers despite having sufficient jobs for ABAWDs. 84 Fed. Reg.
at 981, 985-87. The purpose of notice and comment is not served by vague, conclusory assertions
that cannot meaningfully be tested or addressed. *See California by & through Becerra v. U.S.
Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) (finding inadequate notice
where agency provided only conclusory rationale for rule). Thus, commenters had no meaningful
opportunity to rebut USDA's assertions or propose how the agency may have responded in a
more targeted fashion to these issues.

B.      **The Rule Is Contrary to Clear Statutory Text and Congressional Intent.**

The Rule's new restrictions contravene unambiguous statutory language and

Congressional intent and must fall under *Chevron* step one. The purpose of the ABAWD time

limit waiver is to protect individuals from the loss of vital food assistance that they cannot

reasonably replace with income from steady employment. 7 U.S.C. § 2011. The Statute and its

legislative history reflect Congress's determination that states are in the best position to evaluate

local labor markets and must be given flexibility to define the appropriate geographic scope of a

waiver request. With this local knowledge and flexibility, states could help further the goal of

encouraging ABAWD participation in the workforce while not penalizing those who are willing

but unable to find work. The Rule violates the APA because it contravenes this clear mandate.

i.      The Rule's Strict Definition of "Area" Contravenes the Language and
        Clear Intent of the Statute.

The Statute permits states to obtain a waiver for "*any* group of individuals in the State" if

"the area in which the individuals reside" does not have sufficient jobs "to provide employment

*for the individuals*." 7 U.S.C. § 2015(o)(4)(A)(2) (emphasis added). The word "any" generally

gives the word it modifies an expansive meaning, *New York v. E.P.A.*, 443 F.3d 880, 885 (D.C.

Cir. 2006), and the phrase "employment for the individuals" plainly refers to the "group of

individuals" for whom a waiver is requested, *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019). Thus,

the plain language of the Statute gives states the authority to decide the scope of the group of

individuals for whom states make a waiver request, as long as the state can demonstrate that the

defined group resides in a contiguous area that lacks sufficient jobs to provide employment for

them. The Rule's strict definition of "area" to mean only LMAs designated by DOL, on the other

hand, operates to improperly limit the "group of individuals" subject to a waiver to all ABAWDs

that reside in an LMA. This is contrary to the natural reading of this language.

18

If Congress had intended for the agency to "strictly" define the allowable geographic area for waiver, it would have said so. *See, e.g.*, 29 U.S.C. § 3121 (state identification of workforce development areas for purposes of various workforce development funds, which may include areas that, *e.g.,* are LMAs across two or more states or other appropriate contiguous subareas of more than one state). The Statute eschews such rigid area definitions. For example, in 7 U.S.C. § 2020(e), which sets forth the elements of a state plan of operation for SNAP, the Statute refers to "areas," "project areas," and "geographic areas," but does not refer to any pre-set statistical areas. 7 U.S.C. § 2020(e)(19), (20). And, employment and training programs established to "assis[] members of households" participating in SNAP "in gaining skills, training, work, or experience" are designed by State agencies and meant to focus on "State or local workforce needs." 7 U.S.C. § 2015(d). The Rule's strict definition of "area" to constitute only those that have been designated LMAs by DOL is incompatible with this statutory context.

For more than 20 years, USDA provided that "States may define areas to be covered by waivers." 7 C.F.R. § 273.24(f)(6). Congress reauthorized the Statute four times within that 20-year period without modifying, and thereby adopting, the flexible approach. *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 274-75 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress"); *Fox Tel. Stations, Inc. v FilmOn X LLC*, 150 F. Supp. 3d 1, 27 (D.D.C. 2015) (noting that "[i]f Congress had intended to have Internet-based retransmission services qualify for a § 111 license, it would have already acted to reject the Copyright Office's interpretation"). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575,

580 (1978).

Indeed, Congress expressly endorsed USDA's prior approach and rejected that of the new Rule in its debate and enactment of the 2018 Farm Bill. *Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. N.L.R.B.*, 814 F.2d 697, 711 (D.C. Cir. 1987) ("Congress … decided against the modification of section 9 . . . This fact alone, we believe, 'strongly militates against a judgment that Congress intended a result that it expressly declined to enact.'") (citation omitted) The House version of that Bill proposed restricting the grouping of substate areas in a waiver request unless the areas to be grouped constituted LMAs. House Bill § 4015. Congress rejected that proposal and elected not to further define the terms "area" or "group of individuals," and removed proposed provisions that would have prevented states from combining substate areas in waiver applications unless those areas were LMAs. Conference Report at 615. In so doing, the Conference Committee stated that it sought "to maintain the practice that bestows authority on the state agency responsible for administering SNAP to determine when and how waiver requests for ABAWDs are submitted." Conference Report at 616.

This is a textbook example of an agency action that is foreclosed because it contravenes a precise course of conduct prescribed by Congress. *New Haven Board of Education v. Bell*, 456 U.S. 512, 535 (1982) ("Where an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (citation and internal quotation marks omitted); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975) (rejecting construction of statute that would implement substance of provision that Conference Committee rejected); *Ass'n of Am. Railroads v. I. C. C.*,

564 F.2d 486, 493-94 (D.C. Cir. 1977) (agency precluded from adopting regulatory amendments where Congress affirmatively adopting agency's existing interpretation).

      ii.      <u>The Rule's Imposition of an Unemployment Floor and Emphasis on General Unemployment Contravenes the Statute.</u>

The Rule also fails under *Chevron* step one because it ignores the Statute's plain language that waivers are obtainable for areas that lack "a sufficient number of jobs to provide employment *for the individuals*." 7 U.S.C. § 2015(o)(4)(ii) (emphasis added). This key phrase provides for waivers where there is a lack of jobs *for ABAWDs*, not for the population at large, and forecloses the Rule's near-total reliance on the general unemployment rate to meet the test. Indeed, Congress made the general unemployment rate the sole criterion for a waiver under the other waiver basis, *id*. § 2015(o)(4)(i), but omitted it from the subparagraph at issue here, *id*. § 2015(o)(4)(ii). "Had Congress intended to restrict" the Statute in the manner USDA asserts, "it presumably would have done so expressly as it did in the immediately [preceding] sub[paragraph]." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Dep't of Homeland Security v. MacLean*, 135 S. Ct. 913, 919 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

USDA has acknowledged in prior guidance that the "insufficient jobs" prong is designed to permit a waiver on grounds other than the unemployment rate because Congress believed "the unemployment rate alone [is] an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities." Konopka Decl. Ex. C, at 3. In conformance with this clear mandate, USDA previously permitted states to demonstrate insufficient jobs under several non-exhaustive criteria and by using "whatever data it deems appropriate to support its request." 7 CFR § 273.24(f)(2).

