**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and CITY OF NEW YORK,<br><br>          Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; GEORGE ERVIN PERDUE III, in his official capacity as Secretary of the U.S. Department of Agriculture, and UNITED STATES OF AMERICA,<br><br>          Defendants. | Case No. 1:20-cv-00119 |

**DECLARATION OF CATHERINE BUHRIG IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Catherine Buhrig, declare and state as follows:

    1.    I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

    2.    I am the Director of the Bureau of Policy in the Office of Income Maintenance (OIM) at the Pennsylvania Department of Human Services (PA DHS). I have held this position since December 2014. I have worked for PA DHS for 17 years and have held numerous positions within human services. I hold a B.S. in Psychology from the University of Pittsburgh, a Master's in Organization Development and Leadership with a concentration in public organizations and a Master's in Public Administration from Shippensburg University.

3. As policy director, I am responsible for monitoring, maintaining and analyzing program changes, legislative bill analysis at both the state and federal level, as well as the administration, implementation, oversight, compliance, and reporting of eligibility policy for Medicaid, state-funded Medical Assistance, the Supplemental Nutrition Assistance Program (SNAP), the Temporary Assistance for Needy Families (TANF) program, and the Low-Income Energy Assistance Program (LIHEAP) for the Commonwealth of Pennsylvania.

4. I am aware that the federal government recently issued a final rule "Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents," 84 Fed. Reg. 66,782 ("the Rule"). Under prior authority, able-bodied adults without dependents (ABAWDs) may receive only three months of benefits from SNAP within a three-year period unless they fulfill certain work requirements. However, states, including Pennsylvania, with areas of high unemployment may apply for waivers of this time limit. The Rule eliminates or restricts many of the criteria upon which states can rely when applying for a waiver of the ABAWD time limit. I have reviewed the Rule and am aware of its direct implications on the administration of SNAP, formerly known as the Food Stamp Program, within the state. I understand that this lawsuit challenges the Rule.

5. Poverty and inequity are long-standing, complex issues that Pennsylvania and the United States have been grappling with for years. The new Rule does not appear to adequately address or even consider these issues. A host of socio-economic factors contribute to both poverty and inequity, including a lack of affordable housing, availability of transportation, and inequitable educational opportunities. The Rule does not consider these circumstances, all of which influence the ability of those in poverty to find and maintain secure employment.

6. Approximately 1,758,884 Pennsylvania residents received SNAP benefits in Fiscal Year (FY) 2019. Of those, approximately 94,672 are ABAWDs that would be subject to time limits on SNAP eligibility unless they meet work requirements instituted under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Yet, under Pennsylvania's most recent partial waiver request, 60 counties, one city and one borough have been waived from the time limits through March 31, 2020 because of insufficient job opportunities. In fact, ABAWDs in several parts of Pennsylvania have never been subject to time limits on SNAP eligibility as the United States Department of Agriculture (USDA) has approved waivers each year due to the economic conditions and socio-economic factors in these areas. The counties of Bedford, Cambria, Cameron, Clearfield, Clinton, Fayette, Forest, Huntingdon, Philadelphia, Schuylkill and Somerset, as well as the cities of Erie, McKeesport and Williamsport, have always been waived.

7. Job opportunities in the counties listed above have been limited for most of the last 25 years. To show that ABAWDs have had insufficient employment options, and to qualify for a waiver of the ABAWD time limits, Pennsylvania has primarily relied on the Bureau of Labor Statistics' Local Area Unemployment Data showing that the counties included in the partial waivers have experienced a 24-month average unemployment rate that is 20 percent above the national average for the same period (the "20 percent standard").

8. Under the Rule, however, only two Pennsylvania counties will qualify for a waiver after April 1, 2020: Forest and Mercer counties. Based on data and experience from other

jurisdictions that lost their waivers, PA DHS estimates that if the Rule takes effect 80–90 percent of ABAWDs, or 75,737–85,204 individuals, will lose their SNAP benefits.

