## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br>    441 4th Street, N.W.<br>    Suite 630<br>    Washington, DC 20001<br><br>STATE OF NEW YORK<br>    28 Liberty Street, 19th Floor<br>    New York, NY 10005<br><br>STATE OF CALIFORNIA<br>    1515 Clay Street, 20th Floor<br>    P.O. Box 70550<br>    Oakland, CA 94612-0550<br><br>STATE OF COLORADO<br>    1300 Broadway, 10th Floor<br>    Denver, CO 80203<br><br>STATE OF CONNECTICUT<br>    165 Capitol Avenue<br>    Hartford, CT 06106<br><br>STATE OF HAWAII<br>    425 Queen Street<br>    Honolulu, HI 96813<br><br>STATE OF ILLINOIS<br>    100 West Randolph Street<br>    Chicago, Illinois 60601<br><br>STATE OF MAINE<br>    6 State House Station<br>    Augusta, Maine 04333-0006<br><br>STATE OF MARYLAND<br>    200 St. Paul Place<br>    Baltimore, MD 21202<br><br>COMMONWEALTH OF<br>MASSACHUSETTS<br>    One Ashburton Place<br>    Boston, MA 02108 | Case No.: 1:20-cv-119-BAH<br><br>**FIRST AMENDED COMPLAINT** |

ATTORNEY GENERAL DANA NESSEL
on behalf of the PEOPLE OF MICHIGAN
      P.O. Box 30758
      Lansing, MI 48909

STATE OF MINNESOTA,
      445 Minnesota Street, Suite 1400
      St. Paul, MN 55101

STATE OF NEVADA
      100 North Carson Street
      Carson City, NV 89701

STATE OF NEW JERSEY
      Richard J. Hughes Justice Complex
      25 Market Street
      Trenton, NJ 08625-0080

STATE OF NEW MEXICO
      408 Galisteo Street
      Santa Fe, NM 87501

STATE OF OREGON
      1162 Court St. NE
      Salem, OR 97301

COMMONWEALTH OF PENNSYLVANIA
      1600 Arch Street, Suite 300
      Philadelphia PA 19103

STATE OF RHODE ISLAND
      150 South Main Street
      Providence, RI 02903

COMMONWEALTH OF VIRGINIA
      202 North Ninth Street
      Richmond, VA 23219

STATE OF VERMONT
      109 State Street
      Montpelier, VT 05609

CITY OF NEW YORK
      100 Church Street, 20th Floor
      New York, NY 10007

|  |  |
|---|---|
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE<br>    1400 Independence Avenue, S.W.<br>    Room 214W, Whitten Building<br>    Washington, DC 20250 | |
| GEORGE ERVIN PERDUE III, *in his official Capacity as Secretary of the United States Department of Agriculture*<br>    1400 Independence Avenue, S.W.<br>    Room 214W, Whitten Building<br>    Washington, DC 20250 | |
| UNITED STATES OF AMERICA, | |
| Defendants. | |

## I.   INTRODUCTION

1.      The District of Columbia, the State of New York, the State of California, the State of Colorado, the State of Connecticut, the State of Hawaii, the State of Illinois, the State of Maine, the State of Maryland, the Commonwealth of Massachusetts, Attorney General Dana Nessel on behalf of the people of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of Oregon, the Commonwealth of Pennsylvania, the State of Rhode Island, the Commonwealth of Virginia, State of Vermont, and the City of New York (collectively, "Plaintiffs"), bring this action to challenge an unlawful regulation promulgated by the U.S. Department of Agriculture ("USDA") and George Ervin Perdue III, Secretary of USDA. *Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents*, 84 Fed. Reg. 66782 (Dec. 5, 2019) (to be codified at 7 C.F.R. Part 273) ("the Rule").

2.      The Rule contravenes the federal statute it purports to enforce and arbitrarily reverses a decades-old policy that gave States[1] discretion to seek waivers from the work requirements of the Supplemental Nutrition Assistance Program ("SNAP"), 7 U.S.C. §§ 2011–2036(c); 7 C.F.R. §§ 271–285, for areas within each State that lacked sufficient jobs for benefits recipients. The statute and the USDA's prior regulations recognize that States are in the best position to evaluate local economic circumstances and to determine where there are insufficient job opportunities such that work requirements would be ineffective. The new Rule eliminates State discretion and criteria regarding local economic conditions for waiving work requirements, resulting in the termination of essential food assistance for benefits recipients who live in areas with insufficient jobs.

3.      The waivers that the Rule curtails are critical to ensuring access to food for low-income people who live in areas with limited employment opportunities. If implemented, the Rule will have a drastic impact on Plaintiffs and their residents by depriving between 688,000 and 850,000 vulnerable Americans of much-needed nutritional assistance. The Rule plainly contravenes the statutory text, 7 U.S.C. § 2015(o), and Congress's intent, *see* H. Conf. Rpt. on H.R. 2 (115-1072). In addition, the Rule is procedurally improper and not justified by reasoned support or available evidence. For these reasons, it is unlawful and should be vacated.

4.      First authorized in 1977 as the "Food Stamp Program,"[2] SNAP has long been the country's primary weapon against hunger and an important safety net for low-income Americans.

---

[1] References to a "State" herein include all jurisdictions that administer SNAP under federal law, including the 50 States, the District of Columbia, Guam, and the Virgin Islands. 7 U.S.C. § 2012(r).

[2] The Food Stamp Program was authorized by the Food Stamp Act of 1977. The name of the program was changed to SNAP by the Food Conservation and Energy Act of 2008, Pub. L. No. 110-246, which also changed the name of the Food Stamp Act to the Food and Nutrition Act ("FNA"). All iterations of the Program are referred to as "SNAP" herein.

The program provides crucial food-purchasing assistance for millions of low- and no-income households. The federal government funds SNAP but jointly administers the program through the USDA's Food and Nutrition Service ("FNS") with States and local governments. States and localities pay for approximately 50 percent of the program's administrative costs. *See, e.g.*, 7 U.S.C. § 2025(a); 7 C.F.R. § 277.4.

5.      SNAP benefits are time limited for unemployed individuals aged 18 to 49 who are not disabled or raising minor children. These individuals are commonly referred to as "Able-Bodied Adults Without Dependents" or "ABAWDs." Under a 1996 law, ABAWDs may not receive SNAP benefits for more than three months in any 36-month period, unless they are employed or participate in a work or training program for at least 20 hours per week. 7 U.S.C. § 2015(o)(2); *see also* 7 C.F.R. § 273.24(b). This is called the "ABAWD time limit."

6.      Because the ABAWD time limit's purpose is to engage ABAWDs in the work force, it was never intended to apply to individuals who are unable to obtain employment. The statute thus expressly allows States to seek a waiver to suspend the time limit for "any group of individuals in the State" if the area where those individuals live "has an unemployment rate of over 10 percent" or "does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A). In addition, States are allotted a limited number of discretionary exemptions that allow them to extend SNAP benefits to individual ABAWDs who are otherwise ineligible due to the time limit. The availability of these waivers and exemptions reflects Congress's understanding that the ABAWD time limit is not appropriate in all circumstances and that States need flexibility to address variations in local job availability.

7.      Through the first two decades of the ABAWD time limit, USDA recognized that States were in the best position to engage in the analysis of where the time limit would be futile

due to an absence of meaningful work opportunities. USDA's regulations thus permitted States to define the geographic scope of a time-limit waiver request, provide any data that would be relevant to determining whether there were insufficient jobs in that area for ABAWDs, and carry forward unused exemptions from year to year to account for changes in local economies. In the face of these regulations, Congress reauthorized the statute four times without limiting States' discretion. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (2002); Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008); Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649 (2014); Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018).

8.      The Rule at issue—published on December 5, 2019—upends USDA's longstanding policy by significantly limiting States' discretion to seek waivers and use exemptions. Specifically, the Rule limits States' ability to demonstrate entitlement to a waiver by (1) eliminating States' ability to define the geographic scope of a waiver request; (2) virtually eliminating States' ability to use data other than unemployment rates to demonstrate a lack of sufficient jobs for ABAWDs; and (3) creating a new criterion that Congress recently rejected for receiving a waiver, namely, an unemployment threshold that is unrelated to local job opportunities for ABAWDs. The Rule also requires States to rely on unemployment numbers for the entire population rather than on the availability of employment for ABAWDs or on other metrics that more fully capture local economic conditions. Finally, the Rule unlawfully limits States' authority to carry forward unused exemptions—a longstanding protection for States that Congress expressly reaffirmed in 2018.

9.      The Rule unequivocally runs afoul of Congress's intent to ensure food security for low-income individuals and to permit States, who have a better understanding of their labor

markets and economic conditions, to apply for waivers and use exemptions where local or individual circumstances warrant relief from the ABAWD time limit. USDA justifies these dramatic changes by pointing to current low national unemployment rates and an unsupported allegation that States have manipulated the waiver process.

10.     USDA's professed motivation for the Rule is to combat States' supposed abuse of the waiver process, which it contends inflates the total number of ABAWDs who are not subject to the time limit. But this motivation is itself contrary to law because Congress has never expressed an intent to limit waivers to a specific number of ABAWDs. Rather, the statute contemplates waiver for those who reside in areas with insufficient jobs for ABAWDs, which will vary with economic circumstances, and USDA has provided no basis for suggesting that ABAWDs who currently reside in waived areas have sufficient jobs. Moreover, reducing the number of ABAWDs in waived areas will not satisfy the stated goals of the Rule because individuals subject to the time limit are not likely to find employment or move toward self-sufficiency. To the contrary, without this vital assistance, ABAWDs in these areas will have even less ability to gain employment, increase their incomes, and ultimately reduce their dependence on SNAP benefits.

11.     The Rule harms not only ABAWDs who receive SNAP benefits but also States that administer the program. Indeed, the Rule ignores the substantial fiscal and administrative burdens newly imposed on States, including harm to the States' economies, increased costs associated with providing care for residents suffering from the negative health effects of malnutrition and housing instability, and increased costs associated with the administration of SNAP under the new Rule.

12.     Not only is the Rule substantively flawed, but USDA also failed to engage in a proper rulemaking process because stakeholders did not have the opportunity to comment on several important aspects of the Rule. For example, USDA expressly stated in its proposed rule

that it would maintain waivers for States that qualified for extended unemployment benefits. Even though no commenters opposed maintaining this waiver basis, USDA eliminated this basis for waivers in the Rule. In addition, the Rule prevents States from seeking waivers for towns, cities, and counties though USDA did not propose this restriction. Finally, USDA provided no meaningful basis for several of the assertions in its proposed rule by, for example, stating without evidence that States were gaming the waiver process. Commenters thus could not meaningfully address or rebut USDA's purported bases for the Rule.

13.     Plaintiffs respectfully request that this Court vacate the Rule and enjoin its implementation because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and because the Rule was promulgated without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(D).

## II.   JURISDICTION AND VENUE

14.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

15.     There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706 and the Court's equitable powers.

16.     Venue is proper in this District because Plaintiff the District of Columbia and its Attorney General have offices in the District of Columbia, and the other Plaintiffs consent to adjudication of these issues in this District. Moreover, this action seeks relief against agencies of the United States and officials acting in their official capacities whose principal places of business

are in this District. Finally, a substantial part of the acts or omissions giving rise to this action occurred in this District.

## III.  PARTIES

17.     Plaintiff the District of Columbia is a sovereign municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

18.     Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action under N.Y. Executive Law § 63.

19.     Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action. As California's Chief Law Officer, the Attorney General has the authority to file civil actions to protect public rights and interests and promote the health and welfare of Californians. Cal. Const. art V, § 13. This challenge is brought under the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

20.     Plaintiff the State of Colorado, by and through Attorney General Philip J. Weiser, brings this action. The Attorney General is authorized to pursue this action on behalf of the State under Colo. Rev. Stat. § 24-31-101.

21.     Plaintiff the State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America. The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq*.

22.     Plaintiff the State of Hawaii, represented by and through its Attorney General, Clare E. Connors, is a sovereign state of the United States of America.  The Attorney General is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts, criminal or civil, in which the State may be a party or be interested. Haw. Rev. Stat. § 28-1.  The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party.  *Id.* § 26-7.  This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority.  *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7. Plaintiff the State of Illinois, represented by and through Attorney General Kwame Raoul, is a sovereign state of the United States of America. The Attorney General brings this action as the state's chief legal officer. *See* 15 ILCS 205/4.

23.     Plaintiff, the State of Maine, represented by and through its Attorney General Aaron M. Frey, is a sovereign state of the United State of America.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business. Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

24.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

25.     Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. The Commonwealth brings this action by and through Attorney General Maura Healey, who is the Commonwealth's chief law officer and who has both statutory and common-law authority and responsibility to represent the public interest for the people of Massachusetts in litigation, as well as to represent the Commonwealth, state agencies, and officials in litigation. *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266-67 (Mass. 1977); Mass. Gen. Laws ch. 12, § 3.

26.     Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General, Dana Nessel, is Michigan's chief law enforcement officer and is authorized to pursue this action by Mich. Comp. Laws § 14.28.

27.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

28.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

29.     Plaintiff the State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, New Jersey's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

30.     Plaintiff the State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Hector Balderas is the chief legal officer of the State of New Mexico.  He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). This challenge is brought under Attorney General Balderas's statutory and common law authority.

31.     Plaintiff the State of Oregon, represented by and through its Attorney General, Ellen F. Rosenblum, is a sovereign state of the United States of America. The Attorney General is Oregon's chief law enforcement officer and is authorized to pursue this action under Or. Rev. Stat. § 180.060.

32.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney General Shapiro brings this action on behalf of the Commonwealth under his statutory authority, 71 P.S. § 732-204.

33.     Plaintiff the State of Rhode Island has the authority to initiate this action by and through its Attorney General, Peter F. Neronha. The Attorney General is a constitutional officer of the State, is vested with all of its common-law powers, and has broad discretion to bring actions for the benefit of the State. *See* R.I. Const. art. 9, sec. 12; Rhode Island Gen. Laws § 42-9-6; *see also State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 470-474 (R.I. 2008).

34.     Plaintiff the Commonwealth of Virginia brings this action by, through, and at the relation of its Attorney General, Mark R. Herring. Virginia law provides that the Attorney General, as chief executive officer of the Department of Law, performs all legal services in civil matters for the Commonwealth. Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507.

35.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America. The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

36.     Plaintiff the City of New York is a municipal corporation organized under the laws of the State of New York. New York City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter. New York City is the largest city in the United States by population.

37.     Defendant USDA is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

38.     Defendant George Ervin Perdue III is the Secretary of USDA. As Secretary, Defendant Perdue is responsible for all actions taken by the Department. Secretary Perdue is sued in his official capacity.

39.     Defendant the United States of America is sued under 5 U.S.C. § 702.

40.     Plaintiffs will suffer concrete and substantial injury by the actions of the Defendants because the Rule (i) impinges on Plaintiffs' sovereign and quasi-sovereign[3] interest in the health and well-being of their residents by eliminating their low-income residents' access to food and

---

[3] Though the District of Columbia is not a state, it possesses a similar quasi-sovereign interest in its residents' health and well-being. *See* D.C. Code. § 1-301.81*; Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 n.15 (1982).

nutrition; (ii) increases Plaintiffs' regulatory burden and their costs of administering SNAP; (iii) makes more expensive the provision of health care and housing that Plaintiffs provide to their residents; and (iv) generally injures Plaintiffs' economies.

## IV.  STATUTORY AND REGULATORY BACKGROUND

### A.    Congress Intended For SNAP To Effectively Address Hunger.

41.    Understanding that "the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households," Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet through normal channels of trade." 7 U.S.C. § 2011. To achieve this goal, SNAP provides non-cash nutritional support for millions of low-income individuals and families in the form of benefits redeemable for SNAP-eligible foods at SNAP-eligible retailers.

42.    Congress made clear that addressing the hunger problem in this country would safeguard "the health and well-being of the Nation's population by raising levels of nutrition among low-income households" and create financial stability for low-income individuals. *See* 7 U.S.C. § 2011. In so doing, SNAP would also strengthen the country's agricultural economy. *Id.*

43.    SNAP operates as a federal-state partnership. The federal government pays the full cost of SNAP benefits and contributes half the cost of administering the program; States and local governments contribute the remaining half. 7 U.S.C. §§ 2013(a), 2019, 2025(a); 7 C.F.R. §§ 277.1(b), 277.4. States are responsible for designing their own processes—based on federal guidelines—for determining how people can apply for benefits, and States must track whether participants meet the requirements for the program on a monthly basis and adjust their benefits based on any relevant changed circumstances.

**B.**      **Congress Intended For States To Have Flexibility In Applying The ABAWD Time Limit.**

44.      In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). PRWORA introduced new restrictions on who was eligible for SNAP benefits, including a time limit on how long an ABAWD can receive SNAP benefits in a three-year period. 7 U.S.C. § 2015(o)(2); *see also* 7 C.F.R. § 273.24(b). When the ABAWD time limit was being debated in Congress, then-congressman and co-author of the provision John Kasich said, "It is *only* if you are able-bodied, if you are childless, and if you live in an area where you are getting food stamps and *there are jobs available*, then it applies."[4]

45.      Recognizing that the ABAWD time limit would not effectively encourage ABAWDs to enter the workforce where few or no jobs were available for them, Congress gave States authority to seek waivers from the time limit for "any group of individuals" if the "area in which the individuals reside (i) has an unemployment rate above 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4). As FNS has acknowledged, the dual basis for waivers—unemployment rate or insufficient jobs for ABAWDs in the area they reside—reflects Congress's recognition that "the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities."[5]

46.      In addition to these waivers, Congress provided even more flexibility to States in the Balanced Budget Act of 1997 ("BBA"). Pub. L. No. 105-33. Specifically, BBA allowed States

---

[4] Cong. Record, 104th Congress, Welfare and Medicaid Reform Act of 1996 (House of Representatives – July 18, 1996), page H7905, https://www.congress.gov/crec/1996/07/18/CREC-1996-07-18.pdf (emphasis added).

[5] USDA, "Guidance for states Seeking Waivers for Food Stamp Limits," December 3, 1996.

to extend SNAP benefits each month for up to 15 percent of the ABAWD population who would otherwise be ineligible for SNAP benefits due to the time limit. 7 U.S.C. § 2015(o)(6). If a State did not use all of its allocated exemptions, it could carry over the remaining exemptions to the following year. 7 U.S.C. § 2015(o)(6)(G).

47.    The waiver and exemption provisions together reflect Congress's understanding that States possess a more nuanced knowledge of their labor markets and economic conditions. These provisions also reflect Congress's intent that States should have significant discretion when determining if application of the ABAWD time limit would lead ABAWDs to seek employment or whether such application would be futile because of particular economic or individual circumstances.

C.    **USDA Guidance And Regulations Have Always Afforded States Flexibility In Demonstrating Eligibility For A Waiver.**

48.    Shortly after PRWORA was enacted, in 1996, USDA provided guidance to the States which detailed how a State can qualify for a waiver due to a lack of "a sufficient number of jobs for the individuals." USDA codified the guidance in regulations in 2001.[6]

49.    Recognizing that whether an area had sufficient jobs for ABAWDs was not purely a mathematical inquiry, USDA's guidance and regulation provided that States could seek waivers for areas based on one or more of the following: (i) the area has been designated a Labor Surplus Area ("LSA") for the current fiscal year by the Department of Labor ("DOL"), a criterion that

---

[6] *See, e.g.*, *Food Stamp Program: Personal Responsibility Provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, Notice of Proposed Rulemaking, 64 Fed. Reg. 70920, 70944-46 (Dec. 17, 1999) (noting that the proposed rule did not substantially change the policies expressed in the Department's December 3, 1996 guidance regarding waivers); *Food Stamp Program: Personal Responsibility Provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, Final Rule, 66 Fed. Reg. 4438, 4462 (Jan. 17, 2001) (incorporating the "most pertinent aspects of the [December 3, 1996] guidance into the regulation.").

several federal agencies use to prioritize government contracts or assistance; (ii) the DOL's Department of Unemployment Insurance Service has qualified the State for extended unemployment benefits; (iii) the area has a low and declining employment-to-population ratio; (iv) the area has declining occupations or industries; (v) the area is described in an academic study or other publication as an area where there is a lack of jobs; or (vi) the area has a 24-month average unemployment rate that is 20 percent above the national average for the same period ("20 percent standard").

