**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00119-BAH |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |
| BREAD FOR THE CITY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00127-BAH |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATUTORY AND REGULATORY FRAMEWORK ..................................................... 4

    A.    Statutory Framework for SNAP Work Requirements. ......................................... 4

    B.    Regulatory Framework Related to Waivers and Discretionary Exemptions. ......... 7

        1.    USDA's 2001 Regulation ......................................................................... 7

        2.    2009-2010 Suspension of Work Requirements and 2016 OIG Report .......................................................................................................... 8

        3.    Development of the Challenged Final Rule ............................................... 9

        4.    The Final Rule ........................................................................................ 11

PROCEDURAL BACKGROUND ................................................................................... 15

LEGAL STANDARD ...................................................................................................... 16

ARGUMENT .................................................................................................................... 16

I.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS. ................................................................................................................. 16

    A.    The Final Rule Is a Reasonable Interpretation of the Statute. ........................... 16

        1.    USDA's Interpretations of "Area" and "Sufficient Number of Jobs to Provide Employment for the Individuals" Are Reasonable. ................ 17

            a.    The Term "Area" is Ambiguous and § 2015(o)(4)(A) Does Not Unambiguously Leave the Definition of "Area" to States. ................ 19

            b.    USDA's Interpretation of "Sufficient Number of Jobs" is Consistent with Congressional Intent ................................................ 22

            c.    The Secretary Exercised His Discretion to Proceed by Rulemaking Instead of Adjudication. ................................................ 27

        2.    The Prohibition on Indefinite Carryover of Discretionary Exemptions is Consistent With Congressional Intent. ............................. 29

3.      Subsequent Legislative History From 2018 Is an Unreliable Guide to the PRWORA, a Statute Passed in 1996, and Should be Disregarded. ........................................................................................... 31

B.      The Final Rule Reflects Reasoned Decisionmaking. ............................................. 33

1.      USDA Adequately Justified the Revisions to the State Waiver Criteria. ................................................................................................. 33

2.      The Limitation on the Indefinite Carryover of Exemptions is More Consistent with the Statute and Accounts for Reliance Interests. ........... 45

C.      USDA Provided Adequate Opportunity to Comment on the Final Rule. ............. 48

D.      USDA Considered All Relevant Comments. ........................................................ 52

II.      PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM. ................... 53

A.      Much of the Alleged Harm Plaintiffs Rely on Are Not Article III Injuries. .......... 53

B.      The States' Administrative Costs Are Not Irreparable Harm. .............................. 57

III.      THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF DENYING PLAINTIFFS' MOTIONS. ..................................................... 62

IV.      ANY RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS. .................................. 63

CONCLUSION ................................................................................................................. 65

# TABLE OF AUTHORITIES

## CASES

*A.O. Smith Corp. v. FTC,*
    530 F.2d 515 (1976) ............................................................................... 58

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ............................................................................... 65

*Abington Mem'l Hosp. v. Burwell,*
    216 F. Supp. 3d 110 (D.D.C. 2016) ............................................. 49, 50, 51

*Affinity Healthcare Servs., Inc. v. Sebelius,*
    720 F. Supp. 2d 12 (D.D.C. 2010) ....................................................... 61

*Air Alliance Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) ........................................................... 29

*Allina Health Servs. v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ..................................................... 48, 50

*Am. Hosp. Ass'n v. NLRB,*
    499 U.S. 606 (1991) ............................................................................... 28

*Am. Hosp. v. Harris,*
    625 F.2d 1328 (7th Cir. 1980) ............................................................. 58

*Am. Iron & Steel Inst. v. EPA,*
    886 F.2d 390 (D.C. Cir. 1989) ....................................................... 49, 50

*Am. Pub. Commc'ns Council v. FCC,*
    215 F.3d 51 (D.C. Cir. 2000) ............................................................... 37

*Am. Trucking Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013) ............................................................. 41

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ............................................................................... 63

*Anna Jacques Hosp. v. Burwell,*
    797 F.3d 1155 (D.C. Cir. 2015) ................................................. 20, 21, 23

*Appalachian Power Co. v. EPA,*
    135 F.3d 791 (D.C. Cir. 1998) ............................................................. 52

*Ariz. Pub. Serv. Co. v. EPA*,
   211 F.3d 1280 (D.C. Cir. 2000) ....................................................... 49, 51

*Ass'n of Private Sector Colleges & Universities v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ........................................................ 44, 53

*AT&T, Inc. v. FCC*,
   886 F.3d 1236 (D.C. Cir. 2018) .......................................................... 23

*Auto. Parts & Accessories Ass'n v. Boyd*,
   407 F.2d 330 (D.C. Cir. 1968) ........................................................... 53

*Barton v. Dist. of Columbia*,
   131 F. Supp. 2d 236 (D.D.C. 2001) ...................................................... 58

*Bell Atl. Tel. Cos. v. FCC*,
   79 F.3d 1195 (D.C. Cir. 1996) ........................................................... 30

*Bloomberg L.P. v. CFTC*,
   949 F. Supp. 2d 91 (D.D.C. 2013) ....................................................... 62

*City of Boston Delegation v. FERC*,
   897 F.3d 241 (D.C. Cir. 2018) ........................................................... 37

*British Caledonian Airways, Ltd. v. CAB*,
   584 F.2d 982 (D.C. Cir. 1978) ........................................................... 27

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
   344 F. Supp. 3d 158 (D.C. Cir. 2018) .............................................. *passim*

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ........................................................ 64, 65

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ..................................................................... 32

*Cent. States Motor Freight Bureau, Inc. v. ICC*,
   924 F.2d 1099 (D.C. Cir. 1991) .......................................................... 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .............................................................. 17, 23, 27

*Cigar Ass'n of America v. FDA*,
   323 F.R.D. 54 (D.D.C. 2017) .......................................................... 56, 57

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ............................................................................ 20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................ 55

*City of Portland, Oregon v. EPA,*
   507 F.3d 706 (D.C. Cir. 2007) ............................................................ 42

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
   466 F.3d 134 (D.C. Cir. 2006) ............................................................ 29

*ConocoPhillips Co. v. EPA,*
   612 F.3d 822 (5th Cir. 2010) ............................................................. 42

*Consumer Elecs. Ass'n v. FCC,*
   347 F.3d 291 (D.C. Cir. 2003) ............................................................ 41

*CREW v. FEC,*
   316 F. Supp. 3d 349 (D.D.C. 2018) ................................................ 18, 30

*CSX Transp., Inc. v. Surface Transp. Bd.,*
   584 F.3d 1076 (D.C. Cir. 2009) .......................................................... 51

*Davis v. PBGC,*
   571 F.3d 1288 (D.C. Cir. 2009) .......................................................... 57

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .......................................................... 26, 27, 41

*DHS v. New York,*
   No. 19A785, 2020 WL 413786 (U.S. Jan. 27, 2020) ............................ 64

*E.B. v. U.S. Dep't of State,*
   No. 19-2856, 2019 WL 5728090 (D.D.C. Nov. 4, 2019) ...................... 61

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) .................................................................. 46, 48

*Envtl. Integrity Project v. EPA,*
   425 F.3d 992 (D.C. Cir. 2005) ........................................................ 50, 51

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................ 44, 45, 47

*Feng Wang v. Pompeo*,
    354 F. Supp. 3d 13 (D.D.C. 2018) ........................................................................... 53

*Fiba Leasing Co., Inc. v. Airdyne Indus., Inc.*,
    826 F. Supp. 38 (D. Mass. 1993) ............................................................................ 58

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
    19 F. Supp. 3d 111 (D.D.C. 2014) ........................................................................... 40

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................................ 57

*Garnett v. Zeilinger*,
    313 F. Supp. 3d 147 (D.D.C. 2018) ......................................................................... 56

*Gaughf Props., L.P. v. Comm'r*,
    738 F.3d 415 (D.C. Cir. 2013) ................................................................................ 23

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................................................ 64

*Good Fortune Shipping SA v. Comm'r of IRS*,
    897 F.3d 256 (D.C. Cir. 2018) ................................................................................ 34

*Gov't of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) ................................................................................ 54

*Gulf Oil Corp. v. Dep't of Energy*,
    514 F. Supp. 1019 (D.D.C. 1981) ...................................................................... 61, 62

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ................................................................................................ 65

*Heckler v. Campbell*,
    461 U.S. 458 (1983) ................................................................................................ 28

*In re Navy Chaplaincy*,
    738 F.3d 425 (D.C. Cir. 2013) ................................................................................ 16

*Int'l Internships Program v. Napolitano*,
    798 F. Supp. 2d 92 (D.D.C. 2011) ........................................................................... 60

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Dole*,
    919 F.2d 753 (D.C. Cir. 1990) ................................................................................ 19

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    407 F.3d 1250 (D.C. Cir. 2005) ............................................................. 51

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) ............................................................... 41

*Judulang v. Holder,*
    565 U.S. 42 (2011) ................................................................................. 24

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ............................................................................... 30

*King v. Burwell,*
    135 S. Ct. 2480 (2015) ........................................................................... 24

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994) ............................................................................... 30

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................... 56

*Lipton v. EPA,*
    316 F. Supp. 3d 245 (D.D.C. 2018) ...................................................... 26

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................... 64

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................. 63

*Massachusetts v. U.S. Dep't of Educ.,*
    340 F. Supp. 3d 7 (D.D.C. 2018) .......................................................... 54

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011) ................................................................................. 23

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ............................................................................... 16

*McFalls v. Purdue,*
    No. 3:16-CV-2116-SI, 2018 WL 785866 (D. Or. Feb. 8, 2018) ............ 43

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) ............................................................. 40

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ................................................................ 45

*Miniter v. Moon*,
   684 F. Supp. 2d 13 (D.D.C. 2010) ........................................................... 60

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................. 33, 34

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ........................................................ 16, 22, 24

*N. Air. Cargo v. USPS*,
   756 F. Supp. 2d 116 (D.D.C. 2010) ......................................................... 61

*N. Broward Hosp. Dist. v. Shalala*,
   172 F.3d 90 (D.C. Cir. 1999) .................................................................. 31

*N.E. Power Generators Ass'n v. FERC*,
   879 F.3d 1192 (D.C. Cir. 2018) .............................................................. 45

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ........................................................ 40, 45

*Nat'l Ass'n of Mfrs. v. SEC*,
   748 F.3d 359 (D.C. Cir. 2014) .......................................................... 42, 43

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*,
   545 U.S. 967 (2005) .......................................................................... 17, 45

*Nat'l Med. Care, Inc. v. Shalala*,
   No. 95-0860, 1995 WL 465650 (D.D.C. June 6, 1995) ........................... 58

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) .............................................................. 64

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) .......................................................... 57

*Nat'l Propane Gas Ass'n v. DHS*,
   534 F. Supp. 2d 16 (D.D.C. 2008) .......................................................... 63

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013) ................................................................ 23

*Nat'l Tour Brokers Ass'n v. ICC,*
  671 F.2d 528 (D.C. Cir. 1982) ........................................................................... 36

*Nat. Res. Def. Council, Inc. v. Daley,*
  209 F.3d 747 (D.C. Cir. 2000) ........................................................................... 23

*New York v. EPA,*
  413 F.3d 3 (D.C. Cir. 2005) ............................................................................... 49

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
  416 U.S. 267 (1974) ........................................................................................... 27

*Nuclear Energy Inst., Inc. v. EPA,*
  373 F.3d 1251 (D.C. Cir. 2004) ......................................................................... 23

*Oceana, Inc. v. Locke,*
  670 F.3d 1238 (D.C. Cir. 2011) ......................................................................... 29

*Open Cmtys. All. v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................... 56

*Pennsylvania ex rel. Shapp v. Kleppe,*
  533 F.2d 668 (D.C. Cir. 1976) ........................................................................... 54

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ............................................................................................. 53

*Pharm. Research & Mftrs. of Am. v. FTC,*
  44 F. Supp. 3d 95 (D.D.C. 2014) ................................................................. 35, 52

*Pub. Citizen, Inc. v. FAA,*
  988 F.2d 186 (D.C. Cir. 1993) ........................................................................... 53

*Pursuing Am.'s Greatness v. FEC,*
  831 F.3d 500 (D.C. Cir. 2016) ........................................................................... 63

*Regions Hosp. v. Shalala,*
  522 U.S. 448 (1998) ........................................................................................... 17

*Robinson v. Shell Oil Co.,*
  519 U.S. 337 (1997) ........................................................................................... 17

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) .................................................................... 23, 24

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ........................................................................................ 46, 47

*Sagarwala v. Cissna*,
    No. 18-2860 (RC), 2019 WL 1649943 (D.D.C. Apr. 16, 2019) ............................. 60

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ............................................................................................... 27

*SIFMA v. CFTC*,
    67 F. Supp. 3d 373 (D.D.C. 2014) ....................................................................... 42

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................................. 56

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ....................................................................... 16

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996) .......................................................................................... 17, 18

*Smith v. Berryhill*,
    139 S. Ct. 1765 (2019) .......................................................................................... 22

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ............................................................................................... 32

*Steel Co. v. Citizens for a Better Envt.*,
    523 U.S. 83 (1998) ................................................................................................. 54

*Stilwell v. Office of Thrift Supervision*,
    569 F.3d 514 (D.C. Cir. 2009) ............................................................................. 35

*Stringfellow Mem'l Hosp. v. Azar*,
    317 F. Supp. 3d 168 (D.D.C. 2018) ..................................................................... 50

*Sullivan v. Finkelstein*,
    496 U.S. 617 (1990) ............................................................................................... 31

*Sullivan v. Zebley*,
    493 U.S. 521 (1990) ............................................................................................... 28

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................................................... 56

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ........................................................................ 64

*U.S. Telecom Ass'n v. FCC,*
   825 F.3d 674 (D.C. Cir. 2016) ........................................................... 48

*United States v. Storer Broad. Co.,*
   351 U.S. 192 (1956) ........................................................................... 28

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ........................................................................... 64

*Van Hollen, Jr. v. FEC,*
   811 F.3d 486 (D.C. Cir. 2016) ........................................................... 33

*Verizon v. FCC,*
   740 F.3d 623 (D.C. Cir. 2014) ...................................................... 31, 32

*ViroPharma, Inc. v. Hamburg,*
   898 F. Supp. 2d 1 (D.D.C. 2012) ....................................................... 61

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ........................................................................... 65

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ......................................................................... 16, 55

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ...................................................... 54, 60

*WorldCom, Inc. v. FCC,*
   338 F.3d 449 (D.C. Cir. 2001) ........................................................... 23

**STATUTES**

5 U.S.C. § 702 ........................................................................................ 65

5 U.S.C. § 703 ........................................................................................ 65

5 U.S.C. § 705 ........................................................................................ 65

5 U.S.C. § 706 ................................................................................... 33, 65

7 U.S.C. § 2011 ........................................................................................ 5

7 U.S.C. § 2012 ........................................................................... 4, 15, 19, 61

7 U.S.C. § 2013 ................................................................................ 5, 27

7 U.S.C. § 2015 ................................................................................. *passim*

7 U.S.C. § 2020 ................................................................................ 5, 58

7 U.S.C. § 2025 ................................................................................ 5, 62

Act. of Jan. 11, 1971,
    Pub. L. No. 91-671, 84 Stat Ann. 2048 .................................... 5

Food Agriculture Act of 1977,
    Pub. L. No. 95-113, 91 Stat. Ann. 913 ..................................... 5

Pub. L. No. 104-193, 110 Stat 2105 (1996) ................................... 5

Pub. L. No. 105-33, 111 Stat. Ann. 251 (1997) ............................. 6

Pub. L. No. 111-5, 123 Stat. 115 (2009) ........................................ 8

Agriculture Improvement Act of 2018,
    Pub. L. No. 115-334, 132 Stat 4490 ........................................ 3`

## REGULATIONS

7 C.F.R. § 271.3 ............................................................................... 5

7 C.F.R. § 273.24 .............................................................................. *passim*

64 Fed. Reg. 70920 (Dec. 17, 1999) ............................................. 22

83 Fed. Reg. 8013 (Feb. 23, 2018) ............................................... 9, 51

84 Fed. Reg. 980 (Feb. 1, 2019) ................................................... *passim*

84 Fed. Reg. 66782 (Dec. 5, 2019) ............................................... *passim*

## OTHER AUTHORITIES

11A C. Wright, A. Miller, & M. Kane,
    Federal Practice and Procedure § 2948.1 (3d ed.) ................... 56

142 Cong. Rec. H9,393 (1996) ...................................................... 33

142 Cong. Rec. H9,396 (1996) ...................................................... 33

142 Cong. Rec. H9,411 (1996) ............................................................... 33

164 Cong. Rec. H9,978 (2018) ............................................................... 32

Exec. Order 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993) ........................ 40

Exec. Order 13,563, 76 Fed. Reg. 3821 (Jan. 18, 2011) ........................... 40

Exec. Order 13,771, 82 Fed. Reg. 9339 (Jan. 30, 2017) ........................... 40

H.R. Rep. No. 104-77 (1995) .......................................................... 25, 26

H.R. Rep. 104-725 (1996) .................................................................. 1

H.R. Rep. No. 115-1072 (2018) ............................................................ 32

*Statement on Signing PRWORA* (Aug. 22, 1996), 32 Weekly Comp. of Pres. Doc. ...................... 5

## INTRODUCTION

In the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Congress declared a policy of conditioning benefits under the Supplemental Nutrition Assistance Program ("SNAP") for "able-bodied adults without dependents" ("ABAWDs") on the satisfaction of work requirements. Congress imposed these work requirements to "promote work over welfare and self-reliance over dependency." H.R.. Rep. No. 104-725, at 261 (1996) (Conf. Rep.). However, in contravention of Congress's original intent, many States abused the framework that USDA had established to implement PRWORA by seeking waivers for "gerrymandered" areas and under circumstances that were inconsistent with the purpose of PRWORA. In response, USDA has amended its rules to address these problems and restore program integrity by ensuring a real and substantial relationship between work requirement waivers and those for whom such waivers were actually intended.

