**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, et al.,<br><br>*Defendants.* | Case No. 1:20-cv-119-BAH |

| | |
|---|---|
| BREAD FOR THE CITY, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, et al.,<br><br>*Defendants.* | Case No. 1:20-cv-127-BAH |

**AMICI CURIAE BRIEF OF THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, OPPORTUNITY SOLUTIONS PROJECT, MISSISSIPPI JUSTICE INSTITUTE, SECRETARIES' INNOVATION GROUP, COMMONWEALTH FOUNDATION FOR PUBLIC POLICY ALTERNATIVES, MACKINAC CENTER FOR PUBLIC POLICY, ALASKA POLICY FORUM, NEVADA POLICY RESEARCH INSTITUTE, IDAHO FREEDOM FOUNDATION, RIO GRANDE FOUNDATION, MAINE HERITAGE POLICY CENTER, JOHN LOCKE FOUNDATION, AND AMERICA WORKS IN SUPPORT OF DEFENDANTS**

Jeffrey M. Harris (D.C. Bar #994058)
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

Table of Authorities.................................................................................................................. ii

Interest of Amici Curiae ........................................................................................................... 1

Introduction & Summary of Argument..................................................................................... 4

Argument .................................................................................................................................. 6

    I.      The Final Rule is a reasonable reform that ends years of waiver abuse by States
           and encourages individuals to move off welfare and into the workforce. ...................... 6

           A.      Despite record-low unemployment, States continue to receive waivers
                     from the statutory work requirement......................................................... 6

           B.      States receive waivers by creating elaborate gerrymanders that overstate
                     the unemployment rate. ............................................................................ 9

           C.      The Final Rule will curtail this waiver abuse and promote Congress's goal
                     of encouraging individuals to become self-sufficient.......................................... 10

    II.     The Final Rule is a reasonable exercise of the Department's broad statutory
           authority. ................................................................................................................. 12

           A.      The definition of "area" is a permissible interpretation of the Act.................... 13

           B.      The definition of "sufficient number of jobs" is a permissible
                     interpretation of the Act. ......................................................................... 16

Conclusion.............................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Advanced Micro Devices v. CAB*,
  742 F.2d 1520 (D.C. Cir. 1984) ................................................................ 15, 16

*Am. Trucking Ass'ns v. Atchison, T. & S. F. Ry. Co.*,
  387 U.S. 397 (1967) ........................................................................................ 16

*Beth Israel Hosp. v. NLRB*,
  437 U.S. 483 (1978) ........................................................................................ 15

*Cheney R. Co. v. I.C.C.*,
  902 F.2d 66 (D.C. Cir. 1990) ......................................................................... 18

*Chevron, USA, Inc. v. NRDC*,
  467 U.S. 837 (1984) ................................................................................... 12, 13

*Children's Hosp. Ass'n of Texas v. Azar*,
  933 F.3d 764 (D.C. Cir. 2019) ................................................. 5, 12, 15, 17, 18

*City of L.A. v. U.S. Dep't of Transp.*,
  165 F.3d 972 (D.C. Cir. 1999) ....................................................................... 16

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) ........................................................................................ 15

*Council for Urological Interests v. Burwell*,
  790 F.3d 212 (D.C. Cir. 2015) ........................................................ 11, 12, 13, 15

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989) ....................................................................... 15

*Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB*,
  814 F.2d 697 (D.C. Cir. 1987) ....................................................................... 15

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Dole*,
  919 F.2d 753 (D.C. Cir. 1990) ....................................................................... 11

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................................................ 15

*Mich. Citizens for an Indep. Press v. Thornburgh*,
  868 F.2d 1285 (D.C. Cir. 1989) ..................................................................... 18

*Mourning v. Family Pubs. Serv., Inc.*,
  411 U.S. 356 (1973) ........................................................................................ 18

*Nat'l Comm. for the New River v. FERC*,
  373 F.3d 1323 (D.C. Cir. 2004) ..................................................................... 16

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019) ...................................................................................... 15

*PhRMA v. FTC*,
  44 F. Supp. 3d 95 (D.D.C. 2014) .................................................................. 13

*Ranbaxy Labs., Ltd v. Burwell*,
   82 F. Supp. 3d 159 (D.D.C. 2015) ........................................................ 18

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ........................................................... 16

*Russello v. United States*,
   464 U.S. 16 (1983) ............................................................................. 17

*Tex. Off. of Pub. Util. Counsel v. FCC*,
   183 F.3d 393 (5th Cir. 1999) .............................................................. 16

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
   940 F.2d 685 (D.C. Cir. 1991) ............................................................ 17

*Transitional Hosps. Corp. of La. v. Shalala*,
   222 F.3d 1019 (D.C. Cir. 2000) .......................................................... 12

