# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*,<br><br>　　　　　Plaintiffs<br><br>　　　v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 1:20-cv-00119-BAH |
| BREAD FOR THE CITY, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 1:20-cv-00127-BAH |

## BRIEF OF *AMICI* STATES OF ARIZONA, ALABAMA, ARKANSAS, GEORGIA, KENTUCKY, LOUISIANA, NEBRASKA, SOUTH CAROLINA, AND TEXAS IN SUPPORT OF DEFENDANTS

Mark Brnovich
*Attorney General*

Oramel H. (O.H.) Skinner
*Solicitor General*

Linley Wilson
*Deputy Solicitor General*

Anthony R. Napolitano
*Assistant Attorney General*

OFFICE OF THE ARIZONA ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-4288
o.h.skinner@azag.gov
linley.wilson@azag.gov
acl@azag.gov

*Counsel for Amicus Curiae*
*(additional counsel listed after signature block)*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTEREST OF AMICI CURIAE .................................................................................................. 1

INTRODUCTION ......................................................................................................................... 2

ARGUMENT ................................................................................................................................. 3

    I.    Waivers Are Not Necessary To Ensuring ABAWDs Receive Continued Benefits......... 3

    II.    The Existing Rule Governing Waiver Requests Is Flawed .............................................. 5

        A.    Permitting States To Define An "Area" For Waiver Purposes Has Resulted In Apparent Gamesmanship And Manipulation ...................................................... 5

        B.    Unlimited Carryover Of Discretionary Exemptions Under The Existing Rule Is Wasteful And Unnecessary ....................................................................... 9

    III.    The Final Rule Is Fair And Furthers The Purpose Underlying SNAP's Work Requirements ................................................................................................................. 10

        A.    The Final Rule's New Definition Of An "Area" Prevents Gamesmanship While Ensuring That All States' Waivers Are Measured By The Same Standards And In A Fiscally Prudent Manner ...................................................... 10

        B.    The 6% Floor Ensures That Waivers Will Not Be Granted To Areas With Low Unemployment Rates ................................................................................. 13

CONCLUSION ............................................................................................................................ 16

i

# TABLE OF AUTHORITIES

**Cases**

*Brooks v. Roberts*,
    251 F. Supp. 3d 401 (N.D.N.Y. 2017) ................................................................................. 1, 2

**Statutes**

5 U.S.C. § 8435(e)(1)(C) ................................................................................................................ 12

7 U.S.C. § 2013 ................................................................................................................................ 1

7 U.S.C. § 2015(d) .............................................................................................................. 3, 4, 15

7 U.S.C. § 2015(o) .............................................................................................................. 2, 3, 6, 9

7 U.S.C. § 2020(a)(1) ....................................................................................................................... 1

7 U.S.C. § 2027 ..................................................................................................................... 1, 9, 10

8 U.S.C. § 1229a(e)(1) ................................................................................................................... 12

29 U.S.C. § 213(c)(4)(A) ............................................................................................................... 12

**Regulations**

20 C.F.R. § 654.5 ..................................................................................................................... 12, 13

7 C.F.R. § 273.24 ................................................................................................................... *passim*

Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults
    Without Dependents, 84 Fed. Reg. 66782-01 (Dec. 5, 2019) .......................................... *passim*

**Other Authorities**

*Clarifications on Work Requirements, ABAWDs, and E&T*, USDA (May 25, 2018),
    https://www.fns.usda.gov/snap/clarifications-work-requirements-abawds-and-et ................ 3, 4

*E&T Policy and Guidance*, USDA (Sept. 10, 2013),
    https://www.fns.usda.gov/snap/et-policy-and-guidance ............................................................ 4

*Employment and Training*, USDA (Aug. 26, 2013),
    https://www.fns.usda.gov/snap/et ............................................................................................... 4

*FAQ's*, U.S. Dep't of Lab.,
    https://www.doleta.gov/lsa/lsa_faq.cfm  (last updated Oct. 5, 2018) ....................................... 14

*FAQ's: What are labor market areas (LMAs)?*, U.S. Bureau of Lab. Stat.,
    https://www.bls.gov/lau/laufaq.htm#Q06 (last modified Jun. 14, 2018) ................................. 11

