**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*, | |
| Plaintiffs, | Civil Action No. 20-119 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |
| BREAD FOR THE CITY, *et al.*, | |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

In this country of plenty, the federal and state governments work together to ensure that low-income Americans and their families do not go hungry. The largest federal food assistance program that serves as the cornerstone of this joint federal-state effort to reduce hunger — and hunger's adverse effects on health, educational achievement, and housing security — is the Supplemental Nutrition Assistance Program (SNAP), formerly known as the food stamp program. A new federal rule poised to go into effect in a few weeks, in April 2020, would dramatically alter the long-standing operations of the SNAP program, placing more stringent requirements on states' award of SNAP benefits with concomitant, virtually immediate effects on the lives, by the federal government's estimate, of over one million individuals currently

receiving SNAP benefits.  Of those million, nearly 700,000 would lose their benefits.  Especially now, as a global pandemic poses widespread health risks, guaranteeing that government officials at both the federal and state levels have flexibility to address the nutritional needs of residents and ensure their well-being through programs like SNAP, is essential.

Nineteen states, the District of Columbia, the City of New York, and three private plaintiffs have moved to enjoin preliminarily and to stay this new federal rule, issued by the United States Department of Agriculture (USDA), that would limit state-implemented waivers of the work requirements on which receipt of food assistance from SNAP may be conditioned.  *See* Final Rule, Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, 84 Fed. Reg. 66782 (Dec. 5, 2019); *see also* State Pls.' Mot. for Prelim. Inj. or 5 U.S.C. § 705 Stay Pending Judicial Review ("State Pls.' Mot."), ECF No. 3; Pls.' Mot. for Prelim. Inj. ("Private Pls.' Mot."), *Bread For the City, et al. v. U.S. Dep't of Agric., et al.*, 20-cv-127, ECF No. 4.

The low-income Americans targeted by USDA's Final Rule depend on monthly SNAP benefits to avoid hunger.  These SNAP participants may wield little political or economic power, but, nonetheless, USDA's proposed changes to take away nutrition benefits from almost 700,000 people prompted "more than 100,000 comments," the "majority" of which the agency concedes were opposed to the proposed changes.  84 Fed. Reg. at 66783–84.  Notwithstanding these critical comments, USDA proceeded in the challenged Final Rule to adopt changes that, in some respects, were more draconian than those initially proposed.  Although the hundreds of thousands of low-income individuals who stand to lose their benefits had little direct voice in that rulemaking process, the process exists to protect them and ensure that the agency cannot terminate their benefits arbitrarily.  Under the Administrative Procedure Act (APA), agency

rules, like USDA's, are unlawful unless the agency has considered the relevant evidence, has

weighed the consequences of its actions, and has rationally justified its choices. USDA says it

did all that here, but USDA is not the arbiter of the Final Rule's legality. The courts are, and this

Court has determined that aspects of the Final Rule are likely unlawful because they are arbitrary

and capricious. USDA will be enjoined from implementing those aspects of the Final Rule

nationwide pending final judicial review.

The Final Rule relates to provisions of the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996 (PRWORA) that conditioned the eligibility for SNAP benefits of

able-bodied adults without disabilities, or ABAWDs, on meeting work-related requirements. *See*

Pub. L. No. 104-193 § 824, 110 Stat. 2105, 2323 (1996) (codified at 7 U.S.C. § 2015).

Recognizing that the imposition of inflexible work requirements would undermine the SNAP

program's effectiveness in alleviating hunger, Congress created two relevant exceptions. First,

PRWORA provided that, "[o]n the request of a State," USDA "may waive the work

requirements" in "area[s]" that "do not have a sufficient number of jobs" for ABAWDs. 7

U.S.C. § 2015(o)(4)(A). Portions of the challenged Final Rule set to become effective on April

1, 2020, redefine waiver "area[s]" and limit the ways that states can show lack of sufficient jobs.

*See* 84 Fed. Reg. at 66802; *see also id.* (printing parts of the regulation to be codified, including

the challenged portions: (f)(2) and (f)(4)). Second, the Balanced Budget Act of 1997 (BBA)

allowed states to exempt from the work requirements up to 15% of all "covered individuals in

the State." 7 U.S.C. § 2015(o)(6)(C)–(D); *see also* Balanced Budget Act of 1997, Pub. L. No.

105-33 § 1001, 111 Stat. 251, 252 (1997). Portions of the Final Rule set to become effective on

October 1, 2020, limit states' ability to carry unused discretionary exemptions to later years. *See*

84 Fed. Reg. at 66802. For the reasons stated below, plaintiffs' motions are DENIED as to the

discretionary exemption portions of the Final Rule.  Plaintiffs' motions are GRANTED as to the waiver portions of the Final Rule.

## I.     BACKGROUND

Review of the procedural background follows discussion of the statutory framework, the regulatory framework, and the challenged Rule.

### A.     Statutory Framework

Congress created SNAP in 1964 "to alleviate . . . hunger and malnutrition" by providing "supplemental nutrition assistance" to "low-income households."  7 U.S.C. § 2011; *see also* Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964).  SNAP offers non-cash benefits that can be used to buy eligible food at approved retail stores.  *See* 7 U.S.C. § 2011; *id.* at § 2013(a).  The program served an average of 42.1 million recipients per month in fiscal year 2017.  *See* 83 Fed. Reg. 8013, 8013 (Feb. 23, 2018).  Average monthly benefits are about $123, while average monthly benefits for ABAWDs are around $160.  *See* USDA, Characteristics of Able-Bodied Adults Without Dependents (2018), https://www.fns.usda.gov/snap/characteristics-able-bodied-adults-without-dependents; *see also* Edward Bolen Decl. ("Bolen Decl."), Att. 2 at 228, ECF No. 3-2 (quoting the figure for ABAWDs).

USDA "is authorized to formulate and administer" SNAP, 7 U.S.C. § 2013(a), and has delegated those responsibilities to the Food and Nutrition Service (FNS), a part of USDA, 7 C.F.R. § 271.3(a).  Congress also explicitly granted USDA authority to "issue" regulations "necessary or appropriate" to implement SNAP and prescribed that USDA "shall promulgate all such regulations in accordance with" the APA's notice and comment rulemaking procedures.  7 U.S.C. § 2013(c).

States, including the District, also play a significant role in administering SNAP.  *See* 7 U.S.C. § 2012(r) (including the District in the relevant definition of "State").  By statute, state

agencies "have responsibility for certifying applicant households" as eligible for SNAP and for "issuing" benefits. *Id.* § 2020(a)(1); *see also Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 151–52 (D.D.C. 2018) (describing state responsibilities). The federal government funds at least half of each state's costs to "operat[e]" SNAP, 7 U.S.C. § 2025(a), and federal funds cover the full cost of SNAP benefits paid, *see id.* § 2019.

### 1.    Work Requirement Waivers

PRWORA, which amended the Food Stamp Act of 1977, conditioned ABAWD's eligibility for SNAP benefits on meeting work-related requirements. ABAWDS are specifically defined as individuals between 18 and 49 years of age who are not "medically certified as physically or mentally unfit for employment," are not "a parent or other member of a household with responsibility for a dependent child," are not pregnant, and are not "otherwise exempt under subsection (d)(2)." 7 U.S.C. § 2015(o)(3); *see also id.* § 2015(d)(2) (providing a variety of exemptions, including for students and for those participating in drug treatment programs). Under 7 U.S.C. § 2015(o), ABAWDs can only receive SNAP benefits for three months in a "36-month period" unless they are working or participating in job training for "20 hours or more per week, averaged monthly." *Id.* § 2015(o)(2).[1]

Congress recognized that blunt application of those work requirements in areas where few jobs are available would advance neither PRWORA's goal of engaging ABAWDs in the workforce nor the SNAP program's goal of ensuring food security. *See*, *e.g.*, 142 Cong. Rec. H7905 (1996) (statement of Rep. Kasich) (stating that the program aims to encourage employment in areas where "there are jobs available"). Congress therefore created a process for

---

[1]    Job-substitute and training programs include "a work program . . . as determined by the State agency" and "a program under section 2029 of this title or a comparable program established by a State or political subdivision of a State." 7 U.S.C. § 2015(o)(2).

waiving the work requirements in certain areas. "On the request of a State agency," USDA "may waive" the work requirements "to any group of individuals in the State if" USDA "makes a determination that the area in which the individuals reside" either "(i) has an unemployment rate of over 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." *Id.* § 2015(o)(4)(A). "[T]he individuals" referenced are ABAWDs. *See* State Pls.' Mem. Supp. Mot. for Prelim. Inj. ("State Pls.' Mem.") at 21, ECF No. 3; Private Pls.' Mem. Supp. Mot. for Prelim. Inj. ("Private Pls.' Mem.") at 12, *Bread for the City, et al.*, 20-cv-127, ECF No. 4; Defs.' Consolidated Opp'n to Pls.' Mots. for Prelim. Inj. ("USDA's Opp'n") at 24, ECF No. 26 (describing the statute as providing "whether an area has 'a sufficient number of jobs to provide employment for' ABAWDs" (quoting 7 U.S.C. § 2015(o)(4)(A)(ii)).

As discussed in more detail below, through guidance and regulation, USDA has implemented the statutory phrases "area in which the individuals reside" and "sufficient number of jobs to provide employment for the individuals." The challenged Final Rule radically rewrites the policies that have been in effect for 25 years.

### 2.  Discretionary Exemptions

As stated, in the BBA, Congress allowed states to exempt from a month's work requirements up to 15% of all "covered individuals in the State." 7 U.S.C. § 2015(o)(6)(C)–(D). "Covered individuals" are ABAWDs subject to the work requirements. *Id.* § 2015(o)(6)(A)(ii). Thus, ABAWDs residing in waived areas do not count as "covered individuals," and states with statewide waivers in a given year do not earn any exemptions in that year. For ABAWDs, being granted an exemption in a month means that the month's SNAP benefits will not count towards the three-month limit. Congress reduced these discretionary state exemptions to 12% of "covered individuals" starting in fiscal year 2020. *Id.* § 2015(o)(6)(E).

By statute, USDA calculates each state's available exemptions annually based on an "estimate[]" of the total number of "covered individuals" in a given state.  *Id.* § 2015(o)(6)(C)–(E).  Under 7 U.S.C. § 2015(o)(6)(G), USDA "shall increase or decrease the number of" each state's discretionary exemptions "to the extent that the average monthly number of exemptions in effect in the State for the preceding fiscal year" was "lesser or greater than the average monthly number of exemptions estimated for" that state for the "preceding fiscal year."  In other words, USDA is required to increase a state's allotted discretionary exemptions for a given fiscal year "to the extent" that the state used fewer exemptions in the prior fiscal year than it had earned. USDA is required to decrease a state's allotted discretionary exemptions for a given fiscal year "to the extent" that the state used more exemptions in the prior fiscal year than it had earned. The challenged Rule changes how USDA implements the carrying over of exemptions.

### B.      Regulatory Framework

The full description of that challenged Rule is preceded by a description of the 2001 regulation, which is currently in effect.

### 1.      The 2001 Regulation

Prior to 2001, in 1996, USDA had published guidance similar in substance to the 2001 regulation.  *Compare* Food Stamp Program: Personal Responsibility Provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("2001 Regulation"), 66 Fed. Reg. 4438 (codified at 7 C.F.R. § 273.24), *with* State Pls.' Mot., Kathleen Konopka Decl. ("Konopka Decl."), Ex. C, Att.2, Guidance for States Seeking Waivers for Food Stamp Limits (Dec. 3, 1996), ECF No. 3-12.

The 2001 regulation generally permits a state to "submit whatever data it deems appropriate to support its" waiver requests, but requires data reliant on "standard Bureau of Labor Statistics (BLS) data or methods" for "waiver requests based on unemployment rates or

labor force data." 7 C.F.R. § 273.24(f)(2).  The regulation also provides "[a] non-exhaustive list

of the kinds of data a State agency may submit" to support a "claim of lack of sufficient jobs."

*Id*.  The six criteria on this "non-exhaustive list" include data showing that an area: (1) "is

designated as a Labor Surplus Area (LSA) by the" Department of Labor (DOL); (2) qualifies, as

determined by DOL, "for extended unemployment benefits;" (3) "is described in an academic

study or other publications as an area where there are lack of jobs;" (4) "has a 24-month average

unemployment rate 20 percent above the national average for the same 24-month period."  *Id.*

§ 273.24(f)(2)(ii).  The regulation further permits states to "define areas to be covered by

waivers."  *Id.* § 273.24(f)(6).

 The 2001 regulation implements the statutory provisions about discretionary exemptions

by explaining simply that, if a "State agency does not use all of its exemptions by the end of the

fiscal year, FNS will increase the estimated number of exemptions allocated to the State agency

for the subsequent fiscal year by the remaining balance."  *Id.* § 273.24(h)(2)(i).  Conversely, "[i]f

the State agency exceeds its exemptions by the end of the fiscal year, FNS will reduce the

estimated number of exemptions allocated to the State agency for the subsequent fiscal year by

the corresponding number."  *Id.* § 273.24(h)(2)(ii).

### 2. The Challenged Rule

 USDA issued an Advanced Notice of Proposed Rulemaking (ANPRM) on February 23,

2018 to solicit comments from the public about potential changes to the 2001 regulation's

treatment of state waivers.  83 Fed. Reg. 8013, 8013 (Feb. 23, 2018).  "The ANPRM generated

nearly 39,000 comments . . . ."  Proposed Rule, 84 Fed. Reg. 980, 982 (Feb. 1, 2019).

 On February 1, 2019, USDA published a Proposed Rule that, *inter alia*, altered the 2001

regulation's criteria governing approval of state waivers, redefined "area" for purposes of state

waiver applications, and revised how USDA calculated carried over discretionary exemptions.

*Id.* at 983.  The Proposed Rule cited as one "rationale for modifying waiver standards," *id.* at 980 (capitalization altered), the President's April 2018 "Executive Order on Reducing Poverty in America by Promoting Opportunity and Economic Mobility," which "directed Federal agencies to review regulations and guidance documents to determine whether such documents are consistent with the principles of increasing self-sufficiency, well-being, and economic mobility," *id.* at 980–981.  USDA voiced "confide[nce] that" the proposed "changes would encourage more ABAWDs to engage in work or work activities if they wish to continue to receive SNAP benefits."  *Id.* at 981.

USDA "received more than 100,000 comments" on the Proposed Rule.  84 Fed. Reg. at 66783.  Like the Proposed Rule, the Final Rule tightened the criteria for demonstrating lack of "sufficient jobs," reworked the definition of waiver "area," and changed how discretionary exemptions would be carried over.  *See id.* at 66811–12. [2]  The waiver-related changes are effective April 1, 2020, while the discretionary exemption change is effective October 1, 2020.  *Id.* at 66782.  What follows is an overview of the Final Rule and of USDA's reasoning in adopting it.

a.      *Waivers for Lack of Sufficient Jobs*

The Final Rule provides that USDA will approve states' waivers for areas satisfying one of two "core standards:" (1) "a recent 12-month average unemployment rate over 10 percent;" or (2) a recent 24-month "average unemployment rate 20 percent or more above the national rate" *and* above 6%.  *Id.* at 66811.  The first standard corresponds to the statutory provision allowing a waiver if an area "has an unemployment rate of over 10 percent."  7 U.S.C. § 2015(o)(4)(A)(i).

---

[2]      The differences between the Proposed Rule and the Final Rule are not comprehensively detailed because this decision does not resolve the plaintiffs' procedural challenges that depend on those differences.  *See infra*, note 12 (describing those procedural challenges).

The second standard is intended to correspond to the statutory provision allowing a waiver if an area "does not have a sufficient number of jobs to provide employment for the individuals."  *Id.* § 2015(o)(4)(A)(ii); *see* 84 Fed. Reg. at 66791 (indicating this).  In short, under the Final Rule, to qualify an area for a waiver based on insufficient jobs, a state will generally need to show that the area's 24-month average unemployment rate is both 20% above the national average and above 6%.  The Final Rule thus adds, for the first time in this regulatory scheme, an unemployment rate floor to the waiver criteria.  Finally, as discussed further later, USDA will also consider waiver requests based on "other data and evidence" in an "exceptional circumstance."  84 Fed. Reg. at 66811.

As already noted, the 2001 regulation's non-exhaustive list of criteria for establishing lack of sufficient jobs comprises six examples of data sources and types that may be used.  7 C.F.R. § 273.24(f)(2)(ii).  The Final Rule eliminates five of those criteria and adds the "6 percent unemployment rate floor" to the 2001 regulation's criterion requiring a 24-month average unemployment rate.  84 Fed. Reg. at 66785.  "Not including a floor," the Final Rule stated, "has had the effect of allowing areas with low rates of unemployment to qualify for waivers."  *Id.* at 66784.

The Final Rule addressed USDA's decision to eliminate the following five criteria listed in the 2001 regulation: qualification for federal extended unemployment benefits; designation as an LSA by DOL; a declining employment-to-population ratio; jobs in declining industries or occupations; and description in an academic study or publication as an area lacking jobs.  7 C.F.R. § 273.24(f)(2)(ii).  As to qualification for federal extended unemployment benefits, which DOL evaluates statewide, USDA expressed "concern[]" that retaining this "criterion would allow States to receive statewide waivers even when there is not a lack of sufficient jobs within certain

areas of the State." *Id.* at 66789–90.  The Final Rule thus tied elimination of this criterion to the

redefinition of "waiver area," explaining that USDA "is choosing to provide a strict definition of

a waiver area that will also restrict statewide waivers." *Id.* at 66790.  As to LSA designation,

USDA similarly reasoned that "including LSA designation as a waiver criterion would be

inconsistent with the final rule's definition of an area." *Id.* at 66800.

The other three criteria listed in the 2001 regulation — a declining employment-to-

population ratio, jobs in declining industries or occupations, and description in an academic

study or publication as an area lacking jobs — were rejected as a group for inclusion in the Final

Rule. *Id.* at 66790.[3]  "Many commenters," USDA observed, "opposed excluding these criteria."

*Id.*  Most importantly, some commenters made the "broad[] argu[ment] that" elimination of these

criteria "results in an overreliance on unemployment rates" in measuring lack of sufficient jobs.

*Id.* at 66791.  USDA acknowledged that non-unemployment rate–based measures "can enhance

the understanding of the job market," but, citing its "operational experience," said that "the

Department has recognized that" these measures "are less reliable and consistent than standard

unemployment data in demonstrating a lack of sufficient jobs." *Id.*  USDA also referred readers

to the discussion of unemployment rates in the section of the Rule justifying the 6%

unemployment rate floor. *Id.*

That discussion's summary of comments concerned with overreliance on unemployment

rates was extensive, with "the vast majority of those who commented on the unemployment rate

floor opposed setting any unemployment rate floor." *See id.* at 66786–88.  These commenters

gave statutory and policy reasons for their position. *See id.* at 66786–87.  First, "[c]ommenters

---

[3]       The Final Rule continued to include these criteria as appropriate supporting evidence for waiver applications for areas, such as Indian reservations and U.S. Territories, for which BLS produces limited data. *See* 84 Fed. Reg. at 66791; *see also id.* at 66811.

argued that the statutory language," *id.* at 66786 — which allows a waiver if an area "does not

have a sufficient number of jobs to provide employment *for the individuals*," 7 U.S.C.

§ 2015(o)(4)(A)(ii) (emphasis added) — "requires the Department to base the waiver standards

on whether there are lack of sufficient jobs for the specific ABAWD population, not the broader

population," 84 Fed. Reg. at 66786.  USDA responded to this line of argument with its view that

"limiting the number of ways that a State may demonstrate a lack of jobs in order to prevent the

misapplication of waivers in areas in which the lack of jobs is questionable" is "well within the

authority" granted at 7 U.S.C. § 2015(o)(4)(A), which USDA interpreted "to provide[] the

Secretary with broad discretion on how to define what does and does not constitute a lack of

sufficient jobs," 84 Fed. Reg. at 66788.

