# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv 00119-BAH |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| BREAD FOR THE CITY, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-00127-BAH |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

## PRIVATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Chinh Q. Le (D.C. Bar #1007037)
Jennifer F. Mezey (D.C. Bar #462724)*
Nicole Dooley (D.C. Bar #1601371)*
LEGAL AID SOCIETY OF THE
DISTRICT OF COLUMBIA
1331 H Street, N.W., #350
Washington, DC 20005
Phone: (202) 661-5979
Fax: (202) 727-2132

Daniel G. Jarcho (D.C. Bar #391837)
Kelley C. Barnaby (D.C. Bar #998757)
Jean E. Richmann*
Hilla Shimshoni (D.C. Bar #1033015)*
Kaelyne Y. Wietelman*
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Phone: (202) 239-3300
Fax: (202) 239-3333

*Attorneys for Plaintiffs Bread for the City, Damon Smith, and Geneva Tann*

*Practicing pursuant to LCvR 83.2(g)

The Private Plaintiffs Bread for the City, Damon Smith, and Geneva Tann respectfully move the Court to enter summary judgment in their favor on all three Counts of the Complaint. The Memorandum accompanying this Motion explains the reasons that the U.S. Department of Agriculture issued the Final Rule challenged in this case without statutory authority, through arbitrary and capricious decision-making, and in violation of notice and comment requirements. To remedy these violations, the Court should issue a declaratory judgment holding that the Rule is unlawful and set it aside.

Respectfully Submitted,

_____/s/ *Chinh Q. Le*_____            _____/s/ *Daniel G. Jarcho*_____
Chinh Q. Le (D.C. Bar #1007037)            Daniel G. Jarcho (D.C. Bar #391837)
Jennifer F. Mezey (D.C. Bar #462724)*      Kelley C. Barnaby (D.C. Bar #998757)
Nicole Dooley (D.C. Bar #1601371)*         Jean E. Richmann*
LEGAL AID SOCIETY OF THE                   Hilla Shimshoni (D.C. Bar #1033015)*
DISTRICT OF COLUMBIA                        Kaelyne Y. Wietelman*
1331 H Street, N.W., #350                  ALSTON & BIRD LLP
Washington, DC 20005                        950 F Street, N.W.
Phone: (202) 661-5979                       Washington, DC  20004
Fax: (202) 727-2132                         Phone: (202) 239-3300
                                            Fax: (202) 239-3333

*Attorneys for Plaintiffs Bread for the City, Damon Smith, and Geneva Tann*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | )   C.A. No. 1:20-cv 00119-BAH |
| | ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |
| BREAD FOR THE CITY, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | )   C.A. No. 1:20-cv-00127-BAH |
| | ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE et al., | ) |
| | ) |
| *Defendants.* | ) |

## MEMORANDUM IN SUPPORT OF
## PRIVATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Chinh Q. Le (D.C. Bar #1007037)
Jennifer F. Mezey (D.C. Bar #462724)*
Nicole Dooley (D.C. Bar #1601371)*
LEGAL AID SOCIETY OF THE
DISTRICT OF COLUMBIA
1331 H Street, N.W., #350
Washington, DC 20005
Phone: (202) 661-5979
Fax: (202) 727-2132

Daniel G. Jarcho (D.C. Bar #391837)
Kelley C. Barnaby (D.C. Bar #998757)
Jean E. Richmann*
Hilla Shimshoni (D.C. Bar #1033015)*
Kaelyne Y. Wietelman*
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Phone: (202) 239-3300
Fax: (202) 239-3333

*Attorneys for Plaintiffs Bread for the City, Damon Smith, and Geneva Tann*

*Practicing pursuant to LCvR 83.2(g)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ....................................................**Error! Bookmark not defined.**

INTRODUCTION ...................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................ 1

     A.    1996 Amendments to the SNAP Act .................................................. 2

     B.    USDA's Administration of the Time-Limit Waiver Process From the Time of the 1996 Statutory Amendments Through 2019................................. 3

     C.    The Final Rule Challenged in This Case ............................................. 4

STATEMENT OF FACTS .......................................................................... 6

     A.    The Private Plaintiffs. ................................................................. 6

     B.    Procedural History of This Case. ...................................................... 8

ARGUMENT .......................................................................................... 9

I.     USDA EXCEEDED ITS STATUTORY AUTHORITY BY PROMULGATING A PROSPECTIVE CATEGORICAL RULE THAT SUBSTANTIALLY DISPLACES THE WAIVER ADJUDICATION PROCESS MANDATED BY STATUTE. ....................................................................................... 9

     A.    The Statute's Waiver Provision Requires USDA to Render Decisions on Waiver Applications Through Case-Specific Adjudications. ................... 10

     B.    USDA Exceeded Its Statutory Authority by Substantially Displacing the Adjudication Process with a Prospective Categorical Rule. ................... 11

          1.    The Statute's Waiver Provision Did Not Authorize USDA to Displace the Adjudication Process With a Prospective Categorical Rule. ............................................................................... 13

          2.    USDA's General Rulemaking Authority Did Not Empower the Agency to Displace the Adjudication Process with a Prospective Categorical Rule......................................................... 16

     C.    The Final Rule is Starkly Different Than Permissible Rules That Merely Supplement, Rather Than Displace, an Adjudicatory Process Required by Statute. ................................................................................ 18

1.     The Final Rule is Distinguishable from Supplemental Rules That Uniformly Dispose of Repetitive Issues For Which the Outcome Should Not Vary From Case to Case. ...................................................... 18

2.     The Final Rule is Distinguishable from Supplemental Rules That Limit Adjudication to Matters Contested by the Parties. .......................... 19

D.     USDA Cannot Save the Rule by Asserting That the Court Should Defer to an Agency "Statutory Interpretation." ................................................. 21

1.     There Is No Basis for the Court to Reach the Question of *Chevron* Deference Because Any Statutory Interpretation Occurred in the Wrong Procedural Context. .................................................................... 21

2.     There Is No Basis for the Court to Reach the Question of *Chevron* Deference Because the Rule Derives From a Policy Decision, Not a Statutory Interpretation. ......................................................................... 22

II.     THE USDA RULE IS ARBITRARY AND CAPRICIOUS. ........................................... 24

A.     The Rule is Arbitrary and Capricious Because It Relies Solely Upon Unemployment Rates to Establish Whether ABAWDs Have Sufficient Job Opportunities in the Areas Where They Reside. .................................................. 24

1.     The Final Rule Irrationally Prohibits Consideration of All Factors Relevant to Job Sufficiency. .................................................................. 25

2.     USDA Did Not Adequately Address Evidence That Unemployment Rates Are a Deeply Flawed Measure of ABAWD Job Opportunities. .................................................................................... 26

3.     USDA Failed to Assess Deficiencies in the Specific Unemployment Rate Used in the Final Rule ............................................ 31

B.     The Rule is Arbitrary and Capricious Because It Limits the Geographic Scope of Waivers to Labor Management Areas Established by the Labor Department. ............................................................................................................. 32

1.     The Final Rule is Arbitrary and Capricious Because USDA Did Not Adequately Explain Its Rationale for Choosing One Department of Labor "Area" Designation (LMA) Over Another (LSA). ................................................................................................................ 32

a.     USDA Does Not Adequately Explain Its Decision to Base Waiver Areas on Older Data (Used for LMAs) Instead of Newer Data (Used for LSAs). ...................................................... 34

b.     USDA's Analysis Is Internally Inconsistent, Changing Position When Necessary to Reduce the Number of Beneficiaries. ................................................................................. 35

2.    The Final Rule is Arbitrary and Capricious Because it Bases Waivers for the District of Columbia Upon Job Opportunities That Are Primarily Outside the District of Columbia. ..................................... 37

C.    The Final Rule is Arbitrary and Capricious Because USDA Did Not Adequately Explain Its Justification for Refusing to Include Extended Unemployment Benefits as a Factor for Evaluating ABAWD Job Opportunities..................................................................................................... 43

III.    THE USDA RULE VIOLATES NOTICE AND COMMENT REQUIREMENTS. ....... 44

CONCLUSION................................................................................................................... 45

# **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Air All. Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) ............................................................................................16

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998) ............................................................................................................39

*Allina Health Servs. v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................................................44

*Am. Wild Horse Pres. Campaign v. Purdue,*
    873 F.3d 914 (D.C. Cir. 2017) .......................................................................................26, 33

*ANR Storage Co. v. FERC,*
    904 F.3d 1020 (D.C. Cir. 2018) ............................................................................................36

*Ass'n of Private Sector Colleges & Univs. v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ..............................................................................................44

*Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.,*
    474 U.S. 361 (1986) ............................................................................................................16

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) .....................................................................................................14, 16

*Bowen v. Yuckert,*
    482 U.S. 137 (1987) ............................................................................................................20

*Canadian Ass'n of Petroleum Producers v. FERC,*
    254 F.3d 289 (D.C. Cir. 2001) .......................................................................................26, 27

*Cares Cmty. Health v. HHS,*
    944 F.3d 950 (D.C. Cir. 2019) ..............................................................................................22

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) .....................................................................................................21, 22

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
    466 F.3d 134 (D.C. Cir. 2006) ..............................................................................................15

*Cont'l Air Lines v. Dep't of Transp.,*
    843 F.2d 1444 (D.C. Cir. 1988) ............................................................................................23

*CSX Transp., Inc. v. Surface Transp. Bd.,*
    584 F.3d 1076 (D.C. Cir. 2009) ............................................................................................45

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
No. 18-587, 2020 U.S. LEXIS 3254 (U.S. June 18. 2020)......................................33

*DL v. District of Columbia*, 924 F.3d 585, 592 (D.C. Cir. 2019)..................................42

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ...........................................................................22

*Engine Mfrs. Ass'n v. EPA*,
20 F.3d 1177 (D.C. Cir. 1994) ...........................................................................37

*Envtl. Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ...........................................................................45

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ...........................................................26, 28, 29, 30

*Gulf Power Co. v. FERC*,
983 F.2d 1095 (D.C. Cir. 1993) ..........................................................................37

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ..........................................................................................11

*Haselwander v. McHugh*,
774 F.3d 990 (D.C. Cir. 2014) ...........................................................................42

*Heckler v. Campbell*,
461 U.S. 458 (1983) .....................................................................................18, 19

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
403 F.3d 1250 (D.C. Cir. 2005) ....................................................................44, 45

*Kaufman v. Nielsen*,
896 F.3d 475 (D.C. Cir. 2018) ...........................................................................21

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ..............................................................................................11

*Levine v. Apker*,
455 F.3d 71 (2d Cir. 2006) .................................................................................17

*Lyng v. Payne*,
476 U.S. 926 (1986) ..........................................................................................16

*MCI Telecomms. Corp. v. AT&T*,
512 U.S. 218 (1994) ..........................................................................................15

*\*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) ..........................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................25, 30, 32, 33

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ...........................................................................................24

*Nat. Res. Def. Council, Inc. v. Reilly*,
    976 F.2d 36 (D.C. Cir. 1992) .........................................................................................16

*Nat'l Ass'n of Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*,
    41 F.3d 721 (D.C. Cir. 1994) .....................................................................................23, 24

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) .......................................................................................35

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) .....................................................................................44

*Oceana, Inc. v. Locke*,
    670 F.3d 1238 (D.C. Cir. 2011) .....................................................................................15

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ......................................................................................................11

*Prime Time Int'l Co. v. Vilsack*,
    930 F. Supp. 2d 240 (D.D.C. 2013) ...............................................................................22

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003) .................................................................................26, 33

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ......................................................................................................15

*Sierra Club v. EPA*,
    884 F.3d 1185 (D.C. Cir. 2018) .....................................................................................36

*Sullivan v. Zebley*,
    493 U.SD. 521 (1990) ...............................................................................................17, 20

*SW Gen. Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015) .........................................................................................15

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ......................................................................................................22

*Yousuf v. Samantar*,
    451 F.3d 248 (D.C. Cir. 2006) .......................................................................................11

