**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv 00119-BAH |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| BREAD FOR THE CITY, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-00127-BAH |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

**STATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Plaintiffs the District of Columbia, the State of New York, the State of California, the State of Connecticut, the State of Colorado, the State of Hawaii, the State of Illinois, the State of Maine, the State of Maryland, the Commonwealth of Massachusetts, Attorney General Dana Nessel on behalf of the people of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of Oregon, the Commonwealth of Pennsylvania, the State of Rhode Island, the State of Vermont, the Commonwealth of Virginia, and the City of New York (collectively, "Plaintiffs" or the "States") respectfully move for summary judgment.

Plaintiffs seek an order vacating the final agency action, *Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents*, 84 Fed. Reg. 66782 (Dec. 5, 2019) (the "Rule"), by U.S. Department of Agriculture ("USDA" or the "agency") and George Ervin Perdue III, Secretary of USDA (collectively with the United States, "Defendants") and declaring that the Rule violates the Administrative Procedure Act ("APA").

As demonstrated in the accompanying Memorandum of Points and Authorities, Plaintiffs are entitled to relief because the Rule was promulgated without observance of procedure required by law, 5 U.S.C. §§ 701-706, is substantively not in accordance with law, 5 U.S.C. §§ 701-706, and is arbitrary and capricious, 5 U.S.C. §§ 701-706. In support of this motion, Plaintiffs submit the attached memorandum of law and the declarations of Edward Bolen, Catherine Buhrig, Alexis Carmen Fernández, Joshua Rivera, and Laura Zeilinger. Also attached is a proposed order. Oral argument is requested on this motion because of the complex legal arguments involved in this case.

Dated:  June 24, 2020         Respectfully submitted,

                              KARL A. RACINE
                              Attorney General for the District of Columbia

                              */s/ Kathleen Konopka*
                              Kathleen Konopka (D.C. Bar No. 495257)
                              Deputy Attorney General

                              Jennifer Rimm (D.C. Bar No. 1019209)
                              Vikram Swaruup
                              Nicole Hill (D.C. Bar No. 888324938)
                              David Brunfeld (D.C. Bar No. 1672059)
                              Assistant Attorneys General

                              [signatures continued on following page]

2

441 Fourth Street, N.W., Suite 650-S
Washington, D.C. 20001
(202) 742-6610 (Phone)
kathleen.konopka@dc.gov
jennifer.rimm@dc.gov
vikram.swaruup@dc.gov
nicole.hill@dc.gov

*Attorneys for the District of Columbia*

LETITIA JAMES
Attorney General for the State of New York

*/s/ Eric R. Haren*
Eric R. Haren (D.C. Bar No. 985189)
Special Counsel

Matthew Colangelo (D.C. Bar No. 997893)
Chief Counsel for Federal Initiatives

28 Liberty Street
New York, NY 10005
(212) 416-8804 (Phone)
eric.haren@ag.ny.gov
matthew.colangelo@ag.ny.gov

*Attorneys for the State of New York*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA, et al.,  )
                        )
          *Plaintiffs*,  )
                        )
         v.  )     C.A. No. 1:20-cv 00119-BAH
                        )
UNITED STATES DEPARTMENT OF  )
AGRICULTURE, et al.,  )
                        )
         *Defendants.*  )

BREAD FOR THE CITY, et al.,  )
                        )
          *Plaintiffs*,  )
                        )
         v.  )     C.A. No. 1:20-cv-00127-BAH
                        )
UNITED STATES DEPARTMENT OF  )
AGRICULTURE et al.,  )
                        )
         *Defendants.*  )

## MEMORANDUM OF LAW IN SUPPORT OF STATE PLAINTIFFS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS.......................................................................................2

    A.   CONGRESS INTENDED FOR SNAP TO EFFECTIVELY ALLEVIATE HUNGER.................2

    B.   USDA MAINTAINED REGULATIONS FOR DECADES THAT ACCORDED STATES FLEXIBILITIY IN REQUESTING WAIVERS. ..................................................5

    C.   CONGRESS REJECTED LIMITS LIKE THOSE THE RULE SEEKS TO IMPLEMENT. .............6

    D.   THE RULE UPENDS DECADES OF AGENCY POLICY AND ADOPTS STRICT REQUIREMENTS THAT CONGRESS REJECTED. .............................................7

STANDARD OF REVIEW........................................................................................9

ARGUMENT.........................................................................................................11

    I.   USDA'S PROPOSED RULE FAILED TO PROVIDE SUFFICIENT NOTICE OF THE CHANGES THAT THE RULE IMPOSES....................................................11

    II.   THE RULE VIOLATES THE APA BECAUSE IT IS CONTRARY TO LAW .........................13

       A.  USDA's Near-Total Focus on General Unemployment Data to Evaluate Lack of Sufficient Jobs for ABAWDs is Contrary to Law.. .............................................13

       B.  USDA Acted Contrary to Law by Imposing a Strict Definition of Area............15

       C.  USDA's Elimination of Unused Discretionary Exemptions is Contrary to Law  18

    III.   THE RULE VIOLATES THE APA BECAUSE IT IS ARBITRARY AND CAPRICIOUS. ..........23

       A.  The Rule's Reduction of the Sufficient Jobs Inquiry to General Unemployment Rates is Arbitrary and Capricious......................................................24

       B.  The Rule's Elimination of the Extended Unemployment Benefits Qualification Standard is Arbitrary and Capricious...................................................28

       C.  The Rule's Restrictions on Waiver Area are Arbitrary and Capricious ..............29

       D.  USDA's Decision to Limit Carryover of Unused Exemptions is Arbitrary and Capricious......................................................................................35

       E.  The Rule Fails to Consider the Cost and Disparate Impact of the Rule ..............37

    IV.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULE..........................................41

CONCLUSION.....................................................................................................................42

# TABLE OF AUTHORITIES

CASES

*Air Alliance Houston v. EPA*

   906 F.3d 1049 (D.C. Cir. 2018).--------------------------------------------------------- 42

*Ali v. Federal Bureau of Prisons*

   552 U.S. 214 (2008) ------------------------------------------------------------------------ 21

*Allina Health Servs. v. Sebelius*

   746 F.3d 1102 (D.C. Cir. 2014) ----------------------------------------------------------- 11

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*

   271 F.3d 262 (D.C. Cir. 2001)------------------------------------------------------------- 21

*Am. Fed'n of Labor & Cong. of Indus. Organizations v. Donovan*

   757 F.2d 330 (D.C. Cir. 1985)-------------------------------------------------------------- 9

*Am. Radio Relay League, Inc. v. FCC*

   524 F.3d 227 (D.C. Cir. 2008)-------------------------------------------------------------- 9

*ANR Storage Co. v. FERC*

   904 F.3d 1020 (D.C. Cir. 2018) ---------------------------------------------------------- 29

*Arkema Inc. v. EPA*

   618 F.3d 1 (D.C. Cir. 2010)---------------------------------------------------------------- 23

*Ass'n of Private Sector Colls. & Univs. v. Duncan*

   681 F.3d 427 (D.C. Cir. 2012)--------------------------------------------------------- 12, 41

# TABLE OF AUTHORITIES
### (continued)

*AT&T Wireless Servs. Inc. v. FCC*

270 F. 3d 959 (D.C. Cir. 2001) ------------------------------------------------------------------- 41

*Azar v. Allina Health Servs.*

139 S. Ct. 1804 (2019) ---------------------------------------------------------------------------- 21

*Babb v. Wilkie*

140 S. Ct. 1168 (2020) ---------------------------------------------------------------------------- 15

*Barnhart v. Walton*,

535 U.S. 212 (2002) ------------------------------------------------------------------------------- 21

*Bostock v. Clayton Cty., Georgia*

No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020) ----------------------------------- 13, 35

*Boyle v. United States*

556 U.S. 938 (2009) ------------------------------------------------------------------------------- 15

*BP Energy Co. v. FERC*

838 F.3d 959 (D.C. Cir. 2016) ------------------------------------------------------------------- 22

*Bus. Roundtable v. SEC*

647 F.3d 1144 (D.C. Cir. 2011) ----------------------------------------------------------------- 40

*Catawba County v. EPA*

571 F.3d 20 (D.C. Cir. 2009) -------------------------------------------------------------------- 22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*

467 U.S. 837 (1984) ------------------------------------------------------------------------------- 10

*City of Portland v. EPA*

507 F.3d 706 (D.C. Cir. 2007) ------------------------------------------------------------------- 38

# TABLE OF AUTHORITIES
### (continued)

*ConocoPhillips Co. v. EPA*

    612 F.3d 822 (5th Cir. 2010)-------------------------------------------------------------------41

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*

    365 F. Supp. 3d 28 (D.D.C. 2019) -------------------------------------------------------------39

*Council for Urological Interests v. Burwell*

    790 F.3d 212 (2015) ---------------------------------------------------------------------------22

*CSX Transp., Inc. v. Surface Transp. Bd.*

    584 F.3d 1076, 1082 (D.C. Cir. 2009) ---------------------------------------------- 11, 12

*Dep't of Homeland Sec. v. Regents of the Univ. of California*

    No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020)---------------------------------------32

*Dep't of Homeland Sec. v. MacLean*

    135 S. Ct. 913 (2015)------------------------------------------------------------------ 14, 19

*Encino Motorcars, LLC v. Navarro*

    136 S. Ct. 2117 (2016) --------------------------------------------------------------- 11, 27

*Envtl. Integrity Project v. EPA*

    425 F.3d 992 (D.C. Cir. 2005)---------------------------------------------------------------11

*FCC v. Fox Television Stations, Inc.*

    556 U.S. 502 (2009) ----------------------------------------------------------------- 10, 30

*Forest Grove Sch. Dist. v. T.A.*

    557 U.S. 230 (2009) ---------------------------------------------------------------------17

# TABLE OF AUTHORITIES
### (continued)

*Good Fortune Shipping SA v. Comm'r of Internal Revenue*

   897 F.3d 256 (D.C. Cir. 2018)-------------------------------------------------------------- 10, 28

*Gresham v. Azar*

   950 F.3d 93 (D.C. Cir. 2020) -------------------------------------------------------------- 28, 34

*Guedes v. Bur. of Alcohol, Tobacco, Firearms and Explosives*

   920 F.3d 1 (D.C. Cir. 2019) ------------------------------------------------------------------ 10

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*

   706 F.3d 499 (D.C. Cir. 2013) ----------------------------------------------------------- 20, 22

*Home Box Office, Inc. v. FCC*

   567 F.2d 9 (D.C. Cir. 1977)------------------------------------------------------------------- 12

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*

   407 F.3d 1250 (D.C. Cir. 2005) ------------------------------------------------------------- 11

*Judulang v. Holder*

   565 U.S. 42 (2011)---------------------------------------------------------------------------- 10

*Kisor v Wilkie*

   139 S. Ct. 2400 (2019) ----------------------------------------------------------------------- 17

*Koons Buick Pontiac GMC, Inc. v. Nigh*

   543 U.S. 50 (2004)---------------------------------------------------------------------------- 19

*Lorillard v. Pons*

   434 U.S. 575 (1978) -------------------------------------------------------------------------- 17

# TABLE OF AUTHORITIES
### (continued)

*Loving v. IRS*

    742 F.3d 1013 (D.C. Cir. 2014) ------------------------------------------------------------------- 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*

    456 U.S. 353 (1982) ----------------------------------------------------------------------------- 17

*Michigan v. EPA*

    135 S. Ct. 2699 (2015) -------------------------------------------------------------------------- 38

*Miller v. Casey*

    730 F.2d 773 (D.C. Cir. 1984) ----------------------------------------------------------------- 16

*Milner v. Dep't of Navy*

    562 U.S. 562 (2011) ----------------------------------------------------------------------------- 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*

