**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and CITY OF NEW YORK,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; GEORGE ERVIN PERDUE III, in his official capacity as Secretary of the U.S. Department of Agriculture, and UNITED STATES OF AMERICA,<br><br>　　　　　Defendants. | Civ. Action No. 1:20-cv-00119-BAH |

**DECLARATION OF EDWARD BOLEN IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, Edward Bolen, declare and state as follows:

    1.    I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

1

2. I am a Senior Policy Analyst with the Center on Budget and Policy Priorities (CBPP). In this position, I focus on state and federal issues in the Supplemental Nutrition Assistance Program (SNAP), including SNAP Employment & Training (E&T) and waivers for able-bodied adults without dependents (ABAWDs). I have provided trainings to multiple states regarding their loss of waivers and have worked with advocates and state officials concerning issues in implementing ABAWD time limits. CBPP is a nonpartisan research and policy institute. We work to protect and strengthen programs that reduce poverty and inequality and increase opportunity for people trying to gain a foothold on the economic ladder. Federal nutrition programs, including SNAP, are a core component of our organization's work. We have deep expertise on SNAP time limit policy, including waivers and individual exemptions. I base the analysis and estimates in this declaration on my work and the work of my colleagues at the Center.

3. I am aware that the federal government recently issued a final rule, "Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents," 84 Fed. Reg. 66,782 ("the rule"). I have reviewed the rule and am aware of its direct implications for the administration of SNAP, formerly known as the Food Stamp Program, within the states. I understand that this lawsuit challenges the rule. I previously submitted a declaration in support of the State Plaintiffs' motion for preliminary injunction.

4. Current economic circumstances show how the final Rule would fail to respond to deteriorating labor market conditions. In contrast, the long-standing rules currently in place give states important options to help low-income unemployed workers who have been adversely affected by the events of the last few months.

5. The country is in the midst of both an unprecedented public health emergency caused by the coronavirus pandemic and an economic crash that has resulted in record unemployment. As a result, food insecurity – the limited or uncertain availability of a nutritionally adequate diet arising from a lack of resources – rose at unprecedented rates during the pandemic and remains at historic highs as the economic crisis continues. Beginning with survey responses from late March, nearly a third of non-elderly adults reported that their families spent less on food in the last month.[1] That number rises to 46.5 percent among adults in families that experienced job or income loss. Nearly 23 percent of households said the food they bought "just didn't last" and they didn't have the money to buy more, according to another national survey.[2] In contrast, at the worst point of the 2008 recession, 16 percent of households had the same response. The levels of food insecurity appear to have levelled off but remain historically high.

6. SNAP has historically responded to worsening economic conditions by quickly providing modest food assistance to households that have seen a drop in income. Some states

---

[1] Elaine Waxman, "More than One in Five US Adults Experienced Food Insecurity in the Early Weeks of the Pandemic," April 28, 2020, Urban Institute, https://www.urban.org/urban-wire/more-one-five-us-adults-experienced-food-insecurity-early-weeks-pandemic.

[2] Laruen Baur, https://www.hamiltonproject.org/blog/the_covid_19_crisis_has_already_left_too_many_children_hungry_in_america.

are reporting significant increases in applications for assistance, indicating that SNAP may be responding quickly now as well.

7. The time-limit, however, reduces SNAP's ability to respond to economic downturns, because ABAWDs are at risk of losing benefits when jobs are hard to find and often work in industries that are especially hard hit during recessions, such as food service, home health aides, office support and retail sales. Workers in these jobs are at greatest risk of losing employment due to the pandemic.[3] The Families First Act, passed in response to the coronavirus pandemic, temporarily suspends the time limit until the month after the public health emergency ends.

8. The ability of states to waive the time limit in areas with a lack of sufficient jobs is an important response when childless adults suddenly lose their earnings and are unable to find work. But areas must meet prescribed unemployment-based criteria to document the lack of jobs, and the final rule, had it been in effect as of April 1, would have prevented almost every area throughout the country from qualifying. As a result, despite record unemployment, the final rule would offer almost no relief to unemployed workers and overwhelmed state benefit systems and local food banks.

9. The coronavirus pandemic and state stay-at-home orders have resulted in record unemployment:

- The number of unemployed persons rose from an average of under 6.4 million in January and February to 21.0 million in May. The Bureau of Labor Statistics (BLS) notes, however, that as many as 4.9 million workers who were absent from work may have been misclassified as employed rather than unemployed.[4]

- The unemployment rate in May (not accounting for misclassification) was 13.3 percent.

