# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and CITY OF NEW YORK,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; GEORGE ERVIN PERDUE III, in his official capacity as Secretary of the U.S. Department of Agriculture, and UNITED STATES OF AMERICA,<br><br>    Defendants. | Civ. Action No. 1:20-cv-00119-BAH |

**DECLARATION OF LAURA ZEILINGER IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, Laura Green Zeilinger, declare and state as follows:

  1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

1

2. I am the Director of the District of Columbia (the District) Department of Human Services (DHS). I have been committed to underserved populations throughout my career. Prior to my position as DHS Director, I served as the Deputy Director and then Executive Director of the United States Interagency Council on Homelessness, where I was responsible for the implementation of Opening Doors: Federal Strategic Plan to Prevent and End Homelessness, an effort that includes the coordination of Federal homelessness policies among nineteen federal departments and agencies, as well as partnerships with state and local communities, non-profits, and the private sector. I also previously served as DHS Deputy Director for Program Operations and led efforts to create permanent supportive housing for persons experiencing homelessness and housing stability for District residents.

3. I am aware that the federal government in December 2019 issued a final rule "Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents" 84 Fed. Reg. 66,782 (Dec. 5, 2019) (the "Final Rule"). I have reviewed the Final Rule and am aware of its direct implications on the administration of the Supplemental Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program, within the District. I understand that this lawsuit challenges the Final Rule. I previously submitted a declaration in support of the State Plaintiffs' motion for preliminary injunction.

4. After State Plaintiffs filed their motion for preliminary injunction, the novel coronavirus that causes the disease known as COVID-19 began spreading throughout the District of Columbia. On March 11, 2020, the Mayor of the District of Columbia declared a public health emergency. To mitigate the spread of the coronavirus, many businesses were forced to close their doors. As a result of the economic fallout, many District residents lost their jobs. The District's unemployment rate increased from 5.1% in February 2020 to an estimated 11.1% in April 2020. However, even this figure is likely an underestimation of the District's actual unemployment rate. Between March 15, 2020 and June 17, 2020, the Department of Employment Services has received 115,000 new unemployment claims, which is more than 25% of the District's labor force.

5. Many District residents experiencing increased financial hardship began relying on SNAP benefits in order to keep food on the table. The average number of new SNAP applications per month during the COVID-19 crisis has nearly doubled, going from an average of 3,000 per month pre-COVID to an average of 5,500 per month during COVID-19.

6. The current public health crisis has demonstrated the untenability of the restrictions on ABAWD waiver requests that would be imposed under the Rule. The new ABAWD criteria contained in the Rule will not allow States to respond to sudden economic downturns and emergencies such as the one caused by COVID-19. Rather, the current COVID-19 crisis has underscored the need for jurisdictions to be nimble and flexible in their ability to respond to a crisis, which is allowed under the criteria as currently established.

7. Specifically, the COVID-19 crisis has emphasized that using Labor Market Areas ("LMAs") as the geographic basis of a waiver request is illogical. Each respective state with localities within the LMA will make independent decisions on when to open restaurants, businesses, school, and parks. That will all have a direct bearing on the unemployment rate in each respective jurisdiction. Counties in Virginia, Maryland, and West Virginia that are part of

2

the same LMA as the District have not always been on the same track for reopening. Determinations for how and when to reopen portions of the economy are made in consideration of the public health conditions in those particular jurisdictions, not based on the LMA as a whole. However, the District's ability to request a waiver would be impacted by the decisions in the surrounding states to reopen because it could decrease the overall unemployment rate for the LMA; meanwhile, the District and surrounding counties in the LMA will continue to experience localized high unemployment rates because they are still under stricter guidelines for operating businesses.

8. Job availability in other counties in the LMA that are 50 to 70 miles from the District may improve, but that does not mean that District residents subject to ABAWD time limits will have meaningful access to these jobs. Prior to the COVID-19 crisis, jobs in the farther reaches of the LMA were not easily accessible or were completely inaccessible to District residents, depending on whether the District resident owned a car or had to rely on public transportation. However, accessibility has become even further restricted as public transportation has been limited to reduce public exposure to COVID-19.

9. The District must focus on the well-being of its own residents in determining when to reopen the economy and how to address unemployment in the District. Relying on the LMA as the geographic basis for the waiver inappropriately requires the District to take into account decisions to reopen businesses in surrounding states – in places many miles away where there may not be as many cases of COVID-19. An ABAWD waiver under the new criteria would have to reflect the composite unemployment rate of all counties, disregarding that some portions of the LMA were allowed to return to "normal" economic activity earlier than other jurisdictions and may have seen a dip in unemployment rates. Meanwhile jurisdictions like the District are still seeing high localized unemployment rates as local officials prioritize preventing the spread of COVID-19. Decisions made in these other jurisdictions, without consideration of the status of COVID cases within the District, could nevertheless prevent the District from providing its residents with much-needed food assistance during a public health crisis.

10. As the District reopens – which is being done through a phased approach – it must continue to prioritize the health and well-being of its residents, recognizing that human lives and the economic conditions of households are more influenced by their immediate neighborhood than by the broader LMA.

11. As a result of the economic impact of the COVID-19 crisis, many providers of nutrition assistance, including food banks and other non-profit organizations, have been over-extended in trying to meet the heightened need for nutrition assistance. The economic impact of the public health crisis is likely to last long after emergency declarations are lifted, leaving many without jobs in the coming months who will still need to rely on these providers of nutrition assistance. These providers cannot realistically absorb the demand that would be created if individuals subject to ABAWD requirements in the District cannot receive SNAP benefits. Were this Rule to go into effect, however, the District would be left with extremely limited options, if any, to seek a waiver of the ABAWD work requirements during an unprecedented crisis and while dealing with its aftereffects.

12. Low-income households – the population that would be subject to the ABAWD work requirements without a waiver – have been hit disproportionately hard by the pandemic, experiencing substantially higher rates of infection and poor health outcomes from COVID-19 compared to higher-income households.[1] To comply with work requirements, these individuals will have to place themselves at risk of exposing themselves and their community to COVID-19 while searching for jobs. These jobs are simply not available in the current economic climate and may not be available for several months to come, even as the economy recovers. These individuals should not have to needlessly risk exposing themselves to infection and instead should be able to use SNAP benefits to obtain nutritious food to keep themselves healthy.

I declare under penalty of perjury that the forgoing is true and correct and of my own personal knowledge.

Executed on June 23, 2020 in Washington, DC.

_____
Laura Green Zeilinger
Director
D.C. Department of Human Services

---

[1] Updated data is provided daily on the impact of COVID-19 by ward at https://coronavirus.dc.gov/page/coronavirus-data.