**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-119 (BAH) |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| *Defendants*. | |
| BREAD FOR THE CITY, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| *Defendants*. | |

**BRIEF OF U.S. HOUSE OF REPRESENTATIVES
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF *AMICUS CURIAE* .......................................................................................1

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................5

    I.     THE NEW RULE IS CONTRARY TO THE PURPOSE OF SNAP AND
           THE 2018 FARM BILL, WHICH EFFECTIVELY RATIFIED
           LONGSTANDING AGENCY PRACTICE IN ADMINISTERING THE
           PROGRAM .........................................................................................................5

          A.     The New Rule is Contrary to the Purpose of SNAP ....................................5

          B.     The New Rule Improperly Constrains Historical State Discretion ............12

          C.     In 2018, A Bipartisan Congress Rejected Attempts to Include More
                Stringent Work Requirements in SNAP, Effectively Ratifying the
                Way USDA Had Long Been Administering the Program ........................19

    II.    IN DIVERGING FROM SNAP'S PURPOSE, STRUCTURE, AND
           ADMINISTRATION, THE RULE POSES DANGER TO SNAP
           RECIPIENTS ...................................................................................................22

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amalgamated Transit Union v. Skinner*,
    894 F.2d 1362 (D.C. Cir. 1990) ................................................................. 13

*Garnett v. Zeilinger*,
    313 F. Supp. 3d 147 (D.D.C. 2018) ........................................................... 25

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) .............................................................................. 5, 12

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020) ................................................................... 21

*International Long Term Care, Inc. v. Shalala*,
    947 F. Supp. 15 (D.D.C. 1996) ................................................................. 25

*NLRB v. Bell Aerospace Co. Division of Textron, Inc.*,
    416 U.S. 267 (1974) ................................................................................. 20

*Oceana, Inc. v. Locke*,
    670 F.3d 1238 (D.C. Cir. 2011) ................................................................ 21

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ................................................................................. 21

*Wisconsin Central Ltd. v. United States*,
    138 S. Ct. 2067 (2018) .............................................................................. 21

## STATUTES

7 U.S.C. § 2011 ............................................................................................... 6

7 U.S.C. § 2015(o) ...................................................................................... 7, 12

7 U.S.C. § 2015(o)(4)(A) ................................................................... 7, 13, 14, 17

7 U.S.C. § 2015(o)(6)(A)(ii) ........................................................................... 14

7 U.S.C. § 2015(o)(6)(G) ........................................................................... 14, 18

Agricultural Act of 2014,
      Pub. L. No. 113-79, 128 Stat. 649 (2014) ................................................................ 12

Agriculture Improvement Act of 2018,
      Pub. L. No. 115-334, 132 Stat. 4490 (2018) .................................................. 1, 9, 12

Balanced Budget Act of 1997,
      Pub. L. No. 105-33, 111 Stat. 251 (1997) ......................................................... 8, 14

Families First Coronavirus Response Act,
      Pub. L. No. 116-127, 134 Stat. 178 (2020) ............................................................. 2

Farm Security and Rural Investment Act of 2002,
      Pub. L. No. 107-171, 116 Stat. 134 (2002) ........................................................... 12

Food and Agriculture Act of 1977,
      Pub. L. No. 95-113, 91 Stat. 913 (1977) ................................................................. 6

Food, Conservation, and Energy Act of 2008,
      Pub. L. No. 110-246, 122 Stat. 1651 (2008) ......................................................... 12

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
      Pub. L. No. 104-193, 110 Stat. 2105 (1996) ..................................................... 7, 12

The Food Stamp Act of 1964,
      Pub. L. No. 88-525, 78 Stat. 703 (1964) ................................................................. 6

## REGULATIONS

7 C.F.R. § 273.24(f)(2) (2019) .............................................................................................. 17

7 C.F.R. § 273.24(f)(6) (2019) .............................................................................................. 15

Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without
      Dependents, 84 Fed. Reg. 66,782 (Dec. 5, 2019)
      (codified at 7 C.F.R. pt. 273) ..................................................................... passim

Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without
      Dependents, Proposed Rule, 84 Fed. Reg. 980 (Feb. 1, 2019) ............................... 10

## LEGISLATIVE MATERIALS

142 Cong. Rec. 17,782 (1996) ................................................................................................ 7

164 Cong. Rec. H10,116 (daily ed. Dec. 12, 2018) .............................................................. 9

*Examining the Proposed ABAWD Rule and Its Impact on Hunger and Hardship: Hearing Before the Subcomm. on Nutrition, Oversight, & Dep't Operations of the H. Comm. on Agric.*, 116th Cong. (2019) ................................................................................................ 23

H.R. 2, 115th Cong. § 4015 (2018)................................................................... 15, 18

H.R. 2, 115th Cong. § 4015(c)(2) (2018) ................................................................ 19

H. Rep. No. 104-725 (1996) (Conf. Rep.) ............................................................... 13

H. Rep. No. 115-1072 (2018) (Conf. Rep.) .............................................. 9, 15, 16, 19

*Past, Present, & Future of SNAP: Addressing Special Populations: Hearing Before the Subcomm. on Nutrition of the H. Comm. on Agric.*, pt. 4, 114 Cong. (2016) ......................... 24

*Past, Present, & Future of SNAP: Breaking the Cycle: Hearing Before the Subcomm. on Nutrition of the H. Comm. on Agric.*, pt. 3, 114 Cong. (2015) ............................... 24

*Program Integrity for the Supplemental Nutrition Assistance Program: Joint Hearing Before the Subcomm. on Healthcare, Benefits, & Admin. Rules, and the Subcomm. on Intergovernmental Affairs of the Comm. on Oversight & Gov't Reform*, 115 Cong. (2018) .............................................................................. 24, 25

*The Past, Present, & Future of the Supplemental Nutrition Assistance Program: Hearing Before the Subcomm on Nutrition of the H. Comm. on Agric.*, pt. 1, 114th Cong (2015)................... 2

## OTHER AUTHORITIES

1977 Cong. Q. Almanac 457........................................................................... 6, 7

*Bread for the World Statement on the 2018 Farm Bill* (June 22, 2018), https://www.bread.org/news/bread-world-statement-2018-house-farm-bill-0 ......................... 9

Children's Defense Fund, *A Comparison of the SNAP Provisions in the 2018 House and Senate Farm Bills* (July 2018), https://www.childrensdefense.org/wp-content/uploads/2018/08/2018-farm-bill-comparison.pdf ........................................................................ 9

Exec. Order No. 13,828, Reducing Poverty in America by Promoting Opportunity and Economic Mobility, 83 Fed. Reg. 15,941 (Apr. 10, 2018), https://www.whitehouse.gov/presidential-actions/executive-order-reducing-poverty-america-promoting-opportunity-economic-mobility/ ........................................................ 12

Lauren Bauer, Brookings Institution, The COVID-19 Crisis Has Already Left Too Many Children Hungry in America (May 6, 2020), https://www.hamiltonproject.org/blog/the_covid_19_crisis_has_already_left_too_many_children_hungry_in_america ........................................................................ 2

