**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00119-BAH |
| U.S. DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |
| | |
| BREAD FOR THE CITY, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | Civil Action No. 1:20-cv-00127-BAH |
| Defendants. | |

<u>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**</u>

Pursuant to Federal Rule of Civil Procedure 56, Defendants the United States Department of Agriculture, George Ervin Perdue III, in his official capacity as Secretary of Agriculture, and the United States of America oppose Plaintiffs' Motions for Summary Judgment and hereby move the Court to enter summary judgment in its favor on all claims in Plaintiffs' Complaint. The grounds supporting this motion are set forth in the accompanying memorandum. In accordance with the Local Civil Rules, a proposed order is attached.

Dated:  July 22, 2020                     Respectfully submitted,

                                          ETHAN P. DAVIS
                                          Acting Assistant Attorney General

                                          ERIC R. WOMACK
                                          Assistant Branch Director

                                          */s/ Chetan A. Patil*
                                          CHETAN A. PATIL (DC 999948)
                                          LIAM HOLLAND
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          P.O. Box No. 883
                                          Ben Franklin Station
                                          Washington, D.C. 20044
                                          Tel.: (202) 305-4968
                                          Fax: (202) 616-8470
                                          Email: chetan.patil@usdoj.gov

                                          *Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>       Defendants. | Civil Action No. 1:20-cv-00119-BAH |
| BREAD FOR THE CITY, *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>       Defendants. | Civil Action No. 1:20-cv-00127-BAH |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
# DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
# IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATUTORY AND REGULATORY FRAMEWORK ..................................... 3

    A.    Statutory Framework for SNAP Work Requirements ........................... 3

    B.    Regulatory Framework Related to Waivers and Discretionary Exemptions .......... 6

          *1.*    *USDA's 2001 Regulation* ......................................................... 6

          *2.*    *2009-2010 Suspension of Work Requirements and 2016 OIG Report* ...... 7

          *3.*    *Development of the Challenged Final Rule* ............................... 8

          *4.*    *The Final Rule* ...................................................................... 11

          *5.*    *The Families First Coronavirus Response Act* ....................... 14

PROCEDURAL BACKGROUND .................................................................... 15

LEGAL STANDARD ...................................................................................... 16

ARGUMENT ................................................................................................... 16

I.    THE RULE IS A REASONABLE INTERPRETATION OF THE PRWORA AND THE BBA. .................................................................. 16

    A.    USDA's Interpretations of the Waiver Provisions Are Reasonable. ........ 17

          *1.*    *USDA's Interpretation of "Sufficient Number of Jobs" is Consistent with Congressional Intent.* ...................................... 19

               a.    USDA's reliance on general unemployment data to measure sufficient jobs for ABAWDs is reasonable at *Chevron* step two. ................................................................................. 20

               b.    USDA's reliance on general unemployment data is not manifestly contrary to the statute. ................................ 26

          *2.*    *USDA Reasonably Aligned the term "Area" with Job Markets* ............ 28

               a.    USDA's definition of an area is not manifestly contrary to the PRWORA and thus survives *Chevron* step two. ................. 30

i

          b.     The LMA definition reasonably aligns waiver areas with job markets. ............................................................... 33

       *3.*     *The Secretary Exercised His Discretion to Proceed by Rulemaking Instead of Adjudication.* ............................................. 34

  B.    The Prohibition on Indefinite Carryover of Discretionary Exemptions is Consistent With Congressional Intent. ................................. 35

  C.    Subsequent Legislative History From 2018 Is an Unreliable Guide to the PRWORA, a Statute Passed in 1996, and Should be Disregarded. ...................... 38

II.    THE FINAL RULE IS THE PRODUCT OF REASONED DECISIONMAKING. ........ 41

  A.    USDA's Revisions to the Waiver Scheme Are a Reasonable Response to Problems with the 2001 Regulation. ................................................. 41

      *1.*     *USDA Adequately Justified Its Revisions to the Waiver Criteria.* ............ 41

      *2.*     *USDA Reasonably Redefined the Waiver Area.* ....................................... 49

      *3.*     *USDA Considered Potential Costs and Disparate Impacts of the Rule.* ........................................................... 59

  B.    UDA Reasonably Limited Indefinite Carryover of Discretionary Exemptions. ............................................................ 64

III.   USDA PROVIDED ADEQUATE OPPORTUNITY TO COMMENT ON THE FINAL RULE. ............................................................. 66

CONCLUSION ..................................................................... 70

# TABLE OF AUTHORITIES

**CASES**

*Abington Mem'l Hosp. v. Burwell*,
  216 F. Supp. 3d 110 (D.D.C. 2016) .................................................................. 68, 69

*Ala. Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979) ............................................................................ 27

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ...................................................................... 66, 67

*Am. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991) ...................................................................................... 30, 35

*Am. Iron & Steel Inst. v. EPA*,
  886 F.2d 390 (D.C. Cir. 1989) ........................................................................ 67, 68

*Am. Meat Inst. v. USDA*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc) .............................................................. 61

*Am. Pub. Commc'ns Council v. FCC*,
  215 F.3d 51 (D.C. Cir. 2000) .............................................................................. 57

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n*,
  567 F.2d 1016 (D.C. Cir. 1977) .......................................................................... 57

*Anna Jacques Hosp. v. Burwell*,
  797 F.3d 1155 (D.C. Cir. 2015) ................................................................ 20, 29, 31

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ............................................................................ 69

*Ariz. Pub. Serv. Co. v. EPA*,
  211 F.3d 1280 (D.C. Cir. 2000) ...................................................................... 67, 69

*Arkema Inc v. EPA*,
  618 F.3d 1, (D.C. Cir. 2010) .............................................................................. 36

*Associated Dog Clubs of New York State v. Vilsack*,
  75 F. Supp. 3d 83 (D.D.C. 2014) ..................................................................... 54, 55

*AT&T Corp. v. Iowa Utils. Bd.*,
  525 U.S. 366 (1999) .......................................................................................... 30

*AT&T v. United States*,
  299 U.S. 232 (1936) .................................................................................. 20

*Barnhart v. Thomas*,
  540 U.S. 20 (2003) ................................................................. 22, 26, 58

*Batterton v. Francis*,
  432 U.S. 416 (1977) ................................................... 20, 23, 24, 26

*Baystate Franklin Med. Ctr. v. Azar*,
  950 F.3d 84 (D.C. Cir. 2020) ........................................................ 22, 25

*Bell Atl. Tel. Cos. v. FCC*,
  79 F.3d 1195 (D.C. Cir. 1996) ........................................................ 36

*Bimini Superfast Operations LLC v. Winkowski*,
  994 F. Supp. 2d 103 (D.D.C. 2014) .............................................. 51

*British Caledonian Airways, Ltd. v. CAB*,
  584 F.2d 982 (D.C. Cir. 1978) ........................................................ 34

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................. 16, 25

*Champion v. Shalala*,
  33 F.3d 963 (8th Cir. 1994) ........................................................ 25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................. 16, 17, 18, 20

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ................................................................. 51

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ................................................................. 19, 49

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ................................................................. 17, 21

*City of Boston Delegation v. FERC*,
  897 F.3d 241 (D.C. Cir. 2018) ........................................................ 57

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) ........................................................ 62

*ConocoPhillips Co. v. EPA*,
   612 F.3d 822 (5th Cir. 2010) ..................................................................... 61

*Consumer Elecs. Ass'n v. FCC*,
   347 F.3d 291 (D.C. Cir. 2003) .................................................................... 60

*Consumer Prod. Safety Comm'n v. GTW Sylvania, Inc.*,
   447 U.S. 102 (1980) .................................................................................... 38

*Council for Urological Interests v. Burwell*,
   790 F.3d 212 (D.C. Cir. 2015) ............................................................... 38, 39

*CREW v. FEC*,
   316 F. Supp. 3d 349 (D.D.C. 2018) ...................................................... 18, 37

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) .................................................................. 67

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ................................................................................ 43

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................ 66

*District of Columbia v. USDA*,
   --- F. Supp. 3d ---, 2020 WL 1236657 (D.D.C. Mar. 13, 2020),
    *appeal docketed*, No. 20-5136 (D.C. Cir. 2020) ............................... *passim*

*Eagle Pharm. Inc. v. Azar*,
   952 F.3d 323 (D.C. Cir. 2020) .................................................................... 38

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ..................................................................... 17, 64, 66

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) .................................................................................... 27

*Envtl. Integrity Project v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005) ............................................................... 67, 69

*Evans v. Jeff. D.*,
   475 U.S. 717 (1986) .................................................................................... 30

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................... 46, 64, 65

*Fla. Bankers Ass'n v. U.S. Dep't of Treasury,*
   19 F. Supp. 3d 111 (D.D.C. 2014),
   *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) .................................................... 59

*Franks v. Salazar,*
   816 F. Supp. 2d 49 (D.D.C. 2011) ......................................................................................... 16

*Fund for Animals v. Babbitt,*
   903 F. Supp. 96 (D.D.C. 1995) .............................................................................................. 16

*Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce,*
   720 F. Supp. 2d 564 (D.N.J. 2010) ........................................................................................ 23

*Heckler v. Campbell,*
   461 U.S. 458 (1983) ............................................................................................................... 35

*Heller v. Doe ex rel. Doe,*
   509 U.S. 312 (1993) ............................................................................................................... 26

*Humane Soc'y of U.S. v. Zinke,*
   865 F.3d 585 (D.C. Cir. 2017) ............................................................................................... 21

*Ill. Pub. Telecomm'ns. Ass'n v. FCC,*
   752 F.3d 1018 (D.C. Cir. 2014) ............................................................................................. 20

*IMS, P.C. v. Alvarez,*
   129 F.3d 618 (D.C. Cir. 1997) ............................................................................................... 42

*In re Davis,*
   960 F.3d 346 (6th Cir. 2020) ................................................................................................. 39

*Indus. Union Dept. AFL-CIO v. Hodgson,*
   499 F.2d 467 (D.C. Cir. 1974) ............................................................................................... 23

*Int'l Brotherhood of Elec. Workers No. 474, AFL-CIO v. NLRB,*
   814 F.2d 697 (D.C. Cir. 1987) ............................................................................................... 40

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Dole,*
   919 F.2d 753 (D.C. Cir. 1990) ........................................................................................ 18, 24

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
   407 F.3d 1250 (D.C. Cir. 2005) ............................................................................................. 67

*Inv. Co. Inst. v. CFTC,*
   720 F.3d 370 (D.C. Cir. 2013) ......................................................................................... 61, 62

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ........................................................................... 36

*Leather Indus. of Am., Inc. v. EPA*,
  40 F.3d 392 (D.C. Cir. 1994) ........................................................... 23

*Lipton v. EPA*,
  316 F. Supp. 3d 245 (D.D.C. 2018) ................................................ 28

*Little Sisters of the Poor v. Pennsylvania*,
  --- S. Ct. ---, 2020 WL 3808424 (July 8, 2020) .......................... 21, 32

*Long v. HHS*,
  422 F. Supp. 3d 143 (D.D.C. 2019),
  *appeal docketed*, No. 19-5358 (D.C. Cir. Dec. 19, 2019) ................. 42

*Mayo Found. v. U.S.*,
  562 U.S. 59 (2011) ............................................................... 22, 24, 48

*Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994) ..................................................... 23, 25

*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) ......................................................... 59

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ........................................................... 47

*Miss. Comm'n on Envtl. Quality v. EPA*,
  790 F.3d 138 (D.C. Cir. 2015) ........................................................... 43

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................. 41

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ....................................................... *passim*

*Nat'l Ass'n of Home Builders*,
  682 F.3d 1032 (D.C. Cir. 2012) .................................................. 46S, 60

*Nat'l Ass'n of Mfrs. v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014) ..................................................... 61, 62

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) .................................................................... 17, 46

*Nat'l Oilseed Processors Ass'n v. Browner*,
   924 F. Supp. 1193 (D.D.C. 1996) ........................................................ 51

*Nat'l Tour Brokers Ass'n v. ICC*,
   671 F.2d 528 (D.C. Cir. 1982) ............................................................ 51

*New England Power Generators Ass'n v. FERC*,
   879 F.3d 1192 (D.C. Cir. 2018) .......................................................... 47

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005) ................................................................ 67

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
   416 U.S. 267 (1974) ........................................................................... 34

*NRDC v. EPA*,
   529 F.3d 1077 (D.C. Cir. 2008) .......................................................... 45

*The Ocean Conservancy v. Gutierrez*,
   394 F. Supp. 2d 147 (D.D.C. 2005),
   *aff'd*, 488 F.3d 1020 (D.C. Cir. 2007) ............................................... 45

*Pharm. Res. & Mfrs. of Am. v. FTC*,
   790 F.3d 198 (D.C Cir. 2015) ............................................................. 21

*Pharm. Research & Mftrs. of Am. v. FTC*,
   44 F. Supp. 3d 95 (D.D.C. 2014) ........................................................ 70

*Pierce v. Underwood*,
   487 U.S. 552 (1988) ...................................................................... 38, 40

*Regions Hosp. v. Shalala*,
   522 U.S. 448 (1998) ........................................................................... 17

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ........................................................................... 18

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ........................................................................... 65

*Safari Club Int'l v. Jewell*,
   960 F. Supp. 2d 17 (D.D.C. 2013) ...................................................... 16

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................... 34

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 16

*SIFMA v. CFTC*,
    67 F. Supp. 3d 373 (D.D.C. 2014) ........................................................................ 61

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) ........................................................................ 17, 18, 21

*Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ........................................................................ 39

*Stringfellow Mem'l Hosp. v. Azar*,
    317 F. Supp. 3d 168 (D.D.C. 2018) ........................................................................ 68

*Sullivan v. Finkelstein*,
    496 U.S. 617 (1990) ........................................................................ 38

*Sw. Ctr. for Biological Diversity v. Babbit*,
    215 F.3d 58 (D.C. Cir. 2000) ........................................................................ 26

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
    783 F. Supp. 1426 (D.D.C. 1992) ........................................................................ 26

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ........................................................................ 51

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ........................................................................ 66

*United States v. Crocker-Anglo Nat'l Bank*,
    277 F. Supp. 133 (N.D. Cal. 1967) ........................................................................ 33

*United States v. H & R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................................ 33

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ........................................................................ 29

*United States v. Storer Broad. Co.*,
    351 U.S. 192 (1956) ........................................................................ 35

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) ........................................................................ 23

*Van Hollen, Jr. v. FEC*,
  811 F.3d 486 (D.C. Cir. 2016) ....................................................................... 40, 41

*Verizon v. F.C.C.*,
  740 F.3d 623 (D.C. Cir. 2014) ............................................................................ 38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ............................................................................................ 25

**STATUTES**

5 U.S.C. § 706 .......................................................................................................... 40

7 U.S.C. § 2011 .......................................................................................................... 4

7 U.S.C. § 2012 .................................................................................................... 15, 29

7 U.S.C. § 2013 .......................................................................................... 3, 4, 34, 55

7 U.S.C. § 2015 ................................................................................................. *passim*

7 U.S.C. § 2020 ........................................................................................................... 3

7 U.S.C. § 2025 ........................................................................................................... 4

Act. of Jan. 11, 1971,
  Pub. L. No. 91-671, 84 Stat. 2048 ........................................................................ 4

Food Agriculture Act of 1977,
  Pub. L. No. 95-113, 91 Stat. 913 .......................................................................... 4

Personal Responsibility and Work Opportunity Reconciliation Act,
  Pub. L. No. 104-193, 110 Stat. 2105 (1996) ......................................................... 4

Balanced Budget Act of 1997,
  Pub. L. No. 105-33, 111 Stat. 251 (1997) ............................................................. 5

American Recovery and Reinvestment Act of 2009,
  Pub. L. No. 111-5, 123 Stat. 115 (2009) ............................................................... 8

Agriculture Improvement Act of 2018,
  Pub. L. No. 115-334, 132 Stat. 4490 (2018) ......................................................... 6

Families First Coronavirus Response Act ,
  Pub. L. No. 116-127, 134 Stat. 178 (2020) .................................................... 14, 15

## REGULATIONS

7 C.F.R. § 271.3 ................................................................................................ 3

7 C.F.R. § 273.24 ...................................................................................... *passim*

Exec. Order 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993) ...................................... 59

Exec. Order 13,563, 76 Fed. Reg. 3821 (Jan. 18, 2011) ......................................... 59

Exec. Order 13,771, 82 Fed. Reg. 9339 (Jan. 30, 2017) ......................................... 59

64 Fed. Reg. 70920 (Dec. 17, 1999) ............................................................... 24, 32

75 Fed. Reg. 37246 (June 28, 2010) ............................................................... 56, 58

83 Fed. Reg. 8013 (Feb. 23, 2018) .................................................................. 8, 69

84 Fed. Reg. 980 (Feb. 1, 2019) ........................................................................ *passim*

84 Fed. Reg. 66782 (Dec. 5, 2019) .................................................................... *passim,*

## OTHER AUTHORITIES

142 Cong. Rec. H7762 (July 17, 1996) ................................................................. 25

142 Cong. Rec. H9393 (Aug. 2, 1996) ................................................................. 40

164 Cong. Rec. H9823 (Dec. 10, 2018) ................................................................ 39

H.R. Rep. No. 104-77 (1995) ............................................................................ 28

H.R. Rep. No. 104-725 (1996) ............................................................................ 1

H.R. Rep. No. 115-1072 (1996) ..................................................................... 38, 39

Julie M. Whitaker & Katelin P. Isaacs, *Extending Unemployment Compensation
        Benefits During Recessions* 6 (2013), Cong. Rsch. Serv., RL34340 ....................... 22

*Statement on Signing PRWORA* (Aug. 22, 1996), 32 Weekly Comp. of Pres. Doc.,
        https://www.govinfo.gov/content/pkg/WCPD-1996-08-26/pdf/WCPD-1996-08-26.pdf .......... 4

USDA FNS, *SNAP-Families First Coronavirus Response Act and Impact on Time Limit for
        Able-Bodied Adults Without Dependents (ABAWDs)*,
        https://www.fns.usda.gov/snap/ffcra-impact-time-limit-abawds ............................. 15

**<u>INTRODUCTION</u>**

In the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Congress expressly chose to condition Supplemental Nutrition Assistance Program ("SNAP") benefits for "able-bodied adults without dependents" ("ABAWDs") on their satisfaction of a work requirement.  It imposed this work requirement specifically to "promote work over welfare and self-reliance over dependency," H.R. Rep. No. 104-725, at 261 (1996) (Conf. Rep.), and it subjected no other SNAP recipients to similar conditions.  Over the past two decades, Congress has charged the U.S. Department of Agriculture ("USDA") with implementing limited exceptions to the ABAWD time limit.  USDA's experience over those decades led it to conclude that the regulatory framework it established to govern those exceptions has become unmoored from the objectives of the statute.  The Final Rule is a reasonable effort by USDA to bring the regulatory framework back into alignment with the PRWORA.