The Rule takes the exact opposite position by imposing a six percent unemployment floor

and limiting the data that states can submit to substantiate a waiver to federal general unemployment rates absent "exceptional circumstances." 84 Fed. Reg. at 66,784-89. The Rule effectively, and impermissibly, collapses the two distinct bases for a waiver under the Statute by making both prongs solely dependent on general unemployment levels. As a result, the Rule fails to permit consideration of data that better captures barriers to employment disproportionately experienced by ABAWDs and thus fails to account for whether jobs are available "for the individuals." The Rule allows ABAWDs who are willing but unable to find work to be penalized with a loss of benefits. Moreover, the Rule creates an absurd reading of the Statute where the first basis for a waiver is 10 percent unemployment and the second basis is six percent unemployment when national unemployment is significantly lower. Neither basis answers the question that Congress asked—whether an area actually has insufficient jobs to provide employment for ABAWDs.

The Rule's unemployment floor and drastic curtailment of permissible data in waiver requests means that, contrary to the plain language of the Statute, areas with insufficient jobs for ABAWDs will be ineligible for waivers. For example, the District of Columbia has had a waiver of the ABAWD time limit every year since 1997. *See* Zeilinger Decl. ℙ 6. The District's unemployment rate is currently more than 50 percent higher than the national average. *Id*. ℙ 10. Moreover, as an urban center with limited industry and manufacturing, it possesses a labor market that skews extremely high skill with more than 80 percent of the top 25 job-postings in the city requiring a college degree. Lazere Decl. ℙ 15. The vast majority of the District's ABAWD population has at most a high school degree and less educational attainment than the populations of the surrounding jurisdictions. Zeilinger Dec. ℙ 12. However, despite relatively high unemployment largely driven by a lack of low skill jobs for which ABAWDs would be

qualified, the District's general unemployment is under the six percent floor making the District ineligible for a waiver under the Rule. *Id.* ¶ 10.

Congress has affirmatively rejected what the Rule seeks to accomplish. In the 2018 Farm Bill, Congress rejected proposals that would have replaced the lack of "sufficient jobs" basis with much more narrow waiver grounds, including a seven percent unemployment floor. The Conference Report adopted by the House and Senate expressly stated that "neither the Department nor Congress can enumerate every ABAWD's situation as it relates to possible exemption from the time limit, and subsequently, the work requirement." Conference Report at 616. By rejecting these new restrictions, Congress expressed its intent to maintain the inclusive, flexible approach delineated by the "insufficient jobs" inquiry without further restriction. The Rule cannot be squared with Congress' clear intent to preserve the status quo. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982) (amending a statute while leaving certain statutory provisions intact "is [] evidence that Congress affirmatively intended to preserve that" context); *Kay v. F.C.C.*, 443 F.2d 638, 646-47 (D.C. Cir. 1970).

iii.     The Rule's Curtailment of Exemption Carry-Over is Contrary to Law.

The Rule's elimination of carry-over of unused exemptions beyond one year also ignores statutory language and Congress's clearly articulated intent.

The Statute providing for exemptions permits a state to carry over unused exemptions without restriction. The Statute requires the Secretary to estimate, using a percentage of the total number of ABAWDs, how many exemptions are available in a given year. 7 U.S.C. § 2015(o)(6)(C)-(E). State agencies can then allocate these exemptions to individual ABAWDs. Importantly, however, the Statute expressly provides that the Secretary must increase the number of exemptions available for a subsequent year—above the estimate yielded by applying the statutorily mandated percentage—if a state uses fewer exemptions than the Secretary had

23

estimated for the prior year. 7 U.S.C. § 2015(o)(6)(G). In other words, the statutory scheme requires the Secretary to determine the number of exemptions to which a state is entitled, and then to adjust that number upwards based on any leftover exemptions in the prior year. This procedure effects an ongoing "carry-over" of exemptions from prior years: the underuse of exemptions in one year will increase the number of exemptions available in the next year, and that underuse compared in the second year will roll over to the third and so forth. By limiting carry-over of exemptions to one year, the Rule runs afoul of the statutory scheme. *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014) (it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

The legislative history confirms this reading of the Statute. In the 2018 Farm Bill, Congress expressly elected to enact one proposed change to the exemption policy, to reduce the percentage of available exemptions from 15 to 12 percent starting in Fiscal Year 2020, and rejected another proposed change, to eliminate exemption carry-over. This demonstrates that Congress acted with a "scalpel not a cudgel" to address the exemption policy. *Hearth, Patio & Barbecue Association v. U.S. Dep't of Energy*, 706 F.3d 499, 505 (D.C. Cir. 2013). In other words, "[t]his was a conscious choice." *Id*. The Conference Report made clear that states will "continue to accrue exemptions and *retain any carry-over exemptions from previous years, consistent with current law*." Conference Report at 616 (emphasis added).

Not only does the Rule cap exemption accrual at one year, it goes one step further and eliminates states' prior accrual of exemptions beyond FY 2020. 84 Fed. Reg. at 66,802. By cancelling previously accumulated exemptions aside from those accrued in the preceding fiscal year, the Rule extinguishes prior state rights in violation of the APA. *Georgetown Univ. Hosp. v.*

*Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) ("the APA requires that legislative rules [i.e., rules adopted pursuant to the notice and comment procedures of the APA, 5 U.S.C. § 553] be given future effect only . . . such retroactive application is foreclosed by the express terms of the APA."), *aff'd on other grounds*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).

The Rule's restriction on carry-over exemptions is contrary to the statutory text and Congress's clear, explicit command. It is an end run around a legislative process that chose a different solution. Further, the Rule's retroactive application runs afoul of the express terms of the APA and thus must be vacated as contrary to law.

### C.   The Rule Is Unreasoned and Arbitrary and Capricious.

The Rule also fails APA review because it is arbitrary and capricious. The Rule upends a two-decade long policy based on factors that Congress did not intend the agency to consider, in contravention of record evidence, and without considering important aspects of the problem.