9. Philadelphia is a strong example of the problem with the Rule. As of October 2019, the unemployment rate in Philadelphia is 5.8 percent. As of October 2019, the national unemployment rate is 3.6 percent. This means that Philadelphia's unemployment rate is 62 percent higher than the national average. But because Philadelphia's unemployment rate is below the newly introduced floor rate of 6 percent, it does not qualify for a waiver under the Rule.

10. The Rule requires that states can request waivers from the ABAWD time limit requirements only if the new thresholds are met in a federally designated Labor Market Area (LMA). This was not prefigured in the proposed rule and is a change which limits state authority to determine how local and regional economies interact. LMAs are a construct of the federal government intended to capture information about the entire workforce in a broad area, often crossing state lines. Defining economic opportunity based on these large, federally-defined areas obscures the wide variation within a region. Network effects can allow certain municipal jurisdictions to overperform in labor force participation, median income and employment options while areas in proximity can languish without similar economic opportunities. Limiting waiver eligibility to LMAs, negates the states' ability to identify areas of contiguous economic cohesion., LMAs often join jurisdictions that do not share similar levels of economic opportunity. Joining areas without true economic cohesion is misleading and exaggerates the likelihood of positive labor force outcomes for low-wage workers.

11. In many cases, despite their grouping within an LMA, two jurisdictions are so far apart that even a person with a personal car could not reasonably be expected to commute from one area to another area with greater economic opportunity. Public transportation is rare outside Pennsylvania's major metropolitan areas. Even where public transportation is an option, industries that power some jurisdictions' strong economic performance may not be welcoming to job applicants depending upon their education, skill level, and socio-economic background.

12. Most working-age adults on SNAP who can work do so. Workers in the low-wage market, however, cannot always rely on having a steady full-time job that pays a living wage. This is true for several reasons that are common for our low-income residents. In Philadelphia, for example, 17 percent of the population does not have a high school diploma.[1] Without a post-secondary education, low-paying jobs with unreliable hours and little to no benefits are often all that individuals can reasonably expect. For those working low wage jobs, an unexpected health or transportation issue often means a worker loses their job leading to cycling in and out of employment. Additional barriers to employment that are common among SNAP recipients include skills disparity, housing instability and/or homelessness, transportation challenges, felony convictions, physical health issues, substance use disorders, and behavioral health conditions. Work requirements do not address any of these issues.

---

[1] Towncharts.com - *United States data powerfully illustrated and interactive* (Dec. 15, 2016).

13. Under the Rule, PA DHS would face new administrative challenges and would have to adjust operations significantly, each coming with additional costs that would detract from other elements of SNAP and potentially other programs. PA DHS would need to disseminate notices to impacted and potentially impacted households advising them of their ABAWD status, rights and responsibilities with respect to the new work requirements, reporting obligations, and advanced notice of any adverse actions taken on their SNAP cases as a result of the Rule's implementation. PA DHS anticipates this work would increase the annual state-incurred cost of administering SNAP (staff, notices, service center time) by $2,250,000, plus a one-time cost of $56,050. Instead of enhancing the SNAP program or the ability of PA DHS and its other programs to enhance self-sufficiency, these costs illustrate that the Rule actually detracts from SNAP's purpose and the Rule's stated goal. While administrative costs would increase, administrative reimbursement from the federal government would likely decrease because it is based on the number of program participants.

14. PA DHS also anticipates that it would have to significantly expand the capacity of its work-related programs. The State's current SNAP Education and Training (E&T) program, administered by PA DHS, offers the following components to voluntary participants, in addition to extensive case management services:

- Supervised job search and job search training. Sub-components/activities include employability assessments, training in techniques to increase employability, job placement services, and other trainings and activities to improve employability (this component does not meet ABAWD work requirements);

- Paid work experience facilitated through contractors with a focus on re-entering citizens;

- Community service activity, including volunteering at a 501(c)(3) non-profit organization;

- Educational and Vocational Training. Sub-components/activities include adult basic education (including high school equivalency), general equivalency diploma (GED), career and/or technical education programs, vocational training, English language acquisition, and integrated education and training/bridge programs; and

- Job retention services for up to 90 days after employment to assist individuals with maintaining employment after completing other SNAP E&T activities.