50.     USDA's guidance and regulation also expressly permitted States flexibility with regard to the types of data they could use to support a waiver request. *See* 7 C.F.R. § 273.24(f)(2)-(3). In addition to unemployment data from the DOL's Bureau of Labor Statistics ("BLS"), a State could also submit "whatever data it deems appropriate to support its request." 7 CFR § 273.24(f)(2).

51.     Recognizing that the lack of "sufficient jobs" can be defined only by reference to local labor market conditions for the ABAWDs in that area, USDA has always allowed the States to define the areas to be covered by waivers, as long as States could provide data and analyses regarding a defined area. 7 C.F.R. § 273.24(f)(6).

52.     These regulations have remained the same, and States have relied on these criteria since USDA promulgated them in 2001. These regulations reflected USDA's understanding—rooted in the statutory language and Congressional intent—that the inquiry as to whether an area has sufficient jobs for ABAWDs is sensitive to local conditions that States are in the best position to evaluate in the first instance. The regulations also reflected evidence-based determinations that the sufficient-jobs inquiry was not readily defined by unemployment numbers alone or susceptible to only limited types of data. In sum, USDA recognized that whether an area has sufficient jobs

for ABAWDs requires consideration of a totality of the circumstances and evidence, which States are in the best position to understand and present to USDA in connection with a waiver request.

53.     Under these rules, six States currently have statewide waivers, and 30 States have partial waivers for specific areas. Aside from Delaware, all States have had a waiver at some point since PRWORA was enacted.

54.     In the face of these regulations, Congress reauthorized SNAP without substantively altering the waiver or exemption provisions in 2002, 2008, and 2014.

**D.     Congress Rejected Stricter Requirements For Waivers And Exemptions In The 2018 Farm Bill.**

55.     In 2018, Congress examined and expressly declined to impose additional restrictions on States' authority regarding waivers and exemptions.

56.     Congress considered these changes in connection with the Agricultural Act of 2018 ("2018 Farm Bill"). The House version of the 2018 Farm Bill included many changes similar to those that USDA seeks to impose in the Rule. Specifically, the House proposed to eliminate the statutory language permitting a waiver based on a lack of "sufficient number of jobs" and replace it with a requirement that States show one of the following: (1) that the requested area meets the 20 percent standard *and* has at least 7 percent unemployment; (2) that the area is designated by the DOL as a LSA; (3) that the State was in an extended benefit period within the meaning of section 203 of the Federal-State Extended Unemployment Compensation Act of 1970; or (4) that the State was being provided with temporary or emergency unemployment compensation under any federal law. Agriculture and Nutrition Act of 2018, H.R. 2, 115th Cong. § 4015 (as passed by House, June 21, 2018), *available at* https://www.congress.gov/bill/115th-congress/house-bill/2/text/eh.  In addition, the House proposed to limit the ability of States to combine individual jurisdictions in a waiver request unless the jurisdictions were designated as a Labor Market Area ("LMA") by DOL.

*Id.* Finally, the House proposed to terminate States' ability to carry over unused ABAWD exemptions from year to year.

57.     The Senate version of the 2018 Farm Bill did not include any of these changes to the ABAWD time-limit waiver or exemption requirements. Instead, the Senate Bill left intact the "sufficient number of jobs" language that permitted State flexibility.

58.     Accepting the Senate's position on these points, the Conference Committee struck the House's modifications to the criteria for waivers and exemption carryovers. The final version of the legislation maintained the preexisting waiver and exemption carryover laws that conferred State discretion. The only relevant change to SNAP made in the final version was to reduce the number of exemptions from 15 percent of a State's ABAWD population to 12 percent. The legislative process thus reflects that Congress carefully considered but rejected other, more stringent requirements on waivers and exemptions.

59.     President Trump signed the 2018 Farm Bill on December 20, 2018. *See* Pub. L. No. 115-334.

**E.      USDA Adopts Strict Requirements Limiting States' Discretion As To Waivers And Exemptions That Congress Rejected.**

60.     On the same day that President Trump signed the 2018 Farm Bill, USDA announced that it would reconsider the decades-old regulations regarding time-limit waivers and exemptions that Congress had just chosen to leave unmodified.

61.     One month later, the Secretary of Agriculture announced a proposed rule "intended to move more able-bodied recipients of [SNAP] benefits to self-sufficiency through the dignity of work." *Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents*, Notice of Proposed Rulemaking, 84 Fed. Reg. 980 (Feb. 1, 2019) ("Proposed Rule"). The Proposed Rule sought to do exactly what Congress had rejected: (1) restrict State

discretion to show what would constitute a lack of "sufficient number of jobs" for ABAWD recipients in a particular area; (2) impose new, higher requirements to make that showing; and (3) limit the carryover of ABAWD discretionary exemptions.

62.     The Proposed Rule purportedly resulted from a review undertaken by USDA of its regulations and policies associated with ABAWDs in response to an Executive Order ("EO") on "Reducing Poverty in America by Promoting Opportunity and Economic Mobility." Exec. Order No. 13,828, 83 Fed. Reg. 15941 (Apr. 13, 2018). The EO outlines guiding principles for public assistance programs that primarily focus on enforcing work requirements. The EO directed USDA and other federal agencies to review their public assistance programs and determine whether (i) enforcing work requirements and (ii) existing waivers are consistent with federal laws and the principles outlined in the EO. *Id.* § 3.

63.     The EO emphasized the need "to empower State, local, and tribal governments and private-sector entities to effectively administer and manage public assistance programs." *Id.* § 2(d). The EO also noted that "Federal policies should allow local entities to develop and implement programs and strategies that are best for their respective communities." *Id.*

64.     The Proposed Rule was inconsistent with both Congress's recent rejection of restrictions on waivers and carryover exemptions and the EO's stated goals to "empower" States with discretion to develop and implement "strategies that are best for their respective communities."

65.     USDA expressly stated in the Proposed Rule that notwithstanding other changes, it would continue to approve waivers for States that received extended unemployment benefits, as determined by DOL's Unemployment Insurance Service.

66.     The Proposed Rule also maintained States' discretion to seek waivers for substate areas (like cities or counties) but proposed prohibiting States from grouping together substate areas unless the group was an LMA.

67.     USDA received more than 100,000 comments on the Proposed Rule, the vast majority of which opposed its adoption.

68.     Despite strong opposition from a broad range of stakeholders, including more than 20 States and territories and organizations like Catholic Charities and the Center for Budget and Policy Priorities, on December 5, 2019, USDA published the Final Rule. Like the Proposed Rule, the Final Rule undermines the fact-sensitive inquiry the statute has always contemplated by:

- Eliminating States' discretion to determine the geographic scope of the areas for which they request waivers by restricting waivers to areas designated as LMAs by DOL and effectively eliminating statewide waivers, 84 Fed. Reg. at 66793-98;

- Curtailing the types of data on which States can rely for their waiver requests by requiring States to rely exclusively on unemployment data absent extraordinary circumstances, 84 Fed. Reg. at 66790-91;

- Setting an unemployment rate floor for States that seek waivers even where an area's unemployment rate is 20 percent or more above the national average, 84 Fed. Reg. at 66784-89; and

- Eliminating the ability of a State to qualify for a waiver if it is designated as a Labor Surplus Area by DOL, 84 Fed. Reg. at 66799-80.

69.     In addition, the Final Rule eliminated States' ability to carry exemptions over from year to year. 84 Fed. Reg. at 66802-07.

70.     Contrary to the Proposed Rule, the Final Rule eliminated use of extended unemployment benefits to show entitlement to a waiver. The Final Rule also prohibited States from seeking waivers for substate areas that are not LMAs.

## V.   THE FINAL RULE IS CONTRARY TO LAW.

A.      **The Rule's Waiver Provisions Conflict With The Statutory Discretion Congress Conferred On States.**

71.     Congress designed the waiver provision, which has not materially changed in two decades, to ensure that work requirements were not applied to individuals who reside in areas where meaningful employment opportunities were unavailable. To this end, a State can seek a waiver from the ABAWD time limits for "any group of individuals" where the State can show that "the area in which the individuals reside (i) has an unemployment rate of over 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4).

72.     The Rule contravenes this statutory text in several ways. First, it restricts States' discretion to determine what "group of individuals" would be subject to a waiver request. Second, it sharply curtails the data that a State can use to establish that an area does not provide sufficient jobs for ABAWDs, virtually eliminating a State's option to employ relevant information other than the general unemployment rate. Third, it turns a blind eye to specific facts about the labor market for ABAWDs, as opposed to the labor market in general.

73.     First, the statutory text expressly provides that the waiver request and approval can be for "*any* group of individuals" provided that the area where the individuals reside does not provide sufficient jobs for them. The language does not limit the types of areas for which States can seek waivers. But the Rule places specific and harsh limits on the geographic scope of waivers.

74.     Congress knows how to strictly define an area by statute. For example, in the 2018 Farm Bill, which reauthorized SNAP, Congress also funded emergency medical services training in rural areas and defined "rural area" to mean "(A) a nonmetropolitan statistical area; (B) an area designated as a rural area by any law or regulation of a State; or (C) a rural census tract of a

metropolitan statistical area (as determined under the most recent rural urban commuting area code as set forth by the Office of Management and Budget)." 42 U.S.C. § 254c-15(e)(2). That Congress chose not to limit or define "any group of individuals" here thus indicates that it did not intend to constrain State authority to select the groups of individuals and areas for which it could seek a waiver.

75.     Recognizing this statutory scheme, USDA's prior rule provided that "States may define areas to be covered by waivers." 7 CFR § 273.24(f)(6).

76.     In contrast, the Rule reverses course and dramatically restricts States' discretion to define areas for purposes of a waiver. Under the Rule, States can seek waivers only for areas that have been designated by the DOL as an LMA.

77.     The Rule's geographic restriction contravenes the statutory text that specifies that a waiver is warranted for "any group of individuals" for whom insufficient jobs are available by being both over- and under-inclusive. Specifically, States are essentially prohibited from seeking state-wide waivers where there is a dearth of job opportunities for ABAWDs throughout the State. Conversely, States can also no longer narrowly tailor a waiver request to a smaller area based on the area's unique conditions that lead to a lack of jobs for ABAWDs.

78.     Second, the statute contemplates that determining whether an area lacks a "sufficient number of jobs" for ABAWDs requires looking to multiple sources that are relevant to that inquiry rather than the unemployment rate alone. Indeed, the structure of the statute shows this. Congress permitted waivers where the relevant area "(i) has an unemployment rate of over 10 percent; *or* (ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4) (emphasis added). Congress thus expressly acknowledged that unemployment rates alone do not reliably suggest that there are sufficient jobs for ABAWDs.

23

Congress's exclusive reliance on unemployment for the 10 percent provision while maintaining a separate category for a lack of sufficient jobs suggests that the latter inquiry requires looking more broadly than an unemployment number.

79.     For decades, in accordance with the statutory text, USDA recognized that the sufficient-jobs determination was not a mere mathematical inquiry. USDA's regulations thus allowed each State to make the sufficient jobs showing using "whatever data it deems appropriate to support its request." 7 CFR § 273.24(f)(2). States could make the sufficient-jobs showing by pointing to a variety of non-unemployment factors like whether the area "has a low and declining employment-to-population ratio; has a lack of jobs in declining occupations or industries; [or] is described in an academic study or other publications as an area where there are lack of jobs." 7 CFR § 273.24(f)(2)(ii). The Rule reverses course and contravenes the statutory structure by requiring near exclusive reliance on unemployment numbers to show a lack of sufficient jobs.

80.     Third, the statute makes clear that waivers are warranted for ABAWDs who live in an area that "does not have a sufficient number of jobs to provide employment *for the individuals*." 7 U.S.C. § 2015(o)(4)(ii) (emphasis added). That is, the statute requires determining whether the relevant area has sufficient jobs for the ABAWDs who reside there—not sufficient jobs for the general public. The statute makes this distinction because ABAWDs face substantially higher barriers to employment than the public at large, such as low educational attainment, limited skills, minimal work history, and physical and mental challenges.

81.     Contravening the statutory focus on job prospects for ABAWDs, the Rule in ordinary circumstances requires States to establish entitlement to a waiver based exclusively on unemployment data for the population at large, including by imposing an unemployment rate floor

for waivers under the sufficient-jobs test. By disallowing the use of ABAWD-specific employment circumstances, the Rule contravenes the statute.

82.     Perhaps the clearest indication that the Rule is contrary to the statute and Congressional intent is that the Rule seeks to impose through regulation limitations that Congress expressly rejected in its recent reauthorization of SNAP in the 2018 Farm Bill. Indeed, the Conference Committee Report stated that its intention in rejecting restrictions that the House proposed was "to maintain the practice that bestows authority on the State agency responsible for administering SNAP to determine when and how waiver requests for ABAWDs are submitted." H. Conf. Rpt. on H.R. 2 (115-1072) at 616. The Rule's restriction on States' discretion thus directly contravenes this articulated Congressional intent.

83.     Yet another restriction that plainly contravenes the legislative intent is a limitation on waivers for areas that had an unemployment rate that was 20 percent more than the national rate. This limitation, as considered by Congress and adopted by the House, would have required such an area to also have an unemployment rate above 7 percent. But the Conference Committee removed this. That is, in the face of the long-established 20 percent standard, Congress rejected an unemployment floor in favor of maintaining the existing "sufficient jobs" language. Despite this clear Congressional choice, the Rule adds a nearly identical 6 percent floor for waiver requests based on the 20 percent standard and thus contravenes Congressional intent to continue this basis for waiver without further restriction.

84.     USDA asserts that the 6 percent floor and many of the restrictions on States' discretion are necessary to reduce the number of ABAWDs who reside in waived areas. This justification is itself contrary to law because Congress has never expressed a desire to establish a specific limitation on the number of ABAWDs who reside in waived areas. Rather, the statutory

text clearly contemplates that the number of waived areas and the number of individuals residing in waived areas will vary with changing economic circumstances.

85.     Congressional intent not to place a numerical restriction on the number of waivers is evident from other statutes where Congress clearly set forth such limitations. For example, in the 2017 Tax Cuts and Jobs Act, Congress created Opportunity Zones, which are areas entitled to tax incentives for investment. In doing so, unlike here, Congress expressly restricted the number of Opportunity Zones in each State to a certain percentage of low-income communities in the State. The SNAP statute does not adopt any such numerical limits on the number of people or areas that can be waived.

### B.     The Rule's Limitation On Carryover Exemptions Conflicts With The Statute And Clear Legislative Intent.

86.     In 1997, Congress provided States with the ability to provide exemptions every month to up to 15 percent of the estimated ABAWDs who would otherwise be ineligible for SNAP benefits due to the time limit. States also could carry over any unused exemptions from year to year. 7 U.S.C. § 2015(o)(6)(G). This provision has not been changed since its inception, and USDA regulations have always stated that "[i]f the State agency does not use all of its exemptions by the end of the fiscal year, FNS will increase the estimated number of exemptions allocated to the State agency for the subsequent fiscal year by the remaining balance." 7 CFR § 273.24.

87.     These exemptions allow States to address sudden or short-term changes in local labor market conditions that may hinder ABAWDs' ability to obtain employment and extend some measure of continued food security to these individuals.

88.     Despite the clear statutory text permitting carryover exemptions without temporal restrictions, the Rule terminates States' longstanding ability to carryover unused exemptions beyond one year.

89.     As with waivers, Congress deliberately chose not to restrict carryover exemptions in the 2018 Farm Bill. In fact, the Conference Report makes clear that States will "continue to accrue exemptions and *retain any carryover exemptions from previous years, consistent with current law*." H. Conf. Rpt. on H.R. 2 (115-1072) at 616 (emphasis added).

90.     Congress made a different choice to address exemptions in the 2018 Farm Bill. Instead of restricting carryover, Congress reduced the total number of available exemptions from 15 percent to 12 percent.

91.     The Rule's limitation on carryover exemptions is an impermissible end-around of the legislative process and is contrary to statutory text that has remained unchanged for two decades.

## VI.   THE RULEMAKING PROCESS WAS FLAWED.

### A.      <u>The Rule's Removal Of Extended Unemployment Benefits As A Basis For Waiver Is Procedurally Improper.</u>

92.     Under USDA's prior regulation, one basis for a waiver from the ABAWD time limit was DOL's Office of Unemployment Insurance Service's qualification of a State for extended unemployment benefits.

93.     The Proposed Rule expressly stated that USDA would maintain this as a basis for waiver, making clear that "[u]nder the proposed rule, the Department would continue to approve a State's waiver request that is based upon the requesting State's qualification for extended unemployment benefits, as determined by DOL's Unemployment Insurance Service." 84 Fed. Reg. at 985.

94.     Commenters thus largely did not address the unemployment-insurance basis for a waiver. Indeed, a comment submitted by several Plaintiffs noted only in a footnote that waivers

based on extended unemployment benefits would be unaffected. Plaintiffs did not address the merits of this waiver basis because the Proposed Rule did not contemplate any changes.

95.     Despite the absence of any proposal to do so, the Rule eliminates extended unemployment benefits as a basis for a waiver.

96.     Because this change was not proposed and was specifically disavowed in the Proposed Rule, commenters have not had an adequate opportunity to provide objections or feedback about its impact.

97.     The Rule does not cite any comments suggesting that USDA eliminate unemployment benefits as a basis for a waiver. Rather, the only comments that addressed this criterion, as the Rule itself makes clear, supported maintaining the standard or expanding the standard to provide waivers in even more circumstances. 84 Fed. Reg. at 66788-89.

**B.      The Rule's Restriction Of Waivers To Labor Market Areas Is Procedurally Improper.**

98.     Under USDA's longstanding regulations, States had the flexibility to select geographical areas that would be the subject of a waiver application provided that the areas were contiguous and part of the same economic region.

99.     In the Proposed Rule, USDA suggested only that it would limit this discretion by limiting the grouping of substate areas to LMAs as defined by DOL. USDA did not propose restricting States to LMAs as the sole area for which a waiver application could be submitted. Under the Proposed Rule, States could thus request waivers for individual substate areas like counties and cities but could not group together these areas, except in LMAs.

100.    Many commenters did not address the usage of LMAs as the sole geographical basis for a waiver. Plaintiffs did not address the merits of this exclusive usage of LMAs because the Proposed Rule did not contemplate that.

101.    Despite the absence of any proposal to do so, the Rule restricts the geographical scope of waivers *solely* to LMAs. That is, States can no longer seek waivers for cities or counties. The only area for which a waiver can be sought is an LMA.

102.    Because this change was not proposed, commenters did not have an adequate opportunity to provide objections or feedback about its impact.

      **C.**     **The Proposed Rule Failed To Explain Several Terms And Provide Supporting Data, Undermining The Opportunity For Meaningful Comment.**

103.    Throughout the Proposed Rule, USDA stated that various changes to States' discretion to seek waivers and exemptions were necessary in light of its "operational experience." For example, USDA stated that "[t]he Department's operational experience has shown that some States have used [their] flexibility to waive areas in such a way that was likely not foreseen by the Department." 84 Fed. Reg. at 981.