Under the PRWORA, ABAWDs may only receive benefits for three months out of a 36-month period unless they meet the statute's work or employment training requirements (or receive benefits pursuant to a statutory exception). Congress created two relevant exceptions to the ABAWD time limit and work requirements. First, it created a discretionary waiver system, authorizing USDA to waive the requirements for "any group of individuals" in an "area" with a slack labor market. Specifically, USDA may approve waivers in two circumstances: when the "area" in question either has an "unemployment rate of over 10 percent" or lacks "a sufficient number of jobs." 7 U.S.C. § 2015(o)(4)(A). Second, in the Balanced Budget Act of 1997 ("BBA"), Congress allocated to States a limited number of discretionary exemptions to use each year on individuals who would otherwise be time-barred from receiving benefits. *Id.* § 2015(o)(6).

Both statutes conferred substantial regulatory discretion on USDA to implement their

1

provisions. The waiver provisions nowhere define the statutory terms "area" or "sufficient number of jobs." Similarly, Congress provided few instructions to USDA regarding the discretionary exemptions. It stipulated only that the Secretary must adjust a State's allocation of exemptions in a given year to reflect the difference between the number of exemptions allocated to and used by the State in the prior fiscal year. *Id.* § 2015(o)(6)(G).

Initially, USDA exercised that broad discretion in a manner that effectively deferred to the States. However, USDA's administration of the ABAWD work requirements over two decades revealed several problems with the deferential approach. The flexibility afforded to States to define the area of a waiver request, 7 C.F.R. § 273.24(f)(6), had effectively allowed States to gerrymander their requests, grouping multiple jurisdictions strategically in order to maximize the scope of waivers. As the USDA's Office of the Inspector General ("OIG") found in 2016, some States admitted to requesting waivers in order to avoid the State's responsibility to track ABAWD time limits. *See* Declaration of Casey McConnell, Ex. 1. The Report also found that waivers were being approved for parts of States where unemployment rates were as low as zero percent due to States' strategic combination of low unemployment areas with high unemployment areas. *Id.* at 5 n. 15. Furthermore, State discretion in defining an area for a waiver enabled absurd results—for example, a resident of a particular town may be subject to a waiver even though a neighbor across an invisible boundary is not.

Moreover, the breadth of the criteria for showing a lack of sufficient jobs, *see* 7 C.F.R. § 273.24(f)(2)(ii)—in particular, the absence of a threshold unemployment rate "floor"— suggested that those standards were inadequately tailored to determining whether an area lacked sufficient jobs. Finally, allowing the practice of carrying over exemptions from one fiscal year to the next indefinitely, *see id.* § 273.24(h)(2), had resulted in States accumulating exemptions far

above the limited number envisioned by the statute.

Accordingly, USDA issued the Final Rule at the center of this case, tightening the regulatory framework for State waivers and discretionary exemptions in order to shore up the weaknesses identified in the prior regulatory scheme. 84 Fed. Reg. 66782 (Dec. 5, 2019). The Rule constrains State flexibility regarding the proper waiver area, requiring that waiver areas, in the typical case, be tied to a designation of an economically integrated area made by the Department of Labor ("DOL") and the Office of Management and Budget ("OMB"). It adds an unemployment rate floor to the criteria for insufficient jobs and restricts the use of subjective, non-standardized alternative criteria. And it permits States to carry over one year's worth of unused discretionary exemptions, but prohibits them from carrying over exemptions indefinitely.

Each of these regulatory choices is consistent with the statutory scheme and the intent of Congress to ensure that ABAWDs engage in meaningful work. Nevertheless, Plaintiffs in this consolidated action have moved for a preliminary injunction based on a host of challenges to the Final Rule. All of them fail to establish that Plaintiffs would be likely to succeed at summary judgment on a review of the administrative record.

*First*, Plaintiffs suggest that USDA's interpretation of the statute is inconsistent with unambiguous statutory language. But the PRWORA's key statutory terms for State waivers— "area" and "sufficient jobs"—are ambiguous and should be upheld under the second step of the *Chevron* analysis. Plaintiffs barely even contest that USDA's interpretation is reasonable under that step. Similarly, the BBA says nothing about allowing States to carry over discretionary exemptions indefinitely, and USDA reasonably concluded that the practice was inconsistent with Congress's intent to limit the amount of exemptions granted to each State.

*Second*, Plaintiffs argue that the Final Rule is arbitrary and capricious. But none of the

3

supposed flaws they identify is likely to succeed under that highly deferential standard of review. USDA was required only to articulate the basis for its decision and show a rational connection between the issue presented and the path it chose. Its thorough and detailed articulation of its reasoning more than satisfied these requirements.

*Third*, Plaintiffs assert that USDA's rulemaking suffered from procedural errors. They claim that the Proposed Rule did not provide an adequate opportunity to comment and that allegedly USDA did not adequately respond to comments. These claims founder in light of the administrative record. It shows both that USDA provided ample notice to interested parties to comment about key elements of the Rule and directly responded to each comment Plaintiffs flag.

*Finally*, none of the other injunction factors warrant a preliminary injunction. The irreparable harms that Plaintiffs cite are largely non-cognizable under Article III and, in the case of the States, either self-inflicted, insufficiently explained, or too insignificant to justify an injunction. The balance of the equities and public interest thus tip in favor of retaining a Rule designed to remedy the abuse of an important program that Congress intended to incentivize self-sufficiency. The Rule represents USDA's reasonable decision to prevent the limited exceptions to the work requirements from swallowing the default rule that Congress set in the PRWORA.

Accordingly, the Court should deny Plaintiffs' motions for preliminary injunction.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Statutory Framework for SNAP Work Requirements.

SNAP offers nutrition assistance to qualified low-income households.[1] USDA is authorized to "formulate and administer" SNAP, 7 U.S.C. § 2012(a)—tasks it has delegated to the

---

[1] Before 2008, SNAP was known as the Food Stamp Program. For ease of reference, the Government uses SNAP to refer to both pre- and post-2008 iterations of the program.

Food and Nutrition Service ("FNS"), a component within USDA, *see also* 7 C.F.R. § 271.3(a). USDA shares responsibility with State agencies for the administration of SNAP benefits, 7 U.S.C. § 2020(a); *id.* § 2025(a). Congress has conferred broad rulemaking authority on USDA to issue regulations it deems "necessary or appropriate" to implement SNAP. 7 U.S.C. § 2013(c).

As amended by Congress over the years, SNAP has several goals, including addressing food insecurity by providing supplemental food assistance to low-income individuals and families and to promote self-sufficiency and economic mobility. 7 U.S.C. § 2011; *id.* § 2015(d). For nearly four decades, Congress has directed USDA to implement SNAP's self-sufficiency purposes through work-related requirements. *See, e.g.*, Act of Jan. 11, 1971, Pub. L. No. 91-671 § 4, 84 Stat Ann. 2048, 2050; Food Agriculture Act of 1977, Pub. L. No. 95-113 § 6, 91 Stat. Ann. 913. In 1996, Congress enacted the PRWORA, which strengthened work requirements for SNAP participants. *See* Pub. L. 104-193, 110 Stat. 2105 (1996).[2] The rationale underlying the PRWORA is that work requirements promote self-sufficiency by incentivizing a transition from welfare to work. *See, e.g., Statement on Signing PRWORA* (Aug. 22, 1996), 32 Weekly Comp. of Pres. Doc. at 1487-88 (signing statement by President Clinton declaring that the PRWORA would "transform our broken welfare system by promoting the fundamental values of work, responsibility, and family").[3]

The PRWORA amended the Food Stamp Act of 1977 to condition eligibility for SNAP benefits on meeting work requirements, 7 U.S.C. § 2015(d)(1), except for individuals who satisfy certain enumerated exemptions, *id.* § 2015(d)(2). ABAWDs—individuals between 18 and 49

---

[2] These requirements may be satisfied not only by working, but also by activities that enhance employability, such as vocational education, community service, and job-skills training. *See, e.g.*, 7 U.S.C. § 2015(o); 7 C.F.R. § 273.24(a)(2)-(4). Nevertheless, for ease of reference, the Government uses "work requirements" to refer to both work and work-related requirements.

[3] https://www.govinfo.gov/content/pkg/WCPD-1996-08-26/pdf/WCPD-1996-08-26.pdf.

years of age, who are not medically certified as physically or mentally unfit for work, not a parent or other member of a household responsible for a dependent child, not otherwise exempt under subsection (d)(2), and not a pregnant woman, *id.* § 2015(o)(3)—are subject to a strict time limit for receipt of SNAP benefits, *id.* § 2015(o)(2). Within a 36-month period, an ABAWD is permitted to receive SNAP benefits for only three months in which he or she did not work at least 20 hours a week (averaged monthly), participate in a work program for at least 20 hours, participate in a workfare program, =receive benefits pursuant to a waiver under § 2015(o)(4) or a discretionary exemption under § 2015(o)(6), or receive benefits after regaining eligibility under § 2015(o)(5). *Id.* § 2015(o)(2).

The PRWORA authorizes the Secretary of Agriculture, upon the request of a State, to waive the applicability of the time limit, ad thus the work requirement, "to any group of individuals" if he determines that "the area in which the individuals reside (i) has an unemployment rate of over 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." *Id.* § 2015(o)(4)(A). The statute does not define the term "area" or identify any criteria or methodology for determining whether an area has "a sufficient number of jobs."

The BBA further amended these provisions. Pub. L. 105-33, 111 Stat. Ann. 251 (1997). In relevant part, it authorized States, each month, to exempt up to 15% of all "covered individuals"—which included, broadly speaking, ABAWDs who are not complying with the work requirements and do not reside in an area subject to a waiver—from the PRWORA's time limit. 7 U.S.C. § 2015(o)(6)(A)-(D). In other words, a discretionary exemption means that SNAP benefits in a given month do not count against a recipient's three-month limit. *See id.* § 2015(o)(2)(D). For fiscal year 2020 and beyond, Congress has reduced States' discretionary exemptions to 12% of all "covered individuals." *Id.* § 2015(o)(6)(E).

In practice, these amendments require USDA to estimate the number of covered individuals within a particular State for a given fiscal year, and the State's available—or "earned"—discretionary exemptions is calculated based on that estimate. *Id.* § 2015(o)(6)(C)-(E). USDA must "increase or decrease the number of individuals who may be granted" a discretionary exemption "to the extent that" a State's average monthly number of exemptions granted in the prior fiscal year "is lesser or greater" than estimated by USDA. *Id.* § 2015(o)(6)(G). In other words, if a State used fewer exemptions in the prior fiscal year than they earned in that fiscal year, USDA will adjust the number of exemptions allocated to that State in the following year by the balance. Conversely, if a State uses more than it earned in the prior fiscal year, that difference will be deducted from the next year's allocation.

**B.      Regulatory Framework Related to Waivers and Discretionary Exemptions.**

This case arises from USDA's efforts to interpret the phrases "area in which the individuals reside" and "sufficient number of jobs" in the PRWORA, *id.* § 2015(o)(4)(A), and to implement the BBA's provisions for adjustment of discretionary exemptions, *see id.* § 2015(o)(6)(B)-(G).

**1.      USDA's 2001 Regulation**

In 2001, USDA issued a final rule, codified at 7 C.F.R. § 273.24 (the "2001 Regulation"), setting forth the criteria for approval of State waiver requests.[4] Under the 2001 Regulation, States may "submit whatever data [they] deem[] appropriate to support" waiver requests, although requests based on unemployment or labor-force data must comply with standard Bureau of Labor Statistics ("BLS") data or methods. *Id.* § 273.24(f)(2). States may establish a lack of "sufficient jobs" by showing that the area in question: (i) is designated as a Labor Surplus Area ("LSA") by

---

[4] Before the 2001 Regulation, USDA had issued guidance to State agencies on waiver requests. *See* McConnell Decl., Ex. 2.

DOL; (ii) is qualified by DOL for extended unemployment benefits; (iii) has a low and declining employment-to-population ratio; (iv) has a lack of jobs in declining occupations or industries; (v) is characterized in an academic study or publication as an area with a lack of jobs; or (vi) has a 24-month average unemployment rate that is at least 20% above the national average for the same period. *Id.* § 273.24(f)(2)(ii).   The 2001 Regulation confers on States broad flexibility to "define areas to be covered by waivers."   *Id.* § 273.24(f)(6).   States may group multiple substate areas in one waiver request, so long as the substate areas are either contiguous or within the same economic region.   McConnell Decl., Ex. 3 at 10.   States are not required, however, to include data from all jurisdictions within a single economic region.   *Id.*

The regulation also implements the statutory provisions governing discretionary exemptions.   *See* 7 C.F.R. § 273.24(g)(3).   If a State does not use all of its earned exemptions for a given fiscal year, USDA increases the State's estimated number of exemptions for the following year by the positive balance.   *See id.* § 273.24(h)(2)(ii).   Under the regulation, States are permitted to indefinitely carryover all unused discretionary exemptions.

## 2.  2009-2010 Suspension of Work Requirements and 2016 OIG Report

In the wake of the 2008 Great Recession, Congress suspended the ABAWD work requirements from April 1, 2009, through September 30, 2010.   Pub. L. No. 111-5, § 101(e), 123 Stat. 115, 121 (2009).   Long after that time, many States continued to substantially rely on State waivers, *see* McConnell Decl., Ex. 1 at 2, even as the nation's economy improved.   In September 2016, OIG issued a report auditing USDA's oversight of State controls to determine if they were adequately ensuring that only eligible ABAWDs were receiving benefits.   *Id.* at 3.   The Report found that certain States admitted to "specifically request[ing] ABAWD time limit waivers in as many parts of the State as possible to minimize the areas where they needed to track the ABAWD

time limits," simply to avoid the "burden of implementing the ABAWD time limits." *Id*. at 4. The Report further found that "States are requesting, and [USDA] is approving" waivers "for parts of States where unemployment rates are as low as 0 percent" simply because those areas were grouped "with areas with higher unemployment rates." *Id*. at 5 n. 15.

The Report also expressed "concern[]" that USDA's policy of permitting States to indefinitely accumulate discretionary exemptions had enabled them to accumulate "about 5.9 million unused exemptions" representing nearly a billion dollars in SNAP benefits. *Id*. at 10. The Report concluded that the policy "may not meet the intent of the statute." *Id*.

### 3.   Development of the Challenged Final Rule

On February 23, 2018, USDA issued an Advanced Notice of Proposed Rulemaking ("ANPRM") requesting input from the public on potential changes to USDA's regulations regarding State waivers and discretionary exemptions. 83 Fed. Reg. 8013, 8013 (Feb. 23, 2018). After receiving nearly 39,000 comments, USDA published a Proposed Rule.