**Statutes**

5 U.S.C. §706 ............................................................................................. 15

7 U.S.C. §2013(c) ...................................................................................... 12

7 U.S.C. §2015(d)(4)(A)(i) ........................................................................ 14

7 U.S.C. §2015(o) ...................................................................................... 11

7 U.S.C. §2015(o)(4) ............................................................................ 13, 17

7 U.S.C. §2015(o)(4)(A) ........................................................ 5, 11, 12, 14, 15

7 U.S.C. §2015(o)(4)(A)(i) ................................................................... 13, 17

7 U.S.C. §2015(o)(4)(A)(ii) .................................................................. 13, 16

7 U.S.C. §2015(o)(5)(A)(ii) ...................................................................... 14

7 U.S.C. §2020(d) ...................................................................................... 14

7 U.S.C. §2020(e) ...................................................................................... 14

**Regulations**

Final Rule, 84 Fed. Reg. 66782 (Dec. 5, 2019) .................................... 1, 10, 11, 13, 17

Proposed Rule, 84 Fed. Reg. 980 (Feb. 1, 2019) ................................................ 8, 9, 10

**Other Authorities**

Ben Casselman, *In a Tight Labor Market, a Disability May Not Be a Barrier*,
N.Y. Times (Sept. 5, 2019), https://nyti.ms/2v5oO3f ................................................. 7

*D.C. Labor Market Indicators: December 2019*,
D.C. Dept. of Empt. Servs., https://bit.ly/37NPenf ................................................. 8

FNS-2018-0004-5999,
Opportunity Solutions Proj. (Mar. 15, 2019), https://bit.ly/2vV5fuv ............. 1, 6, 7, 8, 9, 10, 12

Gov. J.B. Pritzker, *A Plan to Revitalize the Illinois Economy and Build the Workforce of the Future* (Oct. 2019), https://bit.ly/38PLLWE ................................................. 8

*How the Trump Administration Can Cut Down on Waivers Gone Wild*,
FGA (Feb. 20, 2019), https://bit.ly/39XHVLg ................................................. 9, 10

*Job Market Continues to Crush Expectations in 2020*,
Council of Econ. Advisors (Feb. 7, 2020), https://bit.ly/3bKurnU ....................... 6, 7

Jon Campbell, *Andrew Cuomo's Jobs Record: The Good, the Bad, and the Ugly*,
Democrat & Chronicle (Aug. 16, 2018), https://bit.ly/32b4t8S ................................................. 8

Sara Sandrik, *Gov. Gavin Newsom Delivers State of the State Address in Sacramento*,
ABC News (Feb. 3, 2020), https://abc30.tv/2vUrMrd ................................................. 8

Sarah Chaney, *U.S. Economy Adds 225,000 Jobs in January*,
Wall St. J. (Feb. 7, 2020), https://on.wsj.com/2w02uYI ................................................. 6

*Statement on Signing PRWORA* (Aug. 22, 1996),
32 Weekly Comp. of Pres. Doc. at 1487-88 ................................................. 11, 12

*States Are Waiving Work Requirements in Areas with Record-High Job Openings*,
FGA (Aug. 17, 2019), https://bit.ly/3c7oFNy ................................................. 8

Susan Crabtree, *Five Times that President Obama Went Around Congress*,
Wash. Times (June 17, 2014), https://washex.am/37Jj3Wg ................................................. 14

*The Employment Situation—January 2020*,
U.S. Bur. of Labor Stats. (Feb. 7, 2020), https://bit.ly/2HNJFLn ........................... 6

*There Has Never Been a Better Time for Welfare Reform*,
FGA (June 13, 2018), https://bit.ly/2TaHYg2 ................................................. 7

*Tying Unemployment Benefits to Economic Conditions*,
FGA (Nov. 20, 2019), https://bit.ly/3bUA8zI ................................................. 11

*U.S. Unemployment Rate Falls to 50-Year Low*,
Council of Econ. Advisors (Oct. 4, 2019), https://bit.ly/32fMuhz ........................... 7

## INTEREST OF AMICI CURIAE[*]

Amici are organizations that study, develop, and support sound welfare policy. Amici work to eliminate dysfunctional welfare policies that trap individuals in cycles of dependency and prevent them from experiencing the dignity, self-sufficiency, and empowerment of work. The Department of Agriculture's Final Rule, 84 Fed. Reg. 66782 (Dec. 5, 2019), is an exemplar of sound welfare reform—one that amici have supported since the notice-and-comment stage. *See, e.g.*, FNS-2018-0004-5999, Opportunity Solutions Proj. (Mar. 15, 2019), https://bit.ly/2vV5fuv (*Comment*). Because Plaintiffs seek to invalidate the Final Rule and reinstate the broken and dysfunctional system that preceded it, this case strikes at the heart of amici's mission. Amici thus have a powerful interest in this important case.

*Foundation for Government Accountability*: FGA is a nonpartisan, nonprofit organization that helps millions achieve the American dream by improving welfare, work, and healthcare policy at the state and federal level. Launched in 2011, FGA has achieved more than 200 policy reforms, removing government barriers to opportunity and helping 9.5 million individuals move off welfare. FGA supports its mission by conducting innovative research, deploying outreach and education initiatives, and equipping policymakers with the information they need to achieve meaningful reforms.