*Geographic Concepts*, U.S. Bureau of Lab. Stat.,
    https://www.bls.gov/lau/laugeo.htm (last modified Mar. 15, 2019) ................................... 10, 11

*Guidance for States on Use of Discretionary Food Stamp Program Time Limit
    Exemptions*, USDA (Aug. 14, 1996),
    https://www.fns.usda.gov/snap/ABAWD/time-limit-exemptions-states ................................. 10

**TABLE OF AUTHORITIES—Continued**

*Senate FY2020 Agriculture Appropriations Bill Gains Committee Approval*, U.S. Senate
   Committee on Appropriations (Sept. 19, 2019) ......................................................................... 1

*Unemployment Rate in Marin County, CA*, FRED (Feb. 5, 2020),
   https://fred.stlouisfed.org/series/CAMARI5URN .................................................................... 7

*Unemployment Rate in San Francisco County/City, CA*, FRED (Feb. 5, 2020),
   https://fred.stlouisfed.org/series/CASANF0URN .................................................................... 7

*Unemployment Rate in San Mateo County, CA*, FRED (Feb. 5, 2020),
   https://fred.stlouisfed.org/series/CASANM0URN .................................................................... 7

## INTEREST OF AMICI CURIAE

The undersigned Attorneys General are their respective States' chief law enforcement or legal officers.  The Amici States' interest here arises from their statutory responsibility to administer the federally-funded Supplemental Nutrition Assistance Program ("SNAP").  *See* 7 U.S.C. § 2013 (establishing SNAP); § 2020(a)(1) ("The State agency of each participating State shall have responsibility for certifying applicant households and issuing EBT cards"); *Brooks v. Roberts*, 251 F. Supp. 3d 401, 410 (N.D.N.Y. 2017) (summarizing background of SNAP and explaining that "[e]ach state must designate an agency responsible for administering SNAP and ensuring federal compliance").

The Amici States have an important interest to ensure that SNAP funding is allocated to States in a fiscally-responsible and fair manner that is consistent with SNAP's underlying policy goals and prevents depletion through state manipulation.  Funding for SNAP benefits is appropriated each year by Congress.  7 U.S.C. § 2027(a)(1) ("To carry out this chapter, there are authorized to be appropriated such sums as are necessary for each of fiscal years 2008 through 2023.").  The SNAP funding allocated for fiscal year ("FY") 2020 is roughly $69 billion.  *See Senate FY2020 Agriculture Appropriations Bill Gains Committee Approval*, U.S. Senate Committee on Appropriations (Sept. 19, 2019), *available at* https://www.appropriations.senate.gov/news/senate-fy2020-agriculture-appropriations-bill-gains-committee-approval.  Relevant to the Amici States' interest here, the Secretary of Agriculture is authorized to issue a blanket reduction of SNAP benefits if he determines that appropriations are not sufficient.  *See* 7 U.S.C. § 2027(b) ("if in any fiscal year the Secretary finds that the requirements of participating States will exceed the appropriation, the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to

1

participate in [SNAP] to the extent necessary to comply with the provisions of this subsection"). The rule at issue here, 7 C.F.R. § 273.24 ("Final Rule"), addresses harms caused by manipulation of flexible standards that have governed States' applications for waiver of certain statutory requirements. Specifically, the Final Rule's modification of the standards prevents States from gerrymandering areas designated for waivers into strategic regional groupings, which in turn reduces the likelihood that the federal annual appropriations for SNAP will be erroneously depleted—a consequence that all States should strive to avoid.

## INTRODUCTION

SNAP generally limits the amount of time that able bodied adults without dependents ("ABAWDs") can receive SNAP benefits. "An ABAWD is an individual between the ages of 18 and 50 who is not disabled and does not have a dependent under the age of 18." *Brooks*, 251 F. Supp. 3d at 410. ABAWDs are entitled to receive SNAP benefits for a maximum of three months during a three-year period, unless they are working, volunteering, or enrolled in an employment and training program ("E&T program") for 80 hours per month. 7 U.S.C. § 2015(o)(2) ("ABAWD time limit"). On the request of a state SNAP agency, the Secretary of Agriculture (hereafter "Department") is authorized to approve waivers from the ABAWD time limit in two circumstances: when the "area" in question either has an "unemployment rate of over 10 percent" or lacks "a sufficient number of jobs." 7 U.S.C. § 2015(o)(4)(A).