Second, commenters offered "analysis" and "research," *id.* at 66787, supporting their

understanding that the standard unemployment rate "does not accurately reflect labor market

prospects for ABAWDs[] and . . . does not fully account for the ability of ABAWDs to find and

keep jobs due to lack of skills, training, or other barriers," *id.* at 66786.  This research included

studies "indicating" that ABAWDs tended to have lower levels of education, higher levels of

disability, higher levels of homelessness, were more likely to have been incarcerated, were more

likely to experience racial discrimination, and were more likely to be underemployed than the

general population and studies "suggesting" that these characteristics correlated with

unemployment rates higher than the unemployment rate of the general population.  *Id.* at 66787.

"Commenters also asked the Department to consider access to transportation, housing stability,

and forced moves among the ABAWD population that lead to particular problems maintaining

stable employment."  *Id.*  Finally, commenters observed that USDA "has previously

acknowledged," in the 1996 guidance and the 2001 rulemaking, "that time limit waivers were

intended by Congress to recognize the challenges that the ABAWD population faces when finding permanent employment." *Id.* at 66787.

"In response to these comments," USDA "recognize[d] that ABAWDs may face barriers to employment and have more limited employment prospects than the general public." *Id.* "[N]otwithstanding" this recognition, "the Department [wa]s resolute" that the Rule's changes, and specifically the 6% unemployment rate floor, were "necessary to ensure that the standard is designed to accurately reflect a lack of sufficient jobs in a given area." *Id.* "The Department's position," USDA stated, "is based on its operational experience, during which it has recognized that, without" such changes "areas that do not clearly lack sufficient jobs will continue to qualify for waivers." *Id.*

b.      *Redefinition of "area"*

The 2001 regulation, which permits states to "define areas to be covered by waivers," 7 C.F.R. § 273.24(f)(6), allows waivers for single counties or towns or for groups of jurisdictions, *see* 84 Fed. Reg. at 66794. The Final Rule would eliminate states' longstanding discretion to tailor waiver requests. Specifically, the Final Rule "prohibit[s] states from combining unemployment data from individual substate areas to calculate an unemployment rate for the combined area . . ., unless the combined area is designated as a Labor Market Area (LMA)" by DOL. *Id.* at 66793.[4] According to the Final Rule, DOL describes an LMA as "an economically integrated area within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." *Id.*

In short, the Final Rule redefines "area in which the individuals reside," 7 U.S.C. § 2015(o)(4)(A), as the LMA in which the individuals reside, *see* 84 Fed. Reg. at 66811. "[T]his

---

[4]      The Rule also "consider[s]" any "reservation area" and "U.S. Territory" "to be an area for the purposes of waivers." *See* 84 Fed. Reg. at 66811.

means that the final rule will only allow for waivers covering LMAs." *Id.* at 66796. "Many

commenters opposed the proposed restriction on grouping only to LMAs." *Id.* at 66793. These

commenters argued that states are best positioned to "understand[] . . . regional patterns in their

labor markets, local commuting burdens, and other local nuances specific to ABAWDs," *id.*, and

that "years of FNS guidance" and "USDA's longstanding position" granting states "flexibility to

group substate areas" had embraced that assessment of state expertise, *id.* at 66794. "[T]he

Department disagree[d]," concluding that arguments supporting state "flexibility" were

"outweigh[ed]" by "the need to address" a "problem" identified by USDA. "The Department

has learned, through its extensive operational experience," the Final Rule stated, "that this

flexibility allows States to strategically group substate areas to maximize the geographic

coverage of waived areas rather than to demonstrate high unemployment or a lack of sufficient

jobs for ABAWDs . . . ." *Id.*

Commenters further objected, citing examples, that the area definition adopted was

problematic because LMAs "do not account for specific ABAWD commuting patterns and other

factors specific to ABAWDs." *Id.* at 66793. USDA was "not compelled by" these comments or

their suggested alternative groupings, however, concluding that "LMAs remain the best available

and most appropriate delineation" because "there are no Federally-designated areas that

specifically assess commuting patterns and other related economic factors for ABAWDs." *Id.*

The Final Rule further explained that USDA had redefined waiver area as LMA because USDA

"expects unemployed ABAWDs to proactively pursue any and all work and/or work training

opportunities within reasonable commuting distance of their homes." *Id.* at 66796. "[G]enerally

restricting waivers to qualifying LMAs," the Final Rule concluded, "will result in a broader

application of the time limit, encourage geographic mobility among ABAWDs, and reduce dependence on government benefits." *Id.* at 66796.

c.  *Carryover of Discretionary Exemptions*

Under the 2001 regulation, when a state did not use all of its exemptions in a given fiscal year, USDA increased the state's discretionary exemptions for the following year by the unused balance.  States were permitted to carryover indefinitely any unused exemptions.  "As a result," the Final Rule stated, "States have accumulated extremely high amounts of unused discretionary exemptions that well exceed the number allotted to each State for the fiscal year." *Id.* at 66803. In fiscal year (FY) 2019, "States earned approximately 1.3 million exemptions, but had about 7.4 million exemptions available for use in total due to the carryover of unused exemptions from previous fiscal years." *Id.*  In USDA's view, "the indefinite carryover and accumulation of unused exemptions is inconsistent with Congress' decision to limit the number of exemptions available to States in a given fiscal year, as expressed" in § 2015(o)(6)(C), (D), and (E). *Id.*

Under the Final Rule, each state is of course still granted discretionary exemptions totaling 12% of the individuals in the state covered by the work requirements, as required by the statute.  7 U.S.C. § 2015(o)(6)(E).  This 12% is also supplemented by exemptions carried over from previous years, but this carry over is much more limited than under the 2001 regulation. Specifically, the Final Rule "allow[s] States to carry over only one year's worth of exemptions from previous years." *Id.* at 66803.  The Final Rule does "not allow States to retain their existing accumulated exemptions past the end of FY 2020." *Id.*  USDA planned to implement this change "during the next scheduled" calculation of exemptions, for FY 2021, on October 1, 2020. *Id.* at 66804.

15

### C.     Procedural Background

Six weeks after publication of the Final Rule, on January 16, 2020, 14 states, the District, and New York City sued under the APA to challenge the Rule.  *See* Complaint, *D.C. et al. v. U.S. Dep't of Agric., et al.*, 20-cv-119, ECF No. 1.  An amended complaint, filed January 29, 2020, added five new states as plaintiffs.  *See* States' Amended Compl. at 1–3, ECF No. 19. Joining the District and the City of New York in this suit are New York, California, Colorado, Connecticut, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Virginia, and Vermont (collectively, the state plaintiffs).  *See id*.  Their complaint challenges the Final Rule under the APA as arbitrary and capricious, contrary to law, and promulgated without observing procedural requirements.  *See* 5 U.S.C. § 706(2)(A), (D); *see also* States' Amended Compl. ¶¶ 461–71 (contrary to law); *id.* ¶¶ 472–77 (procedural claim); ¶¶ 478–82 (arbitrary and capricious).  When they filed their initial complaint, the original state plaintiffs moved for a preliminary injunction or for a stay of the Final Rule pending judicial review.  *See* 5 U.S.C. § 705; *see generally* State Pls.' Mot.

Also, on January 16, 2020, Bread for the City ("BFC") and the individual plaintiffs filed a separate suit making the same claims as the state plaintiffs about the waiver portions of the Final Rule, *see generally* Private Pls.' Compl., and moved for a preliminary injunction, *see* Private Pls.' Mot.  The private plaintiffs do not challenge the discretionary exemption aspect of the Final Rule.  The two suits were consolidated under Federal Rule of Civil Procedure 42 without objection from the parties, on January 23, 2020.  *See* Min. Order on Consolidation (Jan. 23, 2020).[5]

---

[5]      USDA, George Ervin Perdue, III, in his official capacity as Secretary of Agriculture, and the United States are named as defendants in the state plaintiffs' suit, *see* States' Amended Compl. at 3, while USDA and the United

At the Court's direction, the parties conferred and proposed a schedule for briefing on the pending motion for preliminary injunctive relief, *see* Min. Order (Jan. 21, 2020); Notice of Joint Proposed Schedule and Positions Regarding Consolidation, ECF No. 10. The briefing schedule proposed by the parties was adopted, with their proposed date for a hearing moved up a week earlier. Scheduling Order (Jan. 23, 2020).

USDA opposed the preliminary injunction, *see* Defs.' Consolidated Opp'n to Pls.' Mots. for Prelim. Inj. ("USDA's Opp'n"), ECF No. 26, and the plaintiffs filed replies in support of their motions, *see* Private Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Private Pls.' Reply"), ECF No. 30; Pls.' Reply in Supp. of Mot. for Prelim. Inj. or 5 U.S.C. § 705 Stay Pending Judicial Review ("State Pls.' Reply"), ECF No. 31.[6]  A hearing on these pending motions was held on March 5, 2020.

## II.  LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain a preliminary injunction, the plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *See Winter v. Natural Res. Def.*

---

States are named in the suit brought by BFC and the individual plaintiffs, *see* Private Pls.' Compl. at 1.  USDA, the Secretary, and the United States are defendants in the consolidated suit and are collectively referred to as "USDA."

[6]        The United States House of Representatives filed an amicus brief in support of the plaintiffs, *see* Br. of U.S. House of Rep. as *Amicus Curiae* in Supp. of Pls. ("House Amicus Br."), ECF No. 16, and organizations "that study, develop and support" certain welfare reforms, *Amici Curiae* Br. of the Foundation for Gov't Accountability *et al.*, ECF No. 37, as well as nine states — Arizona, Alabama, Arkansas, Georgia, Kentucky, Louisiana, Nebraska, South Carolina, and Texas — submitted amici briefs in support of the USDA, *see* Br. of *Amici* States of Ariz. *et al.* ("State Amici Br."), ECF No. 42.

*Counsel*, 555 U.S. 7, 20 (2008).[7]  The first factor is also the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed.1995)).

Section 705 of the APA authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "to prevent irreparable injury."  5 U.S.C. § 705.  The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay.  *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016); *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009); *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.3d 972, 974 (D.C. Cir. 1985).

## III.   DISCUSSION

The discussion begins with review of the state plaintiffs' challenge to the discretionary exemption aspect of the Final Rule and concludes this challenge is not likely to succeed on the merits.  The state plaintiffs' motion for a preliminary injunction as to that aspect of the Final Rule is thus denied.

The discussion next turns to plaintiffs' arbitrary and capricious challenges to the waiver aspects of the Final Rule and concludes that these claims are highly likely to succeed.  All the plaintiffs have also shown that implementation of those aspects of the Final Rule will cause them

---

[7]     The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Washington v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned), and therefore will not be employed here, *see Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016).

irreparable harm.  The balance of the equities and the public interest further weigh in favor of preliminary relief for the plaintiffs.  Finally, the discussion addresses the proper scope of the relief, determining that a nationwide injunction of the waiver parts of the Final Rule is consistent with D.C. Circuit precedent and necessary to provide complete relief.

### A.    State Plaintiffs Are Not Likely To Succeed In Challenging The Final Rule's Discretionary Exemption Change

The state plaintiffs claim that the discretionary exemption aspect of the Final Rule is unlawful in two respects.  According to these plaintiffs, first, the Final Rule's limitation on the carryover of unused exemptions to one year "runs afoul of the statutory scheme," State Pls.' Mem. at 24, and, second, this part of the Final Rule is arbitrary and capricious, by "fail[ing] to address significant reliance interests," *id.* at 37.  States are understandably upset that USDA's Final Rule radically changes a longstanding policy to the states' detriment.  Indeed, most of the fifty states may stand to lose accumulated exemptions on October 1, 2020, when the discretionary exemption portion of the Final Rule becomes effective.[8]  That said, "[a]gencies are free to change their existing policies," even to change existing policies to the significant detriment of states or other parties, "as long as [agencies] provide a reasoned explanation for the change" and ground the change in a reasonable interpretation of the governing statute.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  USDA likely satisfied that standard here, so plaintiffs' motion for preliminary relief will be denied as to the discretionary exemption aspect of the Final Rule.

---

[8]    The current record is not clear on this point, but any state with areas subject to the work requirements at some point since 1999, when carry over began, could lose carried over exemptions as a result of the Rule.  The District has had a statewide waiver since the enactment of the work requirements and therefore has not accumulated any exemptions.  *See* Rough Hr'g Tr. at 32:7–23.  Four other jurisdictions currently have statewide waivers, but the record does not indicate whether those statewide waivers have been in effect since 1999 as in the District.  *See id.* at 32:1–6.

The state plaintiffs' argument about the Final Rule being contrary to law is governed by the test from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  At *Chevron* step one, a court asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842.  If Congress has spoken, then the agency action comports with the law only if the action "give[s] effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  If Congress has been "silent or ambiguous" on the question at issue, then, at *Chevron* step two, the court asks whether the agency's action "is based on a permissible construction of the statute," and the court must defer to the agency's interpretation if reasonable. *Id.* at 843.

Section 2015(o)(6)(E) allows states to exempt from SNAP program work requirements 12% of ABAWDs, a reduction in the 15% exemption limit that applied before fiscal year 2020. *See* 7 U.S.C. § 2015(o)(6)(C)–(D).  Section 2015(o)(6)(G) instructs USDA to adjust this 12% limit annually.  Specifically, USDA is to "increase or decrease the number of individuals who may be granted an exemption by a State agency . . . to the extent that the average monthly number of exemptions in effect in the State for the preceding fiscal year . . . is lesser or greater than the average monthly number of exemptions estimated for the State agency for such preceding fiscal year." *Id.* § 2015(o)(6)(G).

The state plaintiffs argue that § 2015(o)(6)(G) unambiguously requires USDA to compare the number of exemptions *used* in the prior year to the number of exemptions *available* in the prior year, including all exemptions carried over from prior years, and then carry over the difference. *See* State Pls.' Mem. at 24 (stating that the provision "requires the Secretary to . . . effect[] an ongoing 'carry-over' of exemptions from prior years: the underuse of exemptions in one year will increase the number of exemptions available in the next year, and that underuse compared in the second year will roll over to the third and so forth").  Under this reading, the

state plaintiffs construe the phrase "average monthly number of exemptions estimated . . . for the preceding fiscal year" to mean the number of exemptions *available* in the prior year, without regard to whether those exemptions were initially granted in the prior year or, say, twenty years ago in 1999.  7 U.S.C. § 2015(o)(6)(G).  That phrase could bear the state plaintiffs' reading, but it could also bear USDA's.

To USDA, the statute is at best ambiguous on the issue of whether "number of exemptions estimated . . . for the preceding fiscal year" should include exemptions carried over from years prior to the "preceding fiscal year."  7 U.S.C. § 2015(o)(6)(G).  If anything, in USDA's view, the statutory language's "focus on the 'preceding fiscal year,'" USDA's Opp'n at 30 (quoting 7 U.S.C. § 2015(o)(6)(G)), means that Congress intended USDA to credit unused exemptions granted in the preceding year but not unused exemptions granted in any number of prior years.  A statute that can bear multiple plausible meanings is ambiguous at *Chevron* step one.  *See, e.g.*, *Whitaker v. Thompson*, 353 F.3d 947, 949–50 (D.C. Cir. 2004) (seeing "no basis for finding any unambiguously expressed intent of Congress" where the sentences at issue "might mean" one thing and "might mean" another (internal quotation marks omitted)).

In reply, the plaintiffs argue that, even if the statute's text appears ambiguous, "the legislative history unambiguously contemplates" their reading.  State Pls.' Reply at 16.  Even assuming that legislative history could make ambiguous text clear at *Chevron* step one, the legislative history does not do what the state plaintiffs say it does.[9]  The 2018 Farm Bill reduced the percentage of available exemptions from 15% to 12% starting in FY 2020.  Agriculture

---

[9]     The state plaintiffs argue that "to the extent that congressional silence on time limits is ambiguous, legislative history can fill the gap" as to Congress's intent at *Chevron* step one, but they point to no case in which a court has used legislative history to deem ambiguous statutory language clear.  State Pls. Reply at 17.  The typical use of legislative history at *Chevron* step one is to "shed new light on" an ambiguity in congressional intent, "notwithstanding statutory language that appears superficially clear."  *Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1180 (D.C. Cir. 1995)).

Improvement Act of 2018, Pub. L. No. 115-334, § 4005, 132 Stat. 4490, 4632 (2018); *see also* 7

U.S.C. § 2015(o)(6)(E).  While the Senate version of the Farm Bill left exemptions untouched,

*see* H.R. 2, 115th Cong. § 4103(F) (June 28, 2018) (Engrossed Amendment in Senate), the

House version had not only reduced the percentage to 12%, albeit starting in 2026, but also

entirely eliminated exemption carry over, *see* H.R. 2, 115th Cong. § 4015(a)(G)(iv) (June 21,

2018) (Engrossed in House).

State plaintiffs rest their argument on the following sentence in the Conference Report

explaining the Farm Bill's ultimate compromise: "States will maintain the ability to exempt up to

12% of their SNAP population subject to ABAWD work requirements, down from 15%, and

continue to accrue exemptions and retain any carryover exemptions from previous years,

consistent with current law."  H.R. Rep. No. 115-1072, at 616 (2018) (Conf. Rep.) (quoted in

State Pls.' Mem. at 24 and State Pls.' Reply at 17).  Crediting plaintiffs' reading of this sentence

as a congressional attempt to clarify that exemptions carry over "from previous years," in the

plural, does not, however, dictate the result they want of rendering clear otherwise ambiguous

statutory language on this point.  *See NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571,

582 (1994) ("[I]t is the function of the courts and not the Legislature, much less a Committee of

one House of the Legislature, to say what an enacted statute means." (alteration in original)

(quoting *Pierce v. Underwood*, 487 U.S. 552, 566 (1988)); *Consumer Prod. Safety Comm'n v.*

*GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980) (dismissing similar argument by recognizing

that "a mere statement in a conference report" of subsequent legislation "as to what the

Committee believes an earlier statute meant is obviously" not authoritative of the original

statute's meaning); *Eagle Pharm. Inc. v. Azar*, No. 18-5207, slip op. at 30 (D.C. Cir. Mar. 13,

2020) (stating that legislative history from subsequent legislation is "particularly unhelpful" and

"less persuasive" than legislative history from the original legislation); *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) (stating the general rule of statutory interpretation that "subsequent failed legislation tell[s] us little if anything about the original meaning of" a statutory provision). Moreover, the Conference Report's statement was made in the specific context of explaining the Conference Committee's decision to reject the House's total elimination of carryover exemptions and does not purport to bar agency action in the future.  Put another way, this legislative history does not supplant statutory language nor amount to a congressional command requiring USDA to retain forever into future rulemakings the 2001 regulation's method of carrying over exemptions indefinitely.  Such a command would need to be clearly stated in the statute.  *See Health Care & Ret. Corp. of Am.*, 511 U.S. at 582 (reaffirming that statements in committee reports "do not have 'the force of law, for the Constitution is quite explicit about the procedure that Congress must follow in legislating'" (quoting *Am. Hosp. Ass'n. v. NLRB*, 499 U.S. 606, 616 (1991)); *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988) ("[U]nenacted approvals, beliefs, and desires are not laws.").