**STATUTES**

5 U.S.C. § 551................................................................................................13, 14

5 U.S.C. § 553......................................................................................................44

5 U.S.C. § 554......................................................................................................13

5 U.S.C. § 706(2)(C)...........................................................................................10

7 U.S.C. § 2011......................................................................................................1

7 U.S.C. § 2012(r)...............................................................................................10

7 U.S.C. § 2013(a).................................................................................................2

7 U.S.C. § 2013(c).........................................................................................16, 20

7 U.S.C. § 2015(b)...............................................................................................11

7 U.S.C. § 2015(o)(2)............................................................................................2

7 U.S.C. § 2015(o)(4)......................................................3, 9, 10, 14, 15, 23

7 U.S.C. § 2015(o)(4)(A)(ii) ...................................................................... passim

7 U.S.C. § 2019......................................................................................................2

7 U.S.C. § 2025(a).................................................................................................2

42 U.S.C. § 423(d)..............................................................................................29

42 U.S.C. § 1382c...............................................................................................29

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat.
  1853 (2008).........................................................................................................2

**RULES**

7 C.F.R. § 271.1(a)................................................................................................1

7 C.F.R. § 273.24(b) (2019)..................................................................................2

7 C.F.R. § 273.24(f)(2019) ........................................................................ passim

7 C.F.R. § 273.24(f) .................................................................................... passim

7 C.F.R. § 277.1(b)................................................................................................2

7 C.F.R. § 277.4......................................................................................................2

OTHER AUTHORITIES

66 Fed. Reg. 4438 (Jan. 17, 2001) ....................................................................................4

84 Fed. Reg. 980 (Feb. 1, 2019) ............................................................................. passim

84 Fed. Reg. 66,782 (Dec. 5, 2019) ......................................................................... passim

Attorney General's Manual on the Administrative Procedure Act (1947) ....................14

BLS Data Viewer, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS .....................39, 40

Chart Book: SNAP Helps Struggling Families Put Food on the Table, CTR. ON
    BUDGET & POLICY PRIORITIES ...............................................................................7

Current Population Survey, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS ..........40

Elizabeth Kneebone et al., The Growing Distance Between People and Jobs in
    Metropolitan America, METRO. POLICY PROGRAM AT BROOKINGS (March
    2015) .....................................................................................................................42

Employment Situation Summary, DEPT. OF LABOR, BUREAU OF LABOR STATISTICS ....13

Job Seekers, D.C. POLICY CTR. (May 23, 2018) ...........................................................42

Labor Statistics, Table 1: Civilian labor force and unemployment by state and
    metropolitan area, seasonally unadjusted .....................................................39, 40

Labor Statistics, Table 2: Civilian labor force and unemployment by selected
    metropolitan area and metropolitan area, seasonally unadjusted .........................39

Local Area Unemployment Statistics Frequently Asked Questions, DEP'T OF
    LABOR, BUREAU OF LABOR STATISTICS ..................................................................38

Metropolitan Statistical Area. Employment Status for the Civilian Population
    District of Columbia, Washington Metropolitan Division and Statistical Area
    April 2020 ............................................................................................................38

Official USDA Food Plans: Cost of Food at Home at Four Levels, U.S. Average,
    October 2019, USDA .............................................................................................7

Rucker Johnson, Landing a job in urban space: the extent and effects of spatial
    mismatch, Reg'l Sci. & Urban Econ. 331 (Feb. 2006) .........................................42

## INTRODUCTION

This case challenges a U.S. Department of Agriculture Final Rule intended to cut food assistance benefits for almost 700,000 people across the nation.  The beneficiaries that the Rule puts at risk are Able Bodied Adults Without Dependents (ABAWDs).  USDA claims to have grounded the cutback on the principle that able-bodied adults who can find employment—but choose not to pursue it—should not receive benefits for any significant length of time.  On the surface, that principle may sound reasonable.  But in practice, the Rule fundamentally undermines the principle, preventing USDA from making a fair or reasoned assessment of whether ABAWDs actually have sufficient job opportunities to justify eliminating their benefits.  In so doing, the agency has exceeded its statutory authority, engaged in arbitrary and capricious decision-making, and violated notice and comment procedures.  This Court should grant summary judgment for Plaintiffs, declare that the Rule is unlawful, and set it aside.

## STATUTORY AND REGULATORY BACKGROUND

In 1964, Congress established the federally-funded, state-administered Food Stamp Program to enable low-income beneficiaries to buy food, thereby "safeguard[ing] the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011 (2008); 7 C.F.R. § 271.1(a)(1994).  Since its inception, the Program has helped fight food insecurity among low-income households, lifted millions of the individuals in these households above the poverty line, and supported local economies.[1]  Effective October 1, 2008, the Program was renamed the Supplemental Nutrition Assistance (SNAP) Program, and the

---

[1] *Understanding SNAP, the Supplemental Nutrition Assistance Program*, FEEDING AMERICA, https://www.feedingamerica.org/take-action/advocate/federal-hunger-relief-programs/snap    (last visited June 21, 2020).

Federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 (SNAP Act). *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).

SNAP benefits can only be used to buy food and are paid directly from the State to the entity that sells the food to the beneficiary (through an Electronic Benefits Transfer card). The federal government provides complete funding to States for all SNAP benefits and also covers at least 50 percent of a state's costs to administer the program. 7 U.S.C. §§ 2013(a), 2019, 2025(a) (2018); 7 C.F.R. §§ 277.1(b), 277.4 (2016).

### A.    1996 Amendments to the SNAP Act

In 1996, Congress amended the SNAP Act and created restrictions on the receipt of SNAP benefits by ABAWDs. The 1996 amendments provide that ABAWDs can only receive SNAP benefits for three months in a three-year period unless they are working or participating in training for 20 hours or more per week. 7 U.S.C. § 2015(o)(2)(2018); *see also* 7 C.F.R. § 273.24(b) (2019).

Congress understood, however, that it needed to blunt the harsh effects of the time limit when sufficient jobs were not available for ABAWDs. In congressional debate, John Kasich, the co-author of the provision, clarified that the time limit would only apply "if you are able-bodied," "if you are childless," if "you live in an area where you are getting food stamps," and if "*there are jobs available*."[2] To ensure that the time limit would only apply if ABAWDs had meaningful job opportunities, Congress granted States (including the District of Columbia) broad authority to seek waivers from the time limit for "any group of individuals in the State," which USDA may approve if the "area in which the individuals reside (i) has an unemployment rate above 10 percent; or

---

[2] Welfare and Medicaid Reform Act of 1996, 142 Cong. Rec. H7796, H7905 (daily ed. July 18, 1996) (statement of Rep. Kasich), https://www.congress.gov/crec/1996/07/18/CREC-1996-07-18.pdf (emphasis added).

(ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4).

**B.**    **USDA's Administration of the Time-Limit Waiver Process From the Time of the 1996 Statutory Amendments Through 2019**

From 1996 through 2019, USDA followed essentially the same process for administering time-limit waivers. Initially the agency operated under a 1996 Guidance. In the Guidance, USDA noted that because the statute has two independent standards justifying a waiver—(1) an unemployment rate of over 10 percent or (2) a lack of sufficient jobs—"the statute recognizes that the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities." Guidance for States Seeking Waivers for Food Stamp Limits, December 3, 1996, Certified Corrected Administrative Record, Doc. 10, ABAWD00000166 ("1996 Guidance"), at ABAWD00000168.

Addressing the statutory standard based on lack of sufficient jobs, the 1996 Guidance provided a non-exhaustive list of the types and sources of data that a State could submit to support its waiver request. In so doing, the Guidance recognized that "there are no standard data or methods to make the determination of the sufficiency of jobs" for ABAWDs and that "the decision to approve waivers based on an insufficient number of jobs must be made on an area-by-area basis." *Id.* The 1996 Guidance also emphasized that States should be given "broad discretion" to "decide if a waiver request is appropriate" for the State or a part of the State, and to define "areas that best reflect the labor market prospects of program participants and State administrative needs." *Id.*

In 2001, USDA promulgated the regulations that are still in effect (and unchanged in pertinent part) as of the date of this Motion. The 2001 regulations codify the relevant parts of the 1996 Guidance with respect to waivers based upon a lack of sufficient jobs. A State can submit

"whatever data it deems appropriate to support its request," with the only restriction that "States must submit [unemployment or labor force] data that relies on standard Bureau of Labor Statistics (BLS) data or methods" to support waiver requests based on one of these factors.  7 C.F.R. § 273.24(f)(2) (2019).[3]  Like the 1996 Guidance, the 2001 regulations set forth a "non-exhaustive list" of types of information a State agency could submit to support a claim of "lack of sufficient jobs" for ABAWDs in a given area.  The regulations also note two categories of waivers that are "readily approvable."  And the regulations allow the States to define the areas to be covered by waivers, as long as States can provide supporting data and analyses.  *Id.* §§ 273.24(f)(2), (f)(3), (f)(6) (2019).

C.      The Final Rule Challenged in This Case

In December 2019, USDA issued the Final Rule challenged in this case.  That Rule followed a February 2019 Proposed Rule that proposed substantially restricting ABAWD time-limit waivers (thereby significantly reducing the number of individuals who receive SNAP food assistance).  USDA justified the Proposed Rule with the assertion that time-limit waivers allegedly are less necessary now than in the past.  According to USDA, the relatively low overall unemployment rate in 2019 showed that most ABAWDs have adequate job opportunities to work 20 hours per week, allowing most ABAWDs to avoid triggering the time limit that would terminate their SNAP benefits.  Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, 84 Fed. Reg. 980, 981 (Feb. 1, 2019).

---

[3] The restriction to BLS data or methods was required under an independent "established Federal policy requir[ing] Federal executive branch agencies to use the most recent National, State or local labor force and unemployment data from the BLS for all program purposes."  66 Fed. Reg. 4438, 4462 (Jan. 17, 2001).

The Proposed Rule generated more than 100,000 comments, the vast majority of which objected to the Proposed Rule. *See* Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, Certified Corrected Administrative Record, ABAWD00008218. The objecting commenters included more than 20 States and territories and anti-poverty organizations like the Legal Aid Society of the District of Columbia. Commenters emphasized that a low overall unemployment rate does not necessarily reflect readily-available job opportunities for ABAWDs, because ABAWDs often face substantial barriers to employment that average citizens do not confront. Commenters also noted that because ABAWDs have substantial difficulty seeking employment even when overall unemployment rates are low, the proposal would unfairly deny food assistance to low-income people who cannot find jobs.

In the Final Rule, USDA rejected most of these comments and made sweeping changes to the time-limit waiver process, materially altering the procedures and standards the agency has consistently followed for more than 20 years. One significant change is new "core standards" that substantially displace the flexible, case-by-case determinations through which USDA has decided whether specific areas lack sufficient jobs. Under the "core standards," waiver determinations will (with limited exceptions) turn exclusively on an area's unemployment rate. Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, 84 Fed. Reg. 66,782, 66,811 (Dec. 5, 2019) (citing 7 C.F.R. § 273.24 (f)(2)). This exclusive reliance on unemployment rates is an abrupt and harmful departure from the agency's longstanding acknowledgement that an "unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities;" that "there are no standard data or methods to make the determination of the sufficiency of jobs;" and that "the

decision to approve waivers based on an insufficient number of jobs must be made on an area-by-area basis," with the area defined by the State.  1996 Guidance, at ABAWD00000168.

The stated purpose of the Final Rule is to achieve a massive reduction in the number of people receiving SNAP benefits.  At the time it issued the Final Rule, USDA estimated that effectuating the Final Rule will terminate the SNAP benefits of "688,000 individuals (in FY2021)."  84 Fed. Reg. at 66,807.  And "approximately 77 percent of counties [will] los[e] their current time limit waiver."  *Id*.  Under the current regulation, "less than half of ABAWDs live in areas that are not covered by a waiver and thus face the ABAWD time limit," yet "about 88 percent of ABAWDs will live in such areas" if the Final Rule takes effect.  *Id*.  These individuals will then lose their benefits because they "will not meet the work requirement or be otherwise exempt."  *Id*.