    463 U.S. 29 (1983)------------------------------------------------------------------------- *passim*

*Nat'l Ass'n of Home Builders v. EPA*

    682 F.3d 1032 (D.C. Cir. 2012) ---------------------------------------------------------------- 38

*Nat'l Fuel Gas Supply Corp. v. FERC*

    468 F.3d 831 (D.C. Cir. 2006)------------------------------------------------------------------ 31

*Nat'l Lifeline Assoc. v. FCC*

    921 F.3d 1102 (D.C. Cir. 2019) ---------------------------------------------------------------- 10

*Nat. Res. Def. Council, Inc. v. Rauch*

    244 F. Supp. 3d 66 (D.D.C. 2017) ------------------------------------------------------------- 38

*New York v. U.S. Dep't of Health & Human Servs.*

    414 F. Supp. 3d 475 (S.D.N.Y. 2019)---------------------------------------------------------- 12

# TABLE OF AUTHORITIES
### (continued)

*New York v. U.S. Dep't of Labor*

    363 F. Supp. 3d 109 (D.D.C. 2019).------------------------------------------------------------------- 42

*NLRB v. Bell Aerospace Co. Div. of Textron*

    416 U.S. 267 (1974) -------------------------------------------------------------------------------- 17

*Nuclear Energy Inst., Inc. v. EPA*

    373 F.3d 1251 (D.C. Cir. 2004) -------------------------------------------------------------------- 10

*Office of Consumers' Counsel v. FERC,*

    783 F.2d 206, 222 (D.C. Cir. 1986) ----------------------------------------------------------------- 14

*Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*

    332 F.3d 654 (D.C. Cir. 2003)------------------------------------------------------------------- 20, 21

*Russello v. United States*

    464 U.S. 16 (1983)---------------------------------------------------------------------------------- 14

*Sec. Indus. & Fin. Markets Ass'n v. CFTC*

    67 F. Supp. 3d 373 (D.D.C. 2014) ----------------------------------------------------------------- 40

*Sierra Club v. EPA*

    884 F.3d 1185 (D.C. Cir. 2018) ------------------------------------------------------------------- 29

*Spokeo, Inc. v. Robins*

    136 S. Ct. 1540 (2016) ----------------------------------------------------------------------------- 41

*Tesoro Alaska Petroleum Co. v. FERC*

    234 F.3d 1286 (D.C. Cir. 2000) ------------------------------------------------------------------- 33

# TABLE OF AUTHORITIES
### (continued)

**STATUTES**

5 United States Code

§ 553 --------------------------------------------------------------------------------------------------- 9

7 United States Code

§ 2011-------------------------------------------------------------------------------------------------- 3

§ 2015------------------------------------------------------------------------------------------- *passim*

§ 2027----------------------------------------------------------------------------------------------- 17

29 United States Code

§ 3121----------------------------------------------------------------------------------------------- 16

Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 64-------------------------------------6, 17

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 ------------ 4, 6, 20, 21

Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251-------------------------------- 4

Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 --------6, 17

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651------- 6, 17, 21

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,

Pub. L. No. 104-193, 110 Stat. 2105------------------------------------------------------------ *passim*


**REGULATIONS**

7 C.F.R. § 273.24(f)(2)(ii) ------------------------------------------------------------------5, 8, 17, 20

# TABLE OF AUTHORITIES
### (continued)

Food Stamp Program: Work Provisions of the Personal Responsibility and

    Work Opportunity Reconciliation Act of 1996 and Food Stamp Provisions of

    the Balanced Budget Act of 1997,

    67 Fed. Reg. 41589 -------------------------------------------------------------------------------- 19, 20

Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without

    Dependents, Notice of Proposed Rulemaking,

    84 Fed. Reg. 980 ----------------------------------------------------------------------------------- *passim*

Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without

    Dependents, Final Rule,

    84 Fed. Reg. 66782 -------------------------------------------------------------------------- *passim*

OTHER AUTHORITIES

142 Cong. Rec. 17,782 (1996) ------------------------------------------------------------------------ 3

Agriculture and Nutrition Act of 2018, H.R. 2, 115th Cong. § 4015 ------------------------------ 6, 14

H.R. Rep. No. 115-1072 (2018) (Conf. Rep.) -------------------------------------------------- *passim*

S. 3042, 115th Cong. § 4103 ------------------------------------------------------------------------ 7

# INTRODUCTION

The Supplemental Nutrition Assistance Program ("SNAP") has been the country's primary weapon against hunger for more than 40 years. The Rule dramatically alters long-standing aspects of SNAP applicable to unemployed adults who are not disabled or raising minor children ("ABAWDs"). It imposes stringent restrictions on states' ability to continue benefits to these individuals contrary to Congress' mandate that benefits should continue if there are insufficient jobs for SNAP recipients where they reside and despite strong evidence that these individuals cannot reasonably replace their benefits with income. The restrictions would result in approximately 700,000 SNAP recipients losing their lifeline to food. Especially now, as our nation reels from the COVID-19 pandemic, state flexibility to provide for the nutritional needs of our residents is essential.

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "PRWORA" or "Statute") conditioned continued SNAP benefits for ABAWDs on their meeting certain work requirements. However, because the time limit was not designed to penalize individuals who are willing but unable to find work, the law provides that states can seek waivers to suspend the work requirements for any group of ABAWDs if the area where they reside lacks sufficient jobs for them. Congress also allotted a limited number of exemptions that allow states to temporarily extend SNAP benefits to individual ABAWDs who otherwise would be denied those benefits.

The Rule is procedurally flawed. USDA deprived commenters of a meaningful opportunity to address material aspects of the Rule, including the removal of a state's qualification for extended unemployment benefits as a readily approvable basis for a work requirement waiver. All but two states now qualify for extended unemployment benefits in the wake of the COVID-19 crisis. Bolen

1

Supp. Decl. ⁋ 14.[1]

The Rule also substantively contravenes the SNAP statute by effectively eliminating the insufficient jobs inquiry and the indefinite carryover of exemptions mandated by statutory language and clear statements of congressional intent. The Rule arbitrarily and capriciously upends more than two decades of agency rules and factual findings with no supported justification.

In short, USDA has retreated from the purpose of the Statute in favor of a new goal, nowhere supported in the congressional or administrative record, to reduce the overall number of ABAWD SNAP recipients and "address the problem of States' manipulative usage" of waiver standards "to maximize waived areas." 84 Fed. Reg. at 66795. The Rule furthers this goal by unlawfully rewriting the Statute and arbitrarily reducing the inquiry to a question solely of general unemployment rates. Those rates undisputedly fail to capture the ABAWD experience, which includes the hallmarks of poverty: limited education, limited work experience, unstable housing, lack of access to reliable transportation and childcare, and mental and physical challenges.

In 2018, Congress rejected a proposal to impose restrictions nearly identical to those found in the Rule. USDA cannot impose by Rule restrictions that Congress has expressly refused to impose by legislation. The Rule is unlawful and should be vacated.

## STATEMENT OF FACTS

### A.    Congress Enacted SNAP to Effectively Alleviate Hunger.

Formerly referred to as food stamps, SNAP has provided vital food assistance since 1977. Its goal is to "promote the general welfare" by "raising levels of nutrition among low-income

---

[1] Plaintiffs refer throughout to supplemental declarations submitted with this Motion by the last name of the declarant, followed by "Supp." and the pertinent reference to the paragraph of that declaration. Declarations that were previously submitted and are part of the record also include the Electronic Case File ("ECF") number.

households." 7 U.S.C. § 2011.

In 1996, Congress enacted PRWORA, Pub. L. No. 104-193, 110 Stat. 2105, with the purpose to engage more individuals in the workforce and promote self-sufficiency. Under PRWORA, ABAWDs may not receive SNAP benefits for more than three months in any 36-month period (the "ABAWD time limit") unless they meet certain work-related requirements. 7 U.S.C. § 2015(o). However, Congress expressly made the time limit inapplicable when ABAWDs reside in an area with insufficient jobs for them. 142 Cong. Rec. 17,782 (1996). The co-author of the provision, Rep. John Kasich (R-Ohio), made clear "[i]t is *only* if you are able-bodied, if you are childless, and if you live in an area where you are getting food stamps and *there are jobs available*, then it applies." *Id.* (emphases added).

PRWORA allows states to request waivers for "*any* group of individuals" when the "area in which the individuals reside (i) has an unemployment rate above 10 percent; or (ii) does not have a sufficient number of jobs to provide employment *for the individuals.*" 7 U.S.C. § 2015(o)(4) (emphases added). The dual bases for the waivers—high unemployment or insufficient jobs for ABAWDs—reflects Congress's recognition that "the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities." ABAWD00000168.

Congress's provision for a specific inquiry into the availability of jobs for ABAWDs is meaningful. Most ABAWDs face significant barriers to finding steady employment even in strong economic times. Bolen Decl. ¶ 12, ECF No. 3-2. Many ABAWDs have at most a high school education, which limits their job prospects. *Id.* ¶ 15. ABAWDs also disproportionately struggle with minimal work history, physical and mental illnesses, lack of access to reliable transportation and childcare, and homelessness or unstable living situations. Bolen Decl. ¶¶ 12, 17-22, ECF No.

3-2; ABAWD00110215; Gifford Decl. ⁋ 18, ECF No. 3-9; Storen Decl. ⁋ 11, ECF No. 3-17.

These challenges result in unemployment rates for ABAWDs that are significantly higher than, and often twice as high as the national average. *See* Bolen Decl. ⁋⁋ 15, 20, ECF No. 3-2. Additionally, a substantial percentage of ABAWDs are racial minorities or women that disproportionately lack job opportunities. ABAWD00168815. As the Center on Budget and Policy Priorities ("CBPP") noted, "[o]ver one-quarter of childless adult SNAP participants targeted by the time limit are African American and approximately 20 percent are Latino. These groups, particularly African Americans, have higher unemployment rates than white Americans and are more affected by recessions." ABAWD00110135.

Congress additionally recognized that, in times of swift economic downturn or declining employment opportunities, like the current public health crisis, states may not be able to obtain waivers quickly enough to maintain food security for those in need. Thus, in the Balanced Budget Act of 1997 ("BBA"), Pub. L. No. 105-33, 111 Stat. 251, 252, Congress allowed states to exempt 15 percent of their ABAWDs who would otherwise be subject to the time limit. Each exemption enables a state to extend benefits for one additional month to one SNAP recipient. 7 U.S.C. § 2015(o)(6). Unused exemptions may be carried forward to subsequent years. *Id.* § 2015(o)(6)(G). These exemptions and the ability to carry them over give states the flexibility to quickly respond to changing economic circumstances. In the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 ("2018 Farm Bill"), Congress reduced the number of exemptions accrued each year to 12 percent of ABAWDs, but it simultaneously rejected proposals to eliminate carryover of unused exemptions altogether. 132 Stat. 4632; *see also* H.R. Rep. No. 115-1072, at 615-16 (2018) (Conf. Rep.).

**B.**    <u>**USDA Maintained Regulations for Decades that Accorded States Flexibility in Requesting Waivers.**</u>

For more than two decades, USDA recognized the unique challenges faced by ABAWDs and that states are best suited to define the scope of their waiver requests. In 1996, USDA published guidance acknowledging "that the law provided authority to waive these provisions in recognition of the challenges that low-skilled workers may face in finding and keeping permanent employment." ABAWD00000166 ("1996 guidance"). USDA recognized that states should have "broad discretion in defining areas that best reflect the labor market prospects of program participants and administrative needs." *Id.*

The 1996 guidance recognized that factors other than general unemployment rates are relevant to whether there are sufficient jobs for ABAWDs. USDA therefore permitted states to submit whatever data they deemed appropriate to support their requests "[b]ecause there are no standard data or methods to make the determination of the sufficiency of jobs" for ABAWDs. ABAWD00000168.