- People already facing barriers to opportunity, including Black and Latino workers, those working in industries with low wages, and those without a bachelor's degree, were hit hardest by the massive recent job losses.[5] The white unemployment rate in May was 12.4 percent, the Black rate was 16.8 percent, and the Hispanic rate was 17.6 percent.[6]

---

[3] Berube, Alan and Nicole Bateman, "Who are the workers already impacted by the covid-19 recession?", Brookings Institute, April 3, 2020, https://www.brookings.edu/research/who-are-the-workers-already-impacted-by-the-covid-19-recession/.
[4] U.S. Department of Labor, Bureau of Labor Statistics, "The Employment Situation, May 2020," June 5, 2020, https://www.bls.gov/news.release/pdf/empsit.pdf
[5] Chad Stone, "People Already Facing Opportunity Barriers Hit Hardest By Massive April Job Losses," CBPP, May 12, 2020, https://www.cbpp.org/blog/people-already-facing-opportunity-barriers-hit-hardest-by-massive-april-job-losses
[6] U.S. Department of Labor, Bureau of Labor Statistics, "The Employment Situation, May 2020," June 5, 2020, https://www.bls.gov/news.release/pdf/empsit.pdf

- The number of people claiming unemployment benefits rose to 30 million in the week ending May 16, from an average of 2 million in a typical week between the beginning of the year and mid-March.

10. The Administration's final rule, if it were in effect now, would have failed to allow states to respond to the pandemic and record unemployment. Under the final rule, an area, limited by the rule to be a Labor Market Area (LMA), cannot receive a waiver unless:

- its average unemployment rate over a recent two-year period is at least 6 percent *and* at least 20 percent higher than the national average; or

- its average unemployment rate over a recent one-year period is over 10 percent.[7]

11. The final rule eliminates the two criteria that would most quickly respond to worsening economic conditions affecting low-income unemployed workers. The long-standing criteria allowing states to identify 3-month unemployment rate of 10 percent as evidence of 10 percent unemployment was eliminated in the proposed and final rule. The final rule also eliminated the ability for a state to qualify for a waiver when the state qualifies for Extended Unemployment Benefits (EB). The primary means of qualifying for a waiver under the final rule require at least 12 or 24 months of high unemployment.

12. By requiring such long periods of high unemployment, the final rule was flawed even prior to the pandemic because it lacked a quick response to economic downturns. Under the final rule, far fewer areas would qualify for waivers during any future national recession, when the national average unemployment rate is high — and, the worse the recession, the higher the hurdle to receive a waiver. If national unemployment for the two-year period averaged an already high 7 percent, for example, an area would need an even higher 8.4 unemployment rate to qualify.

13. But more troubling, the final rule largely fails to allow states to respond to the extraordinary circumstances our nation has faced since the final rule was issued in December 2019. As of April 1, when the final rule was scheduled to go into effect, even with the extraordinary increases in unemployment, the share of U.S. counties that are eligible for a waiver would have dropped from about 36 percent to about 9 percent. As of June, during the midst of the pandemic and after record numbers of people filing for unemployment, only 10 percent of counties are eligible for a waiver based on the most recently available data that could be used under the final rule criteria for submitting a waiver.[8] As a result of the restrictions in the final rule, only a negligible number of new areas have become eligible, despite the most staggering loss of employment since at least the Great Depression. Under current rules, 97 percent of U.S. counties could be waived, as a result of most of the U.S. states qualifying of extended unemployment benefits.

---

[7] The final rule does allow waivers for undefined "exceptional circumstances" but the limits of this provision are discussed later.

[8] Based on CBPP internal analysis of unemployment data from the U.S. Bureau of Labor Statistics and the U.S. Census Bureau.

14.     In contrast, the current, long-standing waiver rules allow states to quickly respond to worsening economic conditions. Under the long-standing waiver criteria currently in effect, states have begun to qualify for waivers of the three-month time limit, allowing hard-hit states to adapt quickly to worsening economic conditions.  For example, under current rules, a state that qualifies for federal Extended Unemployment Benefits as determined by the U.S Bureau of Labor Statistics can qualify for a statewide waiver.  In the final rule, USDA notes that no state qualified for EB at the time due to the strength of the economy.  As of June 18, 48 states and the District of Columbia have qualified for Extended Unemployment benefits (and the remaining states – South Dakota and Utah – may qualify in the coming weeks).[9]  Almost the entire country is suffering from widespread unemployment and qualifies for a waiver of the time limit under current rules.

15.     In addition, the flexibility given states to define the areas to waive – eliminated in the final rule – has allowed states to request waivers for all affected areas within the state, including the state as a whole.  Given the geographic impact of the spread of the coronavirus and the economic downturn, this broad flexibility is proving critical to states as they work to respond to the hardships of their residents.  The final rule does not allow states to request waivers for the entire state, unless each LMA qualifies under the rule's more stringent criteria.

16.     Because the long-standing rules are still in place, approximately 97 percent of the counties in the United States could waive the three-month limit on SNAP benefits for unemployment adults during this time of economic hardship and widespread unemployment if the temporary suspension of the time limit were not in effect.