Mark A. McMinimy et al., Cong. Research Serv., R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law* (July 27, 2018), https://fas.org/sgp/crs/misc/R45275.pdf ................................................................... 8

Mark A. McMinimy et al., Cong. Research Serv., R45525, *The 2018 Farm Bill (P.L. 115-334): Summary and Side-by-Side Comparison* (Feb. 22, 2019), https://fas.org/sgp/crs/misc/R45525.pdf ............................................................ 9, 10

Ohio Association of Foodbanks, Franklin County Ohio Work Experience Program, Comprehensive Report: Able-Bodied Adults Without Dependents (2014-2015), http://ohiofoodbanks.org/wep/WEP-2013-2015-report.pdf.................................................... 23

President Clinton Reconciliation Act Signing Statement (Aug. 22, 1996), https://www.govinfo.gov/content/pkg/WCPD-1996-08-26/pdf/WCPD-1996-08-26-Pg1487.pdf................................................................................................................ 7

Press Release, Dear Colleague to All Members on Fighting Hunger During the Coronavirus (May 20, 2020), https://www.speaker.gov/newsroom/52020-1 ............................................. 22

Press Release No. 0277.18, USDA Food and Nutrition Service, USDA to Restore Original Intent of SNAP: A Second Chance, Not A Way of Life (Dec. 20, 2018), https://www.fns.usda.gov/news-item/usda-restore-original-intent-snap-second-chance-not-way-life ................................................................................................................. 10

Press Release, Pelosi Statement on Trump Administration Rule to Slash SNAP Benefits (Dec. 4, 2019), https://www.speaker.gov/newsroom/12419-0 .......................................................... 22

Randy Alison Aussenberg & Kara Clifford Billings, Cong. Research Serv., IF11087, *2018 Farm Bill Primer: SNAP and Nutrition Title Programs* (Jan. 30, 2019), https://fas.org/sgp/crs/misc/IF11087.pdf ................................................................ 3

Robert Greenstein, *Commentary: SNAP's Bipartisan Legacy Can Serve as a Model*, Center on Budget and Policy Priorities (Sept. 26, 2017), https://www.cbpp.org/sites/default/files/atoms/files/9-26-17fa-commentary.pdf .................... 7

Sheila Fleischhacker et al., *Legislative and Executive Branch Developments Affecting the United States Department of Agriculture Supplemental Nutrition Assistance Program*, 15 J. Food L. & Pol'y 131 (2019) ....................................................................... 5, 6

U.S. Census Bureau, Household Pulse Survey Data Tables (Apr. 23, 2020), https://www.census.gov/programs-surveys/household-pulse-survey/data.html.................... 25

U.S. Gen. Accounting Office, GAO/RCED-00-5, Food Stamp Program: How States Are Using Federal Waivers of the Work Requirement, Report to the Chairman, Committee on the

Budget, House of Representatives (Oct. 1999),
https://www.gao.gov/archive/2000/rc00005.pdf .................................................................. 18

USDA Food and Nutrition Service, *A Short History of SNAP* (Sept. 11, 2018),
https://www.fns.usda.gov/snap/short-history-snap .................................................................. 6

USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program (SNAP):
Program Administration*, USDA (June 8, 2020), https://www.fns.usda.gov/snap/admin...... 19

USDA, Guidance for States Seeking Waivers for Food Stamp Limits (Dec. 3, 1996), https://fns-
prod.azureedge.net/sites/default/files/media/file/HistoricalPolicyDocument_GuidanceforState
sSeekingWaiversforFoodStampLimits_December1996.pdf ........................................ 8, 17, 20

USDA, *Supplemental Nutrition Assistance Program - Guide to Supporting Requests to Waive the
Time Limit for Able-Bodied Adults without Dependents (ABAWD)* (Dec. 2, 2016), https://fns-
prod.azureedge.net/sites/default/files/snap/SNAP-Guide-to-Supporting-Requests-to-Waive-
the-Time-Limit-for-ABAWDs.pdf ...................................................................................... 20

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* is the United States House of Representatives, an institution with a strong interest in the appropriate administration of the Supplemental Nutrition Assistance Program (SNAP) and the availability of critical food and nutritional assistance for those in need.  As individuals and communities grapple with the food insecurity challenges made plain and intensified by the COVID-19 pandemic, the importance of SNAP for our nation's security and collective welfare has never been more apparent.  In 2018, Congress enacted, and the President signed, the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018 Farm Bill), following rigorous debate and deliberate consideration and rejection of more stringent eligibility requirements for SNAP benefits.  The House thus is ideally positioned to address the history and rationale behind this critical food and nutritional assistance safety net and the individual and societal benefits created by the program.  Indeed, SNAP was the subject of more than 20 congressional hearings with nearly 100 witnesses over a three-year span from 2015 through 2017, and has continued to be a focus in emergency pandemic legislation passed by the House.  Given the House's particular knowledge about and longstanding experience with SNAP, it has a substantial interest in whether the final rulemaking of the U.S. Department of Agriculture (USDA or the Department) is consistent with the 2018 Farm Bill.

## INTRODUCTION

SNAP has long been an essential antihunger and nutrition program providing crucial support for millions of Americans in need.  That support—critical even during normal periods in our history—has proven indispensable during the COVID-19 pandemic.  In a world in which

---

[1] No person other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

businesses struggle to remain viable, more and more Americans find themselves wrestling with illness, unemployment, and uncertainty around their basic needs.  And in the face of mounting lost wages, millions now face the very real question of how to put food on the table.  Nearly 50 percent more households currently find themselves without sufficient funds for food than during the Great Recession of the late 2000s.[2]  With the prospect of depressed employment opportunities, the assurance that state and local officials will have the necessary flexibility to meet the health and nutritional needs of residents through SNAP is paramount.

Since the 1960s and through the current pandemic, SNAP benefits, previously known as "food stamps," have served as a bulwark against malnutrition and hunger in the United States, improving the health of countless low-income households.  The program has been diverse both in its geography, covering all fifty states, the District of Columbia, and U.S. territories, and in its recipients, benefitting individuals of various races and ethnicities throughout rural and urban communities alike.  SNAP has been recognized as a critical program for lengthening and strengthening the lives of low-income people in the United States—recognition borne out by COVID-19.[3]  Indeed, in response to the ongoing economic damage caused by the pandemic, lawmakers passed the Families First Coronavirus Response Act, which, among other things, temporarily suspended the work and work-training requirements for SNAP recipients.[4]

---

[2] Lauren Bauer, Brookings Institution, *The COVID-19 Crisis Has Already Left Too Many Children Hungry in America* (May 6, 2020), https://www.hamiltonproject.org/blog/the_covid_19_crisis_has_already_left_too_many_children_hungry_in_america (comparing approximately 23 percent of households now with 16 percent during the Great Recession).