Under the PRWORA, ABAWDs are permitted to receive benefits for only three months out of a 36-month period unless they meet the statute's work or employment training requirements (or receive benefits pursuant to a statutory exception).  Congress created two relevant exceptions to the ABAWD time limit.  First, it created a discretionary waiver system, which authorizes USDA to waive the requirements for "any group of individuals" in an "area" with a weak labor market. 7 U.S.C. § 2015(o)(4)(A).  Specifically, USDA may approve waivers in only two circumstances: when the "area" in question either has an "unemployment rate of over 10 percent" or lacks "a sufficient number of jobs."  *Id.*  Second, in the Balanced Budget Act of 1997 ("BBA"), Congress allocated to States a limited number of discretionary exemptions to use each year on individuals who would otherwise be time-barred from receiving benefits.  *Id.* § 2015(o)(6).

In both statutes, Congress conferred substantial discretion on USDA.  The key terms in the

waiver provisions—"area" and "sufficient number of jobs"—are undefined, and Congress does not direct USDA as to how to make either determination. Similarly, in the BBA, Congress directed USDA to adjust a State's annual allocation of discretionary exemptions to reflect the difference between the estimated number of exemptions allocated to and those "in effect in" the State "in the preceding fiscal year." *Id.* § 2015(o)(6)(G). But Congress did not clearly address how USDA must account for a State's failure to use such exemptions over several years.

Initially, USDA chose to exercise its discretion over waivers by broadly deferring to the States. However, after two decades administering the ABAWD work requirement, USDA concluded that the deferential approach has significant weaknesses. The flexibility conferred on States to define the area of a waiver request, 7 C.F.R. § 273.24(f)(6), resulted in the approval of numerous waivers that covered areas incompatible with actual job markets. Specifically, under that prior regulatory approach, a State can define a waiver area that covers, for example, a large swath of the State that did not fairly reflect any economically integrated job market. Conversely, a State can seek waivers for particular counties or towns while ignoring the availability of jobs within a reasonable commute across invisible municipal, county, or State boundaries.

Similarly, USDA concluded that the regulatory criteria for demonstrating a lack of sufficient jobs, *see id.* § 273.24(f)(2)(ii), are insufficiently robust to achieve the statutory objectives. In particular, the primary standard under which USDA authorized waivers—that any jurisdiction or group of jurisdictions selected by a State has an unemployment rate exceeding the national average by 20%—resulted in the broad use of waivers even as the nation's job markets became historically favorable for workers, allowing waivers even for areas with unemployment rates as low as 4.7%. Finally, allowing States to carry over exemptions from one fiscal year to the next indefinitely, *see id.* § 273.24(h)(2), permitted States to accumulate exemptions far beyond the

limited number envisioned by the BBA.

The Final Rule at the center of this case reflects USDA's reasonable effort to respond to these demonstrated weaknesses in its prior regulatory framework. *See* Final Rule, 84 Fed. Reg. 66782 (Dec. 5, 2019). The Rule defines waiver areas through a delineation of economically integrated areas by the Department of Labor ("DOL") and the Office of Management and Budget ("OMB"), ensuring that waiver areas are tied to job markets rather than traversable political boundaries. It adds a threshold unemployment rate "floor" to the criteria for insufficient jobs and restricts the use of other criteria that either do not conform to actual job markets or are subjective, non-standardized, and/or rarely used. And it allows States broad opportunity to carry over unused exemptions, while limiting them from doing so indefinitely.

Each of these revisions is a reasonable interpretation of the ambiguous statutory language of the PRWORA and the BBA. And each was thoroughly explained and is reasonable in light of the administrative record, and thus, the Rule withstands scrutiny under the highly deferential arbitrary and capricious standard. Accordingly, the Court should deny Plaintiffs' motions for summary judgment and enter summary judgment on behalf of Defendants.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    Statutory Framework for SNAP Work Requirements

SNAP offers nutrition assistance to qualified low-income households.[1]    USDA is authorized to "formulate and administer" SNAP, 7 U.S.C. § 2013(a)—tasks it has delegated to the Food and Nutrition Service ("FNS"), a component within USDA, *see* 7 C.F.R. § 271.3(a). USDA shares responsibility with State agencies for the administration of SNAP benefits, 7 U.S.C.

---

[1] Before 2008, SNAP was known as the Food Stamp Program. For ease of reference, the Government uses SNAP to refer to both pre- and post-2008 iterations of the program.

§ 2020(a); *id.* § 2025(a). The federal government is financially responsible for funding all SNAP benefits, *id.* § 2013(a), and approximately 50% of State administrative costs, *id.* § 2025(a). Congress has conferred broad rulemaking authority on USDA to implement SNAP. *Id.* § 2013(c).

SNAP has several goals, including addressing food insecurity by providing supplemental food assistance to low-income individuals and families and promoting self-sufficiency and economic mobility. *Id.* § 2011; *id.* § 2015(d). For nearly four decades, Congress has directed USDA to implement SNAP's self-sufficiency purposes through work-related requirements. *See, e.g.*, Act of Jan. 11, 1971, Pub. L. No. 91-671 § 4, 84 Stat. 2048, 2050; Food Agriculture Act of 1977, Pub. L. No. 95-113 § 6, 91 Stat. 913. In 1996, Congress enacted the PRWORA, which strengthened work requirements for SNAP participants. *See* Pub. L. No. 104-193, 110 Stat. 2105 (1996).[2] The rationale underlying the PRWORA is that work requirements promote self-sufficiency by incentivizing a transition from welfare to work. *See, e.g.*, *Statement on Signing PRWORA* (Aug. 22, 1996), 32 Weekly Comp. of Pres. Doc. at 1487-88 (signing statement by President Clinton declaring that the PRWORA would "transform our broken welfare system by promoting the fundamental values of work, responsibility, and family").[3]

The PRWORA amended the Food Stamp Act of 1977 to condition the eligibility of certain beneficiaries for SNAP benefits on meeting a work requirement. 7 U.S.C. § 2015(o). But Congress imposed this work requirement narrowly, only on a single subset of SNAP recipients— ABAWDs—that consists of individuals typically in their twenties, thirties, and forties, all of whom are by definition fit for work. *See id.* § 2015(o)(3). Not only are people who qualify for Social

---

[2] These requirements may be satisfied not only by working, but also by activities that enhance employability, such as vocational education, community service, and job-skills training. *See, e.g.*, 7 U.S.C. § 2015(o); 7 C.F.R. § 273.24(a)(2)-(4). Nevertheless, for ease of reference, the Government uses "work requirement" to refer to both work and work-related requirements.
[3] https://www.govinfo.gov/content/pkg/WCPD-1996-08-26/pdf/WCPD-1996-08-26.pdf.

Security Administration disability benefits not subject to these rules, but anyone medically certified as physically or mentally unfit for work is not subject to them. *Id*. § 2015(o)(3)(B); *see* 7 C.F.R. § 273.24(c)(2) (describing manner in which states may exempt those as unfit for work). Furthermore, neither parents, other members of a household responsible for a dependent child, nor pregnant women are subject to the work requirement. 7 U.S.C. § 2015(o)(3)(C), (o)(3)(E).

This narrow group of truly able-bodied adults are subject to a strict time limit for receipt of SNAP benefits. Within a 36-month period, an ABAWD may receive SNAP benefits for only three months in which he or she did not work at least 20 hours a week (averaged monthly), participate in a work program for at least 20 hours, participate in a workfare program, receive benefits pursuant to a waiver under § 2015(o)(4) or a discretionary exemption under § 2015(o)(6), or receive benefits after regaining eligibility under § 2015(o)(5). *Id.* § 2015(o)(2). Recognizing that finding a job may be difficult for unskilled low income workers, the work requirement can be fulfilled by volunteer activities, or "[u]npaid work." 7 C.F.R. § 273.24(a)(2)(iii).

The PRWORA authorizes the Secretary of Agriculture, upon the request of a State, to waive the applicability of the time limit, and thus the work requirement, "to any group of individuals" if he determines that "the area in which the individuals reside (i) has an unemployment rate of over 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A). The statute does not define the term "area" or identify any criteria or methodology for determining whether an area has "a sufficient number of jobs."

The BBA further amended these provisions. Pub. L. No. 105-33, 111 Stat. 251 (1997). In relevant part, it authorized States, each month, to exempt up to 15% of all "covered individuals"— defined, broadly speaking, as those ABAWDs who are not complying with the work requirement,

do not reside in an area subject to a waiver, and are not receiving benefits pursuant to their three months' of initial eligibility or after regaining eligibility—from the PRWORA's time limit. 7 U.S.C. § 2015(o)(6)(A)-(D). In other words, a discretionary exemption means that SNAP benefits in a given month do not count against a recipient's three-month limit. *See id.* § 2015(o)(2)(D). In the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. Ann. 4490 (2018) ("2018 Farm Bill"), Congress reduced States' discretionary exemptions to 12% of all "covered individuals" for fiscal year 2020 and beyond. *Id.* § 2015(o)(6)(E).

In practice, USDA must estimate the number of covered individuals within a particular State for a given fiscal year, and the State's allocated—or "earned"—discretionary exemptions are calculated based on that estimate. *Id.* § 2015(o)(6)(C)-(E). USDA must "increase or decrease the number of individuals who may be granted" a discretionary exemption "to the extent that" a State's average monthly number of exemptions granted in the "preceding fiscal year . . . is lesser or greater" than estimated by USDA. *Id.* § 2015(o)(6)(G). In other words, if a State used fewer exemptions in the prior fiscal year than it earned in that fiscal year, USDA must increase the number of exemptions allocated to that State in the following year. Conversely, if a State uses more than it earned in the prior fiscal year, USDA must decrease the next year's allocation.

**B.    Regulatory Framework Related to Waivers and Discretionary Exemptions**

This case arises from USDA's efforts to interpret the phrases "area in which the individuals reside" and "sufficient number of jobs" in the PRWORA, *id.* § 2015(o)(4)(A), and to implement the BBA's provisions for adjustment of discretionary exemptions, *see id.* § 2015(o)(6)(G).

*1.    USDA's 2001 Regulation*

In 2001, USDA issued a final rule, codified at 7 C.F.R. § 273.24 (the "2001 Regulation"),

setting forth the criteria for approval of waiver requests.[4]   Under the 2001 Regulation, States may "submit whatever data [they] deem[] appropriate to support" waiver requests, although requests based on unemployment data must comply with standard Bureau of Labor Statistics ("BLS") data or methods.  *Id.* § 273.24(f)(2).  States may establish a lack of "sufficient jobs" by showing that the area in question:  (i) is designated as a Labor Surplus Area ("LSA") by DOL; (ii) is qualified by DOL for extended unemployment benefits; (iii) has a low and declining employment-to-population ratio; (iv) has a lack of jobs in declining occupations or industries; (v) is characterized in an academic study or publication as an area with a lack of jobs; or (vi) has a 24-month average unemployment rate that is at least 20% above the national average for the same period (the "20% standard").  *Id.* § 273.24(f)(2)(ii).  The 2001 Regulation confers on States broad flexibility to "define areas to be covered by waivers."  *Id.* § 273.24(f)(6).  States may group multiple substate areas in one waiver request, so long as the substate areas are either contiguous or within the same economic region.  ABAWD00000324.  States are not required, however, to include data from all jurisdictions within a single economic region.  *Id.*

The regulation also implements the statutory provisions governing discretionary exemptions.  *See* 7 C.F.R. § 273.24(g)(3).  If a State does not use all of its earned exemptions for a given fiscal year, USDA increases the State's estimated number of exemptions for the following year by the positive balance.  *See id.* § 273.24(h)(2)(ii).  Under the regulation, States are permitted to indefinitely carryover all unused discretionary exemptions.

        2.      *2009-2010 Suspension of the Work Requirement and the 2016 OIG Report*

In the wake of the 2008 Great Recession, Congress suspended the ABAWD work

---

[4] Before the 2001 Regulation, USDA had issued guidance to State agencies on waiver requests. *See* ABAWD00000166.

requirement from April 1, 2009, through September 30, 2010.  Pub. L. No. 111-5, § 101(e), 123 Stat. 115, 121 (2009).  Long after that time, many States continued to rely on waivers, *see* ABAWD00000286, even as the nation's economy improved.

In September 2016, UDSA's Office of the Inspector General ("OIG") issued a report auditing USDA's oversight of State controls to determine if they were adequately ensuring that only eligible ABAWDs were receiving benefits.  ABAWD00000278.  The Report found that certain States admitted to "specifically request[ing] ABAWD time limit waivers in as many parts of the State as possible to minimize the areas where they needed to track the ABAWD time limits," simply to avoid the "burden of implementing the ABAWD time limits."  ABAWD00000289.  The Report further found that "States are requesting, and [USDA] is approving" waivers "for parts of States where unemployment rates are as low as 0 percent" simply because those areas were grouped "with areas with higher unemployment rates."  ABAWD00000289 n.15.  The Report also expressed "concern[]" that permitting States to indefinitely carry over discretionary exemptions had let them accumulate "about 5.9 million unused exemptions" representing nearly a billion dollars in SNAP benefits.  ABAWD00000294.  The Report concluded that the policy "may not meet the intent of the statute."  *Id.*

3.    *Development of the Challenged Final Rule*

On February 23, 2018, USDA issued an Advanced Notice of Proposed Rulemaking ("ANPRM") requesting input from the public on potential changes to USDA's regulations regarding waivers and discretionary exemptions.  83 Fed. Reg. 8013, 8013 (Feb. 23, 2018).  Nearly 39,000 comments and almost a fully year later, USDA published a Proposed Rule.

USDA proposed amending the regulatory criteria governing waivers and restricting the indefinite carryover of discretionary exemptions.  Proposed Rule, 84 Fed. Reg. 980 (Feb. 1, 2019).

The Proposed Rule was expressly motivated by concerns that the 2001 Regulation does not properly implement the PRWORA.  The broad use of waivers by States during a time of low national unemployment raised doubts that the 2001 Regulation's waiver criteria accurately identify job markets that lack sufficient jobs.  *Id.* at 981.  Further, USDA's two-decades' worth of experience with waivers showed that letting States define waiver areas resulted in a disconnect between waiver areas and actual economic conditions.  *Id.*  USDA concluded that strengthening the criteria for waivers would better implement the PRWORA by accurately defining "when and where a lack of sufficient jobs" exists; "encourag[ing] greater engagement in meaningful work activities and movement toward self-sufficiency among ABAWDs"; and ensuring that waivers relied on "representative, accurate, and consistent economic data."  *Id.* at 981-82.

USDA's proposed revisions encompassed several changes to the regulatory framework for waivers and discretionary exemptions that are relevant here:

*First*, USDA indicated it would alter the criteria for demonstrating a lack of "sufficient jobs."  *See* 7 C.F.R. § 273.24(f)(2)(ii).  It proposed adding a 7% unemployment rate "floor" to the 20% standard, Proposed Rule, 84 Fed. Reg. at 983, and retaining a State's qualification for extended unemployment benefits, as determined by DOL, as a criterion, *id.* at 985.  In addition, it proposed eliminating the other criteria in the 2001 Regulation.  Specifically, USDA proposed eliminating qualification based on a low and declining employment-to-population ratio, a lack of jobs in declining occupations or industries, or a characterization in a study or publication as an area with a lack of jobs.  USDA explained that these criteria "are rarely used, sometimes subjective, and not appropriate when other more specific and robust data is available," *id.*, but proposed retaining them where BLS data are limited or unavailable, *id.* at 986.  USDA also suggested eliminating qualification based on designation as an LSA.  *Id.* at 987.  The Proposed Rule

indicated, however, that USDA would consider requests based on other data and evidence in "exceptional circumstances." *Id.* at 985.

*Second*, USDA proposed restricting the flexibility granted to States in the 2001 Regulation, *see* 7 C.F.R. § 273.24(f)(6), to define the relevant "area" for a waiver. Proposed Rule, 84 Fed. Reg. at 985. Through its experience, USDA had concluded that granting waivers for areas merely because they were "contiguous" provides no real indication that those areas "are economically tied." *Id.* at 985-86. In essence, the 2001 Regulation requires USDA to grant waivers whether or not the area subject to the waiver corresponds in any way to a job market. *Id.* USDA identified specific examples of the problem. USDA had waived areas consisting of "nearly all contiguous counties in [a] State" with the exception of "a few counties with relatively low unemployment." *Id*. at 986. USDA had also waived areas consisting of "certain towns" with higher unemployment but excluding other towns "with relatively low unemployment" located in "the same economic region." *Id.* USDA believed that such waivers did not fairly reflect "economically tied" areas. *Id.* Accordingly, it proposed prohibiting States from grouping substate jurisdictions unless they correspond to areas designated as DOL Labor Market Areas ("LMAs"). *Id.* at 986. Relatedly, USDA proposed prohibiting statewide waivers—except where a State qualified for extended unemployment benefits—when BLS data for substate areas are available. *Id.* at 985. This proposed change addressed USDA's concern that statewide figures are inappropriately "targeted" to "ensure that waivers exist only in" job markets lacking sufficient jobs. *Id*.

*Third*, USDA proposed limiting the indefinite carryover and accumulation of discretionary exemptions under 7 U.S.C. § 2015(o)(6). *Id.* at 987. In particular, the Proposed Rule would prohibit indefinite carryover of exemptions and instead limit annual adjustments to the difference between exemptions earned and exemptions used in the preceding year. *Id.* at 988-89.

4.    *The Final Rule*

USDA received over 100,000 comments to its Proposed Rule.  After carefully evaluating the extensive record, USDA published the Final Rule on December 5, 2019.  Consistent with the Proposed Rule, the Rule revises the criteria for demonstrating a lack of sufficient jobs and the parameters of a waiver "area," and restricts the unlimited carryover of discretionary exemptions.[5]

i.    The Final Rule adopts two core standards for waiver approval:  a recent 12-month average unemployment rate over 10% or a recent 24-month average unemployment rate at least 20% above the national average *and* meeting a 6% unemployment floor.  Final Rule, 84 Fed. Reg. at 66784.  The latter standard functionally replaces the various criteria used to show a lack of sufficient jobs in the 2001 Regulation, *see* 7 C.F.R. § 273.24(f)(2)(ii).