In short, the agency admits that its goal is to reduce the number of ABAWDs who reside in waived jurisdictions and crack down on state "manipulation." 84 Fed. Reg. at 66,783. But Congress never indicated that achieving a certain numerical quota of waived ABAWDs is a factor for the agency to consider in enforcing the Statute. The agency's improper purpose has led it to turn a blind eye to evidence demonstrating that limiting the geographic scope and sources of acceptable data for waiver requests impermissibly fails to capture the reality of job availability for ABAWDs. The agency's claim that states have abused the waiver process is unsubstantiated and mere pretext for its overarching purpose of reducing the number of ABAWDs receiving food assistance. The agency improperly failed to consider the significant costs the Rule will impose on states and the Rule's disparate impacts on minorities. Finally, the Rule's rationale runs contrary to factual findings that USDA has made in prior guidance and regulations without adequately addressing those findings and without fully considering the reliance interests that

have developed around the former policy. The Rule is invalid.

        i.      <u>The Rule Is Motivated by Factors that Congress Never Intended the Agency to Consider.</u>

USDA admits that its chief motivation for amending its waiver and exemption regulations is to crack down on alleged state manipulation of the waiver criteria and "encourage broader application of the time limit"—in other words, to deny nutrition assistance to a greater number of individuals. 84 Fed. Reg. at 66,794. The Rule refers to "the problem of States' manipulative usage of grouping substate areas to maximize waived areas," and asserts that "the Department is resolute that it must address this problem," 84 Fed. Reg. at 66,795, but it provides no data to support the existence of such conduct (or even why substate grouping to maximize waived areas is "manipulative" or a "problem"). All of the changes under the Rule are driven by this single agenda. Specifically, the Rule constricts the definition of an "area" to an LMA (even for jurisdictions like the District of Columbia that make up only a portion of a LMA), reduces the data that can be used to substantiate a waiver request to general unemployment figures, and restricts carry-over of exemptions—all for the purpose of reducing the number of ABAWDs who are able to receive continued benefits.

This rationale for the Rule is unreasonable and violates the APA. The task Congress assigned to the agency is to waive work requirements for ABAWDs whose areas lack sufficient jobs for them. *Reducing* the overall number of ABAWDs who meet that test, or determining that some number who meet the test is *too much*, are not factors Congress intended the agency to act upon. *See State Farm*, 463 U.S. at 43; *see also Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 377 (D.D.C. 2018); *Am. Petrol. Inst. v. S.E.C.*, 953 F. Supp. 2d 5, 20-23 (D.D.C. 2013). Similarly, nothing in the Statute supports the agency's justification for undue restrictions on states' ability to demonstrate a lack of sufficient jobs for ABAWDs as a

abuse-deterrent or because some geographic groupings or data sources are more difficult to evaluate than others. *See Good Fortune Shipping*, 897 F.3d at 262-63 (finding that administrative convenience and abuse deterrence are not valid bases to limit the scope of a statutory mandate). Reducing the number of waivers for its own sake guided by unsupported abuse-deterrence strays from Congressional intent and is a quintessentially arbitrary reason to impose the Rule's sweeping restrictions.

ii.   The Rule Runs Counter to the Evidence before the Agency.

The Rule is also arbitrary and capricious because it ignores evidence before the agency. The agency dismisses evidence demonstrating that the Rule will not appropriately target waivers to labor markets where ABAWDs cannot find work, and therefore, fails to comply with the Statute and will not have the intended effect of promoting workforce participation. *See State Farm*, 463 U.S. at 43; *see also Nat.'l Fuel Gas Supply Corp. v. F.E.R.C.*, 468 F.3d 831, 841 (D.C. Cir. 2006) (holding a rule arbitrary where agency lacked evidence to support key factual conclusion); *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 96 (D.D.C. 2017) ("[I]t is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong.").

As a threshold matter, the Rule is premised on the notion that stricter limits on state discretion to define and support a time limit waiver are needed because "States have taken advantage of [] weaknesses [in prior standards] to request and qualify for waivers of the ABAWD time limit in areas where it is questionable as to whether the statutory conditions for approval … are present." 84 Fed. Reg. at 66,783. But no evidence before the agency supports this. Indeed, USDA fails to cite a single concrete example of state abuse or any area that was waived improperly, relying solely on unexplained "operational experience" and an equally unsupported (and inaccurate) claim that state "manipulation is demonstrated by the fact that

27

currently about half of the ABAWDs on SNAP live in waived areas, despite low unemployment levels across the majority of the country." *Id.*

USDA fails to explain its calculation that "about half" of ABAWDs on SNAP live in waived areas. But even if the number is correct for some point in time, it fails to support state manipulation or waiver overuse. ABAWDs in non-waived areas lose their benefits after three months unless they meet work requirements. Thus, the fact that "about half" of ABAWDs still receiving benefits reside in waived areas is unsurprising (in fact one might expect the number to be even higher) and substantiates nothing, because the number fails to account for the ABAWDs whose benefits have been terminated based on the time limit.

Additionally, a large number of ABAWDs in waived areas and low general nationwide unemployment do not (alone or collectively) indicate these areas were improperly waived or actually have sufficient jobs for ABAWDs. USDA fails to confront a plethora of evidence that ABAWDs face significantly greater challenges in obtaining employment than the general population, such as less education and work experience, housing instability, a lack of reliable transportation, and physical and mental disabilities. Konopka Decl. Ex. A, at 3; Konopka Decl. Ex. B, at 3; Bolen Decl. Ex. A, at 174-75. Turning long-standing policy on its head in the quest to crack down on unsubstantiated manipulation is unreasonable and cannot sustain the Rule. *Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin.*, 830 F. Supp. 5, 10 (D.D.C. 1993) ("unsubstantiated assumptions are insufficient justification and rational to support" rulemaking); *see Good Fortune Shipping*, 897 F.3d at 263-65 (finding agency arbitrarily failed to explain change in position regarding accepted documentation of "ownership" under statute).

Specific aspects of the Rule also are not supported by evidence. Key among these is the selection of LMAs as the sole geographic areas for which states can seek a waiver. This

restriction designates a single geographic unit that is over- and under-inclusive for areas that lack sufficient jobs for ABAWDs. States can no longer narrowly tailor a waiver request to a smaller area, like a single city, town, or county, based on the area's unique conditions that lead to a lack of jobs for ABAWDs (for example, the loss of a major local employer). Similarly, states are unable to seek state-wide waivers in instances where state-specific conditions cause a lack of job opportunities for ABAWDs throughout the state unless it can establish that all of the LMAs of which a state is a part (including those that traverse state boundaries) also meet the Rule's thresholds.

As many commenters pointed out, LMAs are "not the only appropriate areas for waiver because LMAs are based on commuting patterns of the general workforce and are not specific to low-income, low-skilled ABAWDs who lack affordable transportation options." 84 Fed. Reg. at 66,794. Work opportunities for ABAWDs are influenced by the types of jobs available, the qualifications needed for such jobs, and whether affordable transportation options are available. But DOL does not consider these factors when determining the boundaries of LMAs, some of which may require a two-hour commute to traverse and lack public transportation options.