15. PA DHS does not have the capacity to expand its SNAP E&T program so that ABAWDs may avoid losing food assistance. PA DHS's SNAP E&T program served 2,776 unduplicated individuals in FY 2019 and is planning to serve 3,289 individuals in FY 2020. PA DHS focuses its SNAP E&T resources on volunteer participants, regardless of ABAWD status. The Rule will force PA DHS to focus more heavily on ABAWD populations, forsaking many of the whole-household benefits that education and training can provide single parents of small children. The SNAP E&T program is already taking full advantage of available SNAP E&T 100 percent federal funds and 50 percent federal matching funds up to the target levels prescribed by USDA. The ABAWDs residing in Pennsylvania who will lose benefits make up a large percentage of the total number of work registrants in the state. As the statutory formula for allocating SNAP E&T 100 percent federal funds is based predominantly on the number of work registrants in each

state, PA DHS would anticipate a reduction in SNAP E&T 100 percent federal funds in future years. Pennsylvania recently learned from Food and Nutrition Service that SNAP E&T 50 percent funding has reached the cap for fiscal year 2020 based on State Plan budget submissions from all of the states. Pennsylvania has consistently and steadily grown its SNAP E&T program since early 2016, including through leveraging third-party resources, and has become a regional leader in SNAP E&T. Despite these strong efforts, the SNAP E&T program is not funded at a level that would allow for thousands of additional participants.

16.     A broad range of other workforce development programs also exist in the State. While PA DHS partners with many of these other programs, there is a limited capacity among programs designed to specifically meet the needs of low-income residents with significant barriers to employment. It would take multiple years and significant additional financial resources to expand the SNAP E&T program and broader workforce systems to effectively serve 94,672 ABAWDs in a way that addresses ABAWDs' barriers to employment and provides them with the skills needed for labor market success. The training and education needed to successfully transition individuals to self-sufficiency can be particularly expensive and lengthy, further complicating our efforts. PA DHS projects that the cost to the SNAP E&T program alone of serving even a modest 1.4% of the Pennsylvanians affected by the Rule would result in increased costs of $21,000,800 over the next six years – a sum normally subject to 50 percent federal cost sharing. However, with SNAP E&T 50 percent funds being more limited than in past years and federal funding for other workforce programs remaining relatively flat, it is unclear whether Pennsylvania will have adequate funds to expand workforce services for ABAWDs even over a multi-year timeframe.

17.     PA DHS currently has approximately 160,000 exemptions to the ABAWD time limits. Due to the Rule's limits on how many exemptions can be carried over, PA DHS will be forced to use approximately 140,000 exemptions in a "use or lose" situation. The Rule's limits on carryovers of exemptions would have an immediate impact on Pennsylvania, as it limits the State's ability to provide exemptions for SNAP recipients in the future if all or part of the State, experiences a sudden economic downturn. It also means the State may not be able to exempt everyone that it has exempted in the past. The State generally exempts people because there are circumstances that make it difficult for people to find or keep employment. For example, Pennsylvania exempts people who are homeless, those expected to return to work within 60 days, women in their third trimester of pregnancy, and those whose travel time is more than two hours round trip from an employment and training site. As exemptions no longer can be carried over, the State may start requiring these people to participate in E&T programs although experience has shown that participating in these programs generally has not been productive for these populations.