104.    USDA has failed to define or explain what "operational experience" led it to the conclusions in the Proposed Rule, and thus commenters had no opportunity to respond to this purported experience.

105.    Similarly, in proposing to restrict States' discretion to define the geographic scope of the area for purposes of a waiver, the Proposed Rule repeatedly asserts that States have used gamesmanship to group together areas that should not have been grouped together. The Proposed Rule states, for example, that "States have created questionable self-defined economic areas with gaping holes to leverage the flexibility of the regulations." 84 Fed. Reg. at 981.

106.    The Proposed Rule, however, provided no examples or specific descriptions of geographic areas that were improperly grouped together. Nor did the Proposed Rule articulate why such grouping was "questionable" or why USDA could not have responded in a targeted fashion by rejecting waivers for improperly grouped areas. In fact, the prior regulations already imposed

restrictions on States' ability to group certain areas, requiring them at the least to be contiguous and part of the same economic region. Nevertheless, because the Proposed Rule had no specific definition of improper grouping, or information to support USDA's assertions, commenters had no opportunity to rebut USDA's bases or explain why grouping certain areas was proper.

107.    The Proposed Rule also asserted that the significant restrictions on waivers it proposed was necessary because of an "excessive" use of ABAWD time limit waivers. 84 Fed. Reg. at 984.

108.    The Proposed Rule provided no explanation of what it considered "excessive" or USDA's basis for concluding that number of waivers was excessive. Instead, USDA cites the current low nationwide unemployment while conceding that such a number fails to capture ABAWDs' realistic ability to obtain employment. Without further substantiation of whether, how, and why current waivers are "excessive," commenters could not appropriately address one of the key bases for the Rule.

109.    The Proposed Rule stated that generally waivers would be approved based only on unemployment data. But the Proposed Rule also stated that waivers could be permissible based on other data in "exceptional circumstances."

110.    Though the Proposed Rule purported to provide examples of what would and would not constitute "exceptional circumstances," it provided no definition for this vague, catch-all term. Commenters thus had no meaningful opportunity to provide feedback regarding this waiver basis, which has never existed in prior regulations.

111.    The Proposed Rule asserts that States have improperly "take[n] advantage" of data sources other than unemployment data to request waivers. However, the Proposed Rule did not explain or define any circumstance where an improper data source was used to secure a waiver

30

that should not have been allowed. Commenters thus had no opportunity to respond to USDA's assertion that States were manipulating data sources or the process more generally to secure waivers.

112.    The Proposed Rule noted that while it was likely to have a disparate effect on minorities, USDA found "that the implementation of mitigation strategies and monitoring by the Civil Rights Division of FNS will lessen these impacts." 84 Fed. Reg. at 990.

113.    The Proposed Rule did not explain what implementation or mitigation strategies USDA would take to reduce the disparate impact. Several commenters thus specifically noted that they could not opine on the efficacy of such measures due to the Proposed Rule's vagueness.

114.    Commenters thus could not meaningfully respond to the Proposed Rule's accusations of States' gamesmanship and improper manipulation of data and process to obtain "excessive" waivers, USDA's unsupported and unexplained "operational experience," and undefined mitigation strategies to address disparate impact on minorities.

## VII. THE FINAL RULE IS ARBITRARY AND CAPRICIOUS.

115.    Agency rulemaking is arbitrary and capricious unless it adequately analyzes the consequences and explains the action taken.

116.    When an agency decides to depart from decades-long policies and practices, as USDA did here, it must offer a reasoned explanation for doing so and for disregarding the facts and circumstances that supported the long-held policy.

117.    In promulgating this Rule, USDA fails to adequately explain the dramatic policy change or explain the basis for disregarding the evidence-based reasons for its prior policies. Specifically, USDA (1) fails to adequately explain limiting States' flexibility in defining geographic areas with insufficient jobs for ABAWDs; (2) fails to consider relevant differences

between job availability for ABAWDs and general job availability; (3) fails to justify imposition of an unemployment floor that ignores the specific circumstances of ABAWDs; (4) removes a waiver basis that no commenter suggested removing without any data; and (5) fails to explain its basis for upsetting States' longstanding reliance interests in carrying forward unused exemptions. In addition, in promulgating the Rule, USDA fails to adequately consider and weigh the costs of the Rule to States and their residents and fails to consider the Rule's impact on minorities.

118.    The overarching basis for the sweeping changes enacted by the Rule is USDA's purported "operational experience" that States are gaming the current process to achieve more and broader waivers than necessary. USDA has failed to define or further explain its "operational experience" or how it justifies USDA's accusation that States are manipulating or overusing waivers for areas with insufficient jobs for ABAWDs. USDA supplies no examples of an area or a State that improperly obtained a waiver under the previous framework. USDA's cursory "operational experience" basis for the sweeping changes is particularly arbitrary because States, not USDA, primarily administer SNAP.

119.    USDA also justifies its Rule on the basis that States' purported gamesmanship has resulted in an inflated number of ABAWDs residing in waived areas. However, USDA supplies no justification for summarily determining that the number of ABAWDs living in waived areas is improperly inflated or that there are in fact sufficient jobs for ABAWDs in those areas. To the contrary, the current proportion of ABAWDs in waived areas is similar to the waived proportion that existed at the inception of the time limit.

120.    Contrary to USDA's asserted rationale, States are using their discretion judiciously and in accordance with appropriate standards under the law and the regulations to ensure that ABAWDs in areas where there are insufficient jobs continue to receive nutritional assistance.

Indeed, waivers sought by States and the population covered by waivers has fallen precipitously as a result of the recovery from the most recent economic downturn, which caused an all-time high number of waivers in 2013.

121.    Congress clearly contemplated an evidence-based approach that considered all available relevant and reliable data in evaluating whether an area had sufficient job opportunities for ABAWDs, not for the general public. USDA's reliance on current low nationwide unemployment numbers and its unsupported accusation of State misconduct cannot justify the Rule without consideration of data specific to the ABAWD population. USDA's focus on the current nationwide unemployment numbers not only ignores geographic differences and circumstances of ABAWDs but it also ignores the effects of the Rule in the event of another economic downturn.

122.    By arbitrarily imposing more stringent work requirements, the Rule also irrationally brushes aside significant taxpayer dollars that Congress has directed toward studying how to increase employment opportunities for SNAP participants. In the 2014 Farm Bill, Congress authorized up to $200 million for pilot projects to study the best ways to secure employment for SNAP participants. Congress will receive the results of this study in 2021. Implementing the Rule before the study is complete will undermine its results and is thus an arbitrary and capricious waste of taxpayer dollars. The pilot projects also demonstrate that Congress did not believe, as USDA asserts in the Rule, that more stringent work requirements will necessarily lead to more employment and self-sufficiency in all cases. Rather, Congress recognized that additional studies were needed to determine in what circumstances increased employment would be likely.

A.      **USDA Fails To Justify Limiting States' Ability To Define the Geographic Scope Of Their Waivers.**

123.    The Rule limits areas for which a State can receive a waiver to LMAs as defined by the DOL and effectively eliminates the ability to obtain statewide waivers. This provision is arbitrary and capricious because it unduly and without justification restricts States' discretion to tailor the scope of their waiver requests based on local conditions.

124.    The primary basis for this limitation on States' discretion is USDA's assertion that States have manipulated substate groupings to obtain the largest waiver area possible, even where, in USDA's view, some areas had sufficient jobs. USDA cites to nothing more than its "operational experience" (which it does not further define or explain) to support its accusation of State manipulation and fails to point to *any* specific area in *any* State where a waiver was improperly obtained despite sufficient jobs for ABAWDs in that area. 84 Fed. Reg. at 66974.

125.    The Rule also brushes aside the fact that LMAs do not account for economic realities regarding available jobs for ABAWDs. Determining what geographic areas have sufficient jobs for ABAWDs requires the use of all relevant information a State submits with a waiver request, as USDA's longstanding regulations recognized. That determination would require looking to the types of jobs available, the qualifications needed for such jobs, the educational and other characteristics of ABAWDs, and whether affordable transportation options are available for those who need it—none of which LMAs consider.

126.    USDA justifies restricting geographic areas to LMAs by stating that an area "should not receive waivers if there are jobs available in a nearby jurisdiction, within a reasonable commuting distance." 84 Fed. Reg. at 66796. LMAs extend to distances that can require several hours to commute from end-to-end, which is hardly a reasonable commuting distance. Additionally, the availability of transportation is a key metric for which LMA designations and

USDA do not account. For many ABAWDs, owning a car is prohibitively expensive. Indeed, data suggest that more than 40 percent of ABAWDs lack access to reliable private or public transportation, and 60 percent lack a valid driver's license. Even where public transportation is available, it can impose an insurmountable financial burden if an ABAWD has to travel a considerable distance to and from work every day.

127.    USDA turns a blind eye to transportation and other concededly relevant ABAWD-specific issues that may bear upon the geographical scope of a waiver because there is allegedly no federal data that "specifically assess commuting patterns and other related economic factors for ABAWDs." 84 Fed. Reg. at 68793. While there may be no single data point that sheds light on this question, the Rule ignores that analyses of whether certain jobs are grouped together, the types of qualifications required in a geographical region, and the demographic profile of local ABAWD populations are relevant to this inquiry.

128.    LMAs do not on their own sufficiently define potential zones of employment. For example, LMAs may encompass multiple counties or even extend to multiple States. In some LMAs, it may take as long as two hours to travel from one end to the other. These LMAs may include urban areas with robust public transportation and rural areas where public transportation is very limited or nonexistent.

129.    Exclusive reliance on LMAs also infringes on the sovereignty of States, which the Rule does not consider or address. Specifically, some LMAs encompass portions of multiple States, which may have vast differences in industries, available transportation, and job training and placement resources. Thus, a State's waiver request may be unduly affected by the economic and regulatory realities of neighboring States over which it has no control.

130.    For example, the District of Columbia is only a portion of an LMA made up of parts of several other States. Thus, for the District to qualify for a waiver based on the LMA metric required by the Rule, the portions of the surrounding States would also need to meet the Rule's thresholds. In other words, the District could meet the Rule's requirements but would remain ineligible for a waiver because its statistics are diluted by other States that have markedly different economic and regulatory conditions.

131.    LMAs are outdated metrics of employment and commuting patterns. The most recent LMAs were determined based on the 2010 census and data collected between 2006-2010. This makes the tool entirely unreliable to respond to changing employment circumstances. Indeed, as a result of this delay, the Office of Management and Budget has cautioned that LMAs are not a reliable tool for development of Federal, State, and local programs. This also contradicts USDA's statement elsewhere in the Rule that reliance on up-to-date data is critical in assessing whether an area has sufficient jobs for ABAWDs.

132.    LMAs also do not account for myriad ways in which parts of a State's geography may be economically integrated, such as through workforce development initiatives, economic development investments, employer recruiting practices, and migration patterns.

133.    The Rule summarily disposes of these concerns by asserting that "after assessing alternative options, the Department has not identified any other labor market definition that uses more recent data and would equally address the problem of States' manipulative usage of grouping substate areas to maximize waived areas." 84 Fed. Reg. at 66794-95. In doing so, the Rule provides no list of the alternative data sources it evaluated, fails to explain why those alternative sources, alone or in concert, lack probative value, and again fails to substantiate USDA's accusation that

States have manipulated the waiver process or obtained waivers for areas where there are sufficient jobs for ABAWDs.

134.    The Rule also does not address why a combination of various relevant, reliable data sources—governmental and otherwise—regarding grouping of areas is less preferable than the out-of-date, unreliable metric it chose as the sole basis for geographic grouping.

135.    In previous guidance, USDA acknowledged that it did not have sufficient expertise to evaluate what geographic areas should be combined for waiver purposes because it did not have expertise on local job markets, feasibility of commuting, or public transportation options. The Rule reverses course on this previous statement with little more than a mere assertion of "operational experience" without any specific examples. The Rule thus does not address why USDA, rather than States, is now in a better position to evaluate the appropriate geographic scope for purposes of determining whether there are sufficient jobs for ABAWDs.

136.    The effective restriction on statewide waivers is also arbitrary and capricious. This restriction ignores without justification that States can be a relevant geographic area for employment purposes because regions within a State are tied together by occupational licensing requirements, labor regulations, a common minimum wage, and other State laws.

137.    Implied in the restriction on statewide waivers is that States should focus their waiver applications on substate areas where unemployment is significant. This is arbitrary and capricious because some States cannot seek substate waivers at all due to a lack of substate LMAs. For example, the District of Columbia contains no LMAs. If it cannot seek a statewide waiver, it effectively cannot seek a waiver at all, including for the parts of the District that have significant unemployment rates.

**B.      The Rule's Exclusive Focus, In Ordinary Circumstances, On Unemployment Numbers In The Waiver Process Is Arbitrary And Capricious.**

138.    The Rule requires States to rely on unemployment numbers, where such data is available, in seeking a waiver request based on a lack of sufficient jobs for ABAWDs. This requirement is arbitrary and capricious because the general unemployment rate does not capture the reality of employment prospects for ABAWDs. For example, ABAWDs are disproportionately likely to have low educational attainment, limited skills, minimal work history, and physical and mental challenges. USDA itself has acknowledged that employment prospects for ABAWDs were "not promising" because "job opportunities for less-educated job seekers are severely limited, especially for nonwhites and in urban areas." The Effect of Welfare Reform on Able-Bodied Food Stamp Recipients." Michael Stravrianos & Lucia Nixon, U.S. Dep't of Agric. (July 23, 1998). Even in this Rule, USDA acknowledges that "ABAWDs may face barriers to employment, and have more limited employment prospects than the general public due to low educational attainment or other factors." 84 Fed. Reg. at 66787.

139.    The general unemployment rate also ignores many other metrics that go to the availability of jobs for ABAWDs in an area. For example, the general unemployment rate does not capture the underemployed (people who want full-time work but who have to settle for part-time work) or people who have stopped looking for work because of a perceived lack of job opportunities (*i.e.*, decreasing labor market participation). Large numbers of underemployed people or people who have exited the labor market may lead to conditions where the unemployment rate is low but where the labor market remains challenging for ABAWDs.

140.    USDA noted in a 1998 report that the ability of the ABAWD population to secure stable employment depends on the local labor market and the availability of jobs for workers with limited education and work histories. In its Rule, USDA cites no evidence that this has changed.

Instead of relying on relevant evidence, USDA repeatedly reiterates its reliance on the current low nationwide unemployment rate.

141.    Despite conceding the failure of general unemployment numbers to answer the sufficient-job inquiry for ABAWDs required by the statute, the Rule brushes aside these concerns by noting that "there is no measure available for precisely determining the number of available jobs specifically for SNAP ABAWDs in any given area." 84 Fed. Reg. at 66789. USDA arbitrarily and capriciously ignores the fact that there are many relevant data sources that together can reasonably address this question. Indeed, States have used these sources for decades to submit waiver requests, and USDA has been considering them for just as long. But the Rule simply prohibits States from using those more targeted metrics where a general unemployment rate is available.

142.    The criteria that could go to whether there were sufficient jobs for ABAWDs include metrics that USDA has long considered, such as a low and declining employment-to-population ratio, a lack of jobs in declining occupations or industries, or academic studies or other publications that describe an area's lack of jobs. Yet the Rule removes consideration of these factors, which are referred to here as "excluded metrics," in the sufficient-jobs analysis without reasoning.

143.    USDA has long explained why the excluded metrics are relevant to determining whether there are sufficient jobs for ABAWDs. In 1996 guidance, for example, USDA stated that because "[j]ob seekers may have a harder time finding work in an area where job growth lags behind population growth," employment-to-population ratio "complements measures of unemployment by taking into account working age persons who may have dropped out of the labor force altogether." It further stated that "[e]mployment markets dominated by declining industries

could lead to the presence of large numbers of people whose current job skills are no longer in demand. This can be especially true in smaller, rural areas where the loss of a single employer can immediately have a major effect on local job prospects and unemployment rates."[7]

144.    In 2006 guidance, USDA reiterated that waiver applications could be based on the excluded metrics and that States "may submit whatever data it deems appropriate to support requests based on this data. FNS will evaluate the data and determine if it is acceptable to justify a waiver."[8]

145.    In December 2016 guidance, USDA provided additional detail on how the excluded metrics assist in determining whether there are sufficient jobs for ABAWDs.[9]

146.    Despite this prior guidance across multiple administrations, the Rule removes consideration of the excluded metrics without adequate explanation.

147.    The Rule itself acknowledges the continuing relevance of the excluded metrics to determining whether there are sufficient jobs for ABAWDs but simply asserts that this data is not as reliable as unemployment numbers. 84 Fed. Reg. at 66791. USDA not only fails to substantiate its claim of relative reliability but also fails to justify why these data may not be used in conjunction with general unemployment numbers, as they have been over the past two decades. Combining excluded metrics with unemployment numbers can flesh out the picture and more fully address the question Congress directed States and USDA to answer: whether there are adequate job opportunities in a particular area for ABAWDs, not for the general public. For example, a low-and-declining employment to population ratio may show a significant decrease in labor market

---

[7] USDA, "Guidance for states Seeking Waivers for Food Stamp Limits," December 3, 1996.
[8] USDA, "Guidance on Requesting ABAWD Waivers," August 2006.
[9] USDA, "Guide to Supporting Requests to Waive the Time Limit for Able-Bodied Adults without Dependents (ABAWD)," December 2, 2016.

participation, an important aspect of determining the strength of the labor market that the unemployment rate does not consider. USDA does not address why the excluded metrics have been important to answering the sufficient-jobs question for decades but now should not even be considered.

148.    The Rule's only basis for the excluded metrics being less reliable than unemployment numbers for the relevant inquiry is USDA's "operational experience." 84 Fed. Reg. at 66791. Again, USDA does not explain what this experience is or provide any examples of where the excluded metrics have led to inappropriate waivers.

149.    Some States have their own data to track local employment conditions, which would be highly relevant to whether there are sufficient jobs for ABAWDs. The Rule nevertheless prohibits these States from relying on local-specific data.

**C.    The Department's Imposition Of A 6 Percent Unemployment Floor To Establish That There Are Insufficient Jobs For ABAWDs Is Arbitrary And Capricious.**

150.    For the last two decades, States could show that there were insufficient jobs for ABAWDs by establishing that areas had an unemployment rate that was 20 percent higher than the national rate. The Rule alters that by requiring that the areas also have at least 6 percent unemployment to qualify for a waiver. USDA fails to adequately explain or justify why, absent this floor, areas that meet the 20 percent standard actually have sufficient jobs for the ABAWDs residing there. Indeed, the Rule does not even attempt to make or justify this required conclusion.

151.    The 6 percent floor relies on general unemployment conditions that do not capture reality for ABAWDs. Even where the area's unemployment rate is below 6 percent, there may nonetheless be insufficient jobs for ABAWDs, because ABAWDs face barriers to employment that the general population does not. Indeed, studies estimate that the unemployment rate for ABAWDs is twice the general unemployment rate.

152.     The Rule asserts that the 6 percent unemployment rate floor aligns with the requirements for DOL to determine that an area is a LSA (*i.e.*, an area to which the federal government directs contracts and other assistance). But USDA makes no attempt to explain why *only* LSAs have insufficient jobs for ABAWDs.