USDA proposed amending the regulatory criteria governing State waivers and restricting the indefinite carryover of discretionary exemptions. Proposed Rule, 84 Fed. Reg. 980 (Feb. 1, 2019). It was motivated by concerns that the 2001 Regulation did not properly implement the PRWORA. The broad use of waivers during a time of low national unemployment raised doubts that the 2001 Regulation's waiver criteria accurately identified areas that lack sufficient jobs. *Id*. at 981. Further, USDA's experience with waivers had revealed that the ability of States to define the area for a waiver permitted them to gerrymander their requests, resulting in a disconnect between waivers and actual economic conditions. *Id*. USDA concluded that strengthening the criteria for waivers would better implement the PRWORA by accurately defining "when and where a lack of sufficient jobs" exists; "encourag[ing] greater engagement in meaningful work

activities and movement toward self-sufficiency among ABAWDs"; and ensuring that waivers relied on "representative, accurate, and consistent economic data." *Id.* at 981-82.

To that end, USDA proposed creating two "core standards" for approval of waiver requests in the mine-run of cases. *Id.* at 983. The revisions encompassed several changes relevant here.

*First*, USDA indicated it would alter the criteria for demonstrating a lack of "sufficient jobs." *See* 7 C.F.R. § 273.24(f)(2)(ii). It proposed adding a 7% minimum unemployment rate "floor" to the requirement that a State show that the relevant area has an average unemployment rate at least 20% above the national average over a 24-month period. 84 Fed. Reg. at 983. In addition, it proposed eliminating most of the other criteria for demonstrating a lack of "sufficient jobs" in 7 C.F.R. § 273.24(f)(2). 84 Fed. Reg. at 985. Specifically, it proposed eliminating qualification based on a low and declining employment-to-population ratio, a lack of jobs in declining occupations or industries, or characterization in a study or publication as an area with a lack of jobs. USDA explained that these criteria "are rarely used, sometimes subjective, and not appropriate when other more specific and robust data is available." *Id.* USDA also suggested eliminating qualification based on an area's designation as an LSA. *Id.* at 987. The Proposed Rule indicated, however, that USDA would consider waiver requests based on other data and evidence in "exceptional circumstances." *Id.* at 985. USDA also proposed retaining the eliminated criteria—except for the LSA designation—where BLS data is limited or unavailable. *Id.* at 986.

*Second*, USDA proposed restricting the flexibility granted to States in the 2001 Regulation, *see* 7 C.F.R. § 273.24(f)(6), to define the relevant "area" for a waiver request. 84 Fed. Reg. at 985. Through its experience, USDA had identified flaws with States' ability to self-define the area for a waiver request. *Id.* at 985-86. In essence, the 2001 Regulation permits States to gerrymander their waiver requests in order to maximize the area waived—whether or not that area accurately

reflects the absence of sufficient jobs in a particular labor market. *Id.* USDA identified specific examples. These include cases where "States have grouped nearly all contiguous counties in the State together while omitting a few counties with relatively low unemployment" and where "States have grouped certain towns together that share the same economic region while omitting others with relatively low unemployment from the group." *Id.* at 986. USDA proposed prohibiting States from grouping substate jurisdictions unless they correspond to areas designated as a DOL Labor Market Area ("LMA"). This would ensure that waiver requests are linked to economically tied regions. *Id.* at 986. Relatedly, USDA proposed prohibiting statewide waivers—except where a State qualified for extended unemployment benefits—when BLS data for substate areas are available. This would address USDA's concern that statewide figures are inappropriately "targeted" to "ensure that waivers exist only in areas" that lack sufficient jobs. *Id.* at 985.

*Third*, USDA proposed limiting the indefinite carryover and accumulation of discretionary exemptions under 7 U.S.C. § 2015(o)(6). 84 Fed. Reg. at 987. In particular, the Proposed Rule would prohibit indefinite carryover of exemptions and instead limit adjustments to the difference between exemptions earned and exemptions used in the preceding year. *Id.* at 988-89.

### 4.    The Final Rule

USDA received over 100,000 comments to its Proposed Rule. After carefully evaluating the extensive record, USDA published its Final Rule on December 5, 2019. Consistent with the Proposed Rule, the Rule revises the criteria for demonstrating a lack of sufficient jobs and the parameters of a waiver "area," and restricts the unlimited carryover of discretionary exemptions.[5]

i.    The Final Rule adopts two core standards for waiver approval: a recent 12-month

---

[5] The revisions to the State waiver criteria are effective April 1, 2020, while the provisions governing the discretionary exemptions are effective October 1, 2020. 84 Fed. Reg. at 66782.

average unemployment rate of over 10% or a recent 24-month average unemployment rate at least 20% above the national average *and* above a 6% unemployment floor. *Id.* at 66784. The latter standard functionally replaces the various criteria used to show a lack of sufficient jobs in 7 C.F.R. § 273.24(f)(2)(ii).

USDA added an unemployment floor because the 2001 Regulation's standard—which approved waivers on a showing of an unemployment rate at least 20% above the national average—was pegged to a floating target. Final Rule, 84 Fed. Reg. at 66783. As a result, waivers are approved under that standard regardless of how low the unemployment rate actually goes, so long as it is sufficiently above the national average. *Id.* at 66784 (noting that current criteria permits waivers for areas with unemployment rates as low as 4.7%). Although USDA had proposed a 7% floor, it adopted a 6% floor after reviewing comments. *Id.* at 66785. That level corresponds to DOL'S requirements for an LSA (which requires an unemployment rate at least 20% above the national average and above a 6% floor), reflects a "meaningful threshold for economic distress," and is generally consistent with the economic concept of a natural rate of unemployment. *Id.*

The Rule eliminates the other criteria in 7 C.F.R. § 273.24(f)(2)(ii) for demonstrating a lack of sufficient jobs. One such criterion is State qualification for extended unemployment benefits, which conflicts with the Rule's general prohibition on statewide waivers. *Id.* at 66789-90. Designation as an LSA similarly does not correspond to the Rule's new definition of "area." *Id.* at 66800. The remaining criteria—a declining employment-to-population ratio, jobs in declining industries or occupations, and descriptions in studies and publications as an area lacking jobs—are not as standardized or reliable as BLS data, not produced by BLS at a substate level, of ambiguous value in determining labor market weakness, or rarely used. *Id.* at 66790-92.

12

The Rule also provides that USDA will consider waiver requests based on other data or evidence in "exceptional circumstances" in order to maintain responsiveness to extraordinary situations. *Id.* at 66791. While the Rule does not identify an exhaustive list of exceptional circumstances, the Rule sets forth examples. These include the "the rapid disintegration" of a significant industry, effects of a natural disaster, "a sharp continuing economic decline," and the "permanent closure of a large plant . . . or an ongoing significant reduction in the plant's workforce." *Id.* at 66792. By contrast, a "short-term" or "temporary" event would not qualify. *Id.* In addition, it expressly permits States to use a declining employment-to-population ratio, jobs in declining industries or occupations, and descriptions in studies and publications for areas with limited data or evidence. *Id.* at 66799.

ii.     The Final Rule also redefines the term "area" in 7 U.S.C. § 2015(o)(4)(A). The goal of the revision is to restrict the ability of States to gerrymander waivers, which USDA viewed as inconsistent with the PRWORA's intent, and to ensure that the availability of jobs is assessed not just by looking at an individual jurisdiction, but also at whether jobs are available within a reasonable commuting distance. 84 Fed. Reg. at 66783, 66796. The Rule thus requires that an "area" for a State waiver conform to an LMA. *Id.* at 66795. Under the criteria, USDA will not approve waivers for any substate jurisdiction other than an LMA, reservation, or U.S. Territory. *Id.* For an LMA that crosses state lines, a State may obtain a waiver of *intrastate* portions only if the entire interstate LMA satisfies the criteria. *Id.*

An LMA is a delineation made in partnership by OMB and DOL reflecting an area that is "an economically integrated . . . within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." *Id.* at 66793. The LMA-definition of an area prevents States from strategically grouping jurisdictions

to maximize the scope of a waiver area. Because grouping larger areas can mask tight labor markets in some substate areas, unless restricted to an economically linked region, grouping areas does not require waivers to be sufficiently targeted to fairly assess whether or not jobs are available in a particular market. *Id.* at 66793-94, *see also id.* at 66797. Similarly, the LMA-definition also ensures that the availability of sufficient jobs is evaluated by looking not only to the jobs in a particular jurisdiction, but also to jobs within a reasonable commuting distance that may exist across state, county, or municipal boundaries. *Id.* at 66795; *see also id.* at 66796 (concluding that "individual jurisdictions . . . should not receive waivers if there are jobs available in a nearby jurisdiction"). Further, use of LMAs also fosters the PRWORA's goal of transitioning individuals from welfare to work by "encourag[ing] geographic mobility among ABAWDs." *Id.* at 66795.

In revising its interpretation of "area," USDA rejected comments that States should retain their ability to self-define waiver areas. USDA pointed to the absence of any statutory definition of "area" and its experience with strategic manipulation of waiver areas. *Id.* at 66794. USDA also considered specific objections to LMAs—including whether they are disconnected from commuting patterns for ABAWDs—and several alternative delineations. *Id.* at 66794-75. But it concluded that LMAs are the "best available" delineation that would both identify economically integrated areas and address "States' manipulative use of grouping substate areas." *Id.* at 66795.

The LMA-definition also prohibits statewide waivers unless all LMAs within a State individually qualify for a waiver. *Id.* at 66797. USDA rejected the use of statewide waivers because "statewide data may mask tight labor markets in some substate areas." *Id.* Thus, Washington, D.C., as part of an interstate LMA, qualifies for a waiver only if the entire LMA does.

iii.     Finally, the Rule substantially restricts carryover of discretionary exemptions. Over time, certain States accumulated an extremely high number of exemptions; by USDA's

count, States had more than five times as many carryover exemptions as they earned in FY 2019. USDA viewed such indefinite exemption hoarding as inconsistent with Congress's expressed intention to limit discretionary exemptions to a small percentage of covered individuals and an "unintended outcome" of the 2001 Regulation. *Id.* at 66802.

In response to comments, USDA substantially modified the Proposed Rule to allow greater retention of discretionary exemptions while still prohibiting unlimited carryover. *Id.* Under the Final Rule, States may carry over one year's worth of exemptions—meaning that States can retain unused exemptions capped at 12% of covered individuals. *Id.* The cap effectively bars States from retaining previously stockpiled exemptions beyond the end of FY2020. *Id.* While USDA acknowledged that discretionary exemptions allow States "to deal with . . . quickly changing circumstances," it concluded that the modifications in the Final Rule effectively balanced this need with Congress's intent to limit the amount of discretionary exemptions. *Id.* at 66803.

## PROCEDURAL BACKGROUND

This consolidated action encompasses two cases, *District of Columbia v. USDA*, No. 1:20-cv-00119 and *Bread for the City v. USDA*, No. 1:20-cv-00127. The plaintiffs in *District of Columbia*—a coalition of 14 States, the District of Columbia, and New York City (the "State Plaintiffs")—challenge the Final Rule under the APA.[6] The plaintiffs in *Bread for the City* (the "BFC Plaintiffs," and collectively with the State Plaintiffs, "Plaintiffs") assert partially overlapping APA claims. The Court consolidated these cases, *see* Minute Order (Jan. 23, 2020), and Defendants now file this consolidated Opposition.

---

[6] "State" is defined to include the District of Columbia. *See* 7 U.S.C. § 2012(r). On January 29, 2020, the State Plaintiffs filed an amended complaint (ECF No. 19) adding five States as plaintiffs. As the newly-added Plaintiffs have not yet joined the State Plaintiffs' motion for preliminary injunction, the Government does not address them in this brief.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up). It is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in" its absence, "that the balance of equities tips in his favor, and that an injunction is in the public interest," *id.* at 20, 24. A plaintiff cannot prevail without some showing on each of those factors. *See id.* at 23-24, 31-32.[7]

## ARGUMENT

## I.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs cannot demonstrate a likelihood of success on the merits. The PRWORA and the BBA are paradigmatic examples of ambiguous statutes providing USDA with wide discretion to fill the statutory gaps in the parameters of the waiver and discretionary exemption framework. And the Final Rule's thorough analysis, which persuasively explains why USDA exercised that discretion in the manner that it did is a rational attempt to promote Congress's original intent.

### A.   The Final Rule Is a Reasonable Interpretation of the Statute.

The two-part *Chevron* framework governs USDA's construction of the relevant statute. *See, e.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 19-20 (D.C. Cir. 2019). Under that framework, the

---

[7] Although the D.C. Circuit has previously followed the "sliding scale" approach to evaluating preliminary injunctions, that approach appears inconsistent with *Winter*. *See, e.g.*, *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (describing approach as "highly questionable . . . in light of . . . *Winter*" (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013)). Regardless, even under the sliding scale approach, a preliminary injunction is inappropriate here.

Court must first determine, using traditional tools of statutory construction, "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984). If Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843. If, however, Congress was "silent or ambiguous with respect" to the challenged issue, the Court then assesses whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843. The Court must defer to USDA's interpretation of the statute if it is reasonable "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 5445 U.S. 967, 980 (2005).

The State Plaintiffs argue that three provisions in the Final Rule fail at *Chevron* step one. Pls.' Mot. for Prelim. Inj. ("State Mem."), No. 20-cv-119, at 18-25, ECF No. 3. Under that step, the State Plaintiffs can prevail only if their reading is "the only possible interpretation." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998) (citations omitted). As a reading of the statutory language reveals, however, Congress left ambiguities in the statute administered by USDA with the understanding "that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996).

### 1. USDA's Interpretations of "Area" and "Sufficient Number of Jobs to Provide Employment for the Individuals" Are Reasonable.

Under *Chevron* step one, the Court must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The Court asks "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, which must "be interpreted tightly," *Cent. States*

*Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1104 (D.C. Cir. 1991).

The State waiver provisions of the PRWORA provide in relevant part that "[o]n the request of a State . . . , the Secretary may waive the applicability of [ABAWD work requirements] to any group of individuals in the State if the Secretary makes a determination that the area in which the individuals reside . . . has an unemployment rate of over 10 percent" or "does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A). The State Plaintiffs raise two arguments that the language unambiguously forecloses USDA's approach. First, they argue that "the plain language" of the PRWORA authorizes States—not USDA—"to decide the scope of the group of individuals" for a waiver request, "as long as the state can demonstrate that the defined group resides in a contiguous area that lacks sufficient jobs to provide employment for them." State Mem. at 18. Second, they contend that the imposition of a 6% unemployment floor to determine whether an area lacks sufficient jobs for ABAWDs is foreclosed by the statute. *Id.* at 21.

Both arguments fail as a matter of textual analysis. As an initial matter, it is important to understand the broader context, structure, and logic of the waiver provision. *See, e.g., CREW v. FEC*, 316 F. Supp. 3d 349, 387 (D.D.C. 2018). The PRWORA starts with a baseline that all ABAWDs are presumptively subject to a time limit unless they satisfy a work requirement. 7 U.S.C. § 2015(o)(2). Although Congress provided for both "exception[s]" to the time limits in § 2015(o)(3) and "waiver[s]" of the time limits in § 2015(o)(4),[8] the language that Congress used in the waiver provision suggested that it "desired the agency . . . to possess [a broad] degree of discretion" in deciding whether waivers were appropriate. *See Smiley*, 517 U.S. at 740-41; *see*

---

[8] As discussed *supra*, Congress later provided States with discretionary "exemptions" to the statute as well. *See* 7 U.S.C. § 2015(o)(6).

*also* 7 U.S.C. § 2015(o)(4) (providing that "the Secretary *may* waive the applicability of [the work requirements] to any group of individuals in the State." (emphasis added)); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Dole*, 919 F.2d 753, 756 (D.C. Cir. 1990) (discussing similar "may waive" language). When Congress spoke to the circumstances in which waivers may be exercised, it was in limiting their applicability, establishing conditions precedent that must be met before any waivers could be granted. 7 U.S.C. § 2015(o)(4)(A). In light of this context, and the lack of otherwise express language directing the Secretary's exercise of its discretion, Plaintiffs' assertion that the Secretary was statutorily foreclosed from issuing the Final Rule is wholly lacking in merit.

Understood as an exception placed in the substantial discretion of USDA to exercise, it is difficult to see how Congress could have intended express restrictions on the grant of waivers to preclude USDA from acting in its discretion to limit such waivers further. In no way does the statutory language at issue unambiguously foreclose USDA's approach.