*Opportunity Solutions Project*: OSP brings together citizens and thought leaders across America to identify proven state-level reforms and promote them to voters, the media, and state policymakers. It often partners with educational policy organizations, sharing its high-quality

---

[*] No party's counsel authored this brief in whole or in part. And no party, party's counsel, or person (other than amici or their counsel) contributed money to fund this brief's preparation or submission.

research and data analysis with state lawmakers to ensure new laws are carefully crafted to expand opportunity and freedom for all.

*Mississippi Justice Institute*: MJI is a nonprofit, public-interest law firm and the legal arm of the Mississippi Center for Public Policy, an independent, nonprofit, public-policy organization dedicated to advancing the principles of limited government, free markets, strong families, individual liberty, and personal responsibility. MJI's activities include intervening in cases important to public policy, participating in regulatory and rule-making proceedings, and filing amicus briefs to offer unique perspectives in Mississippi and federal courts.

*Secretaries' Innovation Group*: SIG is a membership organization of state human-service and workforce secretaries. SIG exchanges state program innovations to help develop national solutions that favor healthy families, work, economic self-reliance, budget responsibility, and limited government. Members gather to learn of successful innovations that have been executed "on the ground," to hear of new opportunities to design or replicate initiatives that advance the goals of family health and self-reliance, to form options for waivers and other administrative vehicles for state freedom of action, and to consider and approve actions that advance the policies of limited government and state autonomy.

*Commonwealth Foundation for Public Policy Alternatives*: The Commonwealth Foundation transforms free-market ideas into public policies so that all Pennsylvanians can flourish. This non-profit, nonpartisan organization believes Pennsylvanians enjoy the highest quality of life when they can earn their own success and provide for their families. Yet Pennsylvania currently exempts ABAWD recipients from work requirements in 94% of counties despite a statewide unemployment rate of 4.5 percent.

***Mackinac Center for Public Policy***: The Center is a Michigan-based, nonpartisan research and educational institute advancing policies fostering free markets, limited government, personal responsibility, and respect for private property. The Center is a 501(c)(3) organization founded in 1987. Mackinac has been involved in shaping, advancing, and supporting work and community-engagement requirements in Michigan since their passage in 2018. It continues to provide ongoing research and analysis to state policymakers and the public as it supports their implementation, which began in January 2020.

***Alaska Policy Forum***: The Forum is a nonpartisan, nonprofit, tax-exempt organization dedicated to empowering and educating Alaskans and policymakers by promoting policies that maximize individual opportunities and grow freedom for all.

***Nevada Policy Research Institute***: Nevada Policy is a nonprofit, nonpartisan, tax-exempt education and research organization dedicated to the principles of economic and individual freedom based in Las Vegas, Nevada. It champions policy solutions that protect and promote the freedoms necessary for human flourishing, ensuring every Nevadan has the opportunity to pursue their unique version of the American Dream.

***Idaho Freedom Foundation***: IFF is a non-partisan educational research institute and government watchdog. Its goal is to hold public servants and government programs accountable, expose government waste and cronyism, reduce the state's dependency on the federal government, and inject fairness and predictability into the state's tax system.

***Rio Grande Foundation***: The Foundation is a research institute dedicated to increasing liberty and prosperity for all of New Mexico's citizens by informing New Mexicans of the importance of individual freedom, limited government, and economic opportunity.

***Maine Heritage Policy Center***: MHPC is a 501(c)(3) non-profit, tax-exempt educational organization dedicated to the promotion of public-policy solutions that free people from dependency, create lasting prosperity, and redefine the role of government in the lives of Maine citizens. MHPC conducts detailed and timely research, develops public-policy solutions, educates the public, and engages with legislators to foster a greater sense of liberty in Maine.

***John Locke Foundation***: Founded in 1990, JLF is an independent, nonprofit think tank. It employs research, journalism, and outreach programs to transform government through competition, innovation, personal freedom, and personal responsibility. JLF seeks a better balance between the public sector and private institutions of family, faith, community, and enterprise. It envisions a North Carolina of responsible citizens, strong families, and successful communities committed to individual liberty and limited, constitutional government.

***America Works***: America Works is a 100% women-owned company that lifts people out of poverty by assisting them in finding meaningful employment. America Works has helped more than 800,000 individuals increase their self-sufficiency through gainful employment, including military veterans, welfare and SNAP recipients, young adults, the criminal justice involved, homeless, non-custodial parents, persons receiving disability, among others. America Works uses a blended model that includes work readiness training, vocational training, career placement, career advancement, and employment retention services.

## INTRODUCTION & SUMMARY OF ARGUMENT

Plaintiffs are correct that something in this case reflects "arbitrary and capricious" policymaking that "plainly contravenes … Congressional intent" and harms "nearly 700,000" Americans. Mot. (Doc. 3) 1-3. But it is not the Final Rule. It is *Plaintiffs'* practice of gerrymandering their States to avoid the work requirements that Congress imposed on able-bodied adults without dependents—the most work-ready people in the country. At a time when employers

have more job openings than people to fill them, it is neither compassionate nor wise to allow "nearly 700,000" Americans to remain on food stamps and unemployed. Mot. 1. The compassionate approach is the one taken by the Final Rule—ending waiver abuse, enforcing Congress's work requirement (except in areas that truly lack sufficient jobs), and encouraging individuals to escape welfare dependency and discover the dignity and self-sufficiency of work.