The Final Rule does not alter the 3-month time limit or the work requirements established under 7 U.S.C. § 2015(o)(2). Instead, the Final Rule: (1) modifies the criteria that the Department considers when a State submits a request for waiver of the ABAWD time limit; and (2) limits the number of unused discretionary exemptions from the ABAWD time limit that a State may carry over from one fiscal year to the next. 7 C.F.R. § 273.24(f), (h). Here, Plaintiff

States have moved for a "nationwide preliminary injunction enjoining the [Final] Rule from taking effect or [a] stay [of] the Rule's effective date until a determination on the merits," alleging, *inter alia*, that the Final Rule is contrary to law, unreasoned, and arbitrary and capricious.  Doc. 3 at 18–44.  Amici States request that this Court deny the extraordinary relief Plaintiff States seek.  As discussed below, application of the Department's existing rule revealed gamesmanship by some States that arose over time and resulted in disparity among waivers granted to States.  The Final Rule ameliorates such unintended consequences, ensures that all States' waiver requests are measured by the same, objective standards (while reducing or eliminating gamesmanship), and furthers the underlying purposes of SNAP's work requirements—to assist States in moving more able-bodied, dependent-less SNAP recipients towards employment and self-sufficiency.

## ARGUMENT

### I.    Waivers Are Not Necessary To Ensuring ABAWDs Receive Continued Benefits

An ABAWD time-limit waiver merely exempts ABAWDs in the waived area from the statutory obligation to satisfy SNAP's work requirement in order to continue receiving benefits beyond the 3-month limit during any three-year period.  7 U.S.C. § 2015(o)(2).  "Fulfilling the work requirement means:" spending 80 hours per month working, participating in a state work program, or a combination of work and state work program participation, or "[p]articipating in and complying with a workfare program."  7 C.F.R. § 273.24(a)(1).

To help ABAWDs meet this work requirement, States are required to operate SNAP Employment and Training ("E&T") programs, *see* 7 U.S.C. § 2015(d)(4)(A)(i), which are "intended to help SNAP recipients gain skills, training, work, or experience that will increase their ability to obtain regular employment and become economically self-sufficient." *Clarifications on Work Requirements, ABAWDs, and E&T*, USDA (May 25, 2018),

https://www.fns.usda.gov/snap/clarifications-work-requirements-abawds-and-et.    An  E&T

program  provides  "case  management  services  such  as  comprehensive  intake  assessments,

individualized,  service  plans,  progress  monitoring,  or  coordination  with  service  providers  and

one  or  more  []  components,"  including,  *inter  alia*,  "[s]upervised  job  search  programs,"  "[j]ob

search  training  programs,"  and  "[p]rograms designed to increase the self-sufficiency of recipients

through  self-employment,  including  programs  that  provide  instruction  for  self-employment

ventures."  7 U.S.C. § 2015(d)(4)(B)(i).   "Participation in SNAP E&T … is one way a person

can  meet  the  80  hour  per  month  ABAWD  work  requirement."  *Clarifications  on  Work*

*Requirements,    ABAWDs,    and    E&T*,    https://www.fns.usda.gov/snap/clarifications-work-

requirements-abawds-and-et.

         States should be in a position to protect certain crucial SNAP benefits and advance the

purpose  of  SNAP's  work  requirements  (without  gamesmanship  in  the  waiver  process)  by

offering  ABAWDs  opportunities  to  gain  employment  through  state-administered  SNAP  E&T

programs that are tailored to "fit the needs of the local economy and SNAP [p]articipants."  *E&T*

*Policy and Guidance*, USDA (Sept. 10, 2013),  https://www.fns.usda.gov/snap/et-policy-and-

guidance  (FNS  "supports  state  flexibility  in  designing  SNAP  E&T  programs"  and  listing

resources that states may use to develop and implement E&T programs); *see also Employment*

*and  Training*,  USDA  (Aug.  26,  2013),  https://www.fns.usda.gov/snap/et  ("the  E&T  program

offers  a  way  to  allow  SNAP  recipients  to  meet  SNAP  work  requirements"  and  "[s]tates  have

considerable flexibility to determine which SNAP participants to serve, which specific services

to offer, and their network of providers and partners").