The state plaintiffs' statutory argument thus fails because the statute bears multiple readings and USDA has settled on one permissible reading of the statute.  *See Chevron*, 467 U.S. at 843 (instructing courts to reach *Chevron* step two if the statute is ambiguous and to defer to the agency if the agency's reading is a "permissible construction").[10]

---

[10]        The state plaintiffs also argue, in a single sentence, that the Final Rule is contrary to law because it violates the APA's prohibition on retroactive legislative rules.  *See* State Pls.' Mem. at 25; *see also* State Pls.' Reply at 17 n.7 (preserving this argument).  State plaintiffs are also unlikely to succeed on this theory, at least as currently presented.  Distinctions are drawn, as a legal mater, "between a rule that imposes new sanctions on past conduct, which is retroactive and invalid [under the APA] unless specifically authorized, and one that merely 'upsets expectations,' which is secondarily retroactive and invalid only if arbitrary and capricious."  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010) (citing *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670–71 (D.C. Cir. 2009)).  The Final Rule merely upsets expectations by "impair[ing] the future value of past" years' carried over exemptions and is thus valid unless arbitrary and capricious.  *Id.* at 161 (quoting *Nat'l Cable*, 567 F.3d at 670).  The Final Rule does not alter the past legal consequences of past decisions about carrying over exemptions.  *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) ("[A]n agency order that 'alters

State plaintiffs next argue that the Final Rule is arbitrary and capricious for several reasons. First, state plaintiffs believe the Final Rule is "unreasoned." State Pls.' Mem. at 37. The Final Rule explained USDA's view that "the indefinite carryover . . . of unused exemptions is inconsistent with Congress' decision to limit the number of exemptions available to States in a given fiscal year, as expressed by sections 6(o)(6)(C), (D), and (E)." 84 Fed. Reg. at 66802 (citing 7 U.S.C. § 2015(o)(6)(C)–(E)). The Final Rule further illustrated that the number of "unused discretionary exemptions" accumulated by states "well exceed[s] the number allotted to each state for the fiscal year." *Id.* "In FY 2019, States earned approximately 1.3 million exemptions, but had about 7.4 million exemptions available for use in total due to the carryover of unused exemptions from previous fiscal years." *Id.* As the agency noted in the Proposed Rule, a 2016 USDA Office of the Inspector General (OIG) report "expressed" "[c]oncerns" about whether such vast accumulation of exemptions was what the statute intended. 84 Fed. Reg. at 988; *see also* USDA's Opp'n, Casey McConnell Decl. ("McConnell Decl."), Ex. 1, FNS Controls Over SNAP Benefits for Able-Bodied Adults Without Dependents ("OIG Report") at 10–11 (Sept. 2016), ECF No. 26-1. These were "entirely rational" reasons to revise how discretionary exemptions were carried over. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009); *see also Rust v. Sullivan*, 500 U.S. 173, 187 (1991) (deeming "justified" with "reasoned analysis" a change in policy that the agency viewed as "more in keeping with the

---

the future effect, not the past legal consequences' of an action, *Sinclair Broad. Group v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002), or that 'upsets expectations based on prior law,' *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (quotation omitted), is not retroactive" in the way the APA forbids.). State plaintiffs argue that "[b]y cancelling previously accumulated exemptions aside from those accrued in the preceding fiscal year, the Rule" impermissibly "extinguishes prior state rights" without specific authorization. State Pls.' Mem. at 24. The analysis of the statute above, however, demonstrates that "the legal status quo ante" did not create inalienable rights to maintain unused exemptions beyond the next fiscal year. *Bergerco Canada, a Div. of Conagra, Ltd. v. U.S. Treasury Dep't*, 129 F.3d 189, 193 (D.C. Cir. 1997); *see also Celetronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001) (holding that no "vested right" existed for purposes of retroactivity analysis where the prior "system offered no vested right to any specific terms" of a license and the agency "always retained the power to alter the term of existing licenses by rulemaking").

original intent of the statute" and that relied on OIG reports concluding that prior policy did not properly implement the statute).

Second, the state plaintiffs argue that the Final Rule "summarily discounts the numerous comments that relay the importance of the exemptions in enabling states to nimbly respond to swift economic downturns or changes in employment conditions." State Pls.' Mem. at 37. To the contrary, USDA "agree[d]" with comments that "demonstrate[d] the importance of discretionary exemptions." 84 Fed. Reg. at 66803. The agency simply concluded that those comments did not demonstrate that states needed to retain unused exemptions "indefinitely" to enable nimble response to changing conditions. *Id.* That conclusion appears rational in light of the evidence before the agency. States' history of accumulating rather than using exemptions — such that 82.5% of exemptions in effect in 2019 were carried over from past years — is consistent with the agency's determination that exemptions could be scaled back without threatening states' ability to "deal with potential unforeseen sharp economic declines or other quickly changing circumstances." *Id.*

Finally, the state plaintiffs argue that the Final Rule "fails to confront the serious reliance interests of states that have accumulated exemptions for many years." State Pls.' Mem. at 37. Those reliance interests are undoubtedly serious, but "reliance does not overwhelm good reasons for a policy change," *Encino Motorcars*, 136 S. Ct. at 2128 (Ginsburg, J., concurring), and USDA appears to have given good reasons here. An explanation of why one "policy 'is more consistent with statutory language' than alternative policies" is a good reason for a policy change, *id.* (majority opinion) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007)), as is remediating a concern identified in an OIG report, *see Rust*, 500 U.S. at 187 (upholding a change in policy that relied in part on OIG reports).

Furthermore, the Final Rule explicitly confronted and considered the states' reliance interests.  As already noted, USDA acknowledged that discretionary exemptions were important to states but reasonably concluded that more limited carryover would still allow states the flexibility to respond to suddenly changing circumstances.  84 Fed. Reg. at 66803.  In addition, recognizing that states with accumulated exemptions may have created policies and plans on the assumption that those exemptions would be available into the future, USDA chose to implement the change in October 2020, rather than April 2020, to give states time to "make significant changes" to their current systems of exemption use "to ensure they do not overuse exemptions" once the Final Rule goes into effect.  *Id.* at 66804.

In sum, the state plaintiffs have not shown a likelihood of success on the merits of their challenges to the discretionary exemption aspects of the Final Rule.

Further, without fully analyzing the matter, the Court notes that the plaintiffs may face an uphill battle in showing irreparable harm.  For one, this aspect of the Final Rule does not become effective until October 1, 2020, and harm that is eight months away may not be sufficiently immediate.  For another, on this record, states may struggle to establish that ending indefinite carryover of discretionary exemptions will have a certain impact.  This is not to diminish the importance of discretionary exemptions, especially in responding to sudden events like manufacturing plant closures, or even pandemics.  That said, some states and areas, including the District and New York City, have earned no or very few exemptions because they have been under waivers for quite some time, and thus are not impacted at all by the elimination of indefinite carryover.  Further, states will continue to earn exemptions yearly at the rate of 12% of covered individuals, and the states' declarations are vague in their assertions about whether that continued accrual is insufficient to continue to exempt the individuals whom the states have been

exempting.  *See, e.g.*, Catherine Buhrig Decl. ("Buhrig Decl.") ¶ 17, ECF No. 3-4 (noting that Pennsylvania currently has approximately 160,000 exemptions, will lose 140,000 with the result that "the State *may* not be able to exempt everyone that it has exempted in the past," but without stating the number actually needed (emphasis added)); Alexis Carmen Fernández ("Fernández Decl.") ¶¶ 19–22, ECF No. 3-5 (stating simply that California has 850,000 carried over exemptions and asserting that these are "instrumental in providing food benefits in the six counties currently implementing the time limit," but without stating the number actually needed).

The state plaintiffs' motion for preliminary relief as to those aspects of the Final Rule is denied.  *See Munaf v. Geren*, 553 U.S. 674, 705 (2008) (reversing entry of a preliminary injunction where the movant failed to show likelihood of success on the merits); *see also, e.g.*, *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) ("[B]ecause the plaintiffs have shown no likelihood of success on the merits, we choose not to 'proceed to review the other three preliminary injunction factors.'" (quoting *Ark. Dairy Coop. Ass'n v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009))); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("*Munaf* means that a strong showing of irreparable harm, for example, cannot make up for a failure to demonstrate a likelihood of success on the merits."); *cf. Citizens for Responsibility & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam) (stating that a movant's failure to show likelihood of success on the merits is "an arguably fatal flaw for a stay [pending appeal] application.").

### B.   Plaintiffs Are Likely To Succeed On The Merits Of Their Arbitrary And Capricious Claim Challenging The Final Rule's Waiver Changes

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "An agency action that 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise' is arbitrary and capricious."  *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "That is not a high bar," the Supreme Court has observed, "but it is an unwavering one."  *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

The plaintiffs are likely to succeed on their claim that the waiver changes in the Final Rule are arbitrary and capricious.  Given this, the plaintiffs' other APA claims — that the Rule is contrary to law and was promulgated without observing procedural requirements — need not be addressed at this stage of the case.[11]  The Rule's severe reduction of the allowable criteria for demonstrating lack of sufficient jobs is addressed first before turning to the Rule's redefinition of "area."

---

[11]    To be clear, the plaintiffs' contrary to law arguments are addressed to the extent those arguments overlap with their arbitrary and capricious claim.  *See infra* Part III.B.1.  The private plaintiffs' contrary to law argument that USDA exceeded its rulemaking authority by promulgating a rule that "substantially displace[d] the waiver adjudication process established by Congress," Private Pls.' Mem. at 21, is not addressed.  Further, the state plaintiffs' procedural claim stemming from USDA's reliance on the phrase "operational experience," *see* State Pls.' Mem. at 17, is addressed to the extent it overlaps with their arbitrary and capricious claim, *see infra* Part III.B.2.  The decision to postpone consideration of any arguments at this stage in no way reflects any assessment that those arguments are less likely to succeed.  Pointing to case law holding that the APA's notice and comment requirements are not satisfied where the agency does the opposite of what it proposed, *see* State Pls.' Mem. at 14 (citing, for example, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014)), the plaintiffs argue that USDA did not provide adequate notice of its decision to eliminate state waivers based on the state's qualification for extended unemployment benefits, *id.*  The Proposed Rule stated the opposite: that USDA "would continue to approve a state's waiver request that is based upon the requesting state's qualification for extended unemployment benefits."  84 Fed. Reg. at 985.  The state plaintiffs further argue that the Proposed Rule did not give notice that LMAs "would be the *sole* geographical unit for a waiver," and that this failure "deprived Plaintiffs and the public of meaningful comment" on a consequential aspect of the Final Rule.  State Pls.' Mem. at 14, 16 (emphasis added).  USDA counters that the Final Rule was a "logical outgrowth" of the notice and by attempting to distinguish the case law plaintiffs rely on.  *See* USDA's Opp'n at 48–52.  USDA suggests that these procedural challenges may be best evaluated on a full administrative record, which is currently being compiled.  *See* USDA's Opp'n at 4 (arguing that plaintiffs' procedural "claims founder in light of the administrative record"); *see also* McConnell Decl. ¶ 34 ("USDA-FNS is in the process of compiling the administrative record for this case.").  The Court accepts that suggestion given that the preliminary injunction motion may readily be resolved on other grounds.

1.      **The Rule's Adoption of New Criteria Governing Approval of Waivers is Likely Arbitrary and Capricious**

The plaintiffs are likely to show that the Rule's adoption of new criteria for evaluation of waivers is arbitrary and capricious in two respects.  First, the agency's decision to eliminate measures of insufficient jobs other than 24-month average unemployment rate runs counter to evidence before the agency, and USDA's decision to depart from that evidence was inadequately explained.  Second, USDA's singular reliance on unemployment rates in implementing 7 U.S.C. §2015(o)(4)(A) was arbitrary and capricious in light of the statutory language, structure, and other indicia of congressional intent.

a.      *Decision to Eliminate Measures of Insufficient Jobs Other than 24-Month Average Unemployment Rate*

Voluminous evidence supported the commenters' view that general unemployment rates alone cannot measure whether an area has "a sufficient number of jobs to provide employment *for the individuals*."  7 U.S.C. § 2015(o)(4)(A)(ii) (emphasis added).  As already reviewed, the Rule summarized "analysis" and "research" submitted by the commenters "indicating" that ABAWDs faced greater barriers to employment than the general population because ABAWD tended to have lower educational levels, higher levels of disability and homelessness, worse access to transportation, and were more likely to have prior criminal convictions and to experience racial discrimination.  *See, e.g.*, 84 Fed. Reg. at 66787 (reciting data from critical commenters "based on the 2017 USDA Household Characteristics data, that non-disabled individuals aged 18 through 49 in households without children in SNAP report lower than average educational attainment" (citation omitted)); *id.* (noting submitted "research indicating that, on average, unemployment rates for people with low-education attainment are much higher than what BLS unemployment rates for the general public indicate"); *id.* (stating that "[c]ommenters provided research indicating that lower unemployment rates are less indicative of

strong labor markets in recent years than in the past, and particularly for those with lower levels of education"); *id.* (observing that "research indicat[es] that employment rates for workers with low levels of education still have not recovered from the recession and pointed to evidence that workers with less education may be hit harder by recessions"); *id.* (considering USDA-"commissioned" analysis "that those subject to SNAP work requirements face substantial barriers to employment.").

USDA waved away these commenters' concerns and their supporting evidence in a few sentences of defective argument.  Although USDA conceded "that ABAWDs may face barriers to employment and have more limited employment prospects than the general public," 84 Fed. Reg. at 66787, it insisted, "based on its operational experience," that "areas that do not clearly lack sufficient jobs will continue to qualify for waivers" without the Rule's limitations.  *Id.* Putting the lesson slightly differently, the Rule also stated that, "[t]hrough its operational experience, the Department has recognized that" measures not based on unemployment rates "are less reliable and consistent that standard unemployment data in demonstrating a lack of sufficient jobs."  *Id.* at 66791.  USDA's sole supporting example was that, if evaluation of sufficient jobs were not pegged to unemployment rates, and specifically to unemployment rates over 6%, then "a state could request and qualify for a waiver in areas with an unemployment rate as low as of 4.7 percent."  *Id.* at 66787.

USDA's logic is arbitrary because it is circular.  The agency erases the concern that general unemployment rates are an inappropriate measure of lack of sufficient jobs for ABAWDs by redefining the thing to be measured in terms of the agency's preferred measure, namely, general unemployment rates.  USDA's example suffers from the same defect of

circularity.  USDA's semantic trick does not address the evidence that the Final Rule simply is not measuring what the statute requires: the lack of sufficient jobs for ABAWDs.

USDA gave no other reason for its tunnel-vision embrace of unemployment rates. Indeed, USDA has embraced non-unemployment rate–based measures since 1996, including in the 2001 regulation.  A new policy of viewing these measures as unreliable or inconsistent for purposes of assessing whether an area has "a sufficient number of jobs to provide employment for the individuals," 7 U.S.C. § 2015(o)(4)(A)(ii), cannot be justified by "merely recit[ing] the terms" reliable and consistent.  *State Farm*, 463 U.S. at 52.[12]  Instead, when faced with considerable evidence that its preferred measure was inappropriate or incomplete in the precise context defined by the statute, the agency needed to provide a meaningful response to that evidence and "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also, e.g.*, *Gresham*, 950 F.3d at 103 (deeming an agency's decision arbitrary and capricious when it "dismiss[ed] important "concerns" "in a handful of conclusory sentences"); *Am. Wild Horse Pres. Campaign v. Purdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (vacating an agency's action that "brushed aside critical facts" and failed to "adequately explain" or "adequately analyze" its policy choice); *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("The Commission's failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious.").

---

[12]     In addition, a look at the full Final Rule indicates that the agency embraced DOL data inconsistently. USDA invoked the supposedly superior reliability of DOL data in eliminating three measures of job availability in the 2001 regulation — a declining employment-to-population ratio, jobs in declining industries or occupations, and description in an academic study or publication as an area lacking jobs, 84 Fed. Reg. at 66790 — but failed to acknowledge or address this preference for DOL data in rejecting a measure that relied on DOL data — LSA designation by DOL, *see id.* at 66799.  Such inconsistency is a signal of arbitrary decisionmaking.  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (stating that an agency's "reasoning cannot be internally inconsistent" (citing *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018)).

USDA now argues that the eliminated metrics were "rarely used," including by the state

plaintiffs.  USDA's Opp'n at 40 (citing McConnell Decl., Exs. 13–28).  To USDA, this shows

that "Plaintiffs' true complaint is not with the use of unemployment rates," but with the height of

the unemployment rate floor.  *Id.*  USDA's view of the plaintiffs' "true complaint" is beside the

point: that many past or current waivers are based on unemployment rates does not change the

record before the agency indicating problems with its approach or the inadequacy of the agency's

response to those problems.

   *b.*   *Singular Reliance on Unemployment Rates*

In § 2015, Congress provided two criteria for waivers: (i) that an area has "an

unemployment rate of over 10 percent; *or*" that the area (ii) "does not have a sufficient number

of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A).  State plaintiffs

argue that the Rule unlawfully implements § 2015(o)(4)(A) because neither of the Final Rule's

two core standards "answers the question that Congress asked — whether an area actually has

insufficient jobs to provide employment for ABAWDs."  State Pls.' Mem. at 22.[13]  Plaintiffs are

---

[13]   State plaintiffs frame their arguments about the Rule's singular reliance on unemployment rates under the test from *Chevron*.  In their view, the Rule falls at *Chevron*'s step one because the statutory language unambiguously "forecloses the Rule's near-total reliance on the general unemployment rate to meet the test."  State Pls.' Mem. at 21.  USDA counters that "the phrase in question . . . is the 'antithesis of a *Chevron* step one statutory directive.'"  USDA's Opp'n at 23 (quoting *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1164 (D.C. Cir. 2015)).  The phrase "sufficient number of jobs to provide employment for the individuals" is not obviously unambiguous at *Chevron* step one, especially when read in light of the context, which signals congressional intent to delegate aspects of waiver determinations to the agency: "the Secretary *may waive*" the work requirements if "the Secretary makes a determination that the area in which the individuals reside . . . does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A).  Thus, a *Chevron* analysis would likely proceed to step two.
  In any event, there is little distance between *Chevron*'s step two and arbitrary and capricious review under the APA.  *See Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (stating that the "analysis would be the same" under *Chevron* step two and APA arbitrary and capricious review); *see also Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017) ("[A]nalysis of the reasonableness of agency action 'under *Chevron* Step Two and arbitrary and capricious review is often the same.'" (quoting *Pharm. Res. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015)).  "[T]he more apt analytical framework in this case is standard 'arbitrary [or] capricious' review under the APA."  *Judulang*, 565 U.S. at 52 n.7 (alteration in original) (quoting 5 U.S.C. § 706(2)(A)).  Although the Rule implements the statutory language of 7 U.S.C. § 2015(o)(4)(A), the Rule does not dwell on "an interpretation of any statutory language."  *Judulang*, 565 U.S. at 52 n.7; *see also Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 727 (D.C. Cir. 1994) ("[A]lthough *Chevron*'s second step sounds closely akin to plain vanilla arbitrary-

likely to succeed on this claim that the Final Rule is an unreasonable construction of the statute, *Guedes*, 920 F.3d at 32 (articulating the *Chevron* step two standard), is arbitrary or capricious in substance, *see Judulang*, 565 U.S. at 52 n.7 (discussing *Chevron* step two), ignores "relevant factors," and amounts to "a clear error of judgment," *State Farm*, 463 U.S. at 42–43.