## STATEMENT OF FACTS

### A.  The Private Plaintiffs.

Plaintiff Bread for the City (Bread) is an award-winning front-line nonprofit organization serving residents experiencing poverty in Washington, D.C.  Started in 1974, Bread's mission is to help these residents develop the power to determine the future of their community.  Declaration of George A. Jones ("Jones Decl."), Dkt. #4-6 (No. 1:20-cv-00119) ¶4.  Bread operates two Centers in the District of Columbia and provides comprehensive direct services in an atmosphere of dignity and respect.  These services include food, clothing, medical care, legal services, and social services, reaching more than 31,000 individuals each year.  Jones Decl. ¶4.  With the exception of the medical clinic, all of Bread's services are free.  Jones Decl. ¶4.  In addition, Bread engages in community organizing and public advocacy.  Finally, Bread is dedicated to combatting racism, as structural racism is a major cause of poverty.  Jones Decl. ¶4.

Every year, Bread's food program serves thousands of low-income individuals and families in Washington, D.C.  Bread provides nutritious groceries to D.C. residents who generally have

incomes at or below 200% of the federal poverty level.  In the twelve-month period ending June 30, 2018, Bread's two food pantries provided groceries to more than 16,000 unique households. Many of Bread's clients have received or currently receive SNAP benefits.  Jones Decl. ¶8.[4]

If allowed to take effect, the Final Rule will force Bread——which already operates under a significant budget shortfall—to divert scarce staff and resources away from its other time-sensitive client services and advocacy efforts in order to meet the heightened needs and increased demand for assistance of its ABAWD clients who suddenly find themselves ineligible for SNAP benefits.  Jones Decl. ¶9.

Plaintiffs Damon Smith and Geneva Tann are among the many D.C. residents (qualifying as ABAWDs) who will lose their SNAP benefits, and thereby lose reliable access to basic food and nutrition, if the Final Rule goes into effect.  Mr. Smith is a 45-year-old resident of the District of Columbia.  Although he has tried for many years to find steady employment, he has not been successful due to his personal circumstances—including physical limitations, mental health issues, transportation limitations, educational attainment, and race. Declaration of Damon Smith ("Smith Decl."), Dkt. #4-4 (No. 1:20-cv-00119) ¶¶6, 9-19.   Nonetheless, Mr. Smith participates in a newspaper vendor program operated by a nonprofit, Street Sense Media, that publishes a biweekly

---

[4] In the District of Columbia, the maximum amount of SNAP benefits for a family of four is $646, so families often have to supplement SNAP by receiving services at Bread and similar organizations.  *SNAP Eligibility*, D.C. DEP'T OF HUMAN SERVS., https://dhs.dc.gov/service/snap-eligibility. For example, in October 2019, a "low cost" food plan (as calculated by USDA) would cost a household of four between $726 and $856 per month on average.  *Official USDA Food Plans: Cost of Food at Home at Four Levels, U.S. Average, October 2019*, USDA, https://fns-prod.azureedge.net/sites/default/files/media/file/CostofFoodOct2019.pdf (last visited June 19, 2020).  This discrepancy between food costs and the ability of SNAP to meet nutritional needs is demonstrated by the fact that almost 80 percent of SNAP benefits are used by the middle of the month. *See Chart Book: SNAP Helps Struggling Families Put Food on the Table*, CTR. ON BUDGET & POLICY PRIORITIES (Updated Nov. 7, 2019), at 8, https://www.cbpp.org/sites/default/files/atoms/files/3-13-12fa-chartbook.pdf (last visited June 19, 2020).

paper providing in-depth coverage of homelessness and poverty.  The newspaper is sold for a $2 donation on street corners and in other public spaces by people experiencing homelessness or poverty.  Smith Decl. ¶¶4, 7. Mr. Smith has no employer-employee relationship with Street Sense and it is not uncommon for him to make less than $20 in donations a day.  Smith Decl. ¶8.  He therefore relies on SNAP to guarantee that he will be able to eat.  Smith Decl. ¶¶20-22.  He is currently receiving SNAP benefits in the amount of $194 a month.  Smith Decl. ¶21.  If the Final Rule goes into effect, Mr. Smith will lose his benefits and, put simply, will not know how he will eat.  Smith Decl. ¶¶22-23.

Ms. Tann is a 28-year-old resident of the District of Columbia who resides with her 95 year-old grandmother.  Declaration of Geneva Tann ("Tann Decl."), Dkt. #4-5 (No. 1:20-cv-00119) ¶¶1-3.  A high school graduate, Ms. Tann attended college but dropped out for financial reasons. Tann Decl. ¶4.  She is currently unemployed but maintains an account with a temporary staffing agency and is actively searching for employment.  Tann Decl. ¶¶5, 7.  Like Mr. Smith, Ms. Tann faces multiple barriers to obtaining permanent employment—both systemic factors at play in the District and her individual circumstances.  Tann Decl. ¶¶10-20.  In January 2020, Ms. Tann applied for and began receiving food stamps in the amount of $194 a month.  These food stamps provide her with an invaluable safety net, giving her the financial and nutritional security she requires as she tries to "get back on her feet."  Tann Decl. ¶22.  If the Final Rule goes into effect, Ms. Tann will lose her SNAP benefits and will not have consistent and steady access to food.  Tann Decl. ¶¶22-23.

### B.    Procedural History of This Case.

On January 16, 2020, with the elimination of SNAP benefits looming and imminent, Bread, Mr. Smith, and Ms. Tann filed this action and moved for a preliminary injunction, seeking to stay implementation of the Final Rule pending the final judgment in the case.  No. 1:20-cv-00127, Dkt. #1, 4.  The same day, 14 States, the District of Columbia, and New York City filed a similar case

and moved for a preliminary injunction seeking the same relief. The Court promptly consolidated the two cases. Shortly thereafter, the State Plaintiffs filed their First Amended Complaint, joining five more States as plaintiffs.

The Court held oral argument and later issued a nationwide preliminary injunction staying implementation of the waiver provisions in the Final Rule. The Court noted that the Final Rule would cause nearly 700,000 people to lose their benefits and recognized that "[e]specially now, as a global pandemic poses widespread health risks, guaranteeing that government officials at both the federal and state levels have flexibility to address the nutritional needs of residents and ensure their well-being through programs like SNAP, is essential." Memorandum Opinion ("Mem. Op."), Dkt. #51 at 1-2.

This Motion for Summary Judgment followed.

## ARGUMENT

### I.    USDA EXCEEDED ITS STATUTORY AUTHORITY BY PROMULGATING A PROSPECTIVE CATEGORICAL RULE THAT SUBSTANTIALLY DISPLACES THE WAIVER ADJUDICATION PROCESS MANDATED BY STATUTE.

The Court should grant the Private Plaintiffs' motion for summary judgment, because USDA exceeded its statutory authority in issuing the Final Rule. The pertinent statutory provision (7 U.S.C. § 2015(o)(4)(A)(ii)) requires USDA to determine job-insufficiency waivers on a case-by-case basis, according to an evaluation of the employment opportunities for a specific group of individuals within a particular geographic area. USDA did not comply with that directive. As Defendants conceded in their preliminary injunction brief, the Final Rule would (1) predetermine the outcome of States' waiver applications through a prospective categorical rule and (2) relegate case-specific waiver adjudications to rare situations involving "extraordinary circumstances" or anomalous geographic areas (Indian Reservations and U.S. Territories). Defendants' Consolidated Opposition to Plaintiffs' Motions for Summary Judgment, Dkt. #26 at 11-13. USDA's decision to

regulate by prospective categorical rule, and abandon decision-making through adjudication of particularized facts, violates the well-established requirement that the agency must follow the regulatory process dictated by Congress.  The Final Rule therefore is an invalid final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act (APA).  5 U.S.C. § 706(2)(C) (1966).

### A. The Statute's Waiver Provision Requires USDA to Render Decisions on Waiver Applications Through Case-Specific Adjudications.

The text of the statute's waiver provision expressly requires USDA to render decisions on waiver applications case by case, based upon the evidence that specific States submit to prove that they have met the statutory waiver standard:

> On the request of a State agency and with the support of the chief executive officer of the State, the Secretary may waive the applicability of [the time limit] to any group of individuals in the State if the Secretary makes a determination that the area in which the individuals reside—
>
> (i) has an unemployment rate of over 10 percent; or
>
> (ii) does not have a sufficient number of jobs to provide employment for the individuals.

7 U.S.C. § 2015(o)(4) (2018).  The "individuals" receiving the benefit of a waiver are the people to whom the time limit "appl[ies]" in the absence of a waiver (*i.e.*, ABAWDs).  The statute places no limitations on the evidence that a State can submit to prove a waiver is justified.[5]

This case focuses on USDA's determinations, under section 2015(o)(4)(A)(ii), about whether a "sufficient number of jobs" exist for ABAWDs living in an area with an unemployment rate of 10 percent or less.[6]  Courts interpreting statutes must "construe language in its context and

---

[5] The statute defines "State" to include the District of Columbia.  7 U.S.C. § 2012(r) (2018).

[6] Areas with an unemployment rate of over 10 percent independently qualify for a waiver under section 2015(o)(4)(A)(i) (2018).

in light of the terms surrounding it." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).  The statute's text requires USDA to make these "determination[s]" on the basis of the "sufficien[cy]" of the "number of jobs" in a particular geographic "area" in which an identifiable "group" of "individuals reside." 7 U.S.C. § 2015(o)(4)(A)-(ii).  Such singular determinations are, by their very nature, case-specific decisions based upon the particular facts presented to USDA.[7]

**B.    USDA Exceeded Its Statutory Authority by Substantially Displacing the Adjudication Process with a Prospective Categorical Rule.**

USDA has announced that it intends, through the Final Rule, to "ensure the waivers are applied on a more limited basis" by implementing "stricter criteria for waiver approvals." 84 Fed. Reg. at 981-982.  USDA implements this objective primarily through restrictions called "core standards."  *See* 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24(f)(2)).  The core standards substantially displace case-specific waiver determinations with a prospective categorical rule that prejudges waiver applications and sharply restricts the evidence States can submit to justify them.

The core standards make the granting of waivers turn *entirely* upon unemployment rates. Under the core standards, USDA will grant a waiver request if the area at issue has either (1) a recent 12-month average employment rate over 10 percent; or (2) a 24-month average

---

[7] Other SNAP statutory provisions similarly use the term "determination" to refer to a case-specific decision based upon the facts presented to the decisionmaker.  *See, e.g*., 7 U.S.C. § 2015(b) (addressing a "determination" that is a court or agency finding that an individual committed wrongful acts); *id*. at § 2015(c) (addressing a "determination" that is a USDA decision regarding a specific household's eligibility for SNAP benefits); *id*. at § 2020(e)(10) (addressing a "determination" that is a USDA decision following a hearing concerning a specific household's participation in SNAP); *id*. at § 2023(a)(5) (2008) (addressing a "determination" that a specific store should be disqualified from the SNAP program). These other provisions corroborate the foregoing interpretation of section 2015(o)(4)(A)(ii), because it is the "'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'"  *Yousuf v. Samantar*, 451 F.3d 248, 256 (D.C. Cir. 2006) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570 (1995)); *Powerex Corp. v. Reliant Energy Servs., Inc*., 551 U.S. 224, 232 (2007) (same).

unemployment rate that is 20 percent or more above the national unemployment rate but not less than 6 percent. 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24 (f)(2)). With very limited exceptions, USDA will automatically deny waiver requests that do not meet either of those two unemployment-rate criteria. *See id*. (citing 7 C.F.R. § 273.24(f)(3), (f)(6)).[8]

The Final Rule's sole reliance on unemployment rates clashes directly with the bipartite design of the statute's waiver provision. Congress specified an unemployment rate (of over 10 percent) as only one of two independent criteria for waiver approvals. 7 U.S.C. § 2015(o)(4)(A)(i) (2018). The second of the two statutory criteria is a flexible determination of job sufficiency for ABAWDs, involving the case-specific assessment of particular facts as described above, which need not include unemployment-rate information. *Id*. at § 2015(o)(4)(A)(ii). The Final Rule generally tracks the first criterion (an unemployment rate of over 10 percent). 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24 (f)(2)(i)). But the Final Rule eviscerates the second criterion, replacing the flexible statutory adjudication process with a predetermined cutoff for waivers: an unemployment rate 20 percent above the national rate and not less than 6 percent. *Id*. (citing 7 C.F.R. § 273.24 (f)(2)(ii)). USDA lacks the statutory authority to promulgate a rule that substantially displaces the waiver adjudication process for job sufficiency established by Congress.[9]

---

[8] The Final Rule provides narrow exceptions to the core-standard criteria for waiver requests that involve "areas with exceptional circumstances or areas with limited data or evidence, such as Indian Reservations and U.S. Territories." 84 Fed. Reg. at 983; 84 Fed. Reg. at 66,811 (citing 7 C.F.R. §§ 273.24(f)(3), (f)(6)). However, USDA intends that the core standard criteria will "serve as the basis for approval for the vast majority of waiver requests," and that only very unusual and "extreme, dynamic circumstances" will satisfy the core-standard exception for "exceptional circumstances." 84 Fed. Reg. at 983, 985. USDA could not meet the objective of the Final Rule (to reduce waivers) if the agency frequently found "exceptional circumstances" justifying a departure from the core standards.