A 2001 rule codified the waiver procedures in the 1996 guidance (the "2001 rule"). ABAWD00000123-24. The rule includes a "non-exhaustive list" of information that states could submit to demonstrate a lack of sufficient jobs, including that an area "(1) [w]as designated as a Labor Surplus Area [("LSA")] by the Department of Labor's ["DOL"] Employment and Training Administration (ETA); (2) was determined by the [DOL's] Unemployment Insurance Service as qualifying for extended unemployment benefits; (3) has a low and declining employment-to-population ratio; (4) has a lack of jobs in declining occupations or industries; or (5) has a 24 month average unemployment rate 20 percent above the national average for the same period." ABAWD00000123; *see also* 7 C.F.R. § 273.24(f)(2)(ii). The 2001 rule also recognized that "State agencies have *complete discretion* to define the geographic areas covered by waivers so long as

they provide data for the corresponding area." ABAWD00000124 (emphasis added). These regulations remained unchanged until the Rule.

USDA implemented the BBA's discretionary exemptions in a rule issued in June 2002 ("2002 rule"). ABAWD00000146-47. The 2002 rule recognized that "State agencies have *maximum flexibility* to apply the exemptions as they deem appropriate." ABAWD00000146 (emphasis added). The 2002 rule stated that "[i]f the State agency does not use all of its exemptions by the end of the fiscal year, FNS [Food and Nutrition Service] will increase by the remaining balance the estimated number of exemptions allocated to the State agency for the subsequent fiscal year." *Id.* The 2002 rule did not limit this carryover from each year to the next, and this rollover of discretionary exemptions enabled states to maintain a safety net for times of sudden economic downturn like the current pandemic.

## C.    Congress Rejected Limits Like Those the Rule Seeks to Implement.

Congress has reauthorized SNAP four times since PRWORA's enactment without materially altering the flexible framework for state waiver requests and exemption carryover.[2] In its most recent reauthorization, the 2018 Farm Bill, Congress rejected the proposals that USDA adopted in the Rule.

The House version of the 2018 Farm Bill proposed to eliminate the statutory language permitting a waiver based on a lack of "sufficient jobs for the individuals" and replace it with more restrictive language, including a 7 percent unemployment floor for the area for which a waiver would be requested. Agriculture and Nutrition Act of 2018, H.R. 2, 115th Cong. § 4015 (as passed

---

[2] *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134; Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651; Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 64; Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490.

by the House, June 21, 2018) ("House Bill"). The House proposed to limit the ability of states to combine individual jurisdictions in a waiver request unless the jurisdictions were designated as a Labor Market Area ("LMA") by the DOL. *Id.* The House also proposed to terminate states' ability to carry over unused exemptions. *Id.* In contrast, the Senate version of the 2018 Farm Bill did not make any changes to the waiver or exemption requirements. S. 3042, 115th Cong. § 4103 (as reported by S. Comm. on Agric., Nutrition, & Forestry, June 18, 2018).

The Conference Committee adopted the Senate's proposal, maintaining the "sufficient jobs" language and imposing no new restrictions on state waiver requests. Congress made only a minor change to the exemption provision, reducing the percentage of ABAWDs a state may exempt annually from 15 percent to 12 percent beginning in fiscal year 2020. H.R. Rep. No. 115-1072, at 616 (2018) (Conf. Rep.) ("Conference Report"). President Trump signed the 2018 Farm Bill into law on December 20, 2018.

### D.    The Rule Upends Decades of Agency Policy and Adopts Strict Requirements that Congress Rejected.

One month later, USDA proposed a rule "intended to move more able-bodied recipients of [SNAP] benefits to self-sufficiency through the dignity of work." *Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents*, Notice of Proposed Rulemaking, 84 Fed. Reg. 980 (Feb. 1, 2019) ("Proposed Rule"). The Proposed Rule sought to do what Congress had rejected: (1) restrict states' discretion to define the geographic scope of waiver requests based on characteristics of local labor markets and economic conditions, (2) impose new data restrictions that effectively narrow the "insufficient jobs" for ABAWDs inquiry to a question of general unemployment levels, and (3) limit the carryover of ABAWD discretionary exemptions. The Proposed Rule asserted that these new restrictions were necessary because USDA's "operational experience" demonstrated that states had manipulated the waiver

criteria to request waivers for areas where it was "questionable" whether there were insufficient jobs for ABAWDs. 84 Fed. Reg. at 981. The Proposed Rule expressly stated that USDA would maintain state qualification for extended unemployment benefits as a basis for waiver and would continue to allow states to seek waivers for single jurisdictions. 84 Fed. Reg. at 985-86.

USDA received more than 100,000 comments on the Proposed Rule. 84 Fed. Reg. at 66783. 99.5 percent of those comments opposed its adoption. ABAWD00008225 (noting that 102,410 of 102,945 commenters opposed aspects of the Proposed Rule). Commenters, including Plaintiffs, provided evidence demonstrating that the proposed changes would result in hundreds of thousands of ABAWDs who lack job opportunities losing vital food assistance that they could not reasonably replace with income. Commenters made clear that this result would lead to detrimental health outcomes and other harms, the costs of which would be borne by states. Nevertheless, USDA adopted a final Rule on December 5, 2019, that made the following changes:

*Limiting the Criteria for Waiver to High General Unemployment.* Prior regulations allowed states to seek waivers based on several criteria relevant to the ABAWD-specific inquiry. *See* 7 C.F.R. § 273.24(f)(2)(ii). The Rule reduces this nuanced inquiry to a cursory assessment of general unemployment. A state now qualifies for a waiver under the "sufficient jobs" language only if an LMA has an unemployment rate that is 20 percent above the national average and at least six percent. 84 Fed. Reg. at 66785. The Rule also eliminates state qualification for extended unemployment benefits as a basis for a waiver, 84 Fed. Reg. at 66789, despite the Proposed Rule's assurances to the contrary. These changes were scheduled to go into effect on April 1, 2020.

*Imposing a Strict Definition for Waiver "Area."* The Rule imposes a "strict definition" of "area" to mean only an LMA. 84 Fed. Reg. at 66793. Thus, states may no longer request a waiver for ABAWDs in a single jurisdiction, such as a county or town; again, despite the Proposed Rule's

assurances to the contrary. The unemployment rate for the entire LMA must meet the Rule's thresholds, even when a state requests a waiver for only its intrastate portion of an interstate LMA. This change was scheduled to go into effect on April 1, 2020.

*Eliminating Carryover of Exemptions.* The Rule bars the carryover of exemptions beyond one year and removes states' remaining balances of carried-over exemptions on October 1, 2020. 84 Fed. Reg. at 66803. Combined with the other changes under the Rule, this is a one-two punch against ABAWDs: the limits on waivers will deny more ABAWDs SNAP benefits, and these exemption restrictions will reduce states' ability to provide the remaining recipients with even temporary continued nutritional assistance.

On March 13, 2020, the Court issued an order preliminarily enjoining USDA from implementing the Rule's changes to the waiver provisions. The Rule's changes to the carryover of exemptions were not enjoined and are scheduled to go into effect on October 1, 2020.

## STANDARD OF REVIEW

The APA imposes both procedural and substantive requirements on agency actions. The APA's procedural requirements demand that an agency publish "notice" in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). "Notice is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was there.'" *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (citation omitted). If notice is inadequate, the "regulation must fall on procedural grounds, and the substantive validity of the change accordingly need not be analyzed." *Am. Fed'n of Labor & Cong. of Indus. Organizations v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985).

If an agency action complies with the APA's procedural requirements, a court assesses

whether an agency action is substantively deficient. *See, e.g.*, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). At *Chevron* step one, a court employs all the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004). These tools include evaluation of the statute's text, structure, purpose, and legislative history. *See, e.g.*, *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014). If the application of those tools reveals "that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

Where a statute is silent or ambiguous on the question presented, the agency's construction will still fail if its interpretation of the statute is unreasonable. *Guedes v. Bur. of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 28 (D.C. Cir. 2019). An agency's construction is unreasonable under *Chevron* step two if it rests on a construction of the statute that is "arbitrary and capricious in substance," *see* P.I. Op. at 32 n.13 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 n.7 (2011)), considering the statute's language and purpose, *see Good Fortune Shipping SA v. Comm'r of Internal Revenue*, 897 F.3d 256, 261-62 (D.C. Cir. 2018).

Agency action is arbitrary and capricious if it "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). To change its policy, an agency must "show that there are good reasons for the new policy," including a reasoned explanation for disregarding factual findings that underlie prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Nat'l Lifeline Assoc. v. FCC*, 921 F.3d 1102, 1112 (D.C. Cir. 2019). When an agency has failed to "give adequate

reasons for its decisions," to "examine the relevant data," or to offer a "rational connection between the facts found and the choice made," the regulation must be set aside. *State Farm*, 463 U.S. at 43 (citation omitted); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

## ARGUMENT

I.    **USDA'S PROPOSED RULE FAILED TO PROVIDE SUFFICIENT NOTICE OF THE CHANGES THAT THE RULE IMPOSES.**

The Rule violates the APA because key provisions were not subject to notice and comment. Such notice deficiencies alone can render a rule unlawful *see, e.g., Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110-11 (D.C. Cir. 2014), and in this case, they do.

First, the Proposed Rule explicitly assured commenters that USDA would "continue" its long-standing practice of "approv[ing] a State's waiver request that is based upon the requesting State's qualification for extended unemployment benefits . . . because [such qualification] has been a clear indicator of lack of sufficient jobs . . . ." 84 Fed. Reg. at 985. Contrary to this clear statement, the Rule eliminates this waiver basis. 84 Fed. Reg. at 66789-90. The APA prohibits such a "surprise switcheroo." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *see Allina Health Servs.*, 746 F.3d at 1107-08 (an agency violates notice and comment requirements when it enacts the opposite of what it proposed to the public); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009); *Int'l Union*, *United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1261 (D.C. Cir. 2005).

Second, the Proposed Rule stated that USDA would allow *grouping* of substate jurisdictions like cities and towns if the combined jurisdictions constituted an LMA. But it did not purport to disturb a state's existing ability to seek a waiver for *individual* substate jurisdictions, such as one city or town. 84 Fed. Reg. at 986. The Rule obliterates that ability: it defines "area" as *only* an LMA and eliminates states' ability to seek a waiver for individual substate jurisdictions. The result is, for example, the entire District of Columbia, which shares an LMA with parts of

11

Maryland, Virginia, and even West Virginia, can qualify for a waiver only if *that entire LMA* meets the Rule's general unemployment thresholds. 84 Fed. Reg. at 66794-96. The Proposed Rule "nowhere even hinted" that USDA was considering this drastic change. *CSX Transp.*, 584 F.3d at 1082; *see Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012). "The gap between the [Proposed Rule] and the final Rule is particularly gaping here inasmuch as the final Rule, without advance notice, overcomes a longstanding statutory framework" permitting states to define the geographic scope of their waiver requests. *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 559-60 (S.D.N.Y. 2019).

Finally, USDA denied the opportunity for meaningful comment by relying on vague and undefined bases. USDA cited its "operational experience" no fewer than five times in the Proposed Rule, but it never defined this term or explained how it supported the changes. USDA claimed that its "operational experience" demonstrated that states have manipulated the waiver system, 84 Fed. Reg. at 981, but it provided no evidence of abuse or of any waiver that had been improperly obtained because the area had sufficient jobs for ABAWDs. USDA's failure to provide such evidence denied commenters a meaningful opportunity to justify the propriety of state waiver applications and dispute USDA's accusations of gamesmanship. *See* ABAWD00008240, -8255; *see, e.g.,* ABAWD00168808, ABAWD00182270, ABAWD00110259-66. An agency's notice and comment obligations are not met by vague, conclusory assertions (indeed, accusations) that cannot be meaningfully tested or addressed. "[T]he notice required by the APA . . . must disclose in detail the thinking that has animated the form of a proposed rule *and the data upon which that rule is based*." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977) (emphasis added).