17.     Eliminating extended unemployment benefits as a qualifying criterion for a waiver will be harmful in any recession. The final rule illustrates that USDA does not understand the impact of eliminating the EB trigger during any future recession. EB was eliminated in the final rule, but not in the proposed rule, giving commenters no opportunity to discuss the drastic impact this change would have when the economy worsens. In describing the elimination of the EB trigger in the Regulatory Impact Analysis (RIA) of the final rule, USDA admits that because the EB trigger is eliminated, some areas may not qualify for waivers as quickly during an economic downturn as they otherwise would have under the long-standing criteria.[10] But USDA doesn't seem to understand that many areas with high unemployment would not qualify *at all* during and after recessions when national unemployment is high, because an area's unemployment rate must be *both* over 6 percent AND 20 percent above the national average. So an area with 9 percent unemployment would not qualify if the national average unemployment rate was 8 percent. This will result in far fewer areas qualifying for waivers during and after recessions.

18.     The RIA fails to provide useful information to assess the impact of the final rule because it was based on the assumption that the economic circumstances and employment rates at the time would continue unabated.  It states "[c]urrently no States qualify for EB so no State

---

[9] https://oui.doleta.gov/unemploy/trigger/2020/trig_062120.html
[10] Regulatory Impact Analysis, 7 CFR Part 273, Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, at 29 and 55, https://www.regulations.gov/document?D=FNS-2018-0004-19016.

5

may apply for waivers under the EB criterion. Therefore this provision is not expected to have measurable impacts on SNAP participants, State agencies, or Federal spending during FYs 2020-2024."[11] Because as of June 2020, 48 states now qualify for EB, that analysis is fatally flawed. Notwithstanding the current economic situation, recessions historically have occurred at least once a decade so it is unreasonable to assume there would never be another one.

19. Research continues to show the shortcomings of the final rule. Using recent data for six LMAs, the Urban Institute found that using LMA unemployment rates could "mask significant variation in the availability of jobs across counties and cities within the same LMA without considering the barriers to transportation faced by low-wage workers." The study also found that the final rule would also adversely affect waiver eligibility for urban areas with high shares of Black and Hispanic residents, areas with significant immigrant populations, and rural areas across the U.S.[12]

20. The flaws with the final rule are not resolved simply because the rule includes an option to submit waivers under "exceptional circumstances." First, USDA would need to decide what constitutes an exceptional circumstance, and states may well be concerned that USDA would not exercise this authority broadly, given the historical experience of the agency (touted repeatedly in preamble of the final rule as the reason to discount comments that suggested changes to, or problems with, the final rule). The current rules have a similar provision that has rarely if ever been approved by FNS. Second, the RIA claimed the "exceptional circumstances" criteria would be rarely used and not impact the number of individuals or cost savings of the final rule, noting "by design these criteria are expected to be used infrequently. Therefore, the Department believes that this provision will have minimal impact on SNAP participants, State agencies, or Federal spending."[13]

21. The final rule significantly diminishes SNAP's value as an important response to economic downturns. In local economies with high unemployment, SNAP payments support recipients to maintain their spending and, as a result help sustain overall economic activity in the area. And in a national recession, SNAP provides high "bang-for-the-buck" stimulus — generating $1.50 or more in spending for each dollar of benefits — that slows job losses when business and consumer confidence is low and economic activity is weak. The expansion in SNAP caseloads due to lower incomes provides this stimulus automatically when the economy weakens. Under the current long-standing rules, waivers allow low-income unemployed workers to receive SNAP, providing added stimulus while simultaneously addressing the greater hardship from a recession. By drastically restricting the number of areas with high unemployment that can qualify, the waiver criteria in the final rule would not help these workers and would thereby suppress economic activity. USDA failed to address the impact this would have on increasing hardship and prolonging the recession.

---

[11] *Id.* at 29.
[12] Kwon, Danielle, Nathan Joo and Elaine Waxman, "Using Labor Market Areas to Determine ABAWD Waiver Eligibility Limits SNAP's Local Flexibility," Urban Institute, April 2020, https://www.urban.org/sites/default/files/publication/101940/using-labor-market-areas-to-determine-abawd-eligibility-limits-snaps-local-flexibility_3.pdf.
[13] Regulatory Impact Analysis 7 CFR Part 273, Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, at 32.

22.     The USDA's stated goal for issuing the final rule is no longer valid.  In the preamble to the final rule, USDA repeatedly notes it intends to limit waiver eligibility, claiming that at a *time of low national unemployment*, too many ABAWDs are living in areas that are covered by waivers.  While that rationale is faulty on its own merits, it is now no longer even true.  We are not in a time of low national unemployment.  Nor are economic forecasts predicting a quick return to a strong economy.  The final rule fails to account for circumstances like those we now are facing.  As a result, the final rule does not permit states to respond to spiking food insecurity by requesting a waiver of the time limit.

I declare under penalty of perjury that the forgoing is true and correct and of my own personal knowledge.

Executed on June 23, 2020 in Washington, DC.

_____
Edward Bolen
Senior Policy Analyst
Center on Budget and Policy Priorities