[3] *See, e.g.*, *The Past, Present, & Future of the Supplemental Nutrition Assistance Program: Hearing Before the Subcomm. on Nutrition of the H. Comm. on Agric.*, pt. 1, 114th Cong. 22-43 (2015) (statement of Robert Greenstein, Founder and President, Center on Budget and Policy Priorities).

[4] Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020).

The advantages of SNAP benefits are manifold, with SNAP combating food insecurity, erosion of public health, and family instability. These harms compound over time and manifest themselves in nutritional deficiencies, stunted physical development, physical and mental illness and disease, and diminished academic and job performance. Despite this, the USDA rulemaking contravenes historical practices and the long-standing administration of SNAP by hampering state flexibility and significantly decreasing the number of persons able to benefit from SNAP.

Since 1973, Congress has reauthorized the Food Stamp Program (later, SNAP) through the enactment of Farm Bills.[5] The Nutrition title constitutes about 76 percent of the 2018 Farm Bill spending, with SNAP accounting for the "vast majority."[6] Given the nation's significant investment in SNAP, it is the subject of much attention and debate by Members of Congress. And following these debates, Congress has reaffirmed the importance of SNAP time and time again, recognizing, on a bipartisan basis, the importance of the program to the livelihood of Americans and effectively adopting USDA's longstanding administration of the program.

In keeping with this practice, Congress enacted the 2018 Farm Bill, endorsing the continued implementation of SNAP and the crucial support it provides beneficiaries through the existing administration and practices of the program. After the President signed the 2018 Farm Bill into law, however, the USDA Food and Nutrition Service (FNS) issued a rule subverting the program and restricting the availability of benefits for "able-bodied" adults without dependents (able-bodied adults)—those without custodial children or other dependents living with them and/or who fail to be categorized as "disabled" because they do not receive federal disability

---

[5] *See* Randy Alison Aussenberg & Kara Clifford Billings, Cong. Research Serv., IF11087, *2018 Farm Bill Primer: SNAP and Nutrition Title Programs* 1 (Jan. 30, 2019), https://fas.org/sgp/crs/misc/IF11087.pdf.

[6] *Id.*

benefits.  *See* Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, 84 Fed. Reg. 66,782 (Dec. 5, 2019) (codified at 7 C.F.R. pt. 273) (the Rule).

This Rule targets the use of SNAP benefits during periods of lower unemployment for able-bodied adults.  Under the statute, SNAP benefits for able-bodied adults generally are time limited, and able-bodied adults may not receive benefits for more than three months in a 36-month period, unless certain work requirements are met.  Through several key provisions, Congress has provided states with the flexibility to waive or exempt individuals from this able-bodied adults time limit based on local conditions.  The Rule, which had been scheduled to take effect April 1, 2020, makes it more difficult for states to waive the able-bodied adults time limit or to grant needed exemptions.

In enacting the 2018 Farm Bill, however, Congress considered and rejected the very restrictions to be imposed by this Rule.  Following robust debate, Congress achieved a bipartisan compromise, rejecting the proposed tightening of work requirements and effectively ratifying the means and methods by which SNAP has long been administered.  The Rule nevertheless specifically constrains the discretion historically reserved for the states with respect to the SNAP work requirements.  By doing so, the Rule effects an end-run around the 2018 Farm Bill.  This unlawful action by USDA harms those beneficiaries SNAP is intended to support, with the Rule projected to eliminate critical benefits for approximately 700,000 Americans.  This Court should not countenance a rule that is so contrary to established law and punishes low-income Americans, particularly in the midst of a global pandemic posing widespread health risks and long-term economic and employment repercussions.

## ARGUMENT

I.  **THE NEW RULE IS CONTRARY TO THE PURPOSE OF SNAP AND THE 2018 FARM BILL, WHICH EFFECTIVELY RATIFIED LONGSTANDING AGENCY PRACTICE IN ADMINISTERING THE PROGRAM**

The historical purpose of SNAP has been to provide crucial nutritional assistance to low-income Americans.  Congress advanced that purpose again in the 2018 Farm Bill by rejecting provisions that would have restricted the discretion long afforded the states in administering SNAP.  In doing so, Congress reinforced the principle embodied in the law and USDA's prior longstanding approach that the states are best positioned to implement SNAP at the local level as Congress designed.  USDA's recent attempt to circumvent the 2018 Farm Bill by removing discretion from the states and disregarding Congress's ratification of agency practice is thus contrary to law.  To accomplish this improper goal, the Administration seeks to do what courts have widely and unambiguously rejected—enact by regulatory fiat what a bipartisan, bicameral Congress already refused in legislation.

A.  **The New Rule is Contrary to the Purpose of SNAP**

As the Supreme Court has recognized, "[f]rom its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders." *Goldberg v. Kelly*, 397 U.S. 254, 264-65 (1970).  In the spirit of this founding commitment, there is "an extensive history of using policy and programmatic approaches to ensure individuals and families in most need have access to nutritious and safe foods and beverages."[7]  This Court has recognized the pivotal role of these legislative efforts, as underscored by recent events:

---

[7] Sheila Fleischhacker et al., *Legislative and Executive Branch Developments Affecting the United States Department of Agriculture Supplemental Nutrition Assistance Program*, 15 J. Food L. & Pol'y 131, 131-32 (2019) (citing FNS website pages, "*A Short History of SNAP*" and "*FNS Strategic Priorities*" (website addresses omitted)).

"Especially now, as a global pandemic poses widespread health risks, guaranteeing that government officials at both the federal and state levels have flexibility to address the nutritional needs of residents and ensure their well-being through programs like SNAP, is essential."  Mem. Op. at 2, ECF No. 51.  SNAP has been an integral part of those efforts as the "nation's largest program in the domestic food security and nutrition safety net" for more than four decades.[8]  The Rule would upend this important legacy.

After the Federal Government spent decades experimenting with ways to provide support to families struggling to obtain sufficient food and nutrition, Congress formally created the Food Stamp Program in 1964, to address the nutritional needs of low-income Americans.[9]  The Food Stamp Act intended "to promote the general welfare, that the Nation's abundance of food should be utilized cooperatively by the States, the Federal Government, and local governmental units to the maximum extent practicable to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households."  The Food Stamp Act of 1964, Pub. L. No. 88-525, § 2, 78 Stat. 703, 703 (1964).  Congress defines the goals of the program similarly to this day.  *See* 7 U.S.C. § 2011 ("to promote the general welfare, [and] to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households").

Underscoring the purpose of SNAP to provide nutrition for those in need, the Food and Agriculture Act of 1977 struck the requirement that recipients purchase their food stamps.  Pub. L. No. 95-113, 91 Stat. 913 (1977); *see* 1977 Cong. Q. Almanac 457.  The requirement had been

---

[8] *Id*. at 133.