USDA adopted an unemployment floor because the 2001 Regulation's 20% standard— which requires only a showing of an unemployment rate at least 20% above the national average— is pegged to a floating target.  Final Rule, 84 Fed. Reg. at 66783.  As a result, waivers are approved regardless of how low an "area['s]" unemployment rate actually goes, so long as it is sufficiently above the national average.  *Id.* at 66784 (noting that current criteria permits waivers for areas with unemployment rates as low as 4.7%).  Although USDA proposed a 7% floor, it adopted a 6% floor after considering comments.  *Id.* at 66785.  That level corresponds to DOL's requirements for an LSA (which requires an unemployment rate at least 20% above the national average and at least 6%), reflects a "meaningful threshold for economic distress," and is consistent with the economic concept of a natural rate of unemployment.  *Id.*

The Rule eliminates the other criteria in 7 C.F.R. § 273.24(f)(2)(ii) for demonstrating a

---

[5] The revisions to the waiver criteria were to go into effect on April 1, 2020, Final Rule, 84 Fed. Reg. at 66782, but these provisions have been enjoined by this Court, as discussed *infra*.  The provisions governing the discretionary exemptions go into effect on October 1, 2020.  *Id.*

lack of "sufficient" jobs. State qualification for extended unemployment benefits is eliminated because it conflicts with the Rule's concern that statewide waivers are not targeted to job markets. *Id.* at 66789-90. Designation as an LSA, which applies to individual jurisdictions, similarly conflicts with the Rule's definition of an area because it fails to take into account whether "there are available jobs within a reasonable commuting distance." *Id.* at 66799-800. The remaining criteria—a declining employment-to-population ratio, jobs in declining industries or occupations, and a description in a study or publication as an area lacking jobs—are not as standardized or reliable as BLS data, not produced by BLS at a substate level, of ambiguous value in determining labor market weakness, and/or rarely used. *Id.* at 66790-92.

The Rule also provides that USDA will consider requests based on other data or evidence in "exceptional circumstances" in order to maintain responsiveness to extraordinary situations. *Id.* at 66791. The Rule does not set out an exhaustive list of exceptional circumstances, but identifies examples, such as "the rapid disintegration" of a significant industry, effects of a natural disaster, "a sharp continuing economic decline," and the "permanent closure of a large plant . . . or an ongoing significant reduction in the plant's workforce." *Id.* at 66792. By contrast, a "short-term" or "temporary" event would not qualify. *Id.* States also may continue to use declining employment-to-population ratios, jobs in declining industries or occupations, and descriptions in studies and publications for areas where BLS data are limited or unavailable. *Id.* at 66799.

ii.    The Final Rule also redefines the term "area" in 7 U.S.C. § 2015(o)(4)(A). The goal of the revision is to ensure that waiver areas are meaningfully related to actual job markets by taking account of jobs available within a reasonable commuting distance—a reform that USDA viewed as more consistent with the PRWORA's intent. Final Rule, 84 Fed. Reg. at 66783, 66796. The Rule requires that an "area" for a waiver conform to an LMA. *Id.* at 66795. Under the Rule,

USDA will not approve waivers for any substate jurisdiction other than an LMA, reservation, or U.S. Territory. *Id.* For an LMA that crosses state lines, a State may obtain a waiver of intrastate portions only if the entire interstate LMA satisfies the criteria. *Id.* Thus, Washington, D.C., as part of an interstate LMA, qualifies for a waiver only if the entire LMA does. *Id.* at 66796.

An LMA is a joint OMB-DOL delineation, determined based on actual commuting patterns of workers, that reflects "an economically integrated area within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." *Id.* at 66793. Because grouping larger areas can mask tight labor markets in some substate areas, unless grouping is restricted to an economically linked region, it can result in waivers that are insufficiently targeted to fairly assess whether or not jobs are available in a particular labor market. *Id.* at 66793-94, *see also id.* at 66797. Similarly, the LMA definition also ensures that the availability of sufficient jobs is evaluated not by looking solely to the jobs in a particular county or town, but also to jobs within a reasonable commuting distance that may exist across state, county, or municipal boundaries. *Id.* at 66795; *see also id.* at 66796 (concluding that "individual jurisdictions . . . should not receive waivers if there are jobs available in a nearby jurisdiction"). Further, use of LMAs fosters the PRWORA's goal of transitioning individuals from welfare to work. *See id.* at 66795.

In revising its interpretation of "area," USDA rejected comments that States should retain the ability to self-define waiver areas. USDA pointed to the absence of a statutory definition of "area" and its experience with waivers that grouped jurisdictions in a manner unrelated to job markets. *Id.* at 66794. It also considered specific objections to LMAs—including whether they do not reflect commuting patterns for ABAWDs—and several alternative delineations. *Id.* at 66794-75. But it concluded that LMAs are the "best available" delineation that would both identify

economically integrated areas and address the agency's concerns with State flexibility.  *Id.* at 66795.

The LMA definition also prohibits statewide waivers unless all LMAs within a State individually qualify for a waiver.  *Id.* at 66797.  USDA rejected the use of statewide waivers because "statewide data may mask tight labor markets in some substate areas."  *Id.*

iii.    Finally, the Rule restricts carryover of discretionary exemptions.  Over time, certain States accumulated an extremely high number of exemptions; by USDA's count, States had more than five times as many carryover exemptions as they earned in FY2019.  USDA viewed the retention of exemptions at such levels as inconsistent with Congress's expressed intention to limit discretionary exemptions to a small percentage of covered individuals and an "unintended outcome" of the 2001 Regulation.  *Id.* at 66802.

In response to comments, USDA substantially modified the Proposed Rule to allow greater retention of discretionary exemptions while still prohibiting unlimited carryover.  *Id.*  Under the Final Rule, States may carry over one year's worth of exemptions, meaning that States can retain unused exemptions capped at the number of earned exemptions from the prior fiscal year, or 12% of covered individuals.  *Id.*  The cap effectively bars States from retaining previously stockpiled exemptions beyond the end of FY2020.  *Id.*  While USDA acknowledged that discretionary exemptions allow States "to deal with . . . quickly changing circumstances," it concluded that the modifications in the Final Rule effectively balanced this need with Congress's intent to limit the amount of discretionary exemptions.  *Id.* at 66803.

5.    *The Families First Coronavirus Response Act*

On March 18, 2020, the President signed the Families First Coronavirus Response Act ("FFCRA") into law.  Pub. L. No. 116-127, 134 Stat. 178 (2020).  In relevant part, the FFCRA

14

suspends the ABAWD time limit due to the ongoing COVID-19 pandemic, except in certain limited circumstances. FFCRA § 2301.[6]  The suspension shall remain in force through the end of the month subsequent to the month the public health emergency declaration by the Secretary of Health and Human Services related to an outbreak of COVID-19 is lifted.  FFCRA § 2301.

## PROCEDURAL BACKGROUND

This consolidated action encompasses two cases, *District of Columbia v. USDA*, No. 1:20-cv-00119 and *Bread for the City v. USDA*, No. 1:20-cv-00127.  The plaintiffs in *District of Columbia*—a coalition of 19 States, the District of Columbia, and New York City (the "State Plaintiffs")—challenge the Final Rule under the Administrative Procedure Act ("APA").[7]  The plaintiffs in *Bread for the City* (the "BFC Plaintiffs," and collectively with the State Plaintiffs, "Plaintiffs") assert partially overlapping APA claims.

Both sets of Plaintiffs moved for a preliminary injunction.  On March 13, 2020, the Court granted the BFC Plaintiffs' motion and granted in part the State Plaintiffs' motion.  Order, ECF No. 50.  Specifically, the Court issued a nationwide injunction as to the Final Rule's revisions to the waiver scheme, but declined to enjoin the provisions governing discretionary exemptions.  *See, e.g.*, *District of Columbia v. USDA*, --- F. Supp. 3d ---, 2020 WL 1236657, at *2 (D.D.C. Mar. 13, 2020), [hereinafter *D.C.*], *appeal docketed*, No. 20-5136 (D.C. Cir. 2020).  Defendants produced an administrative record comprising nearly 180,000 pages of materials.  *See* ECF No. 91-2.  The parties have now cross-moved for summary judgment.

---

[6] Specifically, an ABAWD may only be rendered ineligible as a result of the time limit if (i) he or she is offered by a State a slot in a work or workfare program and (ii) subsequently fails to comply with the requirements of that program, and (iii) the State determines that the ABAWD did not have good cause for the failure to comply.  *See* USDA FNS, *SNAP-Families First Coronavirus Response Act and Impact on Time Limit for Able-Bodied Adults Without Dependents (ABAWDs)*, https://www.fns.usda.gov/snap/ ffcra-impact-time-limit-abawds (Mar. 20, 2020).

[7] "State" is defined to include the District of Columbia.  *See* 7 U.S.C. § 2012(r).

**LEGAL STANDARD**

"In actions under the APA, summary judgment is the appropriate mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 45 (D.D.C. 2013) (citation omitted). The Court "sits as an appellate tribunal to review the purely legal question of whether the agency acted in an arbitrary and capricious manner." *Franks v. Salazar*, 816 F. Supp. 2d 49, 55-56 (D.D.C. 2011) (citation omitted). The Court's review "is limited to the administrative record," *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)), and its role is restricted to "determin[ing] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation omitted). The plaintiff bears the burden of proving "how the decision was arbitrary and capricious." *Safari Club*, 960 F. Supp. 2d at 45.

**ARGUMENT**

**I.    THE RULE IS A REASONABLE INTERPRETATION OF THE PRWORA AND THE BBA.**

The two-part *Chevron* framework governs USDA's construction of the relevant statute. *See, e.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 19-20 (D.C. Cir. 2019). Under that framework, the Court must first determine, using traditional tools of statutory construction, "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984). If Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843. If, however, Congress was "silent or ambiguous with respect" to the challenged issue, the Court then assesses whether the agency's interpretation "is based on a

16

permissible construction of the statute." *Id.* at 843.  The Court must defer to USDA's interpretation

of the statute if it is reasonable "even if the agency's reading differs from what the court believes

is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,

545 U.S. 967, 980 (2005).[8]

The State Plaintiffs argue that three provisions in the Final Rule fail at *Chevron* step one—

the revisions to the waiver criteria, the definition of an "area" as an LMA, and the prohibition on

indefinite carryover of discretionary exemptions.  State Pls.' Mot. for Summ. J. at 13-23, ECF No.

65 ("State Mem.").  But the State Plaintiffs cannot show, as they must, that their reading is "the

only possible interpretation." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998) (citations

omitted).  As the statutory language reveals, Congress left ambiguities in the statutes, which are

administered by USDA, with the understanding "that the ambiguity would be resolved, first and

foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree

of discretion the ambiguity allows." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996).

Because, at step two, the Rule is "within the bounds of reasonable interpretation," *City of Arlington

v. FCC*, 569 U.S. 290, 297 (2013), it is a permissible construction of the statute.

A.     **USDA's Interpretations of the Waiver Provisions Are Reasonable.**

Under *Chevron* step one, the Court must "determine whether the language at issue has a

---

[8] The BFC Plaintiffs' argument that the Court should not apply *Chevron* deference because "the substantive provisions of the Final Rule derive from a policy question, not a statutory interpretation," BFC Mot. for Summ. J. ("BFC Mem.") at 22-24, ECF No. 66, is premised on a plain misunderstanding of *Chevron*.  "[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely on the incumbent administration's views of wise policy to inform its judgments." *Chevron*, 467 U.S. at 865; *see also D.C.*, 2020 WL 1236657, at *9 ("'[A]gencies are free to change their existing policies,' . . . as long as agencies provide a reasoned explanation for the change' and ground the change in a reasonable interpretation of the governing statute." (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016))).

plain and unambiguous meaning with regard to the particular dispute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The Court asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

The waiver provisions of the PRWORA provide in relevant part that "[o]n the request of a State . . . , the Secretary may waive the applicability of [the ABAWD work requirement] to any group of individuals in the State if the Secretary makes a determination that the area in which the individuals reside . . . has an unemployment rate of over 10 percent" or "does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A). These provisions cannot be properly understood absent the broader context, structure, and logic of the waiver provision. *See, e.g., CREW v. FEC*, 316 F. Supp. 3d 349, 387 (D.D.C. 2018).

The PRWORA starts with a baseline that all ABAWDs are presumptively subject to a time limit unless they satisfy a work requirement. 7 U.S.C. § 2015(o)(2). Although Congress provided for both "exception[s]" to the time limits in § 2015(o)(3) and "waiver[s]" of the time limits in § 2015(o)(4),[9] the language that Congress used in the waiver provision suggests that it "desired the agency . . . to possess [a broad] degree of discretion" in deciding whether waivers are appropriate. *See Smiley*, 517 U.S. at 740-41; *see also* 7 U.S.C. § 2015(o)(4) ( "[T]he Secretary *may* waive the applicability of [the work requirement] to any group of individuals in the State." (emphasis added)); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Dole*, 919 F.2d 753, 756 (D.C. Cir. 1990) (discussing similar "may waive" language). When Congress spoke to the circumstances in which waivers may be exercised, it was in limiting their applicability, establishing conditions precedent that must be met before any waivers could be

---

[9] As discussed *supra*, Congress later provided States with discretionary "exemptions" to the statute as well. *See id.* § 2015(o)(6).

granted.  7 U.S.C. § 2015(o)(4)(A).  The PRWORA's "language is a plain and explicit bar to the" prolonged receipt of SNAP benefits without working—only limited specific "situations are exempted."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971).  The PRWORA "indicates that" applying the work requirement "was to be given paramount importance."  *Id*. at 411, 412-13.

Notwithstanding that context, the State Plaintiffs raise two arguments that § 2015(o)(4) unambiguously forecloses USDA's approach.  First, despite consistent agency practice granting waivers for lack of sufficient jobs on the basis of an area's general unemployment rate alone, they contend that the statute unambiguously forecloses USDA from doing just that.  State Mem. at 13. Second, they argue that the PRWORA unambiguously bars USDA from defining waiver areas using a statistical delineation that bears a real and substantial relationship to job markets.  *Id.* at 15.  Instead, they insist that the statute requires USDA to rely on areas defined by arbitrary political boundaries crossed by workers every day and that can be combined in ways that are unrelated to job markets to determine whether an "area" lacks sufficient jobs.

Both arguments must fail.  In light of context and the lack of language directing the Secretary's exercise of his discretion, Plaintiffs' assertion that USDA was statutorily foreclosed from issuing the Final Rule is wholly lacking in merit.

> 1.    *USDA's Interpretation of "Sufficient Number of Jobs" is Consistent with Congressional Intent.*

Defendants agree with the State Plaintiffs that "[t]he Statute commands USDA to ask"— or more correctly, to both ask and answer, *see* 7 U.S.C. § 2015(o)(4)(A)—"a simple question: are there insufficient jobs to provide employment for a group of ABAWDs in the area where they reside."  State Mem. at 13.  But precisely because the statute is silent as to *how* to ask or answer that question, and because there are any number of ways that USDA could do so, that task is the

"antithesis of a *Chevron* step one statutory directive." *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1164 (D.C. Cir. 2015); *see also See D.C.*, 2020 WL 1236657, at *15 n.13.

Accordingly, the analysis moves to *Chevron* step two, and the Court must "defer to [USDA's] interpretation unless it is 'arbitrary and capricious in substance, or manifestly contrary to the statute.'" *Mozilla*, 940 F.3d at 47 (citation omitted).  To fail at *Chevron* step two, the rule must bear no relationship to any recognized concept of the statutory task at hand.  *See e.g., Batterton v. Francis*, 432 U.S. 416, 428 (1977) (cited in *Chevron*, 467 U.S. at 844 n.12) (agencies may not "adopt a regulation that bears no relationship to any recognized concept of" the statutory term); *AT&T v. United States*, 299 U.S. 232, 236-37 (1936) (cited in *Chevron*, 467 U.S. at 844 n.12) ("[w]hat has been ordered must appear 'so entirely at odds with fundamental principles" of the statute being administered "as to be the expression of whim rather than an exercise of judgment").  "That is not a high bar for the [USDA] to clear." *Ill. Pub. Telecomm'ns. Ass'n v. FCC*, 752 F.3d 1018, 1025 (D.C. Cir. 2014).  It has done so here.

  a.    USDA's reliance on general unemployment data to measure sufficient jobs for ABAWDs is reasonable at *Chevron* step two.

USDA's use of unemployment data for the general public to define sufficient jobs is substantively reasonable for several reasons.  First, it is supported by longstanding agency practice. Second, the general unemployment rate is a reasonable proxy for the ABAWD population's job prospects in light of USDA's authority to select an administrable standard based on reasonable approximations, not scientific exactitude.  And third, the administrative record supports USDA's conclusion that there is no objective and reliable measure available for determining the number of jobs specifically for ABAWDs in any given area.[10]

---

[10] Although "the analysis of an agency's statutory interpretation at *Chevron* step two has some overlap with arbitrary and capricious review[,] . . . 'the Venn diagram of the two inquiries is not a

*First*, the State Plaintiffs argue that the Final Rule's "near-total reliance on unemployment rates cannot be squared with" the statute because the determination of whether sufficient jobs exist for ABAWDs "cannot be found in a *general* unemployment rate alone." State Mem. at 13. That claim is inconsistent with longstanding agency practice defining sufficient jobs for ABAWDs under clause (ii) of § 2015(o)(4)(A) by reference only to information regarding the general labor force. To be sure, the 2001 Regulation permits States to demonstrate a lack of sufficient jobs using any of six different criteria. But USDA has always understood the 2001 Regulation to permit a determination of job sufficiency to be made based on the general unemployment rate *alone*. *See* 7 C.F.R. 273.24(f)(2)(ii). Indeed, all of the criteria for showing a lack of sufficient jobs (with the potential exception of academic studies) necessarily rely on information that is tied to the general population. That is, of course, no surprise because there is "no measure available for determining the number of available jobs specifically for ABAWDs." Final Rule, 84 Fed. Reg. at 66787. If the general unemployment rate is a measure that is "so general that the ABAWD unemployment rate is essentially not counted," *D.C.*, 2020 WL 1236657, at *16 n.14, then so too are any of those measures. Yet Plaintiffs do not dispute that job sufficiency determinations under the 2001 Regulation are consistent with the statute.

---

circle.'" *Mozilla*, 940 F.3d at 49 (quoting *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017)). In cases like this one, an agency's reasoned justifications for a rule may satisfy both the arbitrary and capricious standard and *Chevron* step two's reasonableness requirement. *See Pharm. Res. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 208-212 (D.C Cir. 2015). By contrast, an agency's procedural error in failing to take a hard look at an issue would not dictate the substantive "bounds of reasonable interpretation" that "Congress . . . desired the agency (rather than the courts) to possess." *City of Arlington*, 569 U.S. at 296 (quoting *Smiley*, 517 U.S. at 740-41); *see also Mozilla*, 940 F.3d at 49 (agency interpretation was "a reasonable interpretation . . . for purposes of *Chevron*[, b]ut aspects of the . . . decision are still arbitrary and capricious under the [APA]" for failure to take a hard look at two issues); *Little Sisters of the Poor v. Pennsylvania*, --- S. Ct. ---, 2020 WL 3808424, at *23 (July 8, 2020) (Kagan, J., concurring) (concluding statutory construction was within agency discretion but noting "administrative law's demand for reasoned decisionmaking . . . remains open for the lower courts to address").