New York City is a stark example. It is part of a large LMA that includes 25 counties in three states, including areas more than 100 miles from the City. Banks Decl. ⁋ 24. There is no reasonable way for low- or no-income New Yorkers to travel this distance, particularly because parts of the LMA have little to no public transportation. *Id.* Indeed, many ABAWDs lack reliable transportation, and many do not have a valid driver's license. Konopka Decl. Ex. A., at 3; *see also* Negus Decl. ⁋ 9 (noting that lack of transportation in rural Massachusetts imposes a barrier to employment). USDA fails to engage with any of these issues despite evidence before the agency.

The six percent unemployment floor imposed by the Rule similarly fails to confront evidence before the agency that, even where the unemployment rate is well below six percent, there may be insufficient jobs for ABAWDs. Konopka Decl. Ex. A, at 5. *See* Bolen Decl. Ex. A, at 31-50; Ex. B, at 2-9. In fact, USDA itself "recognize[s] that ABAWDs may face barriers to employment and have more limited employment prospects than the general public due to low educational attainment or other factors discussed above." 84 Fed. Reg. at 66,787. Additionally, the unemployment numbers used by the agency fail to account for potentially large numbers of individuals who have stopped looking for employment because of longstanding inability to find work. *See* Lazere Decl. ⁋ 8 (noting that unemployment rates in the District exceed the six percent floor when including people who have been discouraged from looking for work and other marginally attached workers).

Despite this evidence, USDA maintains that an unemployment floor is necessary because without it, "areas that do not clearly lack sufficient jobs will continue to qualify for waivers solely because they are 20 percent above the national unemployment rate." 84 Fed. Reg. at 66,794. This is nothing more than circular reasoning to justify the agency's preferred result: in effect, USDA contends that a six percent floor is an appropriate criterion to demonstrate a "lack of sufficient jobs" for ABAWDs because areas that have lower than six percent unemployment do not lack sufficient jobs for ABAWDs. However, the agency presents no evidence of the latter point and the weight of the evidence before the agency is to the contrary.

Moreover, the Rule's draconian restrictions on acceptable data are contrary to the evidence before the agency. Comments overwhelmingly demonstrate that other data sources are relevant to the questions of where and whether ABAWDs face obstacles to employment. Bolen Decl. Ex. A, at 161-67. USDA does not dispute the probity of these other data sources, but

summarily discounts them as less standardized and reliable than general unemployment data. 84 Fed. Reg. at 66,791; Konopka Decl. Ex. B, at 3. Even if this statement were true as to certain inquiries, there is no support for USDA's claim that general unemployment figures are the most reliable (or even a reliable) indicator of insufficient jobs for ABAWDs. An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted).

The agency cannot categorically refuse to consider probative data based on the arbitrary and unsubstantiated claim that such criteria are less standardized or are more difficult to track or reproduce. Such claims cannot supply the reasoned explanation required by the APA. *See United Healthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 190 (D.D.C. 2018); *see Good Fortune Shipping*, 897 F.3d at 262-63.

The agency's repeated failure to explain how the Rule targets waivers to areas in which ABAWDs lack sufficient jobs is connected to a larger defect in the agency's response to the evidence before it. USDA argues that the Rule is justified because the Rule will "encourage" greater participation in the workforce. This pivotal assumption is both unsupported and contradicted by evidence in the record. Put simply, there is no reason to believe that the Rule's restrictions will promote greater engagement in the workforce because there is no evidence that the new criteria capture whether jobs are available for these individuals. This fundamental disconnect between the evidence and the choice made renders the Rule arbitrary and capricious.

      iii.    <u>The Rule Fails to Consider Important Aspects of the Rule, Including the Costs It Imposes on States.</u>

The Rule is also arbitrary and capricious because it fails to consider important aspects of the problem. *State Farm*, 463 U.S. at 43; *see also Nat. Res. Def. Council, Inc.*, 244 F. Supp. 3d at

97-100. For example, the Rule grossly underestimates some costs to States and their residents and wholly ignores others. *See State v. Azar*, 385 F. Supp. 3d 960, 1015 (N.D. Cal. 2019) (finding rule arbitrary under APA where agency failed to consider rule's costs).

USDA claims that the Rule will result in only a "small increase in the federal share of State administrative costs" and a "small increase" of $1.4 million in "State costs related to the administrative burden for verifying work hours and exemptions and sending notices." 84 Fed. Reg. at 66,807. The agency does not explain the basis for these figures, which stand in stark contrast to state estimates. Zeilinger Decl. ¶ 13 (estimating an increase in annual costs of hundreds of thousands of dollars for the District); Buhrig Decl. ¶ 13 (estimating an increase in annual costs of $2,250,000 for Pennsylvania); Sweeney Decl. ¶ 13 (estimating an increase of hundreds of thousands of dollars in annual costs for Michigan); Gifford Decl. ¶ 20; Brown Decl. ¶ 10; Konopka Decl. Ex. A, at 2. Moreover, USDA's inaccurate cost analysis considers only the immediate costs to the States of increased monitoring and notice requirements, ignoring significantly greater costs that dwarf the immediate administrative burdens even when those are properly calculated.

For example, USDA fails to consider significant costs that States will incur in staffing and defending legal challenges to termination of benefits to those who cannot reasonably find work. *See* Gifford Decl. ¶ 20 (noting increased costs for hiring additional administrative hearing officers for those who have lost benefits); Fernandez Decl. ¶ 72 (explaining increased costs for administrative hearings); *see also* Sweeney Decl. ¶ 17. Additionally, States will incur significant costs to amplify current E&T programs to accommodate the increased number of ABAWDs subject to the time limit. Buhrig Decl. ¶ 16 (anticipating an increase in costs of $21,000,800 to administer SNAP E&T within Pennsylvania over the next six years); Zeilinger Decl. ¶ 15; Storen

Decl. ℙ 12 (estimating increased costs for administering SNAP E&T in Virginia to be $1,605,500); Banks Decl. ℙ 34 (anticipating increase in NYC for modifying workfare programs to be $5.8 million in the first year and $4.3 million each subsequent year); Gifford Decl. ℙ 24 (anticipating increased costs in Connecticut of $1-2 million annually to expand SNAP E&T).