18.     PA DHS is also concerned about the substantial resources needed to defend against potential legal challenges from ABAWDs who lose access to SNAP benefits. In particular, PA DHS is aware that other states, including New York, Louisiana, and Florida, have faced legal challenges by ABAWDs and advocates when they attempted to implement ABAWD rules. ABAWD implementation is particularly susceptible to legal challenges because the rules are complex and burdensome to operationalize. An increase in appeals for case closures will add additional administrative costs.

19. For unwaived counties in Pennsylvania, ABAWDs are certified for three months as opposed to the one-year certification for other households. Increased frequency of reapplication strains PA DHS's case processing staff and customers. SNAP recertification requires completion of a lengthy application form, an interview, and submission of verification documentation. Additional verifications at certification are requested to determine exemption status or participation in other qualifying activities. To comply with due process and federal SNAP regulations, PA DHS must send out an array of consumer notices on very specific timelines, dependent upon the degree to which the household complies with each step in the recertification process. Eligible individuals will have more opportunities to lose access to food assistance for administrative reasons, such as not timely returning SNAP recertification application paperwork. PA DHS will have to absorb the increased SNAP recertification demands.

20. By losing much-needed nutrition assistance that SNAP provides, many Pennsylvania residents may face negative health consequences. Numerous studies have shown the role that SNAP plays in improving and maintaining health.[2] Food insecurity is associated with greater use of health care services. Adults in food-insecure households are about 50 percent more likely to visit an emergency room and to be admitted to a hospital, and they stay hospitalized about 50 percent longer than adults in food-secure households – thus driving up healthcare costs.[3]

21. The large loss of SNAP benefits contemplated by the Rule will also have a negative impact on sectors of the local economy. As SNAP benefits provide purchasing power to help SNAP customers meet their food needs, the anticipated drop in SNAP benefits will result in into between $256.3-$288.3 million in lost economic activity. This drop would be concentrated in the areas that need the benefits the most. In fact, Pennsylvania estimates that Philadelphia alone has more than 34,000 ABAWDs, roughly equivalent to a third of all the ABAWDs in the state. The economic impact to Philadelphia, the largest poor city in the United States, would be more than $57 million per year. The loss of these stabilizing funds would affect not only the individuals, but it would also affect efforts to increase access to healthy food for residents. By cutting off SNAP benefits without the beneficiary having secured stable long-term employment, this proposal will decrease the purchasing power of the State's lowest income residents, making it harder to establish supermarkets and other types of food access in communities that already have large food deserts.

22. The loss of SNAP benefits as a result of the Rule will also affect several local initiatives and programs such as PA DHS's Healthy Corner Store Initiatives. It will also impact the Food Bucks program which enhances SNAP through SNAP benefit matching at local farmers markets throughout the state. Additionally, these individuals may no longer be eligible for SNAP nutrition education programming, which gives valuable nutrition education to SNAP recipients. Preventing ABAWDs from accessing SNAP will also make them ineligible for these programs.

---

[2] *The Role of Supplemental Nutrition Assistance Program in Improving Health and Well-Being* (Dec. 2017), https://frac.org/wp-content/uploads/hunger-health-role-snap-improving-health-well-being.pdf; *The Effect of the Supplemental Nutrition Assistance Program on Mortality* (Nov. 2019), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2019.00405.

[3] *Impact of Food Insecurity and SNAP Participation on HealthCare Utilization and Expenditures* (2017), http://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1105&context=ukcpr_papers.

Further, there is concern that the Rule will lead to a perceived decrease in the demand for healthy foods, which will deeply affect local farmers who participate in the numerous farmers' market locations across the state. This will further exacerbate the lack of healthy food options for many in Pennsylvania, specifically in the Philadelphia area and undermine years of efforts in this space.

I declare under penalty of perjury that the forgoing is true and correct and of my own personal knowledge.

Executed on January 14, 2020 in Harrisburg, Pennsylvania.

_____
Catherine Buhrig
Director, Bureau of Policy
Office of Income Maintenance
Pennsylvania Department of Human Services