153.     If anything, the reliance on the LSA criteria to support the unemployment floor shows the arbitrariness of the Rule. The Rule *eliminates* designation as a LSA as a basis to establish insufficient jobs for ABAWD recipients but contends that the LSA criterion supports the unemployment floor the Rule imposes. Essentially, USDA has taken the position that a LSA does not establish that there are insufficient jobs for ABAWDs, but that adopting a 6 percent unemployment rate floor for establishing that there are insufficient jobs for ABAWDs is justified based on the LSA criteria. It is not apparent how USDA can reconcile such contradictory conclusions based on the same statutory text.

**D.      The Rule's Removal Of An Area's Receipt Of Extended Unemployment Benefits As A Basis For Waiver Is Arbitrary And Capricious.**

154.     The Rule eliminates receipt of extended unemployment benefits as a basis for a waiver. As discussed above, USDA did not suggest that it was contemplating this change in the Proposed Rule and in fact expressly stated just the opposite in the Proposed Rule.

155.     The Rule contains no evidence or data to support the elimination of extended unemployment benefits as a criterion for waiver applications. USDA merely cites to its desire to avoid statewide waivers. In eliminating this criterion, USDA reiterates its blanket, unsupported assertion that statewide waiver areas are inappropriate because they may mask tight job markets in substate areas.

156.     USDA provides no concrete examples of States qualifying for extended unemployment benefits that still have areas of strong economic activity. Indeed, States must

experience particularly high levels of unemployment to even qualify for extended unemployment benefits. Under such circumstances, it is highly unlikely that a substate region would be otherwise thriving and not need a waiver.

157.    The Rule does not cite *any* comments suggesting that USDA eliminate unemployment benefits as a basis for a waiver. Rather, the only comments that addressed this criterion, as the Rule itself makes clear, supported maintaining the standard or expanding the standard to provide waivers in even more circumstances. 84 Fed. Reg. at 66789-90.

### E.    The Rule's Elimination Of Carryover Exemptions Is Arbitrary And Capricious.

158.    As discussed above, the statute permits a fixed number of discretionary exemptions from the ABAWD time limit. Up until this Rule, States could carry forward unused exemptions and accumulate exemptions over time for use during an economic downturn.

159.    Under the Rule, States can no longer carry forward exemptions for more than one year. Any unused exemptions that are from prior years automatically expire.

160.    The Rule arbitrarily incentivizes States to adopt a use-or-lose attitude toward exemptions. Understanding that exemptions will expire, States may feel pressured to use all of those exemptions rather than lose them, regardless of current economic conditions. As such, the exemptions may be given to more than just the individuals who need assistance. Such usage of exemptions contradicts USDA's own asserted interest in subjecting as many people as possible to the time limit. Conversely, the fact that these exemptions cannot be carried over will mean that States have less ability to expeditiously and effectively address sudden economic downturns for all but a few of their affected residents.

161.    The Rule includes no evidence of improper usage of the discretionary exemptions by States, nor does it provide a breakdown of States that have used most of their exemptions as

compared to States that tend to accrue a large portion of their exemptions. Rather, the Rule simply asserts that allowing States to accumulate and carryover exemptions indefinitely "is inappropriate." 84 Fed. Reg. at 66803.

162.    Allowing States to accrue and carry over exemptions year to year creates a safety net for sudden economic downturns. Should the unemployment rate unexpectedly spike, State agencies can immediately address the needs of the increased number of SNAP recipients with exemptions while working on longer-term program solutions. State agencies have a strong understanding of the ABAWD population within their State and can thus tailor allocation of exemptions.

163.    Contrary to this longstanding basis for permitting carryover exemptions, there is no indication in the Rule that USDA considered the effect of the Rule in other parts of the business cycle other than the current environment, where unemployment rates are low. For example, USDA did not consider how the absence of carryover exemptions would have impacted States at the beginning of the last recession.

164.    The Rule provides no explanation for upending the reliance interests of States that have accumulated discretionary exemptions for many years.

F.    **The Rule Is A Departure From Prior Agency Policy With Insufficient Justification.**

165.    Detailed analysis is necessary where an agency changes its policy and its new policy rests on factual findings that contradict those that underlay its prior policy or where the previous policy has engendered serious reliance interests.

166.    Several aspects of the Rule rely on factual findings that contradict USDA's prior factual findings.

167.    Prior policies conferred States discretion to determine the scope of waivers because of a lack of federal expertise in local employment matters, yet the Rule makes expressly the opposite factual finding: that the USDA, not States, is best positioned to determine the geographic unit of a waiver. The USDA emphasized its factual finding that States were best positioned to determine the geographic scope of waivers in its 1996 guidance, 1999 proposed rule, 2001 final rule, 2006 guidance, and 2016 guidance. Despite this extensive prior history, USDA reverses course without any analysis justifying a change in USDA's factual analysis.

168.    Prior policies also found as a factual matter that factors other than general unemployment rates were relevant to determining whether there were sufficient jobs in any area for ABAWDs. USDA's 1996 guidance, 1999 proposed rule, 2006 guidance, and 2016 guidance all reaffirmed USDA's factual determination that unemployment rates alone were not dispositive in assessing whether there are sufficient jobs for ABAWDs. The Rule makes expressly the opposite factual finding, that unemployment data must be used exclusively when available in ordinary circumstances, with no analysis of what has changed.

169.    Prior policies relied on the fact that relative unemployment compared to the national average, by itself, established insufficient jobs for ABAWDs, but the Rule reverses this factual determination without justification, finding that an arbitrarily set floor is also required.

170.    Prior policies relied on the fact that designation by DOL of an area as qualifying for extended unemployment benefits, by itself, established insufficient jobs for ABAWDs, but the Rule reverses this factual determination without justification or meaningful opportunity to comment.

171.    States and ABAWDs relied on two decades of consistent regulations regarding bases for waivers, and the Rule disrupts this without consideration of those reliance interests.

172.     States relied on their statutory and regulatory power to carry over exemptions to prepare for sudden economic downturns. The Rule upsets that reliance without justification.

**G.**     **The Rule Does Not Consider The Costs It Creates.**

173.     Contrary to the requirements of reasoned rulemaking, the Rule does not consider the costs associated with its implementation. USDA found that the Rule would result in a "small increase in the federal share of State administrative costs" and a "small increase" in "State costs related to administrative burden for verifying work hours and exemptions and sending notices." But this does not come close to accounting for the full regulatory and administrative burden this Rule imposes on States.

174.     Rather than a "small increase" in costs, States face hundreds of thousands, even millions, of dollars in increased administrative costs as a result of the Rule. These costs are associated with developing notices for ABAWDs, handling increased workloads for agency staff when waivers expire, and expanding employment and training programs for ABAWDs ("E&T programs") who will newly be subject to the time limit.

175.     State agencies that have been operating under a statewide waiver would need to develop and disseminate notices to ABAWD households. States will also likely have to increase the frequency with which ABAWDs apply for recertification for SNAP benefits to ensure that they receive timely notice of compliance. Failure to do so can cost state agencies thousands of dollars in overpayment of benefits. This increase in workload will require additional staff and resources to process applications. The District of Columbia, for example, anticipates that such an increase in administrative costs would be $656,650 per year plus a one-time cost of $166,566. And in Pennsylvania the increased annual cost will be $2,250,000 plus a one-time cost of $56,050.

176.     The Rule also ignores the massive costs that States will face in expanding their E&T programs to cover ABAWDs who cannot find qualifying employment. Many States do not

have E&T programs that can sufficiently address the needs of all ABAWDs within the State. For example, the District of Columbia only has the capacity to provide E&T services to approximately a tenth of the total ABAWD population. A drastic expansion in E&T programs will require States to expend significant additional funds to develop programs and hire staff to ensure that ABAWDs can meet their work requirements. For example, the creation of adequate job-training programs for ABAWDs in Pennsylvania, where 80 to 90 percent of current ABAWDs would become subject to the time limit, would cost more than $21 million over the next six years.

177. The Rule fails to account for the significant costs that it will also impose on other State assistance programs. The Rule ignores increased healthcare costs that States will incur as a result of their residents' increased malnutrition. Studies have shown that adults in food-insecure households are 50 percent more likely to require emergency healthcare services, largely paid by the State through Medicaid, than adults in food-secure households. Healthcare costs for low-income adults receiving SNAP benefits are on average 25 percent less than for low-income adults not participating in SNAP. Additionally, ABAWDs who lose nutrition assistance and have to devote more financial resources to purchasing food will have fewer resources with which to pay for other necessities like housing. As a result, States will incur increased costs of housing subsidies for these low-income individuals.

178. The Rule also does not account for harm to the local and national economies that will result from the loss of SNAP benefits. Because SNAP benefits are provided to low-income individuals with immediate spending needs, SNAP boosts local economies by increasing consumer demand and injecting money directly into the economy. During strong economic times, $1 in redeemed SNAP benefits means more than $1.20 in the local economy. During a recession, $1 in redeemed SNAP benefits generates more than $1.70 in economic activity.

179.    The Rule does not account for harm to local businesses. SNAP generates revenue for grocery stores as SNAP expenditures comprise approximately 10 percent of all grocery expenditures nationwide. This percentage is even higher in low-income areas where SNAP benefits are used for a greater portion of sales. Food retailers who skate by on thin margins rely on SNAP to stay in business. The Rule does not address the impact of a loss of SNAP benefits on availability of food, particularly healthy foods, in various markets.

180.    The Rule does not address its impact on non-grocery businesses and related impact on local and State government revenue. Non-grocery businesses also receive a boost from SNAP expenditures because individuals who use SNAP to purchase food then have greater purchasing power to buy other types of goods as well. This greater purchasing power also benefits State governments that see increased revenue from additional sales tax when more people are eligible for SNAP benefits.

181.    The Rule does not address its impact on causing job losses. SNAP creates jobs in rural areas and small towns, where it created and bolstered about 567,000 jobs in 2017, including almost 50,000 in agriculture. A reduction in SNAP benefits eliminates these jobs.

**F.      The Rule Does Not Address Deleterious Effects Of Its Implementation On Minorities.**

182.    The Rule is also arbitrary and capricious because, by USDA's own admission, the changes would bear most heavily on protected classes, and USDA fails to address how it will mitigate or address this disparate impact. This impact on minorities is thus an important aspect of the Rule that USDA has insufficiently addressed.

183.    As discussed above, ABAWDs face significant barriers to employment above and beyond the general population. This is even more true for ABAWDs who are women or racial minorities. That is because, in addition to facing the barriers discussed above, women and racial

48

minorities also face significant discrimination in the labor market. This type of discrimination is reflected in the difference in unemployment rates between minorities and whites. For example, though the average unemployment rate since 1972 has been 6.1 percent for whites, that number is 13.9 percent for African Americans and 10.2 percent for Latinos. ABAWDs who are racial minorities or women are more likely than the remaining ABAWD population to lose access to nutrition as a result of this Rule. The Rule acknowledges that it has "the potential for impacting certain protected groups due to factors affecting rates of employment of members of these groups." 84 Fed. Reg. at 66808.

184.    The Rule claims that "implementation and mitigation strategies and monitoring by FNS Civil Rights Division and FNS SNAP may lessen these impacts," but provides no specifics as to what these strategies are or how they will address the disparate impact on protected classes. 84 Fed. Reg. at 66808. Absent evidence of a clear path to ensuring that disparate impact on protected classes is minimized, the Rule arbitrarily and capriciously fails to account for this improper consequence.

### VIII.        THE FINAL RULE WILL HARM THE PLAINTIFFS.

### A.    The Rule Will Harm The Health And Well-Being Of Plaintiffs' Residents.

185.    Plaintiffs have quasi-sovereign and sovereign interests to challenge agency actions that implicate their residents' health and well-being.

186.    Plaintiffs all have ABAWD time-limit waivers, use exemptions, or have accumulated carryover exemptions. By unlawfully eliminating these waivers and exemptions, the

Rule effectively strips SNAP benefits from thousands of Plaintiffs' residents and thus harms their health and well-being.[10]

187.    The deprivation of SNAP benefits adversely affects residents' health because SNAP provides critical access to nutrition, improving the health and well-being of low-income adults and reducing the negative health effects of malnutrition.

188.    SNAP also has a beneficial effect on mental health of recipients because it reduces the stress of food insecurity and related health effects of such stress.

189.    Many ABAWDs suffer from mental illnesses that do not rise to the level of disability but are nonetheless debilitating. Such illnesses include depression, post-traumatic stress disorder, and learning disabilities. Eliminating ABAWDs' SNAP benefits will serve to exacerbate these illnesses.

190.    Additionally, the loss of SNAP benefits will contribute to increased homelessness because ABAWDs will have to divert their limited resources toward food instead of housing.

i.      The District of Columbia

191.    The District first received a District-wide ABAWD time-limit waiver in 1997 and has received such a waiver every year thereafter. The District has relied on its 24-month average unemployment rate, which has been more than 20 percent above the national average since 1997, as the primary basis for its waivers.

192.    The current District-wide waiver expires on March 31, 2020.

193.    The unemployment rate in the District as of September 2019 is 5.4 percent, which is 54 percent higher than the national unemployment rate of 3.5 percent. Although the

---

[10] New Jersey is differently situated from other Plaintiffs. Although it will experience proprietary harm under the Rule and will be able to waive time limits for fewer ABAWDs, New Jersey is able to use its current employment and training structure so that current ABAWD SNAP recipients are connected to services that can help them meet SNAP work requirements.

unemployment rate in the District is far greater than 20 percent above the national average, it falls short of the Rule's new unemployment rate floor of 6 percent. Thus, the District is not entitled to a waiver under the Rule.

194.    There are approximately 14,500 ABAWDs currently receiving SNAP benefits in the District. Approximately 80 to 90 percent of them will lose their benefits within three months were the Rule to be implemented.

195.    ABAWDs in the District face significant barriers to employment. The workforce in the District, an urban center and the seat of the federal government, skews extremely high-skilled, with approximately 70 percent of the available jobs requiring a college degree. The relatively small number of jobs available to those without a college education tend to be low-paying with unreliable hours and little to no benefits. Imposing work requirements will not eliminate the skills disparity experienced by ABAWDs in the District's labor market or create more jobs for which they are qualified. Nor can job training programs alone provide ABAWDs with the college education necessary for most jobs in the District.

196.    The District is also unique in that many jobs within the District are filled with residents of neighboring jurisdictions, all of which have higher average educational attainment levels than that of the District. This competition for jobs from those living outside the District's borders exacerbates low-income residents' skills disparity and ultimate inability to find work.

197.    ABAWDs in the District also are confronted with a lack of affordable housing, which contributes to housing insecurity and homelessness, situations from which it may be impossible to maintain employment.

198.    None of these attributes is properly captured or considered by unemployment numbers alone. If the Rule goes into effect, there is little doubt that the District will continue to

have insufficient jobs for ABAWDs, and yet, contrary to the statute, it will be ineligible for a waiver.

199.    Even though several geographic areas within the District exceed the 6 percent floor, and though the Rule has articulated a preference for substate data and waivers, the District cannot seek waivers for those areas under the Rule. The District is administratively divided into eight wards, three of which in 2017 had unemployment rates higher than the 6 percent floor. Ward 5 has an unemployment rate of 6.5 percent, Ward 7 has an unemployment rate of 8.7 percent, and Ward 8 has an unemployment rate of 11.6 percent, more than twice the floor set by the new Rule. Despite these significant unemployment rates, the District cannot obtain a partial waiver targeting these areas because the Rule restricts waivers to DOL-designated LMAs, and the District has no sub-region that is so designated.

200.    Indeed, even the entire District is designated as only part of a larger LMA. Thus, even if the District's unemployment rate exceeded the 6 percent floor, it may not qualify for a waiver under the Rule because the unemployment rate for the entire LMA, which extends into several States outside the District, may fall below the 6 percent threshold. In other words, even if the District's unemployment numbers qualified it for a waiver under the Rule, the unemployment of other States might sufficiently dilute the District's unemployment number such that the District would be ineligible. This would be so even if the District could show that ABAWDs cannot meaningfully reach jobs outside the District.

201.    Because the District will be ineligible for a waiver based on unemployment rates, the ABAWD time limits will apply to District residents for the first time, without them having any greater prospects for employment or ability to obtain self-sufficiency.

ii.   <u>New York</u>

202.   The State of New York's statewide ABAWD time-limit waiver expired in 2015.

203.   For the period January 1, 2020 through March 31, 2020, 38 of New York State's 62 counties, 35 of them outside of New York City, have federal approval to waive the ABAWD time limit. Among these counties are Bronx County, Kings County (Brooklyn), Richmond County (Staten Island), Erie County (which includes the City of Buffalo), Monroe County (which includes the City of Rochester), and Onondaga County (which includes the City of Syracuse).

204.   In addition, four cities and towns have federally approved ABAWD time limit waivers until March 31, 2020. These are the City of Poughkeepsie, City of Mount Vernon, City of Yonkers, and Town of Haverstraw in Rockland County.

205.   Within the City of New York, several community districts likewise have a federally approved ABAWD waiver until March 31, 2020. In New York County (Manhattan), these include Manhattan Community Districts 9, 10, 11, and 12, which comprise an area in Manhattan above West 110th Street and above East 96th Street. In Queens County, these include Queens Community Districts 10, 12, and 14. These areas include the areas of Ozone Park, South Ozone Park, Jamaica Center, South Jamaica, and The Rockaways, and Far Rockaway, among others.[11]

206.   The BLS unemployment rate in New York State was 4 percent in November 2019. That figure is 14 percent greater than the national average figure of 3.5 percent. In Bronx County, however, the unemployment rate based on most recent data is 5.2 percent—48 percent above the national average.

---

[11]   Maps of New York City community districts, by borough, may be found here. https://www.baruch.cuny.edu/nycdata/population-geography/maps-boroughdistricts.htm

207.    According to data published by the Office of the New York State Comptroller,[12] the unemployment rate in 2018 in New York City for African Americans was 7.3 percent, and the unemployment rate for Hispanics in New York City in 2018 was 5.2 percent—more than twenty percent above the citywide average of 4.1 percent. The comparable figure for Whites was 3.2 percent and for Asians was 2.1 percent. The unemployment rate for people aged 18 to 24 was 9.4 percent, more than twice as high as the rate for all other workers.

208.    According to data published by the Office of the New York State Comptroller, the unemployment rate for New York City residents with a bachelor's degree was 2.8 percent in 2018, but more than twice as high for those with only a high school diploma (5.7 percent). That figure is approximately 40 percent greater than the national average unemployment rate.

209.    SNAP is an important component of New York State's efforts to address hunger. According to the 2019 Annual Report of the Office of Temporary and Disability Assistance ("OTDA"), which administers SNAP in New York State, "[a]n average of 2.7 million people received a combined $366 million in benefits per month during the federal fiscal year. A total of nearly $4.4 billion in SNAP benefits were issued during the past year."

210.    As of October 2019, there were approximately 113,445 ABAWDs living in waived areas in New York, and 16,908 ABAWDs living in non-waived areas. OTDA estimates that as a result of the Rule, only one county in the State consisting of seven ABAWDs will qualify for a waiver. Thus, once the seven waived individuals are removed from the figures, approximately 130,346 ABAWDs in New York State likely will be subject to the work requirements for ABAWDs and will be at risk of losing SNAP benefits within three months if they do not comply with or document exemption from ABAWD work requirements.

---

[12] https://www.osc.state.ny.us/osdc/rpt1-2020.pdf

211.     On March 22, 2019, the U.S. Department of Agriculture published a list of the number of exemptions by jurisdiction.[13] New York State had 173,979 such exemptions available for FY 2018 and used 61,997 such exemptions that year. New York similarly earned 73,152 such exemptions in FY 2019, giving New York a total of 185,134 such exemptions available for FY 2019.

       iii.    <u>California</u>

212.     Approximately 4 million Californians receive essential nutrition assistance each month through CalFresh, California's program to disperse federal SNAP benefits.