### a. The Term "Area" is Ambiguous and § 2015(o)(4)(A) Does Not Unambiguously Leave the Definition of "Area" to States.

7 U.S.C. § 2015(o)(4)(A) authorizes USDA to waive work requirements for "any group of individuals in the State if the Secretary makes a determination that the area in which the individuals reside . . . has an unemployment rate of over 10 percent" or "does not have a sufficient number of jobs to provide employment for the individuals." The statute does not define "area" or "area in which the individuals reside." *See id.* § 2012 (definitions). And nothing in the statute suggests that these gaps are for the States to fill. Nevertheless, the State Plaintiffs argue that the statute requires that they, not the agency entrusted with administering the statute, define the "area in which [any group of] individuals reside." State Mem. at 18-19.

The State Plaintiffs' interpretation finds no purchase in the text of § 2015(o)(4)(A). The

term "area" is inherently ambiguous.   Like the D.C. Circuit held with respect to the term "geographic area" in the Medicare Act, "[t]he statute leaves considerable ambiguity as to the term ['area'], which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block.'"   *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1164 (D.C. Cir. 2015) (citation omitted).   "Congress through its silence delegated these decisions to the Secretary."   *Id.* (citation omitted).   So too here.

Nor does anything in the statute require that *States* must define the "area in which [any group of] individuals reside."   "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."   *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).   The State Plaintiffs argue that Congress "would have said so" if it had "intended for the agency to 'strictly' define the allowable geographic area for waiver," State Mem. at 19, but that argument flips the law on its head.   The fact that Congress did not define "area" at all suggests that it intended *USDA* to do so.   *Anna Jacques Hosp.*, 797 F.3d at 1164 (silence as to meaning of statutory term "is the antithesis of a *Chevron* step one statutory directive").

This conclusion draws support from the overall statutory structure.   Section 2015(o)(4)(A) expressly states that it is the *Secretary* who determines whether the area in which the individuals reside meets a condition for a waiver approval.   This broad delegation of authority to USDA implies that the agency retains the authority to define scope of that area.   If not, the Secretary's authority to "make[] a determination" that an area has an unemployment rate of over 10%, *see* § 2015(o)(4)(A)(i), would effectively be delegated to States because the statute includes no limitation on how small such an "area" might be.   Under the State Plaintiffs' supposedly "unambiguous" interpretation, a State could submit a waiver request for a group of unemployed

neighbors in an "area" consisting of "a city block" with an unemployment rate over 10%, *see Anna Jacques Hosp.*, 797 F.3d at 1164 (citation omitted), and USDA would be bound to "make[] a determination" that the area fell into the statute's scope—even if expanding the area by one more block would mean the area had less than 10% unemployment. Taken literally, the State Plaintiffs' reading of the statute would permit States to request waivers in circumstances wholly untethered to the purposes of both the waiver system and the ABAWD work requirement.

The Plaintiffs claim that the statute "permits states to obtain a waiver for 'any group of individuals in the State,'" if conditions are met. State Mem. at 18 (quoting 7 U.S.C. § 2015(o)(4)(A)). They therefore argue that it "gives states the authority to decide the scope of the group of individuals for whom states make a waiver request." *Id.* But the statute says "[o]n request of a State agency . . . *the Secretary* may waive the applicability of [work requirements] to any group of individuals in the State," 7 U.S.C. § 2015(o)(4)(A) (emphasis added). Because the Secretary, not the State agency, is the subject of the sentence, the statute permits the Secretary, not the State, to define the scope of a group of individuals that may be subject to a waiver.

Even if the statute did give States authority to define that group, it would not mean that the scope of the "area in which [those] individuals reside" must be defined by the States. In other words, a State would remain free to request a waiver for "any group of individuals," and whether the waiver may be approved depends on the labor market characteristics of the "area" where the State's selected group resides. But the scope of that area would still be determined by USDA so long as it is reasonable.

The regulatory history provides no support for the State Plaintiffs' claims either. They argue that "[f]or more than 20 years, USDA provided that 'States may define areas to be covered by waivers.'" State Mem. at 19 (quoting 7 C.F.R. § 273.24(f)(6)). True enough, but USDA did

so *by regulation*.  It never implied that the *only permissible* administrative interpretation of "area" in the PRWORA was that "States may define areas."  Rather, USDA has always understood that Congress delegated the definition of area to the agency, and it is only by regulation that USDA established its preexisting policy.  *See* Proposed Rule, 64 Fed. Reg. 70920, 70945 (Dec. 17, 1999) ("the Department *is allowing* States broad discretion in defining areas" for waiver requests (emphasis added)); McConnell Decl., Ex. 2 at 1 ("Defining an area: USDA *will give* States broad discretion in defining areas . . ." (emphasis added)).  The States' role was a matter of grace, not of right.  And USDA now sees that policy as misguided, as confirmed by findings of the OIG.

The statute's use of the ambiguous term "area," "constitutes an implicit delegation from Congress to the agency to fill in the statutory gap[]."  *Smith v. Berryhill*, 139 S. Ct. 1765, 1778 (2019) (citation omitted).  The State Plaintiffs offer no argument as to why the Final Rule's interpretation of the term area is unreasonable.  Accordingly, the Court should uphold it at *Chevron* step two, which requires only that the agency's interpretation be "based on a permissible construction of the statute."  *Mozilla*, 940 F.3d at 20 (citation omitted).

> ### b.      USDA's Interpretation of "Sufficient Number of Jobs" is Consistent with Congressional Intent

Next, Plaintiffs contend that the imposition of a 6% unemployment floor to determine whether an area lacks "a sufficient number of jobs to provide employment" for ABAWDs is foreclosed by the PRWORA.  State Mem. at 21; Pls.' Mot for Prelim. Inj. ("BFC Mem."), No. 20-cv-127, at 17-21, ECF No. 4.  Emphasizing the language "for the individuals," Plaintiffs argue that "sufficient jobs" cannot be defined through a general unemployment rate because those rates are not sufficiently targeted to ABAWDs.  State Mem. at 21; BFC Mem. at 17-21.  Moreover, the State Plaintiffs contend that the specific reference to an unemployment rate in § 2015(o)(4)(A)(i)—which authorizes the Secretary to approve waivers in areas with at least 10%

unemployment—implies that USDA cannot rely on a general employment rate in defining "sufficient jobs" in clause (ii).  State Mem. at 21-22.

Yet again, the phrase in question—"sufficient number of jobs to provide employment for the individuals"—is the "antithesis of a *Chevron* step one statutory directive."  *Anna Jacques Hosp.*, 797 F.3d at 1164.  The term "sufficient" is inherently "vague" and too "general" to provide a resolution at *Chevron* step one.  *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102 (D.C. Cir. 2009).  Congress's use of the word "sufficient" implies a delegation to the agency "to strike an appropriate balance between" the extent of job scarcity in an area with ABAWDs and § 2015(o)'s primary goal of encouraging greater engagement in meaningful work activities among ABAWDs.  *See id.*  Indeed, USDA has long understood that "[t]he legislative history does not provide guidance on what types of waivers the Department should approve under this standard, and there are no standard data or methods to make the determination of the sufficiency of jobs." 64 Fed. Reg. at 70946.  Thus, the "precise question at issue," *Chevron*, 467 U.S. at 842-43, is whether the language unambiguously forecloses a rule administering the provision using a 6% unemployment floor.  "Because 'the statute does not prescribe a precise . . . figure . . . there is no plain meaning on this point.'"  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (quoting *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 754 (D.C. Cir. 2000)).[9]

Accordingly, the analysis must move to *Chevron* step two.  *See Rural Cellular*, 588 F.3d at 1102 (analyzing term "sufficient" in 47 U.S.C. § 254(b)); *see also AT&T, Inc. v. FCC*, 886 F.3d

---

[9] Further, "[a]n agency has 'wide discretion' in making line-drawing decisions" interpreting ambiguous language.  *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *WorldCom, Inc. v. FCC*, 338 F.3d 449, 462 (D.C. Cir. 2001)); *see also Gaughf Props., L.P. v. Comm'r*, 738 F.3d 415, 425 (D.C. Cir. 2013) ("'regulation, like legislation, often requires drawing lines'" and holding the "[t]he Secretary's lines are reasonably drawn" (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 59 (2011))).

1236, 1251 (D.C. Cir. 2018) (same)).  Under step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute," *Mozilla*, 940 F.3d at 20 (citation omitted), which USDA's interpretation plainly is.  It is not "arbitrary or capricious in substance, or manifestly contrary to the statute," *id.* at 47 (citation omitted), for the agency to rely on a general unemployment rate to determine whether an area has "a sufficient number of jobs to provide employment for" ABAWDs.  7 U.S.C. § 2015(o)(4)(A)(ii).  Even if ABAWDs may face more challenges to finding employment than the average person, the unemployment rate is not "a matter irrelevant to" that inquiry.  *See Judulang v. Holder*, 565 U.S. 42, 52 n.7, 53 (2011).  In fact, Congress itself signaled a rational relationship between the general unemployment rate and USDA's waiver authority by providing the 10% unemployment threshold under clause (i).  And even the previous 2001 Regulation looked to general unemployment rates for the availability of jobs.  *See* 7 C.F.R. § 273.24(f)(2)(ii).

Again, Plaintiffs' reading is logically untenable if taken literally.  It would mean that USDA is barred from *approving* a waiver under clause (ii) unless it has job availability information specific to the ABAWD population.  *See* State Mem. at 21; BFC Mem. at 17-21 (statutory phrase "*for the individuals* . . . provides for waivers where there is a lack of jobs *for ABAWDs*, not the population at large").  But "[i]t is implausible that Congress meant the [statute] to operate" only if the agency has that precise information.  *See King v. Burwell*, 135 S. Ct. 2480, 2494 (2015).

Nor does clause (i)'s reference to a general unemployment figure imply that USDA may *not* consider unemployment rates at all under clause (ii).  *See* State Mem. at 21-22.  First and foremost, the statute does not say that.  What is more, the State Plaintiffs' reading ignores the context of the statute.  Section 2015(o)(4)(A) provides USDA broad waiver authority; it is not a mandatory exception.  *See supra* at pp. 18-19; 7 U.S.C. § 2015(o)(4) (Secretary "may waive" time

24

limits only if he determines that § 2015(o)(4)(A)(i)-(ii) criteria are met).  Congress intended USDA to have flexibility to address particular "circumstances [that] may limit the jobs available" for ABAWDs, *see* H.R. Rep. No. 104-77 at 43 (1995), so the statutory text reflects a decision to entrust waiver decisions to the agency's discretion.  The 10% unemployment condition in clause (i) thus acts as a guidepost, identifying a clear economic crisis that Congress thought likely required a response.  Clause (ii) serves as a safety valve to permit USDA to decide if other labor market circumstances may require action.[10]  Nothing precludes the agency from basing such circumstances on a lowered unemployment rate that covers more individuals than clause (i).

And for that matter, the State Plaintiffs' characterization of the Rule as "making both prongs [of § 2015(o)(4)(A)] solely dependent on general unemployment levels," *see* State Mem. at 22, is not only legally irrelevant but also incorrect.  As previously explained, the Rule provides that USDA will consider a request for a waiver based on "data or evidence other" than those required under the core standards if the request can "demonstrate that [an] exceptional circumstance has caused a lack of sufficient jobs."  84 Fed. Reg. at 66811.  To be sure, USDA does not intend the "exceptional circumstance" provision to subsume the core standards, and it is reserved for circumstances truly "exceptional."  But this provision—as well as the provision permitting use of alternative data or evidence in areas that lack BLS data—means that the Rule does not go as far as the State Plaintiffs suggest and does not prohibit States from making a case for waivers even in truly exceptional circumstances outside of what the Secretary generally deems to meet prudent criteria for a waiver.

The legislative history also directly supports the authority to consider unemployment rates

---

[10] This reading finds further support in the fact that Congress included a reporting requirement—reflecting its need to monitor the discretion it provided USDA.  *See* 7 U.S.C. § 2015(o)(4)(B).

as part of clause (ii).  The 1996 House Report explained the purpose of § 2015(o)(4)(A) as follows:

> The Committee understands that there may be instances in which high unemployment rates in all or part of a state or other specified circumstances may limit the jobs available for [ABAWDs].  Therefore, the Secretary, upon request from a state, is provided with the authority to waive job requirements *in these circumstances or* if unemployment rates are above 10 percent.

H.R. Rep. No. 104-77 at 43 (emphasis added).  The Report indicates that USDA may issue waivers in two scenarios: (1) "in these circumstances"—*i.e.*, "instances in which high unemployment rates" or "other specified circumstances" limit jobs for ABAWDs—or (2) if unemployment rates are above 10%.  In other words, because "high unemployment rates" is a valid basis for a State waiver under clause (ii) distinct from "unemployment rates . . . above 10 percent," the legislative history "confirms what the text suggests."  *Lipton v. EPA*, 316 F. Supp. 3d 245, 252 (D.D.C. 2018).

Finally, the State Plaintiffs argue that the six-percent unemployment floor is "contrary to the plain language of the statute" because, they argue, "areas with insufficient jobs for ABAWDs will be ineligible for waivers."   State Mem. at 22.  But their argument necessarily "second-guess[es] the Secretary's weighing of risks and benefits," *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019), in determining what it means for an area to have sufficient jobs.  *See* State Mem. at 22 (discussing, among other things, the fact that the D.C's unemployment rate is more than 50% higher than the national average and "possesses a labor market that skews extremely high skill").   Nothing in the statute suggests that these figures represent the "just one reasonable course of action," *see Commerce*, 139 S. Ct. at 2571, for determining ABAWD job sufficiency.   And the statute delegates the decision regarding job sufficiency to the Secretary.  *See* 7 U.S.C. § 2015(i)(4)(A) ("the Secretary may waive" time limits "*if the Secretary makes a determination that* the area . . . does not have a sufficient number of jobs to provide employment for the individuals" (emphasis added)).  The plaintiffs may not "wag[e] in a judicial forum a

specific policy battle which they ultimately lost in the agency." *Chevron*, 467 U.S. at 864. "By second-guessing the Secretary's weighing of risks and benefits," the Plaintiffs ask this court to "substitute [its] judgment for the agency." *Commerce*, 139 S. Ct. at 2571.

> **c.** **The Secretary Exercised His Discretion to Proceed by Rulemaking Instead of Adjudication.**

The BFC Plaintiffs additionally argue that § 2015(o)(4)(A) prohibits USDA from "promulgating a prospective categorical rule that substantially displaces [the] waiver adjudication process mandated by statute." BFC Mem. at 10. Specifically, they assert that the statute requires each waiver request to be individually adjudicated, and not decided via rulemaking. *Id.* at 11-12.

But nothing in the statute prohibits USDA from filling the statutory gaps by rulemaking. USDA is expressly authorized to issue rules to administer SNAP. *See* 7 U.S.C. § 2013(c). And it is black letter law that agencies have discretion to proceed by rulemaking or adjudication. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974)) ("[T]he choice made between proceeding by general rule or by individual, ad hoc [adjudication] is one that lies primarily in the informed discretion of the administrative agency." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947))); *see also British Caledonian Airways, Ltd. v. CAB*, 584 F.2d 982, 992-93, 993 n.22 (D.C. Cir. 1978) (and cases cited therein). In fact, courts recognize the benefits of implementing prospective policy changes using rulemaking instead of adjudication, as the former is more consistent with notice principles underlying due process. *See Chenery*, 332 U.S. at 203 ("The functions of filling in the interstices of [a statute] should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future."); *Bell Aerospace*, 416 U.S. at 295 (when prospective policy is done through rulemaking instead of adjudication, the "rulemaking . . . provide[s] the [agency] with a form for soliciting the informed views of those affected . . . before embarking on a new course.").

27

The mere fact that the statute provides that USDA is to resolve individual waiver requests is immaterial. "[E]ven if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991). Rules may establish "general principles to guide the required case-by-case . . . determinations." *Id.* (citation omitted); *see also Heckler v. Campbell*, 461 U.S. 458, 467 (1983) ("It is true that the [social security disability] statutory scheme contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing . . . [but] this does not bar the Secretary from relying on rulemaking to resolve certain classes of issues."); *United States v. Storer Broad. Co.*, 351 U.S. 192, 205 (1956) (FCC may summarily dismiss license applications based on rule limiting station owners to five licenses despite statutory hearing requirement). Courts do not "require agenc[ies] continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding." *Heckler*, 461 U.S. at 467. Here, the BFC Plaintiffs point to nothing more than the fact that individual determinations are ultimately required—no different from the provisions the Supreme Court has rejected as insufficient to "clearly express an intent to withhold [rulemaking] authority." *Am. Hosp.*, 499 U.S. at 612; *see also Heckler*, 461 U.S. at 467.