The Final Rule not only reflects sound policy and survives arbitrary-and-capricious review, but also complies with every term of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Plaintiffs' main argument to the contrary is that, for years, States were in charge of the waiver process and Congress never registered any disapproval. But States cannot wrest control from the Agriculture Department—the *federal* agency that oversees this *federal* program—through adverse possession. The Act gives the "the Secretary" of Agriculture the power to "make a determination" about whether an "area" lacks "a sufficient number of jobs." 7 U.S.C. §2015(o)(4)(A). Statutes that use this kind of language provide "'an express delegation of authority to the agency,'" and thus the only question for this Court is "whether the Rule is reasonable." *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019). None of Plaintiffs' scattershot statutory arguments can overcome that deferential standard.

Plaintiffs may be dissatisfied with the Final Rule, since it means they must work harder to ensure that only deserving individuals receive waivers from the work requirement. But Plaintiffs should take that policy complaint up with Congress. None of their arguments suggests that the Final Rule is contrary to law or arbitrary and capricious. This Court should reject Plaintiffs' challenges.

**ARGUMENT**

Plaintiffs argue, among other things, that the Final Rule is arbitrary and capricious and violates various parts of the Act. Plaintiffs are wrong on both counts. The Final Rule is a reasonable solution to a real problem. And it falls well inside the Department's broad statutory authority.

I.     **The Final Rule is a reasonable reform that ends years of waiver abuse by States and encourages individuals to move off welfare and into the workforce.**

According to Plaintiffs, the Final Rule is arbitrary and capricious because it attempts to fix a problem that does not exist. The Department's "claim that states have abused the waiver process," Plaintiffs insist, "is unsubstantiated and mere pretext for its overarching purpose of reducing the number of ABAWDs receiving food assistance." Mot. 25. Not so. The Department correctly observed that States were undermining Congress's work requirement by claiming unnecessary waivers, and it reasonably acted to end this abuse.

A.     **Despite record-low unemployment, States continue to receive waivers from the statutory work requirement.**

The American economy is booming—and has been for several years. The unemployment rate is currently 3.6%, essentially tied for the lowest rate in the last half century. *The Employment Situation—January 2020* at 1, U.S. Bur. of Labor Stats. (Feb. 7, 2020), https://bit.ly/2HNJFLn (*Employment Situation*); *Comment* 2. Just last month, the economy added 225,000 jobs. *Employment Situation* 1. That continued a trend of 112 straight months of positive job growth— an all-time record for the United States. Sarah Chaney, *U.S. Economy Adds 225,000 Jobs in January*, Wall St. J. (Feb. 7, 2020), https://on.wsj.com/2w02uYI. As the number of jobs continues to grow, wages are rising as well. Last month, hourly earnings rose at an annualized rate of 3.1%, continuing a trend of 18 consecutive months of similar wage growth. *Employment Situation* 3; *Job Market Continues to Crush Expectations in 2020*, Council of Econ. Advisors (Feb. 7, 2020), https://bit.ly/3bKurnU (*Crush Expectations*). Wages are rising because employers are desperate

for workers. The number of unfilled jobs—at least 7 million—is yet another all-time high. *Comment* 2. Although 80.6% of prime-age workers are now participating in the workforce (the highest level since 2001), employers have more jobs than people to fill them. *Crush Expectations*; *Comment* 2.

These unprecedented employment numbers are benefitting all Americans, including groups who the job market has historically left behind. Because they are so desperate for workers, employers are "increasingly looking outside the traditional labor force" and "offering flexible hours," "open[ing] up jobs to people with disabilities," "dropping educational requirements," "waiving criminal background checks," and "offering training to prospective workers who lack the necessary skills." Ben Casselman, *In a Tight Labor Market, a Disability May Not Be a Barrier*, N.Y. Times (Sept. 5, 2019), https://nyti.ms/2v5oO3f; *Comment* 3. The unemployment rates for African Americans, Hispanic Americans, and Asian Americans, people without a high-school diploma, and people with disabilities hit all-time lows in 2019. *Crush Expectations*. The U-6 unemployment rate—which includes people who are no longer seeking a job—is at its lowest point in 20 years. *U.S. Unemployment Rate Falls to 50-Year Low*, Council of Econ. Advisors (Oct. 4, 2019), https://bit.ly/32fMuhz. And the share of new workers who are coming off the sidelines to enter the job market (rather than simply switching jobs) is the highest on record. *Id.* That is because the vast majority of jobs that are opening up require a high-school education or less, minimal to no training, and no prior experience. *There Has Never Been a Better Time for Welfare Reform* 7, FGA (June 13, 2018), https://bit.ly/2TaHYg2.