         Plaintiffs note in their First Amended Complaint that New Jersey is "differently situated

from other Plaintiffs" because it "is able to use its current employment and training structure" to

connect its "ABAWD SNAP recipients … to services that can help them meet SNAP work requirements." Doc. 19 at 50 n.10.  New Jersey, however, should not be unique.  E&T programs are a prominent part of SNAP's work requirements that are implemented in 7 C.F.R. § 273.7. States that invest properly in E&T programs can thereby help ensure the extension of certain crucial SNAP benefits without a federal waiver.

Put simply, amending the standards for ABAWD time-limit waivers in no way necessitates the loss of benefits for any individual or group of individuals in a State.

## II.    The Existing Rule Governing Waiver Requests Is Flawed

Without debating the historical over-utilization of waivers by States at the expense of dedicating resources to E&T programs, the existing rule is flawed in ways that facilitate detrimental gamesmanship with respect to waiver applications.

### A.    Permitting States To Define An "Area" For Waiver Purposes Has Resulted In Apparent Gamesmanship And Manipulation

In 2001, the Department issued a regulation that established criteria for approval of State requests to waive the ABAWD time limit.  7 C.F.R. § 273.24 ("Existing Rule").  The Existing Rule allows States to "submit whatever data [they] deem[] appropriate to support" waiver requests, although requests based on unemployment or labor-force data must comply with the Bureau of Labor Statistics' ("BLS") data or methods.  *Id*. § 273.24(f)(2).[1]  Specifically, States are permitted to establish a lack of "sufficient jobs" within the meaning of 7 U.S.C. § 2015(o)(4)(A) by showing that the area in question:

---

[1] "BLS is the principal federal agency responsible for measuring labor market activity, working conditions, and price changes in the economy."  Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, 84 Fed. Reg. 66782-01, 66784 (Dec. 5, 2019) (codified at 7 C.F.R. pt. 273) ("Final Rule").  "BLS produces unemployment data that is accurate, objective, relevant, timely, and accessible, and that is generally considered by experts to be reliable and robust evidence for evaluating labor market conditions."  *Id*.

(1) is designated as a Labor Surplus Area ("LSA") by the Department of Labor ("DOL");

(2) is qualified by DOL for extended unemployment benefits;

(3) has a low and declining employment-to-population ratio;

(4) has a lack of jobs in declining occupations or industries;

(5) is characterized in an academic study or publication as an area with a lack of jobs; or

(6) has a 24-month average unemployment rate that is at least 20% above the national average for the same period.

7 C.F.R. § 273.24(f)(2)(ii).  The Existing Rule expressly confers on the States broad flexibility to "define areas to be covered by waivers."  *Id*. § 273.24(f)(6).

The latitude the Existing Rule provided to States in defining the regions for waivers has led to what appears to be detrimental gamesmanship in the waiver application process, with States defining geographic areas unrelated to the economically-impacted areas with "unemployment … over 10 percent" or lacking "a sufficient number of jobs."  7 U.S.C. § 2015(o)(4)(A)(i).  For example, in its September 27, 2018 application (Doc. 26-1 at 74–78), California requested that "a regional group of 52" of its 58 counties be considered a state-defined "area" to which a waiver should be granted, based on the overall average unemployment rate of 5.5%—exactly "20 percent above the national average."  *See* 7 C.F.R. §273.24(f)(2)(ii). California's application carves an area that goes from the beach cities of San Diego and Los Angeles, out to the Mojave Desert, up through the agricultural Central Valley, skirts along the eastern edge of the San Francisco Bay to enter the Napa and Sonoma Valleys, and then spreads inland over the Sierra Nevadas and up along the coast to the redwood forests of the border with Oregon—declaring this all to be a single area with a slack jobs market.  Doc. 26-1 at 78.  This region spans over 800 miles from San Diego County to Del Norte County.  *See id*. at 75–76.