The Final Rule adopts unreasonably narrow criteria for implementing the statutory requirements for evaluating waivers. Start with the statutory structure: prong one of § 2015(o)(4)(A) addresses with precision one circumstance, an unemployment rate over 10%, that would warrant a waiver, while prong two states with greater generality that waivers may be granted for lack of "sufficient jobs." USDA is right that prong two, in not prescribing a single permissible measure, necessarily leaves USDA with some discretion to define "sufficient jobs." *See* USDA's Opp'n at 23–24. Nevertheless, the statute's two-pronged structure also plainly limits USDA's discretion: if prong one addresses the circumstances under which unemployment rates would warrant a waiver, prong two must address a distinctive measure. By making both prongs of § 2015(o)(4)(A) dependent on unemployment rate, USDA has arbitrarily written this distinction out of the Rule. *See New York v. EPA*, 443 F.3d 880, 887 (D.C. Cir. 2006) (setting aside an agency action, albeit at *Chevron* step one, based on an interpretation "contrary to '[the] cardinal principle of statutory construction'" that words in the statute should not be made "insignificant" or "superfluous" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)); *Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005) (vacating agency rules at *Chevron* step one because the

---

and-capricious style review, interpreting a statute is quite a different enterprise than policy-making" (internal quotation marks and ellipsis omitted)). Rather, the Rule primarily engages in policymaking. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019) (stating that "the Venn Diagram of the two inquiries is not a circle" and explaining that, even where an agency adopts "a reasonable interpretation of the statute for purposes of *Chevron*," the policy rationales underlying the agency action may still be arbitrary and capricious). As a result, this decision adopts the arbitrary and capricious framework but imports the parties' *Chevron* arguments where applicable. *Cf.* USDA's Opp'n at 31 n.12 (urging that its arguments that the Rule is not arbitrary and capricious should be applied in a *Chevron* step two analysis).

agency's too "narrow interpretation of" a statutory term was "implausible," and acknowledging that the district court reached the same result at *Chevron* step two).

Section 2015(o)(4)(A)(ii)'s use of the phrase "employment *for the individuals*" cements this conclusion.  That phrase is a guardrail on USDA's discretion.  It instructs USDA to determine whether an area has "a sufficient number of jobs" with some attention given to ABAWD-related measures.[14]  As already discussed, USDA has not adequately explained in this Rule that unemployment rates, taken alone, are such a metric.

In USDA's view, the Final Rule reasonably implements § 2015(o)(4)(A) because "[e]ven if ABAWDs may face more challenges to finding employment than the average person, the unemployment rate is not 'a matter irrelevant to' that inquiry."  USDA's Opp'n at 24 (quoting *Judulang*, 565 U.S. at 53).  The statute undoubtedly makes unemployment rate a factor relevant to evaluating waivers, but that point sidesteps the flaw in the Final Rule's core standards.  The real issue is whether the Final Rule, in making general unemployment rates the only factor for evaluating waivers, permissibly interpret § 2015(o)(4)(A).  As just analyzed, based on the statutory structure and text and the Final Rule's justification, the answer is no.

Falling back, USDA says that, even if the statute does require consideration of more than unemployment rates, the Final Rule does so.  *See* USDA's Opp'n at 25.  A provision states that USDA will grant a waiver based on other "data or evidence" if the state can "demonstrate that [an] exceptional circumstance has caused a lack of sufficient jobs" in an area.  84 Fed. Reg. at 66811.  Although the provision parrots the statutory phrase "sufficient jobs," the commentary

---

[14]     USDA relies on faulty logic to protest this reading, as "untenable" because it would "bar[]" USDA "from approving a waiver under clause (ii) unless it has job availability information specific to the ABAWD population." USDA's Opp'n at 24 (emphasis omitted).  Not so: this reading would bar USDA from relying solely on measures so general that the ABAWD unemployment rate is essentially not counted, without requiring USDA to rely solely on ABAWD specific measures.

makes clear the provision is designed to address "extreme, dynamic circumstances," such as "the rapid disintegration of an economically and regionally important industry" or the "prolonged impact of a natural disaster." *Id.* at 66792. The Final Rule's examples illustrate the kind of other "data or evidence" USDA has in mind: "a state might provide unemployment data or other evidence that is similar to the core standards except in that it covers a shorter duration because the area's economy suffered a rapid decline . . . that is not yet demonstrated by a full 12-month or 24-month data period." *Id.* This is the same data, over a "shorter duration," required by the "core standards." The "exceptional circumstances" part of the Final Rule does not meaningfully broaden those criteria for evaluating waivers, and thus cannot save USDA here.

Finally, recent legislative history is consistent with the conclusion that Congress intended the phrase lack of "sufficient jobs" for ABAWDs to capture a broader set of circumstances than those encompassed by the Rule. The House version of the 2018 Farm Bill proposed amending § 2015(o)(4)(A) to limit waivers to areas (1) with an unemployment rate of over 10%; (2) designated as an LSA by DOL; (3) with a 24-month average unemployment rate at least 20% higher than the national average and above 7%; or (4) in states that are in "an extended benefit period" under federal law or "in which temporary or emergency unemployment compensation is being provided under any Federal law." H.R. 2, 115th Cong. § 4015(a)(1)(F) (June 21, 2018) (Engrossed in House). In other words, the House bill would have eliminated two of the current data sources available to states while retaining the criteria of LSA designation and eligibility for federal extended unemployment benefits. For the criterion measuring a higher unemployment rate than the national average, the House bill imposed a floor of an unemployment rate of 7%. The Senate version of the Farm Bill contained no restrictions on waivers. The Conference Committee rejected the House bill's restrictions on waivers. In doing so, the Conference

Committee "acknowledge[d] that waivers from the ABAWD time limit are necessary in times of recession and in areas with labor surpluses or higher rates of unemployment." H. Rep. No. 115-1072 (2018) (Conf. Rept.) at 616. Congress's recent rejection of waiver criteria less stringent than those ultimately adopted by USDA is probative of congressional intent to maintain flexibility in the waiver system. Tellingly, even the House version of the bill did not rely solely on unemployment rates, as USDA does in its Final Rule.

USDA dismisses this legislative history, citing cases like those discussed above in rejecting the state plaintiffs' legislative history argument about the discretionary exemptions. *See* USDA's Opp'n at 31–32. There, the Conference Committee Report, which adopted one of two plausible readings of the statute, could not make the ambiguous statutory text clear or render USDA's plausible reading unreasonable. *See supra* Part III.A. Here, by contrast, the Conference Committee Report and the history of the 2018 Farm Bill merely confirm the conclusion that USDA's reading is unreasonable and arbitrary and capricious in substance, a conclusion that comport with the statute's text and structure. *Council for Urological Interests v. Burwell*, 790 F.3d 212, 222–24 (D.C. Cir. 2015) (rejecting challenger's argument based on a Conference Report that agency's interpretation failed at *Chevron* step one but then remanding to the agency at *Chevron* step two because the agency's interpretation was unreasonable in light of the Conference Report).

## 2. The Final Rule's Redefinition of Waiver Area is Likely Arbitrary and Capricious

Plaintiffs are likely to show that USDA's decision to redefine area was arbitrary and capricious in two respects. First, USDA's state abuse justification for this aspect of the Final Rule was wholly unsupported. Second, USDA responded inadequately to the considerable evidence suggesting that the new definition of area was inappropriate.

a.      *State Abuse Rationale*

USDA adopted a "strict definition of waiver 'area'" because of its view, developed through "operational experience," that "[s]tates are grouping areas in such a way to maximize waived areas rather than demonstrate high unemployment or a lack of sufficient jobs for ABAWDs." 84 Fed. Reg. at 66794.  Yet, USDA "has provided no evidence" that such state manipulation is "a real problem." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006).  "Professing that an" agency action "ameliorates a real . . . problem but then citing no evidence demonstrating that there is in fact a[] . . . problem is not reasoned decisionmaking." *Id.* at 843 (citing *State Farm*, 463 U.S. at 42–43); *see also id.* at 841 (finding an agency order that posited a solution to a problem but "provided no evidence of a real problem" nor "a single example of abuse" to be arbitrary and capricious).

In USDA's view, it was "enough under the APA" that the Final Rule "cited" "operational experience" and "explained the precise nature of [the agency's] concerns" through "examples." USDA's Opp'n at 36.  This correctly articulates but misapplies the standard here.  USDA relies on *National Tour Brokers Association v. ICC*, 671 F.2d 528 (D.C. Cir. 1982), which explained, "[w]hile the practice is not without problems, an agency may rely on its 'experience' to provide the necessary factual support" for a rule.  *Id.* at 533.  "A problem for the agency in relying on its experience as factual support for its decision," however, "is the necessity of adequately recording and explaining that experience on the record."  *Id.*  Part of recording and explaining experience, and part of judicial review of an agency's reliance on experience, is assuring that any agency "findings" based on experience are "themselves . . . factually supported in the administrative record."  *Id.*  USDA flatly fails that test.  Factual support does not necessarily need to come in the form of empirical evidence or other concrete examples of abuse, as USDA recognizes. USDA's Opp'n at 35 (citing *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir.

2009)).  At the same time, factual support does need to be based in fact and "real" rather than manufactured.  *Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 841; *see also Nat'l Tour Brokers*, 671 F.2d at 533 (looking to the agency's factual support to decide whether the agency's decision "was the rational result of reasoned analysis").[15]

USDA attempted to support its view that states are manipulating waiver groupings with three assertions.  None holds up on examination.  First, the Final Rule surmised that state waiver manipulation is "one of the primary reasons why about half of the ABAWDs participating in SNAP live in waived areas, despite current low unemployment levels across the majority of the country."  84 Fed. Reg. at 66794.  As the state plaintiffs observe, this statistic is "unsurprising."  State Pls. Mem. at 28.  Of course, a substantial proportion of ABAWDs receiving benefits live in waived areas: ABAWDs outside of waived areas who cannot meet the work requirements have their benefits terminated rapidly, after just three months.  This statistic could thus reflect the difficulties ABAWDs face in finding work to maintain their benefits outside of waived areas. Despite the existence of at least one readily apparent alternative account for this statistic, USDA articulated zero reasons for its assumption that "about half" is a suspiciously high share of ABAWDs to be living in waived areas.  An unsupported assumption cannot sustain a key justification for a rule.  *See Nat'l Tour Brokers*, 671 F.2d at 534 (requiring lessons from agency experience to have factual support).

---

[15]     USDA also relies on *Pharm. Research & Mfrs. of Am. V. FTC* (*PhRMA*), 44 F. Supp. 3d 95 (D.D.C. 2014) (Howell, C.J.), for the notion that "[a]gency reliance is at its strongest when the agency invokes its experience not in defense of an 'objectively or scientifically determinable' decision, but rather to explain the very need for the very rule in question."  USDA's Opp'n at 36 (quoting *PhRMA*, 44 F. Supp. 3d at 129).  That distinction is a red herring, as *PhRMA* applies the same standard as *Nat'l Tour Brokers*.  In *PhRMA*, as here, the agency invoked its experience to explain the need for the rule.  *See* 44 F. Supp. 3d at 128–29; *see also Pharm. Research & Mfrs.*, 790 F.3d at 208 (explaining the rule).  In *PhRMA*, unlike here, the agency provided specific and substantial factual support for its invocation of experience and "clearly and reasonably explained why it adopted the Rule."  *Pharm. Research & Mfrs.*, 790 F.3d at 208 (observing that, in explaining its experience, the agency "[s]pecifically" described 66 relevant filings supporting the assertion about experience); *see also PhRMA*, 44 F. Supp. 3d at 129 n.15 (distinguishing cases in which agencies did not "provide reasoning" and did not reasonably reject "the contrary evidence").

Second, USDA saw as "manipulative," 84 Fed. Reg. at 66793, state waiver applications that "grouped nearly all contiguous counties in the State together while omitting a few counties with relatively low unemployment," *id.* at 66794.  USDA's assertion that these waivers reflect state abuse is not a finding supported by facts.  *See Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 843.  As support for this perceived problem, the Final Rule states only that such waivers allow states to "maximiz[e] waived areas," 84 Fed. Reg. at 66794, but maximization is not self-evidently manipulative.

In a belated attempt to better connect the dots between the facts and the assertion of state abuse, USDA now offers the slightly more specific argument that such waiver requests reveal that states "conspicuously left out counties that would have jeopardized the request," USDA's Opp'n at 35 (citing 84 Fed. Reg. at 986), while keeping in areas with low unemployment to obtain waivers for the latter areas "simply by grouping them with" areas of high unemployment, *id.* at 37.[16]  Grouping contiguous counties with relatively high unemployment while omitting contiguous counties with relatively low unemployment is entirely consistent with good faith efforts by states to target waiver requests to areas that lack sufficient jobs and to apply the work requirements in areas with enough jobs.  The Final Rule does nothing to rebut this common

---

[16]     USDA cites the Proposed Rule for this jeopardy point, *see* USDA's Opp'n at 35 (citing Rule 84 Fed. Reg. at 986), but the Proposed Rule simply states: "Some States have grouped nearly all contiguous counties in the State together while omitting a few counties with relatively low unemployment in order to maximize the waived areas in the State." 84 Fed. Reg. at 986.  That statement does nothing to provide concrete, factual examples that would fill in the gaps of the Final Rule.

In opposing the plaintiffs' motions, USDA also points to a 2016 USDA Office of the Inspector General (OIG) report stating that "officials in three States told us they specifically requested ABAWD time limit waivers in as many parts of the State as possible to minimize the areas where they needed to track the ABAWD time limits." OIG Report at 5; *see also* USDA's Opp'n at 35.  The OIG Report is a post hoc rationale not mentioned in the Final Rule.  *See, e.g., SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943) (agency actions cannot be upheld based on after-the-fact reasoning).  Nor is this admission indicative of abuse.  The OIG finding came in the context of the OIG's discussion of the difficulty and complexity of implementing PRWORA's ABAWD time-tracking provisions.  *See* OIG Report at 4–8 (findings and recommendations related to the difficulty of implementing the ABAWD provisions).  The OIG's report is consistent with the idea that the state grouping behavior USDA deemed manipulative is a feature of the statutory design rather than a product of state abuse.

sense assessment of state behavior.  A single comment referenced in the Final Rule speculates

that states "will seek to maximize any discretion in order to receive and use as much Federal

money as possible."  84 Fed. Reg. at 66973.  Speculation cannot substantiate the USDA's

assumption of bad faith by states here.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d

156, 210 (D.C. Cir. 1988) (holding that agency speculation is "not adequate grounds upon which

to sustain an agency's action").

Third, USDA saw as "manipulative," *id.* at 66793, state waiver applications that

"grouped certain towns together that share the same economic region while omitting others with

relatively low unemployment from the group," *id.* at 66794.  The Final Rule argues that this

allowed states to obtain waivers for jurisdictions "without consideration for job availability" in

nearby jurisdictions.  *Id.* at 66796.  For example, the Final Rule said, "if a State has the choice to

obtain waivers . . . for individual counties, . . . the State could waive the county without

consideration for the job availability in its surrounding LMA."  *Id.*[17]  Comments suggested

motivations other than state manipulation for such a waiver request.   For example,

"[c]ommenters argued that States have the best understanding of the regional patterns in their

labor markets, local commuting burdens, and other local nuances specific to ABAWDs."  *Id.* at

---

[17]     Although the Final Rule provided only this hypothetical example, USDA now points to two real examples
that do not help its case.  USDA says (1) that a resident of the neighborhood of Takoma in the District is subject to a
waiver while a resident of Takoma Park, Maryland — "immediately across the border (and perhaps even the street)
— is not," USDA's Opp'n at 38 (citing McConnell Decl., Ex. 14 (Maryland Waiver) and then citing McConnell
Decl., Ex. 15 (D.C. Waiver); and (2) that a resident of Manhattanville in New York City is subject to a waiver even
though residents of a community district blocks away might not be, *id.* (citing McConnell Decl., Exs. 9 & 16 (New
York Waivers)).  The first example provides no support for state waiver abuse because the District and Maryland, as
different states, apply separately for waivers, based on analysis of data particular to their own jurisdictions.  The
second example is consistent with state expertise, not state abuse, as the waiver applications provided by USDA
show that New York requested waivers for all of "Upper Manhattan," including Manhattanville, but not elsewhere
in New York City, such as the community district just beneath Manhattanville, which covers the neighborhood
around Columbia University and the Upper West Side.  *See* McConnell Decl., Ex. 9 at 5, Map 2; *see also* Steven
Banks Decl. ("Banks Decl.") ¶ 14, ECF No. 3-1 (explaining that Upper Manhattan is "by many measures" "distinct
and separate from the rest of Manhattan").

66793.  Once again, USDA's failure to engage with any of these readily apparent alternative explanations renders its assumption of state abuse inadequate.

USDA and the state *amici* now point to waivers that will be in the administrative record, which has not yet been filed on the docket or produced to plaintiffs, allegedly "exhibiting" this "pattern of gerrymandering," USDA's Opp'n at 35, but these examples, which USDA's brief makes no attempt to analyze, do not advance USDA's defense, *see* McConnell Decl., Exs. 4–12, ECF No. 26-1 (providing example waiver requests).  The state *amici* highlight a waiver application from California, which covered 52 counties that, together, had an average unemployment rate of 5.5%, "exactly" 20% above the national average unemployment rate at the time.  State Amici Br. at 6 (discussing McConnell Decl., Ex. 4, ECF No. 26-1).  The *amici* see three problems with this application: first, that the unemployment rate for the whole region is precisely at the threshold needed to get a waiver; second, that the waiver "region spans over 800 miles;" and, third, that some of the counties included in the waiver area had unemployment rates below 5.5%.  *See id.* at 6–7.

At the outset, in light of USDA's insensitivity to the concerns of states, like the District, that LMAs are too large to be appropriate waiver areas, the irony cannot be missed that large waiver areas are cited as cause for suspicion.  *See* Rough Hr'g Tr. at 80:25 (the Court noting this in question to USDA).  Further, responding to state *amici*'s argument at the hearing, the state plaintiffs argued that *amici*'s analysis was overly simplistic.  States consider more than just unemployment rate in designing waiver area, the state plaintiffs pointed out, including what areas are "appropriately connected to each other for purposes of considering the inquiry of jobs for ABAWDs, whether [areas] are connected by affordable transportation or not, whether they share similar employment opportunities or not, and even whether the areas for which waivers are

not requested . . . had sufficient jobs for SNAP recipients living there" as well as "for the additional SNAP recipients in the waived areas if those waivers were not in place." *Id.* at 41:17–25. After all, USDA's current regulation, which permits States "to define areas to be covered by waivers" and instructs them to provide "data and analyses that correspond to the defined area" or "as closely to the area as possible," 7 C.F.R. §273.23(f)(6), gives states this responsibility because States are more familiar with the reality of employment challenges confronting AWAWBs in particular areas.

More broadly, the state plaintiffs argued at the hearing that attempts to maximize waived areas are not in themselves manipulative. *See id.* at 49:24–50:14. To the contrary, plaintiff states viewed maximization within the waiver rules laid down by USDA as responsible state policy, preferring that funds appropriated for SNAP go directly to feed the needy rather than to bloat state agencies that enforce work requirements in unwaived areas. *Id.* at 50:10–14; *cf.* House Amicus Br. at 8 (stating that, during debate about the House version of the 2018 Farm Bill curtailing waivers, "[c]oncerns were raised that, while millions of people under the House bill would be losing their benefits, much of this money would be used to pay for a new SNAP bureaucracy to enforce work requirements" (internal quotation marks and alteration omitted)). Finally, the state plaintiffs argued that, if USDA had a different view of maximization, the agency could have "use[d] a scalpel to look at . . . particular waiver requests carefully," seeking "more information" about or "deny[ing]" applications that USDA viewed as not "supported by appropriate evidence." Rough Hr'g Tr. at 42:13–16. Instead, in state plaintiffs' view, USDA "thr[ew] out the baby with the bath water" in radically redefining waiver areas. *Id.* at 42:17.