[9] Recent events demonstrate one reason that USDA's decisions about ABAWD job sufficiency could be deeply flawed if the agency based waiver determinations only on unemployment rates.

### 1.    The Statute's Waiver Provision Did Not Authorize USDA to Displace the Adjudication Process With a Prospective Categorical Rule.

USDA's "determination" of States' waiver applications under section 2015(o)(4)(A)(ii) is a classic example of an informal "adjudication" within the meaning of the APA.  Adjudications are case-by-case agency decisions, based upon particular sets of facts, that result in the issuance of an "order."  *See generally* 5 U.S.C. § 551(7) (2011).  The APA definition of "adjudication" includes an agency process to grant or deny a "statutory exemption or other form of permission." 5 U.S.C. §§ 551(6)-(9).[10]  The waiver process here is an "adjudication," because it results in a USDA order granting a time-limited exemption from statutory time limits on benefits.  And the process is an "informal" adjudication, because there is no statutory requirement for the agency to follow the APA's formal procedural rules set forth at 5 U.S.C. § 554 (1978).

By establishing this adjudication process, Congress did not authorize USDA to replace it with rulemaking, which is the polar opposite of adjudication.  Rulemaking and adjudication are, by definition, mutually exclusive regulatory processes.  5 U.S.C. §§ 551(6), (7) (2011) (defining "adjudication" to mean the process for formulating an agency order in a "matter *other than* rulemaking") (emphasis added).  The drafters and proponents of the APA intentionally "shaped

---

Just this month, the Bureau of Labor Statistics (BLS) announced that it had made a "misclassification error" in its calculation of overall unemployment rates.  BLS acknowledged that if it had not made the mistake, "the overall unemployment rate would have been about 3 percentage points higher than reported (on a not seasonally adjusted basis)." *Employment Situation Summary*, Dept. of Labor, Bureau Of Labor Statistics (June 5, 2020), https://www.bls.gov/news.release/empsit.nr0.htm (last visited June 21, 2020).  BLS acknowledged that this is not the first time it has made such a mistake, noting that "BLS and the Census Bureau are investigating why this misclassification error continues to occur . . . ." *Id*.  Even after BLS discovered the error it refused to correct the published unemployment rate, on the ground that it needed to "maintain data integrity" with regard to how the data were originally classified. *Id*.

[10] The APA specifies that "adjudication" includes "licensing", which among other things means the "process respecting the grant" or "den[ial]" of "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  5 U.S.C. §§ 551(6)-(9) (2011).

the entire Act around" the "distinction between rule making and adjudication."  Attorney General's Manual on the Administrative Procedure Act (1947) ("Attorney General's Manual") at 15; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218 (1988) (1947 Attorney General's Manual on the Administrative Procedure Act is "the Government's own most authoritative interpretation of the APA").  The "entire [Administrative Procedure] Act is based upon a dichotomy between rule making and adjudication."  Attorney General's Manual at 14.  When an agency regulates through rulemaking, it implements legal requirements through prospective rules that are "essentially legislative in nature, not only because [they] operate[ ] in the future but also because [they are] primarily concerned with policy considerations."  *Id*.  In stark contrast, when an agency regulates through adjudication, it implements legal requirements case by case based upon the facts before it, such as when an agency determines "a person's right to benefits under existing law" by deciding "whether he is within the established category of persons entitled to such benefits."  *Id*. at 14-15.

The sequence of events set out in section 2015(o)(4)(A)(ii) illustrates one facet of this fundamental distinction between rulemaking and adjudication.  In an adjudication, an agency makes its regulatory decision *after* being presented with a set of specific facts.  Here the statute's text directs USDA to determine job sufficiency in a specified area *after*—and in *response* to—a State's waiver application:  "*on the request of a state agency . . .* [USDA] makes a determination." 7 U.S.C. § 2015(o)(4)(A) (emphasis added).  By contrast, a rulemaking is, by definition, a prospective pronouncement.  Under the APA, a "rule" is an agency action that "*prescribe[s]* law" through a "statement" of "*future* effect."  5 U.S.C. § 551(4) (emphasis added).  That is what the

14

Final Rule does, by announcing binding "core standards" that will automatically determine the outcome of future waiver applications before States have even submitted them.[11]

When "Congress has *not* specified" which of the two processes to use, an agency ordinarily has discretion to regulate either through adjudication or rulemaking. *Michigan v. EPA*, 268 F.3d 1075, 1087 (D.C. Cir. 2001) (citing *SEC v. Chenery Corp*., 332 U.S. 194 (1947)) (emphasis added). But where, as here, "Congress *has* spoken" and directed which process to use, that direction is binding, and the agency has no discretion to deviate from it. *Michigan*, 268 F.3d at 1087 (emphasis added). That straightforward conclusion derives from the axiom that agencies are "'bound, not only by the ultimate purposes Congress has selected, but by the *means* it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)) (emphasis added). Here case-by-case decision-making (*i.e.*, adjudication) is the particular means that Congress specified to make decisions about waivers for lack of sufficient jobs. USDA had no statutory authority to substitute a wholly different procedural regime (*i.e.*, rulemaking) that denies such waivers through a prospective rule. In cases like this, "when a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'" *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (citation omitted).

---

[11] The statute also directs that after the basis for a waiver is known, USDA must "report the basis" to "the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate." 7 U.S.C. § 2015(o)(4)(B) (2018). Under the Final Rule, there would be no need to report the basis for waivers to Congress, because the (unemployment-rate) basis for waivers would already have been published in advance, in the Federal Register. The Court should reject an interpretation of the statute that renders any of its provisions superfluous. *See, e.g.*, *SW Gen. Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015).

### 2. USDA's General Rulemaking Authority Did Not Empower the Agency to Displace the Adjudication Process with a Prospective Categorical Rule.

USDA has separate general rulemaking authority that permits the agency to issue "regulations consistent with this chapter [that USDA] deems necessary or appropriate for the effective and efficient administration of the supplemental nutrition assistance program." 7 U.S.C. § 2013(c) (2018). This general rulemaking authority also does not empower the agency to deny waivers through categorical rules that materially constrain the adjudication process required by statute. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress" (*Bowen*, 488 U.S. at 208), because "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). *See also Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) (agency's "rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute"). By the terms of the statute, regulations issued under this general rulemaking authority must be "consistent with" the statutory waiver provision requiring case-by-case adjudication. 7 U.S.C. § 2013(c). Yet the Final Rule is fundamentally *inconsistent* with the statutory waiver provision, by materially constraining—indeed displacing—the adjudication process.

Section 2013(c) did not authorize USDA to proceed in this manner. "[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018). A "'general grant of rulemaking power . . . [cannot] trump the specific provisions of the act.'" *Id.* (quoting *Nat. Res. Def. Council, Inc. v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992)); *see also Air Alliance Houston*, 906 F.3d at 1061 (agency "may not 'accommodate' two statutes by allowing one to 'override' the more specific requirements of the other") (internal citation omitted).

In *Sullivan v. Zebley*, the Supreme Court applied the foregoing principles when it invalidated a disability-benefits rule that purported to curtail an adjudication process established by statute. 493 U.S. 521 (1990). The statute required an individualized adjudication of a beneficiary's disability, yet the agency rule established a "decision process restricted to comparing claimants' medical evidence to a fixed, finite set of medical criteria" that could not "respond adequately to the infinite variety of medical conditions." *Id*. at 539. The Supreme Court held that the agency's rule was "'manifestly contrary to the statute'" and "exceed[ed] [its] statutory authority." *Id*. at 528, 541 (internal citation omitted). *Zebley* directly parallels the present case. USDA had no statutory authority to issue a rule that substitutes a "fixed, finite set" of unemployment-rate criteria for an adjudication process designed to assess "the infinite variety" of circumstances affecting ABAWDs' job opportunities. *See also Levine v. Apker*, 455 F.3d 71, 73, 86, 87 (2d Cir. 2006) (Bureau of Prisons "improper[ly] exercise[d] [its] rulemaking authority" by issuing a "categorical rule" determining prisoner eligibility for halfway-house confinement "*solely* on the basis of one criterion" when the statute required Bureau to make "individualized decisions" based on factors "specific to individual prisoners") (emphasis added).

C. **The Final Rule is Starkly Different Than Permissible Rules That Merely Supplement, Rather Than Displace, an Adjudicatory Process Required by Statute.**

The Final Rule is distinguishable from permissible regulations that merely supplement an adjudicative process by enhancing its efficiency. The Final Rule *supplants*—instead of *supplementing*—the adjudicative process.

1. **The Final Rule is Distinguishable from Supplemental Rules That Uniformly Dispose of Repetitive Issues For Which the Outcome Should Not Vary From Case to Case.**

Courts have validated some supplemental regulations when the agency has statutory authority to issue them, and when they allow an agency to give a uniform response to a repetitive issue that will not differ from adjudication to adjudication. These courts conclude that for the sake of efficiency, an agency should not have to relitigate issues that will always come out the same way regardless of a claimant's specific situation. In reviewing the legitimacy of such regulations, courts consider, among other things, whether claimants have a fair opportunity to argue that the general rules should not apply to them.

For example, in *Heckler v. Campbell*, the Supreme Court held that the Department of Health and Human Services (HHS) had properly issued supplemental regulations that enhanced the efficiency of Social Security disability adjudications. 461 U.S. 458 (1983). The regulations contained vocational guidelines that set forth factual information concerning certain types and numbers of jobs that exist in the national economy. HHS had specific statutory authority to issue regulations governing the evidence presented in those adjudications. *Id*. at 466. The subject matter of the regulations was a "general factual issue" that was "not unique to each claimant" and could be "resolved as fairly through rulemaking as by introducing . . . testimony" at each adjudication. *Id*. at 468. The Supreme Court held that HHS had authority to the issue the regulations, in order to "determine issues that do not require case-by-case consideration," and in order to avoid making

the agency "continually . . . relitigate" issues that would turn out the same way in each case. *Id*. at 467. It was significant to the Court's decision that the supplemental regulations still gave "claimants ample opportunity both to present evidence relating to their own abilities and to offer evidence that the guidelines do not apply to them." *Id*. & n.11; *see also id*. at 462 n.5.

In stark contrast, in this case (1) USDA's Final Rule effectively displaces the adjudication process, on questions of job sufficiency that the statute's text recognizes are unique to each affected area and State; (2) the issues will not necessarily turn out the same way from State to State; (3) the questions cannot be resolved as fairly through rulemaking as through adjudication; and (4) there are minimal opportunities to demonstrate that the rules do not apply in a particular case.

### 2. The Final Rule is Distinguishable from Supplemental Rules That Limit Adjudication to Matters Contested by the Parties.

The Final Rule also is distinguishable from supplemental rules that authorize statutorily-required adjudication but *limit* the adjudicatory process to matters *contested* by the parties. This type of supplemental rule identifies one or more categories of claimants for which the agency *concedes* the right to relief (and effectively grants the relief automatically, without the need for adjudication). Neither party is prejudiced by such rules, which enhance the efficiency of the adjudicatory process by summarily disposing of cases presenting no actual controversy. That permits the agency to focus on adjudicating other cases in which an actual controversy does exist.