USDA's procedural failures deprived Plaintiffs and the public of the chance to comment on key provisions of the Rule. These failures alone require that the Rule be vacated.

## II. THE RULE VIOLATES THE APA BECAUSE IT IS CONTRARY TO LAW.

The Court has already found that USDA's near-total reliance on unemployment rates cannot be squared with Congress' mandate that waivers be available for areas that lack jobs for ABAWDs. P.I. Op. at 32-33. Similarly, USDA's strict definition of a waiver area as only an LMA, a geographic designation that may cross state boundaries and encompass dozens of counties, contravenes the Statute's mandates that waivers be permitted for "any group of individuals" and that the inquiry focus on the experience of ABAWDs, not the general populace. Finally, the agency's elimination of carryover of exemptions contravenes the plain text, purpose, and history of the Statute. The Rule is contrary to its authorizing statute and must fall under *Chevron*.

### A. USDA's Near-Total Focus on General Unemployment Data to Evaluate Lack of Sufficient Jobs for ABAWDs Is Contrary to Law.

The Statute commands USDA to ask a simple question: are there insufficient jobs to provide employment for a group of ABAWDs in the area where they reside? *See* 7 U.S.C. § 2015(o)(4). The text is clear. A state may seek a waiver for "*any group of individuals* in the State" where "the area in which the individuals reside" does not have sufficient jobs "to provide employment *for the individuals*." 7 U.S.C. § 2015(o)(4)(A)(2) (emphases added). USDA has not disputed that "the individuals" refers to ABAWDs. March 5, 2020 Hr'g Tr. at 78:5-79:2.

The Statute makes clear that the answer to Congress's question—whether there are enough jobs *for the ABAWDS who reside in a particular area*—cannot be found in a *general* unemployment rate alone. P.I. Op. at 32-33; *see Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686, at *6 (U.S. June 15, 2020) (the use of the word "individual(s)" in the statute requires an assessment for the specific individuals at issue, not generally or even for an entire class). Congress already made the general unemployment rate the sole criterion for a waiver under one prong of the waiver inquiry, *id.* § 2015(o)(4)(i), and expressly provided a second, separate

prong of inquiry in the subparagraph at issue here, *id.* § 2015(o)(4)(ii). "Had Congress intended to restrict" the sufficient-jobs language in the manner USDA asserts, "it presumably would have done so expressly as it did in the immediately [preceding] sub[paragraph]." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). Moreover, as the Court explained at the preliminary injunction stage, "[b]y making both prongs of § 2015(o)(4)(A) dependent on unemployment rate, USDA has arbitrarily written this distinction out of the [statute]." P.I. Op. at 33.

Recent action confirms that Congress did not intend for a general unemployment rate to govern the lack of sufficient jobs language. P.I. Op. at 35-36. During the legislative process that led to the 2018 Farm Bill, Congress considered a House proposal to eliminate the sufficient jobs language and adopt a 7 percent unemployment floor. P.I. Op. at 35 (citing House Bill, § 4015(a)(1)). As the Court noted, "Congress's recent rejection of waiver criteria less stringent than those ultimately adopted by USDA is probative of congressional intent to maintain flexibility in the waiver system." P.I. Op. at 36. The Conference Report expressly endorsed state flexibility by noting that "neither the Department nor Congress can enumerate every ABAWD's situation as it relates to possible exemption from the time limit, and subsequently, the work requirement." Conference Report at 616. Congress's intent to foreclose USDA's near-total reliance on a general unemployment rate is clear under *Chevron* step one.[3]

---

[3] As the Court alluded to previously, the Statute's grant of some discretion to USDA to grant or deny a waiver does not allow USDA to ignore the question Congress plainly directed it to ask in setting the allowable criteria. P.I. Op. at 32 n.2 (referencing "*may waive*" in the Statute but finding that USDA's discretion is not unfettered). USDA's decision to grant sufficient-jobs waivers based only on general unemployment rates is "flatly inconsistent with Congress' clear message on this precise issue." *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 222 (D.C. Cir. 1986).

The Rule similarly cannot survive *Chevron* step two because USDA's interpretation is unreasonable. P.I. Op. at 32 n.13. As the Court rightly observed, the statutory requirement that USDA ask whether there are sufficient jobs to provide employment *for ABAWDs where they reside* "is a guardrail on USDA's discretion." P.I. Op. at 34. USDA ran afoul of this limitation by ignoring the common-sense proposition (not to mention "[v]oluminous evidence") that "general unemployment rates alone cannot measure" whether the statutory standard keyed to ABAWDs has been met. P.I. Op. at 29-30. Similarly, as the Court noted, it would make little sense to conclude that Congress intended a general unemployment rate to be the near-sole arbiter of a sufficient jobs waiver when Congress specified a general unemployment rate as a separate basis for waiver. P.I. Op. at 29, 32-36.

### B.   USDA Acted Contrary to Law by Imposing a Strict Definition of Area.

USDA's "strict definition," 84 Fed. Reg. at 66783, 66795-97, of the "area" for which a state may seek a waiver similarly contravenes the statute and for that reason the Rule must be set aside. "Area" as used in the Statute necessarily refers to where the "group of individuals" for whom the state requests a waiver "reside[s]"—not a statistical area covering multiple states and tens of counties.

A straightforward reading of the text proves this point. First, a waiver may be granted for "*any* group of individuals" in a state. 7 U.S.C. § 2015(o)(4)(A). The word "any" generally gives an expansive meaning to the word it modifies. *See Babb v. Wilkie*, 140 S. Ct. 1168, 1173 & n. 3 (2020). Indeed, the Supreme Court has stated that the phrase "any . . . group of individuals associated in fact" is "obviously broad" and "has a wide reach." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citation omitted). Thus, when section 2015(o) refers to "*any* group of individuals in the state," the phrase is not limited to only all ABAWDs living in the expansive boundaries of a particular statistical designation.

Second, the waiver for "any group of individuals" is triggered only "[o]n the request of a State agency." 7 U.S.C. § 2015(o)(4)(A). The Statute thus gives states the responsibility for designing the request, including selecting for what "group of individuals" to request a waiver. *Cf. Miller v. Casey*, 730 F.2d 773, 776-77 (D.C. Cir. 1984). The Court recognized that the prior regulation, unlike the Rule, was consistent with the statutory design: it gave states discretion to define what areas would be covered by a waiver request, "because States are more familiar with the reality of employment challenges confronting ABAWDs in particular areas." P.I. Op. at 42. Section 2015(o)(4) limits the term "area" in the immediately following phrase "in which the individuals reside," with "*the* individuals" referring to the "group of individuals" for whom the state chose to request a waiver. Thus, the term "area" necessarily refers to where the "group of individuals" for whom a single state requests a waiver "reside[s]" in that state, not a statistical area covering multiple States and tens of counties.

Reading "area" to refer to *only* an LMA renders the phrase "any group of individuals" largely meaningless. This is an "implausible" result that fails at *Chevron* step one. P.I. Op. at 33. If Congress had intended to restrict the broad term "any group of individuals" to only those groups of individuals fitting within a predefined (and expansive) statistical area, it would have done so as it has in other statutes. *See, e.g.*, 29 U.S.C. § 3121 (state identification of workforce development areas, which may include areas that are LMAs across two or more states or other appropriate contiguous subareas of more than one state).[4] The Statute's language forecloses USDA's use of a

---

[4] More generally, in neighboring subsections enacted at the same time as subsection (o)'s work requirement, Congress required the creation of programs to help SNAP recipients find employment. 7 U.S.C. § 2015(d)(4); P.I. Br. 32. These programs eschew rigid statistical boundaries and instead require *state-designed* programs responsive to "State or local workforce needs." *Id.* § 2015(d)(3).

rigid federal statistical area—one that may cross numerous state and county boundaries—to the exclusion of all other metrics.

Finally, consistent with the plain reading of the Statute, USDA has recognized for more than two decades that "States may define areas to be covered by waivers." 7 C.F.R. § 273.24(f)(6). "[T]he government's early, longstanding, and consistent interpretation of a statute" can be "powerful evidence of its original public meaning." *Kisor v Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment).

Moreover, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)). Over the years, Congress re-authorized, revamped, and renamed the SNAP program and amended the work requirement subsection at issue here, but it expressly declined as recently as 2018 to adopt a series of changes nearly identical to those imposed in the Rule.[5] All of these congressional acts are "persuasive evidence" that USDA's longstanding prior interpretation of "area" is the one Congress intended. *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 274-75 (1974); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982) (amending a statute while leaving certain statutory provisions intact "is [] evidence that Congress affirmatively intended to preserve that" context).

---

[5] The Statute expressly requires congressional action to continue SNAP's operation beyond certain fiscal years. Specifically, 7 U.S.C. § 2027(a)(1) requires Congress to authorize funding "[t]o carry out this chapter" (referring to each of the SNAP provisions) in certain fiscal years. This authorization would have expired in fiscal years 2002, 2008, 2014, and 2018 without congressional action expressly reauthorizing funding. *See* Pub. L. No. 107-171, § 4122(c), 116 Stat. 134, 324 (2002); Pub. L. No. 110-246, § 4406(a), 122 Stat. 1651, 1902 (2008); Pub. L. No. 113-79, § 4024, 128 Stat. 649, 809 (2014); 7 U.S.C. § 2027(a)(1).

C.    **USDA's Elimination of Unused Discretionary Exemptions is Contrary to Law.**

USDA's elimination of carryover for exemptions beyond one year also contravenes the statutory text and Congress's clearly articulated intent. Section 2015(o)(6) sets the number of exemptions allotted for a state in each year. Initially, that number is based on a percentage of "covered individuals," meaning those ABAWDs that are subject to the time limit in the state. That number must then be adjusted in a number of ways, including the one applicable here:

> the Secretary shall increase or decrease the number of individuals who may be granted an extension under this paragraph to the extent that the average monthly number of exemptions in effect in the State for the preceding fiscal year under this paragraph is lesser or greater than the average monthly number of exemptions estimated for the State agency for such preceding fiscal year under this paragraph.

*Id.* § 2015(o)(6)(G).

This required adjustment is governed by a comparison between two figures: (1) "the average monthly number of exemptions *in effect*" during the preceding fiscal year, and (2) "the average monthly number of exemptions *estimated for the State agency* for such preceding fiscal year *under this paragraph*." *Id.* (emphases added). If the former is "less[]" than the latter, then USDA "shall increase" the state's exemptions for the present fiscal year by the difference. *Id.*; *see also* P.I. Op. at 7. The number *in effect* plainly refers to exemptions used, so the only question is whether the number "estimated . . . *under this paragraph*" includes the number of carryover exemptions that also were available in the preceding fiscal year. In other words, from the vantage point of year three, does the number "estimated . . . *under this paragraph*" for year two include exemptions that were usable in year two because they were carried into year two from year one?

The statute's plain language demonstrates that it does. Paragraph (6) of subsection 2015(o) is structured so that the number of exemptions is computed based on the statutory percentage, and then adjusted upward or downward in several ways (including via the carryover language in

18

subparagraph (G)). Thus, when the statute refers to the number of exemptions estimated "under this paragraph," it is referring to the number computed under *all* of paragraph (6). *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (noting Congress's "ordinar[y] adhere[nce] to a hierarchical scheme in subdividing statutory sections" into, *inter alia*, paragraphs and subparagraphs). That number includes the number of exemptions carried into the year from the preceding year by operation of subparagraph (G) of paragraph (6). Neighboring provisions within section 2015 demonstrate that Congress's reference in subparagraph (G) to "this paragraph," meaning all of paragraph (6), was intentional. 7 U.S.C. § 2015(o)(6)(F) (referring to estimate "under subparagraph (C), (D), or (E)"); *id.* § 2015(o)(3) (exempting from "Paragraph (2)" individuals meeting certain criteria). *See MacLean*, 135 S. Ct. at 919.