[9] *See* USDA Food and Nutrition Service, *A Short History of SNAP* (Sept. 11, 2018), https://www.fns.usda.gov/snap/short-history-snap.

viewed as a significant barrier to participation because some could not scrape together the money needed to buy in.  1977 Cong. Q. Almanac 457.  As a chief staffer for the Secretary of Agriculture at the time recalls, "[t]he measure that became law [in 1977] was the product of a bipartisan effort between the Administration and Congress, and between both parties on Capitol Hill, reflecting the broad bipartisan support that food stamps has had for much of its history."[10]

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the Reconciliation Act), Pub. L. No. 104-193, § 824, 110 Stat. 2105, 2323-24 (1996), added subsection (o) to the statute, changing the SNAP eligibility requirements such that certain unemployed adults (those between ages 18 to 49, with no disability and without dependent children, who did not fulfill certain work requirements) were limited to three months of benefits in a 36-month period.  7 U.S.C. § 2015(o).  In the Reconciliation Act, however, Congress refrained from penalizing those who were willing to work but unable to find employment by providing for waivers at the state level related to unemployment levels and insufficient numbers of jobs.  *See id.* § 2015(o)(4)(A).  As then-Congressman John Kasich, co-author of the able-bodied adults time limit, made clear, "[i]t is only if you are able-bodied, if you are childless, and [if] you live in an area where you are getting food stamps and *there are jobs available*, then [the time limit] applies."  142 Cong. Rec. 17,782 (1996) (emphasis added).

Congress recognized that states, through their attention to and investment in local conditions, were essential partners in ensuring that the purpose of SNAP was realized.[11]  The

---

[10] Robert Greenstein, *Commentary: SNAP's Bipartisan Legacy Can Serve as a Model* 1, Center on Budget and Policy Priorities (Sept. 26, 2017), https://www.cbpp.org/sites/default/ files/atoms/files/9-26-17fa-commentary.pdf.

[11] *See, e.g.*, President Clinton Reconciliation Act Signing Statement (Aug. 22, 1996), https://www.govinfo.gov/content/pkg/WCPD-1996-08-26/pdf/WCPD-1996-08-26-Pg1487.pdf ("This Act gives States the responsibility that they have sought to reform the welfare system.

following year, Congress re-affirmed and expanded the important role of states in administering food stamps by providing exemptions through the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997), giving states additional flexibility to determine when and how to extend food stamp eligibility to their residents.  *See* Mem. Op. at 3 ("Recognizing that the imposition of inflexible work requirements would undermine the SNAP program's effectiveness in alleviating hunger, Congress created two relevant exceptions.").

With the 2018 Farm Bill, Congress yet again reaffirmed the purpose of SNAP to provide nutrition for those in need, largely maintaining the program without significant changes to the work-related requirements, waivers, or exemptions.  On June 21, 2018, the House passed H.R. 2, the Agriculture and Nutrition Act of 2018, by a slim margin of 213 to 211, and, on June 28, 2018, the Senate passed its own version by a vote of 86 to 11.

The House and Senate versions differed significantly regarding the work-related requirements.  While both bills reauthorized SNAP for five years, and included measures to support error and fraud detection, the House version "include[d] major changes to work requirements, while the Senate bill would make changes that are minor by comparison."[12]  In assessing the proposed changes, the Congressional Budget Office estimated that, under the House bill, by FY2028, 1.2 million SNAP recipients a month would no longer be eligible.[13]

---

This is a profound responsibility, and States must face it squarely."); *see also* USDA, Guidance for States Seeking Waivers for Food Stamp Limits 1 (Dec. 3, 1996), https://fns-prod.azureedge.net/sites/default/files/media/file/HistoricalPolicyDocument_GuidanceforStatesSeekingWaiversforFoodStampLimits_December1996.pdf (1996 USDA Guidance) (noting that USDA "will allow States broad discretion to decide if a waiver request is appropriate for a particular locale or situation").

[12] Mark A. McMinimy et al., Cong. Research Serv., R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law* (Summary) (July 27, 2018), https://fas.org/sgp/crs/misc/R45275.pdf; *see also id*. at 113-14.

[13] *See id.* at 19.

Not surprisingly, the House version of H.R. 2 faced strenuous objections and unfavorable comparisons to the starkly different bipartisan Senate bill, with the latter's provisions more faithfully echoing the historical purpose of SNAP.  For example, prominent non-profit organizations pointed out that the House bill would mean significant cuts to SNAP, owing to more stringent work requirements, which would endanger food security for millions of people.

The Senate bill, by contrast, "maintain[ed] SNAP's current benefit levels while reducing barriers to enrollment, strengthening employment opportunities for beneficiaries, and improving quality and integrity in the program's operation."[14]  Concerns were raised that, while millions of people under the House bill would be losing their benefits, "[m]uch of this money would be used to pay for a new SNAP bureaucracy to enforce work requirements."[15]

Amidst much debate, the Conference Committee ultimately rejected the House's most stringent modifications and generally retained the SNAP work-related provisions.[16]  Congress then enacted the 2018 Farm Bill on a bipartisan basis.  *See, e.g.*, 164 Cong. Rec. H10,116 (daily ed. Dec. 12, 2018) (statement of Rep. Jim McGovern) (acknowledging the 2018 Farm Bill was a "good, bipartisan product" and that House Agricultural Chairman Michael Conaway "recognized the importance of getting a farm bill over the finish line this year").

---

[14] Children's Defense Fund, *A Comparison of the SNAP Provisions in the 2018 House and Senate Farm Bills* 1 (July 2018), https://www.childrensdefense.org/wp-content/uploads/2018/08/2018-farm-bill-comparison.pdf.

[15] *Bread for the World Statement on the 2018 Farm Bill* (June 22, 2018), https://www.bread.org/news/bread-world-statement-2018-house-farm-bill-0.

[16] H. Rep. No. 115-1072 (2018) (Conf. Rep.); 2018 Farm Bill; *see also* Mark A. McMinimy et al., Cong. Research Serv., R45525, *The 2018 Farm Bill (P.L. 115-334): Summary and Side-by-Side Comparison* 157-60 (Feb. 22, 2019), https://fas.org/sgp/crs/misc/R45525.pdf (table comparing the prior law/policy, the House bill (H.R. 2), the Senate bill (H.R. 2), and the 2018 Farm Bill, as enacted).

The 2018 Farm Bill reauthorized SNAP through 2023, incorporating various changes, including provisions to address error and fraud in SNAP, limit the fees charged by electronic transfer benefit processors, and require online acceptance of SNAP benefits across the country.[17] All of these changes are consistent with previous iterations of the program. So, too, are the 2018 Farm Bill's changes to the work requirements in SNAP, which include an expansion of the employment and training programs states can provide.[18] Thus, Congress reaffirmed its commitment to SNAP and made necessary improvements to the program.

Despite Congress's historical commitment to ensuring nutrition for those in need, and the longstanding shared responsibility the Federal Government and states have maintained in administering food stamps, USDA quickly introduced a proposed rule unambiguously hostile to the purpose of SNAP and "intended to move more able-bodied recipients of [SNAP] benefits to self-sufficiency through the dignity of work."[19] The proposal sought to accomplish this goal by curtailing states' discretion over waivers of and exemptions to the able-bodied adults time limit.