What is more, regardless of the availability of other criteria, the record shows that USDA has in recent years almost universally used general unemployment rates to determine insufficient jobs under clause (ii). *See, e.g.,*, ABAWD00000412 ("the vast majority of waived areas qualified for a waiver using the 20 percent standard" and remainder "qualified as LSAs").[11]  In fact, virtually every waiver based on a lack of sufficient jobs has been authorized under the 20% standard, LSA designation, or qualification for extended unemployment benefits—all of which turn on unemployment rates for the general labor force.  *See, e.g.*, Proposed Rule, 84 Fed. Reg. at 985 (noting that other criteria had been "rarely used"); *see also* Final Rule, 84 Fed. Reg. at 66791 (same).[12]  But if the statute prohibited USDA from relying on such data alone to analyze the ABAWD job market under clause (ii), then all of these waivers would have been invalidly granted.

*Second*, USDA's longstanding use of general unemployment rates under clause (ii) is consistent with its authority to rely on "'reasonable approximations' based on the 'most reliable data available'" to balance "accuracy against . . . 'administrative efficiency.'" *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 93 (D.C. Cir. 2020) (citation omitted); *see also Barnhart v. Thomas*, 540 U.S. 20, 28 (2003) (agencies may use easily "workable prox[ies] that avoid[] . . . more expansive and individualized" standards that may effectuate "'[t]he need for efficiency'" (citation omitted)); *Mayo Found.*, 562 U.S. at 59 (agencies may reasonably set standards to ensure

---

[11] *See also* ABAWD00003126-30 (FY2017 Alaska); ABAWD00003146-49 (FY2017 California); ABAWD00003169-78 (FY2017 Connecticut); ABAWD00003180-89 (FY2017 D.C.); ABAWD00003190-202 (FY2017 Georgia); ABAWD00003263-79 (FY2017 Massachusetts); ABAWD00003300-15 (FY2017 Michigan); ABAWD00003356-93 (FY2017 New York)

[12] Extended unemployment benefits can be triggered if a State's total unemployment rate or its insured unemployment rate reaches certain thresholds. *See, e.g.*, Julie M. Whitaker & Katelin P. Isaacs, Cong. Rsch. Serv., RL34340, *Extending Unemployment Compensation Benefits During Recessions* 6 (2013).  While the latter measure is not based on general labor force data—as it excludes various categories of workers including self-employed workers and new entrants and reentrants to the labor force, *see id.*—it is still a measure of the unemployment rate for a population that is no more closely related to ABAWDs than the general public.

"administrability"); *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994) (same). Because no measure of job availability specifically for ABAWDs exists, *see* Final Rule, 84 Fed. Reg. at 66787, it is perfectly reasonable for USDA to not "await the Godot of scientific certainty" and to make job sufficiency determinations "on the basis of 'credible sources of information.'" *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1266 (D.C. Cir. 1980) (discussing statutory best available evidence standard).  USDA is not required to analyze data about job sufficiency specific to the ABAWD population *that does not exist* before being permitted to exercise its discretion to grant a waiver.  *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994); *Indus. Union Dept. AFL-CIO v. Hodgson*, 499 F.2d 467, 474 n.18, 476 (D.C. Cir. 1974); *Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce*, 720 F. Supp. 2d 564, 581 (D.N.J. 2010).

Here, Plaintiffs cannot reasonably dispute that a real and substantial relationship exists between the unemployment rate in a job market and whether there are sufficient jobs in that market for able-bodied adults. *See Batterton*, 432 U.S. at 428.  After all, Congress expressly provided that waivers of the ABAWD-specific time limit may be approved if the area in which the "individuals" reside has a general unemployment rate of 10%, *see* 7 U.S.C. § 2015(o)(4)(A)(i), thereby indicating that the general unemployment rate is a valid proxy for assessing the strength of a job market for ABAWDs.  Moreover, unemployment rates are a natural measure—if not *the* most natural measure—of job availability in a particular area.  "[T]he official unemployment rate . . . is equal to the total number of unemployed persons, as a percent of the civilian labor force."  Final Rule, 84 Fed. Reg. at 66788 n.5.  The higher the unemployment rate in a given job market, the less likely there will be a sufficient number of jobs for those looking for work.  And the lower the unemployment rate, the stronger the bargaining power of workers, and the greater the prospect that

job-seekers—even those with the fewest skills or strongest barriers to obtaining employment—will be able to find work. "Focusing on" the general unemployment rate "is a perfectly sensible way of accomplishing [the] goal" of determining whether there are sufficient jobs for able-bodied adults seeking work. *See Mayo Found*, 562 U.S. at 59; *Batterton*, 432 U.S. at 429-30.

To be sure, USDA has recognized that many ABAWDs face greater challenges in seeking employment than the general workforce. *See* Final Rule, 84 Fed. Reg. at 66787. But as defined by Congress, ABAWDs are exactly what their name says they are—able-bodied adults without dependents. *See* 7 U.S.C. § 2015(o)(3). By definition—and unlike many in the labor force—they are people of prime working age, who are fit for work,[13] and who need not balance the demands of employment with the need to care for a dependent child. *See id*. Indeed, Plaintiffs' suggestions that waivers must be freely approved because of barriers to employment for ABAWDs would apply with equal force to the ABAWD work requirement itself. But in the PRWORA, Congress chose to impose a SNAP eligibility time limit *solely* on ABAWDs, notwithstanding the barriers they may face. That necessarily reflects Congress's judgment that ABAWDs are able to and should work, absent the narrow waiver provision specified by the statute. And by calling them "waivers," USDA reasonably understood that Congress intended them to be "a tightly limited exception to the . . . main rule." *Dole*, 919 F.2d at 759.

Further, receipt of SNAP assistance is not intended to be permanent. SNAP is a program

---

[13] Contrary to the BFC Plaintiffs' suggestions, *see* BFC Mem. at 29 & n.15, a SNAP recipient who suffers from a physical or mental health issue or substance abuse disorder *does not* need to qualify for disability benefits in order to be exempt from the work requirement. The statute "exempts individuals who are 'medically certified as physically or mentally unfit for employment.'" Proposed Rule, 64 Fed. Reg. 70920, 70942 (Dec. 17, 1999) (recognizing that "the language of this exception is more broad" than "disab[ility]"). Thus, a SNAP recipient is not able-bodied if he or she receives disability benefits *or* is "obviously mentally or physically unfit for unemployment as determined by the State agency" *or* provides a mere statement from any one of a long list of persons "that he or she is physically or mentally unfit for employment." 7 C.F.R. § 273.24(c)(2).

designed to provide a temporary economic safety net to those who may fall upon hard times. Accordingly, individuals pass into and out of the SNAP-receiving population, and ABAWDs are not a static population. In fact, at the time the work requirement was imposed, members of Congress recognized that "[e]ighty percent of the able-bodied recipients between the ages of 18 and 50 receive food stamps on a temporary basis already, they leave the program within a year." 142 Cong. Rec. H7762 (July 17, 1996) (statement of Rep. De La Garza). So the bright line Plaintiffs purport to establish between ABAWDs and others is actually quite blurry, and the general unemployment rate is a "reasonable approximation[]" of the sufficiency of jobs for ABAWDs "based on the 'most reliable data available.'" *See Baystate Franklin*, 950 F.3d at 92 (quoting *Methodist Hosp.*, 38 F.3d at 1230).

*Third*, USDA's use of general unemployment rates as a proxy for ABAWD unemployment is reasonable because the record supports—and the parties do not dispute—USDA's finding that "there is no measure available for determining the number of available jobs specifically for ABAWDs participating in SNAP in any given area." *See* Final Rule 84 Fed. Reg. at 66787.

"[T]he focal point for judicial review should be the administrative record," *Camp*, 411 U.S. at 142, and USDA's decision must be "sustainable on the administrative record made," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978) (quoting *Camp*, 411 U.S. at 138). USDA's conclusion that no ABAWD-specific measure of job availability existed is supported by the record because "there was nothing before [USDA] to indicate to the contrary." *Id.* at 553. That absence is particularly telling in an administrative record including over 100,000 comments, the majority of which opposed the Rule. *See Champion v. Shalala*, 33 F.3d 963, 966-67, 966 n.4 (8th Cir. 1994) (reliance on proxy data reasonable though "not a completely accurate reflection of the AFDC population" where "none of the commenters suggested another source of

25

evidence or data").

Thus, the record provides no concrete example as to what alternative ABAWD-specific statistical measure would be adequate in Plaintiffs' estimation. USDA "has no obligation to conduct independent studies" into job market conditions specific to the ABAWD population in the absence of reasonably available credible sources of information. *See Sw. Ctr. for Biological Diversity v. Babbit*, 215 F.3d 58, 60 (D.C. Cir. 2000). The absence from the record of an ABAWD-specific measure undermines the Court's preliminary conclusion that the statute requires USDA to rely on one. *See D.C.*, 2020 WL 1236657, at *16 n.14; *Barnhart*, 540 U.S. at 29 ("proper *Chevron* inquiry is . . . whether, *in light of the alternatives*, the agency construction is reasonable" (emphasis added)); *Batterton*, 432 U.S. at 428 ("statutory term[s are] capable of more than . . . tautological definition[s]").

"The problems of government are practical ones and may justify, if they do not require, rough accommodations." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993) (citation omitted). USDA's standard for determining sufficient jobs for ABAWDs "need not be the best rule conceivable; nor . . . must the rule be perfectly fitted to the problems the agency purports to be addressing." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 783 F. Supp. 1426, 1428 (D.D.C. 1992). Plaintiffs' reasoning to the contrary would "invalidate a vast number of the procedures employed by the administrative state." *Barnhart*, 540 U.S. at 29. USDA's use of a general unemployment rate to determine job sufficiency for ABAWDs is thus substantively reasonable.

> b.    <u>USDA's reliance on general unemployment data is not manifestly contrary to the statute.</u>

The main thrust of the State Plaintiffs' textual argument is that relying on a general unemployment rate to administer clause (ii)'s test for waiver authority is inconsistent with Congress's use of a general unemployment rate for clause (i)'s test. *See* State Mem. at 13-14

26

("[B]y making both prongs of § 2015(o)(4)(A) dependent on unemployment rate, USDA has arbitrarily written this distinction out of the [statute]." (quoting *D.C.*, 2020 WL 1236657, at *16)). But even if this Court believes that Plaintiff's interpretation of clause (ii) is better than USDA's in light of clause (i), USDA's interpretation is not "manifestly contrary to the statute." *Mozilla*, 940 F.3d at 47 (citation omitted).

Under *Chevron* step two, the fact that clause (i) directs the agency to use unemployment rate data does not render the absence of such a requirement in clause (ii) a statutory prohibition on the use of such data. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009) (It "surely proves too much" to argue that "the mere fact that [a statute] does not expressly authorize cost-benefit analysis for [an EPA-administered statutory test] . . . though it does so for two of the other tests, displays an intent to forbid its use."). "It is eminently reasonable to conclude that" clause (ii)'s "silence is meant to convey nothing more than a refusal to tie the agency's hands as to whether" general unemployment rate data "should be used, and if so to what degree." *Id.*; *see also Ala. Power Co. v. Costle*, 636 F.2d 323, 405 (D.C. Cir. 1979) (Congress's use of statutory 100 ton *de minimis* threshold for one pollution regulation did not prohibit EPA from using same standard for different pollution requirement without statutorily explicit *de minimis* standard; holding "only that the Agency must follow a rational approach to determine what level of emission is a *de minimis* amount").

Nor does the use of unemployment rates in clause (i) and clause (ii) read the distinction between the two tests out of the statute because the two clauses have distinct threshold requirements and thus can apply in different circumstances. For example, areas qualify under clause (i), but not clause (ii) regardless of the national average employment rate. Similarly, clause (ii) can be satisfied in circumstances that do not meet clause (i)'s 10% unemployment standard.

USDA's authority to consider unemployment rates in clause (ii) is bolstered by the agency's longstanding practice, under which it has approved clause (ii) waivers on the basis of general unemployment data alone—a practice Congress has never even attempted to modify. Indeed, prohibiting the agency from doing so would threaten to make clause (ii) unadministrable with USDA's existing resources.  If Plaintiffs are correct that sole reliance on unemployment data for determining sufficient jobs under clause (ii) is inconsistent with clause (i), the same would go for each individually granted waiver that relied solely on unemployment data over the past several decades, regardless of whether the 2001 Regulation authorized the use of other criteria in making that determination.  *See supra* pp. 21-22.

The legislative history also directly supports USDA's interpretation.  The 1996 House Report explained the purpose of § 2015(o)(4)(A) as follows:

> The Committee understands that there may be instances in which high unemployment rates in all or part of a state or other specified circumstances may limit the jobs available for [ABAWDs].  Therefore the Secretary, upon request from a state, is provided with the authority to waive job requirements *in these circumstances or* if unemployment rates are above 10 percent.

H.R. Rep. No. 104-77 at 43 (emphasis added).  The Report indicates that USDA may issue waivers in two scenarios: (1) "in these circumstances"—*i.e.*, "instances in which high unemployment rates" or "other specified circumstances" limit jobs for ABAWDs—or (2) if unemployment rates are above 10%.  *Id.*  In other words, because "high unemployment rates" is a valid basis for a waiver under clause (ii) distinct from "unemployment rates . . . above 10 percent," *id.*, the legislative history "confirms what the text suggests."  *Lipton v. EPA*, 316 F. Supp. 3d 245, 252 (D.D.C. 2018).

### 2.    USDA Reasonably Aligned the Term "Area" with Job Markets.

Section § 2015(o)(4)(A) provides that the Secretary "may waive" the time limit  "to any group of individuals in the State if" he determines "that the area in which the individuals reside

. . . has an unemployment rate of over 10 percent" or "does not have a sufficient number of jobs to provide employment for the individuals." The statute does not define "area" or "area in which the individuals reside." *See id.* § 2012 (definitions). And nothing in the statute suggests that these gaps are for the States to fill. What is more, the statute's focus on jobs and employment indicates that USDA should rationally consider whether there is a real and substantial relationship between a waiver "area" and a job market in determining if an area has sufficient jobs for ABAWDs, which it did in tying the "area" to a statistical delineation of economically integrated areas, *i.e.* LMAs.

The State Plaintiffs point out that the statutory language "is not limited to only all ABAWDs living in the expansive boundaries of a particular statistical designation." State Mem. at 15. But neither is it limited to ABAWDs living within arbitrary state or substate boundaries— or arbitrary combinations of substate boundaries determined by States—that bear no relationship to job markets. Like the D.C. Circuit held with respect to the term "geographic area" in the Medicare Act, "[t]he statute leaves considerable ambiguity as to the term ['area'], which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block.'" *Anna Jacques*, 797 F.3d at 1164 (citation omitted). "Congress through its silence delegated these decisions to the Secretary." *Id.* (citation omitted). So too here. *See D.C.*, 2020 WL 1236657, at *15 n.13. Again, the Court must proceed to step two and "defer to [USDA's] interpretation unless it is 'arbitrary and capricious in substance, or manifestly contrary to the statute.'" *Mozilla*, 940 F.3d at 47 (D.C. Cir. 2019) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)). Because LMA boundaries are drawn based on data about where workers actually commute, LMAs reasonably align with job markets at step two.

a.    USDA's definition of an area is not manifestly contrary to the PRWORA and thus survives *Chevron* step two.

USDA's definition of "area" is not contrary to the statute because it is entirely consistent

with the statute's text.  *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388-90 (1999).  To be sure, a waiver may only be issued at "the request of a State agency."  7 U.S.C. § 2015(o)(4)(A).  From that language, the State Plaintiffs reason that the statue gives them "the responsibility for designing the request, including selecting for what 'group of individuals' to request a waiver" and thus that the Secretary is purportedly limited to addressing the specific "'group of individuals' for whom the state chose to request a waiver."  State Mem. at 16.  Even if the statute gave States authority to define the group of individuals subject to a waiver, which it does not,[14] it would not mean that the scope of the "*area* in which [those] individuals reside," 7 U.S.C. § 2015(o)(4)(A), must be defined by the States.

Section 2015(o)(4)(A) states that it is the *Secretary* who determines whether to approve a waiver.  This broad delegation of authority to USDA implies that the agency retains the authority to define the scope of the area subject to a waiver approval because information about the labor market characteristics of the "area" where the selected group resides is relevant to the statutory determination about job availability.  And if the State's group of individuals does not align with the areas the Secretary determines to have insufficient jobs, USDA could always "advise [a state] that it would not approve [a request] unless one or more of its provisions was deleted or modified" to conform to the type of request that USDA would consider granting.  *Evans v. Jeff. D.*, 475 U.S. 717, 727 (1986); *see also Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991).

---

[14] The statute says "[o]n the request of a State agency . . . *the Secretary* may waive the applicability of [the work requirement] to any group of individuals in the State."  7 U.S.C. § 2015(o)(4)(A) (emphasis added).  And he may only do so "if *the Secretary* makes a determination that the area in which the individuals reside" has insufficient jobs.  *Id.* (emphasis added).  Because the Secretary, not the State agency, is the subject of the sentence, and also because the determination is the Secretary's to make, the statutory language doubles down on the clarity with which it requires the Secretary, not the State, to define the scope of the group of individuals for whom he may decide to waive the work requirement.  The text of § 2015(o)(4)(A) is divorced from the type of regulatory scheme that the State Plaintiffs describe.

What is more, if States controlled the area subject to a waiver request, the Secretary's authority to "make[] a determination" that, for example, an area has an unemployment rate of over 10%, *see* § 2015(o)(4)(A)(i), would effectively be delegated to States because the statute includes no limitation on how small such an "area" might be. Under the State Plaintiffs' interpretation, a State could submit a waiver request for a group of unemployed neighbors in an "area" consisting of "a city block" with an unemployment rate over 10%, *see Anna Jacques.*, 797 F.3d at 1164 (citation omitted), and USDA would be bound to "make[] a determination" that the area fell into the statute's scope, even if expanding the area by one more block would mean the area had less than 10% unemployment. Taken literally, the State Plaintiffs' reading of the statute would permit States to request waivers in circumstances wholly untethered to the purposes of both the waiver system and the ABAWD work requirement.