USDA also ignored the many comments that highlighted the devastating public health impacts of the Rule as nearly 700,000 people face hunger and malnutrition and related health consequences as a direct result of losing SNAP benefits. Konopka Decl. Ex. B, at 1-2; Bolen Decl. Ex. A, at 179; 185-87; see Hartline-Grafton Decl. ℙℙ 6, 10. The agency cannot reasonably evaluate a Rule that should ultimately be designed to "promote the general welfare" by "raising levels of nutrition among low-income households," 7 U.S.C. § 2011, based on a cost analysis that fails to account for the detrimental public health effects of so many losing access to vital food assistance.

The negative impact on public health largely will be borne by States in increased Medicaid and uncompensated care costs. Defendants cannot selectively ignore costs that foreseeably flow from Defendants' rulemaking. *See Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 53 (D.D.C. 2019), appeal dismissed, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019) (finding delay regulation arbitrary and capricious where Department of Education failed to consider costs to states and interested stakeholders); *Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Future Trading Commis.*, 67 F. Supp. 3d 373, 430-33 (D.D.C. 2014) (CFTC's failure to consider or evaluate costs of extraterritorial application of Rule rendered rule arbitrary and capricious).

Finally, USDA candidly admits that the Rule has "the potential for impacting protected

groups due to factors affecting rates of employment of members of these groups."[4] 84 Fed. Reg. at 66,808. This conclusion is supported by comments demonstrating that minority groups will disproportionately suffer negative impacts because of the Rule. *Id.*; Konopka Decl. Ex. A, at 3-4; Bolen Decl. Ex. A, at 175; 219-21. Notwithstanding the extensive evidentiary record on this important issue, USDA's analysis stops there. The Rule provides only that "the Department finds that the implementation and mitigation strategies and monitoring by FNS Civil Rights Division and FNS SNAP may lessen these impacts." 84 Fed. Reg. at 66,808. The Rule fails to explain these "mitigation strategies," or how they will address the problem of disparate impact. Such conclusory statements are insufficient under the APA's arbitrary and capricious standard. *Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 448-49 (agency decision arbitrary under the APA where agency failed to meaningfully address comments regarding impact on minorities); *AT&T Wireless Services Inc. v. F.C.C.,* 270 F. 3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.").

### D.   The Rule Fails to Address the Agency's Prior Factual Findings and Reliance Interests Resulting from Prior Regulations.

"A central principle of administrative law is that, when an agency decides to depart from

---

[4] USDA's implementing regulations under Title VI bar actions with an unjustified disparate impact on racial minorities. *See* 7 C.F.R. § 15.3(b)(2). Carrying out these obligations, Departmental Regulation 4300-4 requires the Department to perform a "civil rights impact analysis" ("CRIA") of a proposed regulation such as this one. *See id.* § 9.a. That analysis must identify any adverse or disproportionate impacts that the proposed rule will have on any classes protected by the law, *id.* § 9.a.(2), and it must develop "a mitigation strategy that will eliminate, alleviate, or lessen any adverse impact(s) as a result of a policy, action or decision," *id.* § 9.a.(3). A CRIA constitutes final agency action, subjecting CRIA's to the standard arbitrary and capricious analysis review under the APA. 5 U.S.C. § 704 (2009) (final agency action is subject to judicial review); *McFalls v. Purdue*, No. 3:16-CV-2116-SI, 2018 WL 785866, at *13 (D. Or. Feb. 8, 2018) (CRIA is a final agency action for purposes of judicial review).

decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Moreover, if a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy" or "when [an agency's] prior policy has engendered serious reliance interests that must be taken into account," agencies must provide a reasoned explanation for disregarding facts and circumstances that underlay prior policy. *Fox Tel. Stations, Inc.*, 556 U.S. at 515; *see Nat. Lifeline Assoc. v. F.C.C.*, 921 F.3d 1102, 1112 (D.C. Cir. 2019) (FCC failed to justify fundamental policy reversal). An agency must thus account for changes in "'significant factual predicates.'" *Portland Cement Ass'n v. E.P.A.*, 665 F.3d 177, 187 (D.C. Cir. 2011) (citation omitted).

The Rule relies on significant departures from factual findings that underpinned USDA's prior policy, yet USDA fails to explain the change. USDA has consistently acknowledged that states are in the best position to determine what areas lack sufficient jobs for ABAWDs and what data sources should be used to support a waiver request. For example, in 1996 Guidance, USDA acknowledged that states should have "broad discretion in defining areas that best reflect the labor market prospects of program participants and administrative needs." Konopka Decl. Ex. C, at 1. As the Guidance made clear, "there is enough variety in local employment conditions that statewide averages may mask slack job markets in some counties, cities, or towns. Accordingly, states should consider areas within, or combinations of, counties, cities, and towns for the same reason." *Id.*

This was echoed in the 2001 regulations that codified the 1996 Guidance, where USDA made clear that "State agencies have complete discretion to define the geographic areas covered by waivers so long as they provide data for the corresponding area." 66 Fed. Reg. at 4463.

Again, in 2016, USDA reaffirmed that "[t]he State agency has discretion to define the area(s) in which it requests to waive the time limit." Konopka Decl. Ex. D, at 2.

The Rule completely reverses course, limiting states to federally-defined LMAs as the sole geographic area for which states can seek a waiver. Yet in doing so, USDA fails to address why its prior factual finding—that there are wide variations in local economic conditions, including the conditions in counties, cities, and towns, and that state and local governments are much closer to those conditions than federal officials are—was incorrect or is no longer valid.

As with geographic flexibility, the Rule also limits data that states can use to demonstrate that there are insufficient jobs for ABAWDs in a way that reverses course from the agency's prior factual findings. The first sentence of the 1996 Guidance on "insufficient jobs" states that "[t]he statute recognizes that the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities," and that states could thus use other data to make that showing. Konopka Decl. Ex. C, at 3. This was echoed in USDA's 1999 proposed rule which stated that "the legislative history does not provide guidance on what types of waivers the Department should approve under [the insufficient-jobs] standard, and there are no standard data or methods to make the determination of the sufficiency of jobs. States requesting waivers are therefore free to compile evidence and construct arguments to show that in a particular area, there are not enough jobs for individuals who are affected by the time limit." 64 Fed. Reg. 70,920, 70,946 (Dec. 17, 1999).

USDA maintained a consistent position on this in 2006 Guidance ("The state may submit whatever data it deems appropriate to support requests") and 2016 Guidance (describing "other potential types of waiver requests" beyond those based on unemployment data). Konopka Decl. Ex. D, at 16, Ex. E at 3. As discussed above, the statutory text has not changed since 1996, yet

the Final Rule limits states to generic unemployment data. USDA provides no reasoned

explanation for why its prior factual findings regarding the types of data that are relevant to

answering the question Congress assigned it are no longer valid.