213.     There are approximately 482,000 Californians who are classified as non-exempt ABAWDs statewide. Many of these individuals currently live in areas where the time limit has been waived.

214.     From 2008 to 2018, California was under a statewide waiver of the time limit based on high statewide unemployment rates resulting from the recession.

215.     As of 2019, 52 of California's 58 counties remain under a partial waiver from the time limit. Absent the Rule, 51 of California's 58 counties would have remained under a partial waiver from the time limit from September 1, 2020 through August 31, 2021.

216.     Under the Rule, by April 2020, the number of counties required to implement the time limit will balloon from six counties to 40 counties. Only 18 counties will be eligible for a waiver of the time limit. The 34 counties that will lose waiver eligibility will be required to implement the time limit for the first time since 2008 with less than four months' notice.

---

[13] https://fns-prod.azureedge.net/sites/default/files/SNAP-ABAWD-Percentage-Exemption-Totals-FY2019.pdf

217.    Several of California's counties with larger CalFresh enrollments currently have time limit waivers. For example, Los Angeles County, which had 1,176,731 CalFresh recipients as of October 2019 and is estimated to have provided CalFresh benefits to 98,730 non-exempt ABAWDs in FY 2018, has a time limit waiver.

218.    In the first year of implementation alone, the Rule will impact up to 381,500 ABAWDs in California.

219.    Assuming the best outcome, in the first year alone, California anticipates that a minimum of 57,225 non-exempt ABAWDs will lose eligibility, which could result in a loss of $100 million in CalFresh benefits.

220.    Under the Rule, California will lose its carryover exemptions, which counties used to meet need with flexibility. Because of California's judicious and restrained use of exemptions before the 2008 statewide waiver, no CalFresh recipient has lost benefits solely because of the ABAWD time limit in more than a decade. Therefore, elimination of carryover discretionary exemptions will impact all California counties.

221.    The harm to ABAWDs who lose eligibility as a result of the time limit will likely extend well beyond their period of ineligibility. Based on the experience in other States, California anticipates many non-exempt ABAWDs who become ineligible for CalFresh because of the time limit are unlikely to return to the program even when they regain eligibility.

222.    California's food banks already distribute federal Emergency Food Assistance Program commodities to over 1.5 million people each month. Individuals impacted by the rule, and no longer eligible for CalFresh will still need food and will turn to food banks' supply of federal, purchased, and donated food, but food banks do not have the capacity to address a new significant need of this kind.

iv.   <u>Colorado</u>

223.   Colorado requested and was approved for a statewide waiver during the 2015 and 2016 federal fiscal years. Since then, Colorado has received partial waivers. In 2017, 12 counties were covered by time-limit waivers. In 2018, three Colorado counties had time-limit waivers.

224.   Currently, five counties—Conejos, Fremont, Hinsdale, Huerfano, and Saguache— and the Ute Mountain Ute Tribe Reservation receive time-limit waivers.

225.   Approximately 20,000 ABAWDs receive SNAP benefits in Colorado. Of those ABAWDs receiving SNAP benefits, 890 reside in areas with current waivers.

226.   Although Colorado's statewide unemployment rate is lower than the national unemployment rate of 3.5 percent, some areas of the State have unemployment rates more than 20 percent above the national rate.

227.   From May 2017 through April 2019, the aggregate average unemployment rate in the five counties with waivers was 4.52 percent.

228.   Between July 2017 and June 2019, the average unemployment rate in the Ute Mountain Ute Tribe Reservation was 5.7 percent.

229.   Under the Rule's new unemployment floor criteria, the Huerfano County LMA may be the only geographic area eligible for a time-limit waiver if the Rule takes effect on April 1, 2020. As a result, 750 ABAWDs may lose their SNAP benefits if they do not participate in work activities.

230.   ABAWDs in Colorado face significant obstacles to obtaining employment. The most common barriers to employment faced by ABAWDs who receive SNAP benefits include mental health challenges, homelessness, insufficient access to transportation, and a lack of educational credentials.

v.   Connecticut

231.    As of November 2019, there were 128,641 Connecticut SNAP recipients between the ages of 18 and 49. Of this population, 25,788 (or 20 percent) were ABAWDs exempt from work requirements exclusively because of waivers. This is the "at-risk" population expected to lose SNAP benefits under the Rule.

232.    Connecticut has continuously operated under either a statewide or partial waiver of the ABAWD work requirements since 1998. Connecticut used a partial waiver from 1998 to 2008. Connecticut expanded from a partial waiver to a statewide waiver in 2009 as a result of the recession. Connecticut has used a partial waiver since 2016. The partial waiver currently in place will expire on March 31, 2020.

233.    Partial waivers have covered a large portion of the State population, primarily (though not exclusively) concentrated in more urban parts of the State and transcending traditional county borders or LMA groupings. Waivers have been applied to communities with higher rates of unemployment, regardless of whether these communities constitute an LMA.

234.    The at-risk population is heavily centralized in Connecticut's more populous towns and cities, with nearly 80 percent (19,965) of the at-risk population located in just 16 communities: Hartford, New Haven, Waterbury, Bridgeport, New Britain, Meriden, East Hartford, Norwich, Manchester, Bristol, West Haven, New London, Windham/Willimantic, Middletown, Windsor and Hamden.

235.    The prior interpretation of "lack of sufficient jobs" as well as the discretionary authority to define an "area" provided Connecticut with the needed flexibility to accurately measure the local economic situation and labor market. It also allowed Connecticut to carefully adjust what would otherwise be overly rigid blanket rules to address localized needs.

236.    As of December 2018, Connecticut had five cities with an unemployment rate over 6 percent; each city's unemployment rate was 50 percent above the national average unemployment rate at the time. Although the Rule purports to allow waivers for areas with an unemployment rate that exceeds 6 percent, none of these cities can maintain a waiver because the Rule permits waivers only for LMAs. The data for these cities are thus diluted by data from surrounding areas with stronger economies. As a result, residents in these economically struggling urban communities that are doing substantially worse than the national average will now also be more nutritionally at-risk and pushed even further into poverty. Forty-two percent of Connecticut residents expected to lose SNAP benefits because of the Rule live in these five cities.

237.    Bridgeport in southwestern Connecticut provides a clear example of how the Rule will negatively affect urban areas in Connecticut. Bridgeport cannot be the subject of a waiver because it is grouped in an LMA with Greenwich and Darien. Although in the same LMA, these municipalities have substantially different actual labor markets, job opportunities, and economies. Indeed, Greenwich and Darien routinely rank among the communities with the highest per capita income in the nation, while Bridgeport is one of the poorest cities in the nation.

238.    ABAWDs in Connecticut face structural cost-of-living challenges that can limit their ability to find and hold jobs sufficient to maintain SNAP benefits. In 2016, nearly 40 percent of Connecticut underemployed or low-paid households could not afford basic needs including housing. A lack of affordable housing, which contributes to housing insecurity and periods of homelessness, creates challenging situations from which it can be practically impossible to obtain and maintain employment. Unless an ABAWD works for an average of 80 hours a month, they will lose their basic nutritional support; however, due to housing insecurity and other challenges, ABAWDs often struggle to meet this threshold.

vi.    Hawaii

239.    The State of Hawaii has a current waiver for the island of Molokai that expires on March 31, 2020.

240.    The unemployment rate of the waived area is 5.0 percent, which is higher than the national unemployment rate of 3.5 percent.  There are approximately 400 ABAWDs currently receiving SNAP benefits on Molokai.

241.    Under the Rule, due to the use of LMAs as the geographic basis for waivers, the island of Molokai will be grouped together with the Kahului-Wailuku-Lahaina, HI Metropolitan Statistical Area, which includes the islands of Maui and Lanai. As a combined LMA, the unemployment rate will be 2.5 percent.

242.    Despite the fact that the island of Molokai has a much higher unemployment rate than the rest of the State, and it is geographically and physically separated from the surrounding islands of Lanai and Maui, it can only be considered for waiver purposes as a combined LMA.

243.    As a result, the unemployment rate for Molokai will be diluted by data from Maui and Lanai, which have stronger economies.

244.    Residents in the economically struggling rural community on the island of Molokai are doing substantially worse than the national average and are more nutritionally at-risk.

245.    If this Rule goes into effect, Molokai will continue to have insufficient jobs for ABAWDs and it will be ineligible for a waiver.

246.    If Molokai is not eligible for a waiver, the ABAWD time limits will apply to its residents even though they have no greater employment prospects or the ability to become self-sufficient.

247.    The loss of Hawaii's discretionary authority to address the needs of its residents in areas that lack sufficient jobs will deprive Hawaii of the opportunity to assist its local economy, labor markets, and the needs of its residents in areas with low employment.

vii.    Illinois

248.    As of December 2019, there were 147,414 ABAWDs residing in Illinois.

249.    Illinois has operated on a statewide or partial ABAWD time limit waiver since 1996. The statewide ABAWD time-limit waiver for Illinois expired in the first quarter of Fiscal Year 2018.

250.    For the period January 1, 2020 through March 31, 2020, two of Illinois's 102 counties are subject to the ABAWD time limit. The remaining counties of the State received a waiver in December 2019. The Illinois Department of Human Services ("IDHS") estimates that if the ABAWD rule were to take effect, only 10 Illinois counties would remain eligible for a waiver.

251.    IDHS, which administers SNAP in Illinois, estimates that as much as 50 percent of current ABAWDs in Illinois, or more than 70,000 individuals, could lose their SNAP benefits because of the Rule. IDHS also estimated in December 2019 that if one half of the individuals currently receiving SNAP benefits were to lose them in 2020, the loss of food purchasing dollars flowing into local economies would be as high as $14 million per month.

252.    The BLS unemployment rate in Illinois was 3.7 percent in December 2019, greater than the national average figure of 3.5 percent. Illinois has multiple pockets of high unemployment throughout the state, including those that are home to the highest proportions of the ABAWD population.

253.    Disparities in Illinois employment rates are especially clear within Chicago, where a 2015 study found that working-age African Americans had an average employment rate of 56

percent, versus 83 percent for working-age White residents. This difference existed even though each group composed a similar share of the overall working-age population.

254.     Many individuals within Illinois's ABAWD population experience significant barriers to employment, according to IDHS. At least 10 percent of these individuals likely experience mental illness. A further 8 percent have substance abuse disorders, and 17 percent have felony records.

255.     In DuPage County, Illinois, the Shriver Center on Poverty Law observed an increase in hunger and hardship after the time limit was implemented in January 2018.

viii.     Maine

256.     The State of Maine has a current waiver covering a total of 204 towns that expires on August 31, 2020.

257.     The unemployment rate of the waived areas varies from 3.6 to 24.7 percent, which is higher than the national unemployment rate of 3.5 percent.  There are approximately 2,126 ABAWDs currently receiving SNAP benefits in these areas.

258.     Under the Rule, due to the use of LMAs as the geographic basis for waivers, only 2 LMAs (Lincoln and Millinocket), constituting a total of 24 towns, will be eligible to be waived.

259.     If this Rule goes into effect, 180 of the 204 currently-waived towns will continue to have insufficient jobs for ABAWDs and will be ineligible for a waiver.

260.     If these 180 towns are not eligible for a waiver, the ABAWD time limits will apply to their residents even though they have no greater employment prospects or the ability to become self-sufficient.

261.    The loss of Maine's discretionary authority to address the needs of its residents in areas that lack sufficient jobs will deprive Maine of the opportunity to assist its local economy, labor markets, and the needs of its residents in areas with low employment.

ix.    Maryland

262.    Maryland operated with a statewide waiver in the aftermath of the recession through 2015. Thereafter, Maryland applied for and received waivers for jurisdictions with a lack of sufficient jobs. As of January 2019, waivers applied to thirteen jurisdictions: Allegany, Caroline, Dorchester, Garrett, Harford, Kent, Queen Anne's, Somerset, Talbot, Wicomico, and Worcester counties and Baltimore City. These waivers expire on March 31, 2020.

263.    As of December 2018, there were approximately 27,874 ABAWDs in the jurisdictions currently under waiver.

264.    Under the Rule, none of the areas currently operating under waivers would likely qualify for waivers, meaning that more than 27,000 Marylanders would be impacted by the Rule.

x.    Massachusetts

265.    Massachusetts has received a statewide or partial ABAWD time limit waiver since 2009. Between 2009 and 2015, Massachusetts received a statewide waiver based on extended unemployment benefits accessed by Massachusetts residents. Massachusetts has relied on a partial ABAWD time limit waiver since 2016 to support ABAWDs in areas having aggregate average unemployment rates 20 percent above the national average for a recent 24-month period.

266.    Massachusetts's current waiver, effective January 1, 2020, was awarded in December 2019 and applies to 83 cities and towns. Only seven of these cities and towns have an unemployment rate higher than the Rule's 6 percent floor. None of the 83 cities and towns are in LMAs that meet the 6 percent threshold. Therefore, as a result of the Rule, none of the 83 cities

and towns in Massachusetts that currently qualify for an ABAWD time limit waiver will be eligible to receive such a waiver under the Rule.

267.    Approximately 104,000 SNAP recipients between the ages of 18 and 49 live in the 83 cities and towns of Massachusetts currently under the ABAWD time limit waiver. While many of these individuals are currently eligible for an exemption from the ABAWD work requirement because, for example, they live with someone under 18 or they have a disability, approximately 16,600 SNAP recipients have no known exemption and therefore will become newly subject to the ABAWD time limit under the Rule. These 16,600 SNAP recipients are at risk of losing their SNAP benefits within three months of the Rule's implementation.

268.    ABAWDs in Massachusetts who become newly subject to the ABAWD time limit will lose access to SNAP benefits if they are unable to find work. These vulnerable individuals include low-income veterans and recently discharged military service members; homeless individuals, including those in doubled-up temporary living situations; returning citizens with criminal records struggling to find work; individuals with undiagnosed and untreated mental health and cognitive impairments; victims of domestic violence; and individuals who are aging out of foster care or youth services programs.

269.    In Massachusetts, many ABAWDs experience higher rates of homelessness and poverty because they have lower educational attainment, more health challenges, and fewer support systems compared to the population at large.

270.    In addition to homelessness and poverty, many ABAWDs in Massachusetts face complex barriers to employment, including lack of advanced degrees or specialized training. Key industries in Massachusetts include healthcare, finance, insurance, and technology, which often require advanced degrees and skills. The jobs available to low-skilled workers, such as work in

the hospitality, transportation, and other service industries, often offer less reliable schedules. A more stringently applied work requirement will not close the skills gap experienced by ABAWDs in Massachusetts's labor market or generate employment opportunities.

271.     Moreover, rising housing costs in Massachusetts are leading to strained budgets and a lack of options for ABAWD SNAP recipient households, which makes access to SNAP benefits even more crucial.

272.     The lack of access to technology and transportation in rural Massachusetts present additional challenges for ABAWD SNAP recipients trying to access steady employment that offers a living wage. Approximately half of the ABAWDs living in Massachusetts reside in areas where public transportation is limited or nonexistent. The Rule's strict ABAWD work requirement does not account for these everyday challenges.

273.     The Rule will hamper Massachusetts's ability to respond quickly to a downturn in the economy. During the most recent recession and in the ensuing recovery years, Massachusetts relied on a statewide waiver of the ABAWD work requirement based on extended unemployment benefits accessed by Massachusetts residents. The Rule's elimination of States' ability to use extended unemployment benefits to show eligibility for a waiver will threaten harm to Massachusetts in the event of a future economic downturn.

xi.     Michigan

274.     Michigan had a statewide waiver through 2016. Effective January 1, 2017, Michigan had four counties no longer eligible for the waiver due to decreasing unemployment levels and were subject to the ABAWD time limit. And effective January 1, 2018, there were an additional 10 counties that were no longer eligible for the waiver, but the rest of the State remained eligible.

275.    Michigan's current waiver expired on December 31, 2019. On November 25, 2019, the Michigan Department of Health and Human Services ("MDHHS") applied for an ABAWD waiver through December 31, 2020. Michigan is seeking to have 77 of its 83 counties eligible for the waiver.

276.    Approximately 1,175,365 Michigan residents received SNAP benefits in Fiscal Year 2019, of which approximately 101,205 are ABAWDs who would be subject to the time limits if the Rule were to be implemented. MDHHS estimates, based on data and experience from other States that 80 to 90 percent of these ABAWDs, or approximately 90,000 individuals, would lose their SNAP benefits.

277.    Michigan's unemployment rate has been more than 20 percent above the national unemployment rate for most of the last 20 years. BLS data showing that Michigan counties have experienced a 24-month average unemployment rate that is 20 percent above the national average for the same period has been the primary basis for the Michigan's waiver of the ABAWD time limits.

278.    Although the unemployment rate for the majority of Michigan satisfies the 20 percent standard, it still falls short of the Rule's new unemployment floor rate of 6 percent, which would limit Michigan to only 13 counties eligible for the waiver.

                    xii.    Minnesota

279.    From the 2009 to 2013 federal fiscal years, Minnesota had a statewide waiver from the SNAP work requirements for ABAWDs. Minnesota has since been approved for partial ABAWD time limit waivers.

280.    There are 87 counties within Minnesota. Only three of Minnesota's 26 currently waived counties will continue to qualify for a waiver under the Rule.

281.     Approximately 14,500 SNAP recipients in Minnesota are ABAWDs. About 4,000 of those 14,500 reside in counties or tribal nations with a time limit waiver. Approximately 2,100 of those 4,000 will be subject to the time limit and lose benefits under the Rule.

282.     Minnesota began using exemptions in January 2016 to extend SNAP benefits for ABAWDs in non-waived areas. In federal fiscal year 2019, Minnesota used 64,539 exemptions, which reached approximately 16,500 ABAWDs.

283.     After the Rule's restriction on carrying over exemptions takes effect October 1, 2020, approximately 6,000 ABAWDs per month in Minnesota are expected to lose their SNAP benefits by December 2020.

284.     With changes to the waiver requirements and exemption use, approximately 8,000 ABAWDs in Minnesota are expected to lose their SNAP benefits under the Rule.

285.     ABAWDs who receive SNAP benefits in Minnesota face barriers to employment. Their average education level is 11.48 years, and 28 percent do not have a high school education. Twenty-two percent are homeless.

286.     ABAWDs who receive SNAP benefits in Minnesota have an average annual income of $2,290.

xiii.   Nevada

287.     Between 2009 and 2018, Nevada was under a statewide waiver. Nevada is currently under a partial waiver for 15 counties, one independent city, and 19 tribal reservations. The partial waiver is effective until March 31, 2020.

288.     Nevada's statewide waivers have primarily been based on unemployment data indicating Nevada's overall unemployment rate has exceeded national unemployment rates by more than 20 percent.

289.    Unemployment data for September 2019 shows that only Esmerelda County (4.6 percent unemployment), Lyon County (4.4 percent unemployment), and Nye County (5.1 percent unemployment) meet current criteria to remain eligible for a waiver. However, because those counties do not meet the 6 percent floor under the Rule, all of the ABAWDs in those counties stand to lose their benefits within three months if the Rule goes into effect.

290.    Nevada has approximately 24,500 ABAWDs statewide, and approximately 1,850 ABAWDs reside in Esmerelda, Lyon, and Nye counties.

xiv.    New Jersey

291.    New Jersey currently has time-limit waiver for 15 counties, relying on the 20 percent standard as well as the regional groupings of contiguous counties. This waiver expires on March 31, 2020.