The cases the BFC Plaintiffs cite to the contrary are inapposite. The BFC Plaintiffs misstate the issue in *Sullivan v. Zebley*, where the Court invalidated regulations administering child disability claims. 493 U.S. 521, 541 (1990). There, the operative statute entitled children to benefits if they suffer from disabilities of a "comparable severity" to adults. *Id.* at 524. The agency, however, only provided for benefits if a child met an impairment listed in regulations. *Id.* at 535. Although adults were subject to a similar requirement to meet a listed impairment,

"shortcomings of the listings [were] remedied at the final, vocational steps of the Secretary's test" where an adult claimant had the individualized "opportunity to show that his impairment in fact prevent[ed] him from working." *Id.* at 535. Children had "no similar opportunity." *Id.* Therefore, the "child-disability regulations [were] simply inconsistent with the statutory standard of 'comparable severity.'" *Id.* at 536. In other words, the Court decided that the distinctions between treatment of the claims of adults and children violated the statutory command that children are entitled to benefits if they suffered from disabilities of "comparable severity" to adults, *see id.*, and not that agencies must proceed through adjudication. *Air Alliance Houston v. EPA* similarly involved a clear violation of a statutory command. 906 F.3d 1049, 1060-61 (D.C. Cir. 2018) (EPA delayed effective dates of rule while it reconsidered rule despite command that "reconsideration of a final rule pursuant to that section 'shall not postpone the effectiveness of the rule'"). No circumstance or statutory command comparable to those in *Sullivan* or *Air Alliance* applies to this case. And in both *Colorado River Indian Tribes v. National Indian Gaming Commission*, 466 F.3d 134, 139 (D.C. Cir. 2006) and *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011), *see* BFC Mem. at 21-22, the issue of rulemaking versus adjudication was not before the court.

### 2. The Prohibition on Indefinite Carryover of Discretionary Exemptions is Consistent With Congressional Intent.

7 U.S.C. § 2015(o)(6)(E) allows States each year to exempt 12% of ABAWDs who otherwise are ineligible for SNAP due to the ABAWD time limit. USDA must "increase or decrease the number of individuals who may be granted" a discretionary exemption "to the extent that" a State's average monthly number of exemptions actually granted in the prior fiscal year "is lesser or greater" than estimated by USDA. *Id.* § 2015(o)(6)(G). The statute does not stipulate how USDA must treat a State's failure to use its allotted exemptions for more than one year. With respect to that issue, the statute is open to multiple interpretations. In the Final Rule, USDA

reasonably interpreted it to allow States to carry over only one year's worth of unused exemptions.

The State Plaintiffs contend that the Rule's prohibition on the indefinite "carry-over of unused exemptions. . . ignores statutory language and Congress's clearly articulated intent." State Mem. at 23-25. But tellingly, they point to no text in the statute that entitles States to indefinitely stockpile unused exemptions for use at any point in the future. *See id.* [11] If anything, the statute *precludes* indefinite carryover because it permits USDA to adjust a State's exemptions "to the extent that the average monthly number of exemptions *in effect* in the State *for the preceding fiscal year* under this paragraph is lesser or greater than the average monthly number of exemptions estimated for the State agency *for such preceding fiscal year* under" the discretionary exemption paragraph. 7 U.S.C. § 2015(o)(6)(G) (emphases added). The statute's focus on the "preceding fiscal year" certainly does not suggest—as the States argue—that USDA *must* credit unused exemptions for all preceding years.

The State Plaintiffs' reading ignores not only Congress's directive to account for exemptions "in effect" only the "preceding fiscal year" in making adjustments, but also its decision to grant States only a limited amount of exemptions each year. *See id.* § 2015(o)(6)(E); *CREW,* 316 F. Supp. 3d at 387 ("To determine the plain meaning of a statute, the court must look . . . to

---

[11] The State Plaintiffs mischaracterize the Rule as somehow "cancelling previously accumulated exemptions aside from those accrued in the preceding fiscal year" and argue that the rule is being applied retroactively. State Mem. at 24 (citation omitted). The statute only speaks to a State's right to use exemptions in any given fiscal year, and requires USDA to "adjust" that amount. 7 U.S.C. § 2015(o)(6). Neither the statute nor the rule "regulate[s] past transactions." *Bell Atl. Tel. Cos. v. FCC,* 79 F.3d 1195, 1207 (D.C. Cir. 1996). Instead—consistent with the statute—it regulates only how USDA will determine exemptions under § 2015(o)(6)(G) in the future. *See id.* ("The . . . rules do not regulate past transactions; they regulate future rates."). That the new regulation may have "unsettle[d the States'] expectations," does not make it a retroactive rule. *Landgraf v. USI Film Prods.,* 511 U.S. 244, 269 n. 24 (1994). In fact, the Rule permits States to use accumulated exemptions in FY 2020 without an impact on its earned exemptions in the future. *See infra* at p. 47.

'the language and design of the statute as a whole.'" (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988))). It also conflicts with the primary purpose of the PRWORA itself: ensuring that ABAWDs engage in meaningful work activity. *See* 7 U.S.C. § 2015(o)(2).

At bottom, § 2015(o)(6)(G) only directs USDA to adjust a State's exemptions based on its use in "the preceding fiscal year." It does not unambiguously require USDA to permit States to carry over unused exemptions from prior years. Because of the statute's ambiguity, USDA was free to interpret it to restrict the indefinite carryover of unused exemptions.[12]

### 3.   Subsequent Legislative History From 2018 Is an Unreliable Guide to the PRWORA, a Statute Passed in 1996, and Should be Disregarded.

The State Plaintiffs place great weight on the 2018 Farm Bill—legislation debated more than 20 years after Congress enacted the PRWORA. Because some House provisions in the 2018 Farm Bill never made it into the final Agriculture Improvement Act of 2018, Pub. L. 115-334, 132 Stat. Ann. 4490 and are similar to aspects of the Final Rule, the State Plaintiffs and *amicus* argue that the omission of those provisions in the 2018 statute precludes USDA from adopting similar provisions by regulation. State Mem. at 20-21, 23-24; Amicus Br. at 17-20, ECF No. 16. "Such subsequent legislative history, however, provides 'an unreliable guide to legislative intent.'" *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) (quoting *N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 98 (D.C. Cir. 1999)); *see also Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote."). "Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute."

---

[12] Plaintiffs have not even attempted to make an argument regarding *Chevron* step two, but for the same reasons that the agency's rulemaking was not arbitrary and capricious, *see infra* Pt. I.B.1, the USDA's interpretation of the statute is reasonable at that step.

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 187 (2001) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)).

Here, the State Plaintiffs can only speculate as to why those provisions were not included in the law.[13] The choice to omit those provisions is also consistent with a determination that USDA already had authority to accomplish much of what was proposed and that political capital might be better spent advocating for other provisions. *See Solid Waste Agency,* 531 U.S. at 170 ("A bill can be proposed for any number of reasons, and it can be rejected for just as many others."). And it is consistent with a determination that it would be best to preserve USDA's discretion with respect to State waivers and discretionary exemptions.[14] Congress could have clarified—but did not—that USDA lacks authority to implement the House bill's provisions. Ultimately, then, this "subsequent failed legislation tell[s] us little if anything about the original meaning of" the PRWORA. *Verizon*, 740 F.3d at 639.

If the PRWORA's original meaning is to be found in any legislative history, it is legislative history from the 104th Congress. And proponents of welfare reform from that Congress shed light on the PRWORA's underlying purposes that USDA is validly furthering in the Final Rule. *See,*

---

[13] The same goes for the 116th's Congress's House of Representatives' speculation as to the intent of the 115th Congress. *See* Amicus Br. at 17-20.

[14] The State Plaintiffs cite the Conference Committee Report as proof that the conferees intended to preserve the status quo. They contend that the House language was dropped "to maintain a practice that bestows authority on the state agency responsible for administering SNAP to determine when and how waiver requests for ABAWDs are submitted," State Mem. at 20 (quoting H.R. Rep. No. 115-1072 at 616 (2018) (Conf. Rep.)), which they claim forecloses the Rule. But whatever minimal weight the Report deserves, it does little more than indicate that the conferees did not want to handcuff USDA with *statutory* limits on its discretion to manage the waiver provisions and the work requirements. Indeed, USDA retains statutory authority, as the Report highlights, to issue waivers "in times of recession and in areas with labor surpluses or higher rates of unemployment." 164 Cong. Rec. H9,978 (2018).

*e.g.*,   142 Cong. Rec. H9,393 (1996) (statement of Rep. Soloman); *id*. at H9,396 (statement of Rep. Pryce); *id*. at H9,411 (statement of Rep. Riggs).

### B.      The Final Rule Reflects Reasoned Decisionmaking.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  The arbitrary or capricious standard is a "very deferential scope of review."  *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (citation omitted).  A court must presume that the agency's decision is valid and may not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  A court must consider only whether the agency has considered the relevant factors and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (citation omitted).  The party challenging the agency action bears the burden of "show[ing] the agency action is not a product of reasoned decisionmaking."  *Van Hollen*, 811 F.3d at 495 (citation omitted).  Plaintiffs' objections to the Rule cannot clear the high bar required by this standard.

### 1.      USDA Adequately Justified the Revisions to the State Waiver Scheme.

Plaintiffs raise a series of specific challenges to the Rule's revisions to the State waiver criteria.  None have merit.

i.      The State Plaintiffs first argue that USDA based the Rule on a goal of increasing the number of ABAWDs subject to the time limit, which Plaintiffs claim is not a factor USDA may consider under the PRWORA.  State Mem. at 26-27.  But of course USDA did not act arbitrarily to simply reduce the number of SNAP recipients.  It instead acted comply with Congress's intent in the PRWORA. The PRWORA's work requirements for ABAWDs serves the public interest by fostering self-sufficiency and economic stability.  *See* 7 U.S.C. § 2015(o)(2).  It

cannot be improper for USDA to implement Congress's intent.  Final Rule, 84 Fed. Reg. at 66805 (revisions in Final Rule "would improve economic outcomes, promote self-sufficiency, and encourage greater engagement in meaningful work activities among ABAWDs," which is "consistent with the stated goals of Congress"); *see also id.* at 66782-83.  Moreover, USDA explained that the current waiver criteria resulted in waiver approvals that were divorced from the required showing that a job market lacked sufficient jobs.  *See id.* at 66784, 66794.

Thus, contrary to the State Plaintiffs' assertion, USDA was motivated by considerations squarely within the ambit of the PRWORA.  Plaintiffs have identified nothing in the PRWORA that suggests that USDA cannot consider whether it believes the criteria appropriately effectuates the PRWORA's provisions.  Nor is that argument consistent with Congress's conferral of broad discretion on USDA to implement the State waiver and discretionary exemption frameworks.  The State Plaintiffs may disagree with how USDA exercised that discretion, but the Court is not empowered to "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.

Moreover, though the State Plaintiffs claim that USDA could not consider "administrative convenience and abuse deterrent" to justify restricting State flexibility in the Final Rule, *see* State Mem. at 27, again, that cannot be squared with the structure of the PRWORA.  Waivers are, by definition, a deviation from the general rule that a strict time limit applies to ABAWDs who do not satisfy a work requirement.  *See* 7 U.S.C. § 2015(o)(2).  USDA certainly could consider whether the 2001 Regulation is inconsistent with that structure.[15]

---

[15] Plaintiffs substantially overread the D.C. Circuit's decision in *Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256 (D.C. Cir. 2018), *see* State Mem. at 27. There, the D.C. Circuit held that an IRS regulation that barred corporations from establishing ownership through a particular type of security—based on a "single, undeveloped statement" that it was "difficult" to determine true ownership of such securities—was an unreasonable interpretation of the operative statute. 897 F.3d at 262-63. The court never held that in revising a regulation an agency cannot consider whether affected parties have been circumventing the prior regulatory scheme.

34

ii.     The State Plaintiffs next argue that USDA's concern about State manipulation of waiver areas is unsupported by the record.  State Mem. at 27-28.  They erroneously assert that USDA did not "cite a single concrete example of state abuse or any area that was waived improperly," and instead only relied on "unexplained 'operational experience.'"  *Id.* at 27.

However, USDA undoubtedly identified examples of the types of State gerrymandering that it had identified as a problem.  It cited waiver requests that grouped "nearly all contiguous counties in the State together" but conspicuously left out counties that would have jeopardized the request, and others that sought waivers for particular towns within an economic region, while omitting other towns in the same region with low unemployment rates.  Proposed Rule, 84 Fed. Reg. at 986.  USDA did omit the names of the individual States and jurisdictions involved—in an effort to avoid publicly criticizing its State partners—but the cited examples articulated why USDA believes the revisions are necessary to better implement the PRWORA.  *See, e.g.*, *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (Kavanaugh, J.) (APA "imposes no general obligation on agencies to produce empirical evidence").

Indeed, the administrative record is replete with waivers exhibiting this same pattern of gerrymandering.  *See* McConnell Decl. ¶¶ 7-15 & Exs. 4-12 (examples of gerrymandered waivers). Similarly, USDA's OIG found that States admitted that they "specifically requested ABAWD time limit waivers in as many parts of the State as possible to minimize the areas where they needed to track the ABAWD time limits."  *Id.*, Ex. 1 at 5.

In any event, USDA was entitled to rely on its "operational experience" in articulating its concerns with State self-definition of waiver areas.  "[A]gencies may rely on their experience in administering statutes" so long as they clearly identify that they are doing so and provide an "adequate opportunity to respond."  *Pharm. Research & Mftrs. of Am. v. FTC*, 44 F. Supp. 3d 95,

129 (D.D.C. 2014) (Howell, J.) ("*PhRMA*"), *aff'd*, 790 F.3d 198 (D.C. Cir. 2015) (citation omitted). Agency reliance is at its strongest when the agency invokes its experience not in defense of an "objectively or scientifically determinable" decision, but rather to explain the very need for the rule in question. *Id.* at 129 (agency could rely "on its expertise to justify promulgating a rule that is 'necessary and appropriate'" to implementing statute); *see also Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528, 533 (D.C. Cir. 1982) (agency adequately supported regulatory revision by relying on "its perception that existing rules . . . are without substantial value and of minor importance in achieving the goals" of the statute).

USDA's reliance on its operational experience fits with those principles. It cited its experience to identify examples of the problem it set out to remedy in the Rule, observing that attempts to require "areas be economically tied through policy guidance" had been "ineffective." McConnell Decl., Ex. 13 at 18. And, as noted above, through the examples it provided, USDA adequately explained the precise nature of its concerns. That is enough under the APA.

iii.     Plaintiffs next challenge the reasonableness of the decision to restrict an "area" to an LMA. The State Plaintiffs first argue that LMAs are both overinclusive, because they prevent States from seeking waivers for localized jurisdictions that may have "unique conditions," and underinclusive, because "[S]tate-specific conditions" can cause a lack of jobs for ABAWDs. State Mem. at 29-30.

USDA adequately articulated why it adopted the LMA-definition of an area. In essence, the agency sought to address two issues: (i) the gerrymandering of waiver requests, and (ii) the fact that job sufficiency could be evaluated by looking solely at an individual jurisdiction, regardless of jobs in the same economic region. Final Rule, 84 Fed. Reg. at 66793, 66795. The former issue had allowed States to draw the line for an area in strategic ways, enabling them to

obtain waivers for areas with sufficient jobs simply by grouping them with other areas. The latter allowed States to draw the line too narrowly, enabling a waiver to be obtained for an individual town or county even if jobs might be plentiful in a neighboring jurisdiction. Both necessarily vitiate the PRWORA's intent. USDA concluded that LMAs reflected the "best available and most practical solution" to these twin problems. *Id.* at 66795. As the agency observed, LMAs constitute the best federal designation of "an economically integrated area within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." *Id.* at 66793.

Plaintiffs counter that LMAs are tied to the commuting patterns of the general population and not those of the ABAWD population specifically. State Mem. at 29; BFC Mem. at 30-31. But USDA considered this issue in promulgating the Rule. It noted that there is no federal delineation of "areas that specifically assess commuting patterns and other related economic factors for ABAWDs." Final Rule, 84 Fed. Reg. at 66793. And it considered various alternatives but rejected them because they either were no longer reliably produced or are based in part on non-economic considerations. *Id.* at 66795 (discussing Bureau of Economic Analysis economic areas, Commuting Zones, and Workforce Development Boards). Given these alternatives, USDA reasonably relied on the "best available" federal designation of economically integrated areas— LMAs. *See Am. Pub. Commc'ns Council v. FCC*, 215 F.3d 51, 56 (D.C. Cir. 2000) (courts "cannot require an agency to enter precise . . . judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty"); *see also City of Boston Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) ("Agencies can be expected to respect the views of such other agencies as to those problems for which those other agencies are more directly responsible and more competent" (citation omitted) (cleaned up)).