These national trends are occurring at the state level too. Over the last three years, nineteen States have achieved record-low unemployment rates, some as low as 2.4%. *Comment* 2. Plaintiff D.C., for example, reports that it has two jobs available for every unemployed resident. *D.C. Labor*

*Market Indicators: December 2019* at 2, D.C. Dept. of Empt. Servs., https://bit.ly/37NPenf. Over the last four years, D.C. has seen its unemployment rate decrease 28.4%, its total jobs increase by 57,600, its total employed residents increase by 34,300, and its average time of unemployment for African Americans decrease by 15.4 weeks. *Id.* Plaintiff California, too, has seen 118 consecutive months of job growth and has added 3.4 million jobs since the last recession. Sara Sandrik, *Gov. Gavin Newsom Delivers State of the State Address in Sacramento*, ABC News (Feb. 3, 2020), https://abc30.tv/2vUrMrd. "Simply put," its governor recently touted, "California is the rocket fuel powering America's resurgence." *Id.* Plaintiff New York's governor similarly boasted that, from 2011 to 2018, his State saw a four-percentage-point decrease in unemployment and added 1 million new jobs (predominantly in Plaintiff New York City). Jon Campbell, *Andrew Cuomo's Jobs Record: The Good, the Bad, and the Ugly*, Democrat & Chronicle (Aug. 16, 2018), https://bit.ly/32b4t8S. And the governor of Plaintiff Illinois recently noted the "simultaneous strong job growth in every region of the state." Gov. J.B. Pritzker, *A Plan to Revitalize the Illinois Economy and Build the Workforce of the Future* 2 (Oct. 2019), https://bit.ly/38PLLWE.

Plaintiffs are right: unemployment is down and jobs are plentiful across the country. Yet despite this "strong economy," the Department observed in 2019 that a "significant number of States continue to qualify for and use ABAWD waivers." 84 Fed. Reg. 980, 981 (Feb. 1, 2019). Thirty-three States and D.C. waived the work requirement in some or all areas—over 1,000 total jurisdictions, virtually all of which have unemployment rates at or below 6%. *Comment* 3. Those waived jurisdictions had 4.1 million open jobs, and some had unemployment rates as low as zero. *States Are Waiving Work Requirements in Areas with Record-High Job Openings* 5, FGA (Aug. 17, 2019), https://bit.ly/3c7oFNy. Several States requested *more* waivers as their unemployment rates declined. *Comment 3*. All told, "nearly half of ABAWDs live in areas that are covered by

8

waivers," 84 Fed. Reg. at 981, and the number of ABAWDs on food stamps remains near record highs, *Comment* 3.

> **B.      States receive waivers by creating elaborate gerrymanders that overstate the unemployment rate.**

How could work-requirement waivers approach record highs while unemployment rates approach record lows? States were abusing the waiver process. Under its prior rules, the Department granted waivers when an "area" had an unemployment rate that was 20% higher than the national rate, and it allowed States to define what constitutes an "area." Opp. (Doc. 26) 7-8. States took advantage of this scheme by creating large, gerrymandered "areas" that swept in as many people as possible while staying under the 20% threshold—an easy target when the national employment rate is so low. Opp. 8-11. States drew these gerrymanders using software and analyses from organizations, such as the Center on Budget and Policy Priorities, that oppose work requirements. *Comment* 2.

Take Plaintiff Illinois, for example. Illinois received a waiver by combining all but one county into a single "area." In other words, Illinois represented that there are only two economic "areas" in the state: DuPage county (part of the Chicago metropolitan area) and the rest of the State. *Id.* at 3 (citing *How the Trump Administration Can Cut Down on Waivers Gone Wild*, FGA (Feb. 20, 2019), https://bit.ly/39XHVLg (*Waivers Gone Wild*)). This maneuver allowed Illinois to treat cities that are hundreds of miles apart as a single economic region, and to obtain waivers for many counties that would not otherwise qualify because they had record-low unemployment rates. *Waivers Gone Wild* 4.

Or consider Plaintiff California. The State of California received a waiver by combining all of its counties except three into a single "area." California represented that there are only two economic "areas" in the entire State: (1) San Francisco, San Mateo, and Santa Clara—part of the

San Francisco metropolitan area—and (2) the rest of the State. *Comment* 3-4 (citing *Waivers Gone Wild*). Among the 55 counties that California lumped together as a single area, 38 have unemployment rates at or below 5%, 24 have unemployment rates below 4%, and some have record-low unemployment rates (as low as 2.2%). *Waivers Gone Wild* 5. In fact, some of the waived counties have lower unemployment rates than the three *non*-waived counties. *Id.*

Plaintiffs' insistence that this obvious waiver abuse is "unsubstantiated" is mystifying. Mot. 25. Plaintiffs should know better, since they were among the worst offenders. *See* McConnell Decl. (Doc. 26-1) 2-4 (documenting massive gerrymandered areas that were "discussed by USDA in connection with the Final Rule" in California, Connecticut, Illinois, Michigan, New York, Oregon, and Pennsylvania). The problem was also obvious from the incentives created by the Department's regulations and the fact that, after the economy recovered from the Great Recession, waivers did not meaningfully decrease. 84 Fed. Reg. at 981. The Department also saw the abuse firsthand in its "more than 20 years of operational experience." 84 Fed. Reg. at 66794. And the States even *confessed* to this strategy of waiver maximization. As multiple state officials told the Department's Office of Inspector General, States requested "waivers in as many parts of the State as possible" to "minimize the areas" subject to the work requirement. McConnell Decl. 20. Maximizing waivers, they said, allowed them to "reduce the burden of tracking ABAWD time limits." *Id.* at 19.