While inland regions are also included in California's 52-county regional group, a look at just the coastal counties between the state's rural northernmost coastline and southernmost metropolis illustrates the improbability of the claim that these two counties are somehow linked by common economic forces on their respective job markets. From north to south, the coastal counties in the proposed regional group reflect the following:

| County | Average Unemployment Rate Jan. 2016 – Dec. 2017[2] |
|---|---|
| Del Norte | 7.0% |
| Humboldt | 4.6% |
| Mendocino | 4.9% |
| Sonoma | 3.7% |
| Marin[3] | 2.9% |
| San Francisco[3] | 3.0% |
| San Mateo[3] | 2.7% |
| Santa Cruz | 6.3% |
| Monterey | 7.4% |
| San Luis Obispo | 3.9% |
| Santa Barbara | 4.8% |
| Ventura | 4.9% |
| Los Angeles | 5.0% |
| Orange | 3.8% |
| San Diego | 4.4% |

The national average unemployment rate was 4.6% during this period, so to qualify for a waiver from the ABAWD time limit on its own, a geographic area would need an average unemployment rate of at least 5.5%. Doc. 26-1 at 74. Only *three* of the above-listed counties

---

[2] Calculated using the data contained in Exhibit 4 to the McConnell Declaration (Doc. 26-1), except where noted.

[3] These rates are not provided in California's waiver application, but historical data from the BLS is available from the Federal Reserve Bank of St. Louis. These rates are calculated by taking the average of the January 2016 and December 2017 unemployment rates. *Unemployment Rate in Marin County, CA*, FRED (Feb. 5, 2020), https://fred.stlouisfed.org/series/CAMARI5URN; *Unemployment Rate in San Francisco County/City, CA*, FRED (Feb. 5, 2020), https://fred.stlouisfed.org/series/CASANF0URN; *Unemployment Rate in San Mateo County, CA*, FRED (Feb. 5, 2020), https://fred.stlouisfed.org/series/CASANM0URN.

cross this threshold and only *two* of them are contiguous with one another.  Indeed, the majority of the above-listed counties had unemployment rates at or below the 4.6% national average for that time period.

And three other counties, which represent a portion of the populous San Francisco Bay Area, had unemployment rates so low that their inclusion in the state-defined region would have brought California's weighted average below 5.5%.  This likely explains why California did not include these three counties in its waiver application (despite including 52 of its 58 other counties in the same region).

This kind of aggressively gerrymandered job market area—with just the right unemployment rate to qualify for ABAWD time-limit waivers as a whole—results in extraordinary numbers of ABAWDs in California receiving benefits beyond the time limit notwithstanding noncompliance with the SNAP work requirements (especially as compared to States that do not gerrymander, or do so less aggressively).  The Amended Complaint estimates that "up to 381,500 ABAWDs in California" will be subject to the rule change, with a "best outcome" of "57,225 non-exempt ABAWDs [losing] eligibility."  Doc. 19 at 56.  But co-plaintiff Colorado asserts that only "20,000 ABAWDs receive SNAP benefits in Colorado" and only "750 ABAWDs may lose their SNAP benefits if they do not participate in work activities" under The Final Rule.  *Id*. at 57.  Similarly, Nevada anticipates that "approximately 1,850" of its 24,500 ABAWDs will lose waiver eligibility under The Final Rule.  *Id*. at 68.

Accordingly, under the existing rule, California has three times as many ABAWDs receiving SNAP benefits beyond the statutory time limit *per capita* as Colorado and 1.3 times as many *per capita* as Nevada.  The Amended Complaint also estimates that The Final Rule will impact waiver eligibility for 12.5 times as many people *per capita* in California as in Colorado

and 2.5 times as many *per capita* compared to Nevada.  Doc. 19 at 57, 68.  These multiples are likely too large to just be noise in the system; they are instead likely a consequence of the wildly different way in which California structures its data for waiver applications under the existing rules, even when compared to other Plaintiff States.