If USDA did indeed think that states were manipulating the waiver process, then asking states why they were grouping as they were, requesting that states resubmit waiver applications

that USDA viewed as inappropriate, or outright denying such waiver applications, would have been a sensible course.  USDA, it appears, did none of that.[18]  That history is another sign that USDA's new policy eliminating state discretion in designing waiver areas is a solution in search of a problem.

### b.  Problems with LMAs

The plaintiffs also say that problems with USDA's new definition of "area in which the individuals reside" rendered it arbitrary and capricious.  7 U.S.C. § 2015(o)(4)(A).  On the current record, the plaintiffs are likely to succeed on this argument because considerable evidence before USDA posited that LMA was an inappropriate definition of area, and USDA's treatment of this evidence was "wanting."  *Gresham*, 950 F.3d at 102.  That evidence showed "LMAs are based on commuting patterns of the general workforce" and thus cannot capture available employment for "low-income, low-skilled ABAWDs who lack affordable transportation options."  84 Fed. Reg. at 66793.

The mismatch between available employment for ABAWDs and available employment across an LMA is starkest in large urban areas.  Take the District, an example before the agency.  *See id.* at 66796 (alluding to the District).  The LMA that includes the District comprises the District, sixteen counties in Virginia, five counties in Maryland, and one county in West Virginia.  *See* Bolen Decl. ¶ 29.  As a result, District ABAWDs would be subject to the work requirement if the unemployment rate is low in suburbs and exurbs of the District as far out as

---

[18]     The Final Rule pointed out that USDA "attempted" in 2016 "to clarify its intention that areas be economically tied through policy guidance."  84 Fed. Reg. at 66794 & n.8 (citing Guide to Supporting Requests to Waive the Time Limit for Able-Bodied Adults without Dependents).  That guidance states: "In order to be combined, the areas must be contiguous or considered parts of the same economic region. For example, two or more contiguous counties could be grouped together in order to consider their aggregate average unemployment rate." McConnell Decl., Ex. 3, Guide to Supporting Requests to Waive the Time Limit for Able-Bodied Adults without Dependents at 10, ECF No. 26-1.  Since USDA did not then begin denying or questioning waiver areas that it viewed as inconsistent with this guidance, unsurprisingly, this guidance did not "prevent[] States from strategically using grouping to maximize waived areas."  84 Fed. Reg. at 66794.

West Virginia, although these out-of-state counties are inaccessible by public transportation from the District and although unemployment rates in parts of the District are as high as 11.6%. Zeilinger Decl. ¶ 11.  Another example is New York City, which is part of an LMA including 25 counties in three states — New York, New Jersey, and Pennsylvania — that extends more than 100 miles from the City.  Banks Decl. ¶ 22–24.  New York City's current waiver encompasses the boroughs of the Bronx, Brooklyn, and Staten Island, along with four community districts in Manhattan, and three community districts in Queens.  *Id.*  ¶¶ 13–15.  About 64,500 ABAWDs who live in these areas, *see id.* ¶ 16, would be subject to the work requirement if the unemployment rate is sufficiently low across the tristate LMA, regardless of the barriers to employment within New York City.  Indeed, the plaintiffs anticipate that both the District and New York City would lose existing waivers under the Final Rule, given the relatively low unemployment rates in the LMAs as a whole.  *See* Bolen Decl. ¶ 29; Banks Decl. ¶ 24; State Pls.' Mot., Laura Zeilinger Decl. ("Zeilinger Decl.") ¶¶ 8, 11–12, ECF No. 3-19.

The Final Rule alludes to the fact that commenters raised examples like the District and New York City, *see* 84 Fed. Reg. at 66794 (acknowledging that "[c]ommenters gave examples in which some LMAs are too big to properly define commuting patterns for ABAWDs"), but USDA brushed off those examples, stating that the agency was "not compelled by the commenters' suggestions . . . that LMAs do not account for specific ABAWD commuting patterns and other factors specific to ABAWDs."  *Id.* at 66793.  Rejecting alternatives to LMAs proposed by commenters, USDA concluded that "LMAs remain the best available and most appropriate delineation to address the issue of grouping, as there are no Federally-designated areas that specifically assess commuting patterns and other related economic factors for ABAWDs."  *Id.*  Faced with evidence that, under the LMA definition, ABAWDs, especially

those in large urban areas, would be subject to the work requirement despite lacking access to sufficient jobs, USDA did no more than state that that this evidence was rejected.  "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."  *Gresham*, 950 F.3d at 103 (citing *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932 and then citing *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)).

Moreover, as justified, USDA's preference for LMAs is arbitrary.  Elsewhere in the Final Rule, USDA explicitly "recognize[d] that ABAWDs may face barriers to employment" not faced by the general population.  84 Fed. Reg. at 66787.  The LMA section of the Final Rule implicitly recognizes the same reality and acknowledges that USDA has discretion to adopt an approach that accounts for that reality.  USDA "note[d] that if in the future a more robust delineation" — meaning, a statistical area measuring "commuting patterns and other related economic factors for ABAWDs" — "becomes available from a Federal source," USDA would consider adopting that definition of area.  *Id.* at 66793.  USDA thus chose to exercise its discretion in a way that admittedly ignored critical factors about ABAWDs in service of two goals — ending grouping and relying only on federal government data —unsupported by the record before the agency and by the agency's explanation.  As already discussed, no evidence supported USDA's assertions about state abuse, and nothing required the agency to rely on already available federal data sources.  Those reasons do not stick here either.

*     *     *

USDA's conclusory reasoning and summary dismissal of extensive evidence submitted by commenters is particularly troubling in light of the reliance interests involved.  *Encino Motorcars, LLC*, 136 S. Ct. at 2126 (requiring "reasoned explanation" given the "significant

reliance interests involved").[19]   The Final Rule, USDA calculated, would "newly subject an estimated 1,087,000 ABAWDs to the time limit," and "the vast majority, approximately 688,000" people, would lose their benefits for failure to find work.  84 Fed. Reg. at 66809. These almost 700,000 individuals have depended on SNAP benefits to avoid hunger.  The states where these individuals live have depended on SNAP and the concomitant federal funding to ensure that the basic needs of their residents are met.  Especially when a change in policy risks disrupting interests as fundamental as access to nutrition, the law demands that the agency take care to explain and justify the change.

### C.   Absent Preliminary Relief, Plaintiffs will Suffer Immediate, Irreparable Harm

The plaintiffs have shown that they "would suffer irreparable injury if the injunction were not granted."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The analysis starts with the state plaintiffs, then turns to BFC and the individual plaintiffs.

### 1.   State Plaintiffs

The state plaintiffs assert that they will suffer irreparable harm in the form of significant administrative burdens and costs, including staffing and training costs, notification costs, and costs from expanding employment and training programs.  *See* State Pls.' Mem. at 38–43.  The Rule would trigger these burdens by restricting states' flexibility in using waivers.  The Center for Budget and Policy Priorities' declaration predicts that 65% of currently waived counties and

---

[19]     *Encino Motorcars* is one of several cases addressing the obligations to explain that attach to agency actions departing from "longstanding policies [that] may have 'engendered serious reliance interests.'"  136 S. Ct. at 2126 (quoting *Fox Television.*, 556 U.S. at 515).  Some read these cases as imposing requirements on agencies beyond those imposed where reliance interests are not found, *see* State Pls.' Mem. 35–38 (arguing that a heightened standard applies in this case), but a heightened standard has not been applied here.  Instead, simply put, USDA failed to "articulate a satisfactory explanation" for its choice under the typical arbitrary and capricious standard. *State Farm*, 463 U.S. at 43.

92% of currently waived towns will lose their waivers.  Bolen Decl. ¶ 5.  State plaintiffs predict

that areas of each of their states will lose existing waivers as a result of the Final Rule.[20]  The

District, for example, anticipates losing the statewide waiver held since PRWORA became

effective in 1997.  *See* Zeilinger Decl. ¶ 10.  New York state "estimates that as a result of the

Final Rule, only one county in the State consisting of seven ABAWDs, will qualify for" a

waiver.  Jeffrey Gaskell Decl. ("Gaskell Decl."), ¶ 18 ECF No. 3-8.  Currently, 113,445 New

York ABAWDs live in waived areas.  *Id.*  Across the plaintiff states, and indeed the country, loss

of waivers will mean applying the work requirements to hundreds of thousands of additional

ABAWDs, even where the lack of sufficient jobs for this group may persist and the states,

though scrambling now, currently lack the infrastructure necessary to provide alternative

mechanisms to meet the work requirements, such as employment and training programs, or

process status exemptions.

As a threshold matter, USDA claims that "the costs of compliance with a regulatory

scheme do not constitute irreparable injury."  USDA's Opp'n at 58 (quoting *Nat'l Med. Care,*

*Inc. v. Shalala*, No. 95-0860 (WBB), 1995 WL 465650, at *3 (D.D.C. June 6, 1995)).[21]

---

[20]     Banks Decl. ¶ 24 (predicting that New York City will lose its waiver); Tikki Brown Decl. ("Brown Decl.")
¶ 5, ECF No. 3-3 (anticipating that only 3 of Minnesota's 26 currently waived counties will continue to qualify for a
waiver); Buhrig Decl. ¶ 8 (stating that only two of Pennsylvania's 60 currently waived counties will qualify under
the Final Rule); Fernández Decl. ¶ 28 (stating that 34 counties in California will likely lose their waivers); Steve
Fisher Decl. ("Fisher Decl.") ¶ 7, ECF No. 3-6 (stating that three Nevada counties will lose their waivers); Holly
Freishtat Decl. ("Freishtat Decl.") ¶ 10, ECF No. 3-7 (stating that the Final Rule "effectively disqualifies the
Baltimore Region from qualifying for an area waiver"); Deirdre Gifford Decl. ("Gifford Decl.") ¶ 14, ECF No. 3-9
(calculating that five Connecticut cities will lose their waivers); Daniel Haun Decl. ("Haun Decl.") ¶ 13, ECF No. 3-
11 (stating that "only 6 counties" in Oregon "may be eligible for a waiver," while 31 counties currently have
waivers); Brittany Mangini Decl. ("Mangini Decl.") ¶ 7, ECF No. 3-14 (stating that Massachusetts currently has 83
waived towns and cities and none would be eligible for waivers because none "are located in Labor Market Areas
that meet the six percent floor"); Elisa Neira Decl. ("Neira Decl.") ¶¶ 8–9, ECF No. 3-16 (stating that New Jersey
currently has a waiver in fifteen counties and predicting that thousands will lose their benefits in the state); S. Duke
Storen Decl. ("Storen Decl.") ¶ 10, ECF No. 3-17 (stating that Virginia has a waiver for 55 localities, but that at
most 5 of those would qualify for waivers under the Final Rule); Dawn Sweeny Decl. ("Sweeney Decl.") ¶¶ 8,11
(stating that at most 11 counties in Michigan would qualify for waivers under the Final Rule, compared to 77
counties that would have qualified under the 2001 regulation).
[21]     USDA cites *Nat'l Med. Care, Inc. v. Shalala*, No. 95-0860 (WBB), 1995 WL 465650, at *3 (D.D.C. June
6, 1995), which relies on an outdated, out-of-circuit case, *A.O. Smith Corp v. FTC*, 530 F.2d 515, 527 (3rd Cir.

Although as a "general rule[,] . . . economic harm does not constitute irreparable injury," *Davis*, 571 F.3d at 1295, economic loss caused by federal agency action is an exception: typical economic harm is not irreparable because it is generally recoverable as monetary damages, *see id.* (citing *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995)), whereas economic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims, *see* 5 U.S.C. § 702 (allowing relief "other than money damages"); *see California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (stating that economic harm caused by federal agency action "is irreparable . . . because the states will not be able to recover monetary damages"); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."); *Pennsylvania v. Trump*, 930 F.3d at 574 ("Because the States cannot collect money damages under the APA, the States will suffer irreparable harm if the Rules are enforced." (citations and footnote omitted)).[22]

USDA presses that, "even if the court considers these costs," they cannot constitute irreparable harm because the training harms are "self-inflicted" and the other harms are "neither

---

1976). *See Am. Hosp. v. Harris*, 625 F. 2d 1328, 1331 (7th Cir. 1980) (relying on *A.O. Smith* as well). Most problematic for USDA is the fact that the Third Circuit recently rejected the principal USDA advances, holding in no uncertain terms that "financial consequences" resulting from federal regulation are irreparable harm. *Pennsylvania v. Trump*, 930 F.3d 543, 574 (3d Cir. 2019), *cert. granted sub nom. Little Sisters of Poor v. Pennsylvania*, No. 19-431, 2020 WL 254158 (U.S. Jan. 17, 2020), *and cert. granted sub nom. Trump v. Pennsylvania*, No. 19-454, 2020 WL 254168 (U.S. Jan. 17, 2020).

[22]      The D.C. Circuit has not squarely addressed the irreparability of economic losses caused by federal agency action but has repeatedly affirmed that economic injury is "irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'"  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wis. Gas Co.*, 758 F. 2d at 674)).

'certain' nor 'great.'"  USDA's Opp'n at 58 (quoting *Wis. Gas Co.*, 758 F.2d at 674).  These characterizations are inaccurate.

To begin, the state plaintiffs claim that implementing the Rule will require allocating resources to train new or existing staff to implement the ABAWD time limits in previously waived areas.  *See* Brown Decl. ¶ 10 (asserting that staff time and training will cost Minnesota at least $500,000); Fernández Decl. ¶¶ 49–50 (averring that the Rule will require California "to provide extensive training to our forty counties on a very tight timeline" and describing the extensive training previously provided to the six counties in California "currently implementing the time limit"); Gifford Decl. ¶ 21 (stating that "all eligibility staff [in Connecticut] will need to be retrained in ABAWD case administration, given that the new rule greatly expands the number of statewide ABAWD cases"); Haun Decl. ¶¶ 18–19 (declaring that "[t]en (10) months of onboarding activities will be necessary in a matter of three months . . . to ensure those areas [of Oregon] are ready to serve ABAWDs"); Storen Decl. ¶ 23 (explaining that Virginia will need to "train staff from 55 local departments of social services who now need to implement this policy"); Zeilinger Decl. ¶ 13 (anticipating hiring new staff because the District does not currently administer the work requirements).

USDA argues that this harm is self-inflicted because states have always been required to "track whether ABAWDs subject to the time limit are or are not meeting the work requirements," even in waived areas.  USDA's Opp'n at 59 (quoting McConnell Decl., Ex. 30, FNS, Memorandum to All Regional Directors of SNAP (May 25, 2018) ("2018 FNS Memo") at 3).  True, USDA had advised states, at least since 2018, to "measure the 3-year period and track ABAWDs on a continuous basis."  2018 FNS Memo at 3.  In USDA's own words, however, that was "so that [the state] will be ready to transition off-of [sic] the waiver when it expires and

reintroduce the time limit," 2018 FNS Memo at 3.  States with no reason to anticipate the demise

of a waiver under the 2001 regulation would have no reason to implement the time limits in

waived areas.  Indeed, to have done so, as the states put it, "would have been a misuse of

government resources."  State Pls.' Reply at 27.  In other words, states were not previously

subject to a blanket requirement to track in waived areas, so the complained-of training costs

would "directly result from" the regulatory changes announced in the Rule, *Wis. Gas Co.*, 758

F.2d at 674, not from state "neglect[]," USDA's Opp'n at 58.

In any event, the case cited by USDA for the idea that self-inflicted harm cannot be

irreparable is not talking about the kind of harm USDA calls self-inflicted.  *See* USDA's Opp'n

at 58–59 (relying on *Barton v. DC*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001)).  Rather, self-

inflicted generally means curable by the moving party without an injunction.  So, in *Barton*, a

business owner could not make the requisite showing of harm threatening the business's

existence because the business owner had ways to avoid destruction of the business short of an

injunction.  *Barton*, 131 F. Supp. 2d at 247.[23]  This conception of self-inflicted irreparable harm

is echoed in standing doctrine, where plaintiffs "cannot manufacture standing merely by

inflicting harm on themselves."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see*

*also California*, 911 F.3d at 573–74 (analyzing the argument that states' asserted harms

stemming from a federal administrative action were "self-inflicted" by the states as a standing

issue); *Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) (same).  Here, USDA has not

---

[23]     Similarly, in *San Francisco Real Estate Investors v. Real Estate Investment Trust*, 692 F.2d 814 (1st Cir. 1982), relied on by *Barton*, the injury asserted by plaintiff's motion for preliminary injunction was market uncertainty stemming from the plaintiff's filing of the lawsuit.  *Id.* at 818; *see also Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) ("[T]ypically, a finding of self-inflicted harm results from either misconduct or something akin to entering a freely negotiated contractual arrangement.").

alleged that states administered their SNAP programs to manufacture injuries, nor has the USDA contended that the states could now avoid the training costs absent equitable relief.[24]

Next, the state plaintiffs assert that implementing the time limits in previously waived areas requires states to give notice to ABAWDs about the time limits, the work requirements, the available exemptions, and about any loss of benefits.  Developing these notices, which must comport with complex legal requirements, *see, e.g.*, 7 C.F.R. § 273.13 (Notice of Adverse Action), is burdensome, especially for states like the District that do not currently administer the time limits, *see* Zeilinger Decl. ¶ 13 ("The District would also need to develop and disseminate notices to impacted and potentially impacted households advising of their ABAWD status, rights and responsibilities with respect to the new work requirements, reporting obligations, and advanced notice of any adverse actions taken on their SNAP cases as a result of the Final Rule's implementation.").  Even states that have notices drawn up for use in areas currently subject to the time limits, aver that "significant amendments" to those sample notices "will be required to address issues specific to the expedited timeframe for implementation and the anticipated elimination of the State's carryover of discretionary exemptions."  Fernández Decl. ¶ 52 (California).

Once the notices are drafted, states will need to assess which of the thousands of ABAWDs in the state need notice and will need to "execute the mailings."  Gifford Decl. ¶ 20 (Connecticut); *see also* Brown Decl. ¶ 10 ("Eligibility workers [in Minnesota] will have limited time to reassess affected cases and send proper 10-day notices to ABAWDs whose SNAP benefits must stop after implementation of the Rule."); Mangini Decl. ¶ 10 (describing the "case

---

[24]    To the extent USDA argues that the states' proof does not establish that the training costs are "certain," *see* USDA's Opp'n at 59–61 (quoting *Wis. Gas Co.*, 758 F.2d at 674), the declarations establish with the requisite certainty that implementation of the Rule will cause them to incur the staffing and training costs already described.

review process to identify SNAP recipients who may become newly subject to ABAWD work requirements under the Rule" in Massachusetts); Gaskell Decl. ¶ 19 (noting that districts in New York state are "review[ing] their current caseload to identify individuals who will be subject to the ABAWD requirements" through a "labor intensive, manual process" that "requires running caseload reports and manually reviewing each case record and sending manual notices").  In some states, completing this notice process will entail "reprogram[ming]" computer systems that track SNAP recipients.  Neira Decl. ¶ 10 (New Jersey); *see also* Fernández Decl. ¶ 52 (declaring that California's "three eligibility Information Technology (IT) systems, particularly noticing and client reporting mechanisms, will have to be newly implemented or updated and prioritized over existing high priority projects."); Gifford Decl. ¶ 20 (stating that Connecticut will need to "make system coding changes to execute the mailings").