A significant example is the current version of USDA's waiver rule, which defines categories of applications that the agency will not contest (and will automatically grant). 7 C.F.R. § 273.24(f)(3)(i)–(3)(iii) (2019). It is fundamentally important here that the current rule *also* provides for individualized adjudication of waiver applications that do *not* meet the automatic-qualification standards. *See id*. § 273.24(f)(2) (explaining that "[t]he State agency may submit whatever data it deems appropriate to support its request" and providing a "non-exhaustive list" of

19

suggested "kinds of data" for the State to consider submitting). That process satisfies the congressional mandate that USDA must exercise its general rulemaking authority in a manner "consistent with" the rest of the statute (7 U.S.C. § 2013(c)), including the statutory requirement that State applicants must have the opportunity for individualized determinations of their waiver applications.

However, rules granting relief in uncontested cases are *not* permissible if they *limit* relief to uncontested cases, without providing for adjudication of actual controversies. A compelling example is the unlawful rule at issue in *Zebley*. That rule identified categories of disability claims for which the claimant "qualifies for benefits without further inquiry." *Zebley*, 493 U.S. at 525. In so doing, the rule "'streamline[d] the decision process by identifying those claimants whose medical impairments'" plainly justified disability benefits. *Id*. at 532 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)). However, the rule was fatally defective because of the way it treated claimants who did *not* satisfy the automatic-qualification standard. Such claimants were "simply denied benefits," even if they could otherwise prove, in an individualized adjudication, that they satisfied the applicable statutory standard. *Id*. at 535-36; *see also id*. at 526 (rule allowed "no further inquiry" past the automatic-qualification standard). The rule was unlawful, because it deprived such claimants of an individualized determination that the statute required: an opportunity to prove that they were entitled to benefits. *Id*. at 539-41.

There is a striking parallel between the rule challenged in *Zebley* and the Final Rule challenged here. The Final Rule's "core standards" define a category of applications that USDA will automatically grant, because the agency does not contest that the waivers are justified. However, the Final Rule is fatally defective, because it *also* deletes the current rule's entitlement to an individualized adjudication of applications that are *not* automatically granted. Under the

20

Final Rule, USDA will automatically grant applications that comply with the core standards but also will automatically *deny* waiver applications that do *not* meet the same standards. Like the disability determinations challenged in *Zebley*, such denials will occur even when the parties actively dispute the right to a waiver, without permitting an individualized adjudication (in which the State applicant could prove a lack of "sufficient" jobs for the ABAWD population). Accordingly, like the rule in *Zebley*, the rule challenged here is unlawful.

### D. USDA Cannot Save the Rule by Asserting That the Court Should Defer to an Agency "Statutory Interpretation."

#### 1. There Is No Basis for the Court to Reach the Question of *Chevron* Deference Because Any Statutory Interpretation Occurred in the Wrong Procedural Context.

The Court also should reject Defendants' argument, in the preliminary injunction proceedings, that the substantive provisions of the Final Rule allegedly are entitled to deference under step II of the *Chevron* doctrine. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984). That argument assumes the erroneous premise that the agency had statutory authority to displace adjudication with rulemaking in the first place (and interpret the statute in the context of that rulemaking). Because any statutory interpretation occurred in the wrong procedural context—a rulemaking instead of an adjudication—the Court should set aside the rule on that ground, so that there is no basis for even reaching the deference issue.

Setting aside the rule would not, as Defendants previously asserted, improperly restrict whatever discretionary authority USDA may have to interpret and administer the statute. If USDA determines waiver applications through informal adjudication as it should, the agency will exercise its proper authority to interpret the statute in that context. *See, e.g.*, *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018) (describing statutory interpretation in informal adjudication). USDA also will be able to lay its claim to *Chevron* deference if it regulates through informal adjudication

as the statute requires (though the claim would likely fail).[12]  However, it is premature to address these deference issues now, because USDA has unlawfully displaced the adjudicatory process, and the Court should set aside the rule on that ground.

> **2.    There Is No Basis for the Court to Reach the Question of *Chevron* Deference Because the Rule Derives From a Policy Decision, Not a Statutory Interpretation.**

There also is no basis for the Court to reach the question of *Chevron* deference, because such deference only applies to an agency's interpretation of a statute, and the substantive provisions of the Final Rule derive from a policy decision, not a statutory interpretation.  For example, USDA's preamble to the Final Rule justifies the core standards with policy arguments (like encouraging "broader application of the time limit" (84 Fed. Reg. 66,782, 66,783)) instead of using any of the traditional tools of statutory construction, which include evaluating the statute's "text, structure, purpose, and legislative history."  *Cares Cmty. Health v. HHS*, 944 F.3d 950, 957 (D.C. Cir. 2019).  The "most traditional tool" is to "read the text," which is the proper starting point of any statutory construction.  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quotation omitted).  But in the Final Rule's preamble, the agency does not even attempt to do a textual analysis of critical statutory terms like "sufficient" (much less apply the other traditional tools) in establishing the core standards.

---

[12] It is very unlikely that *Chevron* deference would apply to a USDA ruling on a waiver application. That type of informal adjudicatory ruling likely lacks the formality even to be considered under the two-part *Chevron* test.  *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218 (2001).  The courts often use the term *Chevron* "step zero" to refer to a determination that the *Chevron* analytical construct does not apply at all to an agency decision.  *See, e.g.*, *Prime Time Int'l Co. v. Vilsack*, 930 F. Supp. 2d 240, 248 (D.D.C. 2013).  If the agency decision does not pass step zero, the court does not even reach the question whether *Chevron* deference is due on the ground that the statute is ambiguous.  The Supreme Court's decision in *Mead* suggests that rulings from informal adjudications of waiver applications likely would not pass step zero.  533 U.S. 218 (refusing to apply the *Chevron* analytical construct to informal adjudication).

USDA also made conclusory statements in response to comments that referred to the statute's text and legislative history in arguing that Congress intended for "insufficient jobs" to be an independent waiver criterion that did not rely upon an unemployment rate. According to these commenters, Congress intended the "insufficient jobs" criterion "as a recognition of the shortcomings of the unemployment rate for measuring job opportunities for the individuals subject to the time limit, and established that it could use flexibility in determining whether a State demonstrates a lack of jobs." Center on Budget Priorities Comment, Certified Corrected Administrative Record, Public Comments on Proposed Rule, FNS-2018-0004-5999 and FNS-2018-0004-9011, ABAWD00110100 at 127 ("Center on Budget Priorities Comment"). USDA provided no statutory analysis whatsoever in response to these comments. Instead, the agency simply asserted that it "does not find setting an unemployment rate floor to be in conflict with legislative intent" and that it believes its Final Rule is "well within the authority under [7 U.S.C. §2015(o)(4)(A)], which provides the Secretary with broad discretion on how to define what does and does not constitute a lack of sufficient jobs." 84 Fed. Reg. at 66,788.

What USDA is really trying to implement in the Final Rule is a new *policy decision* (limiting the number of SNAP beneficiaries) and not a new statutory interpretation. *See, e.g.*, 84 Fed. Reg. at 66,785, 66,788 (referring to 6 percent floor as the most "justified option" and a "reasonable policy change[ ]"). USDA cannot convert its policy choice into a statutory interpretation simply by asserting that the agency is construing the statute. "[I]nterpreting a statute is quite a different enterprise than policymaking." *Cont'l Air Lines v. Dep't of Transp*., 843 F.2d 1444, 1452 (D.C. Cir. 1988). An agency's decision is properly viewed as a statutory interpretation (potentially triggering judicial deference)—instead of a policy decision—the more the decision rests upon statutory language instead of upon a claim of agency discretion. *See Nat'l Ass'n of*

*Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 727 (D.C. Cir. 1994). Here USDA has done just the opposite, effectively ignoring the statutory language and claiming broad discretion to reach the agency's policy goals.

When an agency bases its decision upon policy instead of upon a statutory interpretation, a reviewing court uses a different mechanism (other than judicial deference) for honoring the agency's executive-branch prerogatives. To review a policy decision, a court typically applies the "arbitrary and capricious" standard to give the agency's decision proper leeway and respect (instead of applying judicial deference doctrines relevant when a statutory interpretation truly is at issue). *See id.* But that assumes that the agency had statutory authority to issue the decision in the first place. Here USDA did not, so the Court should set aside the Rule.

## II.    THE USDA RULE IS ARBITRARY AND CAPRICIOUS.

Even if USDA had the statutory authority to issue the Final Rule, it would still need to survive review under the "arbitrary and capricious" standard, which must be "independently satisfied." *Mozilla Corp. v. FCC*, 940 F.3d 1, 49 (D.C. Cir. 2019). The Rule also fails that test.

### A.    The Rule is Arbitrary and Capricious Because It Relies Solely Upon Unemployment Rates to Establish Whether ABAWDs Have Sufficient Job Opportunities in the Areas Where They Reside.

In its preliminary injunction opinion, the Court properly questioned USDA's decision to use unemployment rates as the sole yardstick for ABAWD job opportunities. The Court found that "[v]oluminous evidence supported the commenters' view that general unemployment rates alone cannot measure whether an area has 'a sufficient number of jobs to provide employment *for the individuals*.'" Mem. Op. at 29 (citing 7 U.S.C. § 2015(o)(4)(A)(ii)). USDA's singular reliance on unemployment rates to measure ABAWD job opportunities renders the Final Rule arbitrary and capricious.

1.    **The Final Rule Irrationally Prohibits Consideration of All Factors Relevant to Job Sufficiency.**

By relying solely on unemployment rates, the Final Rule irrationally prohibits the agency from even considering other relevant factors to determine whether an area lacks sufficient jobs for ABAWDs.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983) (decision is arbitrary and capricious if it is not "'based on consideration of the relevant factors'") (citation omitted).  USDA expressly concedes that its Final Rule is intended to "limit[ ] the number of ways that a State may demonstrate a lack of jobs."  84 Fed. Reg. 66,782, 66,788. Yet the agency also implicitly concedes that these limitations will require it to deny waivers even when there is legitimate, probative evidence of job insufficiency.  In particular, the text of the Final Rule lists three types of evidence that USDA (with limited exceptions) will not consider in adjudicating waiver applications:  (1) proof of a "low and declining unemployment-to-population ratio," (2) proof of a "lack of jobs in declining occupations or industries", or (3) an "academic study or other publication describing the area as lacking a sufficient number of jobs to provide employment for its residents."  84 Fed. Reg. at 66,811 (citing 7 C.F.R. §§ 273.24(f)(6)(i)(B), (i)(C), (i)(D)).  USDA imposes this substantial restriction while simultaneously *acknowledging* that all three types of proof can be "sufficient data or evidence" that an area lacks sufficient jobs (and will be accepted to justify waivers in limited areas such as U.S. Territories or Indian reservations).  *Id*. (citing 7 C.F.R. § 273.24(f)(6)(i)).  It is not surprising that USDA expressly concedes the legitimacy of these modes of proof.  For the two decades that ABAWD time-limit waivers have existed, USDA has consistently accepted all three types of evidence to prove lack of sufficient jobs.  *See* 7 C.F.R. §§ 273.24(f)(2), (2)(ii) (2019)).  USDA does not adequately explain why it departed from that practice in the Final Rule.

### 2. USDA Did Not Adequately Address Evidence That Unemployment Rates Are a Deeply Flawed Measure of ABAWD Job Opportunities.

The Final Rule also is arbitrary and capricious, because USDA chose to rely solely on unemployment rates without adequately addressing evidence that they are a deeply flawed measure of ABAWD job opportunities. USDA first failed to confront its *own* longstanding acknowledgement that unemployment rates, taken alone, do not necessarily measure the "employment prospects of individuals with little work history and diminished opportunities." 1996 Guidance, at ABAWD00000168. The agency acted arbitrarily and capriciously because it did not adequately explain its abrupt departure from this prior conclusion. *Am. Wild Horse Pres. Campaign v. Purdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (vacating an agency's action that "brushed aside critical facts" and failed to "adequately explain" or "adequately analyze" its policy choice); *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) ("agency action is arbitrary and capricious if it departs from agency precedent without explanation.").

In addition, numerous comments demonstrated that general unemployment rates are a wholly inadequate measure of ABAWD job opportunities (as opposed to opportunities for the population at large). *See, e.*g., Center on Budget Priorities Comment, at ABAWD00110148 ("The area unemployment rate is a poor proxy for employment opportunities available to adult SNAP participants without dependent children."). Yet USDA dismissed this fundamental flaw in conclusory fashion, thereby rendering the Final Rule arbitrary and capricious. *See Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) (agency decision was arbitrary and capricious because it merely "[n]od[ded] to concerns raised by commenters only to dismiss them in a conclusory manner."); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("The Commission's failure to respond meaningfully . . . renders its decision to use the median rate arbitrary and capricious.").