This ordinary meaning is confirmed by longstanding, consistent agency interpretation. *See Kisor*, 139 S. Ct. at 2426. USDA guidance and rules have consistently provided for an initial estimate of exemptions, adjusted as described in the various subparagraphs of section 2015(o)(6). For example, the 2002 rule referred to USDA's estimate, adjusted it to reflect "[t]he State agency's caseload," as require under subparagraph (D),[6] adjusted it again for a greater-than-ten percent variation between SNAP recipients and caseload, as required by subparagraph (F), and finally adjusted it again to reflect subparagraph (G)'s carryover adjustment. *Food Stamp Program: Work Provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and Food Stamp Provisions of the Balanced Budget Act of 1997*, 67 Fed. Reg. 41589, 41619 (June 19, 2002). Describing the last step, USDA stated: "If the State agency does not use all of its exemptions

---

[6] For ease of reference, the text refers to paragraph (6)'s subparagraphs as they exist today after the 2018 Farm Bill added a new subparagraph applying the 12 percent figure for fiscal years 2020 and following.

by the end of the fiscal year, FNS will increase the *estimated number of exemptions* allocated to the State agency for the subsequent fiscal year *by the remaining balance.*" *Id.* at 41619 (codifying 7 C.F.R. § 273.24(h)) (emphases added). That standard, under which states have consistently carried forward all of their unused exemptions (including those carried over from prior years), has been USDA's consistent approach for nearly two decades.

In 2018, Congress extended SNAP's authorization and made a "conscious choice" to reject a House proposal that would have eliminated exemption carryover. *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 505 (D.C. Cir. 2013). The regular reauthorization process that SNAP undergoes in the Farm Bills—distinct from some other statutory schemes— makes clear that "Congress revisits the [SNAP statute] with purpose." *Id.* Instead of adopting the House's drastic revision, the full Congress made a more measured change. It preserved the existing exemptions language in section 2015(o)(6) but reduced the accrual percentage of exemptions from 15 to 12 percent starting in fiscal year 2020. Pub. L. No. 115-334, § 4005(b)(3), 132 Stat. 4490, 4632 (2018). Thus, Congress acted with a "scalpel, not a cudgel," to address any perceived concern that states had too many exemptions, foreclosing USDA from imposing that cudgel on its own. *Hearth, Patio & Barbecue Ass'n,* 706 F.3d at 505.

This process clearly demonstrates congressional intent to maintain the status quo for exemption carryover. And the Conference Committee confirmed that intent, explaining that states will "continue to accrue exemptions and retain any carry-over exemptions from previous years, consistent with current law." Conference Report at 616; *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003) (citing Conference Report as evidence of congressional intent).

That language confirms Plaintiffs' reading in several ways. Its reference to "*any*" carryover

exemptions conveys the breadth of the retention provision. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008). Its reference to "previous years" conveys that exemptions would carry over from more than one previous year. Finally, the Report's reference to "consistent with current law" shows that Congress sought to maintain the existing carryover of exemptions. For more than twenty years, over four different reauthorizations that made other amendments to the SNAP program,[7] Congress left the carryover language intact. *See Public Citizen*, 332 F.3d at 668 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (according weight where "Congress has frequently amended or reenacted the relevant provisions without change")).[8]

At the preliminary injunction stage, this Court noted that Plaintiffs had "point[ed] to no case in which a court has used legislative history to deem ambiguous statutory language clear." P.I. Op. at 21 n.9. But the Supreme Court itself has said that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011); *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (indicating that "clear legislative history" can sometimes "illuminate ambiguous text" (citation omitted)). And it can certainly show that Congress had a precise intent at *Chevron* step one. *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 271 (D.C. Cir. 2001). Moreover, Plaintiffs do not

---

[7] For example, in the 2008 Farm Bill, Congress overhauled numerous aspects of the program and changed its name from the Food Stamp Program to the Supplemental Nutrition Assistance Program. *See* Pub. L. No. 110-246, §§ 4001-4142, 122 Stat. 1654, 1853-1882. That bill also amended the work requirements under 7 U.S.C. § 2015. *See* Pub. L. No. 110-246, § 4131, 122 Stat. at 1875.

[8] The 2018 Farm Bill amended the Statute, including the waiver and exemptions provisions, in several respects. Pub. L. 115-334, §§ 4005(a) (amending employment and training program provision), 4005(b)(1) (amending what satisfies work requirement), 4005(b)(2) (requiring "support of the chief executive officer of the State" for a waiver request), (b)(3) changing 15 percent exemptions to 12 percent exemptions), 4005(c) (amending employment-and-training requirement for state plan).

point merely to a statement in a committee report, but instead present evidence of conscious decision-making to enact a narrowly tailored change to the provision at issue (from 15 to 12 percent) and to reject harsher limits on carryover in a statutory reauthorization of the entire program. "[A] statute may foreclose an agency's preferred interpretation despite . . . textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque." *Catawba County v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009). That is what occurred here. *See Hearth, Patio & Barbecue Ass'n*, 706 F.3d at 504-05 (statute barred the agency's regulation where Congress had left a contrary interpretation in place for several decades, had revisited the relevant statute "with purpose," and had "tak[en] to the statutory scheme a scalpel, not a cudgel").

The Rule acknowledges that commenters pointed USDA to the pertinent Conference Report language and argued that USDA's proposal was "out of line with Congressional intent." 84 Fed. Reg. at 66803. But, as with other responses, USDA "waved away these commenters' concerns and their supporting evidence in a few sentences of defective argument." P.I. Op. at 30. Indeed, the only statutory justification cited by USDA for the Rule's complete reversal on the carryover point is Congress's purported "decision to limit the number of exemptions available to States in a given fiscal year, as expressed by sections 6(o)(6)(C), (D), and (E) of the Act." 84 Fed. Reg. at 66802. Congress' other restrictions are fully consistent with indefinite carryover of those otherwise limited exemptions, and USDA's remark fails to "grapple with" the statutory text explained above. *See BP Energy Co. v. FERC*, 838 F.3d 959, 965-66 (D.C. Cir. 2016). USDA improperly "reads . . . out of the Conference Report entirely" the report's specific references to "*any*" exemptions, "previous years," and "consistent with current law," *Council for Urological Interests v. Burwell*, 790 F.3d 212, 222-24 (2015).

Finally, even if USDA's new interpretation may be applied to affect exemptions first

22

accumulated on or after its effective date, it may not be applied to extinguish exemption balances accumulated under prior law. In *Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010), the D.C. Circuit evaluated a rule governing companies' future baseline allowances of production and consumption of certain chemicals. The circuit concluded that an EPA regulation, operative in the future, could not extinguish baseline allowances accumulated within that system under prior regulation when EPA itself had recognized the accumulation of those allowances. *Id.* at 1-10. Here too, states have accumulated significant baseline balances usable within an agency-run regulatory scheme under clear prior regulation with the agency's repeated assurance and recognition of those balances.[9] Those balances represent millions of dollars in vital food assistance to state residents that cannot be summarily extinguished by a Rule enacted well after their accumulation. *See Arkema*, 618 F.3d at 8.

### III. THE RULE VIOLATES THE APA BECAUSE IT IS ARBITRARY AND CAPRICIOUS.

This Court already found based on Plaintiffs' arguments for a preliminary injunction (State Pls.' Mot. 25-28, ECF No. 3, hereby incorporated by reference) that Plaintiffs are "highly likely" to succeed in showing that the Rule runs afoul of the requirement of reasoned decision-making. P.I. Op. at 18, 27-45. The Rule radically rewrites longstanding rules governing ABAWD waivers and exemptions based on unsupported justifications contradicted by the evidence and in disregard of significant burdens to states and individuals. USDA attempts to justify the Rule's overly narrow criteria by asserting that states "manipulated" the prior criteria to obtain "questionable" waivers and that states' accumulation of unused discretionary exemptions was an "unintended"

---

[9] USDA has acknowledged as much not only in the Rule (84 Fed. Reg. at 66,802) but also in other publications. For example, in fiscal year 2019, USDA described the agency's prior "unlimited carryover and accumulation" approach and listed each State's outstanding exemption balance. https://fns-prod.azureedge.net/sites/default/files/SNAP-ABAWD-Percentage-Exemption-Totals-FY2019.pdf.

consequence of the Statute. 84 Fed. Reg. at 66783. The administrative record does not support these assertions.

Moreover, USDA ignored evidence that the Rule's new waiver criteria are poorly suited to determining which areas lack sufficient jobs for ABAWDs, will greatly increase costs to states, and will have a disparate impact on minorities. The agency similarly dismissed the negative impact that the Rule's removal of exemptions will have on states' ability to effectively administer SNAP in times of rapid economic downturn. Before the current economic crisis, USDA estimated that 688,000 people would lose access to critical SNAP benefits under the Rule. 84 Fed. Reg. at 66809. Current evidence indicates that number could be much greater given the steep increase in unemployment caused by the COVID-19 pandemic and the likelihood that unemployment will persist, particularly for ABAWDs well after the public health emergency is lifted.[10] *See* Bolen Supp. Decl. ⁋ 22; Fernández Supp. Decl. ⁋ 4; Rivera Supp. Decl. ⁋ 5; Zeilinger Supp. Decl. ⁋⁋ 4, 11.[11]

### A.    The Rule's Reduction of the Sufficient Jobs Inquiry to General Unemployment Rates Is Arbitrary and Capricious.

USDA's decision to limit the "sufficient jobs" inquiry to an examination of an area's 24-month average unemployment rate and impose an unemployment rate floor is contradicted by both the agency's own prior factual findings and evidence provided by commenters that unemployment

––––––––––––––––––––

[11] As set forth in the Court's Order, P. I. Op. at 32-45, and for the reasons discussed herein, USDA's overly narrow interpretation of the sufficient jobs prong both fails under the *Chevron* analysis and is arbitrary and capricious because it ignores "relevant factors" and amounts to "a clear error of judgment." *State Farm*, 463 U.S. at 43. Further, for the reasons discussed herein, the agency's flawed definition of "area" and reading of the statutory requirements for carryover exemptions fail under both tests. As the Court has noted, "there is little distance between *Chevron*'s step two and arbitrary and capricious review under the APA," *see* P.I. Op. at 32-33 n. 13.

levels alone are not an adequate measure of sufficient jobs for ABAWDs. This Court previously found that the Rule fails to provide valid reasons for drastically changing waiver standards in the face of overwhelming contrary evidence and failed to respond meaningfully to commenters' legitimate objections. *See* P.I. Op. at 29-45.

For more than twenty years, USDA recognized the shortcomings of general unemployment rates as a measure of job availability for ABAWDs, and the importance of other economic indicators to this evaluation. In its 1996 guidance, USDA observed that "[t]he statute recognizes that the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities," and that states could thus use other evidence to make that showing "in recognition of the challenges that low-skilled workers may face in finding and keeping permanent employment." ABAWD00000166. The USDA's 1999 proposed rule likewise stated that "there are no standard data or methods to make the determination of the sufficiency of jobs" for ABAWDs. ABAWD00000090. USDA's 2001 rule made clear that the agency interprets the "lack of sufficient jobs" inquiry as encompassing a broad range of metrics and not exclusively tied to demonstrating high general unemployment. ABAWD00000123-24. USDA maintained a consistent position in 2006 guidance, ABAWD00000212, and 2016 guidance, ABAWD00000330-31.

Commenters provided extensive evidence that doing away with USDA's longstanding waiver criteria in favor of a single, limited, and concededly imperfect measure, as the Rule does, will prevent states from securing waivers for areas that lack sufficient jobs for ABAWDs.[12]

---

[12] *See, e.g.,* ABAWD00110124-93, ABAWD00168808-09, -168812; ABAWD00078131-32; ABAWD00079165-69; ABAWD000168348-49; ABAWD00158908-13; ABAWD00167078-79; ABAWD00084261-63; ABAWD00181824-34; ABAWD00068066-67; ABAWD00173990-92.