Although USDA received more than 100,000 comments, most in opposition, *see* 84 Fed. Reg. at 66,783-84, the Department nevertheless adopted the Rule on December 5, 2019.

The Rule would:

- "Eliminat[e] States' discretion to determine the geographic scope of the areas for which they request waivers by restricting waivers to areas designated as LMAs [Labor Market Areas] by DOL [Department of

---

[17] *See* Mark A. McMinimy et al., Cong. Research Serv., R45525, *The 2018 Farm Bill (P.L. 115-334): Summary and Side-by-Side Comparison* (Summary) (Feb. 22, 2019), https://fas.org/sgp/crs/misc/R45525.pdf.

[18] *Id.* at Summary & 157-60.

[19] Press Release No. 0277.18, USDA Food and Nutrition Service, USDA to Restore Original Intent of SNAP: A Second Chance, Not A Way of Life (Dec. 20, 2018), https://www.fns.usda.gov/news-item/usda-restore-original-intent-snap-second-chance-not-way-life; Supplemental Nutrition Assistance Program: Requirements for Able-Bodied Adults Without Dependents, Proposed Rule, 84 Fed. Reg. 980 (Feb. 1, 2019).

Labor] and effectively eliminat[e] statewide waivers, 84 Fed. Reg. at 66793-98;"

- "Curtail[] the types of data on which States can rely for their waiver requests by requiring States to rely exclusively on unemployment data absent extraordinary circumstances, 84 Fed. Reg. at 66790-91;"

- "Set[] an unemployment rate floor for States that seek waivers even where an area's unemployment rate is 20 percent or more above the national average, 84 Fed. Reg. at 66784-89;"

- "Eliminat[e] the ability of a State to qualify for a waiver if it is designated as a Labor Surplus Area by DOL, 84 Fed. Reg. at 66799-[800][;]"

- "[E]liminate[] States' ability to carry exemptions over from year to year. 84 Fed. Reg. at 66802-07[;]"

- "[E]liminate[] use of extended unemployment benefits to show entitlement to a waiver[; and]"

- "[P]rohibit[] States from seeking waivers for substate areas that are not LMAs."

First Am. Compl. ¶¶ 68-70, No. 20-cv-119 (BAH), ECF No. 19.

Individually and collectively, these provisions severely undermine the purpose of SNAP and ignore that many people affected by the Rule will struggle to feed themselves absent the critical support the program provides. Contrary to SNAP's purpose to raise levels of nutrition, the Rule will result in an expected 688,000 people *losing* their eligibility for SNAP, *see* 84 Fed. Reg. at 66,807, with no assurance that these individuals will otherwise be able to provide for their own nutritional needs. Equally troubling, the Rule would hamstring SNAP in times, like now, of economic stress. The Rule strikes a severe blow to the program, handcuffing states and their ability to get assistance to those in need.

The Rule relies on Executive Order 13,828, signed by President Trump on April 10, 2018.[20]  According to the Rule, the Executive Order prompted USDA to conduct a review of regulations and policies regarding able-bodied adults.  84 Fed. Reg. at 66,783.  Notably, however, the Executive Order does *not* direct USDA to undermine the fundamental purpose of SNAP, which has consistently and recently been reaffirmed by Congress.  The Rule's elimination of states' discretion to respond to the nutritional needs of low-income people within their jurisdiction, of course, does just that.  By no longer permitting states to respond to residents' basic needs based on local conditions, the Rule rejects a "basic commitment . . . to foster the dignity and well-being" of its people.  *Goldberg*, 397 U.S. at 264-65.

### B.   The New Rule Improperly Constrains Historical State Discretion

The Rule drastically curtails the flexibility historically reserved for the states with respect to implementation of SNAP work requirements.  Beginning with the Reconciliation Act more than two decades ago, Congress authorized and then repeatedly has re-authorized work requirements in 7 U.S.C. § 2015(o) that balance the desire to encourage additional personal responsibility and self-sufficiency with the needs of SNAP recipients.[21]

USDA itself acknowledged that "[t]he time limit and work requirement for [able-bodied adults] enacted by [the Reconciliation Act] has been maintained by Congress through several reauthorizations of the Federal law governing SNAP."  84 Fed. Reg. at 66,783.  To achieve the

---

[20] *See* Exec. Order No. 13,828, Reducing Poverty in America by Promoting Opportunity and Economic Mobility, 83 Fed. Reg. 15,941 (Apr. 10, 2018), https://www.whitehouse.gov/presidential-actions/executive-order-reducing-poverty-america-promoting-opportunity-economic-mobility/.

[21] *See* Reconciliation Act; Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (2002); Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008); Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649 (2014); 2018 Farm Bill.

balance envisioned for the statute, Congress contemporaneously authorized states to assume a key role in identifying where and when the needs of their residents are greatest.  Congress appreciated that states are uniquely positioned to understand the nuances of local labor markets and assess the realities for residents in their communities.

Indeed, the Reconciliation Act was premised on the understanding that the "best welfare solutions come from those closest to the problems—not from bureaucrats in Washington."  H. Rep. No. 104-725, at 262 (1996) (Conf. Rep.).  Accordingly, Congress designed Section 2015(o) to combine the able-bodied adult time limit with a package of waivers and exemptions for states to leverage when local economic conditions warrant critical food assistance.  As explained below, the Rule's new requirements destroy these carve outs and the discretion they provide to states.  *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1366, 1370-71 (D.C. Cir. 1990) (rejecting as invalid strict regulations imposed by federal regulator on state recipients because the statute "provided increased flexibility enabling state and local officials to devise their own . . . programs to meet their unique, local needs").

In the Reconciliation Act, Congress paired the able-bodied adults time limit with discretionary waivers to enable states to respond to needs driven by local economic conditions. Congress accomplished this in part through waivers administered by the states.  Waivers are available for "any group of individuals in the State" if the "area" they reside in: (1) has an unemployment rate above ten percent, or (2) "does not have a sufficient number of jobs to provide employment for the individuals."  7 U.S.C. § 2015(o)(4)(A).  This language provides states with substantial flexibility in determining where the need is greatest.

The following year, Congress provided states with even more flexibility to determine when and how to extend SNAP eligibility to their residents.  The Balanced Budget Act allowed

states to exempt fifteen percent of the able-bodied adults otherwise subject to the statute's restrictions.  Pub. L. No. 105-33, § 1001(2), (3), 111 Stat. at 251-52 (adding par. (6) to 7 U.S.C. § 2015(o)).  Without this exemption, states were prevented from providing benefits to able-bodied adults who needed them, but did not live in waived areas.  *See* 7 U.S.C. § 2015(o)(6)(A)(ii).  Enhancing states' flexibility even more, Congress also allowed states to accrue unused exemptions and carry them over from one year to the next.  *See id.* § 2015(o)(6)(G).  Such flexibility has allowed states to prepare for and respond to times of economic downturn or disruptions in local labor markets as they see fit.