When Congress intended State agencies, and not USDA, to exercise discretion in defining § 2015's statutory provisions, it did so clearly. For example, under § 2015(d)(1)(D)(iii)(I), Congress provided that "a State agency shall determine . . . the meaning of any term used in" subparagraph (A) of that subsection. No such language can be found in § 2015(o)(4)(A), which leaves waivers to the Secretary's "determination."

The State Plaintiffs argue that "[r]eading 'area' to refer to *only* an LMA renders the phrase 'any group of individuals' largely meaningless." State Mem. at 16; *see also id.* at 15. Defendants agree that the statute may not be read to *compel* USDA to define an area using LMAs. Instead, Congress explicitly delegated the power to USDA to "*make a determination* that the area in which" "any group" of ABAWDs reside has sufficient jobs to provide them employment. 7 U.S.C. § 2015(o)(4)(A)(ii). And USDA has exercised that authority to set the standard for areas it will consider. *See infra* pp. 34-35.

31

The regulatory history provides no support for the State Plaintiffs' claims either. They argue that "USDA has recognized for more than two decades that 'States may define areas to be covered by waivers.'" State Mem. at 17 (quoting 7 C.F.R. § 273.24(f)(6)). True enough, but USDA did so in its discretion to interpret the statute, not because the statute required it. It never implied that the *only permissible* administrative interpretation of "area" in the PRWORA was that "States may define areas." Rather, USDA has always understood that Congress delegated the definition of area to the agency, and it is only by regulation that USDA established its preexisting policy. *See* Proposed Rule, 64 Fed. Reg. at 70945 ("[T]he Department *is allowing* States broad discretion in defining areas" for waiver requests (emphasis added)); ABAWD00000166 ("Defining an Area: USDA *will give* States broad discretion in defining areas . . ." (emphasis added)). The States' role was a matter of grace, not of right. *Cf. Little Sisters of the Poor*, 2020 WL 3808424, at * 23 (Kagan, J., concurring) ("While the exemption itself has expanded, the Departments' reading of the statutory delegation—that the law gives [the agency] discretion over the 'who' question—has remained the same."). And USDA now sees that policy as misguided, resulting in "areas" defined by boundaries that are untethered to job markets and therefore provide no indication whether or not people living within them are able to meet Congress's work requirement. It is black letter administrative law that USDA has the discretion to change its view on this matter. *See D.C.*, 2020 WL 1236657, at *9 ("[A]gencies are free to change their existing policies." (citation omitted)).

         b.    <u>The LMA definition reasonably aligns waiver areas with job markets.</u>

In the absence of any statutory mandate for USDA to defer to the States, USDA's use of LMAs to define the statute's job market "areas" is reasonable because it relies on statutorily relevant factors. Section 2015(o)(4)(A)(ii) authorizes USDA to waive the work requirement for

SNAP recipients living in an "area" that "does not have a sufficient *number of jobs to provide employment*" for them. (emphasis added). The statute's focus on jobs and employment indicates that USDA should rationally consider whether there is a real and substantial relationship between a waiver "area" and a job market. As USDA explained, an "LMA is an economically integrated area within which individuals can reside and find employment within a reasonable distance or can readily change jobs without changing their place of residence." Final Rule, 84 Fed. Reg. at 66793. Because LMA boundaries are drawn based on data about where workers commute for work, LMAs reasonably align with job markets.

To be sure, LMAs may not be perfectly aligned with job markets solely for ABAWDs. But there is no indication from the record that anything closer to an administrable definition of an ABAWD-labor market area exists. *See* Final Rule, 84 Fed. Reg. at 66793; *id.* at 66794-95 (discussing alternatives); *see also supra* pp. 25-26; *cf. United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 65 (D.D.C. 2011) (Howell, J.) ("[I]t was reasonable to use switching data as a proxy for diversion, *especially since no more refined historical data apparently exists*." (emphasis added)). USDA's use of LMAs is particularly reasonable in light of Plaintiffs' desired alternative: use of civil jurisdictions. The relationship between a civil jurisdiction, which is based on a political boundary, and a job market is so attenuated to perhaps be nonexistent. *Cf. United States v. Crocker-Anglo Nat'l Bank*, 277 F. Supp. 133, 173 (N.D. Cal. 1967) ("[T]he test as to whether any given geographic area is a relevant (economically significant) market . . . is not based on political boundaries, but is based on economic grounds."). People can and do cross these boundaries every day for work. Plaintiffs provide no logical reason why the statute *requires* USDA to permit "areas" to be drawn based on, for example, the border between D.C. and Maryland, when someone living on one side can walk, drive, or take public transportation to find a job on the other side.

3.    *The Secretary Exercised His Discretion to Proceed by Rulemaking Instead of Adjudication.*

The BFC Plaintiffs additionally argue that § 2015(o)(4)(A) prohibits USDA from "promulgating a prospective categorical rule that substantially displaces the waiver adjudication process mandated by statute." BFC Mem. at 9. Specifically, they assert that the statute requires each waiver request to be individually adjudicated, and not decided via rulemaking. *Id.* at 9-10.

But nothing in the statute prohibits USDA from filling the statutory gaps by rulemaking. USDA is expressly authorized to issue rules to administer SNAP. *See* 7 U.S.C. § 2013(c). And it is black letter law that agencies have discretion to proceed by rulemaking or adjudication. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974)) ("[T]he choice made between proceeding by general rule or by individual, ad hoc [adjudication] is one that lies primarily in the informed discretion of the administrative agency." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947))); *see also British Caledonian Airways, Ltd. v. CAB*, 584 F.2d 982, 992-93 & n.22 (D.C. Cir. 1978) (and cases cited therein). In fact, courts recognize the benefits of implementing prospective policy changes using rulemaking instead of adjudication, as the former is more consistent with notice principles underlying due process. *See Chenery*, 332 U.S. at 202 ("The function of filling in the interstices of [a statute] should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future."); *Bell Aerospace*, 416 U.S. at 295 (when prospective policy is done through rulemaking instead of adjudication, the "rulemaking . . . provide[s] the [agency] with a forum for soliciting the informed views of those affected . . . before embarking on a new course.").

The mere fact that the statute provides that USDA is to resolve individual waiver requests is immaterial. "[E]ven if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general

applicability unless Congress clearly expresses an intent to withhold that authority." *Am. Hosp.*, 499 U.S. at 612. Rules may establish "general principles to guide the required case-by-case . . . determinations." *Id.* (citation omitted); *see also Heckler v. Campbell*, 461 U.S. 458, 467 (1983) ("It is true that the [social security disability] statutory scheme contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing . . . [b]ut this does not bar the Secretary from relying on rulemaking to resolve certain classes of issues."); *United States v. Storer Broad. Co.*, 351 U.S. 192, 205 (1956) (FCC may summarily dismiss license applications based on rule limiting station owners to five licenses despite statutory hearing requirement). Courts do not "require [] agenc[ies] continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding." *Heckler*, 461 U.S. at 467. Here, the BFC Plaintiffs point to nothing more than the fact that individual determinations are ultimately required—no different from the provisions the Supreme Court has rejected as insufficient to "clearly express[] an intent to withhold [rulemaking] authority." *Am. Hosp.*, 499 U.S. at 612; *see also Heckler*, 461 U.S. at 467.

### B. The Prohibition on Indefinite Carryover of Discretionary Exemptions is Consistent With Congressional Intent.

7 U.S.C. § 2015(o)(6)(E) allows States each year "to exempt from SNAP program work requirements 12% of" covered individuals. *D.C.*, 2020 WL 1236657, at *10. But § 2015(o)(6)(G) "instructs USDA to adjust this 12% limit annually." *Id.* Specifically, USDA must "increase or decrease the number of individuals who may be granted" a discretionary exemption "to the extent that the average monthly number of exemptions in effect in the State for the preceding fiscal year . . . is lesser or greater than the average monthly number of exemptions estimated for the State agency for such preceding fiscal year." 7 U.S.C. § 2015(o)(6)(G). The statute does not stipulate how USDA must treat a State's failure to use its allotted exemptions for more than one year. As

35

this Court has recognized with respect to that issue, "the statute bears multiple readings and USDA has settled on one permissible reading of the statute"—allowing States to carry over only one year's worth of unused exemptions.  *D.C.*, 2020 WL 1236657, at *11.

The State Plaintiffs contend that the Rule's prohibition on the indefinite carry-over of unused exemptions "contravenes the statutory text and Congress's clearly articulated intent."  State Mem. at 18-21.  But tellingly, they point to no text in the statute that entitles States to indefinitely stockpile unused exemptions for use at any point in the future.  *See id*.[15]  If anything, the statute *precludes* indefinite carryover because it permits USDA to adjust a State's exemptions "to the extent that the average monthly number of exemptions *in effect* in the State *for the preceding fiscal year* under this paragraph is lesser or greater than the average monthly number of exemptions

_____

[15] Relying on *Arkema Inc v. EPA*, 618 F.3d 1, (D.C. Cir. 2010), State Plaintiffs argue that USDA's new interpretation "may not be applied to extinguish exemption balances."  State Mem. at 22-23. In *Arkema*, the court addressed regulations issued under Title VI of the Clean Air Act, which gradually phases out hydrofluorocarbons ("HCFCs") by annual percentage reductions against a baseline year.  *Id*. at 3.  In 2003, EPA had established baseline HCFC consumption allowances for each regulated entity, allocating allowances based on regulated company pollution during years 1989-1994.  *Id*.  But, in 2010, EPA issued a rule effectively modifying that baseline allocation among companies that had traded their baseline allocations, which the D.C. Circuit held was a "retroactive[]" operation that "t[ook] away or impair[ed] vested rights."  *Id*. at 7; *id.* at 10 ("The Final Rule is impermissibly retroactive not because it unsettled Petitioners' expectations . . . but quite simply because it attempted to undo the Petitioners' inter-pollutant baseline transfers.").  In other words, EPA had effectively "regulate[d] past transactions," *Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996).

In contrast to Title VI of the Clean Air Act, which contemplated a vested market share of HCFCs from which each company received annually reduced allowances, § 2015(o)(6) only contemplates that a State may exempt 12% of its ABAWDs each year, and requires USDA to annually "adjust" that amount to account for the previous year.  As this Court has recognized, *see D.C.*, 2020 WL 1236657, at *11 n.10, neither the statute nor the Rule "regulate[s] past transactions."  *Bell Atl.*, 79 F.3d at 1207.  Instead—consistent with the statute—the Rule regulates only how USDA will determine exemptions in the future.  *See id.* ("The . . . rules do not regulate past transactions; they regulate future rates.").  That the new regulation may have "unsettle[d the States'] expectations," does not make it retroactive.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 n.24 (1994).  In fact, the Rule permits States to use accumulated exemptions in FY2020 without impact on its earned exemptions in the future.  *See infra* pp. 65-66.

estimated for the State agency *for such preceding fiscal year* under" the discretionary exemption paragraph.  7 U.S.C. § 2015(o)(6)(G)  (emphases added).  Contrary to the States' argument, the fact that the statute may be "referring to the number computed under *all* of paragraph (6)," State Mem. at 19, does nothing to alter the statute's focus on the "preceding fiscal year." 7 U.S.C. § 2015(o)(6)(G).  The language certainly does not suggest that USDA *must* credit unused exemptions for all prior years.  *See D.C.*, 2020 WL 1236657, at *10-11.

The State Plaintiffs' reading ignores not only Congress's directive to account for exemptions "in effect" during the "preceding fiscal year" in making adjustments, but also its decision to grant States only a limited amount of exemptions each year.  *See* 7 U.S.C. § 2015(o)(6)(E); *CREW*, 316 F. Supp. 3d at 387 ("To determine the plain meaning of a statute, the court must look . . . to the language and design of the statute as a whole." (citation omitted)); *see also* ABAWD00000294 (finding that allowing indefinite carryover had let States accumulate exemptions worth an estimated $960 million in SNAP benefits by 2016 and permitted one State to exempt all of their "ABAWDs from the time limit and work requirement for over 1 year, which may not meet the intent of the statute").  It also conflicts with the primary purpose of the PRWORA itself: ensuring that ABAWDs engage in meaningful work activity.  *See* 7 U.S.C. § 2015(o)(2).

At bottom, § 2015(o)(6)(G) only directs USDA to adjust a State's exemptions based on its use in "the preceding fiscal year."  It does not unambiguously require USDA to permit States to carry over unused exemptions from prior years.  Because of the statute's ambiguity, USDA reasonably interpreted it to restrict the indefinite carryover of unused exemptions.[16]

---

[16] The number of exemptions that a State may issue each year is based on the number of covered individuals in the State during that same year—a number that may not be precisely known until appropriate accounting.  *See* 7 U.S.C. § 2015(o)(6).  Accordingly, another plausible reading of the § 2015(o)(6)(G) adjustment provision, in light of that uncertainty, is to do nothing more than reconcile the actual number of exemptions a State may issue each year with those estimated.  *See*

### C.    Subsequent Legislative History From 2018 Is an Unreliable Guide to the PRWORA, a Statute Passed in 1996, and Should be Disregarded.

The State Plaintiffs' resort to subsequent legislative history from the 2018 Farm Bill, *see* State Mem. at 14, 17, 20-21 (citing H.R. Rep. No. 115-1072 (2018) (Conf. Rep.))—legislation from more than 20 years after Congress enacted the statute at issue in this case—is unpersuasive. Because some provisions in the House version of the 2018 Farm Bill that were not included in the final bill are similar to aspects of the Final Rule, the State Plaintiffs argue that those aspects of the Final Rule are inconsistent with the PRWORA and the BBA. This argument fails for two reasons.

First, the 2018 Conference Report constitutes subsequent legislative history, and "[a]rguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote." *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring). This Court recognized this principle with respect to the Rule's discretionary exemption provisions. *See D.C.*, 2020 WL 1236657, at *11 (citing *Pierce v. Underwood*, 487 U.S. 552, 566 (1988)). That reasoning applies with equal force to the Rule's waiver provisions. *See Consumer Prod. Safety Comm'n v. GTW Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980); *Verizon v. F.C.C.*, 740 F.3d 623, 639 (D.C. Cir. 2014); *Eagle Pharm. Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020)).

*Council for Urological Interests v. Burwell*, 790 F.3d 212 (D.C. Cir. 2015) does not support an exception to this rule. *See D.C.*, 2020 WL 1236657, at *17. In that case (which has no majority opinion), a 1993 Conference Report was deemed persuasive in explaining the meaning of a statute because Congress in that year made substantial amendments to the pertinent provisions, *see* 790 F.3d at 231 (Henderson, J., dissenting in part), and "whenever Congress amends a statutory

---

ABAWD00000189 (describing methodology for generating estimates of covered individuals).

provision, a significant change in language is presumed to entail a change in meaning." *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (citation omitted). Here, however, Congress only changed 7 U.S.C. § 2015 in 2018 to reduce the discretionary exception percentage from 15% to 12%—hardly a significant change in language and one that in any event has nothing to do with the waiver provisions under § 2015(o) from 1996.

Second, the 2018 Conference Report is not inconsistent with USDA's rulemaking. As the Report indicates: "The Conference [Committee] substitute adopts the House provision with amendments. The amendments retain the general work requirement and ABAWD work requirement in current law." 164 Cong. Rec. H9823, H9977 (Dec. 10, 2018). And as Defendants have explained, "current law,"—*i.e.*, the PRWORA—unlike the House bill, provides USDA broad discretion to set standards for evaluating the strength of ABAWD job markets.[17]

The State Plaintiffs can only speculate as to why the House provisions were not included in the final 2018 Farm Bill.[18] The choice to omit those provisions is also consistent with a determination that USDA already had authority to accomplish much of what was proposed and that political capital might be better spent advocating for other provisions. *See Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs,* 531 U.S. 159, 170 (2001) ("A bill can be proposed for any number of reasons, and it can be rejected for just as many others."). Indeed, several *amici*

---

[17] The State Plaintiffs also cherry pick language from the Conference Report. In arguing that the Report prevents USDA from limiting State discretion in the waiver provisions, they point out that the Report says "neither the Department nor Congress can enumerate every ABAWD's situation as it relates to possible exemption from the time limit, and subsequently, the work requirement." State Mem. at 14 (quoting H.R. Rep. No. 115-1072 at 616). But that text refers to the reasons why Congress "maintain[ed] the ability to exempt up to 12% of their SNAP population" under the discretionary exemption provisions of 7 U.S.C. § 2015(o)(6). *See* 164 Cong. Rec. at H9978. The language does not refer to the waiver provisions at all. *See id.*

[18] The same goes for the 116th Congress's House of Representatives speculation as to the intent of the 115th Congress's intent. *See* Brief of U.S. House of Representatives as *Amicus Curiae* in Support of Plaintiffs at 21-22, ECF No. 81.

argue that the President only signed the 2018 Farm Bill because he understood that it did not affect USDA's discretion under the PRWORA to address work requirement waiver issues through regulation. *See* Brief of Impact Fund, *et al*. as *Amici Curiae* at 9, ECF No. 71. Congress could have clarified—but did not—that USDA lacks authority to implement the House bill's provisions by amending the statute. The cited 2018 legislative history is not authoritative as to the meaning of the 1996 PRWORA since, in the words of the *Pierce* Court:

> "[I]t is not an explanation of any language that the [2018] Committee drafted, because on its face it accepts the [1996] meaning of the terms as subsisting, and because there is no indication whatever in the text or even the legislative history of the [2018] reenactment that Congress thought it was doing anything insofar as the present issue is concerned except reenacting and making permanent the [1996] legislation."

487 U.S. at 566-67; *see also Int'l Brotherhood of Elec. Workers No. 474, AFL-CIO v. NLRB*, 814 F.2d 697, 700, 709-10 (D.C. Cir. 1987) (where amendments to statute "did *nothing* to modify" section under which agency "possesses broad discretion," amendments cannot have "changed . . . standards under the Act" notwithstanding legislative history of amendment).

If the PRWORA's original meaning is to be found in any legislative history, it is legislative history from the 104th Congress. And proponents of welfare reform from that Congress shed light on the PRWORA's underlying purposes that USDA is validly furthering in the Final Rule. *See, e.g.*, 142 Cong. Rec. H9393 (1996) (statement of Rep. Soloman); *id.* at H9396 (statement of Rep. Pryce); *id.* at H9411 (statement of Rep. Riggs).