The Rule's new restrictions on states' ability to carry forward unused individual

exemptions beyond one year are similarly unreasoned and fail to address significant reliance

interests. Under earlier USDA policies, states could accumulate exemptions because states have

a better understanding of the ABAWD population within their state and can tailor allocation of

exemptions over time. Food Stamp Program: Food Stamp Provisions of the Balanced Budget Act

of 1997, 64 Fed. Reg. 48,249 (Sept. 3, 1999). This policy created a reliance interest insofar as

states depend on the ability to carry over exemptions in at least two respects: *first*, some states

may choose to carry over exemptions because they expect their population to face known

economic challenges, like loss of a major employer, in the future; and *second,* some states may

choose to carry over exemptions to use in the event of an unanticipated downturn or other

emergency hardship, so that they are able to immediately address the increased needs of SNAP

recipients with exemptions while working on longer-term program solutions. *See* Buhrig Decl. ¶

17; Fernandez Decl. ¶¶ 21-22; Neira Decl. ¶ 12.

USDA strips states of their previously retained exemptions and eliminates exemption

carry-over beyond one year without justification, except for a bald statement that "the

Department views the accumulation of unused exemptions over several years to be inappropriate

and inconsistent with the Act." 84 Fed. Reg. at 66,803. The agency fails to confront the serious

reliance interests of states that have accumulated exemptions for many years and summarily

discounts the numerous comments that relay the importance of the exemptions in enabling states

to nimbly respond to swift economic downturns or changes in employment conditions. Konopka

Decl. Ex. A, at 6; Bolen Decl. Ex. A, at 156-57; 214-17. The APA requires more than conclusory statements when an agency abandons its longstanding practices, particularly where, as here, "serious reliance interests [are] at stake." *Encino*, 136 S. Ct. at 2127; *N.A.A.CP v. Trump*, 298 F. Supp. 3d 209, 240 (D.D.C.), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018) ("The Department's failure to give an adequate explanation of its legal judgment was particularly egregious here in light of the reliance interests involved.").

### III.   ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IMMEDIATE, IRREPARABLE HARM.

An "irreparable harm" is an imminent injury that is both great and likely to occur, and for which legal remedies are inadequate. *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). To show that a future harm is likely, the movant must provide "proof indicating that the harm is certain to occur in the near future. Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id*. The states will suffer irreparable harm in the form of significant increased regulatory burdens and costs, increased costs associated with negative public health impacts, and harm to local economies through the decreased spending power of SNAP recipients subject to the time limit as a direct result of the Rule's new restrictions.

### A.      Rapid Implementation of the Rule Will Greatly Burden the States.

With the Rule's effective date less than three months away, the States must undertake significant, immediate changes to their administration of SNAP to accommodate the significant influx of ABAWDs newly subject to the time limit. In California, implementation of the time limit in only six counties required more than a year of training and preparation to ensure that staff could "(1) properly explain the rule to recipients; (2) determine exemptions; (3) engage ABAWDs in qualifying work activities; (4) apply the rule; and (5) track recipients' countable months, work and other qualifying activities, and use of discretionary exemptions." Fernandez

Decl. ¶ 49. Training was particularly burdensome in the counties that had never administered the time limit. *Id*. Under the Rule, California will have to provide training to almost six times as many counties under a much tighter timeframe. *Id.* ¶ 46. Other States will similarly have to hire additional staff and provide training because they have never implemented the time limit or have been operating under a geographically expansive partial waiver. *See* Zeilinger Decl. ¶ 13; Haun Decl. ¶¶ 18-19; Storen Decl. ¶ 23. The expedited implementation time frame will require state agencies to divert resources and funding for other program priorities to address current deficiencies in staff and training, thus potentially compromising the integrity of those other state programs. *See* Gifford Decl. ¶ 22; Fernandez Decl. ¶ 50.

States also will have to develop and disseminate notice to affected ABAWDs. State agencies must be able to distill and explain to ABAWDs the time limit, its complex work requirements, and the available exemption criteria. *See* Fernandez Decl. ¶ 52. States must ensure that notices are fulsome and timely to comport with due process requirements. *Id.* Even for States that have already distributed such notices, these notices must be updated to account for changes that the Rule makes to the ABAWD time limit, including issues relating to the expedited implementation timeframe and the restrictions on carry-over of discretionary exemptions. *See id.* Agency staff also must pour through thousands of case files to ensure ABAWDs are properly exempt or otherwise properly notified of their eligibility restrictions under the time limit. *See* Mangini Decl. ¶ 10; Neira Decl. ¶10; Gaskell ¶ 19. Many States will need to hire additional staff to handle such a rapid and significant increase in notification. Gifford Decl. ¶ 20; Brown Decl. ¶ 10. In addition to preparing and disseminating notices, many States will have to overhaul their Information Technology systems that track ABAWDs and generate notifications. Fernandez Decl. ¶ 51; Gifford Decl. ¶ 22.

Such a rapid expansion in administering the ABAWD time limit will impose a significant monetary burden on the state agencies in the near term. In Connecticut, communications with ABAWDs alone is estimated to cost an additional $207,500, which does not take into account additional costs for developing the notices and making system coding changes to mail the notices. Gifford Decl. ¶ 20. The District of Columbia will have to administer the time limit for the first time after having had a statewide waiver since 1997. Under these circumstances, the District estimates increased administrative costs of hundreds of thousands of dollars. Zeilinger Decl. ¶ 13. These costs would cover hiring additional full-time employees, developing and disseminating notices to impacted and potentially impacted households, and increased burdens on the service center. *Id.* Pennsylvania, where eleven counties and three cities would be implementing the time limit for the first time, anticipates an increase in annual costs of $2,250,000, to cover new costs of notice and administration of the time limit. Buhrig Decl. ¶¶ 7, 13. In California, 34 counties will have to implement the time limit for the first time since 2008, covering an estimated 352,077 non-exempt ABAWDs. Fernandez Decl. ¶ 45.

Effectuating the Rule will also impose onerous burdens on States to expand their E&T programs to provide services to thousands of ABAWDs who will be newly subject to work requirements. *See* Buhrig Decl. ¶ 15; Fernandez Decl. ¶ 69; Sweeney Decl. ¶ 15. For example, the District has used all available District and federal funding to reach its current SNAP E&T capacity, which is only about 10 percent of the estimated ABAWD population in the District. Zeilinger Decl. ¶ 15. Under the Rule, however, demand for these programs could increase tenfold. Research has shown that most ABAWDs will lose their benefits three months after implementation of the time limit because they will be unable to find employment. Bolen Decl. ¶¶ 8-9.