292.    The combined unemployment rate of the waived areas is 5.2 percent, which is higher than the national unemployment rate of 3.5 percent. There are approximately 12,000 ABAWDs currently receiving SNAP benefits in New Jersey.

293.    Most, if not all, of New Jersey's counties would lose their waivers based on the Rule's prohibition of grouping, reliance on LMAs, and the 6 percent floor.

294.    New Jersey uses its carryover exemptions in non-waived areas to provide ABAWDs with transitional support. The loss of thousands of carried-over exemptions will leave the State with few options to support individuals in the case of an economic downturn or if some ABAWDs experience trouble finding work. Thousands of ABAWDs live in non-waived areas, and the number will increase if the Rule is implemented.

xv.    New Mexico

295.    The State of New Mexico operates under a statewide waiver that expires Feb. 29, 2020.

296.    The expiration of the waiver for work requirements could cause New Mexico's more than 37,000 ABAWD recipients to lose SNAP benefits.

297.    The unemployment rate in New Mexico as of December 2019, is 4.7 percent, the sixth-highest rate in the country. The national unemployment rate for that same month is 3.5 percent.

298.    The State's Human Services Department ("HSD") has documented unemployment based on BLS data of more than 20 percent above the national average threshold over a period of 24 months, as required for a waiver.

299.    New Mexico is unique among the States because of its diverse and sparse population. More than one-third of the State is categorized as completely rural or mostly rural by the Census Bureau. New Mexico is one of the five least densely populated states in the nation, with an average of only 17 people per square mile. Residents of the State's sparsely populated areas often live long distances from job opportunities and lack public transportation. This is especially so in tribal areas with few employers and public services provided by a variety of governments sometimes lacking coordination.

300.    The problem of the rural and frontier nature of the state is amplified by the State's widespread poverty, which limits the resources job-seekers and commuters can access for employment. Recent statistics indicate that 36 percent of children in New Mexico have parents who lack secure employment, a problem that caused New Mexico's children to be rated as the worst in the nation for child well-being.

301.    The State's high poverty rate creates additional obstacles to people seeking work, as those with inadequate resources often lack independent transportation for interviewing and commuting to jobs. And not only does poverty in New Mexico create additional barriers to employment but it also raises the stakes for the termination of SNAP waivers, which would harm an already vulnerable population.

302.    As minorities often face employment challenges because of ethnic or racial discrimination or a legacy of historical inequities, New Mexico faces unique challenges from the new SNAP rules.  New Mexico's overall poverty rate is 19.7 percent, according to its Department of Workforce Solutions ("DWS") —the second highest in the country.  New Mexico is one of only two states in the country where Hispanic residents comprise a plurality of the population. The poverty rate of New Mexico's Hispanic population was 24.8 percent in 2017 (the most recent year statistics are available), and of the American Indian or Alaska Native population, 33.6 percent.

303.    Comparing New Mexico's unemployment rate with the national unemployment rate is a sufficient measure of those deserving a waiver of the work requirement, but the Rule's additional requirement of a 6 percent unemployment rate to qualify for SNAP waivers would cause many people in this poor state to fail to qualify. As an example, one of the State's larger cities, Farmington, has an unemployment rate of 5.5 percent in its Metropolitan Statistical Area-- a rate under the 6 percent threshold required by the Rule.

                    xvi.    <u>Oregon</u>

304.    Oregon has received at least a partial waiver every year since 2008. From 2008 to 2015, Oregon received a statewide waiver.

305.    Oregon's partial waiver for 23 counties and seven reservation areas expired on December 31, 2019. As of January 1, 2020, based on the current waiver criteria, five counties continue to apply SNAP time limits and the rest (31 counties) are waived. However, the Rule will

terminate those waivers on March 31, 2020, and based on new requirements, only six Oregon counties are eligible for waivers effective April 1, 2020.

306.    In 2018, the number of partial waivers covered 29 counties and three reservation areas and in 2017, 33 counties and nine reservation areas. In 2016 Oregon had partial waivers in 34 counties and eight reservation areas.

307.    Oregon's statewide unemployment rate is 3.9 percent relative to the national unemployment rate of 3.5 percent, however that figure varies widely between urban and rural areas of the State, and among demographic groups. In counties with waivers, the unemployment rate is 4.8 percent.

308.    Using the November 2019 numbers, 57 percent of ABAWDs will reside in waived areas and 43 percent are in non-waived areas during the January through March 2020 waiver period. The 57 percent residing in waived areas are outside of Oregon's major population centers in the Willamette Valley, residing primarily in rural and agricultural areas, or other areas heavily affected by changes in timber industry or other historic sources of geographically localized employment.

309.    With new criteria from the Rule, only six counties may be eligible for a waiver and 30 will have to apply the ABAWD time limits. Five percent of ABAWDs will continue to reside in waived areas, and 109,918 ABAWDs or 95 percent will be in non-waived areas if the new Rule takes effect. This is an increase of 60,584 participants in non-waived areas. Of the ABAWDs subject to SNAP time limits, 19 percent, or 21,886 individuals, would lose their SNAP benefits if they do not participate in work activities.

310.    Oregon's currently waived counties have insufficient jobs for ABAWDs, but, under the Rule, will be ineligible for a waiver nonetheless.

xvii.   <u>Pennsylvania</u>

311.    Pennsylvania has received at least a partial waiver every year since 2009. From 2009 to 2015, Pennsylvania received a statewide waiver. Since 2016, Pennsylvania has received a waiver for a State-defined area of contiguous counties and for isolated civil divisions. Pennsylvania has relied on the 20 percent standard as the primary basis for its waivers. Eleven counties and three cities in Pennsylvania have qualified for a waiver since the ABAWD time limit was first instituted because of consistently high rates of unemployment.

312.    The current partial waiver expires on March 31, 2020.

313.    Pennsylvania's most recent waiver covers 60 of the Commonwealth's 67 counties, and two civil divisions. The 60 contiguous counties' combined, average unemployment rate from January 2017 to December 2018 was 4.9 percent. From March 2016 to February 2018, the unemployment rate of the two civil divisions was 5.9 percent and 5.6 percent, respectively. The national unemployment rate from January 2017 to December 2018 was 4.1 percent. So in each case the average unemployment rate was 20 percent greater than the national unemployment rate.

314.    Because Pennsylvania's group of contiguous counties does not meet the 6 percent floor, it would not be eligible for a waiver. Nor would Pennsylvania counties with some of the worst employment prospects. Philadelphia County, for example, where a third of all Pennsylvania's ABAWDs reside, had an unemployment rate of 5.8 percent as of October 2019. Although that is 62 percent above the national average, Philadelphia County would not qualify for a waiver because the unemployment rate is below the newly introduced 6 percent floor.

315.    In any event, under the Rule, Pennsylvania could not apply to waive just Philadelphia County. Indeed, because of the limitation of waivers exclusively to LMAs,

Pennsylvania cannot exercise its local expertise and knowledge of statewide employment patterns to define the areas for which it seeks a waiver.

316.    In Pennsylvania, many LMAs encompass large geographic areas. Even in a single LMA, there could be a great distance between homes and job opportunities. Many low-income workers do not have a car and few parts of the State outside the major metropolitan areas have a public transportation system that permits individuals to travel to more economically robust areas for work. So limiting waiver eligibility to LMAs rather than allowing Pennsylvania to use its knowledge of areas of economic cohesion overstates the positive labor options for low-wage workers.

317.    Only two LMAs in Pennsylvania would meet the 20 percent standard and 6 percent floor. Therefore, of the 95,000 ABAWDs currently receiving SNAP benefits in Pennsylvania, between 80 and 90 percent of them will lose their benefits within three months were this Rule to be implemented.

318.    Pennsylvania's currently waived counties have insufficient jobs for ABAWDs, but, under the Rule, they will nevertheless be ineligible for a waiver.

319.    Because many Pennsylvania counties will be ineligible for a waiver based on unemployment rates, the ABAWD time limits will apply to many Pennsylvania residents for the first time, without them having any greater prospects for employment or ability to obtain self-sufficiency.

xviii.    Rhode Island

320.    Rhode Island first received an ABAWD time-limit waiver in 1996 and has received such a waiver every year thereafter for at least some of the State's municipalities. From 2008 to 2017, Rhode Island has had a statewide waiver. Rhode Island has relied on its 24-month average

unemployment rate, which has been more than 20 percent above the national average since 1997, as the primary basis for its waivers.

321.    On September 1, 2017, the Town of Richmond's waiver expired. On September 1, 2018 the waivers for the following municipalities expired: Barrington, Cumberland, Exeter, Glocester, Jamestown, Little Compton, Lincoln, Narragansett, Newport, North Kingstown, North Smithfield and Warwick. On September 1, 2019 the waivers for the following municipalities expired: Bristol, Burrillville, Coventry, Cranston, East Greenwich, Foster, Hopkinton, Middletown, Portsmouth, Smithfield, South Kingstown, Tiverton, and West Greenwich. The waivers for all the remaining Rhode Island municipalities except New Shoreham are set to expire on March 31, 2020.

322.    There are approximately 8,935 ABAWDs currently receiving SNAP benefits in Rhode Island. Approximately 80 percent of them will lose their benefits within three months were this Rule to be implemented.

323.    ABAWDs in the Rhode Island face significant barriers to employment. For example, many of Rhode Island's long-term unemployed workers may face hiring discrimination, as some employers discriminate against workers with long career gaps by assuming that their skills are no longer valuable.

324.    ABAWDs in Rhode Island are also confronted with a lack of affordable housing, which contributes to housing insecurity and homelessness, situations from which it may be impossible to maintain employment.

325.    None of these attributes is properly captured or considered by the overall unemployment rate. Rhode Island has insufficient jobs to accommodate its ABAWD population, and yet, contrary to the statute, will be ineligible for a waiver.

326.    Even if Rhode Island's unemployment as a whole exceeded the 6 percent floor, it may not qualify for a waiver under the Rule because the unemployment of the entire LMA, which extends into Massachusetts, may as a whole have unemployment less than 6 percent. In other words, even if Rhode Island's unemployment numbers qualified it for a waiver under the Rule, the unemployment of other areas might sufficiently dilute Rhode Island's unemployment number such that Rhode Island would ineligible, despite the fact that the unemployment or lack thereof of another State will not create more jobs in Rhode Island that ABAWDs are qualified for and can reasonably get to.

327.    Because Rhode Island will be ineligible for a waiver based on unemployment rates, the ABAWD time limits will apply to many Rhode Island residents for the first time, without them having any greater prospects for employment or ability to obtain self-sufficiency.

xix.    Virginia

328.    The Commonwealth of Virginia first received a waiver from the ABAWD time limit in 1996 and has received such a waiver every year thereafter. The waiver has always been for certain localities except from 2009 to 2013 when it was statewide due to the recession. Virginia used the combined unemployment rates of geographically connected localities to identify areas where the unemployment rate was 20 percent more than the national average as the primary basis for its waivers.

329.    The current Virginia waiver expires on March 31, 2020.

330.    Using the criteria in the Rule, Virginia will have no localities that are entitled to a waiver.

331.    There are approximately 12,000 ABAWDs currently receiving SNAP benefits in Virginia. Approximately 38 percent of them will lose their benefits within three months were this Rule to be implemented.

332.    ABAWDs in Virginia face significant barriers to employment. Many individuals in today's tight labor market without employment face multiple barriers including lack of high school education, undiagnosed mental illness, physical disabilities, and lack of transportation.

333.    Many of Virginia's waived localities are in rural areas of the State with few resources for employment including transportation. These rural areas lack public transportation to available jobs and training opportunities. In urban areas, there is more competition for available jobs making it difficult for those with limited education and training to compete.

334.    While Virginia's unemployment rate is low, there are still localities that have an unemployment rate that is 20 percent more than the national unemployment rate. The new 6 percent floor prevents these areas from qualifying for a waiver. Many localities in Virginia have never been without a waiver. Residents of these localities will now be subject to the time limit without increased resources for employment. This will lead to increased poverty among an already vulnerable population.

xx.    Vermont

335.    The State of Vermont has received a waiver from ABAWD time limits for every year since 2013. The current waiver exempts 17 towns, primarily in the northeastern part of the state, widely known as the Northeast Kingdom, an area that is extremely rural with a limited economy and support services.

336.    Under the Rule, Vermont's current waiver will expire on March 31, 2020.

337.     Using the criteria in the Rule, no geographic areas of Vermont will qualify for a waiver and 217 households will now be subject to the ABAWD requirements, putting them at risk of losing benefits on July 1, 2020 if they are not able to meet the work requirements due to their unique barriers to employment.

338.     ABAWDs in Vermont face significant barriers to employment, particularly in the Northeast Kingdom. Many individuals in today's tight labor market without employment face multiple barriers including lack of high school education, undiagnosed mental illness, substance use disorder, physical disabilities, lack of transportation, and lack of childcare.

339.     Many of Vermont's waived localities are in rural areas of the State with few resources for employment including transportation. These rural areas lack public transportation to available jobs and training opportunities.

340.     Because Vermont will be ineligible for a waiver based on unemployment rates, the ABAWD time limits will apply to many Vermont residents for the first time, without them having any greater prospects for employment or ability to obtain self-sufficiency.

xxi.     New York City

341.     New York City accepted and began to operate under the New York statewide waiver in 2014. That waiver ran through the end of 2015 and covered all ABAWDs in New York City.

342.     Since the beginning of 2016, New York City has received a waiver that covers most ABAWDs in New York City. New York City's current waiver runs from January 1, 2020, through March 31, 2020, and covers ABAWDs that reside in three out of the five boroughs (counties) of New York City—the Bronx, Brooklyn, and Staten Island. The average unemployment rate in these counties was 4.9 percent for the 24-month period from January 2017 to December 2018, which

was 20 percent above the national average rate of 4.1 percent during the same 24-month period. New York City's current waiver also covers ABAWDs that reside in four Community Districts (which are subdivisions of boroughs) in Manhattan. These four Community Districts cover a section of Upper Manhattan that, by many measures, is distinct and separate from the rest of Manhattan, and had a combined average unemployment rate of 6.3 percent for the 24-month period from January 2017 to December 2018, which was also more than 20 percent above the national average. In addition, the waiver also covers ABAWDs that reside in three Community District in New York City's fifth borough, Queens. Each of these three Queens Community Districts qualified for a waiver with 24-month unemployment rates that were more than 20 percent above the national average.

343.    There are approximately 70,000 ABAWDs in New York City. The vast majority, approximately 64,500, reside in parts of New York City that are covered by the 2020 waiver.

344.    Several geographic areas within New York City do meet the 6 percent floor set by the Rule. The four Community Districts in Upper Manhattan had a combined 24-month average unemployment rate of 6.3 percent for period of January 2017 through December 2018 and one Community District in Queens had a 6 percent unemployment rate during the same period.

345.    However, New York City cannot seek waivers for *any* areas under the Rule, which requires the unemployment rate in New York City's LMA to be above 6 percent. New York City is part of an LMA that extends not only past New York City and into bordering counties in New York, but also pushes past the borders of New York State and includes counties in New Jersey and Pennsylvania. The outer limits of the LMA, which includes 25 counties in three States, are more than 100 miles from New York City.

346.    New York City will not receive a waiver under the Rule because the unemployment rate for its LMA is below 6 percent. This will be so even though New York City can credibly show that ABAWDs in New York City cannot meaningfully access jobs in large portions of the LMA, some of which may be up to 100 miles away and in areas that do not have reliable public transportation, if at all.

347.    The unemployment rate of an LMA that includes 25 counties over three states hardly reflects the economic reality facing the approximately 70,000 ABAWDs in New York City. As is the case across the country, ABAWDs in New York City face significant barriers to employment. ABAWDs in New York City are much more likely than the general labor force to be members of racial or ethnic groups that face employment discrimination. They also tend to have lower levels of educational attainment than the general labor force and also often lack basic job skills such as reading and writing, resulting in a mismatch between available jobs and the skill set of ABAWDs.

348.    ABAWDs in New York City face high rates of housing instability, which adds another barrier to seeking and retaining employment. As of January 2019, almost 30 percent of ABAWDs in New York City had no permanent address, and an additional 4 percent were living in homeless shelters.

349.    Many ABAWDs in New York City also have tenuous and unstable health as a result of conditions that may not be severe enough to exempt them for work requirements, such as post-traumatic stress disorder, back injuries, respiratory difficulties, and depression, but make it difficult to maintain consistent employment.

350.    Each year, the New York State Office of Temporary and Disability Assistance ("NYS OTDA") allocates a certain number of exemptions to New York City. New York City does

not know how many exemptions it will receive from NYS OTDA under the Rule, but the ABAWD time limit will apply to the vast majority of ABAWDs in New York City.

351.    Based on the USDA's own estimate that two-thirds of ABAWDs will lose SNAP benefits a result of the Rule, New York City estimates approximately 50,000 ABAWDs in New York City will lose SNAP benefits shortly after the Rule goes into effect without any greater prospects for long-term, stable employment or ability to obtain self-sufficiency.

**B.**      **The Rule Will Increase Plaintiffs' Regulatory Burdens.**

352.    Plaintiffs will incur several administrative and logistical costs as a result of the Rule, including the cost of communicating with SNAP recipients regarding the changes in applicable regulations, the cost of dramatically increasing the scope of E&T programs for ABAWDs who are newly subject to work requirements, and increased costs related to benefits-termination hearings. These costs harm Plaintiffs' proprietary interests.

i.      The District of Columbia

353.    The District's Department of Human Services ("DCDHS"), which administers SNAP in the District, will incur significant administrative costs as a result of the Rule, which DCDHS estimates will be hundreds of thousands of dollars (including staff, notices, and service center time). These increased costs will detract from other elements of the District's administration of SNAP and DCDHS's programs.

354.    The Rule's changes would require DCDHS to significantly adjust operations toward termination of SNAP benefits based on the three-month time limit for the first time.

355.    The District would also need to develop and disseminate notices to impacted and potentially impacted households advising of their ABAWD status, rights and responsibilities with respect to the new work requirements, reporting obligations, and advanced notice of any adverse actions taken as a result of the Rule.

356.     In addition to these regulatory costs, DCDHS will need to greatly expand its E&T program to provide services to ABAWDs who are newly subject to work requirements as a result of the Rule. DCDHS currently offers an E&T program to voluntary participants that includes job search training, work experience, educational and vocational training, job retention services, and case management services.

357.     The Rule dramatically increases the need for E&T program services. DCDHS's E&T program currently serves about 1,200 people and is planning to serve 2,000 people in FY 2020, or about 10 percent of the estimated ABAWD population in the District. Serving the entire ABAWD population will require a tenfold increase in the scope of the E&T program.

358.     DCDHS has used all available District and federal funding to reach its current E&T capacity. Indeed, the District has consistently leveraged a significantly higher portion of federal funds than most States by spending several hundred thousand dollars of its own resources and leveraging millions of dollars in subgrantee resources for the SNAP E&T program. Despite these efforts, the SNAP E&T program is not funded at a level that would allow for participation of thousands of additional participants.

359.     Providing an adequate E&T program is particularly expensive in the District because of the high skill level demanded by the District's labor market, with approximately 70 percent of jobs requiring at least a bachelor's degree. Most low-income District residents have a high school degree or less, creating a skills disparity for this population that is greater than in many other areas of the country. Given this skills and education disparity, the training and education needed to successfully transition individuals to self-sufficiency is particularly expensive and lengthy. Expanding E&T programs to eliminate the education disparity is not feasible and even lessening the disparity imposes particularly onerous burdens on DCDHS.

    ii. <u>New York</u>

360. OTDA administers SNAP in New York. OTDA supervises the administration of several programs, including SNAP, by local social services districts in New York State.