Moreover, although Plaintiffs stress the supposed overbreadth of LMAs, *see* State Mem. at 29; BFC Mem. at 27-28, 30-31, the 2001 Regulation they wish to retain creates analogous problems of arbitrarily narrow areas that do not reasonably reflect job sufficiency. Boundaries between towns, counties, and States are not impervious; simply because a certain town may lack jobs does not mean that jobs are not readily available a commutable distance away. For example, a resident of the neighborhood of Takoma in Washington, D.C. is subject to a waiver, while a resident of Takoma Park, Maryland—immediately across the border (and perhaps even the street)—is not. *Compare* McConnell Decl., Ex. 14 (Maryland waiver), *with id.* Ex. 15 (D.C. waiver). A resident of Manhattanville in New York City is subject to a waiver—despite the 4.3% unemployment rate in that community district—even though a resident a few blocks away may not be. *Id.*, Exs. 9 & 16. Indeed, Plaintiffs' suggestion that a waiver area must be more geographically limited than an LMA, *see* State Mem. at 29; BFC Mem. at 30, is at odds with their view that statewide waivers should be permitted.[16]

iv.     Plaintiffs also challenge the reasonableness of the 6% unemployment floor. They principally argue that the general unemployment rate is an inappropriate proxy for evaluating the strength of a labor market for ABAWDs because ABAWDs face barriers to employment beyond those of the general public. State Mem. at 30-31. They claim that USDA should have retained

---

[16] The BFC Plaintiffs argue that the LMA's application to Washington, D.C. is arbitrary because it makes D.C.'s eligibility for a waiver dependent on the labor market in the broader metropolitan area, therefore creating an "[in]accurate representation of unemployment" in D.C. BFC Mem. at 30. As explained, USDA adopted the LMA-definition to ensure that waivers considered the presence of jobs in economically linked areas. Considering only employment opportunities within D.C. makes little sense. D.C. residents undoubtedly work in other jurisdictions within the applicable LMA, and vice versa. Indeed, unlike arbitrary state boundaries, tracking how workers commute to jobs is precisely how OMB and DOL establish LMAs. And while the BFC Plaintiffs cite allegedly idiosyncratic factors about D.C., *see id.* at 27, the LMA-definition applies to D.C. in the same manner as any other State.

the criteria for demonstrating a lack of sufficient jobs that it eliminated in order to better track the specific employment prospects of ABAWDS. *Id.*; BFC Mem. at 29.

The decision to rely on unemployment rates to define sufficient jobs is consistent with the PRWORA. There, Congress itself endorsed a rational connection between general unemployment rates and ABAWD employment prospects. *See supra* Pt. I.A.1.b; 7 U.S.C. § 2015(o)(4)(A)(i) . In fact, USDA has always used general unemployment rate as a proxy for ABAWD job prospects. *See* 7 C.F.R. § 273.24(f)(2)(ii).

Further, USDA adequately justified its adoption of an unemployment floor. While USDA recognized that ABAWD job prospects may be distinct from the general public, it noted that there is no available metric for "determining the number of available jobs specifically for ABAWDs." Final Rule, 84 Fed. Reg. at 66787. Absent a floor, waivers may be approved even when unemployment rates are extremely low, which suggests that the 2001 Regulation's criterion that an area have an unemployment rate 20% above the national average is inconsistent with the PRWORA. *Id.* at 66784. Though Plaintiffs complain that this is "circular reasoning," State Mem. at 30, the issue with the criterion is obvious. Because it is pegged to a floating target, it permits States to obtain waivers without any objective measure of the slack in the job market. *See* Final Rule, 84 Fed. Reg. at 66784 (waivers can be approved with under 5% unemployment).

USDA similarly explained the reasons for eliminating the other regulatory criteria. Certain criteria are omitted because they are inconsistent with the definition of a waiver area. *See id.* at 66790 (extended employment benefits qualification inconsistent with prohibition on statewide waivers); *id.* at 66800 ("LMAs and LSAs are often geographically inconsistent"); *id.* at 66788-89 (U-6 unemployment rates, which measures discouraged workers, "is not available at the substate level"). The other criteria were rejected because they are subjective and do not rely on

39

standardized, reliable data from federal sources. *See id.* at 66790-91.

For all Plaintiffs' handwringing about how the unemployment rate is incompatible with ABAWD job prospects and the value of the alternative criteria, in reality, the Rule does not represent a sea change in USDA's approach. States have only rarely used alternative criteria. *See* McConnell Decl., Ex. 13 at 30-31 (omitted criteria "have been infrequently used except in areas such as reservations where their use will still be permitted"). Even when used, USDA has historically required States to submit additional BLS data to support the request. *See* Final Rule, 84 Fed. Reg. at 66790.[17] That is why all of the State Plaintiffs currently have waivers based on general unemployment rates. *See* McConnell Decl., Exs. 14-28. In essence, then, Plaintiffs' true complaint is not with the use of unemployment rates, but simply that the unemployment floor is set too high. But that is the classic sort of agency judgment to which this Court should defer.

v.     The State Plaintiffs next argue that USDA failed to consider the costs it would impose on States. State Mem. at 31-34. USDA analyzed the costs to States as part of its Regulatory Impact Analysis required by Executive Orders 12,866, 13,563, and 13,771. *See* Final Rule, 84 Fed. Reg. at 66807-08. A claim alleging a failure to adequately perform that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *see also Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not subject to judicial review.").[18]

---

[17] USDA has not required additional evidence where BLS data does not exist, but under the Final Rule, States may still support waiver requests for such areas with alternative evidence. 84 Fed. Reg. at 66791.

[18] Although the D.C. Circuit has held that a cost-benefit analysis is subject to challenge when the agency "decides to rely on" it affirmatively to support a regulation, *Nat'l Ass'n of Home Builders*

But even if USDA's analysis were subject to review, it would withstand scrutiny under the APA. The rule that a "court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (citation omitted)); *see also Am. Trucking Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013) ("burden to show error" in cost-benefit analysis is "high" (citation omitted)). The State Plaintiffs fail to identify a sufficient basis to overcome the deference due to USDA's determination of costs.

They first argue that USDA's estimate of administrative costs conflicts with their own estimates, *see* State Mem. at 32, but that improperly asks the Court to "substitute[] its judgment for that of the agency." *Commerce*, 139 S. Ct. at 2570. Moreover, USDA considered comments raising concerns about administrative costs, McConnell Decl., Ex. 13 at 6, and explained the bases for its estimate of administrative costs, *see, e.g.*, *id.* at 52-53. In fact, USDA adjusted the Rule's effective date to give States more time to implement the Rule, but also noted that some of the putative burden to States arose from obligations that they were required to comply with "even when a waiver is in place." Final Rule, 84 Fed. Reg. at 66802.

The State Plaintiffs next argue that USDA did not take into account various other costs, including costs to defend future legal challenges and increase employment training programs, and the downstream effects of the Rule on public health and local economies. State Mem. at 32-34. But there is no requirement that, to comply with the APA, an agency must quantify every potential cost of a rule. *See, e.g.*, *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) ("[T]he law

---

*v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012), USDA did not justify its Rule on a rigorous calculation that the qualitative and unquantifiable societal benefits outweighed the overall costs. Rather, it simply took into account the potential financial burden on States, among other factors, as part of the Regulatory Impact Analysis.

does not require agencies to measure the immeasureable."); *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 840 (5th Cir. 2010) (rejecting claim that agency's "failure to estimate benefits for specific new facility locations renders the process arbitrary and capricious").   The costs that the State Plaintiffs identify are necessarily speculative, as they depend on how States and individuals choose to respond to the Rule.   And contrary to the State Plaintiffs' assertions, USDA did in fact consider these costs but reasonably determined that the administrative record "do[es] not permit estimation of potential costs specific to the dispersed ABAWD population," and therefore that USDA "cannot feasibly estimate potential impacts of this rule on the overall U.S. economy."   McConnell Decl., Ex. 13 at 6-7; *id.* at 54 (balance between "increases in poverty and food insecurity" for ABAWDs who lose SNAP benefits and "increased self-sufficiency and . . . economic well-being" of ABAWDs who become employed "cannot be accurately estimated").   "As predicting costs and benefits without reliable data is a 'primarily predictive' exercise, the [agency] need[s] only to 'acknowledge the factual uncertainties and identify the considerations it found persuasive' in reaching its conclusions."   *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014) (citation omitted); *see also Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369-70 (D.C. Cir. 2014) (agency did not need to quantify benefits of regulation where not reasonably estimable and where agency did not have "particular expertise" about predicted benefits), *overruled on other grounds*, *Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc); *City of Portland, Oregon v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007) (rejecting challenge to rule where "the Agency clearly thought about the cities' objections and provided reasoned replies—all the APA requires").

For that matter, the PRWORA itself reflects a judgment by Congress that the benefits of imposing work requirements specifically on ABAWDs is in the public interest, even though those provisions necessarily may render some ABAWDs ineligible for SNAP benefits.   Though it

authorized USDA to issue discretionary waivers, there is no reason to believe that Congress intended that the waiver process to fundamentally displace the default that the work requirement applies. USDA was entitled to rely on Congress's implicit judgment in weighing the costs of the Rule. *See* Final Rule, 84 Fed. Reg. at 66807 (citing "the intent of Congress when passing PRWORA" and noting that comments regarding public health and economic impacts "do[] not change the statutory work requirements established by Congress"); *see also Nat'l Ass'n of Mfrs*, 748 F.3d at 369-70 (agency could rely on "Congress's conclu[sion], as a general matter," that rule's "costs were necessary and appropriate in furthering" statutory goals (citation omitted)).

vi. The State Plaintiffs also argue that USDA failed to adequately consider the allegedly disproportionate effects the Rule will impose on minority groups. State Mem. at 33-34. USDA addressed the potential for a disparate impact on minority groups in a Civil Rights Impact Analysis ("CRIA") accompanying the Rule, which was prepared pursuant to an internal Department Regulation. *See* McConnell Decl., Ex. 29. The State Plaintiffs' challenge to the content of the CRIA, therefore, fails for the same reason as its challenge to USDA's Regulatory Impact Analysis. *See supra* at p. 40.[19]

Even if reviewable, the challenge still fails on the merits. The CRIA "outlines outreach and mitigation strategies to lessen any possible civil right impacts" from the Rule, and, as USDA explained, "the implementation of mitigation strategies and monitoring by the FNS Civil Rights

___

[19] The State Plaintiffs cite out-of-Circuit authority for the proposition that a CRIA is a "final agency action" that is subject to judicial review. *See* State Mem. at 34 n.4 (citing *McFalls v. Purdue*, No. 3:16-CV-2116-SI, 2018 WL 785866, at *13 (D. Or. Feb. 8, 2018)). *McFalls*, however, involved a CRIA issued pursuant to a different statutory scheme, in which the CRIA represented the agency's final position on the particular decision in question (whether a housing unit owner could prepay his government loan consistent with the Emergency Low Income Housing Preservation Act). 2018 WL 785866, at *13. That case sheds no light on the reviewability of a CRIA prepared pursuant to an internal Department Regulation and that merely accompanies a final rule.

Division and FNS SNAP may lessen these impacts." *See* Final Rule, 84 Fed. Reg. at 66808; *see also* [CRIA] at 10-12. The State Plaintiffs complain that USDA did not define "these 'mitigation strategies,' or how they will address the problem of disparate impact," State Mem. at 34, but cites nothing for the proposition that USDA was required to prospectively set forth how it would respond to hypothetical future situations. *See Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (cited State Mem. at 34; involving agency's failure to respond at all to significant comment).

vii.     Finally, the State Plaintiffs argue that the Final Rule improperly conflicts with prior "factual findings" that purportedly underpinned the 2001 Regulation. State Mem. at 34-37. As they concede, *see id.* at 34-35, an agency is free to change its policy, so long as it provides a "reasoned explanation" for doing so, which "ordinarily demand[s] that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). There is no "heightened standard" of review, and an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 514-15. "It suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515.

Though an agency may need to provide a more "detailed justification" where its policy "rests upon factual findings that contradict" those underlying the prior policy, *id.* at 515, that circumstance is not present here. The State Plaintiffs claim that the Rule departs from two findings in USDA's prior guidance and the 2001 Regulation: (i) that States "are in the best position" to define the areas that "lack sufficient jobs for ABAWDs" given "variations in local economic conditions," and (ii) that the PRWORA's focus on "[in]sufficient" jobs means that the general unemployment rate is an "imperfect measure" of ABAWD job prospects. State Mem. at 35-36.

44

These are not factual findings; they are policy and legal judgments, which are legitimate even if they differ from USDA's past judgment. *See Brand X*, 545 U.S. at 981 (agency "must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to . . . a change in administrations" (citation omitted)); *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038 (agency not required to make more "detailed" showing where it "did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts" (citation omitted)).

In any event, USDA provided ample justification for the change. USDA was plainly aware that the Rule is a change to the 2001 Regulation, and it explained why it no longer believed State flexibility in defining waiver areas was appropriate and why the current criteria for showing a lack of sufficient jobs needed to be tightened. *See* Final Rule, Fed. Reg. at 66784, 66793-94. That is all that the APA requires. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 727-28 (D.C. Cir. 2016) (agency justified change where it explained basis for change in its views and how "new information developed after" prior policy "reasonably informed its conclusions"); *see also N.E. Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018) ("So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating that the agency's earlier decisions should be altered or abandoned." (citation omitted)).

### 2.    The Limitation on the Indefinite Carryover of Exemptions is More Consistent with the Statute and Accounts for Reliance Interests.

The State Plaintiffs also challenge the Rule's restriction on the carryover of discretionary exemptions on the ground that it allegedly fails to consider the reliance interests of States who have accumulated and carried over such exemptions. USDA's reasons for prohibiting the indefinite carryover of unused exemptions are "entirely rational." *Fox Television*, 556 U.S. at 517.

USDA promulgated the 2001 Regulation under the expectation that States would use their

discretionary exemptions. *See* Proposed Rule, 84 Fed. Reg. at 987 ("The Department views the carryover of significant amounts of unused exemptions to be an unintended outcome of the current regulations."). Nevertheless, a number of States did not use their allocated discretionary exemptions over many years. Final Rule, 84 Fed. Reg. at 66802. As a result, States accumulated "extremely high amounts of unused discretionary exemptions that well exceed the number allotted to each State for the fiscal year," to a degree not contemplated by the 2001 Regulation. *See id.* ("[I]n FY 2019, States earned approximately 1.3 million exemptions, but had about 7.4 million exemptions available for use in total due to the carryover of unused exemptions from previous fiscal years."). USDA explained that this unlimited hoarding of exemptions is "inconsistent with Congress's decision to limit the number of exemptions available to States in any given fiscal year." 84 Fed Reg. at 66802. It is reasonable for "an agency [to] justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies." *Encino Motorcars*, 136 S. Ct. 2117, 2127 (2016) (citation omitted).

Further, an agency engages in "reasoned analysis" when it "justif[ies] [its] change of interpretation" of a statute in response to "reports of [its] . . . Office of the Inspector General (OIG) . . . that [the] prior policy failed to implement properly the statute." *Rust v. Sullivan*, 500 U.S. 173, 187 (1991). That is what USDA did here. In deciding to limit carryover of exemptions, USDA reasonably relied on the findings of its September 2016 OIG audit report, *see* 84 Fed. Reg. at 988, which found that permitting indefinite carryover of exemptions:

> [A]llows the States to accumulate more than the 15 percent allowed per the statute. For example, according to FNS, one of the States had over 1.6 million exemptions available to use at its discretion. This State has over 125,000 ABAWDs in an average month. If the State chose to, it could exempt all 125,000 ABAWDs from the time limit and work requirement for over 1 year, which may not meet the intent of the statute.

46

McConnell Decl., Ex. 1 at 10.[20] "[T]hese justifications are sufficient to support the Secretary's revised approach." *Rust*, 500 U.S. at 187.