### C.   The Final Rule will curtail this waiver abuse and promote Congress's goal of encouraging individuals to become self-sufficient.

The Final Rule is a measured response to the States' well-known abuse of the waiver process. By adopting its own independent definition of "area," the Department ended States' ability to gerrymander regions that do not need waivers with regions that do. 84 Fed. Reg. at 66793-97. And by defining "sufficient number of jobs" to include a presumptive floor of 6%

unemployment, the Department ensured that States are not seeking waivers when the economy is strong and jobs are plentiful. *Id.* at 66784-93. These reforms "further[] the purpose of the statute by closing a loophole otherwise available … that would allow circumvention of the purpose of the [Act]." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 224 (D.C. Cir. 2015).

Plaintiffs' assertion that Congress would have wanted States to obtain as many waivers as possible, *see* Mot. 2, is perplexing. Under the Act, the work requirement is the general rule; waivers are supposed to be *exceptions*. *See* 7 U.S.C. §2015(o). In fact, waivers are never required: The Act states that "the Secretary *may* waive" the work requirement, §2015(o)(4)(A) (emphasis added), which means the Department has discretion to deny waivers even when all other statutory conditions are satisfied, *see Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Dole*, 919 F.2d 753, 756 (D.C. Cir. 1990). None of that should be surprising, as the Act was a bipartisan measure meant to reform an overly lax welfare system. As President Clinton explained when he signed the Act, its "[m]ost important" feature is that it's "tough on work." *Statement on Signing PRWORA* (Aug. 22, 1996), 32 Weekly Comp. of Pres. Doc. at 1488 (*Signing Statement*). "[T]his legislation provides an historic opportunity to end welfare as we know it and transform our broken welfare system," he explained, "by promoting the fundamental values of work, responsibility, and family." *Id.* at 1487-88.

President Clinton recognized what the research demonstrates: work requirements are an effective tool to combat poverty. Welfare "too often hurts those it is supposed to help" by becoming, not "a second chance," but "a way of life." *Id.* at 1488. Studies show that receiving benefits for an extended period of time reduces job-search efforts, and that the imminent end of benefits makes it 80% more likely that an individual will find a job. *Tying Unemployment Benefits to Economic Conditions* 4, FGA (Nov. 20, 2019), https://bit.ly/3bUA8zI. Unsurprisingly then,

11

work requirements have been highly effective at moving able-bodied adults from welfare to work. Department researchers determined that, from 1996 to 2000, the Act moved millions of able-bodied adults from welfare to work. *Comment* 8. At the State level, Kansas, Maine, Florida, and Arkansas found that restoring work requirements for able-bodied adults caused their incomes to more than double within one year—more than offsetting the value of the food stamps they lost. *Id.* The Final Rule's crackdown on waiver abuse was thus imperative because, to quote President Clinton, "The best antipoverty program is still a job." *Signing Statement* 1488.

## II.    The Final Rule is a reasonable exercise of the Department's broad statutory authority.

The Final Rule not only reflects sound welfare policy, but also fits comfortably within the Department's statutory authority. The Act exudes deference to the agency. It broadly authorizes regulations "as the Secretary deems necessary or appropriate for the effective and efficient administration of [SNAP]." 7 U.S.C. §2013(c). And it expressly delegates to "the Secretary" the discretion to "waive" work requirements and to "determin[e]" that an area has insufficient jobs. §2015(o)(4)(A). Because these congressional delegations are "express rather than implied," there is "no need to search for statutory ambiguity" under *Chevron* step one. *Children's Hosp.*, 933 F.3d at 770. This Court should "skip straight to asking whether the Rule is reasonable" under *Chevron* step two. *Id.*; *accord Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1025 (D.C. Cir. 2000). In other words, the Final Rule must be "given controlling weight" unless it is "manifestly contrary to the statute." *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 844 (1984). The Department's interpretations need only be "permissible," regardless whether Plaintiffs identify other interpretations that are better. *Id.* at 843 & n.11.

None of Plaintiffs' statutory arguments comes close to overcoming this "deferential" standard. *Urological Interests*, 790 F.3d at 224. Most of their arguments are not even permissible

interpretations of the Act, much less the *only* permissible interpretation. Their assortment of debater's points provide no basis to invalidate the Final Rule's eminently reasonable definitions of "area" and "sufficient number of jobs."