In sum, the above data supports the Department's conclusions that there are "key weaknesses in the current regulations on ABAWD time limit waivers" and that some States have strategically "group[ed] areas in such a way to maximize waived areas rather than demonstrate high unemployment or lack of sufficient jobs for ABAWDs."  Final Rule, 84 Fed. Reg. at 66783, 66794.  And when certain States can succeed in expanding their SNAP-eligible ABAWD population through such manipulation, notwithstanding the purpose of the SNAP work requirements, it diverts funding and puts all States at risk of having SNAP benefits reduced across the board due to depletion of the appropriation.  *See* 7 U.S.C. § 2027(b).

### B.    Unlimited Carryover Of Discretionary Exemptions Under The Existing Rule Is Wasteful And Unnecessary

Separate from SNAP's waiver provisions, which allow *the Department* to grant States waivers of the ABAWD time limit, SNAP also establishes exemption provisions, which allow *States* to determine that a percentage of its ABAWD population should be exempted from the ABAWD time limit.  7 U.S.C. § 2015(o)(6)(B).  For FY2020 "and each subsequent fiscal year," the "average monthly number of exemptions in effect during the fiscal year" cannot exceed 12 percent of the state's number of covered individuals.  *Id*. § 2015(o)(6)(E).  Under the Department's existing rule, States are allowed to indefinitely carryover their discretionary exemptions.  7 C.F.R. §273.24(h).  Yet some States appear to have relied too heavily on waivers instead of granting exemptions from the time limit on an individualized basis (to tailor SNAP benefits to the ABAWDs within each State).  *See Guidance for States on Use of Discretionary*

*Food Stamp Program Time Limit Exemptions*, USDA (Aug. 14, 1996), https://www.fns.usda.gov/snap/ABAWD/time-limit-exemptions-states (advising states to manage their discretionary exemptions "by estimating the effects of certain policy choices states may make in deciding which ABAWDs are in the greatest need of exemptions, and how long those exemptions should last").

As a practical matter, it makes little sense to allow States to indefinitely hoard exemptions because unemployment rates do not remain constant; they fluctuate from year-to-year. As the Department observed, the 5.9 million unused, accumulated exemptions represent nearly a billion dollars in SNAP benefits. Doc. 26 at 9. The Existing Rule's authorization of unlimited carryover of discretionary exemptions is undesirable, unnecessary, wasteful, and puts all States at risk of having to reduce allotments to eligible SNAP recipients due to depletion of the appropriation. *See* 7 U.S.C. § 2027(b).

III. **The Final Rule Is Fair And Furthers The Purpose Underlying SNAP's Work Requirements**

   A. **The Final Rule's New Definition Of An "Area" Prevents Gamesmanship While Ensuring That All States' Waivers Are Measured By The Same Standards And In A Fiscally Prudent Manner**

In contrast to the existing rule, which effectively defers to the States' subjective definitions of the "area[s]" for which time-limit waivers may be requested, The Final Rule establishes an objective standard—that an "area" is one that is "considered a Labor Market Area" ("LMA") by DOL. 7 C.F.R. § 273.24(f)(4)(i). States "must support a waiver for an LMA using corresponding LMA data from the BLS." *Id*. If such data is unavailable, however, States may combine "data from sub-LMA areas that are collectively considered to be a LMA by DOL." *Id*.

LMAs "are an exhaustive level of substate geography" published by the Local Area Unemployment Statistics ("LAUS") program. *Geographic Concepts*, U.S. Bureau of Lab. Stat.,

https://www.bls.gov/lau/laugeo.htm (last modified Mar. 15, 2019).  "Broadly, a LMA is an economically integrated geographic area within which individuals can reside and find employment within a reasonable distance or can readily change employment without changing their place of residence."  *Id*.  "LMAs include metropolitan and micropolitan areas defined by the Office of Management and Budget and the small labor market areas maintained by the [BLS]."  *FAQ's:  What are labor market areas (LMAs)?*, U.S. Bureau of Lab. Stat., https://www.bls.gov/lau/laufaq.htm#Q06 (last modified Jun. 14, 2018).  As the Department appropriately reasoned, "generally restricting waivers to qualifying LMAs will result in a broader application of the time limit, encourage geographic mobility among ABAWDs, and reduce dependence on government benefits."  Final Rule, 84 Fed Reg. at 66796.