States estimate that the total monetary costs of noticing ABAWDs will be in the hundreds of thousands of dollars.  *See id.* (predicting that Connecticut's "[a]dministrative costs will include a minimum of $207,500 just for the costs of direct communications to all ABAWDs, plus costs to develop notices and make system coding changes to execute the mailings); Zeilinger ¶ 13 (averring that the District will "incur hundreds of thousands of dollars in additional costs each year that would detract from other elements of the District's SNAP and potentially other programs"); Buhrig Decl. ¶ 13 (estimating that Pennsylvania's total cost, for both notice and administration, will be "$2,250,000, plus a one-time cost of $56,050").

At the hearing, the state plaintiffs also emphasized that they were preparing to "add staff" to "supply denial hearings" to beneficiaries who challenge the termination of their benefits. Rough Hr'g Tr. at 33:14–15; *see also id.* at 56:24–57:1 (explaining that "people that lose benefits are entitled to administrative hearings under the Due Process Clause").  For example,

Connecticut, like other states, "anticipate[s] a significant rise in the number of hearings requested," and plans to hire "additional hearing officers," who, in that state, have "an average annual salary of approximately $131,500."  Gifford Decl. ¶ 20; *see also* Buhrig Decl. ¶ 18 ("An increase in appeals for case closures will add additional administrative costs."); Fernández Decl. ¶ 72 (stating that the Final Rule will "create a substantial burden on [California's State Hearings Division] and will lead to delays in hearings, which violate the rules of SNAP and the many other programs for which SHD provides administrative review"); *cf.* Sweeney Decl. ¶ 17 (expressing "concern[] about the substantial resources that would be needed to defend against legal challenges from ABAWDs who lose access to SNAP benefits").

USDA argues that these allegations of harm are too "conclusory" to be certain, USDA's Opp'n at 59, but USDA's position is belied by the Final Rule itself.  There, USDA acknowledged and quantified this very burden.  USDA estimated that noticing the 688,000 ABAWDs expected to lose their benefits would take "45,867 hours" and that "[t]he total start up burden for State agencies will result in 84,463 burden hours."  84 Fed. Reg. at 66809.  So, USDA has actually "done much of the legwork in establishing," at least in broad strokes, the certainty, as well as the magnitude of this harm.  *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 224–25 (1st Cir. 2019) (relying on Regulatory Impact Analysis done by agency to establish plaintiffs' injury for purposes of standing analysis).  The states' descriptions of the steps required to provide notice to ABAWDs in formerly waived areas fill in the concrete details.

Undeterred by its past findings, USDA's next objection is that the regulatory burdens are not "great."  USDA's Opp'n at 60–61 (quoting *Wis. Gas Co.*, 758 F.2d at 354).  The state plaintiffs counter that "economic harm under these circumstances need not be 'great' to meet the irreparable injury standard," State Pls.' Reply at 24, and that they need only show that "Plaintiffs

will suffer (and indeed already are suffering) economic harm that is certain and unrecoverable," *id.* at 25.[25]  The question of the proper standard is ultimately academic, though, because the state plaintiffs have shown that their anticipated injuries are significant.  Changes of this scope to a complex program serving about forty million people nationwide are self-evidently onerous to implement.  As the state declarations describe, rewriting legal notices, combing through thousands of ABAWD files, mass mailing thousands of citizens, and training staff and building technological infrastructure to do all of that is a massive undertaking, especially on a very short time frame of less than three months.

USDA argues that state-by-state cost estimates, supported by evidence like financial statements or budget projections, are the only way to "substantiate" the states' claims of significant loss.  USDA's Opp'n at 59–60.  No such proof requirement has ever been adopted in this Circuit, however.  As support for such a requirement, USDA leans on *CAPPS*, *see id.* at 57– 61, where plaintiffs seeking a preliminary injunction of part of an agency rule could not

---

[25]     In arguing this, state plaintiffs misread *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) (Howell, C.J.).  *See* State Pls.' Reply at 25.  *Open Communities Alliance* did not deem a great harm requirement inapplicable to claims of unrecoverable economic harm.  *See id.* (reading the case this way).  Rather, *Open Communities Alliance* deemed inapplicable to unrecoverable economic harm *Wisconsin Gas*'s existential harm requirement. 286 F. Supp. 3d at 178 (quoting *Wis. Gas Co.*, 758 F. 2d at 674).  *Wisconsin Gas* held that monetary harm, to be irreparable, must "threaten the very existence of the movant's business."  *Wis. Gas Co.*, 758 F. 2d at 674.  Not even USDA argues here that the states must show an existential budgetary threat.
        To elaborate on this point, some courts have held that any unrecoverable economic loss is "irreparable *per se*," no matter the magnitude.  *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (citing *United States v. State of N.Y.*, 708 F.2d 92, 93–94 (2d Cir.1983)); *see also California*, 922 F.3d at 571 (noting that, in the Ninth Circuit, "[t]here is also no requirement that the economic harm be of a certain magnitude").  More typically, however, some form of a significance test has been imposed in this district on claims of irreparable harm from irrecoverable financial loss.  *See, e.g., Cal. Ass'n of Private Postsecondary Sch. v. DeVos* (*CAPPS*), 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("But it proves too much to suggest that 'irreparable' injury exists, as a matter of course, whenever a regulated party seeks preliminarily to enjoin the implementation of a new regulatory burden.  *See Air Transport Ass'n of Am., Inc. v. Export-Import Bank*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012).  Rather, an asserted 'economic harm' must 'be significant, even where it is irretrievable because a defendant has sovereign immunity.'  *Id.* at 335."); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 26 (D.D.C. 2012) (stating that "it remains incumbent on plaintiffs" claiming unrecoverable losses "to demonstrate, first, that they are threatened with serious injury." (emphasis omitted) (citing *N. Air Cargo v. USPS*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010) and then citing *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)); *Gulf Oil Corp.*, 514 F. Supp. at 1026 (requiring the injury to be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff").

demonstrate irreparable harm using five declarations that all "recite[d] the same boilerplate conclusion" that implementing the rule would be burdensome and disruptive. *CAPPS*, 344 F. Supp. 3d at 171. The declarations "sa[id] nothing about the extent of th[e] cost" or about when it would be incurred. *Id.* By contrast, here, the states' declarations, albeit in varying degrees of detail, are concrete and specific, not boilerplate and identical. Further, the states provide representative estimates of the monetary costs of implementing the Rule. That is enough proof.

Finally, USDA objects that "[t]he few proffered estimates demonstrate that the states' injuries are insufficient 'in proportion to the plaintiffs' operations,'" as quantified by the total state budgets. USDA's Opp'n at 61 (quoting *Gulf Oil*, 514 F. Supp. at 1025). Discerning whether an unrecoverable injury is irreparable is not a mathematical judgment, but, even if it were, USDA's proportion argument uses the wrong denominator. The proper reference point would be the budget for the relevant state agency or program, as "[s]tates cannot simply . . . move money from one agency or program to another." State Pls.' Reply at 25 n.8.

The states have shown that their SNAP costs are likely to increase exponentially. Adding to the states' burdens in retraining staff and noticing ABAWDs, discussed above, are the state declarations' averments that states' current SNAP Employment & Training (E&T) programs could not accommodate demand from the thousands of ABAWDs who will be subject to the work requirements. *See* Buhrig Decl. ¶ 16 (Pennsylvania); Fisher Decl. ¶¶ 9–10 (Nevada); Gifford Decl. ¶ 24 (Connecticut); Dawn Sweeney Decl. ("Sweeney Decl.") ¶ 15, ECF No. 3-18 (Michigan); Zeilinger Decl. ¶ 15 (the District). This demand could increase tenfold three months after the effective date for implementation of the time limits, when ABAWDs unable to find employment will lose their benefits. *See* Gifford Decl. ¶ 24 (anticipating that demand in Connecticut will increase tenfold). Connecticut estimates that right-sizing their E&T programs

would cost $1 to 2 million annually, just for the staff, *see id.*, and Pennsylvania predicts that increasing capacity to meet demand would cost $21 million over six years, Buhrig Decl. ¶ 16. Federal cost sharing would be inadequate to cover the needed expansions of state E&T programs. *See id.*; Sweeney Decl. ¶ 15; Zeilinger Decl. ¶ 15.

Based on these attested-to estimates of additional E&T costs, the burdens of training new and existing staff, and the burdens associated with noticing ABAWDs, the state plaintiffs have shown that absent an injunction or stay they will suffer immediate, irreparable injury in the form of significant regulatory and administrative burdens. As a result, state plaintiffs' other complained-of injuries — increased Medicaid and other program expenditures triggered by the negative health effects of food insecurity and harm to states' economies, *see* State Pls.' Mem. at 41–43 — need not be evaluated.[26]

### 2.    Private Plaintiffs

The state plaintiffs' showing of irreparable harm is enough to support the injunctive relief ordered, without analysis of the irreparable harm claimed by BFC and the two individual

---

[26]      The state plaintiffs' Medicaid argument is premised on the uncontested link between hunger and health. *See* Heather Heartline-Grafton Decl. ("Hartline-Grafton Decl.") ¶ 6, ECF No. 3-10 (declaration from the Food Research & Action Center). Food insecurity "contributes to poor physical and mental health outcomes." *Id.* Inadequate nutrition increases the prevalence of diseases, "including obesity, type-2 diabetes, heart disease, stroke, and some cancers." *Id.* Unsurprisingly, then, SNAP "improv[es] health outcomes," as numerous studies have shown. *Id.* ¶ 10.

The current pandemic of coronavirus disease further highlights the connections between health and the SNAP program. "Data from the Bureau of Labor Statistics shows that low-wage workers are far less likely to have access to paid sick leave or paid family leave." Bolen Decl., Ex. A, Comment of Center on Budget and Policy Priorities on Final Rule, at 44. The pandemic has put these already more vulnerable workers at higher risk of losing much-needed income, or even their jobs. Recognizing this, the Families First Coronavirus Response Act, proposed in the House of Representatives, includes special waivers of the work requirements in times of national health emergencies. *See* H.R. 6201, 116th Cong. §§ 301, 302 (2020). Under the Final Rule's waiver policy, as it stands now, states have lost the flexibility they would need to obtain waivers of the work requirements in areas smaller than an LMA that may become, for example, a "hotspot" in the current pandemic or to target quickly any area for a waiver because under the Final Rule states would have to wait for national or regional unemployment rates to catch up with the emergency.

plaintiffs.  Nevertheless, these plaintiffs have also established irreparable harm.  USDA's

arguments to the contrary are misplaced, as explained below.

As a threshold matter, USDA contends that these plaintiffs "lack standing to assert" their

complained-of irreparable injuries.  USDA's Opp'n at 53.  In mounting this argument, USDA at

times elides Article III's standing test and equity's irreparable harm analysis.  *See e.g.*, *id.* at 56

(arguing that "the alleged harm to Bread to the City is also insufficient to establish standing and,

accordingly, irreparable harm").  Although "case-or-controversy considerations 'obviously shade

into those determining whether a complaint states a sound basis for equitable relief,'" *City of Los*

*Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499

(1974)), the concepts of an Article III cognizable injury and an irreparable harm are not

coterminous, as will be discussed further later, *see In re Navy Chaplaincy*, 534 F.3d 756, 762

(D.C. Cir. 2008) (rejecting the idea that establishing irreparable harm establishes standing); *Food*

*& Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (observing that standing

arguments are properly raised in opposition to a motion to for a preliminary injunction under the

prong of likelihood of success on the merits).  For clarity, USDA's standing and irreparable harm

arguments will be disentangled and addressed separately.[27]

### a.   Bread for the City

BFC is a "front-line agency serving [District] residents experiencing poverty."  George

Jones Decl. ("Jones Decl.") ¶ 4, *Bread for the City*, No. 20-cv-127, ECF No. 4-6.  The

organization's mission "is to help th[o]se residents develop the power to determine the future of

---

[27]      Although plaintiffs here "filed their complaint and moved for a preliminary injunction
contemporaneously," *Food & Water Watch* indicates that the standard applicable to evaluating USDA's standing
arguments for purposes of resolving the motion for a preliminary injunction is the summary judgment standard, not
the motion to dismiss standard.  808 F.3d at 912–13 (stating that "an inability to establish a substantial likelihood of
standing requires denial of the motion for preliminary injunction" and that the "correct" approach for "determining
whether or not to grant the motion for a preliminary injunction" is the summary judgment standard).

their community." *Id.* BFC, which operates two centers in the District providing food, clothing, medical care, legal services, and social services, reaches 31,000 individuals annually. *Id.* Among these individuals are "16,000 unique households" of "26,000 individuals" who collected "nutritious groceries" from one of BFC's two food pantries. *Id.* ¶ 8 (discussing fiscal year 2019).

"Many of" BFC's "clients have received or currently receive SNAP benefits." *Id.* Indeed, about 110,000 District residents, including 14,500 ABAWDs, received SNAP benefits in fiscal year 2019. *See id.* ¶ 7; Zeilinger Decl. ¶ 8. As a result of the Final Rule, the District expects to lose its waiver, *see* Jones Decl. ¶ 7; Zeilinger Decl. ¶ 10, and the District estimates that the loss of the waiver will cause 80% to 90% of the ABAWD recipients — between 11,6000 and 13,050 individuals — to lose their SNAP benefits, *see* Jones Decl. ¶ 7; Zeilinger Decl. ¶ 8.

BFC claims that a chain of events set off by the Rule will cause BFC irreparable harm: when District ABAWDs' SNAP benefits are terminated, those individuals will turn to BFC's food assistance program, increasing demand and forcing BFC to divert resources to its food assistance program and to helping ABAWDs navigate the new time limits and away from other social service programs and from legislative advocacy and community organizing. *See* Jones Decl. ¶¶ 9–14.

USDA's argument that this alleged harm "is insufficient to establish standing," USDA's Opp'n at 56, focuses on the requirement that an organizational plaintiff show "a concrete and demonstrable injury to [its] activities," *Food & Water Watch*, 808 F.3d at 919 (alteration in original) (quoting *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)). BFC has satisfied that requirement at this stage of the litigation by showing that implementation of the Rule would "inhibit[]" its "daily operations" and that it will "use[] its resources to counteract that harm." *Id.* (quoting *PETA*, 797 F.3d at 1094). In *PETA*, for example, PETA had standing to challenge

inaction by USDA because USDA's failure to regulate had forced PETA to expend resources

seeking regulation from states and stepping in to address gaps in regulation.  *See PETA*, 797 F.3d

at 1095–96.  Similarly, here, BFC alleges that it will be required to step in to make up the gaps in

benefits caused by USDA's Rule and that this compensation will demand organizational

resources.  *See* Jones Decl. ¶¶ 9–14.

The case USDA relies on, *Cigar Ass'n of Am. v. FDA*, 323 F.R.D. 54 (D.D.C. 2017), is

not to the contrary.  There, proposed organizational intervenors lacked standing to defend FDA

regulations imposing warning requirements on tobacco products.  *Id.* at 57.  The intervenors

alleged that vacatur of the regulations would increase demand for their services, but those

services were educational, *id.* at 61–63, and "an organization does not suffer an injury in fact

where it 'expend[s] resources to educate its members and others.'"  *Food & Water Watch*, 808

F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir.

1995)).  Such an injury is too abstract or ideological to constitute injury in fact, unless it comes

with proof of an attendant increase in "operational costs."  *Nat'l Taxpayers Union*, 68 F.3d at

1433–34.  No intervenor showed "that it would incur" abnormal "operational costs."  *Cigar*

*Ass'n*, 323 F.R.D. at 63.  In contrast, BFC alleges that implementation of the Final Rule would

compel the expenditure of additional resources on non-educational services, including food

assistance and "medical and social work."  *See* Jones Decl. ¶¶ 9, 11, 13.  To the extent BFC

alleges that it will need to do additional education of and outreach to its clients, BFC has

established that these efforts will lead to "operational costs beyond those normally expended."

*Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434); *see*

Jones Decl. ¶ 11 (alleging that "Bread will need to engage in new outreach efforts to educate

District residents about the Rule" and that BFC will need to "dedicate more staff time to

conducting outreach within and outside of Bread"); *id.* ¶ 12 ("Bread for the City will need to allocate more resources away from existing projects to the provision of legal and/or social services to address" the increased difficulty of applying for and maintaining SNAP).

BFC has also shown irreparable harm because the Rule will "perceptibly impair[]" BFC's programs, *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)), and the Rule "directly conflict[s] with" BFC's mission, *id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  Implementation of the Rule will cause BFC to expend its limited resources meeting demand for food assistance and helping ABAWDs navigate the new requirements.  *See* Jones Decl. ¶¶ 9, 11–13.  BFC alleges that this resource diversion will necessarily impair other BFC programs advancing its mission, *see id.* ¶ 9, including its "systemic advocacy and fundraising efforts," *id.* ¶ 14 (describing those efforts in detail).  Finally, the resource diversion will impair BFC's efforts to hire additional staff to fill 13 open positions, and understaffing "negatively impacts [BFC's] ability to fulfill its mission." *Id.* ¶ 10.

These harms from the forced diversion of resources are similar to those recognized as irreparable harm in other suits.  *See, e.g., Open Communities Alliance*, 286 F. Supp. 3d at 178 (finding irreparable harm because plaintiff had "changed its activities" and "diverted scarce resources away from previously planned projects" as a result of agency inaction); *League of Women Voters*, 838 F.3d at 8 (citing *Fair Emp't Council of Greater Wash., Inc.*, 28 F.3d at 1276 and *Nat'l Treasury Emps. Union v. United States*, 101 F.3d at 1430) (finding irreparable harm where organization's key project of voter registration drives would be impaired); *see also E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) ("Organizations

'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from other sources." (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

In sum, BFC has demonstrated irreparable harm from the waiver aspects of the Final Rule.

### b.    *Individual Plaintiffs*

Smith and Tann both currently receive $194 monthly in SNAP benefits.  Smith Decl. ¶ 21; Tann Decl. ¶ 21.  Smith, who is 45 years-old, "ha[s] been chronically homeless for many years, but . . . currently ha[s] a housing voucher from" the District enabling him to rent an apartment with a "rent obligation" of "$0 a month."  *Id.* ¶ 4.  Smith, who graduated from high school and completed a year of college, "ha[s] significant skills and experience" working construction, and has "occasionally worked short-term construction jobs" recently, when "able to get them."  *Id.* ¶¶ 5, 9, 12.  "[S]erious mobility issues" related to "a major accident in 2006," however, prevent Smith from taking "regular employment in construction."  *Id.* ¶¶ 11–12.  "To make ends meet," Smith sells newspapers with Street Sense Media, a nonprofit that publishes a biweekly newspaper about poverty and homelessness that is sold in public spaces "by people experiencing homelessness or poverty."  *Id.* ¶ 8.  "On a good day," this work yields "about $20 in donations."  *Id.*

Smith identifies other obstacles to his finding steady employment, in addition to his mobility issues: He "ha[s] not had a valid driver's license since the early 2000s," and obtaining one would require paying "nearly $1,000 in unpaid traffic tickets," which he cannot afford.  *Id.* ¶ 15.  Smith is thus "restricted to jobs that are accessible by public transportation."  *Id.*  Finally, he has been diagnosed with post-traumatic stress disorder, anxiety, and bipolar II depression,

which "make it difficult for [him] to maintain healthy interpersonal relationships with superiors and coworkers." *Id.* ¶ 13.

Tann, who is 28 years-old, lives with her 95-year-old grandmother in the District.  Tann Decl. ¶ 1, 3.  She "g[ave] up on . . . having her own apartment" to "cut expenses" because she has "significant student loans and very little income." *Id.* ¶ 6.  Tann attended college for several semesters, but "withdrew for financial reasons." *Id.*  ¶ 4.  Although Tann has been "actively searching for employment," she has been "most[ly] unemployed" for the last two years. *Id.* ¶¶ 7, 9.  During those two years, Tann has been on the roster of a temporary staffing agency in the District, and has done clerical and administrative assistant work at a few placements. *See id.* ¶¶ 7–9.