*First*, the agency did not seriously confront the fact that ABAWDs face barriers to employment based upon educational levels lower than those of the general population. Fifty-four percent of SNAP beneficiaries have only a high school diploma (or equivalent), and 24 percent do not even have a high school diploma. Center on Budget Priorities Comment, at ABAWD00110132. It is well established that adults with lower educational attainment have higher unemployment rates than their more educated counterparts:

> Research shows that adults with lower educational attainment have higher unemployment rates than those with more education. For example, in 2018, while the unemployment rate for workers with a bachelor's degree or more was 2.1 percent, the unemployment rate for high school graduates was 4.1 percent, and for those with less than a high school education, 5.6 percent. African Americans with less than a high school diploma had an unemployment rate of 10.4 percent.

*Id*. at ABAWD00110133. In addition, "[w]orkers with less education are more likely to lose jobs during an economic downturn and will recover more slowly in the aftermath of a recession." *Id*. at ABAWD00110134. And this difference can be quantified:

> Researchers have found that an increase of one percentage point in the state unemployment rate leads to almost a two-percentage-point increase in unemployment for workers with less than a high school degree compared to less than 0.5 percentage point increase for those with a college degree.

*Id*. at ABAWD00110134.

*Second*, the agency did not adequately address comments demonstrating that a significant portion of ABAWDs face barriers to employment because they were formally incarcerated or have a criminal record. For example, in a Franklin County, Ohio education and training program, one third of ABAWD participants reported a criminal record. *Id.* Formerly incarcerated people face steep barriers to employment, including lower levels of education, gaps in work experience,

occupational licensing prohibitions, and general hiring aversions based on incarceration status.  *Id.* at ABAWD00110147-148.

*Third*, USDA skipped past comments that ABAWDs disproportionately include members of minority groups who face employment barriers from discrimination—over 40 percent of SNAP participants targeted by the waiver are African American or Latino.  *Id.* at ABAWD00110135. For example, for the past several decades, unemployment rates among African American workers have been roughly double the unemployment rates for white workers with comparable education levels.  *Id.*  From 2013 to 2017, Rochester, MN had an average overall unemployment rate of 3.9 percent and an average African American unemployment rate of 20.2 percent, (*id.* at ABAWD00110160) which far exceeded the average unemployment rate during the Great Depression (approximately 14 percent).  *Id.* at ABAWD00110162, n.155.  In the District, the disparity is even greater.  In 2018, the African American unemployment rate was approximately 8.5 times higher than that for white residents (12.9 percent vs. 1.5 percent).[13]  Thus, in the District, there is likely a much higher unemployment rate for African-American ABAWDs than for white ABAWDs.  Yet the agency effectively sidestepped the issue.[14]

---

[13] Sasha-Ann Simons, *D.C.'s Black Unemployment Rate Remains Among Highest In The Country*, WAMU, https://wamu.org/story/18/05/18/d-c-s-black-unemployment-rate-remains-among-highest-country/ (last visited June 21, 2020).

[14] USDA compounded this failure through its cursory reference, in the preamble, to the Final Rule's impact on ABAWDs' civil rights.  The agency's Civil Rights Impact Analysis concluded that, although "a reduction in the number of ABAWD waivers granted to States will affect potential SNAP program participants in all groups who are unable to meet the ABAWD work requirements, and have the potential for impacting certain protected groups due to factors affecting rates of employment of members of these groups, the Department finds that the implementation of mitigation strategies and monitoring by the FNS Civil Rights Division and FNS SNAP may lessen these impacts."  84 Fed. Reg. 66,782, 66,808.  But the preamble did not explain what these "mitigation strategies" and "monitoring" might actually entail.  And at the preliminary injunction hearing, Defendants' counsel could not provide any details, stating simply that "[w]e are going to keep our eyes open.  And if [disparate impact] occurs, we'll take steps at that time to address that." Preliminary Injunction Hearing Transcript, Dkt. #52 at 91.

*Fourth*, USDA failed to analyze adequately the fact that SNAP beneficiaries tend to work in occupations subject to higher rates of instability. Therefore ABAWDs who meet the 20 hour per week requirements for one month may not do so consistently. *See, e.g*., Contra Costa County, California Comment, Certified Corrected Administrative Record, Public Comments on Proposed Rule, FNS-2018-0004-5999 and FNS-2018-0004-9011, ABAWD00078323 ("The nature of the work and the industries in which many ABAWDs are employed (e.g., retail and restaurant) can make it difficult to maintain predictable and consistent hours from week to week" and citing difficulties in providing proof of all hours worked). In 2018, service jobs had an unemployment rate 23 percent higher than the national average; for those in food service, the unemployment rate was 56 percent higher. Center on Budget Priorities Comment, at ABAWD00110139. These jobs also tend to have higher rates of turnover and underemployment. *Id.* at ABAWD00110138-140. And these workers are more likely to face geographic or transportation barriers to employment, because available jobs are often located far from affordable housing where SNAP beneficiaries often live. *Id*. at ABAWD00110144.

*Finally*, ABAWDs typically suffer from physical or mental health issues or substance abuse disorders that are severe enough to impair their ability to work for 20 hours or more per week on a consistent basis (but would not lead to an award of disability benefits).[15] One study conducted by the Ohio Association of Food Banks found that for workers in Franklin County, Ohio, one third of participants in a work assistance program cited mental or physical limitation,

---

[15] In order to qualify for federal disability benefits through the Social Security Administration, an individual must have a disability that causes severe impairments and has lasted or is expected to last for twelve months or more. The disability must be so severe as to preclude a threshold level of the individual's prior work or any work in the national economy. *See* 42 U.S.C. §§ 423(d) (2015), 1382c(a)(3)(A)-(B), (F)-(G) (2004). In addition, if the Social Security Administration finds that substance abuse is a "contributing factor material" to a finding of disability, an otherwise eligible individual will not be eligible for benefits. *Id*. at §§ 423(d)(2)(C), 1382c(a)(3)(J).

including depression, PTSD, mental or learning disabilities, and physical injury as a factor in their unemployment.  Center on Budget Priorities Comment, at ABAWD00110142.  Similarly, a 2017 study of SNAP employment and training found that 30 percent of participants noted health issues as a barrier to employment.  *Id.* ABAWDs facing these issues may not be sufficiently disabled to qualify for disability benefits but will still face substantial difficulties finding jobs, even in an area with an overall average unemployment rate of less than 6 percent.

In sum, the Final Rule uses a general unemployment rate as the sole proxy for ABAWD job opportunities, in the face of irrefutable administrative-record evidence that ABAWDs have a substantially greater difficulty finding employment than average citizens.  USDA was well aware of the issue, as it repeatedly pointed out research showing the discrepancy between unemployment rates and employment opportunities for individuals with less education.  *See* Mem. Op. at 29 (citing 84 Fed. Reg. at 66,787).  To reject that research and those concerns, USDA used purely circular reasoning, simply stating that "based on its operational experience" there are "areas that do not clearly lack sufficient jobs," but continue to qualify for waivers under the current rule.  84 Fed. Reg. at 66,787.  Put another way, USDA argued that a 6 percent floor is warranted, because otherwise areas could obtain a waiver with an unemployment rate less than 6 percent.  That is textbook arbitrary and capricious decision-making.

In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted).  USDA's failure to do so renders the Final Rule arbitrary and capricious. *Id.* at 56-57.

30

### 3.    USDA Failed to Assess Deficiencies in the Specific Unemployment Rate Used in the Final Rule

USDA compounded its flawed reliance on unemployment rates by failing to address objections, in the comments, to the specific "U-3" unemployment rate required by the Final Rule. *See* 84 Fed. Reg. 66,789 (stating that USDA will "us[e] the BLS U-3 rate for the 20 percent standard").  The U-3 rate is a poor yardstick for measuring sufficient job opportunities for ABAWDs who, as discussed above, face numerous impediments to searching for and obtaining a job.  The U-3 rate does not account for the challenges that ABAWDs face in finding fulltime employment.  Instead, measures like the U-6 rate come closer to approximating the employment status for ABAWDs.

The U-3 unemployment rate is the rate of people actively seeking a job.  But that does not represent the complexity of circumstances facing ABAWDs.  For example, the U-3 rate does not accurately capture unemployment rates for people with disabilities.  Florida Chamber Foundation: Quantifying the Unemployment Rate for Workers with Disabilities in Florida, Certified Corrected Administrative Record, Public Comments on Proposed Rule, FNS-2018-0004-5999 and FNS-2018-0004-9011, ABAWD00193403 at 405 (graphically demonstrating the difference between the U-3 unemployment rate and unemployment rates for persons with disability).  Comments to the Proposed Rule urged USDA to consider instead the U-6 rate, which "includes a number of groups who are considered either employed or out of the labor force in the conventional measure," such as involuntary part-time workers.  Comment on Trump Administration Proposal to Limit SNAP Waivers for the ABAWD Population by Harry J. Holzer, Certified Corrected Administrative Record, Public Comments on Proposed Rule, FNS-2018-0004-5999 and FNS-2018-0004-9011, ABAWD00034696 at 697, n.5 ("Holzer Comment").  The comments pointed out that "[s]ince U-6 numbers also measure those who wish greater employment (and greater self-

sufficiency), the need for SNAP may be better estimated."  Rutgers School of Environmental and Biological Sciences, Certified Corrected Administrative Record, Public Comments on Advanced Notice of Proposed Rulemaking, FNS-2018-0004-0001, ABAWD00025903 at 905.  As the U-6 rate "tends to average nearly twice the U3 rate at most points in time," using the U3 rate significantly overestimates the sufficiency of jobs available.  Holzer Comment, at ABAWD00034697, n.5; *see also* California Labor Federation Comment, Certified Corrected Administrative Record, Public Comments on Proposed Rule, FNS-2018-0004-5999 and FNS-2018-0004-9011, ABAWD00181037 at 039, n.8 (same).

Here USDA failed to provide a "'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted).  USDA simply stated that "there is no measure available for precisely determining the number of available jobs specifically for SNAP ABAWDs in any given area" and relied on U-3 because it was the only unemployment data available on a substate level.  84 Fed. Reg. 66,782, 66,789.  Focusing only on the shortcomings that other unemployment rates may have, USDA ignored any shortcomings of the U-3 rate.  USDA's argument is again circular:  the U-3 rate is appropriate because other rates are inappropriate.  For this reason as well, the Final Rule is arbitrary and capricious.  *State Farm*, 463 U.S. at 56-57.

 **B.** **The Rule is Arbitrary and Capricious Because It Limits the Geographic Scope of Waivers to Labor Management Areas Established by the Labor Department.**

  **1.** **The Final Rule is Arbitrary and Capricious Because USDA Did Not Adequately Explain Its Rationale for Choosing One Department of Labor "Area" Designation (LMA) Over Another (LSA).**

This Court correctly concluded, in its preliminary injunction ruling, that USDA "embraced DOL data inconsistently" and "failed to acknowledge or address this preference for DOL data in rejecting a measure that relied on DOL data—LSA designation by DOL."  Mem. Op. at 31, n.12.

Specifically, USDA did not adequately explain its rationale for adopting LMAs as the only waiver "areas" and rejecting the agency's prior practice (codified in the current rule) of considering LSAs as permissible waiver areas.  It is well established that an action is arbitrary and capricious if the agency does not adequately explain its departure from a prior practice or policy.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 U.S. LEXIS 3254, at *40 (U.S. June 18. 2020) ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy].") (quoting *State Farm*., 463 U.S. at 51); *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932; *Ramaprakash*, 346 F.3d at 1124.