According to USDA, "many" commenters presented evidence that general unemployment rates do not reflect the reality of jobs for ABAWDs "because of factors affecting the availability of jobs to ABAWDs that unemployment rates do not account for," "such as criminal records, housing instability, a lack of transportation, necessary skills or education, or of reliable, quality jobs." ABAWD00008234-35; 84 Fed. Reg. at 66785-86. Commenters identified other metrics of labor market conditions that could better demonstrate insufficient jobs for ABAWDs. ABAWD00008235; 84 Fed. Reg. at 66788-89. The record also includes extensive evidence that the unemployment rate on which the Rule relies underestimates the number of ABAWDs who are unable to find work because this rate fails to account for the potentially numerous ABAWDs who have stopped looking for employment because of their longstanding inability to find work, ABAWD00008235, -8238, -8246, and that the 2-year average unemployment rate is "insufficiently responsive to economic downturns," ABAWD00008246. *See also* 84 Fed. Reg. at 66798.[13] As one commenter shrewdly summarized, USDA "avoided the statutory requirement of measuring the availability of jobs to ABAWDs by using this metric." ABAWD00008255.

This Court found that USDA's perfunctory rationale for the Rule's new waiver standard was merely a "few sentences of defective argument" that falls short of the reasoned explanation the law requires. P.I. Op. at 30-32. The Rule acknowledges "that ABAWDs may face barriers to employment and have more limited employment prospects than the general public due to low educational attainment or other factors," 84 Fed. Reg. at 66787, but maintains that the 2-year

---

[13]The economic disruption wrought by the COVID-19 pandemic provides a vivid illustration of this point: in less than three months, general unemployment in many areas skyrocketed from the low single digits to nearly 20 percent. The 24-month average unemployment rate thus wildly understates current economic suffering and the difficulty of finding work. *See* Rivera Supp. Decl. ¶ 5 (noting that unemployment rates in Michigan rose from 3.8% in January 2020 to 22.7% in April 2020).

unemployment rate and a 6 percent floor is the best standard by which to judge the availability of jobs for ABAWDs. *Id.* at 66787. USDA's circular statement is devoid of analysis beyond noting that, absent the Rule, "a state could request and qualify for a waiver in areas with an unemployment rate as low as of 4.7 percent." *Id.* at 66787. USDA presents no evidence that an area with 4.7 percent general unemployment necessarily provides sufficient job opportunities for ABAWDs.

USDA failed to "analyze or explain" why it rejected other previously accepted measures of job availability for ABAWDs. *Encino*, 136 S. Ct. at 2127; *see* 84 Fed. Reg. at 66790-91. For example, "[m]any commenters" "expressed opposition to the proposal to no longer allow employment to population ratios that demonstrate economic weakness to qualify areas for waivers." ABAWD00008237. Commenters provided evidence that this metric can be reliably calculated and shows a more accurate picture of the economic climate. ABAWD00008246. Broadly, commenters showed that eliminating this criterion "would unduly limit the economic factors considered in assessing an area's eligibility for a waiver." ABAWD00008237.

Other commenters contended that "information about declining industries or occupations should be retained as a criterion" to provide "appropriate flexibility for local labor conditions." ABAWD00008238. Commenters also "stated that academic studies and publications can often provide a more accurate description of a region's unemployment or can more accurately describe job availability among the ABAWD population than unemployment rates." 84 Fed. Reg. at 66791. Commenters argued that excluding these criteria, along with the imposition of an unemployment rate floor, results in an overreliance on unemployment rates that do not accurately capture ABAWDs' job prospects. *Id*. at 66790.

USDA agrees that these criteria "can be used to help understand employment changes in an area," but summarily discounts these previously credited metrics as "less reliable and consistent

than standard unemployment data" based on USDA's "operational experience." *Id.* at 66791. USDA never provides its basis for determining that these metrics are "less reliable and consistent" evidence of local labor markets or why this information cannot be used in combination with other metrics to demonstrate a lack of sufficient jobs. USDA fails to justify this departure from past practice. *See* P.I. Op. at 31-32.

USDA cannot arbitrarily prioritize its purported desire to rely on standardized or "consistent" data over answering the Statute's mandated inquiry. *State Farm*, 463 U.S. at 43 (reliance on nonstatutory factors "which Congress has not intended it to consider" constitutes arbitrary and capricious action); *Gresham v. Azar*, 950 F.3d 93, 104 (D.C. Cir. 2020) (agency arbitrarily "prioritize[d] non-statutory objectives to the exclusion of the statutory purpose"); *see also Good Fortune Shipping SA v. Comm'r of IRS.*, 897 F.3d 256, 262 (D.C. Cir. 2018) (finding that IRS could not "categorically deny consideration of a recognized form of ownership based on only a single, undeveloped statement that it is 'difficult[ ]' to reliably track the location of a given owner"). USDA never supports its conclusion that the unemployment figures are a *more* reliable— or even *a* reliable—indicator of sufficient jobs for ABAWDs in the area where they reside. Nor does the record provide any basis for this unexplained assumption. Absent a substantive reason why the unemployment rate alone best captures ABAWDS' job prospects, the Rule is arbitrary and capricious.

### B.   The Rule's Elimination of the Extended Unemployment Benefits Qualification Standard Is Arbitrary and Capricious.

In addition to being procedurally unlawful, USDA's decision to eliminate receipt of extended unemployment benefits as a basis for waiver is unreasoned. USDA's only justification for its summary about-face on this criterion is that "qualification for extended unemployment benefits is designated only at the state level, not at the LMA level." 84 Fed. Reg. at 66790. USDA

invoked "concern[s]" that "the extended unemployment benefits criterion would allow States to receive statewide waivers even when there is not a lack of sufficient jobs within certain areas of the State." *Id.* USDA provides no evidence or other analysis for its newfound concerns that this criterion—which USDA described in the Proposed Rule as a "clear indicator" of labor market distress—was likely to result in waivers in areas with sufficient jobs for ABAWDs. 84 Fed. Reg. at 985.[14]

The importance of this criterion has been brought into stark relief by the COVID-19 pandemic: currently, 48 states and the District of Columbia qualify for a waiver under this criterion. Bolen Supp. Decl. ¶ 14. But some of these states would not qualify for a waiver under the Rule because an area's unemployment rate must be *both* over 6 percent AND 20 percent above the national average. *Id.* ¶ 17. Accordingly, an area with 9 percent unemployment would not qualify if the national average unemployment rate was 8 percent. *Id.*

Moreover, USDA's supposed reservations about a statewide waiver under this criterion failing to narrowly target areas that lack sufficient jobs is incongruous with USDA's decision to grant waivers only for entire LMAs, areas that often encompass much larger areas across multiple state boundaries. Such incongruity is a hallmark of arbitrary decision-making. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (stating that an agency's "reasoning cannot be internally inconsistent") (citing *Sierra Club v. EPA*, 884 F.3d 1185, 1194-96 (D.C. Cir. 2018)); *see* P.I. Op. at 31 n. 12.

**C.**    **The Rule's Restrictions on Waiver Area Are Arbitrary and Capricious.**

The Rule's redefinition of "area," 84 Fed. Reg. 66793-97, is arbitrary and capricious.

---

[14] Notably, some commenters submitted evidence that this standard is already set too high to provide appropriate relief to states facing high unemployment. *See, e.g.,* ABAWD00079168.

USDA fails to offer a reasoned explanation for abandoning factual findings and longstanding regulation supporting states' superior knowledge of local labor conditions and permitting states flexibility to define "areas" that lack sufficient jobs for ABAWDs. *Fox Television Stations, Inc.*, 556 U.S. at 515 (requiring "good reasons" for changing course and discounting prior findings). USDA failed to satisfactorily respond to comments showing that LMAs do not accurately capture the ABAWD experience. P.I. Op. at 36-45.

USDA previously found that less flexible definitions of "area" diminish the ability of states to evaluate and respond to local economic realities. In 1996 guidance, USDA acknowledged that states should have "broad discretion in defining areas that best reflect the labor market prospects of program participants and State administrative needs" and that "to some extent, the decision to approve waivers based on an insufficient number of jobs must be made on an area-by-area basis." ABAWD00000166, -168. USDA's 1999 proposed rule expressed that states should request waivers for substate areas because statewide unemployment averages may "mask slack job markets in some counties, cities, or towns." ABAWD00000089. USDA reiterated this need for state discretion in the 2001 rule, which made clear that "State agencies have complete discretion to define the geographic areas covered by waivers so long as they provide data for the corresponding area." ABAWD00000124. In 2006, USDA reaffirmed that states have discretion to define the areas for waiver requests. ABAWD00000212. In 2016, USDA observed that "the state can request that a waiver apply statewide or at the sub-state level, as statewide averages may mask slack job markets in some counties, cities, or towns," and recognized that the "economic regions" could include non-contiguous areas defined by shared industries or other factors. ABAWD00000316-17 -324.

Commenters expressed opposition to the proposed restrictions on grouping areas for waiver

applications, ABAWD00008239, and "[m]ost" argued that states should retain the flexibility in administering SNAP that was provided for under USDA's past policies. ABAWD00008225; 84 Fed. Reg. at 66793.[15] Commenters observed that states have more detailed knowledge of local job markets and challenges faced by ABAWDs and are better suited to identify the most appropriate grouping areas for a waiver application. ABAWD00008239-43. They pointed out that states have properly exercised discretion to identify areas for waiver requests for decades under USDA's longstanding policies, and that USDA "fails to identify the data and evidence that justify the . . . use of one narrow, inflexible, federally prescribed method for grouping areas." ABAWD00008240. Commenters also observed that USDA had provided insufficient evidence of states abusing waivers to justify the strict area definition which admittedly failed to capture ABAWD job prospects. ABAWD00008240, -8255.

The Rule arbitrarily rejects longstanding policy, prior findings, and commenters' evidence. USDA's only justification for its strict "area" definition is supposed "operational experience" that "States are grouping areas in such a way to maximize waived areas" and that the "problem" of strategic grouping "outweighs" arguments for state flexibility. 84 Fed. Reg. at 66794. USDA rationalizes its reversal by accusing states of "manipulat[ing]" the waiver process to "maximize" the number of ABAWDs subject to a waiver. *Id.* This Court has already found that the agency "has provided no evidence" that such state manipulation is "a real problem." P.I. Op. at 37; *see Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) ("Professing that an" agency action "ameliorates a real . . . problem but then citing no evidence demonstrating that there is in fact a[] . . . problem is not reasoned decisionmaking."). There is no basis to conclude otherwise

---

[15]   *See, e.g.,*   ABAWD00110192-202;   ABAWD00168809-10;   ABAWD00078132-33; ABAWD00079169-70; ABAWD000168348-49; ABAWD00167079.

now. Indeed, USDA does not show that any prior waiver requests actually resulted in waivers for ABAWDs that had sufficient job opportunities, or that the agency denied any prior waiver request because it failed to adequately substantiate a lack of sufficient jobs for ABAWDs.

As the Court previously found, USDA's assertion that "about half" of ABAWDs live in waived areas is no indicator of manipulation because ABAWDs outside of waived areas who cannot meet the work requirements lose their benefits after three months, and USDA's analysis failed to account for these individuals. P.I. Op. at 38. USDA asserted that states had "grouped nearly all contiguous counties in the State together while omitting a few counties with relatively low unemployment," and "grouped certain towns together that share the same economic region while omitting others with relatively low unemployment from the group." 84 Fed. Reg. at 66794. The Court correctly found that these observations were entirely consistent with a good faith effort to seek a waiver only for areas where jobs for ABAWDs are scarce. P.I. Op. at 39-43.