Despite this history, USDA's avowed purpose in promulgating the Rule is to curtail the ability of states to make determinations based on local conditions; to that end, the Department mischaracterizes the flexibility written into the law as "weaknesses" that states "have taken advantage of."  *See* 84 Fed. Reg. at 66,783; *see also id.* at 66,794 ("[T]he Department's operational experience has shown that current regulations provide States with too much flexibility.").  The Rule's provisions achieve this end, eliminating much of the discretion Congress and USDA had carefully maintained for the states over the last two decades—discretion as important now as ever while Americans grapple with the immediate and long-term damage of the COVID-19 pandemic.

First, the Rule establishes strict geographic boundaries that contravene the discretion Congress reserved for the states to determine where nutrition assistance is needed.  Under law, states can apply for a waiver for "any group of individuals."  7 U.S.C. § 2015(o)(4)(A). Congress did not place geographic limits on the groups eligible, and, under prior regulations, USDA allowed states to "define areas to be covered by waivers" and "encourage[d] State

agencies to submit data and analyses that correspond to the defined area."  7 C.F.R. §
273.24(f)(6) (2019).

Under the Rule, however, an area does not qualify for a waiver unless it is "considered a
Labor Market Area."  84 Fed. Reg. at 66,811 (codified at 7 C.F.R. § 273.24(f)(4)); *see id*. at
66,793-98.  As a result, substate areas now may not be grouped, despite a state's understanding
of a region's integrated labor markets or economic ties.  *Id.* at 66,793-95 (restricting the grouping
of substate areas); 66,796-97 (restricting the definition of waiver area); 66,797 (restricting
statewide waivers).  USDA acknowledged that the purpose of this change is to constrain state
discretion: "[T]his flexibility allow[ed] States to strategically group substate areas to maximize
the geographic coverage of waived areas . . . . [T]he need to address this problem outweighs the
arguments received in support of States' need to maintain current flexibility."  *Id.* at 66,794.
Defining the states' flexibility as a "problem" that the Rule needed to fix conflicts with the
statute and its purpose, structure, and history described above.

In fact, this restrictive definition of "area" was previously considered and rejected by
Congress.  USDA claims that "Congress has been silent on the specific issue of combining data
to group substate areas."  *Id*.  In 2018, however, Congress explicitly considered "grouped" areas
or "grouping"—terms that, as USDA itself explains, refer to "combining unemployment data
from individual substate areas to calculate an unemployment rate for the combined area."  *Id.* at
66,793.  Specifically, through a proposed subparagraph titled "Limit on combining
jurisdictions," the House version of the 2018 Farm Bill would have proscribed the grouping of
substate areas unless formerly designated as Labor Market Areas.  H.R. 2, 115th Cong. § 4015
(2018).  This change was rejected.  H. Rep. No. 115-1072, at 615.  In preserving the status quo,
Congress "intend[ed] to maintain the practice that bestows authority on the State agency

15

responsible for administering SNAP to determine when and how waiver requests for [able-bodied adults] are submitted." *Id.* at 616.

The Rule's geographic restriction is based on an implausible—and incorrect—understanding of the discretion Congress has historically provided to the states.  In interpreting the 2018 Conference Report's statement that Congress meant to preserve States' control over the administration of SNAP benefits, USDA states in the Rule that "the Conference Report . . . is referring broadly to maintaining the States' ability to choose which areas it wishes to request when submitting a request to the Department, not referring to maintaining the discretion of States to combine data from substate areas to form an economic region."  84 Fed. Reg. at 66,794.  Later, in response to a comment related to state flexibility, the Department notes that "States still maintain the ability to choose which areas to request."  *Id.* at 66,795.  This USDA discussion fundamentally misconstrues the nature of the discretion Congress reserved for the states.

As described above, Congress provided states with flexibility and responsibility to manage SNAP benefits for the particular needs of their residents, including by defining the geographic area eligible for relief.  This Court already predicted ways in which USDA's inflexible approach undoes protections that Congress put in place, the importance of which continues to be highlighted as COVID-19 devastates communities around the country:

> Under the Final Rule's waiver policy, as it stands now, states have lost the flexibility they would need to obtain waivers of the work requirements in areas smaller than an LMA that may become, for example, a 'hotspot' in the current pandemic or to target quickly any area for a waiver because under the Final Rule states would have to wait for national or regional unemployment rates to catch up with the emergency.

Mem. Op. at 56 n.26.  Nothing in the text of the statute or the legislative history implies, let alone provides, that the only discretion afforded the states is the mere decision of whether to in

16

fact request a waiver.  Congress's consideration and ultimate rejection of a provision that would have restricted waivers to Labor Market Areas is evidence to the contrary.

Second, the Rule rewrites the waiver criteria established by Congress.  Since 1996, when Section 2015(o) was first added, a waiver has been appropriate for any area that: (1) "has an unemployment rate of over 10 percent" or (2) "does not have a sufficient number of jobs to provide employment for the individuals."  7 U.S.C. § 2015(o)(4)(A).  Historically, USDA has understood the flexibility provided through the combination of these two criteria.[22]  But now, under the Rule, if the area does not demonstrate that the unemployment rate is above ten percent and thus the first criterion is not satisfied, an area must have "a 24-month average unemployment rate 20 percent or more above the national rate for a recent 24-month period, but in no case may the 24-month average unemployment rate of the requested area be less than 6 percent."  84 Fed. Reg. at 66,811 (codified at 7 C.F.R. § 273.24(f)(2)(ii)).  As a result, states are no longer free to consider local employment conditions and needs beyond the general employment rate, and the second criterion set forth by Congress is effectively erased.[23]

---

[22] *See* 7 C.F.R. § 273.24(f)(2) (2019) (providing "[a] non-exhaustive list of the kinds of data" a state could submit for a request); *see also* 1996 USDA Guidance at 3 (explaining that list of examples of data that could be used to show lack of sufficient jobs is not exhaustive "[b]ecause there are no standard data or methods to make the determination of the sufficiency of jobs").

[23] *See* Mem. Op. at 33 ("[T]he statute's two-pronged structure also plainly limits USDA's discretion: if prong one addresses the circumstances under which unemployment rates would warrant a waiver, prong two must address a distinctive measure.  By making both prongs of § 2015(o)(4)(A) dependent on unemployment rate, USDA has arbitrarily written this distinction out of the Rule.").  Other data will suffice only "if the request demonstrates an exceptional circumstance in an area" that has "caused a lack of sufficient jobs," or if "standard BLS data or data from a BLS-cooperating agency is limited or unavailable."  84 Fed. Reg. at 66,811 (codified at 7 C.F.R. § 273.24(f)(3), (6)).