## II.   THE FINAL RULE IS THE PRODUCT OF REASONED DECISIONMAKING.

In addition to their statutory claims, Plaintiffs challenge the Final Rule as arbitrary and capricious under 5 U.S.C. § 706(2)(A). The arbitrary or capricious standard is a "very deferential scope of review." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (citation omitted). A court must presume that the agency's decision is valid and may not "substitute its judgment for

that of the agency." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is not arbitrary or capricious if the agency has considered the relevant factors and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation omitted). The party challenging the action bears the burden of showing that it "is not a product of reasoned decisionmaking." *Van Hollen*, 811 F.3d at 495 (citation omitted). The Final Rule passes muster under this highly deferential standard.[19]

**A. USDA's Revisions to the Waiver Scheme Are a Reasonable Response to Problems with the 2001 Regulation.**

The Final Rule is a reasonable exercise of USDA's broad discretion to define the parameters of the waiver scheme. The agency's revisions to that scheme are consistent with the statutory objectives of the PRWORA and well-supported by the administrative record.

*1. USDA Adequately Justified Its Revisions to the Waiver Criteria.*

In the Final Rule, USDA functionally redefined the standard for a lack of sufficient jobs (where BLS data are available) to require showing that the area meets the 20% standard and also has an average unemployment rate that is at least 6%. 84 Fed. Reg. at 66784. USDA determined that the other criteria in the 2001 Regulation should be eliminated because they are either insufficiently tied to job markets and thus conflict with the revised definition of a waiver area, *see id.* at 66790, 66800, or are subjective, non-standard, of ambiguous value, and/or rarely used, *id.* at 66790-91. It also concluded that adding an unemployment floor ensures that the 20% standard has an objective measure of job insufficiency. Plaintiffs' challenges to that determination fail.

---

[19] As discussed above, USDA's interpretations of the PRWORA and the BBA should be upheld under the *Chevron* framework. *See supra* Pt. I. USDA's interpretations are reasonable for the same reasons that the Rule is not arbitrary and capricious. *See supra* pp. 20-21 n.10 (explaining overlap between *Chevron* step two and arbitrary and capricious standards).

i.      Plaintiffs principally argue that unemployment rates for the general public are an improper standard for assessing a lack of sufficient jobs for ABAWDs.  *See* State Mem. at 25-27; BFC Mem. at 26-31.  They argue that ABAWDs face barriers to employment greater than those that apply to the general public, which render general unemployment rates inapposite to ABAWDs. State Mem. at 26-27; BFC Mem. at 27-30.  Because the Final Rule eliminated the other waiver criteria from the 2001 Regulation, Plaintiffs claim that it unreasonably collapses the sufficiency of jobs inquiry to a singular focus on general unemployment rates.  State Mem. at 27; BFC Mem. at 30; *see also D.C.*, 2020 WL 1236657, at *15-16.[20]

It has never been understood that USDA is limited to considering waivers based on measures of available jobs specific to ABAWDs because no such measure exists.  *See* Final Rule, 84 Fed. Reg. at 66787.  Rather, it has always looked to measurements of general labor market strength as proxies for ABAWD job availability.  *See supra* pp. 21-22.  The use of general

---

[20] Throughout their briefs, Plaintiffs rely on extra-record evidence to attempt to bolster their arguments, particularly regarding barriers to employment for ABAWDs, *see, e.g.*, State Mem. at 3-4; BFC Mem. at 28 n.13, 42 n.22, and the impacts of the COVID-19 pandemic, *see, e.g.*, State Mem. at 1, 24, 26 n.3, 29, 36; BFC Mem. at 40 n.21, 43.  Under the APA, however, the Court's review is limited to "the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997); *see also Long v. HHS*, 422 F. Supp. 3d 143, 156-57 (D.D.C. 2019) (plaintiff could not submit extra-record declarations to support substantive arguments in APA case), *appeal docketed*, No. 19-5358 (D.C. Cir. Dec. 19, 2019). None of these declarations were submitted to the agency at the appropriate time, *i.e.*, the notice-and-comment period.  Nor do Plaintiffs even attempt to identify a basis for the Court to consider these materials.  Accordingly, they should be disregarded.

Furthermore, Plaintiffs' attempts to undercut the Rule by claiming that certain States may not qualify for waivers under the Final Rule even during the COVID-19 pandemic, *see* State Mem. at 1, 25, 26 n.13, 29; BFC Mem. at 40 n.21, are not only procedurally improper but also substantively incorrect.  The FFCRA, enacted in March 2020, has suspended the ABAWD time limit (subject to a very limited exception).  FFCRA § 2301.  In any event, even absent the FFCRA, the Final Rule allows States to seek waivers based on data or evidence beyond the core standards for approval in exceptional circumstances, expressly to "maintain a level of flexibility to approve waivers as needed in extreme, dynamic circumstances."  84 Fed. Reg. at 66791-92.

unemployment rates as a proxy is reasonable as they are a natural measure of assessing job availability in a particular job market; consistent with Congress's decision to link general unemployment rates to the strength of a job market for ABAWDs; and bolstered by two-decades' worth of waiver requests that USDA has approved on the basis of unemployment rates for the general labor force. *See id.*

Plaintiffs argue that the criteria from the 2001 Regulation that are omitted paint a clearer picture of the job market specific to ABAWDs than general unemployment rates, *see* State Mem. at 27-29; BFC Mem. at 25, but Plaintiffs may not substitute their own judgment for the agency's view as to what the best proxy is. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019) (court cannot "second-guess[] the Secretary's weighing of risks and benefits" and "substitute [its] judgment for that of the agency"). In any event, USDA explained why each of the omitted criteria should be excluded from the Final Rule. LSA-designation and qualification for extended unemployment benefits, *see* State Mem. at 28-29; BFC Mem.at 43-44, conflict with the Rule's definition of a waiver area. *See* Final Rule, 84 Fed. Reg. at 66789-90 (extended unemployment benefits qualification conflicts with Rule's general bar on statewide waivers as insufficiently tied to job markets); *id.* at 66800 (LSA designations "are often geographically inconsistent" with LMAs and do not account for "available jobs within a reasonable commuting distance"). Certainly, USDA did not act irrationally by relying on its interpretation of the waiver "area" in rejecting these two criteria, particularly as consistency in the application of an interpretation is a significant factor in determining the reasonableness of agency action. *See, e.g.*, *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 160 (D.C. Cir. 2015). Regardless, both of these criteria reflect measures of general unemployment rates, just like the Final Rule's criterion. *See supra* p. 22.

The same goes for the BFC Plaintiffs' claim that USDA arbitrarily excluded U-6 unemployment data as a waiver criterion.  *See* BFC Mem. at 31-32.[21]  U-6 data are not produced at the substate level, so it does not correspond to the Rule's redefinition of a waiver area as linked to job markets.  Final Rule, 84 Fed. Reg. at 66789.  Moreover, even under the 2001 Regulation, USDA did not approve waivers based on U-6 data.  *See* ABAWD00004482-83 (noting in 2015 that "FNS does not consider the U6 measure . . . an accurate measure of a State's unemployment situation and has not approved ABAWD waivers supported by U6 data in the past").

Further, USDA explained that employment-to-population ratios are similarly not calculated at a substate level.  Final Rule, 84 Fed. Reg. at 66790.  Moreover, declining ratios have an "ambiguous" meaning in the context of job availability, as it can reflect mere demographic shifts at the local or national level and not slack in the labor market.  For that very reason, USDA has traditionally required "the few States using [that] criterion to provide additional evidence showing . . . labor market weaknesses."  *Id.*  Jobs in "declining industries" and descriptions in academic studies, which are on their face subjective metrics, have been "rarely used" and are insufficiently standardized and reliable to justify their inclusion, except when BLS data are unavailable.  *Id.* at 66791.[22]

---

[21] BLS publishes six measures of labor underutilization (U-1 through U-6), with U-3 being the official unemployment rate, defined as the total number of unemployed persons as a percentage of the civilian labor force.  Final Rule, 84 Fed. Reg. at 66788 n.5.  U-6, by contrast, is defined as the sum of the total number of unemployed persons, all marginally attached workers, and all persons employed part time for economic reasons as a percentage of the sum of the civilian labor force and all marginally attached workers.  *Id.*

[22] The Court suggested that USDA "embraced DOL data inconsistently" because it excluded these criteria, as they were not based on BLS data, but then "failed to acknowledge or address this preference for DOL data in rejecting . . . LSA designation."  *D.C.*, 2020 WL 1236657, at *15 n.12; *accord* BFC Mem. at 35-36.  Respectfully, this criticism is unwarranted.  USDA did not reject LSA designation—or for that matter, U-6 unemployment rate—because it was non-standardized or unreliable, but because it did not square with the definition of the waiver area.  *See* Final Rule, 84 Fed. Reg. at 66799-800 (acknowledging that LSA designations are developed by DOL, but

USDA's preference for reliable, standardized evidence over subjective or ambiguous measures did not violate USDA's statutory mandate, as the State Plaintiffs claim, *see* State Mem. at 28. It simply reflects USDA's reasoned determination as to what data its judgments should rely on, a determination that is entitled to deference. *See, e.g.*, *NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (rejecting argument that agency "could have used *better* data in conducting its risk analysis" because "inquiry under the arbitrary and capricious standard" requires "defer[ence] to an agency's decision to proceed on the basis of imperfect scientific information" (citation omitted)); *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 161 (D.D.C. 2005) ("Great deference must be given to the [agency] when assessing the sufficiency of the scientific data the agency relied upon to reach its conclusions."), *aff'd*, 488 F.3d 1020 (D.C. Cir. 2007). Nor was the decision to omit these criteria from the core standards for approval inconsistent with the decision to retain them where BLS data are limited or unavailable. *See* BFC Mem. at 25. The Final Rule recognizes that the excluded criteria are suboptimal as compared with objective, reliable BLS data on unemployment rates; but where such objective data does not exist, it is entirely rational to rely on what is available.

Finally, the Court reasoned that by omitting all criteria other than the 20% standard, USDA adopted an unexplained "tunnel-vision embrace of unemployment rates." *D.C.*, 2020 WL 1236657, at *15; *see also* State Mem. at 27; BFC Mem. at 30. However, USDA fully explained its reasons why the omitted criteria were omitted—because they either are insufficiently targeted to job markets to correspond to the new definition of an area or because they are ambiguous,

---

declining to include it because it is "often geographically inconsistent" with LMAs); *see also id.* at 66788-89 (acknowledging that U-6 data are produced by BLS but declining to include it because it is not produced at substate level). USDA is not required for consistency's sake to accept all DOL measures regardless of how they correspond to the broader regulatory framework.

subjective, and/or rarely used. Moreover, concerns about overreliance on general unemployment rates cannot be squared with USDA's historical practice regarding waivers, namely that almost every waiver for lack of sufficient jobs under the 2001 Regulation has been based on a criterion that is tied to general unemployment rates. *See supra* p. 22. That consistent historical practice belies Plaintiffs' dire warnings about the mismatch between general unemployment rates and ABAWD job prospects.

       ii.      Plaintiffs also argue that USDA's reliance on general unemployment rates conflicts with its prior position, expressed in guidance, that general unemployment rates are an "imperfect measure" of ABAWD job prospects. State Mem. at 25 (quoting ABAWD00000166); BFC Mem. at 26. An agency is free to change its policy, so long as it provides a "reasoned explanation" for doing so, which "ordinarily demand[s] that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Such changes are not subject to a "heightened standard" of review, and an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 514-15. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515.

       Although an agency may need to provide a more "detailed justification" if its policy "rests upon factual findings that contradict" those underlying the prior policy, *id.*, that circumstance is not present here. USDA's view on general unemployment rates as a proxy for ABAWDs is not based on a new factual finding; it is a policy and legal judgment, which can be freely changed. *See Brand X*, 545 U.S. at 981 (agency "must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to . . . a change in administrations" (citation omitted)); *Nat'l Ass'n of Home Builders*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (agency

not required to make more "detailed" showing where it "did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts" (citation omitted)).

In any event, USDA provided ample justification for the change. It was plainly aware that the Rule is a change in policy, and it explained why it needed to tighten the criteria for showing a lack of sufficient jobs. *See* Final Rule, Fed. Reg. at 66784, 66793-94. That is all that the APA requires. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 727-28 (D.C. Cir. 2016) (agency justified change where it explained basis for change in its views and how "new information developed after" prior policy "reasonably informed its conclusions"); *see also New England Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018) ("So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating that the agency's earlier decision should be altered or abandoned." (citation omitted)).

iii.    Plaintiffs also take issue with the addition of a 6% unemployment floor to the 20% standard. *See* State Mem. at 27-28; BFC Mem. at 30. USDA's rationale was that absent an objective threshold, the 20% standard allows waivers for areas that do not lack sufficient jobs because it defines an absence of jobs solely in relation to the national average unemployment rate, even in times of low unemployment. *See* Final Rule, 84 Fed. Reg. at 66788. Though the Court concluded that this was "circular" reasoning, *D.C.*, 2020 WL 1236657, at *14; *see also* State Mem. at 26-27; BFC Mem. at 30, the weakness inherent in a floating target like the 20% standard is plain. Absent a floor, the 20% standard defines an absence of sufficient jobs solely in relation to the national average unemployment rate. Final Rule, 84 Fed. Reg. at 66787-88. When the national average falls, even to historically low levels, the threshold for satisfying the 20% standard falls with it, without any objective threshold for establishing that the job market is weak. *See* Final

47

Rule, 84 Fed. Reg. at 66784 (noting that waivers could be approved for areas with as low as a 4.7% unemployment rate); *compare* ABAWD000002180 (FY2015 New Hampshire waiver that had to show at least 8.9% unemployment), *with* ABAWD00004148-49 (FY2019 New Hampshire waiver establishing insufficient jobs by showing 5.5% unemployment); ABAWD00003407-08 (FY2017 waiver of 16 Ohio counties that had to show at least 6.9% unemployment), *with* ABAWD00004423 (FY2020 waiver of 42 Ohio counties establishing insufficient jobs by showing 4.9% unemployment); ABAWD00003625-27 (FY2018 waiver for 101 Illinois counties with average unemployment of 5.9%), *with* ABAWD00004359-62 (FY2020 waiver for 100 Illinois counties with average unemployment of 4.8%).  It was reasonable for USDA to conclude that the 20% standard requires a floor to ensure that waivers will be linked to weak labor markets, rather than a labor market that is merely relatively weaker than the national average.

The State Plaintiffs suggest that USDA cannot show that an area with even a 4.7% unemployment rate offers "sufficient job opportunities for ABAWDs," State Mem. at 27, but such reasoning is out of step with how USDA has administered the waiver scheme since its inception. As USDA has repeatedly noted, "there is no measure available for determining the number of available jobs specifically for ABAWDs on SNAP in any given area."  Final Rule, 84 Fed. Reg. at 66788.  USDA always relied on proxies for ABAWD job prospects, and, typically, proxies that are based on general unemployment rates.  *See supra* pp. 21-22.  Any claim that low general unemployment rates have no bearing on job availability for ABAWDs cannot be squared with USDA's regulatory history or the practical administration of the waiver scheme.  *See Mayo Found.*, 562 U.S. at 59 (reasonable for agency to set standards to ensure "administrability").

Further, though Plaintiffs emphasize that ABAWDs face greater barriers to unemployment as compared to the general public, USDA considered those arguments when lowering the

unemployment floor from the Proposed Rule. *See* Final Rule, 84 Fed. Reg. at 66785. That ABAWDs may face greater barriers to employment does not on its own justify waiving the ABAWD time limit in areas with objectively low unemployment rates. Congress specifically selected ABAWDs as the only subset of SNAP beneficiaries subject to a time limit, a judgment that is irreconcilable with Plaintiffs' suggestion that these barriers should excuse ABAWDs from the work requirement even in areas of low unemployment. The PRWORA gives the work requirement "paramount importance." *Overton Park* 401 U.S. at 412-13. If the work requirement is "to have any meaning," waivers must be designed to be an exception to the default time limit specific to ABAWDs, and not to become the default themselves. *See id.* at 413.

Finally, to the extent that Plaintiffs challenge the level at which the unemployment floor is set, as opposed to the existence of any floor, they offer no basis for rejecting USDA's reasoned judgment. *See* Final Rule, 84 Fed. Reg. at 66785 (6% floor corresponds to standard for LSA designation, reflects "meaningful threshold for economic distress," and is consistent with natural rate of unemployment).

### 2.    USDA Reasonably Redefined the Waiver Area.

The Final Rule redefines the term "area" for purposes of waivers as an LMA, a statistical measure developed to delineate "an economically integrated area" based on commuting ties. *Id.* at 66793. USDA's experience administering the waiver scheme had shown that the 2001 Regulation requires USDA to approve waivers for any group of jurisdictions combined to meet the 20% standard whether or not the resulting area reflects a cohesive job market and for individual counties or towns, even if jobs were readily available in nearby jurisdictions within the same job market. *Id.* at 66793, 66795. The LMA definition is a reasonable response to these weaknesses in the 2001 Regulation.

i.      Plaintiffs first focus on the fact that the LMA definition differs from USDA's view in the 2001 Regulation that States should have flexibility to define the waiver area.  *See* State Mem. at 29-30; BFC Mem. at 33.  Again, USDA's position on the appropriate level of State flexibility is not a factual finding and thus does not require a more "detailed justification."  *See supra* pp. 46-47.  Regardless, USDA recognized that it was changing its position and articulated its reasons for doing so.  *See* Final Rule, 84 Fed. Reg. at 66793-94.  That is enough.  *See supra* p. 47.

ii.     Plaintiffs next argue that the LMA definition is arbitrary because USDA's experience with improperly grouped jurisdictions is not a "real problem."  State Mem. at 31 (quoting *D.C.*, 2020 WL 1236657, at *17).  Plaintiffs claim that USDA failed to cite evidence that States had misused their discretion to group jurisdictions in ways that deviated from the PROWRA's intent.  *See* State Mem. at 31-32; BFC Mem. at 34-35.  Rather, they contend that States used their discretion to carefully tailor waiver areas to cover only those jurisdictions that did in fact lack sufficient jobs for ABAWDs and to group areas on the basis of local nuances and ABAWD-specific job conditions (such as commuting patterns and "similar employment opportunities").  State Mem. at 32; *see also id.* at 34; *D.C.*, 2020 WL 1236657, at *19.

USDA was not required to defer to the States' biased views that their judgments best aligned with congressional intent.  USDA's experience administering the waiver scheme over two decades revealed that granting States broad flexibility to self-define waiver areas led to waivers that "maximize waived areas rather than demonstrat[ing] high unemployment" in a particular job market.  Final Rule, 84 Fed. Reg. at 66794.  USDA highlighted two types of waivers that demonstrated this concern:  (i) those that grouped virtually all counties in a State (including many counties with low unemployment), but omitted counties that, if included, would have jeopardized the request, and (ii) those that covered particular jurisdictions within an economic region while

omitting others with low unemployment rates that were plainly within the same economic region. *Id.* The agency reasonably concluded that State flexibility allowed States to define waiver areas not to demonstrate a weak job market for ABAWDs, but rather to waive as much of a State as possible. *Id.*; *see also Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528, 533 (D.C. Cir. 1982) (agency adequately supported regulatory revision by relying on "its perception that existing rules . . . are without substantial value and of minor importance in achieving the goals" of the statute).