Demand for SNAP E&T in Connecticut could similarly rise tenfold and would require an increase in annual costs of $1-2 million to pay the new staff needed to administer the program. Gifford Decl. ¶ 24. Pennsylvania estimates that increasing its SNAP E&T capacity to serve the roughly 80,000 ABAWDs that would lose benefits under the Rule would cost approximately $21,000,800 over the next six years, and increasingly limited federal cost sharing funds would leave much of these costs to the State. Buhrig Decl. ¶ 16. Michigan's SNAP E&T program only has sufficient funds to run a robust program in less than a third of its counties. *See* Sweeney Decl. ¶ 15. Nevada's SNAP E&T program only has one education component, and it is only available at one location with limited space for participants. Fisher Decl. ¶ 9.

    **B.**    <u>**The Rule Will Endanger the Health of Hundreds of Thousands of Plaintiffs'**</u>
               <u>**Residents and Increase States' Healthcare Costs.**</u>

USDA estimates that 688,000 ABAWDs may lose SNAP benefits as a result of the Rule. 84 Fed. Reg. at 66,807. Additionally, the Center for Budget and Policy Priorities ("CBPP") estimates that 65 percent of currently waived counties, 92 percent of currently waived towns, and 62 percent of currently waived Native American reservations will lose their ability to continue to provide food assistance to ABAWDs after the three-month time limit. Bolen Decl. ¶ 5. These estimates are remarkable; not only for the obvious point that a large number of Plaintiffs' residents will lose life-saving food assistance, but because USDA does not even attempt to argue that an appreciable number of these ABAWDs will find employment or otherwise be able to maintain their benefits. In other words, USDA makes no claim that these losses will be ameliorated by greater engagement by ABAWDs in the workforce or that qualifying jobs are or will be available for them.

Many ABAWDs will experience hunger and the negative effects of food insecurity and inadequate nutrition, such as worse health and increased poverty. Studies have found that food

insecurity leads to increases in the prevalence and severity of serious diseases, including obesity, type-2 diabetes, heart disease, stroke, and some cancers. Hartline-Grafton Decl. ⁋ 6. Recipients of SNAP benefits, however, tend to face fewer or less severe physical health concerns. For example, a study focused on low-income, urban medical patients with type-2 diabetes found a link between receipt of SNAP benefits and lower risk of poor glucose control. *Id.* ⁋ 10. Use of SNAP is associated with better overall health for this population. *Id*. The negative health impacts associated with greater food insecurity will only exacerbate ABAWDs' inability to maintain employment by limiting the types of jobs they can do and increasing the days they are sick and unable to go to work as required. These harms are significant and irreparable. *See Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157-58 (D.D.C. 2018) (finding that depriving residents of SNAP benefits constitutes irreparable harm); *see also Int'l Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 19 (D.D.C. 1996) (finding "irreparable harm to residents" where agency terminated Medicare participation by nursing home).

The costs of these negative outcomes will be largely borne by Plaintiffs through increased Medicaid and uncompensated care expenditures and required expansion of state programs that assist with housing and other essentials. A national study found that "SNAP participation was associated with approximately $1400 per year per person lower subsequent health care expenditures in low-income adults." Hartline-Grafton Decl. ⁋ 12. SNAP participants on average incurred about 25 percent less in health care costs annually than low-income adults who did not receive SNAP benefits. Bolen Decl. ⁋; *see* Brown Decl. ⁋ 11 (citing Minnesota DHS study finding lower health care expenditures for SNAP recipients).

Loss of SNAP benefits will impose an arduous financial burden on the already resource-constrained ABAWD population. ABAWDs must divert more of their limited resources toward

food purchases and will have less money to spend on rent and other critical needs. *See* Lazere Decl. ⁋ 21; Storen Decl. ⁋ 22; *see also* Bolen Decl. ⁋ 26. States in turn will have to increase housing assistance for these individuals. In some circumstances, such a diversion of resources can result in homelessness, and an increase in homelessness can place a further strain on state-funded programs to address such problems. *See* Neira Decl. ⁋ 9.

### C.      The Rule Will Harm States' Economies.

States' economies will suffer as soon as ABAWDs start losing their benefits under the Rule. As USDA itself recognizes, because SNAP benefits are provided to low-income individuals with immediate spending needs, SNAP boosts local economies through increased consumer demand and spending power. Konopka Decl. Ex. A, at 8-9; Konopka Decl. Ex. B, at 2.

State and local economies will feel a direct, financial impact under the Rule from the loss of revenue that federal food assistance provides. Banks Decl. ⁋⁋ 28-30; Buhrig Decl. ⁋ 21 (providing estimate of $256.3-288.3 million economic loss statewide in Pennsylvania and $57 million in Philadelphia specifically); Freishtat Decl. ⁋ 15; Gifford Decl. ⁋ 16; Haun Decl. ⁋ 24. Expenditures at grocery stores and other retailers will decrease, and the resulting loss of purchasing power will make establishing supermarkets and other types of food access more difficult. Fernandez Decl. ⁋ 73; Zeilinger Decl. ⁋ 21. Local business owners will have less money to spend in other economic sectors, their employees may see reduced hours or even lose their jobs, and States will collect less sales tax. *See* Lazere Decl. ⁋ 19. For these reasons, the Rule directly harms States' general economies.

### IV.   CONSIDERATION OF INJURY TO OTHERS AND THE PUBLIC INTEREST FAVOR AN INJUNCTION TO PRESERVE THE STATUS QUO.

Consideration of injury to others and the public interest favor preliminary injunctive

relief. In previous litigation involving SNAP, this Court recognized that the balance of the equities weighs heavily in favor of preventing recipients from going without food in the absence of an injunction. *Garnett*, 313 F. Supp. 3d at 158-60 (preliminary injunction granted in part and denied in part on other grounds). The *Garnett* court held that, while SNAP recipients going without food would cause "serious and irreparable harm," the burden on the government to comport with the Statute is minimal. *Id*. at 159. *See Make the Road NY v. McAleenan*, 405 F. Supp. 3d 1, 64 (D.D.C. 2019) (finding agency's inability to enforce new expedited removal rule did not constitute a significant injury). The balance of equities and the public interest weigh heavily in favor of injunctive relief.