361. All social services districts in New York must evaluate each SNAP applicant or recipient's employability and ABAWD status at application, re-certification and whenever they become aware of a change in a household's circumstances. If there is an individual in the household who may be an ABAWD, social services districts must inform the household of the time limit, which individual(s) are subject to the requirement, exemption criteria, the consequences for refusing or failing to comply with the ABAWD requirement without good cause and the action that may be taken by the ABAWD to maintain or re-establish eligibility for SNAP benefits for more than three months in the 36-month period. At a minimum, this information must be provided during the eligibility interview verbally and in writing.

362. Social service districts that do not have an ABAWD waiver for the full county are required to monitor compliance with the ABAWD requirement on a monthly basis. This requires districts to establish procedures and have staff capacity to (1) gather monthly attendance verification for all ABAWDs, (2) enter actual hours of participation in work activities in the caseload management system or appropriate New York City systems for all ABAWDs, and (3) monitor compliance with the 80-hour monthly work requirement for every ABAWD each month to ensure that non-compliant ABAWDs do not receive more than three months of benefits.

363. ABAWDs who have failed satisfy ABAWD requirements for two months and are not meeting the ABAWD requirement in the third month must be issued a Notice of Adverse Action. This requires staff to review individual case record documentation to ensure the accuracy and timeliness of discontinuance of benefits to prevent the issuance of a fourth month of SNAP

benefits. Moreover, social services districts must ensure that any SNAP benefits provided to such individuals are consistent with ABAWD rules, which in turn requires the collection of information about activities each ABAWD is performing and determination whether those activities satisfy work requirements. By substantially increasing the number of ABAWDs subject to these requirements, the Rule will necessarily increase the number of individuals with whom social services districts will need to perform the additional monitoring work.

364.    The number of individuals newly subject to ABAWD work requirements due to the Rule represents an almost sevenfold increase in ABAWD population. With the loss of the ABAWD waiver in all but one district in New York State, districts must notify all individuals subject to the ABAWD time limits well in advance of the waiver expiration. This requires districts to review their current caseload to identify individuals who will be subject to the ABAWD requirements beginning April 1, 2020, and provide adequate notification. This is a labor intensive, manual process for each district as it requires running caseload reports and manually reviewing each case record and sending manual notices (districts outside of New York City)—including an ABAWD Informational Letter and the mandatory ABAWD Work Activity Letter that provides the offer of enrollment in an ABAWD qualifying work activity. The cost for these mailings is borne by OTDA and social services districts.

365.    No additional funding was provided to the State or social service districts to address the changes presented by the Rule or to ensure meaningful service to an exponentially larger ABAWD population in less than four months. This would necessitate the reallocation of existing resources, additional staffing to ensure ABAWD compliance, and additional noticing and adherence to due process requirements.

iii.   <u>California</u>

366.    The Rule will require the California Department of Social Services ("CDSS"), which administers CalFresh, to provide extensive nearly statewide training to more 40 counties that have been under a time-limit waiver for over a decade. With little to no institutional knowledge of the ABAWD time limit rules at the county level, staff must be trained how to: (1) properly explain the Rule to recipients; (2) determine exemptions; (3) engage ABAWDs in qualifying work activities; (4) apply the Rule; and (5) track recipients' countable months, work and other qualifying activities, and use of discretionary exemptions, all in less than four months. This will require substantial staff time at both the State and county level that will likely require diversion of staff and resources from other important project and program areas.

367.    Ahead of implementation, each county is required to develop an ABAWD Time Limit County Readiness Plan and submit it to CDSS for review. Normally counties are aware of their implementation date at least a year in advance, and CDSS receives these county plans six months before implementation. This provides CDSS time to review the plans and provide any necessary technical assistance. As a result of the Rule, 34 newly implementing counties will need to develop their plans and CDSS will need to conduct its review on an unreasonably expedited timeline—in less than four months total.

368.    When Santa Clara County prepared for implementation of the time limit in 2018, the county launched a significant effort to add six new CalFresh E&T providers to serve non-exempt ABAWDs. This effort, supported by the State, took over a year and required the commitment of significant county and community resources. But, most importantly, Santa Clara County had the benefit of an existing CalFresh E&T program infrastructure. Not all counties in California currently offer CalFresh E&T due to limited county and community resources, financial

and otherwise, and because there may be limited employment and training service providers available.

369.    Before April, ABAWDs must be provided with written notice of the ABAWD time limit. The notice must explain how the ABAWD time limit works, what the requirements are, and what exemptions exist. Even in the six counties that currently implement the time limit, significant amendments will be required to address issues specific to the expedited timeframe for implementation and the anticipated elimination of the State's carryover of discretionary exemptions. These notices must be sent at least 30 days prior to the April 1, 2020, effective date of the Final Rule, though ideally, they would be sent earlier.

370.    Once CDSS's notice and screening tool is finalized, it must be translated into 17 languages to ensure compliance with SNAP language access requirements. These translations take time and will lead to additional previously unanticipated costs. Moreover, processing the results of the screening tool outside of normal touchpoints will create an unanticipated workload for counties.

371.    It is possible that the State's three eligibility IT systems will not be able to program a mass mailing of the notices and screening tool in this expedited timeframe. If unable to complete this mailing, California can anticipate significant costs that were not previously budgeted for, including through the Office of State Publishing ("OSP"). If OSP cannot complete a statewide mailing on time, individual counties may have to print and mail notices to certain ABAWDs outside of the mass noticing process. This will likely lead to further delays and will heighten the risk of benefit payment errors.

372.    The expedited timeline also invites a great risk of human error. Although CDSS plans to provide several training opportunities and detailed written guidance, California's counties

have thousands of eligibility workers, so it is unrealistic to assume that all eligibility workers will be prepared to accurately apply the ABAWD time limit in the time provided.

373.    CalFresh E&T anticipates a drastic increase in the demand for E&T services as more ABAWDs are subject to the time limit. However, SNAP E&T annual plans are submitted each August, so CalFresh E&T did not account for this impact in its annual plan.

374.    The drastic increase in demand for assistance finding work to remain eligible for the SNAP benefit cannot be met. CalFresh E&T does not have the capacity to provide services to all of the ABAWDs who will need to engage in qualifying work activities as a result of the Rule, much less within the timeline required by the Rule. The Rule neither offers nor contemplates supplementing E&T resources. Those seeking employment to maintain SNAP benefits will likely not have assistance through E&T.

375.    Without adequate access to CalFresh E&T services, ABAWDs may lose eligibility for CalFresh benefits, and, once an ABAWD is no longer receiving CalFresh benefits, they also lose their eligibility for CalFresh E&T services. Even if additional CalFresh E&T services become available over time, ABAWDs may not be eligible for them and will, as a result, potentially not gain enough qualifying work hours to regain CalFresh eligibility.

376.    The Rule's changes to discretionary exemptions will also require significant reallocation of resources. California's 850,000 carryover exemptions are a critical part of how California distributes benefits because it encourages counties to be judicious in their use and allows flexibility in meeting different needs. Under the Rule, California will have to have to re-allocate the number of available exemptions by county, a much more rigid process, and will require significant resources to determine the allocation. CDSS will need to identify the likely usage rate of each county and formally allocate discretionary exemptions to each of 40 counties, including

the 34 counties newly implementing the time limit. This analysis and policy guidance will require substantial staff time for both CDSS CalFresh policy and CDSS fiscal staff.

377.    When recipients lose eligibility or experience a decrease in benefits, they are entitled to an administrative evidentiary hearing. As a result of the implementation of the Rule, CDSS anticipates a significant increase in requests for administrative hearings. This will likely lead to delays in hearings, which violates the rules of SNAP and the many other programs for which the State Hearing Division provides administrative review.

iv.    Colorado

378.    SNAP and SNAP E&T are State-supervised, county-administered programs in Colorado. The Colorado Department of Human Services ("CDHS") oversees SNAP implementation, which is administered by county departments of human/social services. CDHS provides policy guidance, training, technical assistance, and overall programmatic monitoring in adherence to program regulations.

379.    Counties that no longer receive a waiver as a result of the Rule will need to reassess SNAP recipients who are currently qualified as ABAWDs, to determine if each ABAWD is eligible for an exemption from the work requirement or time limit.

380.    Counties that no longer receive a waiver will need to develop outreach materials to notify all impacted ABAWDs of work requirements and possible adverse actions.

381.    Counties that no longer receive a waiver will need to expand or develop E&T programs.

382.    In reviewing SNAP eligibility for ABAWD recipients, developing outreach materials, and notifying all impacted individuals of work requirements and adverse actions, counties that no longer receive a waiver will incur significant administrative costs and burdens.

383.    CDHS will also incur costs and burdens as a result of the Rule. CDHS will need to begin providing policy guidance, training, technical assistance, and overall programmatic monitoring in adherence to program regulations for areas no longer covered by a waiver.

v.    Connecticut

384.    The Rule adds administrative costs to the Connecticut Department of Social Services ("DSS") and the State. Allocating financial and staff resources to address the Rule's complexity and inefficiency will detract from other necessary components of SNAP administration.

385.    Administrative costs will include a minimum of $207,500 just for the costs of direct communications to all ABAWDs, plus costs to develop notices and make system coding changes to execute the mailings. Based on prior mass mailings of this scope, there will be increased operational burdens on call centers and field offices, slowing or disrupting the pace of other critical work.

386.    Additionally, given the volume of discontinuances involved, Connecticut anticipates a significant rise in the number of hearings requested, which will require the hiring of additional hearing officers with an average annual salary of approximately $131,500 (including benefits).

387.    Operational costs of the Rule will continue into the future. Monitoring ABAWD compliance is an arduous and inefficient process, requiring substantially more staff effort than the typical SNAP case. ABAWD rules are more complex than most other eligibility rules with additional client reporting requirements and additional worker evaluation required compared to typical cases. Additionally, all eligibility staff will need to be retrained in ABAWD case administration, given that the Rule greatly expands the number of statewide ABAWD cases.

388.     DSS will be required to make system coding changes to implement the Rule. System information technology changes are currently fully scheduled through 2020. Designing and testing new expedited system changes in advance of an April 1, 2020, effective date will displace other important system changes intended to ensure SNAP program integrity and operational efficiency.

389.     Connecticut will not be able to support the at-risk ABAWDs who seek job training assistance in order to maintain SNAP benefits. Connecticut, like many other States, does not have sufficient capacity in the SNAP E&T program to support the number of ABAWDs expected to lose benefits under the Rule. Connecticut, after years of painstakingly building up E&T partner operations with community colleges and community-based organizations, currently serves approximately 2,700 clients through the voluntary E&T program at a cost of approximately $7 million per year. To support the entire ABAWD at-risk population, nearly 10 times more resources would be required. In addition to the nearly $70 million dollars that would need to be provided by the State legislature or private entities, Connecticut would need a significant period to be able to ramp up the program to expand it so vastly from its current state. It is entirely unrealistic to think that there would be any meaningful expansion by April 1, 2020.

390.     Connecticut currently administers its SNAP E&T program with two State employees and a limited technology support structure. To expand the SNAP E&T program tenfold to serve those individuals at risk of losing benefits due to the new rule, an additional 10 to 20 staff would be required, at a cost of $1 million to $2 million annually, as well as costs for system updates and maintenance.

vi.   Hawaii

391.   The Hawaii Department of Human Services will incur additional costs as a result of the Rule.

392.   The number of in-person visits and phone calls will increase as more individuals become subject to the ABAWD time limit or lose benefits. This will result in additional labor costs needed to address public concerns, and staff will have less time to process needed on-going eligibility work.

393.   Notices to all ABAWDs to advise them what the Rule means for them and what will happen effective April 2020 will have to be generated by eligibility staff, batch job processed by IT staff, and mailed and distributed by contracted vendors, all of which will result in additional and unexpected costs.

394.   Additionally, the Rule will impact Hawaii's SNAP E&T program. Currently E&T programs are located primarily in cities and towns that do not qualify for an ABAWD time limit waiver.  Under the Rule, Hawaii will now have to develop plans to expand the SNAP E&T program so that ABAWDs will have access to that program.

vii.   Illinois

395.   The Rule will impose a significant administrative burden on the field offices of the Illinois Department of Human Services ("IDHS"), which administer SNAP benefits in the state.

396.   As currently situated, IDHS does not have the resources to provide adequate federal SNAP E&T funding on the proper scale to assist all ABAWDs in Illinois to find employment. The Rule's more expansive application of the time limit will endanger the food security of those ABAWDs in Illinois whom IDHS is not able to properly serve with E&T.

397.    At present, IDHS's contracted E&T providers have funded capacity to serve approximately 1,500 ABAWDs at a given time. In FY 2019, IDHS estimated that it could serve just 9,400 participants through E&T. This lack of resources is particularly harmful in rural areas, where there are few E&T providers and IDHS field offices are typically geographically distant from the populations they serve.

viii.    Maine

398.    The Maine Department of Human Services will incur additional costs as a result of the Rule.

399.    The number of in-person visits and phone calls will increase as more individuals become subject to the ABAWD time limit or lose benefits. This will result in additional labor costs needed to address public concerns, and staff will have less time to process needed on-going eligibility work.

400.    Notices to all ABAWDs, to advise them what the Rule means for them and what will happen effective April 2020, will have to be generated by eligibility staff, batch job processed by IT staff, and mailed and distributed by contracted vendors, all of which will result in additional and unexpected costs.

401.    Additionally, the Rule will impact Maine's SNAP E&T program.  Currently E&T programs are located primarily in cities and towns that do not qualify for an ABAWD time limit waiver. Under the Rule, Maine will now have to develop plans to expand the SNAP E&T program so that ABAWD's will have access to that program.

ix.    Maryland

402.    Maryland's E&T program, the Food Supplement Employment and Training Program ("FSET"), matches individuals receiving SNAP benefits with job training programs.

Maryland recently revamped its program by making it voluntary and transitioning from a job-search-only program to one that offers more intensive services. FSET is not prepared to handle the influx of thousands of ABAWDs newly subject to time limits under the Rule.

<blockquote>x.   <u>Massachusetts</u></blockquote>

403.   The Massachusetts Department of Transitional Assistance ("MA-DTA") will incur additional costs as a result of the Rule.

404.   The Rule's sweeping change will require MA-DTA to devote significant administrative time and resources to identify SNAP recipients who become newly subject to the ABAWD time limit under the Rule. This case review process will require extensive oversight, paperwork, case management, administrative time and resources, and systems changes.

405.   MA-DTA will also need to develop targeted ABAWD outreach materials to appropriately notify all impacted individuals of their rights and responsibilities with respect to the latest work requirements, reporting obligations, and any adverse actions taken as a result of the Rule. This outreach and notification process will be labor intensive. MA-DTA agency staff will be required to individually engage a significant number of SNAP recipients to explain the new requirements and counsel them through the process.

406.   The number of in-person visits and phone calls from SNAP recipients will increase as more individuals become subject to the ABAWD time limit or lose benefits and inquire about their status.

407.   The increased volume of work for MA-DTA agency staff will lead to additional, unreimbursed administrative costs for Massachusetts.

408.   In addition to increased administrative costs, the Rule will impact MA-DTA's SNAP E&T program (which, in Massachusetts, is also known as SNAP Path to Work). SNAP Path

to Work offers job-focused education and training opportunities, job search assistance, and employment support services to approximately 1,300 SNAP recipients each year. Currently these E&T programs are located primarily in cities and towns that do not qualify for an ABAWD time limit waiver. As a result of the Rule, SNAP recipients in formerly waived areas may seek employment-related-services from MA-DTA's E&T program.

xi.   <u>Michigan</u>

409.    MDHHS does not have the capacity to expand its SNAP E&T program to meet all of the ABAWDs' needs to help them avoid loss of food assistance. MDHHS's SNAP E&T program is currently funded at $3.6 million for the entire State. This allows the State to run a robust program through service centers in only 26 of the 83 counites. ABAWDs in the remaining 57 counties are more limited in options to satisfy work requirements. MDHHS is already taking advantage of all available federal funding for E&T. Despite these strong efforts, the SNAP E&T program is not funded at a level that would allow for participation of thousands of additional participants.

xii.   <u>Minnesota</u>

410.    In Minnesota, SNAP eligibility is determined by counties and tribal nations, and they are responsible for administering the program. The Minnesota Department of Human Services is responsible for statewide oversight of the program.

411.    For areas no longer waived as a result of the Rule, SNAP eligibility will need to be reassessed for all ABAWD recipients. Reviewing SNAP eligibility for ABAWD recipients will yield increased burden and costs for the Minnesota Department of Human Services, counties, and tribal nations.

412.    Eligibility workers will have limited time to reassess affected cases and send proper notices to ABAWDs whose SNAP benefits must stop after implementation of the Rule. Eligibility workers for agencies in areas that were once waivered will also need training on ABAWD policies, further burdening the Minnesota Department of Human Services, counties, and tribal nations.

413.    All ABAWDs will have the right to appeal the termination of their benefits, and substantial local and state resources will be exhausted through those proceedings.

xiii.    Nevada

414.    As discussed above, Nevada has 24,500 ABAWDs statewide, with approximately 1,850 ABAWDs in Esmerelda, Lyon, and Nye counties, which will be subject to the time limit as the result of the Rule.

415.    The Nevada Supplemental Nutrition Assistance Employment and Training ("SNAPET") only has one education component. The educational component of SNAPET is only available at Truckee Meadows Community College in Reno, Nevada, and is limited to 150 participants.

416.    The Nevada Division of Welfare and Supportive Services is working with the Nevada System of Higher Education to expand availability of the educational component of SNAPET statewide. However, even with the expected expansion of the educational component, the program will remain limited on space. Current infrastructure and funding for SNAPET are inadequate to support the entire ABAWD population in Nevada.

xiv.    New Mexico

417.    New Mexico will incur significant administrative and logistical costs as a result of the Rule, including the cost of communicating with SNAP recipients regarding the changes in applicable regulations, the cost of dramatically increasing the scope of E&T programs for

ABAWDs who are newly subject to time limits, and increased costs related to benefits-termination hearings. These costs harm New Mexico's proprietary interests.

418.    The New Mexico Human Services Department ("NM HSD") estimates that the State initially will need to spend approximately $60,000 to provide notices to affected SNAP recipients. This cost includes the development and dissemination of notices advising SNAP recipients of their ABAWD status, rights and responsibilities with regard to new work and reporting obligations, and advance notice of adverse actions taken as a result of the Rule.

419.    NM HSD estimates that it will need to spend $3.76 million with an additional $3.7 million needed in federal funding to expand E&T to serve ABAWDs.

420.    No additional funding was provided to the State or social service districts to address the changes presented by the Rule or to ensure meaningful service to an exponentially larger ABAWD population in less than four months. This would necessitate the reallocation of existing resources, additional staffing to ensure ABAWD compliance, and additional noticing and other requirements to adhere to due process.

xv.    New Jersey

421.    New Jersey's Department of Human Services ("NJDHS") supervises the State's SNAP program. New Jersey's SNAP program is supervised by the State and administered by the individual counties. The eligibility determinations occur at the county level. The State and counties will incur costs to administer the programmatic changes.

422.    NJDHS operates a computer system that determines eligibility and issues benefits for all SNAP recipients as well as tracking ABAWD months for continued eligibility. The eligibility system is an older legacy mainframe system that requires a significant amount of specialized resources to program. Currently, the system is reprogrammed once per year after the

State receives its waiver approvals. In 2020, New Jersey will be forced to recode the entire system when the Rule is implemented. This will require the State to shift resources from other programs and may cause delays in the administration and tracking of other programs.