The State Plaintiffs argue that the Final Rule's restriction on indefinite carryover "fail[s] to address significant reliance interests." State Mem. at 37. Specifically, they complain that USDA "fail[ed] to confront the serious reliance interests of states that have accumulated exemptions for many years and summarily discount[ed] the numerous comments that relay the importance of the exemptions." *Id.* But USDA did much more than rely on "conclusory statements," *id.* at 38. "In response to [the States'] comments," USDA modified the Proposed Rule, "allow[ing] States to carry over . . . one year's worth of exemptions from previous years." 84 Fed. Reg. at 66803. USDA also "provid[ed] States with more time to use exemptions," even though they were effectively on notice of the shaky legal basis for indefinite carryover since the 2016 OIG Report and had several years to put accumulated exemptions to use. *Id.* Unlike in the Proposed Rule, the Final Rule permits States to use all of their accumulated exemptions in FY 2020 without incurring liability. *Id.* at 66804; *see also id.* at 66805 (explaining in example 3 how State that uses all accumulated exemptions in FY 2020 does not incur liability for overuse). These changes addressed any significant reliance interests.

The State Plaintiffs also argue that USDA did not sufficiently address their concern that accumulated exemptions enable States to respond quickly "to swift economic downturns or changes in employment conditions." State Mem. at 37. But USDA did not "ignor[e] such matters." *Fox Television*, 556 U.S. at 515. It modified the Rule to permit greater carryover of

---

[20] The Report did not conclude that the statute prohibited USDA from allowing indefinite carryover. Instead, it determined that "apparent inconsistencies in the authorizing statute itself" permit the agency "discretion to interpret and implement the exemption provision as it ha[d] done," even though it "may not meet the intent of the statute." *See* McConnell Decl., Ex. 1 at 10-11.

unused exemptions in order to balance this specific concern with its concern that indefinite carryover is "inconsistent with the act." 84 Fed. Reg. at 66803 (modification allowing carryover of one year's worth of exemptions "will give States some flexibility to 'save up' a limited number of exemptions . . . in order to deal with potential unforeseen sharp economic declines or other quickly changing circumstances").

What is more, "reliance does not overwhelm good reasons for a policy change." *Encino Motorcars*, 136 S. Ct. at 2128 (Ginsburg, J., concurring). And the reasons first articulated in the 2016 OIG Report and reiterated by the agency in its rulemaking provide the "reasoned explanation" required by the APA. *Id.* at 2126 (majority opinion).

### C.     USDA Provided Adequate Opportunity to Comment on the Final Rule.

An agency must publish a notice of proposed rulemaking that "provide[s] sufficient factual detail and rationale for the rule to permit interest parties to comment meaningfully." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (citation omitted). The final rule "need not be the one proposed," but must "only be a logical outgrowth of its notice." *Id.* "A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (citation omitted).

Here, Plaintiffs argue that USDA failed to provide adequate notice of three issues: (i) the removal of State qualification for extended unemployment benefits as a way of showing a lack of sufficient jobs; (ii) the requirement that a waiver "area" be an LMA; and (iii) USDA's reliance on its operational experience. USDA provided sufficient notice to comment on each of these issues.

<u>**Extended Unemployment Benefits ("EB") Qualification**</u>.   Plaintiffs argue that USDA failed to provide an opportunity to meaningfully comment on the removal of EB qualification as a

criterion for demonstrating a lack of sufficient jobs. State Mem. at 14-15; BFC Mem. at 16 n.16.
To be sure, the Proposed Rule indicated that USDA was considering "continu[ing] to approve"
waiver requests based on EB qualification, 84 Fed. Reg. at 985, whereas the Final Rule excluded
that criterion. But an agency's refusal to adopt its proposal is always a logical outgrowth of the
proposal. *See, e.g.*, *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (per curiam) ("One logical
outgrowth of a proposal is surely . . . to refrain from taking the proposed step." (quoting *Am. Iron
& Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989)); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d
1280, 1299-1300 (D.C. Cir. 2000) (final rule's removal of proposed requirement permissible
because "any reasonable party should have understood that EPA might reach the opposite
conclusion after considering public comments"). That is particularly the case here because the
Proposed Rule made clear that USDA intended "to amend the regulatory standards" applicable to
State waivers. 84 Fed. Reg. at 980. Similar language is present throughout the Proposed Rule.
*See, e.g.*, *id.* at 981 (discussing "changes" to waiver criteria); *id.* at 982 (discussing ANPRM's
request for input regarding "changes" to "information and data States must provide to support the
waiver request"); *id.* at 983 (discussing "revisions" to criteria); *see also Abington Mem'l Hosp. v.
Burwell*, 216 F. Supp. 3d 110, 131-32 (D.D.C. 2016) (use of terms like "revise" and "changes"
adequately notified public agency was considering broad changes implemented in final rule).

Moreover, the context of the Proposed Rule indicated that USDA might decide not to
include EB qualification in the new criteria. EB qualification applies to a State as a whole, *see*
Final Rule, 84 Fed. Reg. 66790, meaning that retention of that criterion would permit statewide
waivers. That result would be in obvious tension with USDA's proposal to drastically curtail the
availability of statewide waivers—a policy to which EB qualification constituted a stark exception
in the Proposed Rule. *See* 84 Fed. Reg. at 985. Interested parties could fairly anticipate, then, that

USDA might simply "refrain from taking the proposed step," *Am. Iron*, 886 F.2d at 400, and eliminate the main exception to a proposed general prohibition on statewide waivers.

Plaintiffs' principal authority, *see* State Mem. at 14—*Allina*—is readily distinguishable. In that case, the agency "propos[ed] to clarify" that a certain figure would fall into one of two buckets for calculating supplemental Medicare reimbursement payments, but in the final rule decided to place that figure in the other bucket. The court held the public lacked notice of the change because the agency had proposed only to "clarify" its prior rule, and [t]he word 'clarify does not suggest that a potential major issue is open for discussion." 746 F.3d at 1108; *accord Envtl. Integrity Project v. EPA*, 425 F.3d 992, 994-95, 998 (D.C. Cir. 2005) (agency proposed to "clarify" rule by "codifying" prior interpretation).

Here, by contrast, the Proposed Rule was no mere clarification—rather, USDA made clear it was contemplating a root-and-branch revision to the State waiver criteria. *See, e.g., Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp. 3d 168, 189 (D.D.C. 2018) (Howell, J.) (where agency reversed position from proposed rule, *Allina* and *Environmental Integrity Project* did not govern because language of proposed rule did not "merely state[] that the Secretary was considering a 'clarification,'" but instead "clearly indicated that the Secretary was proposing to change our policy" (citation omitted)); *Abington*, 216 F. Supp. 3d at 134 (distinguishing *Allina* where language of proposed rule made clear agency was contemplating change). Moreover, the *Allina* court noted that because the proposed rule was "favorable" to hospitals, "there was no reason" for affected hospitals "to fear that another party would offer comments opposed to such an interpretation." 746 F.3d at 1108. That distinguished the case from other proposed rules where interested parties "can usually anticipate fierce opposition . . . and it might be thought prudent to submit comments in support of favorable proposed rules." *Id.* at 1108-09. Here, the Proposed Rule itself put parties

on notice that such opposition would be forthcoming. *See* 84 Fed. Reg. at 983 (comments to ANPRM supported "stricter waiver approval requirements" and "identified a number of areas of concern with current practices," including "the use of certain metrics for waiver approvals").[21]

**LMA-Definition**.   The State Plaintiffs next argue that USDA did not provide adequate notice of the decision to generally require waiver areas to conform to an LMA. State Mem. at 15. Again, the Proposed Rule placed interested parties on notice that USDA intended to fundamentally rework the definition of "area."   It repeatedly expressed concerns about State flexibility to define the relevant area because it resulted in waivers of areas that were not fairly considered a single economic region.   Proposed Rule, 84 Fed. Reg. at 981.  And it proposed "[e]liminat[ing] waivers for areas that are not economically tied together."   *Id.* at 983; *accord* ANPRM, 83 Fed. Reg. at 8015 (requesting comments on whether "an 'economic area' [should] be limited in geographic scope, such as to a single county, metropolitan area, or *labor market area*" (emphasis added)).

Interested parties were on notice, then, that USDA might choose to require that all waiver areas correspond to an economically tied region.   The Final Rule, therefore, found "roots in the agency's proposal." *Envt'l Integrity Project*, 425 F.3d at 996.  "[P]arties were not asked to divine [USDA's] unspoken thoughts," *Ariz. Pub. Serv.*, 211 F.3d at 1299 (citation omitted), and indeed other commenters addressed this exact issue.  *See* Final Rule, 84 Fed. Reg. at 66796 (comments arguing that "States should not be able to choose when to apply for a combined area using the LMA definition and when to apply for a single-jurisdiction waiver"); *see also Abington*, 216 F.

---

[21] Plaintiffs' other authority is similarly distinguishable. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009) (vacating rule where proposed rule "nowhere even hinted" that agency "might consider" expanding it); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259-60 (D.C. Cir. 2005) (final rule setting *maximum* permissible rate was not logical outgrowth of proposal to set *minimum* permissible rate, as proposed rule had not floated "possibility of a maximum cap much less" particular rate chosen).

Supp. 3d at 134 (holding that "the D.C. Circuit has long treated the submission of relevant comments as evidence that sufficient notice was given" to interested parties (citing *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998)).

**Operational Experience**. Finally, the State Plaintiffs argue that the Proposed Rule failed to adequately define the "operational experience" that USDA cited as a basis for the need to revise the State waiver criteria.  State Mem. at 17.  This too fails.

As discussed above, USDA cited its own experience with the ABAWD time limit to identify perceived weaknesses in the 2001 Regulation—*i.e.*, the absence of an unemployment rate floor and State flexibility to define the waiver area. Proposed Rule, 84 Fed. Reg. at 981.  It clearly explained why it thought these were weaknesses and identified examples of exactly these sorts of requests.  *See id.* ("States have combined counties with unemployment rates under 5 percent with counties with significantly higher unemployment rates in order to waive larger areas."); *id.* ("States have grouped areas that are contiguous but left out certain low-unemployment areas that would otherwise logically be considered part of the [economic] region.").   Accordingly, USDA sufficiently conveyed the nature of its concerns with the 2001 Regulation to allow for comments on the validity of those concerns.  That is true even though USDA did not identify by name the particular waiver requests or jurisdictions it was discussing  *See, e.g*, *PhRMA*, 44 F. Supp. 3d at 129 (agency could cite its operational experience without disclosing "physical records of everything that has contributed to its expertise over time").   Nonetheless, those waiver requests will be part of the administrative record and can be challenged on summary judgment.  *See also* McConnell Decl., Exs. 4-12 (examples of waiver requests).

D.     **USDA Considered All Relevant Comments.**

The BFC Plaintiffs fault USDA for purportedly failing to adequately respond to comments.

BFC Mem. at 32-34.  Although agencies must respond to "significant comments," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), the obligation is "not particularly demanding," *Ass'n of Private Sector Colls.*, 681 F.3d at 441-42 (citation omitted).  The agency's response "need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'"  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968).

Here, the BFC Plaintiffs identify three "examples" of comments that USDA failed to respond to: (i) comments arguing that general unemployment rates do not correspond to ABAWD employment prospects; (ii) comments arguing that the PRWORA precludes defining "sufficient jobs" in terms of unemployment rates; and (iii) comments relating to the 2018 Farm Bill.  *See* BFC Mem. at 33-34.  But as the BFC Plaintiffs' own brief lays out, *see id.* at 33-34, USDA considered and responded directly to each of these comments.  *See* Final Rule, 84 Fed. Reg. at 66784, 66787, 66790-91 (explaining rationale for unemployment floor and eliminating alternative criteria); *id.* at 66788 (explaining that Rule corresponds to statutory language); *id.* at 66794 (discussing 2018 Farm Bill).  USDA's responses more than suffice to clear the low bar the APA requires.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

### A.    Much of the Alleged Harm Plaintiffs Rely on Are Not Article III Injuries.

At the outset, the Court should not consider a number of the alleged irreparable harms Plaintiffs cite.  Where plaintiffs lack standing to assert certain injuries, those injuries are not cognizable harms, and a court lacks jurisdiction to consider them in the irreparable harm analysis.  An injunction tailored to irreparable injuries for which a plaintiff is without standing "is not an Article III remedy because it does not redress a cognizable Article III injury."  *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 107 (1998); *see also Feng Wang v. Pompeo*, 354 F. Supp.

3d 13, 25 (D.D.C. 2018) (party seeking injunctive relief must "show that the alleged harm will *directly result* from the action which the movant seeks to enjoin." (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (emphasis added)).

Here, the State Plaintiffs invoke the interests of their residents as *parens patriae, see* State Mem. at 41-42, but they may not do so in an action against the United States. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80, 183 (D.C. Cir. 2019). Nor may the Court consider the alleged "negative outcomes" States will supposedly bear "through increased Medicaid and uncompensated care expenditures and required expansion of [other] state programs," State Mem. at 42, including those arising from a hypothetical and discretionary decision to "expand their [employment and training] programs to provide services to" more ABAWDs, *id. See Massachusetts v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 17 (D.D.C. 2018) (allegation that regulation would compel "States to pay increased government benefits," was not "concrete and particularized" injury (citations omitted)). And the Court may not look to the alleged downstream harm to State economies from reduced SNAP benefits, State Mem. at 43, either. *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (reduced benefits though "a comprehensible harm to the economic interests of the state government," are "generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable").

Similarly, the Court may not enter a preliminary injunction based on the individual Plaintiffs in the *Bread for the City* action because those Plaintiffs are likely excepted from the ABAWD work requirements. It is necessarily speculative as to whether the individual Plaintiffs will continue to be unemployed by July 1, 2020, when their three-month time limit for receipt of benefits would expire, or that they will not receive a discretionary exemption from D.C. But setting aside that fact, these Plaintiffs are likely excepted from the ABAWD work requirements

pursuant to 7 U.S.C. § 2015(o)(3)(B)'s exception for individuals who are "medically certified as physically or mentally unfit for employment." Accordingly, they cannot show a threat of irreparable injury that is "real," "substantial," and "immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, (1983); *see also Winter*, 555 U.S. at 22 (plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction").

Both Ms. Tann and Mr. Smith admit to being unable to work because of mental impairments, and Mr. Smith also attests that the primary reason he cannot work is his physical impairments. *See* Declaration of Damon Smith ¶ 11, ECF No. 4-4 (citing "serious mobility issues" including "serious stiffness and weakness" in his left leg and "damage to [his] right knee" and doctor's advice that he "will need to have orthopedic surgery, followed by a recovery period"); Declaration of Geneva Tann ¶¶ 10-11, ECF No. 4-5 (plaintiff has "been diagnosed with anxiety, depression, and ADHD," which "interfere with" abilities key to maintaining employment and "make it difficult for [her] to get jobs or, once hired, to remain employed"). Although both note that their impairments do not rise to the level necessary to qualify for social security disability benefits, *see* Smith Decl. ¶ 14; Tann Decl. ¶ 11, qualifying for disability benefits is *not required* for the § 2015(i)(3)(B) exception. Instead, Mr. Smith and Ms. Tann qualify if they are "obviously mentally or physically unfit for employment as determined by" D.C. or if they "provide[] a statement from" a broad list of medical personnel, a social worker, or "any other medical personnel" that D.C. "determines appropriate." 7 C.F.R. § 273.24(c)(2)(ii)-(iii). Both Mr. Smith and Ms. Tann testify that they received medical diagnoses with respect to their injuries. Smith Decl. ¶ 11; Tann Decl. ¶ 11. Accordingly, it is currently unknown whether these Plaintiffs would qualify for a medical certification, which would mean that they are simply not ABAWDs. Any alleged injury is therefore speculative, and these Plaintiffs lack standing—or at a minimum, their

injury is not yet ripe for adjudication—because the alleged irreparable injury "may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Alternatively, if Plaintiffs fail to seek medical certifications, their loss of SNAP benefits will not "satisfy the irreparable harm requirement [because] the harm complained of [would be] self-inflicted." 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed.). And they would lack standing because their injury would not be traceable to the Final Rule. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

Further, though the BFC Plaintiffs cite this Court's decision in *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157 (D.D.C. 2018) to suggest that the Court may consider the loss of benefits by "similarly-situated ABAWDs," *see* BFC Mem. at 36, they misread *Garnett*. That case was a certified class action, *see* 313 F. Supp. 3d at 154, and thus the Court looked beyond the potential irreparable injury of the particular declarants to the potential irreparable injury of other individuals who "are members of the plaintiff class," *id.* at 158. Here, however, there is no such class, and thus no basis to gauge irreparable harm by the Rule's alleged effects on non-parties.