### A. The definition of "area" is a permissible interpretation of the Act.

The Final Rule's definition of "area" is reasonable. The Act tasks "the Secretary" with defining the relevant "area" for purposes of waivers. 7 U.S.C. §2015(o)(4). The goal in defining the relevant "area," according to the Act, is to assess whether "the individuals" seeking waivers have a meaningful opportunity to work. *See* §2015(o)(4)(A)(i)-(ii). To achieve this goal, the "area" in question cannot be too broad (since individuals are not affected by market conditions in faraway places) or too narrow (since individuals are expected to travel a reasonable distance to find work). *See* 84 Fed. Reg. at 66796. The Department's decision to use the well-known concept of a "labor market area" was a "rational[]" way to perform this balancing act. *Urological Interests*, 790 F.3d at 224. As the Department explained, labor market areas are what the federal government currently uses to identify "an economically integrated area within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." 84 Fed. Reg. at 66793. Defining "area" by reference to labor market areas is certainly not "manifestly contrary" to the Act, *Chevron*, 467 U.S. at 844, as the Act does not define the term "area" at all. *See PhRMA v. FTC*, 44 F. Supp. 3d 95, 124-25 (D.D.C. 2014) (Howell, J.) (upholding agency interpretation under *Chevron* step two because "the statute is silent on the issue" and "[n]o statutory text directly forecloses the [agency's] … rule"), *aff'd*, 790 F.3d 198 (D.C. Cir. 2015).

What would be manifestly contrary to the Act is *Plaintiffs'* proposed definition of "area." According to Plaintiffs, the only permissible reading of the Act is that it requires the Department to treat any "contiguous" region that a State identifies as the relevant "area." *See* Mot. 18. In other

words, States can identify an "area" as small as a city block, as large as the entire State, or any bizarrely gerrymandered shape in between—whatever the State says goes. But that definition is wholly divorced from the Act's goal of accurately assessing whether individuals have access to jobs. And it flatly contradicts the statutory text. The Act empowers "the Secretary" to "determin[e]" the relevant "area"; States are given only a "support[ing]" role. §2015(o)(4)(A). That is not surprising, as SNAP is a *federal* program funded by *federal* dollars. In the few places where Congress empowered the States to make determinations, it used markedly differently language. *See, e.g.*, §2015(o)(5)(A)(ii) ("as determined by a State agency"); §2015(o)(2)(B) ("as determined by the State agency"); §2015(d)(4)(A)(i) ("Each State agency shall implement"); §2020(d)-(e) ("The State agency … shall submit for approval a plan").

Plaintiffs' main support for their atextual interpretation is an appeal to subsequent congressional inaction. *See* Mot. 19-21. Plaintiffs note that the Department's regulations previously allowed the States to define "area," and that Congress never repealed those regulations. Amici doubt that Plaintiffs really want to live in a world where, once Congress fails to pass legislation, agencies are powerless to adopt the same proposal via rulemaking. *See* Susan Crabtree, *Five Times that President Obama Went Around Congress*, Wash. Times (June 17, 2014), https://washex.am/37Jj3Wg (providing examples from Obama administration where agencies implemented proposals that failed in Congress, including regulations of LGBT discrimination, student loan repayment, minimum wage, and the DACA program). Regardless, Plaintiffs' appeal to congressional inaction doesn't work in this case.

This case is a prime example of the "general rule" that "[i]naction by Congress" is "too diffuse, ephemeral, and ultimately unaccountable for it to confine … regulatory adaptation to changing circumstances." *Advanced Micro Devices v. CAB*, 742 F.2d 1520, 1541-42 (D.C. Cir.

1984). Again, the Act tasks "the Secretary" with making "area" determinations, §2015(o)(4)(A), so this case involves an "express" delegation of authority to the Department. *Children's Hosp.*, 933 F.3d at 770. No amount of "legislative history" could "clearly impose a constraint" on this "expressly delegated" authority. *Urological Interests*, 790 F.3d at 222 n.6; *accord Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). After all, agencies are constrained by "law," 5 U.S.C. §706, and laws mean what they meant "'at the time Congress enacted [them].'" *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). "That subsequent Congresses have eschewed [legislative amendments] tells us nothing about what Congress meant when it [originally enacted the law]." *Massachusetts v. EPA*, 549 U.S. 497, 529-30 (2007).

The Department's express discretion under the Act makes subsequent congressional inaction fatally ambiguous. As Plaintiffs' lead authority explains, congressional inaction in the face of express agency discretion means "only … that Congress was satisfied to rely on the [agency] to continue to exercise the responsibility to strike the appropriate balance." *Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB*, 814 F.2d 697, 711 (D.C. Cir. 1987) (quoting *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 497 (1978)). Congressional inaction when an agency adopts one rule does not mean the agency "may not switch to another [rule] in the exercise of its discretion"; it "merely" means that "Congress did not intend to *require* that the [agency] make such a switch." *Id.* at 711-12; *accord DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 282 n.4 (D.C. Cir. 1989) (explaining that "subsequent congressional inaction" suggested "not approval, but only absence of disapproval in light of the breadth of the prior congressional grant of discretion"); *Urological Interests*, 790 F.3d at 222 n.7 (explaining that Congress's approval of one practice is "not equivalent to a statement that the [agency] must continue [that practice] as [it] reevaluates, in light of experience, the operation of the statute").