Notably, the Department's Final Rule does not reflect an absolute, rigid requirement that States must always rely on standard BLS unemployment data in support of ABAWD time-limit waiver requests.  To the contrary, the Department retained in the Final Rule the following criteria for "areas with limited data or evidence": "low and declining employment-to-population ratio," "lack of jobs in declining occupations or industries," and "academic study or other publication describing the area as lacking a sufficient number of jobs to provide employment for its residents."  7 C.F.R. § 273.24(f)(6).  The Department reasonably concluded that this type of information is "not as standardized and reliable as unemployment data," however, and emphasized that "the best data should be used when it is available."  Final Rule, 84 Fed. Reg. at 66791.  Additionally, the Department explains that "requests tied to an exceptional circumstance need not necessarily meet the core standards" of supporting waiver requests with BLS data, but the request should "include some form of data or evidence showing that the exceptional circumstance has caused a lack of sufficient jobs in the area."  *Id*.; *see* 7 C.F.R. §273.24(f)(3)

11

("FNS may approve waiver requests that are supported by data or evidence other than those listed under paragraph (f)(2) of this section if the request demonstrates an exceptional circumstance in an area.")

As a general matter, an "exceptional circumstance" standard is useful to evaluate whether a legal requirement should be waived for a particular person or entity, or for classification purposes. *See, e.g.,* 5 U.S.C. § 8435(e)(1)(C) (permitting waiver of a spousal-consent requirement to certain withdrawals under Federal Employees' Retirement System Act when "exceptional circumstances" exist); 8 U.S.C. § 1229a(e)(1) (defining "exceptional circumstances" as those that are "beyond the control of [an] alien" who fails to appear at a removal proceeding and seeks to reopen removal proceedings conducted in absentia); 20 C.F.R. § 654.5 (establishing "[b]asic criteria" and "[c]riteria for exceptional circumstances" to classify "labor surplus areas" and providing examples of "exceptional circumstances"). In light of the Final Rule's language and associated guidance from the Department, there is no reason to believe that the Department will not consider unique circumstances that attend a particular State's waiver request.

The Final Rule is grounded in objectivity and creates a logical preference for objective, data-based waiver requests. *Cf.* 29 U.S.C. § 213(c)(4)(A) (permitting Secretary of Labor to waive the application of child labor provisions to an "employer or group of employers," but only upon finding, "based on objective data submitted by the applicant," that certain statutory conditions exist). The Final Rule will have a practical effect of preventing gerrymandered regional groupings through manipulation of the standards governing waiver requests, which in turn reduces the likelihood that annual appropriations for SNAP will be erroneously depleted—a consequence that all States should strive to avoid.

B.     **The 6% Floor Ensures That Waivers Will Not Be Granted To Areas With Low Unemployment Rates**

The Department's Final Rule also establishes a floor—a 6% unemployment rate—when requests are submitted to show that "an area has a 24-month average unemployment rate 20 percent or more above the national rate for a recent 24-month period[.]"   7 C.F.R. §273.24(f)(2)(ii).  This addition is an evidence-based standard that aligns with the DOL's 6% floor to designate an area as a "Labor Surplus Area."  *See* Final Rule, 84 Fed. Reg. at 66785 (reasoning a 6% floor is "particularly justified" because it "aligns with DOL's LSA standard," is "a relatively meaningful threshold for economic distress," and "target[s] waivers to areas with a 'lack of sufficient jobs'").  A "LSA designation is a longstanding Federal standard for job insufficiency relied upon by Federal and State governments and other workforce development partners."  *Id*.

The Department appropriately coupled the 20% standard with a 6% floor.  The 20% standard is not sufficient, by itself, to demonstrate that an area lacks sufficient jobs.  For example, the national average unemployment rate for the 24-month period of May 2017 through June 2019 was 3.9 percent.  *Id*. at 66784.  With this national average, a State could request and qualify for an ABAWD time-limit waiver in areas with an unemployment rate as low as 4.7 percent during this period.  Thus, the 6% floor helps ensure that areas with low unemployment rates are not improperly characterized as lacking sufficient jobs.