In her "efforts to find regular employment," Tann says she has "encountered several barriers." *Id.* ¶ 10.  First, Tann "ha[s] been diagnosed with anxiety, depression, and ADHD," which "interfere with" her "motivation" and "ability to focus." *Id.* ¶ 11.  Second, she "do[es] not have a car," and therefore can only work in jobs accessible by public transit. *Id.* ¶ 12.  For example, Tann has "worked as a bartender in the past, but" finds it impossible to "bartend or work as a server now because of the hours — the [District's] Metro closes earlier than bars and restaurants close." *Id.* ¶ 12.  Third, Tann "pled guilty to two misdemeanors" in Virginia in 2018, for which she "was sentenced to 24 months of probation." *Id.* ¶ 14.  These convictions have caused companies to "rescind[] . . . offer[s]" of employment "after conducting a criminal background check." *Id.* ¶ 16.  In addition, her frequent "court-mandated appointments during business hours" have made it hard for her to maintain jobs. *Id* ¶ 17; *id.* ¶ 19 (stating her belief "that my frequent absences during work hours contributed to my most recent employer's decision not to hire me on a permanent basis.").

Tann "avoided applying for food stamps because of the stigma," but her "situation . . . bec[a]me dire" in January 2020, and she began receiving SNAP benefits then.  Tann Decl. ¶ 21. Tann recognizes that the benefits "provide an invaluable safety net" and that without them, she will experience greater "food insecurity" and "financial instability."  *Id.* ¶ 22.  Smith, too, says that he "would experience hardship without food stamps" because he has "gone for periods without them."  Smith Decl. ¶ 22.  "[W]ithout food stamps," he "cannot guarantee that" he "will be able to eat."  *Id.*

Going without food is an irreparable harm.  This sort of deprivation of nutrition, and the psychological and physical distress attending that deprivation, are "quite likely to impose lingering, if not irreversible" effects on the individual plaintiffs.  *Haskins v. Stanton*, 794 F.2d 1273, 1276 (7th Cir. 1986) (finding irreparable harm in a case involving the Food Stamp Act); *see also Garnett*, 313 F. Supp. 3d at 157 (same).  Those effects are ones that "back payments cannot erase."  *Garnett*, 313 F. Supp. 3d at 157 (quoting *Kildare v. Saenz,* 325 F. 3d 1078, 1083 (9th Cir. 2003)).

USDA does not contend otherwise.  Instead, USDA argues that Smith and Tann "lack standing — or at a minimum, their injury is not yet ripe for adjudication — because the alleged irreparable injury 'may not occur at all.'"  USDA's Opp'n at 55–56 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Most generally, USDA objects that the allegation that Smith and Tann "will continue to be unemployed" when their three-month time limits expire "is necessarily speculative."  *Id.* at 54.  More specifically, USDA asserts that the plaintiffs "are likely excepted from the ABAWD requirements," USDA's Opp'n at 55, because they should be "medically certified as physically or mentally unfit for employment," *id.* at 56 (quoting 7 U.S.C. § 2015(o)(3)(B)).  Under the applicable federal regulations, individuals can qualify for medical

certification if they are "obviously mentally or physically unfit for employment as determined by" a state, or if they "provide[] a statement from" "medical personnel" that a state "determines appropriate." USDA's Opp'n at 55 (quoting 7 C.F.R. § 273.24(c)(2)(ii)–(iii)). As a result, USDA says, any injury is "speculative" because "it is currently unknown whether these Plaintiffs would qualify for a medical certification" by the District. *Id.*

The general objection is easily dismissed. Both Smith and Tann have searched for regular employment for years without success, and the barriers and obstacles that have plagued those efforts — lack of access to transportation, physical and mental conditions, and criminal convictions — will not disappear. Add to this the structural factors of the District's labor market that make it difficult for individuals like Smith and Tann to obtain employment or job training. *See* Zeilinger Decl. ¶¶ 11 (describing unemployment Wards 5, 7, and 8 of the District); 12 (describing market-related barriers to employment such as the mismatch between the education level of the District's ABAWDs and the District's highly skilled job market). In short, "there is a 'substantial risk' that" Smith and Tann will not satisfy the work requirements three months after the effective date of the Final Rule. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 & n.5).

As to USDA's more specific objection that these individual plaintiffs may be exempted from the work requirement, the plaintiffs respond that "the need to take [the] affirmative step[]" of applying for a certification "to avoid the risk of harm" is itself an injury that establishes standing. Private Pls.' Reply at 19 (quoting *Meese v. Keene*, 481 U.S. 465, 475 (1987)). Even putting that argument aside, USDA's contention is unconvincing. All the plaintiffs need to do is show that "the threat of future" loss of benefits is "substantial," *Susan B. Anthony List*, 573 U.S. at 164 (concluding that "the threat of future enforcement" action was "substantial"), rather than

"imaginary or speculative," *id.* at 165 (quoting *Babbitt v. United Farm Workers Nat.'l Union*, 442 U.S. 289, 298 (1979)).  Smith and Tann have shown that the District is likely to lose its waiver and that they are unlikely to have employment when their three-month clocks run out. They both aver that they do not qualify for social security disability benefits, *see* Smith Decl. ¶ 14; Tann Decl. ¶ 11, and neither claims to be medically unfit to work altogether, although both Smith and Tann attribute their inability to find regular employment to mental and physical conditions, among other factors.  Meanwhile, the possibility that Smith and Tann would qualify for medical exemptions is totally speculative, and next-to impossible to evaluate on the current record: as the District confirmed at the hearing, the District has never issued a medical exemption, or made standards for issuing one, as the work requirements have been waived in the District since PRWORA's effective date.  *See* Hr'g Tr. at 54:18 (state plaintiffs' counsel confirming this); *see also* Private Pls.' Reply at 20–21.[28]  Future loss of benefits is likely based on the facts in the plaintiffs' declarations, and the abstract possibility USDA posits does not materially diminish that likelihood such that Smith and Tann are deprived of standing.  *See Attias v. Carefirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (explaining, based on *Clapper*, that a too-speculative future injury is one that depends on a "series of contingent events, none of which was alleged to have occurred by the time of the lawsuit").

Similarly, Smith and Tann have offered enough "proof indicating that the harm is certain to occur in the near future" to show irreparable harm.  *Wisc. Gas Co.*, 758 F. 2d at 674.  Smith and Tann's evidence that they have struggled to find work "in the past" is sufficient to show that

---

[28]     For the same reason, USDA has not provided enough to support its single-sentence argument that, if the plaintiffs "fail to seek medical certifications," then "they would lack standing because their injury would not be traceable to the Final Rule."  USDA's Opp'n at 56 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).  USDA ignores the reality that the District has not set up the considerable infrastructure to evaluate applications for medical exemptions under the SNAP program, having relied on its long-standing waiver to avoid these supporting the exemption bureaucracy, for which the federal government pays only partially.

that this difficulty is "likely to occur again.," *id.*, triggering a loss of benefits after the District

loses its waiver.  Even taking into account the unquantifiable possibility that Smith and Tann will

qualify for medical exemptions, they have shown with enough certainty that they are likely to

lose their SNAP benefits as a result of the Rule.

> **D.      The Balance of Equities and the Public Interest Weigh in Favor of**
> **Preliminary Relief**

Turning to the final factors, the plaintiffs must demonstrate that the balance of equities

and the public interest weigh in favor of preliminary relief.  That burden is easily and decisively

met.

The equities weigh sharply in favor of preliminary relief.  USDA's only harm is that it

will be required to keep in place the existing regulation — which USDA has used for 19 years —

while judicial review of its new regulation runs its course.  *See* USDA's Opp'n at 63.  USDA

objects to being "require[d] to disburse taxpayer dollars through a State waiver system that the

agency believes is subject to abuse and does not implement Congressional intent." *Id.*  That

hardship pales in comparison to the injuries asserted by the plaintiffs.  As already detailed,

absent preliminary relief, the state plaintiffs will suffer irreparable harm in the form of massive

costs associated with implementing a sea change in a program that serves over 40 million U.S.

residents.  Implementation of the Rule would overburden BFC's programs, forcing it to divert

resources from longer-term and high-impact projects.  Finally, there is the grave harm to the

individual plaintiffs who will have to go without the $194 per month they need to buy food.

Nearly 700,000 people across the country face the same hardship as the individual plaintiffs, a

reality that factors into evaluation of the public's interest in preliminary relief.  *See Trump v. Int'l*

*Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("In awarding a preliminary

injunction, a court must also "consider[] . . . the overall public interest." (quoting *Winter*, 555 U.S. at 26)).

USDA claims that the federal government's "harm and the public interest are one and the same, because the government's interest *is* the public interest." USDA's Opp'n at 63 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). That assertion is specious here, where state and local governmental entities who represent the public just as the federal government does, are opposing parties. The public does have an interest in the executive branch's "effectuating statutes enacted" by Congress. *Id.* (quoting *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)). That public interest articulated by USDA is far outweighed here by the public interest USDA does not acknowledge but the state plaintiffs press: avoiding the implementation of an illegal policy that could result in hundreds of thousands of people going hungry and severely restrict the flexibility states have heretofore exercised to address nutritional needs of residents. *See, e.g.*, *Pursuing Am.'s Greatness*, 831 F.3d at 511 (concluding that the public's interest in exercising certain rights outweighed the public interest in enforcing the law articulated by the government); *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 65 (D.D.C. 2019) (concluding that the interest in administration of laws is outweighed by potential harm to individuals from erroneous application of the law).

*     *     *

As to the waiver-related provisions of the Final Rule, the plaintiffs have shown that they are likely to succeed on the merits of their arbitrary and capricious claim, that they will suffer irreparable harm absent preliminary relief, and that the balance of equities and the public interest weigh in favor of the preliminary relief they have requested. Accordingly, the plaintiffs are entitled to a preliminary injunction under Rule 65 and a stay of the pertinent provisions' effective date under § 705 of the APA.

**E.     The Waiver-Related Provisions of the Final Rule Will be Enjoined Nationwide and the Effective Date of those Provisions Will be Stayed Pending Judicial Review**

The final dispute is about the scope of relief.  The state plaintiffs request "a nationwide preliminary injunction" or a stay of the relevant effective date until a determination on the merits, *see* State Pls.' Mot. at 44, while USDA urges that "any relief should be," or even must be, "limited to the plaintiffs," USDA's Opp'n at 63.  This dispute arises amid an active debate about the necessity and propriety of nationwide, sometimes called universal, injunctive relief, especially in APA cases.  The very same arguments USDA advances here have been urged only recently by the federal government and have taken up space in ensuing district court, court of appeals, and Supreme Court opinions since 2018.  That year, federal agencies began opposing the issuance of nationwide injunctive relief against federal policies, essentially as a matter of course.[29]  Before then, however, the relief plaintiffs request here would have been uncontroversial: federal courts have issued hundreds of injunctions reaching beyond the parties in the lawsuit.  As in those cases, nationwide relief is most consistent with governing precedent and is necessary here to afford complete relief.

USDA's arguments to the contrary are not only implausible, they are off-the-wall, or at least they were before agencies started pressing them.  USDA claims that injunctions reaching beyond the plaintiffs are "inconsistent with Article III" and that the APA supplies no "basis for a nationwide injunction."  USDA's Opp'n at 64.  Article III is not and has never been as feeble as the agency says: longstanding practice confirms that nationwide injunctions are constitutional,

---

[29]      In September 2018, the Department of Justice issued litigation guidelines instructing civil litigators defending government programs to oppose the issuance of nationwide injunctive relief.  Memorandum from Att'y Gen. Jeff Sessions on Litigation Guidelines for Cases Presenting the Possibility for Nationwide Injunctions to Heads of Civil Litigating Components, U.S. Att'ys (Sept. 13, 2018) at 2, https://www.justice.gov/opa/press-release/file/1093881/download.

and the absence of even a single binding precedent questioning the constitutionality of such relief

shows just how radical the agency's objection is.  USDA's reading of the APA is equally brazen

in its ignorance of longstanding practice and precedent.

Past practice and precedent are important in themselves.  *See Michigan v. Bay Mills*

*Indian Cmty.*, 572 U.S. 782, 798 (2014) ("[S]*tare decisis* is a foundation stone of the rule of

law.").  Even more important, though, are what the precedents at issue enable: judicial review of

the executive branch.  This case illustrates why administrative actions must be subject to court

scrutiny.  The vast federal bureaucracy wields staggering power over the lives of vulnerable

Americans.  Agencies like USDA can dictate their access to housing, health care, and food.  The

APA's requirements — designed to protect these individuals from arbitrary terminations of their

benefits and all Americans from agency action run amok — are merely hortatory unless they can

be meaningfully enforced by courts.  The agency's theory of judicial power threatens to

undermine that enforcement function.  This Court will not abdicate at the executive branch's

request.

### 1.   A Nationwide Injunction is the Appropriate Remedy Under Binding D.C. Circuit Precedent Interpreting the APA

As USDA conceded at the hearing, "this Court is bound" by the D.C. Circuit's

precedents, Rough Hr'g Tr. at 90:8, and those precedents hold "that '[w]hen a reviewing court

determines that agency regulations are unlawful, the ordinary result is that the rules are vacated

— not that their application to the individual petitioners is proscribed.'"  *Nat'l Mining Ass'n v.*

*U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original)

(quoting *Harmon v. Thornburg*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also, e.g.*,

*Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common remedy when

we find a rule is invalid is to vacate."); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289

F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an agency so clearly violates the APA we would

vacate its action . . . and simply remand for the agency to start again.").  In *National Mining*, the

district court had found that the challenged rule exceeded the agency's authority and ordered

"that the . . . rule is declared invalid and set aside, and henceforth is not to be applied or enforced

by" the relevant agencies.  *Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 951 F. Supp. 267,

278 (D.D.C. 1997).  On appeal, the D.C. Circuit rejected the agencies' argument that the rule

should have been enjoined only as to the plaintiffs, stating unequivocally that vacatur of an

unlawful rule is not just one possible form of relief but the "ordinary" remedy.  The other, less

ordinary, remedy, not available at a preliminary stage, is remand to the agency without vacatur.

*See, e.g.*, *Humane Soc'y*, 865 F.3d at 614 (discussing both options).

The Supreme Court and other circuits have recognized the same principle: that "courts

invalidate — without qualification — unlawful administrative rules as a matter of course, leaving

their predecessors in place until the agencies can take further action."  *Pennsylvania*, 930 F.3d at

575; *see also* Zayn Siddique, *Nationwide Injunctions*, 117 COLUM. L. REV. 2095, 2121–23

(2017) (criticizing *National Mining* but reading it to hold this and observing that "[c]ourts

outside the D.C. Circuit have also adopted" the same principle); Amanda Frost, *In Defense of*

*Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065, 1100 (2018) (describing *National Mining*).

This principle flows directly from the APA's text: section 706 states that reviewing courts

"shall" "set aside" unlawful agency actions.  5 U.S.C. § 706.  Thus, as the Ninth Circuit has

observed, "the text of the" APA's § 706 "*compel*[*s*]" nationwide injunctions of invalid rules.

*Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), *aff'd in part, rev'd in part*

*sub nom.*, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (emphasis added); *see also E. Bay*

*Sanctuary Covenant v. Trump*, No. 18-17274, 2020 WL 962336, at *24 (9th Cir. Feb. 28, 2020)

("Singular equitable relief is commonplace in APA cases, and is often necessary to provide the plaintiffs with complete redress." (internal quotation marks omitted)).

An often-cited statement of the same principle is Justice Blackmun's view, "in dissent but apparently expressing the view of all nine justices," *Nat'l Mining Ass'n*, 145 F.3d at 1409, that when a plaintiff "prevails" on a challenge under the APA to "a rule of broad applicability," "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual," *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting); *see also id.* 890 n.2 (majority opinion) (recognizing that "a person adversely affected" can bring suit to alter a whole agency program).  Justice Blackmun contrasted "these circumstances," under which "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court," with a case where "a generally lawful policy is applied in an illegal manner on a particular occasion" and "one who is injured is not thereby entitled to challenge other applications of the rule."  *Id.* at 913 (Blackman, J., dissenting); *cf.* Frost, *supra*, at 1082–83 ("When a court finds that a statute is unconstitutional on its face, it does not hold that the statute applies to everyone but the plaintiff; rather, it holds that the statute is invalid.").

All of this shows that the APA's instruction that unlawful agency actions be "set aside" is ordinarily read as an instruction to vacate, wherever applicable, unlawful agency rules.  Similarly, the APA's § 705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs.  That provision allows "the reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  Section 705, which speaks in

terms of the "agency action" and that action's "effective date," *id.*, plainly and simply

"authorizes courts to stay agency rules pending judicial review," *Mexichem Specialty Resins,*

*Inc.*, 787 F.3d at 562 (Kavanaugh, J., dissenting in part); *see also In re GTE Service Corp.*, 762

F.2d 1024, 1026 (D.C. Cir. 1985) (recognizing that § 705 supplies "statutory authority to stay

agency orders pending review in this court."); *see also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435

(5th Cir. 2016) (staying a final rule "in its entirety" across the country in a case brought by

Texas, other state regulators, and private parties).

Rather than confront this consensus about the APA head-on, USDA ignores it, arguing

that courts' remedial power under the APA has always been limited by unspecified "established

principles of equitable discretion."  USDA's Opp'n at 65 (internal quotation marks omitted).

The agency does not cite a D.C. Circuit case applying those unspecified principles to narrow

injunctive relief under the APA.  Nevertheless, the agency insists that those principles require

here that "the 'set aside' language in § 706(2) . . . apply only to the Plaintiffs."  *Id.*  The contrary

consensus, of course, destroys USDA's argument.  The argument also flops on its own terms.

## 2. A Nationwide Injunction Is Consistent With "Established Principles of Equitable Discretion"

Although USDA is peculiarly coy in not specifying precisely the equitable principles it

believes constrain courts' remedial powers under the APA, the principle USDA seems to have in

mind is equity's "rule that injunctive relief should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702

(1979); *see* USDA's Opp'n at 64 (referencing this principle).  In *Califano*, the Supreme Court,

addressing a question about nationwide class actions, described that principle of "complete

relief," stating that nationwide classes were not "inconsistent with principles of equity

jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation

established, not by the geographical extent of the plaintiff class." 442 U.S. at 702.  Nationwide

relief here is necessary to provide complete relief to the plaintiffs for the "violation established."

*Id.*

That a nationwide remedy is necessary to provide complete relief for promulgation of an

unlawful rule follows from the nature of the claim that the rule is facially unlawful.  As Judge

Ketanji Brown Jackson of this Court explained in her incisive defense of nationwide injunctions:

when "the plaintiff's claim is that the agency has breached the plaintiff's (and the public's)

entitlement to non-arbitrary decisionmaking," "to provide the relief that" the plaintiff "is entitled

to receive for establishing that the agency's rule is" arbitrary, "the rule must be invalidated, so as

to give interested parties (the plaintiff, the agency, and the public) a meaningful opportunity to

try again." *Make the Road N.Y.*, 405 F. Supp. 3d at 72.  Put differently, when a plaintiff proves

that a rule was unlawfully promulgated, halting the rule's application to the plaintiff may lessen

the real-world impact of the unlawful rule on the plaintiff but does not fully redress "the

violation established" — that is, the promulgation of an unlawful rule.

The same reasoning has force in the preliminary injunction context.  *See, e.g.*, *id.* at 67–

68 (applying *National Mining* in granting a preliminary injunction); *Doe v. Rumsfeld*, 341 F.

Supp. 2d 1, 18–19 (D.D.C. 2004) (entering a permanent injunction, after having issued a

preliminary injunction, of the Department of Defense's "involuntary anthrax inoculation

program" as to "all persons," not just the plaintiffs and relying on *National Mining*); *see also,

e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 217 (D.D.C. 2017), *vacated sub nom. Doe 2 v.

Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (entering preliminary injunction of policy banning

transgender individuals from the military in case filed by current and aspiring military service

members without discussing scope of relief); *Planned Parenthood Fed'n of Am., Inc., v. Heckler*,

712 F.2d 650, 651 (D.C. Cir. 1983) (affirming preliminary and then final injunction prohibiting enforcement of federal regulations).  Nationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated.  *See Pennsylvania*, 930 F.3d at 575–76 (justifying similarly a nationwide preliminary injunction).

Nationwide relief at the preliminary stage also ensures that complete relief remains available to the plaintiffs after that final adjudication.  Denial of nationwide preliminary relief would allow implementation of the Final Rule in two dozen states.  Once that "egg has been scrambled," "restor[ing] the status quo ante" will be considerably more disruptive.  *Sugar Cane Growers Co-op. of Fla.*, 289 F.3d at 97.  Such disruption is one of the factors that weighs in favor of remand without vacatur after an adjudication of the merits.  *Id.*  As a result, denial of nationwide relief at this preliminary stage could make it less likely that the plaintiffs get complete relief — that is, vacatur — in the end.  *See id.* (remanding without vacating, despite the seriousness of the violation, because "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante"); *cf. Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019)(finding that remedy granted of vacating permit issued in violation of National Environmental Policy Act (NEPA) for construction of electrical transmission towers across the historic James River required remand to consider "whether vacatur remains the appropriate remedy," upon discovery that tower construction had been completed "the week before we issued our opinion," a "troubling" situation that could have been avoided if "either the district court or this court might have enjoined tower construction").  USDA is thus incorrect to imply that nationwide relief conflicts with the idea that preliminary injunctions are an "equitable

tool designed merely to preserve the 'relative positions of the parties' until final judgment."
USDA's Opp'n at 64 (quoting *Camenisch*, 451 U.S. at 395).

USDA insists, citing to a recent Ninth Circuit case, that this Court's focus should be not
on the relief necessary to remedy the legal violation alleged, as *National Mining* contemplates,
but on the relief necessary "to redress only the injury shown" in the irreparable harm analysis.
*California*, 911 F.3d at 584; *see also* USDA's Opp'n at 65 (citing *California*, 911 F.3d at 583).
In *California v. U.S. Dep't Health and Human Services*, 281 F. Supp. 3d 806 (N.D. Cal. 2017),
the district court enjoined enforcement of two rules nationwide because the agencies "did not
violate the APA just as to Plaintiffs: no member of the public was permitted to participate in the
rulemaking process via advance notice and comment." *Id.* at 832 (emphasis omitted).  The Ninth
Circuit affirmed the preliminary injunction only as to the states who were plaintiffs.  *California*,
911 F.3d at 584.  Rejecting the district court's reasoning about the legal wrong alleged, the Ninth
Circuit required the "scope of the remedy" to be "no broader and no narrower than necessary to
redress the" irreparable "injury shown by the plaintiff states." *Id.*  "District judges," the Ninth
Circuit added, "must require a showing of nationwide impact or sufficient similarity to the
plaintiff states to foreclose litigation in other districts." *Id.*  "[W]hile the record before the
district court was voluminous on the harm to the plaintiffs, it was not developed as to the
economic impact on other states," that Circuit said. *Id.*; *see also E. Bay Sanctuary Covenant v.
Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (granting motion for stay pending appeal "insofar as
the [preliminary] injunction" entered by the district court "applies outside the Ninth Circuit,
because the nationwide scope of the injunction is not supported by the record as it stands"); *E.
Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974 (N.D. Cal. 2019) (restoring the nationwide
scope of the injunction on supplementation and reexamination of the record); *E. Bay Sanctuary*

*Covenant*, No. 18-17274, 2020 WL 962336, at *23 (affirming the nationwide injunction entered

on the supplemented record); *cf. City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244

(9th Cir. 2018) (concluding that "the district court was correct to enjoin the Administration from

enforcing" an unconstitutional Executive Order but that "the present record is not sufficient to

support a nationwide injunction.").

This Court is not in the Ninth Circuit, but were *California*'s rule to apply, a nationwide

injunction would still be necessary here to provide complete relief for the injury shown in the

irreparable harm analysis.  The record in this case establishes that implementation of the waiver

portions of the Final Rule would have "nationwide impact" and would cause injuries of

"sufficient similarity to the plaintiff[s']" to other states and individuals throughout the country.

*California*, 911 F.3d at 584.

The starkest of those impacts is the hunger that threatens the nearly 700,000 people who

will lose their SNAP benefits if the Final Rule is implemented.  *See* 84 Fed. Reg. 66809.  These

individuals reside in 34 states, plus the Virgin Islands and the District, as those 36 jurisdictions

currently have either statewide or partial ABAWD time limit waivers.  *See* USDA, Supplemental

Nutrition Assistance Program (SNAP): Status of State Able-Bodied Adult without Dependents

(ABAWD) Time Limit Waivers – Fiscal Year 2020 – First Quarter (Nov. 12, 2019), https://fns-

prod.azureedge.net/sites/default/files/media/file/FY20-Quarter%201-ABAWD-Waiver-

Status.pdf.  These states, like the plaintiff states, are spread across the country, spanning from

Alaska and Oregon to Louisiana and Tennessee to Montana and North and South Dakota to

Georgia and West Virginia.  *Id.*  Threatened loss of essential benefits by individuals in plaintiff

states and other states alike merits nationwide preliminary relief.

In addition, other states with current waivers will experience harms similar to those alleged by state plaintiffs.  The state plaintiffs' declarations all detail similar harms, indicating that other non-plaintiff states facing loss of waivers will likewise suffer.  Further, as already stated, the Final Rule itself contemplated uniform types of administrative burdens across states, and USDA was able to quantify those burdens into estimates of hours required to implement the Final Rule across the country.  *See* 84 Fed. Reg. at 66809.  Anticipated regulatory burdens affecting plaintiff states and non-plaintiff states alike merit nationwide preliminary relief.

Presented with an analogous record of geographically diffuse harm, the Supreme Court blessed nationwide preliminary injunctions for aspects of the executive branch's ban on entry of travelers from certain Muslim countries in 2017.  *See Int'l Refugee Assistance Project*, 137 S. Ct. at 2088–89 (declining to stay aspects of nationwide preliminary injunctions entered by district courts).[30]  There, many thousands of people across the country were potentially affected by the policy.  *See id.* at 2083, 2087–88.  A diverse array of plaintiffs, including states, individuals, and organizations, filed multiple suits.  *Id.* at 2083–84.  Some of these plaintiffs were awarded nationwide preliminary injunctions of the policy.  *Id.*  In allowing these injunctions to go forward as to aspects of the policy, the Supreme Court praised the "courts below" for "focusing specifically on the concrete burdens that would fall on" the plaintiffs and did not disturb those courts' preliminary "injunctions that covered not just [plaintiffs], but parties similarly situated to them" whose "rights" might be similarly "affected."  *Id.* at 2087.  The same reasoning applies here: because the burdens that would fall on the plaintiffs upon the Final Rule's implementation

---

[30]     The Supreme Court also recently declined to stay a nationwide temporary restraining order of a rule promulgated by the Attorney General and the Secretary of Homeland Security limiting asylum seekers to certain designated ports of entry.  *See Trump v. E. Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018) (mem.).   That said, as discussed later, the Supreme Court's recent messages on the topic of nationwide injunctions have, admittedly, been mixed.

would also fall on those similarly situated, a nationwide preliminary injunction of the Final Rule is justified.

USDA argues that "the structure of the State waiver process does not support entry of a nationwide injunction." USDA's Opp'n at 65. "State waivers are approved on a state-by-state basis," USDA says, "so any effect of the Rule outside of the state plaintiffs would have no impact on them." *Id.* That argument misses the point, which is that the record supports a finding that the harms claimed by the plaintiffs — increased regulatory burdens, restrictions on the flexibility of states to address the needs of residents and loss of essential nutritional benefits — will be suffered not just in the plaintiff states but in states across the country. In the face of such a finding, to allow a likely unlawful policy to go forward anywhere at all would be judicial malpractice. Courts exist not to condone such harms but to remedy them.

At the hearing, USDA pressed a similar point: that the plaintiffs should not be able to "speak for non-party states" or to ask for "a change to the regulatory regime" in "states that aren't parties here," pointing out that nine states "have shown up as *amici* saying they" want the Final Rule to go into effect. Rough Hr'g Tr. at 90:4–16. This argument lacks a limiting principle. As already discussed, nationwide injunctive relief is sought and granted on the merits in APA cases all the time. If opposition to the relief sought by plaintiffs by others similarly situated could defeat a plaintiffs' request for nationwide equitable relief at the preliminary stage, why would it not defeat a plaintiffs' request to vacate an unlawful rule nationwide at the merits stage? Limiting final relief to the plaintiffs in APA cases would be absurd, making a patchwork out of federal law.

Even at the preliminary stage, slicing and dicing up the country as USDA suggests would invite chaos. For this reason, the federal government would be expected to prefer nationwide

relief in a case like this one, as an order staying or enjoining the Final Rule everywhere serves

the important interest of uniformity in administration of a federal program.  That interest is

particularly strong here, where Congress instructed USDA to "establish uniform national

standards" for eligibility for SNAP benefits, 7 U.S.C. § 2014(b) ("[T]he Secretary shall establish

uniform national standards of eligibility . . . for participation by households in the supplemental

nutrition assistance program.").  Subjecting different states and the individuals within those

states to different policies about who can and cannot get benefits is not only needlessly

complicated, it is fundamentally unfair.[31]  Piecemeal injunctions make it impossible for ordinary

people, who do not think in terms of judicial circuit boundaries and who are unaware which

states are party to a suit, to know what law applies to them.

Imagine how the chaos and confusion borne of a partial injunction would multiply were

multiple courts to get involved.  In cases where plaintiffs file suit in multiple federal district

courts, a collage of partial injunctions could quickly pop up.  In those cases, a single, nationwide

injunction or stay may be particularly helpful in "temporarily silenc[ing] the whirlwind of

confusion that springs from uncertainty about the requirements of the new Rule and whether they

will survive legal testing" and smoothing over "disparate rulings on" the "question issued by

district courts around the country."  *In re EPA*, 803 F.3d at 808.

Paradoxically, critics of nationwide injunctions have argued the opposite: that nationwide

injunctions burden the federal government and breed chaos.  As already discussed, the harm to

the federal government from having to enforce existing law, as it has for the last 25 years, in all

---

[31]     Of course, in some cases, slicing and dicing is not only chaotic and unfair, it is impossible and ineffective.
For example, enjoining environmental rules about air and water in some states but not in neighboring states would
be useless, as pollutants do not respect state boundaries.  *Make the Rd. N.Y.*, 405 F. Supp. 3d at 70 (stating that the
federal government opposing a nationwide injunction "has no good answer to the obvious practical problems that
partial invalidation of agency rules—including and especially rules that pertain to food, air, and water—would
pose"); *see also, e.g.*, *In re EPA*, 803 F.3d 804, 808 (6th Cir. 2015), *vacated on other grounds*, 713 F. App'x 489
(6th Cir. 2018) (staying pending judicial review an EPA rule redefining waters subject to the Clean Water Act).

50 states is minimal.  One critic recently wrote that "the routine issuance of universal injunctions is patently unworkable, sowing chaos for litigants, the government, courts, and all those affected by . . . conflicting decisions."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in the grant of the stay).  Yet the chaos described was a product not of a nationwide injunction, which would quickly settle legal issues at play once and for all potential plaintiffs, but of emergency appeals by the federal government seeking stays of nationwide injunctions entered by district courts.  *See id.* (describing the history of litigation surrounding the regulation at issue, the so-called "public charge" rule, which was enjoined nationwide in three federal district courts and in several states between two other federal district courts before two circuits stayed two nationwide injunctions and the Supreme Court intervened to stay the third).  Such emergency requests have become increasingly common.  *See, e.g.*, Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 HARV. L. REV. 123, 134–44 (2019) (reviewing eighteen requests by the federal government to stay nationwide injunctions or to grant certiorari before judgment where nationwide relief had been ordered); *see also Wolf v. Cook Cty.*, 140 S. Ct. 681, 681 (2020) (mem.) (Sotomayor, J., dissenting from the grant of stay) ("Today's decision follows a now-familiar pattern.  The Government seeks emergency relief from this Court, asking it to grant a stay where two lower courts have not.  The Government insists — even though review in a court of appeals is imminent — that it will suffer irreparable harm if this Court does not grant a stay.").  These requests for relief raise the very same arguments about the impropriety of nationwide injunctions that USDA raises here.  Any recent chaos stemming from nationwide injunctions is the product of an executive branch aggressive in pursuit of appeals and in advancing its present arguments in derogation of judicial power.

Perhaps that sort of power grab is to be expected from the executive branch.  What is unexpected, and dangerous to the maintenance of our constitutional order, is that instead of fighting back, some courts have rolled over.  In a growing number of cases, the Supreme Court has granted the federal government the relief it seeks.  *See, e.g.*, *Dep't of Homeland Sec.* 140 S. Ct. at 599; *Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019) (mem.); *Wolf v. Innovation Law Lab*, No. 19A960, 2020 WL 1161432 (U.S. Mar. 11, 2020).  Two members of the Supreme Court have even said that nationwide injections "raise serious questions about the scope of courts' equitable powers under Article III."  *Dep't of Homeland Sec.*, 140 S. Ct. at 600; *Trump v. Hawaii*, 138 S. Ct. 2392, 2428–29 (2018) (Thomas, J., concurring).  The Ninth Circuit, citing those two concurrences and reacting to the "intense and active controversy" surrounding "the proper scope of injunctions against agency action," recently stayed outside that Circuit its decision affirming a nationwide injunction.  *Innovation Law Lab v. Wolf*, No. 19-15716, 2020 WL 1046241, at *3 (9th Cir. Mar. 4, 2020).  Courts that have rejected federal agencies' requests to enter limited injunctions have, by and large, in reliance on long-standing precedent and common sense, not taken the time to explain why the arguments underlying those requests are so wrong.

This passivity stands in stark contrast to the judicial reaction to legislative attempts to strip judicial power.  For example, courts have enforced a strong presumption in favor of judicial review of agency action, setting a high bar for congressional attempts to strip the federal courts of their subject matter jurisdiction to review certain agencies or certain types of agency actions.  *See, e.g.*, *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Sackett v. EPA*, 566 U.S. 120, 130 (2012).  In cases with constitutional stakes, the courts have been more protective still, fending off congressional attempts to foreclose plaintiffs from seeking judicial

remedies for constitutional violations.  *E.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988)

(observing that construing a statute "to deny any judicial forum for a colorable constitutional

claim" would raise "serious constitutional question[s]" (internal quotation marks omitted)).

Allowing "the political branches . . . the power to" strip courts of the jurisdiction to hear

constitutional claims, the Supreme Court has said, "would permit a striking anomaly in our

tripartite system of government, leading to a regime in which Congress and the President, not

th[e] [c]ourt[s], say 'what the law is.'"  *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (quoting

*Marbury v. Madison*, 1 Cranch 137, 177 (1803)) (holding that Congress could not suspend the

writ of habeas corpus for certain individuals).  Permitting the executive branch to redefine the

reach of Article III without putting up a fight would be similarly anomalous.

### 3.  A Nationwide Injunction is Consistent with Article III

The agency's argument that the APA provides no basis for nationwide relief has already

been answered.  USDA also argues that "[e]xtending an injunction to other States that have

chosen not to challenge the Rule is inconsistent with Article III."  USDA's Opp'n at 64.  Quoting

*Gill v. Whitford*, 138 S. Ct. 1916, 1930–31 (2018), a case about standing to bring suit, the agency

claims that "any 'remedy' ordered by a federal court must 'be limited to the inadequacy that

produced the injury in fact that the plaintiff has established.'"  *Id.* at 64–65.  In essence, USDA's

view is that even if the plaintiffs have standing to seek a remedy to address their injuries, the

plaintiffs do not have standing to seek a remedy that benefits non-plaintiffs.  Indeed, in USDA's

view, to issue an injunction that redresses injuries of non-plaintiffs would exceed this court's

"judicial power" to decide "cases" and "controversies."  U.S. CONST., art. III, § 2.

The preceding discussion — of dozens of the countless federal cases ordering relief

redressing injuries of non-plaintiffs — proves the agency's Article III argument is not just wrong

but almost comically so, if the stakes for judicial power were not so dire.  Indisputably, a

plaintiff must show standing to sue, *see, e.g.*, *Lujan*, 504 U.S. at 560–61, and standing to pursue the type of remedy sought, *see Lyons*, 461 U.S. at 97–98.  After one plaintiff in a suit satisfies those requirements, however, Article III's demands are exhausted.  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *Salazar v. Buono*, 559 U.S. 700, 713 (2010) (plurality opinion) (stating that an argument about the scope of the injunction "is not an argument about standing but about the merits"); *see also, e.g.*, Spencer E. Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 HARV. L. REV. F. 49, 54 (2017) ("Article III has never required courts to meticulously ensure that no relief reaches anyone beyond the plaintiff.").  Fashioning equitable relief is not and has never been an exercise in formalistic matching, of formulaically ordering relief scoped precisely to the injury the plaintiff has asserted and proven.  As the Supreme Court recently said in allowing an equitable remedy affecting non-parties, "[c]rafting a preliminary injunction," indeed any equitable relief, "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087.

To underscore just how commonplace relief affecting non-plaintiffs is, consider some examples outside the already-covered APA context.  *See generally* Mila Sohoni, *The Lost History of The "Universal" Injunction*, 133 HARV. L. REV. 920, 996 (2020) (deploying hundreds of cases to rebut the "contention that injunctions reaching beyond the plaintiffs are inherently illegitimate as an Article III matter").  Take an action to abate a public nuisance: if a private plaintiff injured by the nuisance wins an injunction to abate the nuisance, that injunction will undoubtedly remedy injuries not only of the plaintiff but also of non-plaintiffs who did not

participate in the suit.  Class actions are another example.  Absent class members do not appear before the court to prove their standing, but any relief ordered benefits those absent class members.  Last but definitely not least, federal courts have declared unconstitutional and enjoined enforcement of countless state and federal laws in suits brought by individual plaintiffs but benefiting many similarly situated non-parties.  These are constitutionally permissible exercises of federal judicial power, and so is the nationwide relief ordered here.

The agency's objection to the issuance of a nationwide preliminary injunction should be seen for what it is: a bold and bald-faced effort to restrict the exercise of Article III judicial power to aggrandize that of the executive branch.  This Court declines the invitation.

## IV.    CONCLUSION

For the reasons explained, the state plaintiffs' motion for a preliminary injunction and a stay pending judicial review is denied as to the discretionary exemption portions of the Final Rule.  The state plaintiffs' and private plaintiffs' motions for a preliminary injunction and a stay pending judicial review are granted as to the challenged waiver portions of the Final Rule.  USDA will be preliminarily enjoined from implementing the challenged waiver portions of the Final Rule.  *See* 84 Fed. Reg. at 66811 (printing parts of the regulation to be codified, including the challenged portions: 237.24 (f)(2) and (f)(4)).  The effective date of these aspects of the Final Rule shall be stayed under 5 U.S.C. § 705 pending judicial review.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 13, 2020

_____
BERYL A. HOWELL
Chief Judge