For more than two decades, USDA has considered LSAs to be permissible waiver areas. USDA first permitted this practice in 1996, when it issued Guidance that allowed—and even encouraged—States to propose small waiver areas.  USDA concluded that "[t]here is enough variety in local employment conditions that statewide averages may mask slack job markets in some counties, cities, or towns.  Accordingly, States should consider areas within, or combinations of, counties, cities, and towns for the same reason."  1996 Guidance, at ABAWD00000166.  The 1996 Guidance recommended using LSA designations because the data was based on civil jurisdictions.  *Id.*  That allowed "specific localities with high unemployment rather than all civil jurisdictions within a metropolitan area, (not all of which may suffer from the same degree of unemployment) [to] be identified."  *Id*. at ABAWD00000169.  LSA designation allowed a State government to tailor its benefits (and waivers) to areas of the State with the most need.  In the new rule, USDA takes the diametrically opposite position, labeling this practice "gerrymandering" and limiting waiver areas solely to LMAs.  USDA does not adequately explain its rationale for this substantial change.

a.    **USDA Does Not Adequately Explain Its Decision to Base Waiver Areas on Older Data (Used for LMAs) Instead of Newer Data (Used for LSAs).**

USDA gives no rational explanation for why it chose an area designation based upon older data (used for LMAs) instead of one based on newer data (used for LSAs). Several commenters put USDA on notice that data underlying LMAs is outdated, explaining that "the current list of LMAs are based on population data from the 2010 Census and commuting data from the American Community Survey five-year dataset for 2006–2010." 84 Fed. Reg. at 66,794. USDA has previously acknowledged that "[e]stablished Federal policy requires Federal executive branch agencies to use the *most recent* National, State, or local labor force and unemployment data from the Bureau of Labor Statistics (BLS) for all program purposes, including the determination of eligibility for and the allocation of Federal resources unless otherwise directed by statute." 1996 Guidance, at ABAWD00000166 (emphasis added). And USDA has long understood that data underlying LSAs are more recent than data underlying LMAs. Even back in 1996, USDA's Guidance shows that LSAs were intended to be produced monthly, and the DOL's website provides that the Department issues an official "LSA" list each fiscal year.[16]

In its Final Rule, USDA acknowledged that LMAs are based upon outdated data, but disregarded that issue on the ground that the agency needed to use LMAs to avoid alleged manipulation, by the States, that would maximize the size of waiver areas. 84 Fed. Reg. at 66,794–95 ("after assessing alternative options, the Department has not identified any other labor market definition that uses more recent data and would equally address the problem of States'

---

[16]    *Labor Surplus Area,* DEP'T OF LABOR, EMP'T & TRAINING ADMIN., https://www.dol.gov/agencies/eta/lsa#:~:text=A%20Labor%20Surplus%20Area%20(LSA,same%2024%2Dmonth%20reference%20period (last visited June 21, 2020). The Department also provides waivers under its "Exceptional Circumstance Consideration Provision," which allows a civil jurisdiction to be included in the LSA list following a natural or economic disaster. *Id.*

manipulative usage of grouping substate areas to maximize waived areas."). Yet USDA gave no facts supporting its assertion that such manipulation had in fact occurred, or that there might not be valid reasons for these subgroupings. That rendered its action arbitrary and capricious. "'Professing that an' agency action 'ameliorates a real . . . problem but then citing no evidence demonstrating that there is in fact a[ ] . . . problem is not reasoned decisionmaking.'" Mem. Op. at 37 (citing *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006)).

> ### b.     USDA's Analysis Is Internally Inconsistent, Changing Position When Necessary to Reduce the Number of Beneficiaries.

The challenged rule also is arbitrary and capricious, because USDA's underlying analysis is inconsistent, changing position when necessary to achieve the agency's stated goal of reducing the number of SNAP beneficiaries. In the agency's flawed analysis, the end justifies the means, regardless of whether the analysis underlying the means is consistent.

*First*, USDA took internally inconsistent positions on the significance of using recent data underlying LSAs, depending upon whether such data would support or undermine the agency's quest to reduce the number of beneficiaries. As explained above, USDA had no difficulty passing over recent data underlying LSAs when it wanted to choose LMAs instead of LSAs as waiver areas. Yet USDA took great care to ensure that it utilized recent data underlying LSAs to identify the unemployment rates that the agency would use in applying the "core standards." The obvious reason for this inconsistency is that the agency believed such data would lead to the rejection of more waiver applications.

The Final Rule requires States to "use data as recent as DOL uses to determine LSAs for a given fiscal year, no matter the month in which the waiver would start" to qualify for a waiver. 84 Fed. Reg. at 66,782, 66,798. This requirement stems from a USDA concern that States might use older data (that might encompass multiple fiscal years) to qualify for waivers under the core

standards.  Addressing that issue, "the Department sought to stop States from using older data to waive more areas than justified by more recent data used by DOL."  *Id*.  USDA acted arbitrarily and capriciously by cherry-picking when and where it is acceptable to use—and determine waiver qualification from—recent data underlying LSAs.  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (stating that an agency's "reasoning cannot be internally inconsistent" (citing *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018)).

*Second*, in addressing its choice of LMAs as waiver areas, USDA took internally inconsistent positions on whether it should permit States to tailor the boundaries of waiver areas to coincide with areas of high unemployment.  The answer depended upon whether doing so would meet USDA's goal of reducing the number of beneficiaries by reducing waivers.

As explained above, USDA chose LMAs over LSAs (in defining waiver areas) on the ground that LSAs, as the smaller areas, were *too closely* tailored to areas of high unemployment. That was the dynamic underlying the "gerrymandering" allegation.  USDA was concerned that permitting grouping of LSAs in a waiver area would increase waivers by excising pockets of low unemployment that would otherwise cause rejection of waivers (by reducing the waiver area's overall unemployment rate).  By contrast, when USDA thought it would serve the goal of reducing the number of beneficiaries, the agency justified choosing LMAs on the opposite ground that larger areas (like States) were not tailored *closely enough* to areas of high unemployment.  Specifically, the agency chose LMAs as waiver areas in large part on the ground that they are generally smaller than a State.  As USDA put it, choosing LMAs as waiver areas would "provide a strict definition of a waiver area that will also restrict statewide waivers."  84 Fed. Reg. at 66,790.  USDA made this decision on the ground that statewide waiver areas would allow too many beneficiaries to remain unemployed, because an area as large as a State might extend waivers to places with low

unemployment, where the agency believed SNAP work requirements should apply. 84 Fed. Reg. at 66,790 and 66,798. The agency's internally inconsistent rationale rendered the rule arbitrary and capricious. *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (noting that "unexplained inconsistency" in final rule was "not reasonable"); *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir. 1993) ("[W]hen an agency takes inconsistent positions . . . it must explain its reasoning.").

2.     **The Final Rule is Arbitrary and Capricious Because it Bases Waivers for the District of Columbia Upon Job Opportunities That Are Primarily Outside the District of Columbia.**

The Final Rule bases waivers for the District of Columbia upon job opportunities located primarily *outside* of the District. The disconnect between the waiver area and the areas where the job opportunities are renders the Final Rule arbitrary and capricious.

The Final Rule relies upon LMAs to address both the territorial scope of waivers and related unemployment-rate data. If an LMA is within a single State, USDA bases the waiver determination upon unemployment-rate data from the LMA, and a waiver (if granted) is limited to the territory of the LMA. 84 Fed. Reg. at 66,811 (citing 7 C.F.R. § 273.24(f)(4)(i)). Some LMAs include territory in more than one State. For these "interstate" LMAs, USDA bases the waiver determination upon employment-rate data from the entire LMA, yet the waiver (if granted) is limited to the "intrastate" territory of the LMA. *Id.* (citing 7 C.F.R. § 273.24(f)(4)(ii)). There is only one "interstate" LMA in the country in which an entire State falls within the LMA (together with territory from other States). That "State" is the District of Columbia. *Id.* at 66,796. The Final Rule says that a waiver determination for the District will be "based on data from the entire interstate LMA"—not just from the District. *Id.* at 66,811 (citing 7 C.F.R. § 273.24(f)(4)(ii)).

The composition of this "entire interstate LMA" virtually guarantees that waivers for District of Columbia residents will be based primarily upon job opportunities (measured by the

unemployment rate) outside the District. The reason is that the "entire interstate LMA" that includes the District of Columbia also includes *substantially larger* areas and populations outside the District. In particular, the LMA includes sixteen counties in Virginia, five counties in Maryland, and one county in West Virginia.[17] Because the vast majority of the LMA's territory is outside the District, more than 85 percent of the LMA's labor force lives outside the District. As a result, the unemployment rate for the entire LMA (which is the statistic pertinent to the waiver) is primarily derived from employment data outside the District.[18]

Basing the District of Columbia's waivers primarily upon job opportunities outside the District is arbitrary and capricious. *First*, this approach skews the considered unemployment rate downward, so that it is not an accurate representation of unemployment in the District. USDA is well aware that within a given geographic area, there may be "multiple labor markets with significant variation in economic conditions" such that an overall unemployment rate covering those multiple markets "may mask 'slack' job markets (insufficient jobs)." 84 Fed. Reg. at 66,790. Even a passing glance at the counties in the LMA reveals that it covers numerous affluent suburban areas (*e.g.*, Fairfax County, Virginia and Montgomery County, Maryland) that are starkly different than the urban environment of the District, which has numerous pockets of chronic high

---

[17] *See Local Area Unemployment Statistics Frequently Asked Questions*, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS, https://www.bls.gov/lau/laufaq.htm#Q06 (last visited June 21, 2020).

[18] The District's civilian labor force was approximately 403,200 in April 2020 compared to approximately 2.7 million in the "suburban ring" comprising the remainder of the Metropolitan Statistical Area. *Employment Status for the Civilian Population District of Columbia, Washington Metropolitan Division and Statistical Area April 2020/a,* D.C. DEP'T OF EMP'T SERVS., OFFICE OF LABOR MKT. RESEARCH & INFO., https://does.dc.gov/sites/default/files/dc/sites/does/page_content/attachments/Apr_2020_DCarea _EmplStatus.pdf (preliminary data).

unemployment.[19]  It therefore is not surprising that the unemployment rate for the District of Columbia taken alone (currently at 11.7 percent) exceeds the rate for the entire LMA (currently at 9.9 percent).[20]

Nevertheless, under the Final Rule, the unemployment rate for the "entire interstate LMA" would be the sole basis for deciding whether the District of Columbia receives a waiver on the ground that it lacks a sufficient number of jobs to provide employment for ABAWDs who live there.  The agency's decision to use such a deeply defective measure for job sufficiency for District of Columbia ABAWDs is arbitrary and capricious.  *See, e.g.*, *Allentown Mack Sales & Serv., Inc.*

---

[19] In April 2020, unemployment in the District's poorest wards (Wards 7 and 8) was 20.7 percent and 16.5 percent respectively.  *D.C. Labor Market Indicators: January 2015 - April 2020*, D.C. DEP'T OF EMP'T SERVS. (Dr. Unique Morris-Hughes, Dir. et al.), at 6, https://does.dc.gov/sites/default/files/dc/sites/does/page_content/attachments/DC%20Labor%20Market%20Indicators_April20.pdf.  That month, all but three of the District's eight wards had a higher unemployment rate than the (seasonally unadjusted) LMA rate of 9.9 percent.  Bureau of Labor Statistics, *Table 2: Civilian labor force and unemployment by selected metropolitan area and metropolitan area, seasonally unadjusted*, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS (last modified June 3, 2020), https://www.bls.gov/news.release/metro.t01.htm.  Even before the pandemic devastated the economy, the February 2020 unemployment rate in wards 7 and 8 was 8.3 percent and 11.1 percent, respectively.  *D.C. Labor Market Indicators: January 2015 - April 2020*, D.C. DEP'T OF EMP'T SERVS. (Dr. Unique Morris-Hughes, Dir. et al.), at 6, https://does.dc.gov/sites/default/files/dc/sites/does/page_content/attachments/DC%20Labor%20Market%20Indicators_February20.pdf.  That month, the unemployment rates of all wards in the District exceeded the LMA rate of 3.0 percent.  Bureau of Labor Statistics, *BLS Data Viewer*, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS (data extracted June 23, 2020), https://beta.bls.gov/dataViewer/view/timeseries/LAUMT114790000000003.  *See also* Legal Aid Society of the District of Columbia, Proposed Rule: Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents (ABAWDs) at 84 Fed. Reg. 980 (Feb. 1, 2019)), Certified Corrected Administrative Record, Public Comments on Advanced Notice of Proposed Rulemaking, FNS-2018-0004-0001, ABAWD00027271.

[20] Bureau of Labor Statistics, Table 1: Civilian labor force and unemployment by state and metropolitan area, seasonally unadjusted, DEP'T OF LABOR, BUREAU OF LABOR STATISTICS (last modified June 3, 2020), https://www.bls.gov/news.release/metro.t01.htm.

*v. NLRB*, 522 U.S. 359, 374 (1998)) (agency action is arbitrary and capricious if the "process by which it reaches" a result is not "logical and rational").[21]

*Second*, USDA's decision to rely exclusively on unemployment rates as a basis for deciding waiver applications magnifies the arbitrariness and capriciousness of relying on a skewed unemployment rate. If the District had the opportunity to expose the deficiencies of the LMA-wide rate (and introduce other more probative evidence) in an adjudication, the impact of the LMA-wide rate would be greatly reduced. But as explained above, USDA has effectively displaced an adjudicative process with a categorical rule that precludes consideration of evidence other than unemployment rates. And as this Court has already explained, USDA's sole focus on

---

[21] Moreover, because the Final Rule bases the waiver determination on an average 12-month or 24-month unemployment rate, the Final Rule will inevitably reflect outdated unemployment information. For example, despite a global pandemic ravaging the nation's health and employment prospects, and a current District unemployment rate above 10 percent, the District's residents still would not qualify for a waiver under the Final Rule.

To qualify for a waiver, the LMA would need to have a recent 12-month average unemployment rate over 10 percent or a 24-month average unemployment rate that is 20 percent or more above the national unemployment rate (but not less than 6 percent). 84 Fed. Reg. 66,782, 66,811 (citing 7 C.F.R. § 273.24 (f)(2)). While the (seasonally unadjusted) unemployment rate for the District's LMA was 9.9 percent in April 2020, the LMA's 12-month average unemployment rate from May 2019 through April 2020 was 3.6 percent. Bureau of Labor Statistics, *Table 1: Civilian labor force and unemployment by state and metropolitan area, seasonally unadjusted*, https://www.bls.gov/news.release/metro.t01.htm (last modified June 3, 2020) (April 2020 unemployment rate); Bureau of Labor Statistics, *BLS Data Viewer*, Dep't of Labor, Bureau of Labor Statistics (data extracted June 23, 2020), https://beta.bls.gov/dataViewer/view/timeseries/LAUMT114790000000003 (12 month average). Therefore, the District would not have met the first standard.

The District also would not have met the second standard, because the LMA's 24-month average unemployment rate was *lower* than—not 20 percent or more *above*—the national rate. Even though the national unemployment rate in April 2020 was 14.4 percent, the 24-month average was 4.2 percent. *See* data generated using Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, Dep't of Labor, Bureau of Labor Statistics, https://data.bls.gov/PDQWeb/ln (last visited June 23, 2020). The LMA's 24-month average unemployment rate for that same period of time was 3.4 percent. *See* Bureau of Labor Statistics, *BLS Data Viewer*, Dep't of Labor, Bureau of Labor Statistics (data extracted June 23, 2020), https://beta.bls.gov/dataViewer/view/timeseries/LAUMT114790000000003.

unemployment rates is circular, because "[t]he agency erases the concern that general unemployment rates are an inappropriate measure of lack of sufficient jobs for ABAWDs by redefining the thing to be measured in terms of the agency's preferred measure, namely, general unemployment rates."  Mem. Op. at 30.

*Third*, in establishing the District's interstate LMA as a waiver area, USDA relied on an arbitrary and capricious assessment of the relationship between an ABAWD's place of residence and the locations of realistic job opportunities.  The statute requires the agency to base its waiver determination on job-sufficiency in "the area in which the individuals reside."  7 U.S.C. § 2015(o)(4)(A)(ii).  It would literally be possible to define "the area in which the individuals reside" by reference to a region of the United States, the entire United States, or even the continent of North America.  But defining the "area" that broadly would be out of context, with no rational connection to the territory covered by the waiver.  The most natural reading of the statutory language, in context, is that the "area in which the individuals reside" must be *within* the applicant State.  But even assuming *arguendo* that locations outside the State could qualify, there must be a close connection between the area in which the ABAWDs subject to a waiver reside and the area where pertinent job opportunities are (otherwise the ABAWDs could not pursue them).

USDA claims that it has legitimately identified interstate LMAs as "areas in which the individuals reside" because areas within an LMA (even those located in another State) allegedly are a "reasonable commuting distance" for ABAWDs.  84 Fed. Reg. at 66,796.  But USDA presents no analysis or facts establishing that ABAWDs have any capacity whatsoever to travel to other States within an LMA for work.  USDA does not explain, for example, how ABAWDs would travel from the District to distant parts of Maryland, Virginia or even West Virginia for a job,

particularly given the barriers to transportation that ABAWDs confront.[22]  Because there is no

factual or analytical support for USDA's decision to define an entire interstate LMA as the "area"

for data pertinent to a waiver for District of Columbia resident ABAWDs, the Final Rule is

arbitrary and capricious.  *See, e.g.*, *Haselwander v. McHugh*, 774 F.3d 990, 992 (D.C. Cir. 2014)

(decision that is "devoid of any evidentiary support" is arbitrary and capricious); *cf. DL v. District

of Columbia*, 924 F.3d 585, 592 (D.C. Cir. 2019) (holding that attorney rates from the

"community" of the District of Columbia do not include rates from a Census-Bureau area covering

the District and portions of Virginia, Maryland and West Virginia).

---

[22]  For example, Plaintiff Damon Smith has no driver's license and cannot afford public transportation outside the District.  Smith Decl. ¶¶15–17.  Plaintiff Geneva Tann has no car and no viable public transportation options beyond a five-mile radius of her District home.  Tann Decl. ¶12.  Numerous sources document these types of transportation barriers more generally.  *See, e.g.*, Bruce Ormond Grant, *Reducing Barriers for Job Seekers*, D.C. POLICY CTR. (May 23, 2018), https://www.dcpolicycenter.org/publications/reducing-barriers-for-job-seekers-in-d-c-and-the-metro-region/ ("Wards 7 and 8 have the lowest median household incomes in the District, while also reporting the highest poverty rates (27.7 percent and 36.8 percent, respectively); these are also the neighborhoods with the longest commutes and circuitous public transit infrastructure."), Center on Budget Priorities Comment, at ABAWD00110100; Elizabeth Kneebone et al., *The Growing Distance Between People and Jobs in Metropolitan America*, METRO. POLICY PROGRAM AT BROOKINGS (March 2015), at 1, https://www.brookings.edu/wp-content/uploads/2016/07/Srvy_JobsProximity.pdf ("Overall, 61 percent of high-poverty tracts (with poverty rates above 20 percent) and 55 percent of majority-minority neighborhoods experienced declines in job proximity between 2000 and 2012"), Certified Corrected Administrative Record, ABAWD00163844; Rucker Johnson, *Landing a job in urban space: the extent and effects of spatial mismatch*, Reg'l Sci. & Urban Econ. 331 (Feb. 2006), at 333, https://gsppi.berkeley.edu/~ruckerj/SMHRSUEpub.pdf ("[J]ob accessibility for less-educated workers is greatest in predominantly white suburbs more than 10 mi[les] from the centroid of black residential concentration, and . . . these job-rich areas are not served by public transportation."), Certified Corrected Administrative Record, ABAWD00151169.

**C.    The Final Rule is Arbitrary and Capricious Because USDA Did Not Adequately Explain Its Justification for Refusing to Include Extended Unemployment Benefits as a Factor for Evaluating ABAWD Job Opportunities.**

The Final Rule also is arbitrary and capricious, because USDA did not adequately explain its justification for refusing to include extended unemployment benefits as a factor for evaluating ABAWD job opportunities.    The Department of Labor qualifies a State for extended unemployment benefits when the State's unemployment rate reaches certain elevated levels.  84 Fed. Reg. 980, 985 (Feb. 2, 2019).  Given the current economic crisis, it is not surprising that 49 States (including the District of Columbia) are currently providing these benefits to their residents.[23]

In the Proposed Rule preamble, USDA explained that qualification for such benefits supported issuing a waiver, because "it has been a clear indicator of lack of sufficient jobs and an especially responsive indicator of sudden economic downturns."  *Id.*  The Proposed Rule even elevated the significance of extended unemployment benefits in comparison with the current regulation, changing them from a factor the USDA can consider to a factor that automatically justifies a waiver.    *Compare* 7 C.F.R. § 273.24(f)(2)(ii) (2019) *with* Proposed Rule § 273.24(f)(2)(iii) (cited in 84 Fed. Reg. at 992).

Yet the Final Rule unexpectedly excluded extended unemployment benefits as a permissible factor for determining waivers.    The Final Rule precludes USDA from even considering an area's qualification for such benefits when deciding whether to issue a waiver for lack of sufficient jobs.  84 Fed. Reg. at 66,790.  USDA stated that it made this decision because

---

[23] Department of Labor, *Trigger Notice No. 2020-23, State Extended Benefits Indicators Under P.L. 112-240, Effective June 21, 2020*, https://oui.doleta.gov/unemploy/trigger/2020/trig_062120.html (last modified June 19, 2020). (Only South Dakota and Utah are not providing extended benefits at this time).

the agency was "concerned that the extended unemployment benefits criterion would allow States to receive statewide waivers even when there is not a lack of sufficient jobs within certain areas of the State." *Id.* But USDA did not explain why such statewide information—which by the agency's own assessment is "a clear indicator of lack of sufficient jobs" (84 Fed. Reg. at 985)—could never be relevant or probative evidence of ABAWD job opportunities in a smaller area within a State. USDA's failure to explain this substantial change in position rendered the Final Rule arbitrary and capricious. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1105 (D.C. Cir. 2019).

## III.   THE USDA RULE VIOLATES NOTICE AND COMMENT REQUIREMENTS.

The agency's enthusiastic endorsement of extended unemployment benefits (as a waiver criterion) in the Proposed Rule, and dramatic about-face (removing it as a criterion) in the Final Rule, created a situation in which the public did not have proper notice that it should comment on the significance of extended unemployment benefits as proof that an area lacks sufficient jobs. *See* 84 Fed. Reg. at 66,789 (acknowledging that "the Department did not receive many comments with regard to retaining the extended unemployment benefits standard"). In APA parlance, the Final Rule was not the "logical outgrowth" of the Proposed Rule. "A final rule is a logical outgrowth of the proposed rule 'only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 403 F.3d 1250, 1259 (D.C. Cir. 2005) (citation omitted).

A rule violates the notice-and-comment requirements of 5 U.S.C. § 553 if the final rule is not the "logical outgrowth" of the proposed rule. *See, e.g., Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012). The D.C. Circuit has repeatedly found no logical outgrowth, and a violation of notice and comment requirements, if the agency implements the opposite of what it proposed to the public. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102,

1108 (D.C. Cir. 2014); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009); *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *Int'l Union*, 407 F.3d at 1261.  That is precisely what happened here, when USDA issued a Proposed Rule maintaining the extended unemployment benefit criterion and then eliminated it in the Final Rule.  Accordingly, the Rule violated notice and comment requirements.

## CONCLUSION

The Court should grant the Private Plaintiffs' motion for summary judgment.  The Court should issue a declaratory judgment holding that Final Rule is unlawful and set it aside.

Respectfully Submitted,

_____/s/ *Chinh Q. Le*_____
Chinh Q. Le (D.C. Bar #1007037)
Jennifer F. Mezey (D.C. Bar #462724)*
Nicole Dooley (D.C. Bar #1601371)*
LEGAL AID SOCIETY OF THE
DISTRICT OF COLUMBIA
1331 H Street, N.W., #350
Washington, DC 20005
Phone: (202) 661-5979
Fax: (202) 727-2132

_____/s/ *Daniel G. Jarcho*_____
Daniel G. Jarcho (D.C. Bar #391837)
Kelley C. Barnaby (D.C. Bar #998757)
Jean E. Richmann*
Hilla Shimshoni (D.C. Bar #1033015)*
Kaelyne Y. Wietelman*
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004
Phone: (202) 239-3300
Fax: (202) 239-3333

*Attorneys for Plaintiffs Bread for the City, Damon Smith, and Geneva Tann*