Commenters explained that issues like cost of living, commuter patterns, availability of employment and training services, and whether areas share similar employment opportunities could explain why states seek waivers for some areas and not others. ABAWD00008242. The Rule fails to engage with any of these alternative explanations for the purported "problem" and does not acknowledge past USDA guidance that encouraged states to explore methods for grouping areas. P.I. Op. at 40-41. Even if some states sought to "maximize" waivers, USDA never explains how these examples reflect "gerrymandering" or establish that sufficient jobs for ABAWDs were available in these areas. Nor is there any evidence that USDA *ever* took steps to address any such issue where it purportedly arose—such as by notifying the state in question, seeking a modified waiver application, or denying an application in whole or in part. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, No. 18-587, 2020 WL 3271746, at \*14 (U.S. June 18, 2020)

(failure to consider alternative "'within the ambit of the existing' [policy]" rendered agency rule arbitrary and capricious) (citing *State Farm*, 463 U.S. at 51); P.I. Op. at 3 (agency rule is unlawful unless the agency has "weighed the consequences of its actions"). As the Court noted, "That history is another sign that USDA's new policy eliminating state discretion in designing waiver areas is a solution in search of a problem." P.I. Op. at 43.

USDA compounded its arbitrary area restriction by rejecting several waiver criteria because they do not align with LMA boundaries. USDA rejected evidence that the "U–6 unemployment rate may better reflect the unemployment situation for ABAWDs" on the grounds that "this measure … is not available at the substate level." 84 Fed. Reg. at 66789. The agency similarly eliminated the long-established LSA designation criteria because it applies statewide, rather than LMA-wide. In both instances, USDA's reasoning is arbitrary because the agency failed to engage with the statutory question (whether areas lack sufficient jobs for ABAWDs) and instead relied on its self-imposed LMA limit—a limit not calibrated to capture factors influencing ABAWDs' job prospects.

USDA neglected to "respond meaningfully" to the evidence that LMAs do not appropriately reflect job availability for ABAWDs, *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000), noting only that "LMAs remain the best available and most appropriate delineation to address the issue of grouping, as there are no Federally-designated areas that specifically assess commuting patterns and other related economic factors for ABAWDs." 84 Fed. Reg. at 66793.[16]

The Rule replaces an informed, tailored approach to defining waivable "areas" with a one-

---

[16]    *See, e.g.,*    ABAWD00110203-10;    ABAWD00168810-11;    ABAWD00078132-33; ABAWD00079169-70; ABAWD00070511; ABAWD00182272-73.

size-fits-all definition that has little to do with ABAWDs' job prospects. Numerous commenters provided evidence that "LMAs are based on commuting patterns of the general workforce" and thus cannot capture available employment for "low-income, low-skilled ABAWDs who lack affordable transportation options." 84 Fed. Reg. at 66793. Commenters also provided evidence that "local nuances" in work opportunities—such as the types of jobs available, the kinds of skills needed, whether affordable transportation options are available, and even job losses in neighboring areas—counseled against reliance on rigid and "overly narrow" LMAs. ABAWD00008242.

In light of this mismatch, commenters argued that LMAs would hamper states' ability to target waivers to specific areas, like a single city, town, or county—or, in some cases, an entire state—based on the area's particular conditions. ABAWD00008239-40, 42. Commenters noted that LMAs are problematic when applied to assess waivers for both "rural States" and "urban areas," and suggested other metrics for evaluating labor market conditions within a local area and grouping substate areas for waivers, ABAWD00008239, -8241, -8243; *see, e.g.,* ABAWD00110318-28.

"Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham*, 950 F.3d at 103 (citations omitted). As this Court observed, two examples highlighted at oral argument underscore the shortcomings of LMAs to appropriately target waivers: New York City and Washington, D.C. Both cities are part of large LMAs that include counties in adjacent states that are considerable distances from the city. P.I. Op. at 43-45. There is no reasonable way for residents of these cities to travel to far-flung jobs in neighboring states that are inaccessible by public transportation. It is irrational to conclude that when Congress asked whether there are sufficient jobs to provide employment for an ABAWD who resides in New York City or Washington, D.C., Congress intended USDA to look to a

statistical area covering parts of Pennsylvania or West Virginia, respectively. *Bostock*, 2020 WL 3146686, at *6.

### D.   USDA's Decision to Limit Carryover of Unused Exemptions Is Arbitrary and Capricious.

USDA's plan to remove exemption balances from states in October 2020, and yearly thereafter, relies on deeply flawed reasoning. Most of the 50 states will lose accumulated exemptions. P.I. Op. at 19. Yet USDA does not offer a "good reason" for undermining states' significant reliance interests, and it summarily discounts numerous comments stressing the irrational consequences of limiting accumulation of these exemptions.

Congress provided for exemptions to give states a tool to mitigate the impact of the time limit on ABAWDs and more nimbly provide for their residents in times of swift economic downturn. USDA's longstanding policy permitting indefinite carryover of these exemptions best effectuated this purpose by enabling states to save their exemptions in times of economic well-being and use them in times of economic instability. This policy created a reliance interest whereby states relied on their "banks" of these exemptions to weather rapid changes in economic circumstances, like loss of a major employer or a national pandemic, by quickly and temporarily addressing increased needs of SNAP recipients while working on longer-term solutions. *See* Buhrig Decl. ¶ 17, ECF No. 3-4; Fernandez Decl. ¶¶ 21-22, ECF No. 3-5; Neira Decl. ¶ 12, ECF No. 3-16.

The impact of the Rule on these reliance interests is amply set forth in hundreds of comments. ABAWD00008249-50.[17] Many commenters argued that the carryover of exemptions

---

[17]   *See, e.g.,*   ABAWD00110252-258;   ABAWD00078133;   ABAWD00079170; ABAWD00070512; ABAWD000168350; ABAWD00167080.

provides states flexibility to respond to unexpected economic crises, such as the current pandemic. *Id*. Other commenters argued that a one-year limitation on accumulation of exemptions creates the perverse incentive to use exemptions in relatively good economic times instead of tailoring exemptions to where they are needed. *Id*. Finally, commenters provided that states who have accumulated exemptions should not be punished for conservative use of their exemptions. ABAWD00008250.

The current public health and economic crises caused by the COVID-19 pandemic underscore the importance of these exemptions and the agility they give states to address needs for vital food assistance in the face of rapid economic downturn. The crisis triggered an unprecedented rise in unemployment and economic instability as the nation effectively shut down. Parts of the country today are only "reopening" in fits and starts, *see* Buhrig Supp. Decl. ¶ 8, and certain places where reopening has proceeded are seeing spikes in new cases of infection. Despite the speed with which the impacts were felt, the economic crisis threatens to continue for an extended period of time. *See* Rivera Supp. Decl. ¶ 5. States need all reasonable flexibility under the Statute to best address this crisis and ensure that the maximum number of their struggling residents can eat. *See* Bolen Supp. Decl. ¶ 13 (estimating only 9-10 percent of counties would qualify for waiver under final Rule during current pandemic, but 97 percent of counties would qualify under current regulations); Fernández Supp. Decl. ¶ 12 (explaining that current areas of high unemployment would not qualify for waiver under final Rule); Buhrig Supp. Decl. ¶¶ 7, 11, 13-14; Rivera Supp. Decl. ¶ 8; Zeilinger Supp. Decl. ¶¶ 6-7.

Several commenters elaborated on the impacts of the Rule on specific states. For example, commenters explained that some states accumulate exemptions to provide flexibility as they begin implementing the ABAWD time limit. ABAWD00008250. Commenters also argued that

36

discretionary exemptions should not be restricted "because they can be a lifeline for some of the most vulnerable recipients," including former foster children, domestic violence survivors, formerly incarcerated individuals, people who are looking for work or are in low-paid jobs with unpredictable hours, people who cannot work, and people who work the number of hours required but have difficulty reporting it. *Id*. Some of these commenters recommended that, at the very least, all exemptions earned prior to the finalization of this Rule should be permanently available for states to use moving forward. ABAWD00008251-52.

USDA's response to these comments was limited to a conclusory and flawed claim that the Rule was more consistent than prior practice with the statute. USDA asserts that removing states' accumulated balances hews to Congress's decision to limit the number of exemptions available to states in a given fiscal year by sections 6(o)(6)(C), (D), and (E) of the statute. 84 Fed. Reg. at 66802. But nothing in these sections is incompatible with the decision to permit carryover. To the contrary, the statute's plain language supports the states' position, and, beyond merely referring to the statute's subparagraphs as "limit[s]," the agency does not provide any good reason for its newfound construction of the statute. *See supra* Section II(C). The notion that Congress intended some "limit" does not negate or alter that Congress also intended carryover. It is unreasonable for USDA to conclude that because the statute contains *some* limits that the carryover provision should now be substantially curtailed—particularly when Congress has recently concluded just the opposite. Conference Report at 616 (noting, in conjunction with reduction of percentage, that "States will … continue to accrue exemptions and retain any carryover exemptions from previous years, consistent with current law").

### E.      The Rule Fails to Consider the Cost and Disparate Impact of the Rule.

The Rule also is arbitrary and capricious because it ignores evidence of the Rule's significant impacts on state governments and protected groups. *See State Farm*, 463 U.S. at 43;

*Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 97 (D.D.C. 2017). "[A]gencies have long treated cost as a centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). The Supreme Court has recognized that "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Id.* at 2707. And "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). The Rule upends a regulatory scheme without justification for the high costs it will impose on states and minorities, who are disparately impacted by the changes.

USDA's cost analysis overlooks many demonstrable costs, rendering the rule unreasonable. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (noting that "we will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses")*.* In its Regulatory Impact Analysis, USDA claimed that the "proposed regulation is not expected to result in any additional administrative costs" for states. ABAWD00000452. USDA walked back this statement in the final Rule, claiming that the Rule will result in a "small increase" of $1.4 million in "State costs related to the administrative burden for verifying work hours and exemptions and sending notices." 84 Fed. Reg. at 66807. The agency does not explain the basis for either projection, which both stand in stark contrast to state estimates. *See, e.g.,* Zeilinger Decl. ⁋ 13, ECF No. 3-19 (estimating an increase in annual costs of hundreds of thousands of dollars for the District alone).

USDA was on notice that its cost analysis was defective and failed to adequately address the concerns. ABAWD00008257-60. The agency's cost analysis considers only the immediate costs to the states of increased monitoring and notice requirements, but commenters identified (and

in some instances quantified) many other foreseeable costs of the Rule.[18] These include, for example:

- **The cost to amplify current state programs to accommodate the increased number of ABAWDs subject to the time limit**. Commenters explained that the Rule will impose significant costs on states in the form of heavier burdens on Employment and Training programs and the need for additional resources to develop policy, retain and train staff, and implement IT measures. Commenters also noted the need for additional personnel to respond to an increase in fair hearing requests. ABAWD00008257-58.[19]

- **Increased poverty and hunger**. Commenters explained that, because ABAWDs who lack access to jobs will be ineligible for SNAP benefits under the Rule, the Rule will result in increased hunger and poverty, and a greater burden on states to mitigate food insecurity and its impacts. ABAWD00008258-59.

- **Health care costs.** Commenters highlighted significant increases in health care costs as a direct result of the increased food insecurity caused by the Rule. The negative impact on public health largely will be borne by states in the form of increased Medicaid and uncompensated care costs. ABAWD00008259-60.

- **The impact on economic activity of cutting SNAP benefits**. "Many commenters … highlighted the economic impact the proposed rule would have, stating that every $1 in federal SNAP benefits generates $1.79 in economic activity," and provided evidence that the proposed rule would significantly reduce economic activity in a number of states, including negative impacts on local small businesses in particular. ABAWD00008257-58. Commenters also assessed the indirect impact of reduced SNAP benefits on employment. ABAWD00008258.

USDA gave no weight to the exorbitant costs resulting from these "second order impacts" in its analysis of the Rule. ABAWD00008260. USDA cannot selectively ignore costs that foreseeably flow from its rulemaking to justify its preferred results. *See Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 53 (D.D.C. 2019) (finding delay regulation was arbitrary and capricious where Department of Education failed to consider costs to

---

[18] *See, e.g.,* ABAWD00110316-317; ABAWD00168812-14; ABAWD00078135-36; ABAWD00079151-52; ABAWD000168358-59; ABAWD00173986-89.

[19] *See* Buhrig Decl. ¶ 16, ECF No. 3-4; Zeilinger Decl. ¶ 15, ECF No. 3-19; Storen Decl. ¶ 12, ECF No. 3-17; Banks Decl. ¶ 34, ECF No. 3-1; Gifford Decl. ¶¶ 20, 24, ECF No. 3-9; Fernandez Decl. ¶ 72, ECF No. 3-5.

states and interested stakeholders), *appeal dismissed*, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019); *Sec. Indus. & Fin. Markets Ass'n v. CFTC.*, 67 F. Supp. 3d 373, 430-33 (D.D.C. 2014) (CFTC's failure to consider or evaluate costs of extraterritorial application of Rule rendered rule arbitrary and capricious). USDA's failure to assess reasonable costs renders the Rule arbitrary and capricious. *See Bus. Roundtable v. SEC.,* 647 F.3d 1144, 1152 (D.C. Cir. 2011).

Finally, while USDA concedes that the Rule has "the potential for impacting protected groups due to factors affecting rates of employment of members of these groups," 84 Fed. Reg. at 66808, it fails to adequately consider the impact of the Rule on minorities, or to meaningfully respond to numerous comments urging USDA to analyze such effects.[20]

USDA's Civil Rights Impact Analysis ("CRIA") states that "[s]pecific race, ethnicity, and gender data regarding the ABAWDs that will be impacted are not available" but that "implementation of the final rule may impact African Americans and Hispanic groups at a higher rate due to factors more strongly associated with potential program users in these minority groups." ABAWD00000358; 84 Fed. Reg. 66808. USDA's claim that it lacked data is dubious because it received numerous comments from various organizations regarding the Rule's impact on communities of color, the LGBTQ community, the disabled community, immigrants, women, the elderly, those afflicted with HIV/AIDS, those with criminal records, victims of domestic abuse, veterans, and Native Americans. ABAWD00008263-66. As just one example, an elected official provided evidence that more than half of ABAWDs come from communities of color, and other commenters provided empirical data that the Rule will not accurately evaluate the availability of

---

[20] *See* ABAWD00008263-66; *see, e.g.,* ABAWD00110318-328; ABAWD00168814-16; ABAWD00078130-31; ABAWD00078136; ABAWD00079153-163; ABAWD00079170; ABAWD000168350-58; ABAWD00168373-74.

jobs for ABAWDs who are minorities because the general unemployment rate does not account for barriers to consistent, gainful employment faced by minority communities. ABAWD00008235, -8264. USDA fails to offer a reasoned response to evidence that its new standards are poorly calibrated to evaluate the availability of jobs for these communities (and others) who make up a substantial portion of ABAWDs.

Even if it were true that USDA lacked adequate data to evaluate this issue, an agency cannot simply ignore impacts it deems too difficult to calculate. *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 840 (5th Cir. 2010) ("Given the admitted information shortage, the EPA must make use of the information it has …; EPA cannot refuse to carry out its mandate, waiting for the day when it might possess perfect information."). USDA's conclusory statements cannot meet the agency's burden to consider the Rule's impact on protected groups. *Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 448-49 (agency decision arbitrary under the APA where agency failed to meaningfully address comments regarding impact on minorities); *AT&T Wireless Servs. Inc. v. FCC,* 270 F. 3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.").

### IV.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULE.

To show standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The Court has already found that the Rule is likely to impose significant harm on Plaintiffs and that enjoining the Rule is likely to ameliorate that harm. P.I. Op. at 46-56. No more is required to establish standing.

In particular, unless the Rule is vacated, Plaintiffs will suffer three independent injuries traceable to the rule and redressable by the requested relief: (1) the Rule will increase the

administrative burden on state-operated programs;[21] (2) Plaintiffs' health care costs will rise because the Rule puts the states' residents at greater risk of adverse health impacts, and the states pay health care costs for some of those residents;[22] and (3) the states will lose tax revenue and suffer other direct economic injuries as a result of the Rule.[23]

As this Court previously recognized, USDA's own analysis confirms these injuries. P.I. Op. at 53-54 (citation omitted). These harms—particularly when confirmed by the agency's own analysis—establish injury-in-fact for standing purposes. *See, e.g.*, *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018). Plaintiffs' injuries are traceable to the challenged provisions of the Rule, and a favorable decision would redress those injuries. *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 127 (D.D.C. 2019).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment.

---

[21] *See, e.g.*, Brown Decl. ¶ 10, ECF No. 3-3; Buhrig Decl. ¶¶ 13, 16, ECF No. 3-4; Fernandez Decl. ¶¶ 46, 49-52, 69, ECF No. 3-5; Fisher Decl. ¶¶ 9, 10 ECF No. 3-6; Gifford Decl. ¶¶ 20-24, ECF No. 3-9; Haun Decl. ¶¶ 18-19, ECF No. 3-11; Mangini Decl. ¶ 10. ECF No. 3-14; Neira Decl. ¶ 10, ECF No. 3-16; Storen Decl. ¶ 23, ECF No. 3-17; Sweeney Decl. ¶¶ 5, 15, ECF No. 3-18; Zeilinger Decl. ¶ 13, ECF No. 3-19.

[22] *See, e.g.*, Brown Decl. ¶ 11, ECF No. 3-3; Hartline-Grafton Decl. ¶¶ 6-12, ECF No. 3-10.

[23] *See, e.g.*, Banks Decl. ¶¶ 28-30, ECF No. 3-1; Buhrig Decl. ¶ 21, ECF No. 3-4; Fernandez Decl. ¶ 73, ECF No. 3-5; Freishtat Decl. ¶¶ 14-16, ECF No. 3-7; Gifford Decl. ¶ 16, ECF No. 3-9; Haun Decl. ¶¶ 24-25, ECF No. 3-11; Lazere Decl. ¶¶ 17-19, ECF No. 3-13; Zeilinger Decl. ¶ 21, ECF No. 3-19.

Dated: June 24, 2020                           Respectfully submitted,


**KARL A. RACINE**                             **LETITIA JAMES**
*Attorney General*                             *Attorney General*
*District of Columbia*                          *State of New York*

*/s/ Kathleen Konopka*                          */s/ Eric R. Haren*
Kathleen Konopka (D.C. Bar No. 495257)         Eric R. Haren (D.C. Bar No. 985189)
Deputy Attorney General                        Special Counsel

Jennifer Rimm (D.C. Bar No. 1019209)           Matthew Colangelo (D.C. Bar No. 997893)
Vikram Swaruup                                 Chief Counsel for Federal Initiatives
Nicole Hill (D.C. Bar No. 888324938)
David Brunfeld (D.C. Bar No. 1672059)          Office of the New York State Attorney
Assistant Attorneys General                    General
                                               28 Liberty Street
Office of the Attorney General                 New York, NY 10005
for the District of Columbia                   Phone: 212-416-8804
441 4th St., N.W.                              Eric.Haren@ag.ny.gov
Suite 630S
Washington, DC 20001
Phone: 202-724-6610
Fax: 202-741-0444
Kathleen.Konopka@dc.gov

**XAVIER BECERRA**
*Attorney General*
*State of California*

Cheryl L. Feiner
Michael L. Newman
Senior Assistant Attorneys General

*/s/ Dane Barca*
Dane Barca
Jacquelyn Young
Deputy Attorney General

Office of the Attorney General
455 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102
Phone: 415-510-3371
Dane.Barca@doj.ca.gov

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

*/s/ Eric R. Olson*
Eric R. Olson
Solicitor General

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: 720-508-6000
eric.olson@coag.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Joshua Perry*
Joshua Perry
Special Counsel for Civil Rights

State of Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: 860-808-5318
Fax: 860-808-5387
Joshua.Perry@ct.gov

**CLARE E. CONNORS**
*Attorney General*
*State of Hawaii*

*/s/ Melissa L. Lewis*
Melissa L. Lewis
Deputy Attorney General

Department of the Attorney General
465 S. King St., Rm. 200
Honolulu, HI 96813
Phone: (808)587-3050
Meissa.L.Lewis@hawaii.gov

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Elizabeth Roberson-Young*
Elizabeth Roberson-Young
Public Interest Counsel

100 W. Randolph St., 12th Fl.
Chicago, IL 60601
Phone: (312) 814-5028
ERobersonYoung@atg.state.il.us

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

Steven M. Sullivan
Solicitor General

*/s/ Jeffrey P. Dunlap*
Jeffrey P. Dunlap
Assistant Attorney General

200 St. Paul Place
Baltimore, MD 21202
Phone: 410-576-7906
Fax: 410-576-6955
jdunlap@oag.state.md.us

**AARON M. FREY**
*Attorney General*
*State of Maine*

*/s/ Susan P. Herman*
SUSAN P. HERMAN
Deputy Attorney General

6 State House Station
Augusta, Maine 04333-0006
Phone: (207) 626-8814
Email: susan.herman@maine.gov

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Angela Brooks*
Angela Brooks
Widmaier Charles
Assistant Attorneys General

One Ashburton Place
Boston, MA 02108
Telephone: (617) 963-2590
Email: Angela.Brooks@mass.gov

45

**DANA NESSEL**
*Attorney General*
*State of Michigan*

Fadwa A. Hammoud
Solicitor General

*/s/ Toni L. Harris*
Toni L. Harris
First Assistant Attorney General

Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
Phone: 517-335-7603
HarrisT19@michigan.gov

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Ali P. Afsharjavan*
Ali P. Afsharjavan
Assistant Attorney General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
ali.afsharjavan@ag.state.mn.us

**AARON D. FORD**
*Attorney General*
*State of Nevada*

*/s/ Heidi Parry Stern*
Heidi Parry Stern
Solicitor General

Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

*/s/ Mayur P. Saxena*
Mayur P. Saxena
Assistant Attorney General
Marie Soueid
Deputy Attorney General

New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
Phone: (973) 648-3283
Mayur.Saxena@law.njoag.gov

**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

*/s/ Tania Maestas*
Tania Maestas
Chief Deputy Attorney General

PO Drawer 1508
Santa Fe, New Mexico 87504-1508
Phone: 505-490-4060
tmaestas@nmag.gov


**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

*/s/ Elleanor H. Chin*
Elleanor H. Chin
Senior Assistant Attorney General

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Phone: 503-947-4700
Fax: 503-947-4791
elleanor.chin@doj.state.or.us


**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

*/s/ Jacob B. Boyer*
Jacob B. Boyer
Deputy Attorney General

Office of the Pennsylvania Attorney General
1600 Arch Street, Suite 300
Philadelphia PA, 19103
Phone: 267-768-3968
jboyer@attorneygeneral.gov


**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

*/s/ Adam D. Roach*
Adam D. Roach
Special Assistant Attorney General

150 South Main Street
Providence, RI 02903
Phone: 401-274-4400 x 2490
aroach@riag.ri.gov

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

*/s/ Jessica Merry Samuels*
Jessica Merry Samuels (D.C. Bar No. 1552258)
Assistant Solicitor General

Michelle S. Kallen (D.C. Bar No. 1030497)
Deputy Solicitor General

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: 804-786-7240
Fax: 804-371-0200
solicitorgeneral@oag.state.va.us

**JAMES E. JOHNSON**
*Corporation Counsel*
*City of New York*

*/s/ Tonya Jenerette*
Tonya Jenerette
Sabita Krishnan
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
Phone: 212-356-2273
skrishna@law.nyc.gov

**THOMAS J. DONOVAN**
*Attorney General*
*State of Vermont*

*/s/ Benjamin D. Battles*
Benjamin D. Battles
Solicitor General

109 State Street
Montpelier, VT 05609
Phone: 802-828-5500
benjamin.battles@vermont.gov