Congress considered nearly identical restrictions in 2018.  In fact, the House bill proposed limiting requests for waivers to areas with a 24-month average unemployment rate 20 percent higher than the national average—with a seven percent floor. [24]  H.R. 2, 115th Cong. § 4015.  The Conference Committee rejected such a change.  The Rule, which imposes these same kinds of restrictions, improperly contracts the scope of SNAP benefits as defined by Congress.[25]

Third, the Rule limits exemption carry-overs contrary to the exemption program established by Congress, which explicitly provides for such accrual.  7 U.S.C. § 2015(o)(6)(G) ("During fiscal year 1999 and each subsequent fiscal year, the Secretary shall increase or decrease the number of individuals who may be granted an exemption by a State agency under this paragraph to the extent that the average monthly number of exemptions in effect in the State for the preceding fiscal year under this paragraph is lesser or greater than the average monthly number of exemptions estimated for the State agency for such preceding fiscal year under this paragraph.").  As a result, states no longer can store exemptions for when they are needed the most.  84 Fed. Reg. at 66,803 (codified at 7 C.F.R. § 273.24(h)(2)(i)).

USDA lamented that "[s]tates have accumulated extremely high amounts of unused discretionary exemptions that well exceed the number allotted to each State for the fiscal year."

---

[24] H.R. 2 also provided for a waiver if an area "is in a State . . . that is in an extended benefit period (within the meaning of section 203 of the Federal-State Extended Unemployment Compensation Act of 1970); or . . . in which temporary or emergency unemployment compensation is being provided under any Federal law."  H.R. 2, 115th Cong. § 4015.

[25] *See* U.S. Gen. Accounting Office, GAO/RCED-00-5, Food Stamp Program: How States Are Using Federal Waivers of the Work Requirement, Report to the Chairman, Committee on the Budget, House of Representatives 4 (Oct. 1999), https://www.gao.gov/archive/2000/rc00005.pdf ("[T]he law provides for waivers based on an insufficient number of jobs because the Congress recognized that 'the unemployment rate alone is an imperfect measure of the employment prospects of individuals with little work history and diminished opportunities.'").

*Id.* at 66,783.  Yet, this flexibility is precisely the point of Section 2015(o)(6).  In fact, in 2018, Congress explicitly retained states' ability to accrue exemptions, noting this practice to be "consistent with current law."  H. Rep. No. 115-1072, at 616.  The reason for retaining this discretion was clear: "[N]either the Department nor Congress can enumerate every [able-bodied adult]'s situation as it relates to possible exemption from the time limit, and subsequently, the work requirement."  *Id.*

Finally, in 2018, Congress not only determined that each of the Rule's restrictions described above would unduly limit the states' discretion, it also understood that the stringent limitations proposed in H.R. 2 were contrary to the law enacted in 1996.  Specifically, to impose the new restrictions, H.R. 2 would have struck Section 2015(o) entirely.  H.R. 2, 115th Cong. § 4015(c)(2).  The Rule's requirements—which mirror the rejected H.R. 2 proposals—similarly breach the provisions of Section 2015(o) that Congress so recently decided to retain.  The Rule is thus contrary to law.

### C.     In 2018, A Bipartisan Congress Rejected Attempts to Include More Stringent Work Requirements in SNAP, Effectively Ratifying the Way USDA Had Long Been Administering the Program

With the 2018 Farm Bill, Congress adopted the agency's longstanding approach to administering SNAP.  In the wake of the 1996 changes to the Food Stamp Program, USDA interpreted the law to require that states be given substantial discretion to request waivers of the work requirements, and USDA has worked in partnership with states in achieving the purpose of the program, providing "guidance to support state agencies in operating SNAP."[26]  By expressly

---

[26] USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program (SNAP): Program Administration* (June 8, 2020), https://www.fns.usda.gov/snap/admin.

rejecting proposals to restrict state discretion respecting waivers, Congress 2018 affirmed the Department's interpretation.

As the 1996 USDA Guidance to states seeking waivers to limits on food stamps explains, "[USDA] will allow States broad discretion to decide if a waiver request is appropriate for a particular locale or situation."  1996 USDA Guidance at 1; *see also id*. ("USDA will give States broad discretion in defining areas that best reflect the labor market prospects of program participants and State administrative needs.").  In 2016 guidance, USDA stated that the law "provides that States may request to waive the time limit for individuals in all or part of the State if the requested area demonstrates high unemployment or a lack of sufficient jobs."[27]  USDA further explained that, to assist the states, the Department has provided policy memoranda for years in addition to the federal regulations given the complexity of the information used to support requests for waiver of the time limits.[28]

The Rule will upend this process, just as the United States is facing one of the greatest economic and public health challenges in its history, and despite the fact that, in enacting the 2018 Farm Bill, Congress effectively ratified USDA's administration of SNAP in coordination with the states.  *See NLRB v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 275 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.").

---

[27] USDA, *Supplemental Nutrition Assistance Program - Guide to Supporting Requests to Waive the Time Limit for Able-Bodied Adults without Dependents (ABAWD)* (Dec. 2, 2016), https://fns-prod.azureedge.net/sites/default/files/snap/SNAP-Guide-to-Supporting-Requests-to-Waive-the-Time-Limit-for-ABAWDs.pdf.

[28] *See id.*

USDA's attempt to circumvent the 2018 Farm Bill and the flexibility and discretion it retained for the states is not permissible and should be rejected.  The Rule rewrites a core component of SNAP's structure, specifically the ability of states to obtain waivers and exemptions and to tailor the program to meet their local needs.  That is not a decision Congress authorized USDA to make.  To the contrary, as explained above, Congress expressly considered and rejected proposals similar to those that USDA now seeks to put in place, and  "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences."  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

By imposing new geographic restrictions on waiver requests, rewriting the waiver criteria, and severely restricting the carry-over of critical exemptions, *see supra* Section I.B., the Rule contravenes the statute governing SNAP.  *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) ("When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'" (alterations in original) (citation omitted)); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("reaffirm[ing] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

Furthermore, the Rule is at odds with the Congress's purpose and efforts before, and during, the COVID-19 crisis to ensure that vulnerable Americans are able to fend off the severe threat of food insecurity.  *See Gresham v. Azar*, 950 F.3d 93, 104 (D.C. Cir. 2020) (rejecting approval of work requirements for Medicaid as arbitrary and capricious where the Secretary of

the Department of Health and Human Services "prioritize[d] non-statutory objectives to the

exclusion of the statutory purpose").  Indeed, as the Speaker of the House observed before the

COVID-19 crisis, the Rule is in "direct opposition to the bipartisan, bicameral will of the

Congress, which has repeatedly rejected similar attacks on working Americans and instead

passed a strong Farm Bill that bolsters rural communities and critical nutrition initiatives."[29]

And, as she commented more recently, "SNAP . . . has been a cornerstone in the fight against

hunger and a pathway out of poverty for decades.  Now, it is an essential part of the fight against

the coronavirus."[30]  Adopted contrary to law, and poised to take effect just as many are most in

need of support, the Rule should be rejected.

## II.    IN DIVERGING FROM SNAP'S PURPOSE, STRUCTURE, AND ADMINISTRATION, THE RULE POSES DANGER TO SNAP RECIPIENTS

The changes under the Rule—changes rejected by Congress's bipartisan passage of the

2018 Farm Bill—will create immediate and avoidable danger for SNAP recipients.  Similar risk,

of course, was recognized by Congress in affirmatively requiring the USDA to toll SNAP work

and work-training requirements in the Families First Coronavirus Response Act.  While the

current tolling is temporary, the damage to employment prospects, the economy, and public

health engendered by the Rule changes is not.

Even absent the pandemic crisis, the cuts in benefits already are expected to spur hunger

among an estimated 688,000 recipients—compounding food insecurity, dangers to public health,

and risks to many families.  The changes deny SNAP benefits to some of the most vulnerable,

targeting people and households already beset by poverty and others newly struggling with the

---

[29] Press Release, Pelosi Statement on Trump Administration Rule to Slash SNAP Benefits (Dec. 4, 2019), https://www.speaker.gov/newsroom/12419-0.

[30] Press Release, Dear Colleague to All Members on Fighting Hunger During the Coronavirus (May 20, 2020), https://www.speaker.gov/newsroom/52020-1.

22

post-COVID-19 employment landscape for the foreseeable future. Those adversely affected encompass the homeless and other at-risk populations with barriers to employment, including those with transportation, housing, or substance abuse problems. And in some cases, employees may feel pressure to work while sick, endangering themselves, their colleagues, and their communities. With the changes imposed by the Rule, nutrition assistance will be automatically denied for those adults failing to meet the work requirements, regardless of their efforts to find employment or challenges beyond their control preventing them from finding work opportunities.

In reviewing the actual circumstances of able-bodied adults traditionally participating in SNAP, the reality has been that the large majority in fact are in the labor force.[31] But, for these individuals, steady employment remains an elusive objective.[32] The Rule's changes ignore that in many regions of the country, under-employment is a very real hurdle—with the prospect of finding full-time, permanent employment a continual, daunting challenge in current and post-pandemic times. Indeed, one study found that up to one-third of able-bodied SNAP participants struggled with at least one impediment significant enough to affect their ability to work, including mental disabilities, physical injuries, learning disabilities, depression, or post-traumatic stress disorder, but not so severe as to qualify these individuals for federal disability benefits.[33]

---

[31] *Examining the Proposed ABAWD Rule and Its Impact on Hunger and Hardship: Hearing Before the Subcomm. on Nutrition, Oversight, & Dep't Operations of the H. Comm. on Agric.*, 116th Cong. 55-108 (2019) (statement of Jay C. Shambaugh, Ph.D., Director, The Hamilton Project).

[32] *Id.*

[33] Ohio Association of Foodbanks, Franklin County Ohio Work Experience Program, Comprehensive Report: Able-Bodied Adults Without Dependents (2014-2015), http://ohiofoodbanks.org/wep/WEP-2013-2015-report.pdf.

Food insecurity is at the forefront of perils for able-bodied adults, whom the Rule would seek to exclude from SNAP benefits.  Research has demonstrated that this exposure stretches across an individual's lifespan, increasing the risk of nutritional deficiencies and general poor health.[34]  Households participating in SNAP, however, are better positioned to manage their lives, being spared the choice between purchasing food or tending to other critical needs, including medical care.[35]  Conversely, the greater the food insecurity, the greater the adverse effects on chronic disease and health care costs.[36]

Food insecure individuals have been found to require more than twice the costs in medical care than those with food security.[37]  For example, one study of hunger and health found that hospital admissions for hypoglycemia in the last week of the month spike in comparison to the first week, reflecting the lack of end-of-month funds for low-income households.[38]  And when comparing low-income households with and without SNAP support, low-income adults participating in SNAP were found to require nearly 25 percent less in annual medical care costs than low-income non-participants.[39]

---

[34] *Past, Present, & Future of SNAP: Breaking the Cycle: Hearing Before the Subcomm. on Nutrition of the H. Comm. on Agric.*, pt. 3, 114 Cong. 411-16 (2015) (statement of Dr. Eduardo Ochoa, Jr., M.D., F.A.A.P., Children's Healthwatch).

[35] *Id.*

[36] *Past, Present, & Future of SNAP: Addressing Special Populations: Hearing Before the Subcomm. on Nutrition of the H. Comm. on Agric.*, pt. 4, 114 Cong. 568-74 (2016) (statement of Eric J. Schneidewind, J.D., AARP).

[37] *Id.*

[38] *Id.*

[39] *Program Integrity for the Supplemental Nutrition Assistance Program: Joint Hearing Before the Subcomm. on Healthcare, Benefits, & Admin. Rules and the Subcomm. on Intergovernmental Affairs of the H. Comm. on Oversight & Gov't Reform*, 115 Cong. 68-92 (2018) (statement of Stacy Dean, Vice President for Food Assistance Policy, Center on Budget

Moreover, in imposing the new SNAP restrictions, the Rule aggravates the adverse effects on health and nutrition for able-bodied adults by imperiling the capacity for families and communities around the country to thrive.  Recent U.S. Census Bureau data indicates that nearly 19 percent of those surveyed reported they were not working because they were furloughed, laid off, or their employer was temporarily or permanently closed due to the coronavirus pandemic.[40] Of those, individuals reporting food insecurity rose from 12.5 to nearly 18 percent from the previous week.[41]  Those living in rural communities, often with limited access to alternative food sources and permanent, full-time employment, will be among those most gravely affected.

This Court has recognized that this loss of food or other necessities—an inevitable result of the Administration's new Rule—is harm too severe to be ignored.  *See Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157-58 (D.D.C. 2018); *Int'l Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 19 (D.D.C. 1996).  Such harms may take the form of able-bodied adults being forced to choose between obtaining food or paying for other necessary expenses like rent or utility bills, perversely skipping meals to survive.  *Garnett*, 313 F. Supp. 3d at 157-58.  At best, during normal times, the Rule changes would pose immediate danger to SNAP recipients.  During the COVID-19 pandemic and its anticipated long-lasting health and economic effects, the changes are life-threatening.

## CONCLUSION

For the reasons stated above, the House submits this brief in support of Plaintiffs.

---

and Policy Priorities).  The study found the difference in annual costs between low-income SNAP participants and non-participants to be even greater with regard to hypertension and coronary heart disease.  *Id.*

[40] U.S. Census Bureau, Household Pulse Survey Data Tables (Apr. 23, 2020), https://www.census.gov/programs-surveys/household-pulse-survey/data.html.

[41] *Id.*

Respectfully submitted,

/s/ Douglas N. Letter
Douglas N. Letter (DC Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Principal Deputy General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

Jonathan L. Marcus (DC Bar No. 451172)
Paul M. Kerlin (DC Bar No. 993243)
Marisa B. Van Saanen (DC Bar No. 1021818)
Kathleen Shelton (DC Bar No. 1619066)
1440 New York Avenue NW
Washington, D.C. 20005
Telephone: (202) 371-7000
jonathan.marcus@probonolaw.com
paul.kerlin@probonolaw.com
marisa.vansaanen@probonolaw.com
kathleen.shelton@probonolaw.com

*Counsel for Amicus U.S. House of Representatives*

July 8, 2020