The administrative record confirms that strategic grouping was a real problem. USDA's OIG found that States had admitted that they "specifically requested ABAWD time limit waivers in as many parts of the State as possible to minimize the areas where they needed to track the ABAWD time limits," and that waivers covered even "parts of States where unemployment rates are as low as 0 percent." ABAWD00000289 & n.15; *see also* Final Rule, 84 Fed. Reg. at 66794 (noting that USDA's "attempt[s] to clarify its intention that areas be economically tied through policy guidance" have not "prevented States from strategically using grouping to maximize waived areas").[23] Further, numerous waiver requests that indisputably passed muster under the 2001

---

[23] The Court declined to consider these findings in the OIG Report on the basis that the Report was a post hoc rationale that was not cited in the Final Rule. *See D.C.*, 2020 WL 1236657, at *18 n.16. The prohibition on post hoc rationalization prevents an agency from offering new *reasons* for its action beyond those asserted contemporaneously. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012). It does not prevent an agency from providing an amplified explanation of the reasons it offered at the time of the action. *See, e.g.*, *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996) ("As long as the agency does not present a new basis for its action, it may supply a clearer or more detailed explanation [in litigation]."), *aff'd in part and remanded on other grounds sub nom.*, *Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997). USDA clearly indicated that the Final Rule was motivated in part by its conclusion that States had been seeking waivers for reasons unrelated to the statutorily required showing that a job market lacked sufficient jobs. *See, e.g.*, Final Rule, 84 Fed. Reg. at 66794. The citation of the OIG Report—which was before USDA in the rulemaking—to bolster USDA's contemporaneously expressed rationale for the Final Rule does not constitute a post hoc rationalization. *Cf. Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 103, 105 (D.D.C. 2014) (rejecting argument "that a document constitutes a *post hoc* rationalization simply because the agency did not specifically cite to the document in its final determination").

Regulation exhibit waiver areas that are unexplained, and indeed inexplicable, as anything other than an effort to ensure the broadest possible application of the waiver.

Consider, for example, Georgia's waiver for FY2016, which covered 152 counties, out of 159 total counties in the State, because the aggregated unemployment rate of those jurisdictions was equal to exactly 120% of the national average. ABAWD00002477-78. The request does not explain how the 152 grouped counties reflect similar job market conditions for ABAWDs. It does not explain how ABAWDs on the southern and southwestern borders were part of the same job market as those in some—but notably not all—counties in the Atlanta metropolitan area (though many of the latter would not have met the 20% standard on their own) or why patterns in labor markets, commuting burdens, or other ABAWD-specific nuances in Atlanta matched those in counties hundreds of miles away. *See* ABAWD00002478-81; *see also* ABAWD00008495. Neither does the request explain why ABAWD job market conditions in the seven omitted counties were dissimilar from those in the rest of the State or why the sufficient job opportunities for ABAWDs in those counties were unavailable to ABAWDS in other nearby counties. It does not explain, for example, why ABAWDs in Barrow County or Forsyth County—with unemployment rates of 6.58% and 5.37% respectively, both of which were *lower* than the national average*, see* ABAWD00002478; ABAWD00002481—necessarily lacked job opportunities regardless of the job opportunities in the numerous proximate counties that had been conspicuously omitted from the waiver area, *see* ABAWD00008495.

Georgia's FY2016 request was not unique, and a similar pattern is apparent in numerous requests in the record. California's FY2018 request covered 55 out of 58 counties in the State, *see* ABAWD00008534, and was approved because the 5.9% aggregate unemployment rate of those 55 counties hit the exact threshold of 120% of the national average, *see* ABAWD00003542. The

request does not explain why ABAWDs in the northeastern-most county in the State (Modoc) were part of the same job market as those in the southwestern-most county (San Diego), which on its own had an unemployment rate below the national average.  *See* ABAWD00008534; ABAWD00003542-43.  Nor does it explain why it made sense to include Marin County (with a 3.2% unemployment rate, *see* ABAWD00003543) but not San Francisco in that waiver area, despite the obvious commuting ties between those jurisdictions and the obvious inability of Marin County ABAWDs to commute across hundreds of miles to counties like Los Angeles and Imperial Counties that were included in the waiver area.  *See* ABAWD00008543.  For FY2020, New York similarly did not explain why ABAWDs in the Bronx, Brooklyn, and Staten Island were subject to common job market conditions that were not shared by ABAWDs in most of Manhattan and Queens, *see* ABAWD00004410, ABAWD00008902, while Illinois did not explain why local nuances or ABAWD-specific conditions were common to all but one county in the State, *see* ABAWD00004022; *see also* ABAWD00003009, ABAWD00003026 (FY2016 Vermont request including Bridgewater, with below national average unemployment rate, in waiver area that omitted all but one bordering town); ABAWD000008526 (FY2017 Rhode Island request drawing waiver area that omitted single county in entire state); ABAWD00008529 (FY2017 Tennessee map noting, without explanation, that one county could be substituted for another in waiver).[24]

Given this pattern, it was reasonable for the agency to draw the conclusion it did:  that these waiver areas had been (and could continue to be) drawn, not on the basis of State expertise about ABAWD-specific job market conditions, but rather to group as much of a particular State as

---

[24] *Accord* ABAWD00002811-12, 00008517 (FY2016 North Carolina); ABAWD00003274-77, 00008520 (FY2017 Massachusetts); ABAWD00003427-29, 000008908 (FY2017 Pennsylvania); ABAWD00003492-94, 00008531 (FY2017 Virginia); ABAWD00003959-62, 00008667 (FY2019 Connecticut); ABAWD00004128, 00008814 (FY2019 Montana); ABAWD00004403-04, 00008900 (FY2020 New Jersey).

possible to hit the target of 120% of the national unemployment rate. Concluding that such efforts to maximize the scope of waiver requests were inconsistent with the purpose of the PRWORA does not require assuming that States acted in "bad faith," or indeed any other value judgment about the intent of the States in making these requests. *D.C.*, 2020 WL 1236657, at *18. It merely reflects USDA's belief, based in years of experience, that the 2001 Regulation included a weakness, and therefore, that the regulatory framework needed strengthening—an action within the agency's responsibility and jurisdiction. *See, e.g.*, *Associated Dog Clubs of New York State v. Vilsack*, 75 F. Supp. 3d 83, 91 (D.D.C. 2014) ("An agency can change its prior position to address a loophole, even a longstanding one, and can decide that a growing problem warrants more oversight than was previously necessary."). And even if the Court assumes that the States were interested in maximizing SNAP benefits for their beneficiaries, *see D.C.*, 2020 WL 1236657, at *20, the agency still retained the authority to conclude that this interest was nevertheless inconsistent with Congress's intent in the PRWORA.[25]

The Court preliminarily reasoned that USDA should have "ask[ed] states why they were grouping as they were, request[ed] that states resubmit waiver applications that USDA viewed as inappropriate, or outright den[ied] such waiver applications." *D.C.*, 2020 WL 1236657 at *20; *see also* State Mem. at 32. But the 2001 Regulation confers discretion on States to draw waiver areas, so long as grouped jurisdictions are either contiguous or are part of the same economic region. 7 C.F.R. § 273.24(f)(6); ABAWD00000324. So the Court's preliminary reasoning failed to consider

---

[25] The State Plaintiffs argue that strategically grouped waivers cannot constitute a "'real problem'" because USDA has not "show[n] that any prior waiver requests actually resulted in waivers for ABAWDs that had sufficient job opportunities." State Mem. at 31-32. But this is a red herring. The very fact that, under the 2001 Regulation, waiver requests like those detailed above *satisfied* the standard for a lack of sufficient jobs was the impetus for the redefinition of the waiver area.

that, under that framework, USDA simply could not reject waivers that, for example, grouped counties separated by hundreds of miles into a single area or conspicuously omitted nearby jurisdictions whose inclusion would mean the request no longer met the 20% standard.  In any event, the APA does not "require agencies to tailor their regulations as narrowly as possible to the specific concerns that generated them."  *Associated Dog Clubs*, 75 F. Supp. 3d at 92.

Finally, the Court suggested that maximization of waivers is not problematic because it enables States to let "funds appropriated for SNAP go directly to feed the needy rather than to bloat state agencies that enforce work requirements in unwaived areas."  *D.C.*, 2020 WL 1236657, at *20.  However, it is the federal government, not the States, that funds 100% of SNAP benefits, *see* 7 U.S.C. § 2013(a), and USDA funding for benefits is separately appropriated from that for covering State administrative costs.  A reduction in State administrative costs, therefore, would not result in increased funds to pay for SNAP benefits.  More fundamentally, the administrative burdens related to enforcing the work requirement are a necessary product of the ABAWD time limit and thus are part and parcel of a determination by Congress that the benefits of encouraging work through a work requirement is worth the costs of enforcing it.  It would be unreasonable for USDA to consider reducing the administrative burden on States in setting standards for waivers because the States' administrative burdens are not a relevant factor under the statute.  *See* Final Rule, 84 Fed. Reg. at 66805 (recognizing that revisions in Final Rule are "consistent with the stated goals of Congress.").

iii.    Plaintiffs next challenge the reasonableness of the LMA-definition.  *See* State Mem. at 33-34; BFC Mem. at 32-42.  They argue that LMAs are both "overly narrow" and excessively broad and thus prevent States from pursuing an "informed, tailored approach to defining waivable 'areas.'"  State Mem. at 33-34; *see also* BFC Mem. at 36-37; *D.C.*, 2020 WL 1236657, at *19.

55

As USDA explained, the LMA definition was motivated by the need to align waiver areas with job markets. Final Rule, 84 Fed. Reg. at 66793, 66795. The 2001 Regulation requires USDA to approve waiver areas consisting of jurisdictions grouped into overly broad areas that do not reflect cohesive job markets. It also requires USDA to approve waivers for individual towns or counties even if jobs are readily available in neighboring jurisdictions. Both vitiate the PRWORA's intent. USDA concluded that LMAs are the "best available and most practical solution" to these concerns, as they constitute the best available delineation of areas that are economically integrated based on commuting ties. *Id.* at 66793.

In other words, unlike individual jurisdictions, which turn on invisible boundaries that people can and do cross for work, LMAs incorporate the economic reality of commuting in an attempt to define job markets. *See* ABAWD00000463-64; *see also 2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas*, 75 Fed. Reg. 37246, 37251 (June 28, 2010). Though the Court preliminarily concluded that LMAs are "mismatch[ed]" to the ABAWD population because LMAs reflect commuting patterns of the general public, *D.C.*, 2020 WL 1236657, at *20; *see also* State Mem. at 34; BFC Mem. at 41-42, there are no "Federally-designated areas that specifically assess commuting patterns" of ABAWDs. Final Rule, 84 Fed. Reg. at 66793. USDA considered several alternatives to LMAs suggested by commenters but rejected them because they either are no longer reliably produced or are based in part on non-economic considerations. *See id.* at 66795 (discussing Bureau of Economic Analysis economic areas, Commuting Zones, and Workforce Development Boards). And, as discussed above, leaving it up to the States to self-define the waiver area did not lead to waiver areas that matched realistic commuting patterns for ABAWDs. *See supra* pp. 52-53.

Thus, in the absence of viable alternative measures, Plaintiffs cannot simply rest on the

argument that LMAs are an imperfect match for ABAWD commuting patterns. *See Am. Pub. Commc'ns Council v. FCC*, 215 F.3d 51, 56 (D.C. Cir. 2000) (court "cannot require an agency to enter precise . . . judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty"); *Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1047 (D.C. Cir. 1977) ("Courts cannot fairly demand the perfect at the expense of the achievable." (citation omitted)).  USDA could reasonably rely on the "best available" approximation—LMAs— even if that delineation is not a perfect fit for ABAWDs.  *See City of Boston Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) ("Agencies can be expected to respect the views of such other agencies as to those problems for which those other agencies are more directly responsible and more competent." (citation omitted) (cleaned up)).

Distilled to its essence, the dispute over the scope of the waiver area is a line-drawing question.  Plaintiffs complain that LMAs are too narrow and too broad, but the same is true about the framework they wish to retain.  Under the 2001 Regulation, States can define waiver areas extremely broadly and exceedingly narrowly, even if the resulting area has little to do with actual job markets.  *See supra* pp. 52-53.  Thus, while the Court has pointed out that the LMA definition would, for example, subject ABAWDs in D.C. "to the work requirement if the unemployment rate is low in suburbs and exurbs of the District as far out as West Virginia, although these out-of-state counties are inaccessible by public transportation from the District and although unemployment rates in parts of the District are as high as 11.6%," *D.C.*, 2020 WL 1236657, at *20; *see also* State Mem. at 34; BFC Mem. at 41-42, ECF, the inverse is true under the 2001 Regulation.  ABAWDs in San Diego, for example, may be excused from the congressionally-imposed work requirement simply because a slack job market for ABAWDs exists hundreds of miles away.[26]

---

[26] For that matter, it is not clear that ABAWDs in metropolitan areas are required to commute to

But Congress tasked USDA with determining how best to strike the balance inherent in defining a waiver area. That USDA would strike this balance differently from Plaintiffs does not render its judgment arbitrary and capricious. "The proper . . . inquiry is not whether an agency construction can give rise to undesirable results in some instances (which both [USDA's] and [Plaintiffs'] constructions can), but whether, in light of the alternatives, the agency construction was reasonable." *Barnhart*, 540 U.S. at 21.[27]

iv.    Finally, the BFC Plaintiffs argue that the Final Rule arbitrarily eliminates LSA designation as a permissible waiver area. *See* BFC Mem. at 33-37. They argue that LSAs reflect more recent data than LMAs, which are based on data from the most recent Census, *id.* at 34-35, and claim that using LMAs over LSAs is inconsistent with USDA's reasoning elsewhere in the Final Rule, *id.* at 35-36. However, the BFC Plaintiffs are comparing apples to oranges. LSAs are not themselves a geographical concept. Rather, they reflect a DOL designation that a "*civil jurisdiction* . . . has a civilian average annual unemployment rate during the previous two calendar

---

the outer boundaries of an LMA in order to find jobs, as Plaintiffs presuppose. *See* State Mem. at 34; BFC Mem. at 41-42. LMAs are delineated based on commuting flows, meaning that an outlying county can be included in a metropolitan LMA if residents of that county commute into another part of the LMA in sufficiently high numbers. *See* ABAWD00000463-64; *see also* 75 Fed. Reg. at 37248, 37250. And the unemployment rate for a particular county turns on the employment status of its *residents*, not whether jobs exist in that county. Thus, nothing suggests that commuters who live near the urban core of a metropolitan LMA must commute to the outer boundaries of the LMA in order to find work. To the contrary, it is common sense that areas near urban centers tend to have the largest quantity of available jobs in the LMA.

[27] The BFC Plaintiffs argue that the LMA-definition's particular application to D.C. is arbitrary because it makes D.C.'s eligibility for a waiver dependent on the labor market in the broader metropolitan area. BFC Mem. at 37-42. As explained, USDA is using LMAs, which reflect commuting patterns, to ensure that waiver requests take into account the presence of jobs in economically linked areas. Considering only employment opportunities within D.C. makes little economic sense. D.C. residents undoubtedly work in other jurisdictions within the LMA, and vice versa. Nor is D.C. somehow singled out simply because it is the only "State" for the purposes of the waiver scheme that falls within a single interstate LMA, *see id.* at 37; the LMA-definition applies to D.C. in the same manner as it applies to any other State.

58

years of 20% or more above the average" national rate and at least 6%. ABAWD0000468 (emphasis added). As such, LSAs are based on political boundaries, not commuting flows, and do not reflect "newer" data vis-à-vis the geographical scope of job market as compared to LMAs.

Relatedly, the State Plaintiffs argue that the limitation of waiver areas to LMAs arbitrarily led USDA to reject LSA designation and U-6 unemployment data as permissible criteria for demonstrating a lack of sufficient jobs. *See* State Mem. at 33. But as explained, USDA reasonably adopted the LMA-definition to address the concern that States were defining waiver areas that were unrelated to actual job markets. *See supra* pp. 52-53. Having done so, USDA was well within its rights to reject waiver criteria that conflicted with that definition.

### 3. *USDA Considered Potential Costs and Disparate Impacts of the Rule.*

The State Plaintiffs argue that USDA failed to sufficiently consider the costs that the Final Rule will impose on States and the possibility of disparate impacts on protected groups. *See* State Mem. at 38-41. Neither claim has merit.

The claim regarding costs imposed on States fails at the outset because USDA analyzed the potential State costs as part of its Regulatory Impact Analysis ("RIA") required by Executive Orders 12,866, 13,563, and 13,771. *See* Final Rule, 84 Fed. Reg. at 66807-08. A claim alleging a failure to adequately perform that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *see also Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review.").[28]

---

[28] Although the D.C. Circuit has held that a cost-benefit analysis is subject to challenge when the

Even if USDA's analysis were subject to review, it would withstand scrutiny under the APA. USDA considered comments about administrative costs and explained the bases for its estimate. *See* ABAWD00000374, ABAWD00000420-21. The State Plaintiffs argue that USDA's estimate of administrative costs is "in stark contrast to state estimates," State Mem. at 38, but they rely only on extra-record materials that must be disregarded, *see supra* p. 42 n.20. That is not enough to overcome the deference due to the agency. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (rule that "court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies" (citation omitted)). Nor do the State Plaintiffs show that any purported discrepancy in administrative costs is material. USDA was aware the Rule would impose administrative costs on States, but proceeded nonetheless based on its understanding that the Rule better aligned with congressional intent—which is within the agency's purview.

The State Plaintiffs next argue that USDA failed to consider various "second order" costs, such as the downstream effects of the Rule on public health and local economies. *See* State Mem. at 38-39. To the contrary, USDA considered these costs but determined that the administrative record "do[es] not permit estimation of potential costs specific to the dispersed ABAWD population that might result from this Rule." ABAWD00000374. USDA determined that evidence that SNAP benefits "act as an economic stabilizer during an *economic downturn*" did not permit the agency to estimate the overall impact on State economies outside of that context.

---

agency "decides to rely on" it affirmatively to support a regulation, *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040, USDA did not justify its Rule on a systematic calculation that the qualitative and unquantifiable societal benefits of encouraging meaningful work outweighed the overall administrative costs to States. Rather, it simply took into account the potential financial burden on States, among other factors, as part of the RIA.

ABAWD00000374-75 (emphasis added).[29]  USDA also found that existing studies on employment outcomes for "ABAWDs following a re-imposition of time limits" did not "permit [the agency] to reasonably estimate employment rates that are likely to result," particularly given that the possible impacts would depend on State responses to the Rule that could not be forecast. ABAWD00000391.  Finally, USDA acknowledged that "there may be increases in poverty and food insecurity" for ABAWDs who lose SNAP eligibility.  ABAWD00000422.  But there would also be a countervailing "increase[] [in] self-sufficiency and an overall improvement in . . . economic well-being" for those ABAWDs who become employed, and "[t]he magnitude and direction of these impacts . . cannot be accurately estimated."  *Id.*

The APA does not require agencies to quantify every potential cost of a rule.  *See, e.g.*, *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) ("[T]he law does not require agencies to measure the immeasurable."); *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 840 (5th Cir. 2010) (rejecting claim that agency's "failure to estimate benefits for specific new facility locations renders the process arbitrary or capricious").  "As predicting costs and benefits without reliable data is a 'primarily predictive' exercise, the [agency] need[s] only to 'acknowledge the factual uncertainties and identify the considerations it found persuasive' in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014) (citation omitted); *see also Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369-70 (D.C. Cir. 2014) (agency not required to quantify benefits of regulation where not reasonably estimable and where it lacked "particular expertise" about predicted benefits), *overruled on other grounds*, *Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir.

---

[29] One *amicus* points out that USDA has estimated "the economic stimulus effect of SNAP," *see* Brief of Inst. for Policy Integrity as *Amicus Curiae* at 10, 17, ECF No. 70, but as the *amicus* acknowledges, the cited study only measures SNAP's effect on the overall national economy in providing economic stimulus during economic downturns.  It says little about the effects of SNAP on a localized economy during a time of economic strength like the time of the Rule's issuance.

2014) (en banc).  USDA did so here.  *See Inv. Co.*, 720 F.3d at 379 (agency's "discussion of unquantifiable benefits" satisfied its "statutory obligation to consider and evaluate potential costs and benefits"); *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007) ("Agency clearly thought about the cities' objections and provided reasoned replies—all the APA requires.").

Furthermore, the Rule was motivated, not by a systematic cost-benefit analysis, but by USDA's understanding of the PRWORA's statutory goals.  *See* Final Rule, 84 Fed. Reg. at 66807 (citing "the intent of Congress when passing PRWORA").  And the PRWORA itself reflects a judgment by Congress that the benefits of imposing a work requirement specifically on ABAWDs is in the public interest, even though those provisions necessarily may render some ABAWDs ineligible for SNAP benefits.  Though it authorized USDA to issue discretionary waivers, there is no reason to believe that Congress intended that the waiver process fundamentally displace the default that the work requirement applies.  USDA was entitled to rely on Congress's implicit judgment in weighing the costs of the Rule.  *See id.* (noting that comments regarding public health and economic impacts "do[] not change the statutory work requirements established by Congress"); *see also Nat'l Ass'n of Mfrs*, 748 F.3d at 369-70  (agency could rely on "Congress['s] . . . conclu[sion], as a general matter," that rule's "costs were necessary and appropriate in furthering" statutory goals (citation omitted)).

The State Plaintiffs' argument that USDA failed to consider the effect of the Rule on minority groups fails for similar reasons.  USDA considered the potential for a disparate impact on minority groups in a Civil Rights Impact Analysis ("CRIA") accompanying the Rule, which was prepared pursuant to an internal Department Regulation.  *See* ABAWD00000358.  As with their challenge to USDA's RIA, the State Plaintiffs cannot base their claim on the content of a CRIA prepared solely pursuant to internal procedures.  *See supra* p. 59.

Even if reviewable, the challenge still fails on the merits. The State Plaintiffs principally suggest that USDA erroneously claimed to "lack[] data" about the Rule's potential impact on protected groups, *see* State Mem. at 40-41, but they misread the quoted language, which states, correctly, that USDA lacked "[s]pecific [demographic] . . . data" about the individual ABAWDs who may be newly subject to the time limit, ABAWD0000358. Nevertheless, the CRIA assessed the impact based on data concerning a reasonably similar category of individuals. ABAWD00000357. Moreover, the purpose of the CRIA is to ensure that policymakers can consider possible impacts of the Rule, and it did exactly that. The CRIA acknowledges that the Final Rule "will affect potential SNAP . . . participants in all groups" and has the potential to disproportionately impact certain protected groups, and thus, it "outlines outreach and mitigation strategies to lessen any possible civil right impacts" from the Rule. Final Rule, 84 Fed. Reg. at 66808. As USDA explained, "the implementation of mitigation strategies and monitoring by the FNS Civil Rights Division and FNS SNAP may lessen these impacts." *Id.*; *see also* ABAWD00000358-60. Though the BFC Plaintiffs complain that USDA "did not explain what these 'mitigation strategies' and 'monitoring' might actually entail," BFC Mem. at 28 n.14, they cite nothing for the proposition that USDA was required to prospectively set forth how it would respond to hypothetical circumstances that would only arise once the Rule was in effect.[30]

---

[30] In addition, certain *amici* contend that USDA failed to consider the impacts the Rule would have on Native American communities and that USDA failed to consult with Tribal governments prior to issuance of the Rule. *See* Brief of NABPI, *et al.* as *Amici Curiae* at 4-7, 9-13, ECF No. 88-1. Both of these arguments are belied by the record. First, USDA adjusted the Rule's application to Native American communities in light of their specific characteristics. The revised definition of a waiver "area" expressly includes reservation areas, meaning that Tribal areas are not subject to the LMA-definition. *See* Final Rule, 84 Fed. Reg. at 66797. Similarly, the Rule provides that for areas where BLS data "is limited or unavailable, such as a reservation area," waiver requests need not conform to the core standards for approval. *See id.* at 66799. Second, *amici*'s focus on a purported failure to meaningfully consult with Tribes during the ANPRM comment period is curious, given that, as *amici* acknowledge, *see* NABPI Br. at 13, USDA consulted with Tribes after

**B.      USDA    Reasonably    Limited    Indefinite    Carryover    of    Discretionary Exemptions.**

The State Plaintiffs also challenge the Rule's restriction on the carryover of discretionary exemptions on the ground that it allegedly fails to consider the reliance interests of States who have accumulated such exemptions.  State Mem. at 35-37.  USDA's reasons for prohibiting the indefinite carryover of unused exemptions are "entirely rational."  *Fox*, 556 U.S. at 517.

USDA promulgated the 2001 Regulation under the expectation that States would use their exemptions.  *See* Proposed Rule, 84 Fed. Reg. at 987 ("[C]arryover of significant amounts of unused exemptions . . . [is] an unintended outcome of the current regulations.").  Nevertheless, a number of States failed to do so over many years.  Final Rule, 84 Fed. Reg. at 66802.  As a result, States accumulated "extremely high amounts of unused discretionary exemptions that well exceed the number allotted to each State for the fiscal year," to a degree not contemplated by the 2001 Regulation.  *See id.* ("[I]n FY 2019, States earned approximately 1.3 million exemptions, but had about 7.4 million exemptions available for use in total due to the carryover of unused exemptions from previous fiscal years.").  USDA explained that this level of accumulated exemptions is "inconsistent with Congress' decision to limit the number of exemptions available to States in a given fiscal year."  Final Rule, 84 Fed Reg. at 66802.  It is reasonable for "an agency [to] justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies."  *Encino Motorcars*, 136 S. Ct. at 2127 (citation omitted).

Further, an agency engages in "reasoned analysis" when it "justif[ies] [its] change of interpretation" of a statute in response to reports of its OIG "that [the] prior policy failed to

---

the issuance of the Proposed Rule and "received no feedback" in response to a request for further consultation.  *See* Final Rule, 84 Fed. Reg. at 66808; *see also* Proposed Rule, 84 Fed. Reg. at 990 (consultation with Tribal leaders after ANPRM).

implement properly the statute." *Rust v. Sullivan*, 500 U.S. 173, 187 (1991). That is what USDA

did here. In deciding to limit carryover of exemptions, USDA reasonably relied on the findings

of its September 2016 OIG audit report, *see* Proposed Rule 84 Fed. Reg. at 988, which found that

permitting indefinite carryover of exemptions:

> [A]llows the States to accumulate more than the 15 percent allowed per the statute.
> For example, according to FNS, one of the States had over 1.6 million exemptions
> available to use at its discretion. This State has over 125,000 ABAWDs in an
> average month. If the State chose to, it could exempt all 125,000 ABAWDs from
> the time limit and work requirement for over 1 year, which may not meet the intent
> of the statute.

ABAWD00000294. "These were 'entirely rational' reasons to revise how discretionary

exemptions were carried over." *D.C.*, 2020 WL 1236657, at *12 (quoting *Fox*, 556 U.S. at 517);

*see also Rust*, 500 U.S. at 187 (deeming "justified" with "reasoned analysis" change in policy that

agency viewed as "more in keeping with the original intent of the statute" and that relied on OIG

reports concluding that prior policy did not "implement properly the statute").

The State Plaintiffs describe the numerous reliance interests, all of which USDA

considered before limiting the unlimited carryover of discretionary exemptions. State Mem. at 35-

37. They nonetheless erroneously contend that "USDA's response to these comments was limited

to a conclusory and flawed claim that the Rule was more consistent than prior practice with the

statute." *Id.* at 37. But USDA did much more than that. "In response to [the States'] comments,"

USDA modified the Proposed Rule, "allow[ing] States to carry over . . . one year's worth of

exemptions from previous years" expressly to give States "flexibility" to "deal with potential

unforeseen sharp economic declines or other quickly changing circumstances." Final Rule, 84

Fed. Reg. at 66803. USDA also "provid[ed] States with more time to use exemptions," even

though they were effectively on notice of the questionable nature of indefinite carryover since the

2016 OIG Report and had several years to put accumulated exemptions to use. *Id.* Unlike in the

65

Proposed Rule, the Final Rule permits States to use all of their accumulated exemptions in FY2020 without incurring liability. *Id*. at 66804; *id*. at 66805 (explaining in example 3 how State that uses all accumulated exemptions in FY 2020 does not incur liability for overuse). The modification of the Final Rule to make it "more accommodating" to the States' reliance interests reflected precisely the kind of "weigh[ing]" of reliance "interests against competing policy concerns" that the APA requires. See *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914-15 (2020).

What is more, "reliance does not overwhelm good reasons for a policy change." *Encino Motorcars*, 136 S. Ct. at 2128 (Ginsburg, J., concurring). And the reasons first articulated in the 2016 OIG Report and reiterated by the agency in its rulemaking provide the "reasoned explanation" required by the APA. *Id*. at 2126 (majority opinion).

## III.    USDA PROVIDED ADEQUATE OPPORTUNITY TO COMMENT ON THE FINAL RULE.

In addition to their substantive APA challenges, Plaintiffs assert a single procedural challenge to the Final Rule: that the Proposed Rule failed to provide sufficient notice to meaningfully comment on the Rule. An agency must publish a notice of proposed rulemaking that "provide[s] sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (citation omitted). The final rule "need not be the one proposed," but must "only be a logical outgrowth of its notice." *Id.* That standard is satisfied "if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (citation omitted).

Here, Plaintiffs argue that USDA failed to provide adequate notice of three issues: (i) the removal of State qualification for extended unemployment benefits as a way of showing a lack of sufficient jobs; (ii) the requirement that a waiver "area" be an LMA; and (iii) USDA's reliance on

its operational experience.  USDA provided sufficient notice on each of these issues.

**Extended Unemployment Benefits ("EB") Qualification**.  Plaintiffs argue that USDA

failed to provide an opportunity to meaningfully comment on the removal of EB qualification as a

criterion for showing a lack of sufficient jobs.  State Mem. at 11; BFC Mem. at 44-45.  The

Proposed Rule stated that USDA was "propos[ing] to continue to include" EB qualification as a

criterion, 84 Fed. Reg. at 985, but USDA decided in the Final Rule not to include it.  According to

Plaintiffs, that change violates the APA because an agency may not "implement[] the opposite of

what it proposed."  BFC Mem. at 44; *accord* State Mem. at 11.

To the contrary, the D.C. Circuit has repeatedly held that an agency's refusal to adopt its

proposal is *always* a logical outgrowth of the proposal.  *See, e.g.*, *New York v. EPA*, 413 F.3d 3,

44 (D.C. Cir. 2005) (per curiam) ("One logical outgrowth of a proposal is surely . . . to refrain

from taking the proposed step." (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C.

Cir. 1989)); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000) (final rule's

omission of proposed requirement permissible because "any reasonable party should have

understood that EPA might reach the opposite conclusion after considering public comments").

The cases Plaintiffs rely on are distinguishable and do not abrogate this longstanding principle.[31]

---

[31] *See Allina*, 746 F.3d at 1108 (public lacked notice of reversal in final rule because agency had proposed only to "clarify" its prior rule, and "[t]he word 'clarify' does not suggest that a potential underlying major issue is open for discussion" and because "there was no reason" for affected hospitals "to fear that another party would offer comments opposed to such an interpretation"); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009) (vacating rule where proposed rule did not solicit comments on any issue and did not propose revisions to system that "even hinted" that agency "might consider" expanding particular provision); *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 994-95, 998 (D.C. Cir. 2005) (agency proposed to "clarify" rule by "codifying" prior interpretation); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259-60 (D.C. Cir. 2005) (final rule setting *maximum* permissible rate was not logical outgrowth of proposal to set *minimum* permissible rate, as proposed rule had not floated "possibility of a maximum cap much less" particular rate chosen).

Moreover, the full context of the Proposed Rule placed the public on notice that USDA might ultimately decide not to include EB qualification in the new waiver criteria. The language of the Proposed Rule made clear that USDA was proposing a wholesale revision to its waiver criteria. *See, e.g.*, 84 Fed. Reg. at 980 (discussing USDA's intention "to amend the regulatory standards" applicable to waivers); *id.* at 982 ("changes" to "information and data States must provide to support the waiver request"); *id.* at 983 ("revisions" to criteria); *see also Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 131-32 (D.D.C. 2016) (use of terms like "revise" and "changes" adequately notified public agency was considering broad changes implemented in final rule).

Further, EB qualification applies to a State as a whole, *see* Final Rule, 84 Fed. Reg. 66790, meaning that retention of that criterion would permit statewide waivers. That result was in obvious tension with USDA's proposal to drastically curtail the availability of statewide waivers—a policy to which EB qualification constituted a stark exception. *See* Proposed Rule, 84 Fed. Reg. at 985. Interested parties could fairly anticipate, then, that USDA might simply "refrain from taking the proposed step," *Am. Iron*, 886 F.2d at 400, and resolve the tension by eliminating this exception to a proposed general prohibition on statewide waivers.

**LMA-Definition**. The State Plaintiffs next argue that USDA did not provide adequate notice of the decision to generally require waiver areas to conform to an LMA. State Mem. at 11-12. Again, the Proposed Rule placed interested parties on notice that USDA intended to fundamentally rework the definition of "area." *See, e.g.*, *Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp. 3d 168, 189 (D.D.C. 2018) (where agency reversed position from proposed rule, final rule was logical outgrowth because agency "clearly indicated that the Secretary was proposing to change our policy" (citation omitted)). It expressed concerns about State flexibility to define the

waiver area because it resulted in waivers of areas that were not tied to actual job markets. Proposed Rule, 84 Fed. Reg. at 981.  And it proposed "[e]liminat[ing] waivers for areas that are not economically tied together."  *Id.* at 982; *see also* ANPRM, 83 Fed. Reg. at 8015 (requesting comments on whether "an 'economic area' [should] be limited in geographic scope, such as to a single county, metropolitan area, or *labor market area*" (emphasis added)).

Interested parties were on notice, then, that USDA might choose to require that all waiver areas correspond to an economically tied region.  The Final Rule, therefore, found "roots in the agency's proposal."  *Envtl. Integrity Project*, 425 F.3d at 996.  "[P]arties were not asked to divine [USDA's] unspoken thoughts," *Ariz. Pub. Serv.*, 211 F.3d at 1299 (citation omitted), and indeed other commenters addressed this exact issue.  *See* Final Rule, 84 Fed. Reg. at 66796 (comments arguing that "States should not be able to choose when to apply for a combined area using the LMA definition and when to apply for a single-jurisdiction waiver"); ABAWD00078212; ABAWD00034773; *see also Abington*, 216 F. Supp. 3d at 134 (noting that "the D.C. Circuit has long treated the submission of relevant comments as evidence that sufficient notice was given" to interested parties (citing *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998)).

**Operational Experience**.  Finally, the State Plaintiffs argue that the Proposed Rule failed to adequately define the "operational experience" that USDA cited as a basis for the need to revise the waiver criteria.  State Mem. at 12.  This too fails.

As discussed above, USDA cited its own experience with the ABAWD time limit to identify perceived weaknesses in the 2001 Regulation—*i.e.*, the absence of an unemployment rate floor and State flexibility to define the waiver area.  Proposed Rule, 84 Fed. Reg. at 981.  It clearly explained why it thought these were weaknesses and identified examples of exactly these sorts of requests.  *See id.* ("States have combined counties with unemployment rates under 5 percent with

counties with significantly higher unemployment rates in order to waive larger areas."); *id.* ("States have grouped areas that are contiguous but left out certain low-unemployment areas that would otherwise logically be considered part of the [economic] region.").  That explanation sufficiently conveyed the nature of USDA's concerns with the 2001 Regulation to enable comments on the validity of those concerns.  That is true even though USDA did not name the particular waiver requests or jurisdictions it was discussing—requests that are now fairly discernible in the administrative record that is the basis for Plaintiffs' challenge.  *See, e.g*, *Pharm. Research & Mftrs. of Am. v. FTC*, 44 F. Supp. 3d 95, 129 (D.D.C. 2014) (agency could cite its operational experience without disclosing "physical records of everything that has contributed to its expertise over time").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motions for summary judgment and grant Defendants' cross-motion for summary judgment.


Dated:  July 22, 2020                    Respectfully submitted,

                                         ETHAN P. DAVIS
                                         Acting Assistant Attorney General

                                         DAVID M. MORRELL
                                         Deputy Assistant Attorney General

                                         ERIC R. WOMACK
                                         Assistant Branch Director

                                         */s/ Chetan A. Patil*
                                         CHETAN A. PATIL (DC 999948)
                                         LIAM HOLLAND
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         P.O. Box No. 883
                                         Ben Franklin Station
                                         Washington, D.C. 20044

Tel.: (202) 305-4968
Fax: (202) 616-8470
Email: chetan.patil@usdoj.gov

*Attorneys for Defendants*