## V.   THE COURT SHOULD ENJOIN IMPLEMENTATION OF THE RULE WITHOUT GEOGRAPHIC LIMITATION.

The Court should issue a nationwide preliminary injunction enjoining the Rule from taking effect or stay the Rule's effective date until a determination on the merits, pursuant to 5 U.S.C. § 705. Nationwide relief is the only practical relief to ensure that federal law and programs are executed in a consistent and equitable manner across the country. *See McAleenan*, 405 F. Supp. 3d at 66 (limited preliminary injunction is "patently inconsistent with the dictates of the law" in APA cases). Here, Plaintiffs have demonstrated a likelihood of success on the merits of their claims that Defendants violated the APA, and nationwide relief is the usual course because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). "By enjoining enforcement of the Rules [nationwide] we provide a basis to ensure that a regulation that the States have shown likely to be proven unlawful is not effective until its validity is firmly adjudicated." *Pennsylvania v. President United States*, 930 F.3d 543, 576 (3d Cir. 2019), *as*

*amended* (July 18, 2019).

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin the Rule, and/or

postpone the Rule's effective date until judicial review of its validity has concluded.


Dated: January 16, 2020                    Respectfully submitted,


KARL A. RACINE                            LETITIA JAMES
*Attorney General District of Columbia*    *Attorney General State of New York*

*/s/ Kathleen Konopka*                     */s/ Eric R. Haren*
Kathleen Konopka (D.C. Bar No. 495257)    Eric R. Haren (D.C. Bar No. 985189)
Deputy Attorney General                   Special Counsel

Jennifer Rimm (D.C. Bar No. 1019209)      Matthew Colangelo (D.C. Bar No. 997893)
Vikram Swaruup                            Chief Counsel for Federal Initiatives
Nicole Hill (D.C. Bar No. 888324938)
David Brunfeld (D.C. Bar No. 1672059)     Office of the New York State Attorney
Assistant Attorneys General               General
                                          28 Liberty Street
Office of the Attorney General for the District   New York, NY 10005
of Columbia                               Phone: 212-416-8804
441 4th St., N.W.                         Eric.Haren@ag.ny.gov
Suite 630S
Washington, DC 20001
Phone: 202-724-6610
Fax: 202-741-0444
Kathleen.Konopka@dc.gov

XAVIER BECERRA
*Attorney General State of California*

Cheryl L. Feiner
Michael L. Newman
Senior Assistant Attorneys General

*/s/ Dane Barca*
Dane Barca
Jacquelyn Young
Deputy Attorney General

Office of the Attorney General
455 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102
Phone: 415-510-3371
Dane.Barca@doj.ca.gov


WILLIAM TONG
*Attorney General State of Connecticut*

*/s/ Joshua Perry*
Joshua Perry
Special Counsel for Civil Rights

State of Connecticut Office of the Attorney
General
165 Capitol Avenue
Hartford, CT 06106
Phone: 860-808-5318
Fax: 860-808-5387
Joshua.Perry@ct.gov


BRIAN E. FROSH
*Attorney General State of Maryland*

Steven M. Sullivan
Solicitor General

*/s/ Jeffrey P. Dunlap*
Jeffrey P. Dunlap
Assistant Attorney General

200 St. Paul Place
Baltimore, MD 21202
Phone: 410-576-7906
Fax: 410-576-6955
jdunlap@oag.state.md.us


MAURA HEALEY
*Attorney General Commonwealth of
Massachusetts*

*/s/ Angela Brooks*
Angela Brooks
Widmaier Charles
Assistant Attorneys General

One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2590
Email: Angela.Brooks@mass.gov

DANA NESSEL
*Attorney General of Michigan*

Fadwa A. Hammoud
Solicitor General

*/s/ Toni L. Harris*
Toni L. Harris
First Assistant Attorney General

Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
Phone: 517-335-7603
HarrisT19@michigan.gov


KEITH ELLISON
*Attorney General State of Minnesota*

*/s/ Ali P. Afsharjavan*
Ali P. Afsharjavan
Assistant Attorney General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
ali.afsharjavan@ag.state.mn.us


AARON D. FORD
*Attorney General State of Nevada*

*/s/ Heidi Parry Stern*
Heidi Parry Stern
Solicitor General

Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov


GURBIR S. GREWAL
*Attorney General State of New Jersey*

*/s/ Glenn J. Moramarco*
Glenn J. Moramarco
Assistant Attorney General
Marie Soueid
Deputy Attorney General

New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
Phone: 609-376-3235
Glenn.Moramarco@law.njoag.gov

ELLEN F. ROSENBLUM
*Attorney General State of Oregon*

*/s/ Elleanor H. Chin*
Elleanor H. Chin
Senior Assistant Attorney General

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Phone: 503-947-4700
Fax: 503-947-4791
elleanor.chin@doj.state.or.us


PETER F. NERONHA
*Attorney General State of Rhode Island*

*/s/ Adam D. Roach*
Adam D. Roach
Special Assistant Attorney General

150 South Main Street
Providence, RI 02903
Phone: 401-274-4400 x 2490
aroach@riag.ri.gov


MARK R. HERRING
*Attorney General Commonwealth of Virginia*

*/s/ Jessica Merry Samuels*
Jessica Merry Samuels (D.C. Bar No.
1552258)
Assistant Solicitor General

Michelle S. Kallen (D.C. Bar No. 1030497)
Deputy Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: 804-786-7240
Fax: 804-371-0200
solicitorgeneral@oag.state.va.us


JOSH SHAPIRO
*Attorney General Commonwealth of
Pennsylvania*

*/s/ Jacob B. Boyer*
Jacob B. Boyer
Deputy Attorney General

Office of the Pennsylvania Attorney General
1600 Arch Street, Suite 300
Philadelphia PA, 19103
Phone: 267-768-3968
jboyer@attorneygeneral.gov


THOMAS J. DONOVAN
*Attorney General State of Vermont*

*/s/ Benjamin D. Battles*
Benjamin D. Battles
Solicitor General

109 State Street
Montpelier, VT 05609
Phone: 802-828-5500
benjamin.battles@vermont.gov


JAMES E. JOHNSON
*Corporation Counsel City of New York*

*/s/ Tonya Jenerette*
Tonya Jenerette
Sabita Krishnan
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
Phone: 212-356-2273
skrishna@law.nyc.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for a Preliminary

Injunction or 5 U.S.C. § 705 Stay Pending Judicial Review and the Memorandum and Exhibits in

support thereof were served by certified mail, postage prepaid, on January 16, 2020, upon:

United States Department of Agriculture
1400 Independence Avenue, S.W.
Room 214W, Whitten Building
Washington, DC 20250

George Ervin Perdue III
1400 Independence Avenue, S.W.
Room 214W, Whitten Building
Washington, DC 20250

U.S. Attorney for the District of Columbia
c/o Civil Process Clerk
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

Attorney General of the United States
c/o Assistant Attorney General for Administration
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ Kathleen Konopka*