423.    NJDHS will face additional administrative burdens. It must now rapidly analyze the LMA data, compile a new waiver request, and await a determination from FNS.

xvi.    <u>Oregon</u>

424.    Oregon will need to request a new waiver for counties to be considered beyond March 31, 2020. However, the biggest impact is on areas previously waived and now required to apply SNAP time limits. A year's worth of onboarding activities will be necessary in a matter of months prior to the Rule effective date to ensure those areas are ready to serve ABAWDs. These areas are mostly located in rural geographic regions and lack the resources available to areas currently applying SNAP time limits.

425.    Based on the impact of prior changes to the waiver requirements, Oregon estimates the Rule will require the following from its Department of Human Services ("ODHS") and Self-Sufficiency Programs ("SSP") to prepare for a new time SNAP time limit waiver: (1) review and analysis of BLS data to identify affected population and applicable waiver and non-waiver areas; (2) communicate the program changes to local area affected divisions and program partners including local managers of SSP programs, the Oregon Employment Department, which is the Employment & Training partner for ABAWDs, internal SSP policy leadership and management, and Community based partners in affected counties, reservation, and communities; and (3) the E&T Contractor will need to hire and train staff to be an ABAWD employment specialist.

426.    The Rule imposes several administrative burdens without increase in funding. Thus, SSP and ODHS would have to absorb additional costs of compliance. As a result, resources

currently devoted to providing direct support to Oregonians would have to be diverted to program administration.

427.    Additional costs to SSP and ODHS would include developing and disseminating notices to impacted and potentially impacted households advising of their ABAWD status, rights and responsibilities with respect to the new work requirements, reporting obligations, and advanced notice of any adverse actions taken on their SNAP cases as a result of the new Rule's implementation. These costs would erode effectiveness of the SNAP program and are counter to the Rule's stated goal.

xvii.    <u>Pennsylvania</u>

428.    Under the Rule, Pennsylvania's Department of Human Services ("PADHS") will incur significant costs. Those costs will hamper PADHS's ability to administer both SNAP and its other programs.

429.    The Rule will require PADHS to spend $56,050 on a one-time mailing to alert all ABAWDs of the new policies.

430.    On top of that, PADHS will need to spend $2,250,000 per year because of the increased administrative burden associated with the recertifying ABAWDs' eligibility every three months rather than annually, which the Rule effectively requires.

431.    PADHS also must expand its job training programs. Providing job-training programming to just 1.4 percent of ABAWDs who will be subjected to time limits for the first time will cost more than $21 million over the next six years. Half that cost will be borne by Pennsylvania, local governments, or others within the Commonwealth. And, at least for fiscal year 2020, the half that would come from the federal government is unavailable because of an already-reached funding limit.

xviii.   <u>Rhode Island</u>

432.     Rhode Island's Department of Human Services ("RIDHS"), which administers the State's SNAP program, will incur significant costs as a result of the Rule. These increased costs will detract from other elements of the State's SNAP program and RIDHS's programs.

433.     The Rule's sea change would require RIDHS to significantly adjust operations toward having the terminate SNAP benefits based on the ABAWD time limit for the first time for many SNAP recipients.

434.     Rhode Island would also need to develop and disseminate notices to impacted and potentially impacted households advising of their ABAWD status, rights and responsibilities with respect to the new work requirements, reporting obligations, and advanced notice of any adverse actions taken as a result of the Rule.

435.     In addition to these regulatory costs, RIDHS will need to expand its E&T program to provide services to ABAWDs who are newly subject to work requirements as a result of the Rule. RIDHS currently offers an E&T program to voluntary participants that includes adult education, skills training, work readiness training, job counseling, case management, help finding a job, and support after getting a job.

436.     The Rule dramatically increases the need for E&T program services. RIDHS's SNAP E&T program currently serves about 1,200 individuals of which 256 are ABAWDs and is planning to serve 1,400 individuals in FY 2020, or about 5 percent of the estimated ABAWD population in the State. Serving the entire ABAWD population will require a twenty-fold increase in the scope of the E&T program.

437.    RIDHS has used all available State and federal funding to reach its current E&T capacity. The SNAP E&T program is not funded at a level that would allow for participation of thousands of additional participants.

       xix.    <u>Virginia</u>

438.    If the Rule goes into effect, it will impose significant additional burdens on Virginia and its agencies including the State Department of Social Services ("VDSS") and the 120 local departments of social services.

439.    To implement the Rule, VDSS will be required to update its policies and procedures, information systems, and training materials, as well as train staff from 55 local departments of social services who now need to implement this policy. This effort will involve significant staff time and resources.

440.    VDSS would also need to provide expanded E&T services to the increased number of ABAWDs needing services under the Rule.

       xx.    <u>New York City</u>

441.    The New York City Department of Social Services ("NYC DSS"), which administers SNAP in New York City, will face increased administrative costs as a result of the Rule. NYC DSS will be required to redevelop relevant notices and forms, procedures, training curricula and provide training to employees regarding the Rule. NYC DSS expects to see increased foot traffic at its SNAP centers across New York City and will have to adjust staffing to accommodate the additional traffic. It also expects to face a surge in case processing costs as ABAWDs who are terminated reapply and potentially re-establish eligibility. NYC DSS also expects to face an increase in the number of fair hearing requests as clients receive notification of ineligibility for SNAP benefits and wish to challenge that determination.

442.     New York City currently offers work engagement opportunities through contracted vendors to the approximately 5,500 ABAWDs that do not reside in areas of New York City that receive a waiver. While ABAWDs can qualify for SNAP benefits by participating in these work engagement opportunities for a certain number of hours per month, New York City would have to drastically expand its programming to accommodate all of the approximately 70,000 ABAWDs. As a result of the Rule, New York City will have to expend resources modifying these contracts to meet the needs of the ABAWD population that will no longer be covered by a waiver.

443.     As a result of the Rule NYC DSS estimates increased administrative and programmatic costs of approximately $8.7 million in the initial year and approximately $6 million per year thereafter.  USDA only reimburses approximately 50 percent of the City's programmatic and administrative costs; the remaining 50 percent is incurred by the City.

## C.     The Rule Will Increase Plaintiffs' Health Care And Housing Costs.

444.     Medicaid, which is funded jointly by the federal government and the States, helps cover medical costs for millions of low-income Americans.

445.     There is significant overlap between the population that receives SNAP benefits and the population that relies on Medicaid.

446.     SNAP reduces health care utilization and costs. On average, low-income adults participating in SNAP incurred nearly 25 percent less in health care costs in a 12-month period than low-income adults not participating in SNAP.

447.     Adults in food-insecure households are about 50 percent more likely to visit an emergency room and to be admitted to a hospital, and they stay hospitalized about 50 percent longer, than adults in food-secure households, which drives up healthcare costs.

448.     A policy that reduces federal SNAP participation will result in increasing Medicaid expenditures for Plaintiffs. One study found that SNAP participation was associated with reduced

hospitalization and reduced hospitalization costs among older adults dually enrolled in Medicare and Medicaid. The study team estimated that "expanding SNAP access to nonparticipating dual eligible older adults in Maryland could have resulted in inpatient hospital cost savings of $19 million in 2012."

449.     Similarly, a boost in SNAP benefits has been shown to decrease Medicaid costs. A $10 increase in monthly SNAP benefits yielded reduced hospitalization and less costly hospital stays among older Maryland adults dually enrolled in Medicare and Medicaid.

450.     In Massachusetts, Medicaid cost growth significantly declined after increasing SNAP benefits. This decline in Medicaid cost was attributed to reduced hospital admissions and reduced length of hospital stays as a result of the additional SNAP benefits.

451.     Reducing SNAP benefits will also burden Plaintiffs by increasing housing insecurity and homelessness and the costs associated with addressing these social ills because ABAWDs in Plaintiffs' jurisdictions will be forced to divert their limited resources away from housing and other needs toward food.

452.     The Rule increases Plaintiffs' health care and housing costs and thus harms their proprietary interests.

**D.      The Rule Will Harm Plaintiffs' Economies.**

453.     Because SNAP benefits are provided to low-income individuals with immediate spending needs, SNAP boosts local economies by increasing consumer demand and injecting money directly into the economy.

454.     SNAP generates revenue for grocery stores, and food retailers with thin margins rely on SNAP to stay in business. Non-grocery businesses also receive a boost from SNAP expenditures because residents who use SNAP to purchase food then have greater purchasing power to buy other types of goods. This greater purchasing power also benefits Plaintiffs, which

see increased revenue from additional sales tax when more people are eligible for SNAP benefits. Additionally, SNAP creates jobs in rural areas and small towns.

455.    By reducing SNAP benefits, the Rule adversely affects all these parts of the Plaintiffs' economies. Indeed, these economic harms will be concentrated in already vulnerable communities. For example, a third of ABAWDs in the District of Columbia reside in Ward 8. By eliminating SNAP benefits for these residents, the Rule not only decreases the purchasing power of those residents but also make it harder to establish supermarkets and other types of food access in these communities, which have been underserved.

456.    In California, SNAP generates more than $11 billion in economic activity annually. SNAP benefits thus lead to tens of thousands of jobs in California alone, many of which will be lost if the Rule is implemented.

457.    In Connecticut, the average SNAP benefit is $134.29 per person. If all of the at-risk ABAWD individuals were to lose access to SNAP benefits, as expected under the Rule, the total loss of direct benefits to Connecticut residents would be approximately $41,556,846.24 per year. This amounts to a loss of between $74 million and $104 million annually in state economic activity, given that SNAP benefits have a significant positive economic multiplier effect.

458.    In federal fiscal year 2017, SNAP recipients spent approximately $4.7 billion in New York State at authorized retailers. In 2019, an average of 2.7 million New York residents a month received a total of almost $4.4 billion in SNAP benefits during the year.

459.    SNAP has helped to shorten recessions and dampen the effects of an economic downturn. For example, carry-over exemptions permit States to accumulate exemptions when the economy is strong and provide them with flexibility to extend SNAP benefits when there is a sudden economic downturn. By eliminating benefits to more than half a million recipients as well

as eliminating the carry-over exemptions, the Rule deprives States of vital resources to soften the blow of another recession and exacerbates its likely impact.

460.    The Rule thus harms Plaintiffs' proprietary interests by harming their general economies.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*(ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701-706)*

461.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

462.    Under the APA, 5 U.S.C. §§ 701-706, courts must overturn agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

463.    USDA is an "agency" under the APA. 5 U.S.C. § 551(1).

464.    The Rule conflicts with the federal statute, the purpose of SNAP, and the clear intent of Congress to alleviate hunger and malnutrition while maintaining States' flexibility.

465.    The language of the statute permits States to waive the ABAWD time limits when there are insufficient jobs for ABAWDs in the area where they reside.

466.    The Rule is contrary to this clear statutory authority, and more than 20 years of agency guidance and regulations holding that the sufficient-jobs inquiry is fact-intensive, cannot be captured solely by unemployment numbers for the general population, and is best undertaken in the first instance by States. The Rule reverses course on this long-standing policy and limits the data that may be used and the discretion of States to make this showing in the way that most accurately reflects job opportunities for ABAWDs.

467. In the 2018 Farm Bill, Congress considered and explicitly rejected similar restrictions on State discretion, including the imposition of an unemployment floor and elimination of States' ability to define the geographic scope of waivers.

468. USDA circumvented Congress and incorporated rejected language into its Rule.

469. Further, Congress expressly decided to maintain statutory language that permits States to carry over exemptions for ABAWDs subject to the time limit from year to year. In fact, the 2018 Farm Bill Conference report makes clear that States will "continue to accrue exemptions and retain any carryover exemptions from previous years, consistent with current law."

470. Notwithstanding the clear intent of Congress to the contrary, USDA's Rule eliminates States' ability to carry over these exemptions.

471. By promulgating the Rule against the express statutory language and intent of Congress, Defendants have acted contrary to law and have acted in excess of statutory jurisdiction and authority.

## SECOND CLAIM FOR RELIEF
*(ACTION WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701-706)*

472. Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

473. The APA requires courts to "hold unlawful and set aside" agency action promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

474. The Proposed Rule expressly disclaimed any change to the criterion that extended unemployment benefits would qualify a State for a waiver from the ABAWD time limit. Nevertheless, the Final Rule removed this criterion as a basis for a waiver with no meaningful opportunity for comment.

475.    The Proposed Rule also did not suggest any limitation on States' ability to seek waivers for substate areas like cities or counties. Yet, the Final Rule limits States' discretion to seek substate waiver exclusively to LMAs with no meaningful opportunity to comment.

476.    The Proposed Rule also failed to define or explain several of its terms and bases, such as its reliance on USDA's "operational experience" and its bald assertion that States were gaming and manipulating the waiver process. By failing to define or explain these concepts, the Proposed Rule did not appraise interested parties fairly such that they had an opportunity to meaningfully comment.

477.    The failure of an appropriate ability to meaningfully comment on these key aspects of the Rule conflicts with required procedure and requires that the Rule be set aside.

### THIRD CLAIM FOR RELIEF
*(ARBITRARY AND CAPRICIOUS ACTION IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701-706)*

478.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

479.    The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary," "capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

480.    The Rule is arbitrary and capricious and an abuse of discretion because USDA has relied on factors that Congress did not intend and specifically rejected, failed to consider important aspects of the problem USDA is addressing, and has offered no explanation for the Rule, particularly the sea change it enacts, that is consistent with evidence that is before USDA.

481.    Although USDA may change its policies within statutory limits, it must provide a reasoned explanation for the change. This is particularly true where, as here, USDA has reversed its view on factual findings that it has previously made, and reliance interests have developed

regarding the prior rule. USDA fails to provide the necessary explanation for its changes and does not provide any detail justifying the massive changes in the Rule.

482.     The Rule is thus arbitrary and capricious and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

483.     Declare that the Rule is:

- An action not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

- An action promulgated without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

- An arbitrary and capricious action, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

484.     Vacate and set aside the Rule;

485.     Grant a preliminary injunction and permanent injunction proscribing the Rule from going into effect;

486.     Stay the effective date of the Rule pending final judgment pursuant to 5 U.S.C. § 705;

487.     Award to Plaintiffs their costs of litigation including, but not limited to, reasonable attorneys' fees, under 28 U.S.C. § 2412, and any other applicable law; and

488.     Order such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

*/s/ Kathleen Konopka*
Kathleen Konopka (D.C. Bar No. 495257)
Deputy Attorney General

**LETITIA JAMES**
*Attorney General*
*State of New York*

*/s/ Eric R. Haren*
Eric R. Haren (D.C. Bar No. 985189)
Special Counsel

Jennifer Rimm (D.C. Bar No. 1019209)
Vikram Swaruup
Nicole Hill (D.C. Bar No. 888324938)
David Brunfeld (D.C. Bar No. 1672059)
Assistant Attorneys General

Office of the Attorney General for the District
of Columbia
441 4th St., N.W.
Suite 630S
Washington, DC 20001
Phone: 202-724-6610
Fax: 202-741-0444
Kathleen.Konopka@dc.gov


**XAVIER BECERRA**
*Attorney General*
*State of California*

Cheryl L. Feiner
Michael L. Newman
Senior Assistant Attorneys General

*/s/ Dane Barca*
Dane Barca
Jacquelyn Young
Deputy Attorney General

Office of the Attorney General
455 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102
Phone: 415-510-3371
Dane.Barca@doj.ca.gov

Matthew Colangelo (D.C. Bar No. 997893)
Chief Counsel for Federal Initiatives

Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Phone: 212-416-8804
Eric.Haren@ag.ny.gov


**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

*/s/ Eric R. Olson*
Eric R. Olson
Solicitor General

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: 720-508-6000
eric.olson@coag.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Joshua Perry*
Joshua Perry
Special Counsel for Civil Rights

State of Connecticut Office of the Attorney
General
165 Capitol Avenue
Hartford, CT 06106
Phone: 860-808-5318
Fax: 860-808-5387
Joshua.Perry@ct.gov


**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Elizabeth Roberson-Young*
Elizabeth Roberson-Young
Public Interest Counsel

100 W. Randolph St., 12th Fl.
Chicago, IL 60601
Phone: (312) 814-5028
ERobersonYoung@atg.state.il.us

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

Steven M. Sullivan
Solicitor General

*/s/ Jeffrey P. Dunlap*
Jeffrey P. Dunlap
Assistant Attorney General

200 St. Paul Place
Baltimore, MD 21202
Phone: 410-576-7906
Fax: 410-576-6955
jdunlap@oag.state.md.us


**CLARE E. CONNORS**
*Attorney General*
*State of Hawaii*

*/s/ Melissa L. Lewis*
Melissa L. Lewis
Deputy Attorney General

Department of the Attorney General
465 S. King St., Rm. 200
Honolulu, HI 96813
Phone: (808)587-3050
Meissa.L.Lewis@hawaii.gov


**AARON M. FREY**
*Attorney General*
*State of Maine*

*/s/ Susan P. Herman*
SUSAN P. HERMAN
Deputy Attorney General

6 State House Station
Augusta, Maine 04333-0006
Telephone: (207) 626-8814
Email: susan.herman@maine.gov

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Angela Brooks*
Angela Brooks
Widmaier Charles
Assistant Attorneys General

One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2590
Email: Angela.Brooks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

Fadwa A. Hammoud
Solicitor General

*/s/ Toni L. Harris*
Toni L. Harris
First Assistant Attorney General

Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
Phone: 517-335-7603
HarrisT19@michigan.gov

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Ali P. Afsharjavan*
Ali P. Afsharjavan
Assistant Attorney General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
ali.afsharjavan@ag.state.mn.us

**AARON D. FORD**
*Attorney General*
*State of Nevada*

*/s/ Heidi Parry Stern*
Heidi Parry Stern
Solicitor General

Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

*/s/ Glenn J. Moramarco*
Glenn J. Moramarco
Assistant Attorney General
Marie Soueid
Deputy Attorney General

New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
Phone: 609-376-3235
Glenn.Moramarco@law.njoag.gov

**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

*/s/ Tania Maestas*
Tania Maestas
Chief Deputy Attorney General

**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

*/s/ Elleanor H. Chin*
Elleanor H. Chin
Senior Assistant Attorney General

PO Drawer 1508
Santa Fe, New Mexico 87504-1508
Phone: 505-490-4060
E-mail: tmaestas@nmag.gov

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Phone: 503-947-4700
Fax: 503-947-4791
elleanor.chin@doj.state.or.us

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

*/s/ Jacob B. Boyer*
Jacob B. Boyer
Deputy Attorney General

Office of the Pennsylvania Attorney General
1600 Arch Street, Suite 300
Philadelphia PA, 19103
Phone: 267-768-3968
jboyer@attorneygeneral.gov

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

*/s/ Adam D. Roach*
Adam D. Roach
Special Assistant Attorney General

150 South Main Street
Providence, RI 02903
Phone: 401-274-4400 x 2490
aroach@riag.ri.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

*/s/ Jessica Merry Samuels*
Jessica Merry Samuels (D.C. Bar No. 1552258)
Assistant Solicitor General

Michelle S. Kallen (D.C. Bar No. 1030497)
Deputy Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: 804-786-7240
Fax: 804-371-0200
solicitorgeneral@oag.state.va.us

**THOMAS J. DONOVAN**
*Attorney General*
*State of Vermont*

*/s/ Benjamin D. Battles*
Benjamin D. Battles
Solicitor General

109 State Street
Montpelier, VT 05609
Phone: 802-828-5500
benjamin.battles@vermont.gov

**JAMES E. JOHNSON**
*Corporation Counsel*
*City of New York*

*/s/ Tonya Jenerette*
Tonya Jenerette
Sabita Krishnan
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
Phone: 212-356-2273
skrishna@law.nyc.gov