Finally, the alleged harm to Bread for the City also is insufficient to establish standing and, accordingly, irreparable harm. "An organization, to show irreparable harm, must show first that 'the actions taken by the defendant have perceptibly impaired the organization's programs.'" *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)). Bread for the City claims that the Rule will "inflate demand for [its] nutritional support program." Declaration of George Jones ¶ 9, ECF No. 4-6. Even if true, it is not a "perceptible impairment" of the organization's mission.

Bread for the City's interest in this case is on all fours with the proposed intervenors in *Cigar Ass'n of America v. FDA*, 323 F.R.D. 54, 62-63 (D.D.C. 2017). In that case, the proposed

organizational intervenors led anti-tobacco efforts—just as Bread for the City leads anti-hunger efforts in D.C. *Id.* at 62. Bread for the City's alleged harm is indistinguishable from that of the intervenors in *Cigar Ass'n*, who argued that a void FDA rule would increase tobacco smoking and therefore increase demand for their services. *Id.* And just like the proposed intervenors in *Cigar Ass'n*, Bread for the City "does no more than assert that it will have to expend some undefined amount of additional resources" if the rule is not vacated. *Id.* "Such a generalized harm . . . amounts to 'no more than an abstract injury to its interests.'" *Id.* at 62-63 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015)).

### B.    The States' Administrative Costs Are Not Irreparable Harm.

The State Plaintiffs identify a number of administrative costs they claim will be imposed by the Final Rule:  increased staffing and training costs, notification costs, unspecified technological costs, and expansion of employment and training programs. State Mem. at 38-40. Even assuming these costs establish standing, they are insufficient to establish irreparable harm because they represent insignificant economic harms imposed as a regulatory burden. The "general rule [is] that economic harm does not constitute irreparable injury." *Davis v. PBGC*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). "To be sure, economic loss sustained due to a federal administrative action is typically 'uncompensable' in the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not reach damages claims." *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("*CAPPS*"). But "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) (citation omitted).  "[I]t proves too much to suggest that 'irreparable' injury exists, as a matter of course, whenever [an entity] seeks to preliminarily enjoin the implementation

of a new regulatory burden." *CAPPS*, 344 F. Supp. at 170. Indeed, it is a well-established principle that "as a general matter, the costs of compliance with a regulatory scheme do not constitute irreparable injury." *See, e.g.*, *Nat'l Med. Care, Inc. v. Shalala*, No. 95-0860, 1995 WL 465650, at *3 (D.D.C. June 6, 1995) (citing *Am. Hosp. v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (1976)). But even if the court considers these costs, they still do not establish irreparable harm because some of those costs are self-inflicted, and all of them are neither "certain" nor "great." *Wis Gas Co.*, 758 F.2d at 674.

**Self-Inflicted Training Costs**. The State Plaintiffs complain that the Final Rule will create a "significant influx of ABAWDs newly subject to the time limits," forcing the States to train their staff how to, for example, "properly explain" the work requirements, "determine exceptions," and "track recipients' countable months." State Mem. at 38. But these supposed harms are little more than descriptions of the States' own failure to administer SNAP. *See Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) (declining to issue preliminary injunction when "the plaintiffs . . . seem to have suffered the most from their own actions or inactions"). The ABAWD time limit and work requirements are not new. They are the core aspects of the PRWORA that States have had a duty to understand and administer since 1996. *See* 7 U.S.C. § 2020(a) ("The State agency of each participating State *shall have responsibility* for certifying applicant households . . . ." (emphasis added)); *id.* § 2020(e)(5) (States must submit a "plan of operation . . . . [which] shall provide . . . . standards to be used in determining the eligibility of applicant households . . . in accordance with [ABAWD work requirements]").

That States may have neglected to hire and train staff to address core SNAP requirements does not mean that they are now "harmed." *Barton*, 131 F. Supp. 2d at 247 ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." (quoting *Fiba*

*Leasing Co., Inc. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993)).  That is especially so because waivers have never been guaranteed, and an improvement to a State's economy could always have triggered the need to apply the work requirements.  That is one reason why USDA has repeatedly advised States of their duty to track ABAWDs—necessarily requiring an understanding of the work requirements—even in areas covered by a waiver.  *See, e.g.,* McConnell Decl., Ex. 30 at 3 ("States must . . . [m]easure the continuous 3-year period, and track whether ABAWDs subject to the time limit are or are not meeting the work requirements . . . includ[ing] period of time when the individual is in an area with a waiver of the time limit.").  Indeed, the waiver approvals that USDA issues clearly instruct States that they must continue to track ABAWDs (which requires understanding the statute's requirements) even when a waiver is granted.  *See, e.g.*, *id.*, Ex. 18 at ("FNS also reminds the State agency that it must measure the 3-year period and track ABAWDs on a continuous basis, even in areas under a waiver.  The State must continue tracking so that the State will be ready to transition off-of the waiver when it expires and reintroduce the time limit.");  *id.*, Ex. 15 at 1 (same).

**States Have Not Established Certain Harm**.  Irreparable injury must be "certain."  *Wis Gas Co.*, 758 F.2d at 674.  "To permit the Court to evaluate the nature and extent of the alleged irreparable injury, the movant bears the burden of presenting 'specific details regarding the extent to which' its business will suffer."  *CAPPS*, 344 F. Supp. 3d at 171 (citation omitted).

The State Plaintiffs' conclusory allegations of harm have not sustained their burden of showing a certain injury in the form of administrative costs.  Only three have provided any cost estimate at all: Connecticut, Pennsylvania, and Minnesota.  The remainder fail to proffer any estimate.  *See*, *e.g.*, Declaration of Alexis Carmen Fernández ¶ 46, ECF No. 3-5 (California's implementation "will require a large-scale redirection and increase in fiscal and program

expenditures"); Declaration of S. Duke Storen ¶ 23, ECF No. 3-17 (conclusory assertions that Virginia's administrative costs will increase). By definition, these Plaintiffs rely only on "conclusory assertions of potential loss." *CAPPS*, 344 F. Supp. 3d at 171.[22] Even if the Court is "sensitive to the apprehensions" States may have regarding indirect increases in administrative costs, the Court cannot find that they have established irreparable injury on this basis because they have "provided virtually no specific factual information to substantiate their claims." *Sagarwala v. Cissna*, No. 18-2860 (RC) 2019 WL 1649943, at *3 (D.D.C. Apr. 16, 2019).

In any event, the Court without a doubt must decline to extend preliminary injunctive relief to Rhode Island, Vermont, and Maryland (outside of Baltimore),[23] because these Plaintiffs have provided *no evidence at all* to substantiate a claim of irreparable harm. *See CAPPS*, 344 F. Supp. at 172 ("[T]he movant must . . . '*substantiate* the claim that irreparable injury is 'likely' to occur.'" (quoting *Wis. Gas Co.*, 758 F.2d at 674)); *Int'l Internships Program v. Napolitano*, 798 F. Supp. 2d 92, 100 (D.D.C. 2011), *vacated on other grounds*, 463 F. App'x 2 (D.C. Cir. Feb. 21, 2012) (declining to find irreparable harm where "plaintiff does not offer a single piece of evidence—not a bill, financial statement, past budget, current budget, or financial projection—to support the [economic] harm it alleges"); *Miniter v. Moon*, 684 F. Supp. 2d 13, 17 (D.D.C. 2010) (denying preliminary injunction because plaintiff failed to submit any evidence permitting court to assess whether plaintiff in fact faced irreparable harm).

The Court must decline to infer arguable cost impacts from those represented by three

---

[22] Plaintiff Bread for the City also provides nothing in support of their injuries beyond "conclusory assertions" of the Rule's impact, which are insufficient to establish irreparable harm. *CAPPS*, 344 F. Supp. 3d at 171. *See* Jones Declaration ¶¶ 9-15.

[23] The State of Maryland did not submit evidence regarding its alleged irreparable injury, but the City of Baltimore did. *See* Declaration of Holly Freishtat, ECF No. 3-7. The Court also must deny relief to States in the Amended Complaint that have not joined the preliminary injunction motion.

States. Cost impacts may differ greatly from State to State for many reasons, including differing State SNAP administrative structures. *See* 7 U.S.C. § 2012(s) (States may operate SNAP "on a decentralized basis," where "counterpart local agencies" predominately administer SNAP or on a centralized basis). Training cost impacts, for example—if the Court determines it should consider them—might be higher in certain States based on that structure. States may also face different costs based on how they have sought waivers in the past.

**<u>Estimated Costs are not "Great."</u>** The administrative costs identified by the State Plaintiffs are simply not significant enough to warrant a preliminary injunction. Any "asserted economic harm must be significant, even where it is irretrievable because a defendant has sovereign immunity." *CAPPS*, 344 F. Supp. at 170 (citation omitted); *see also ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 25-26 (D.D.C. 2012) ("irreparability aside, it remains incumbent on plaintiffs to demonstrate, first, that they threatened with serious *injury*.") (emphasis in original). Even where plaintiffs demonstrate irrecoverable financial loss, "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm is great." *ViroPharma*, 898 F. Supp. 2d at 26 (quoting *N. Air. Cargo v. USPS*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)). Indeed, "some concept of magnitude of injury is implicit in the preliminary injunction standards." *E.B. v. U.S. Dep't of State*, No. 19-2856, 2019 WL 5728090 (D.D.C. Nov. 4, 2019) (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)); *see also Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp.2d 12, 17 (D.D.C. 2010) (same). The loss "must . . . be serious in terms of its effect on the plaintiff." *Gulf Oil*, 514 F. Supp. at 1026.

The few proffered estimates demonstrate that the states' injuries are insufficient "in proportion to the plaintiff's operations," *Gulf Oil*, 514 F. Supp. at 1025. For example, Connecticut

identifies $207,500 in estimated increased costs related to communications with ABAWDs[24]—only $103,750 after federal reimbursements.  *See* Gifford Decl. ¶ 20; *see also* 7 U.S.C. § 2025(a) (USDA reimburses States for 50% of allowable administrative costs).  In light of Connecticut's proposed FY 2020 budget of $21.2 billion and projected FY 2019 "operating surplus of more than $516 million" not including "the almost $650 million" to be deposited in a "Rainy Day Fund,"[25] $103,750 is not significant; it is approximately 0.00000494% of the proposed FY 2020 budget.

Pennsylvania's inexplicably larger cost estimate—$2,250,000 per year (plus a one-time cost of $56,050), *see* Declaration of Catherine Buhrig ¶ 13, ECF No. 3-4, or about $1,153,025 after federal matching reimbursement if this litigation were to last a year—must be "considered in proportion to the plaintiff's operations," *Gulf Oil*, 514 F. Supp. at 1025.  It represents only about 0.00003391% of its two-year budget.[26]  Similarly, Minnesota's training and administrative cost estimate of $500,000, *see* Declaration of Tikki Brown ¶ 10, ECF No. 3-3, is insignificant in light of Minnesota's substantial budget.[27]

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF DENYING PLAINTIFFS' MOTIONS.

The final two factors for a preliminary injunction motion, which are merged when the Government is the non-movant, are the harm to the opposing party and weighing the public

---

[24] Connecticut represents that this figure excludes "costs to develop notices and make system coding changes to execute the mailings" among other costs, but provides no information estimating the scope of these costs. Declaration of Dr. Deidre S. Gifford ¶ 20, ECF No. 3-9. These allegations are insufficient.  *CAPPS*, 344 F. Supp. 3d at 171 (irreparable injury "requires more than conclusory assertions of potential loss"); *see also Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 125 n.25 (D.D.C. 2013) (discussing inadequacy of speculative assumptions).

[25] https://portal.ct.gov/-/media/OPM/Budget/2020_2021_Biennial_Budget/GovBud_FY2020-21_Final.pdf?la=en, at 1-2.

[26] http://budgetfiles.pa.gov/budget2019e/DetailReports/Overview/EnactedBudgetComparison.html.

[27] https://mn.gov/mmb/forecast/forecast/ (estimating $1.332 billion current budget surplus).

interest.  *See, e.g.*, *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (Government's "harm and the public interest are one and the same, because the government's interest *is* the public interest").  The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

The Government will "suffer[] a form of irreparable injury" if it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (citation omitted).  That is particularly true here where USDA has concluded that the current State waiver framework does not adequately implement Congressional intent as reflected in the PRWORA. *See Nat'l Propane Gas Ass'n v. DHS*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008) ("[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce.").  Granting Plaintiffs their desired injunction—which is not even limited to the States who are challenging the Rule, *see infra* Pt. IV—would require USDA to disburse taxpayer dollars through a State waiver process that the agency believes is subject to abuse and does not implement Congressional intent.  That is an unquestionably irreparable injury that outweighs Plaintiffs' asserted injuries, which, as discussed above, are non-cognizable, unsupported by more than conclusory assertions, or insufficiently significant to warrant an injunction. *See supra* Pt. II.

## IV.    ANY RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS.

In the event that the Court agrees with Plaintiffs and preliminarily enjoins the Rule, it should be limited to the few States that have established irreparable harm and who are parties to the motion before the court.  As the Supreme Court recently confirmed, any "remedy" ordered by a federal court must "be limited to the inadequacy that produced the injury in fact that the plaintiff

has established"; a court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it"; and "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933-34 (2018). Equitable principles similarly require that an injunction 'be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also DHS v. New York*, No. 19A785, 2020 WL 413786, at *1 (U.S. Jan. 27, 2020) (Gorsuch, J., concurring) (criticizing "increasingly common practice of trial courts ordering relief that transcends the cases before them" as "flaw[ed]" because "they direct how the defendant must act toward persons who are not parties to the case"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (nationwide injunctions "are legally and historically dubious"). These principles apply with greater force to a preliminary injunction, an equitable tool designed merely to "preserve the relative positions of the parties" until final judgment. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *cf. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (affirming nationwide injunction issued after *final* judgment).

Plaintiffs fail to show that a nationwide injunction is necessary to redress their alleged injuries. An injunction limited to the few States that have actually demonstrated irreparable harm—or at most the States and the District of Columbia who brought suit—would redress any injury Plaintiffs purportedly suffered. Extending an injunction to other States that have chosen not to challenge the Rule is inconsistent with Article III. *See Gill*, 138 S. Ct. at 1930-31 (in constitutional vote-dilution challenge by individual, remedy limited to "revising only such districts as are necessary to reshape the voter's district" rather than "all of the State's legislative districts").

Nor does the APA provide any basis for a nationwide injunction. *See, e.g., California v.*

*Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (vacating nationwide scope of injunction in APA challenge). The APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), does not mandate a "depart[ure] from established principles" of equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). The Supreme Court held in *Hecht Co. v. Bowles*, 321 U.S. 321, 328-30 (1944), that not even a provision directing that an injunction "shall be granted" with respect to a threatened or completed violation of a particular statute was sufficient to displace traditional principles of equitable discretion, and Congress is presumed to have been aware of that case when it later enacted the APA. The APA itself confirms that absent a special review statute, "[t]he form of proceeding for judicial review" is simply the traditional "form[s] of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and that the statutory right of review does not affect "the power or duty of the court to . . . deny relief on any . . . appropriate legal or equitable ground," *id.* § 702(1). The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). Thus, the "set aside" language in § 706(2) should apply only to the Plaintiffs.

Finally, the structure of the State waiver process does not support entry of a nationwide injunction. State waivers are approved on a state-by-state basis, so any effect of the Rule outside of the State Plaintiffs would have no impact on them. There is no reason why the views of a subset of States should govern the rest of the country. *See, e.g., California*, 911 F.3d at 583 ("detrimental consequences of a nationwide injunction" include effect on "the equities of non-parties").[28]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions.

---

[28] For the same reasons, a stay of the effective date pursuant to 5 U.S.C. § 705 is not warranted.

Dated:  February 5, 2020    Respectfully  submitted,

            JOSEPH H. HUNT
            Assistant  Attorney  General

            DAVID  M. MORRELL
            Deputy  Assistant  Attorney  General

            ERIC  R.  WOMACK
            Assistant  Branch  Director

            */s/ Chetan A. Patil*
            CHETAN  A. PATIL  (DC 999948)
            LIAM  HOLLAND
            Trial  Attorneys
            United  States Department  of Justice
            Civil  Division,  Federal Programs  Branch
            P.O. Box No. 883
            Ben Franklin  Station
            Washington,  D.C. 20044
            Tel.: (202) 305-4968
            Fax: (202) 616-8470
            Email:  chetan.patil@ usdoj.gov

            *Attorneys for Defendants*