In short, "Congress's failure to adopt [legislation in 2018] does not prevent the [Department] from considering its ability to reach a similar result through rulemaking." *Adv. Micro Devices*, 742 F.2d at 1542; *see Am. Trucking Ass'ns v. Atchison, T. & S. F. Ry. Co.*, 387 U.S. 397, 416-18 (1967) (allowing agency to change a position it maintained for 25 years, even after Congress refused to change the policy itself). The Department's decision to flesh out the undefined "area" using a well-known economic concept, rather than allowing States to manipulate it and continue abusing the waiver process, was entirely reasonable.

### B.   The definition of "sufficient number of jobs" is a permissible interpretation of the Act.

The Department's definition of "sufficient number of jobs" is also reasonable. The Act does not specify what it means to have a "sufficient number of jobs to provide employment" for individuals in a given area. §2015(o)(4)(A)(ii). But two observations are evident from the text. By using the capacious term "sufficient," Congress meant to afford the Department "a substantial amount of deference"; "[c]alculating how much … is sufficient … is a judgment the [agency] is better able to make." *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 436 (5th Cir. 1999); *accord Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009). And because what must be "sufficient" is "the number of jobs to provide employment"—a technical, scientific judgment—the Department's method for making that determination receives an "'extreme degree of deference.'" *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004). Even if "many economists would disapprove of the Department's approach," courts "do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority." *City of L.A. v. U.S. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999).

The Department's decision to define "sufficient number of jobs" by setting an unemployment floor of 6% was permissible. The unemployment rate is a natural metric (perhaps the *most* natural metric) for assessing the job market in a given area. *See Children's Hosp.*, 933 F.3d at 771 (explaining that Congress would not intend to prevent agencies from considering "the most common" metrics). In fact, Congress instructed the Department to evaluate the "unemployment rate" in the prior subsection of the Act. §2015(o)(4)(A)(i); *see Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) (explaining that, because Congress identified a relevant consideration in one section of the statute, the agency can use that same consideration to implement other sections). Indeed, as the Department explained, other federal agencies already use the unemployment rate to assess whether jobs are available for able-bodied adults without dependents. 84 Fed. Reg. at 66789.

Other than another unpersuasive appeal to subsequent congressional inaction, Mot. 23, Plaintiffs' only objection to the Department's definition of "sufficient number of jobs" is "the so-called '*Russello* presumption'"— the notion that "the presence of a phrase in one provision and its absence in another reveals Congress' design." *Children's Hosp.*, 933 F.3d at 771. Plaintiffs contend that, because §2015(o)(4)(i) of the Act already mentions the "unemployment rate of over 10 percent," the "sufficient number of jobs" language in §2015(o)(4)(ii) cannot take the unemployment rate into account. *See* Mot. 21-22 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Plaintiffs' commitment to this argument is doubtful, as it would also invalidate the *prior* regulation that Plaintiffs say they like. *See* Opp. (Doc. 26) 24.

In any event, Plaintiffs' argument is unpersuasive. Again, the Act expressly delegates the authority to "determin[e]" whether an area has a "sufficient number of jobs" to "the Secretary." §2015(o)(4). That express delegation triggers *Chevron* step two, *Children's Hosp.*, 933 F.3d at

770, and Plaintiffs' weak contextual presumption cannot carry the day under that deferential standard. *See Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292 (D.C. Cir.) ("[Under *Chevron* step two], a reviewing court cannot reverse an agency decision merely because it failed to rely on any one of a number of canons of construction that might have shaded the interpretation a few degrees in one direction or another."), *aff'd*, 493 U.S. 38 (1989). The *Russello* presumption is "especially feeble" because "the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Cheney R. Co. v. I.C.C.*, 902 F.2d 66, 69 (D.C. Cir. 1990); *accord Mourning v. Family Pubs. Serv., Inc.*, 411 U.S. 356, 372-73 (1973). Here, for example, the Act specifies one scenario where waivers would be appropriate (when the unemployment rate exceeds 10%) and then leaves other scenarios to the Department's rulemaking discretion. The Department reasonably exercised that discretion here.

## CONCLUSION

The Final Rule is a much-needed, well-developed reform to a broken waiver process. While Plaintiffs are free to disagree with the Final Rule as a matter of policy, their challenges to its legality should be rejected. It is neither "[t]he job of the courts" nor Plaintiffs "to engage in their own interstitial lawmaking and make public policy by prescribing the meaning of ambiguous statutory commands." *Ranbaxy Labs., Ltd v. Burwell*, 82 F. Supp. 3d 159, 182 (D.D.C. 2015) (Howell, J.) (cleaned up). It is the job of the Department.

Dated: February 25, 2020                    Respectfully submitted,

                                         *s/ Jeffrey M. Harris*

                                      Jeffrey M. Harris (D.C. Bar #994058)
                                      Cameron T. Norris
                                      CONSOVOY MCCARTHY PLLC
                                      1600 Wilson Blvd., Ste. 700
                                      Arlington, VA 22209
                                      (703) 243-9423
                                      jeff@consovoymccarthy.com
                                      cam@consovoymccarthy.com

                            *Counsel for Amici Curiae*