The 6% floor accurately demonstrates that an area lacks sufficient jobs.  As noted above, the DOL uses the same criteria when designating a LSA.  In order to be designated as an LSA, an area must have both (1) an unemployment rate of at least 20% or more above the national unemployment rate for the reference period; and (2) the area must have had an unemployment rate of 6% or higher for the same reference period.  20 C.F.R. § 654.5(a).  This designation has

13

been long and widely used by various federal, state, and private entities to assess whether an area

lacks sufficient jobs.  For example:

- The Administrator for Federal Procurement Policy uses the LSA list to identify where procurement set asides should be emphasized in order to strengthen our Nation's economy;

- General Service Administration Online Representations and Certifications Application system uses the LSA list as a tool to determine if a business qualifies as a Labor Surplus Area concern;

- The Small Business Administration uses the LSA list for bid selections for small business awards in Historically Underutilized Business Zones;

- Some state and local area governments use the LSA list to allocate employment related assistance (food stamps and training); and

- Private industry has used the LSA list for strategic planning and potential areas of human capital.

*FAQ's*, U.S. Dep't of Lab., https://www.doleta.gov/lsa/lsa_faq.cfm  (last updated Oct. 5, 2018).

Thus, including the 6% floor within the 20% standard further aligns the 20% standard

with the longstanding LSA criteria (on which the 20% standard was originally based). 84 Fed.

Reg. at 66785.  It was not arbitrary and capricious for the Department to adopt the same 6% floor

in the Final Rule.

And the Final Rule does not *always* require areas to satisfy the 6% floor to qualify for a

waiver of the ABAWD time limit.  If standard BLS data or data from a BLS-cooperating agency

is limited or unavailable, waiver requests "are not required to conform to the criteria for approval

under paragraphs (f)(2), (3), and (5)" of the Final Rule, which includes the 6% floor.  7 C.F.R.

§273.24(f)(6).  The 6% floor is therefore a workable and reasonable requirement, which is

designed to correspond with economic areas that have high unemployment rates where

ABAWDs should be waived from the time limit for lack of sufficient jobs.

\*          \*          \*

The Final Rule promotes fiscal responsibility and fairness to all States; it is a logical, workable rule that creates preferences for evidence-based standards and allows consideration of exceptional circumstances when objective, reliable data is unavailable.  More importantly, the Final Rule furthers the statutory purpose of SNAP's work requirements more effectively than the Existing Rule and can lead to better outcomes for ABAWDs by eliminating flaws that have led to abuse and overuse of ABAWD time-limit waivers.  States that have relied too heavily on waivers in the past should take this opportunity to introduce meaningful E&T programs or other opportunities to help ABAWDs return to work and be self-sufficient.  *See* 7 U.S.C. § 2015(d)(4)(A)(i) (stating the purpose of E&T programs is to "assist[] members of households participating in [SNAP] in gaining skills, training, work, or experience" designed to "increase the ability of the household members to obtain regular employment").  The Final Rule aligns with SNAP's purpose of promoting work and self-reliance over welfare.

**CONCLUSION**

For the reasons stated above, the Court should rule in favor of the Department.

RESPECTFULLY SUBMITTED this 28th day of February, 2020.

Mark Brnovich
  *Attorney General*

Oramel H. (O.H.) Skinner
  *Solicitor General*

Linley Wilson
  *Deputy Solicitor General*

Anthony R. Napolitano
  *Assistant Attorney General*

OFFICE OF THE ARIZONA ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-4288
o.h.skinner@azag.gov
linley.wilson@azag.gov
acl@azag.gov

*Counsel for Amicus Curiae*
*(additional counsel listed after signature block)*

16

**ADDITIONAL COUNSEL**

STEVE MARSHALL
Attorney General
State of Alabama

LESLIE RUTLEDGE
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

DANIEL CAMERON
Attorney General
State of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas